JUDGE COTE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

**12 CIV 1087**

-------------------------------------------------- x

THE ASSOCIATED PRESS,

                   Plaintiff,

       - against -

MELTWATER U.S. HOLDINGS, INC.;
MELTWATER NEWS U.S., INC.; and
MELTWATER NEWS U.S. 1, INC.

                 Defendants.

-------------------------------------------------- 

: 12 Civ. _____

: **`COMPLAINT**

: **Trial by Jury Demanded**

RECEIVED
FEB 14 2012
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff The Associated Press ("AP"), by and through its attorneys, Davis Wright

Tremaine LLP, for its complaint against Defendants Meltwater U.S. Holding, Inc., Meltwater

News U.S., Inc., and Meltwater News U.S. 1, Inc. (collectively, "Meltwater"), hereby alleges as

follows:

## NATURE OF THE ACTION

1.      Meltwater has built its business on the willful exploitation and copying of the

AP's and other publishers' news articles for profit.  Meltwater styles itself a modern day

commercial clipping service.  Through its Meltwater News service, Meltwater copies and

delivers to paying customers substantial infringing excerpts from AP stories and other published

news stories, based on keywords selected by the subscriber.  Meltwater then offers its customers

the ability to store these excerpts and even full text articles in a customer archive housed on

Meltwater's server and to further distribute these materials.

2.      Meltwater thus provides a directly competing product for many AP subscribers,

including government agencies and others that use the AP wire to monitor the news for breaking

developments.  AP bears all of the extensive costs associated with creating its content, while

1

Meltwater bears only the minimal costs of distribution in the Internet age, and thus can undercut the AP with lower subscription rates. Meltwater even promotes its electronic news clipping service with a guarantee of "no copyright fees." Meltwater contributes no creative content and provides no editorial commentary. Its business serves no independent purpose other than the distribution of news created by others.

3.      As set forth in this complaint, through its subscriber-only Meltwater News Service, Meltwater engages in direct, contributory and vicarious copyright infringement, along with "hot news" misappropriation by:

- Storage: copying and storing entire AP and other news articles dating back to at least 2007 in its databases, so as to facilitate its touted ability to provide a "retrospective search tool";

- Excerpts: copying, distributing and displaying substantial verbatim excerpts from countless AP and other online news articles that capture the heart of those stories, including in email reports to subscribers and subscriber newsletters, and facilitating the copying and storage of such excerpts by subscribers through a subscriber archive function;

- Full Text: providing the means and facilitating the copying, storage and display of full text, unlicensed AP stories and other news articles by its subscribers on Meltwater's system, including for further distribution of the full text articles by the subscriber via Meltwater's Newsletter service— with or without attribution to AP; and

- Translation: creating infringing derivative copies of copyrighted articles by preparing translations of full text articles.

DWT 18759392v12 0025295-000064

4.      AP was founded in 1846 and is one of the oldest and most highly regarded news organizations in the world.  AP's mission, as a not-for-profit news cooperative, is to provide fast, accurate, reliable, clear, and unbiased news reports as news breaks around the globe.  To achieve this mission, AP has invested substantial resources in building a state-of-the-art newsgathering and distribution infrastructure to deliver the news from its worldwide beat.  Its reporters and editors are trained to the highest standards, and it deploys those reporters and editors in every corner of the globe, including in zones of war and natural disaster.  In the course of gathering, writing and transmitting the news 24 hours a day, 365 days a year, AP incurs significant costs in personnel, training, travel, security, legal protection, and technology, and its employees often incur substantial personal risk.  AP stories are original and creative news reports reflecting the financial, professional, and personal investment of the AP organization and its dedicated employees.

5.      In order to support its newsgathering activities, AP licenses its highly-regarded content to subscribers and other customers, either through subscriptions to its various wire services or on an à la carte basis for individual articles. As a not-for-profit organization, AP applies any incidental profits to its newsgathering operations.

6.      Defendant Meltwater was founded in 2001.  It employs no reporters or newsgatherers of its own.  On its website, Meltwater boasts that its mission is to "challenge existing business models and market leaders sleeping in class."[1]  To achieve that mission, it merely distributes electronically for a fee news content created at the expense and through the labor of others.

7.      Meltwater has built its business on routinely copying, verbatim, the heart of AP's and other publishers' stories, and selling that infringing content to its subscribers.  Meltwater's

---

[1] www.meltwatergroup.com/about/vision

DWT 18759392v12 0025295-000064

services have been found to be infringing in Norway (the company's original home) and to require a license in England. Nonetheless, Meltwater has expanded its parasitic business model and now does business on six continents.

8.     In contrast to the practice of other news sources and news aggregators who deliver the AP's news reports to the public, Meltwater does not license the content that it delivers to its subscribers. Google News, Yahoo News, and AOL, for example, have negotiated arrangements with AP to distribute its content. Further, unlike Google News or other news aggregators that deliver search results to the public for free, Meltwater is a closed commercial business that only provides news excerpts and other services after payment of a substantial annual fee. Critical to Meltwater's business model is the fact that it incurs no expense to create or license the content it delivers, allowing it to reap substantial subscription fees with minimal expenses while undercutting its competitors—including the AP, and other entities who have paid valuable consideration to AP for licenses to distribute its content.

9.     Meltwater provides a fully integrated closed system that is designed to supplant the need for an AP subscription, not to drive traffic to legitimately licensed sites. First, its excerpts of AP stories appropriate sufficient actual and expressive content that many subscribers have no need to click through to the legitimately licensed site. Moreover, Meltwater has purposefully built into its Meltwater News system a way for its customers to capture, save and store the full text of retrieved news articles on the Meltwater website, including AP articles. For additional subscription fees, Meltwater News customers can also incorporate the infringing content—including the full text of AP articles—into a branded newsletter through the Meltwater News platform. These newsletters are then stored on the Meltwater system for further dissemination to subscriber employees or third parties. Meltwater facilitates the dissemination of

4

such excerpts or entire articles without the link to the original article, and even allows its customers to alter the article, remove attribution information, or remove copyright management information from the copy of the distributed article.

10.     The news industry today is facing a period of crisis. Numerous venerated newspapers and magazines have folded, while others have faced slashed budgets and reduced staff. In the last 20 years, the number of American newspapers has declined by approximately 14%.[2] Over the past decade, employment of full-time newsroom staff dropped by over 26%.[3] One of the significant reasons for this crisis is that aggregators, like Meltwater, who need only bear the minimal costs of distribution without the significant expense of newsgathering and reporting, have been taking subscriptions, licensing revenue and advertising dollars away from traditional news organizations and wire services, leaving the news content providers unable to continue bearing their high costs of creating content.

11.     The loss of traditional news sources and their high-quality news gathering and reporting infrastructures represents a significant loss to the public, as a well-informed citizenry is an essential condition for a functioning democracy. The dangers of losing our sources of original reporting have been well documented. For example, in a case study of news outlets in one American city, the Pew Research Center's Project for Excellence in Journalism found that "much of the 'news' people receive contains no original reporting. Fully eight out of ten stories studied simply repeated or repackaged previously published information. And of the stories that did

---

[2] Pew Research Center, Project for Excellence in Journalism, The State of the News Media 2011, Executive Summary at 12.
[3] *Id.*

DWT 18759392v12 0025295-000064

contain new information nearly all, 95%, came from traditional media—most of them newspapers."[4]

12.     The purpose of copyright law is to "promote the progress of science and the useful arts" by providing content creators with incentives to create works.  The state of the news industry today makes clear that continuing to allow parasitic distribution services like Meltwater to compete directly with traditional news sources—without paying license fees for the stories these news organizations have gathered, created and edited at great cost—has had and will continue to have a tremendous negative impact on the ability of these news sources to continue generating the high-quality news reports on which the public relies.

13.     This lawsuit is not a general attack on news aggregators—many of whom are AP's licensees.  Nor does this lawsuit in any way seek to restrict linking or challenge the right to provide headlines and links to AP articles.  Meltwater's actions are readily distinguishable from most news aggregators.  Most notably, Meltwater is a closed system sold only to subscribers for a fee, and not a means of expanding public access.  As such, Meltwater builds a directly competing product on the backs of news organizations like the AP.  Further, Meltwater provides lengthier and more systematic excerpts from AP articles than most news aggregators, including breaking news articles.  It also is evident that Meltwater retains a vast archive of AP articles dating back to at least 2007, many of which are no longer publicly available on the Internet.  In addition, Meltwater allows its customers to store both excerpts and full text versions of news stories on the Meltwater system, and facilitates further distribution of those excerpts and full text articles, both with and without a link to the originating article.  For these and other reasons set forth herein, Meltwater is far from the typical news aggregator.

---

[4] Project for Excellence in Journalism, "How News Happens: A Study of the News Ecosystem of One American City," at 1-2.

DWT 18759392v12 0025295-000064

14.     In sum, this is an action for: (i) copyright infringement in violation of 17 U.S.C. §§ 101 and 501 et seq.; (ii) contributory copyright infringement in violation of 17 U.S.C. §§ 101 and 501 et seq.; (iii) vicarious copyright infringement in violation of 17 U.S.C. §§ 101 and 501 et seq.; (iv) a declaratory judgment that the business practices of Meltwater News constitute an infringement upon AP's copyright in all AP news reports; (v) "hot news" misappropriation under New York State common law; and (vi) improper removal or alteration of copyright management information in violation of 17 U.S.C. §§ 1202 et seq.

## PARTIES

15.     Plaintiff AP is a New York not-for-profit corporation with its principal place of business at 450 West 33rd Street, New York, New York.

16.     Defendant Meltwater U.S. Holdings, Inc., upon information and belief, is a privately-held, for-profit corporation organized and existing under the laws of Delaware, with its principal place of business at 50 Fremont Street, San Francisco, California.

17.     Defendant Meltwater News U.S., Inc., upon information and belief, is a privately-held, for-profit corporation organized and existing under the laws of Delaware, with its principal place of business at 50 Fremont Street, San Francisco, California.

18.     Defendant Meltwater News U.S. 1, Inc., upon information and belief, is a privately-held, for-profit corporation organized and existing under the laws of Delaware, with its principal place of business at 50 Fremont Street, San Francisco, California.

19.     Defendant Meltwater has an office in this state and district located at 49 West 27th Street, New York, New York.  Meltwater is registered to do business in New York as a foreign corporation under the name "Meltwater News U.S. 1, Inc."

DWT 18759392v12 0025295-000064

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to (a) 28 U.S.C. § 1331; (b) 28 U.S.C. § 1332, in that this is an action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs; (c) 28 U.S.C. § 1338; and (d) 28 U.S.C. § 1367.

21.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400(a).

22.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. Proc. 4(k)(1)(A) and CPLR §§ 301 and/or 302(a) because (a) Defendants do business in this district and state, and (b) Defendants supply and transmit, or offer to supply and transmit, the Meltwater News service to clients and potential clients in this district and state.

## FACTUAL BACKGROUND

### A.    THE ASSOCIATED PRESS

*Overview of AP's Business*

23.     Founded in 1846, the AP today is one of the largest and most highly-respected news agencies in the world, distributing news to news outlets in over 100 countries. AP has earned 49 Pulitzer Prizes for its work, the largest number for any news organization in the categories in which AP can compete.

24.     AP invests significant resources in its worldwide mission to gather and distribute the news. AP employs a staff of approximately 3,700 people—two-thirds of whom are newsgatherers—in more than 300 locations worldwide. With its vast coverage, AP is able to provide thousands of newspapers, radio stations, television stations, Web services, governmental agencies, and corporate clients with high-quality news 24 hours a day, 365 days a year. On any given day, the AP's content—which includes text, photos, graphics, audio, and video—can reach more than half the world's population. AP not only reports breaking and developing news

8

stories around the globe but also expends substantial resources to develop exclusive investigative reports on matters of significant public interest. In the United States alone, AP serves thousands of radio and television stations and 1,400 member newspapers.

25.   AP incurs significant expense to produce and deliver its news services, including costs for personnel, training, travel, security, technology and legal protection. For example, access to news is crucial for journalists, who must be present to the greatest extent possible at the moment when and the place where the news occurs in order to capture it. Accordingly, AP has invested significant resources to develop a comprehensive on-the-ground newsgathering infrastructure. Currently, the AP is in 116 countries. In the United States, the AP is the only news organization with a journalist staffing every statehouse. AP's staffing and practices allow its reporters to gain intimate knowledge of their beats and sources, and their reporters spend days, weeks and months gathering the source material for exclusive investigative reports, as well as breaking and updating news reports as stories continue to develop. Just in the past few months, AP's on-the-ground reporting, exclusive contacts and skilled editing have yielded a series of important accomplishments:

- AP reported exclusively on a secret New York Police Department document showing the department's counterterrorism officers set out to spy on Muslims in contravention of its own guidelines about placing entire religious groups under suspicion. The report was part of an AP series on the NYPD that, in February, won a prestigious George Polk Award and was named a finalist for the Goldsmith Prize for Investigative Reporting.

- AP avoided the error of other news organizations that prematurely reported the death of Penn State coach Joe Paterno. AP's commitment to

DWT 18759392v12 0025295-000064

accuracy—even at the cost of possibly being beaten by a competitor—led AP to cross-check the reports of Paterno's death and determine they were incorrect. (Paterno died the next day, and AP was first with the story.)

- AP became the first Western news organization to open a full, multimedia news bureau in North Korea, the culmination of decades of effort. North Korean officials told AP that its reputation for independence and accuracy played a great role in their decision.

- When Aretha Franklin wanted to announce she was getting engaged, she called just one reporter: AP music writer Nekesa Mumbi Moody, who has cultivated a long relationship with Franklin.

These four instances are very different in nature, but all point to one thing: the investment in time, money, judgment and personal contact that have distinguished AP as a news organization. The creative work that operators like Meltwater appropriate for free and exploit to their benefit is expensive, substantial and highly skilled, and could not be sustained without appropriate compensation to those who create it.

26.     In recent years, the AP has expanded its worldwide presence by opening new bureaus and investing millions of dollars to upgrade its communications network. AP routinely incurs high expenses sending journalists to report on breaking news stories in remote locations, an effort that may involve hiring aircraft, leasing satellite equipment, and evacuating ill or wounded staffers. When the Costa Concordia cruise ship went aground in January off Italy, for example, AP learned of the incident at 3 a.m. and had a team of reporters, photographers and video journalists at the site before dawn.

10

27.     In today's world, the AP and its wire service peers are often the only sources for timely, high-quality, on-the-ground reporting for news as it breaks around the world.  AP's reporting from far-flung and remote locations—both domestic and foreign—is increasingly used by many major news organizations to inform their readership and replace their own expensive international or local bureaus.

28.     In addition to AP's investment of financial resources, AP reporters, photographers and broadcast journalists often put their lives in jeopardy to report from dangerous and unstable regions.  More than 30 AP journalists and photographers have lost their lives in the line of duty since AP was established.  In recent years alone, 19 AP journalists have been incarcerated or otherwise detained, and at least 23 have been harassed, intimidated, or beaten while gathering the news.  To take only a few recent examples, in the past few months AP photographers and reporters were assaulted while covering a protest in Indian-controlled Kashmir; detained while covering the Occupy Wall Street protests in New York City; and held hostage while covering the fall of Moammar Gadhafi's regime in Tripoli, Libya.

29.     In recent months, covering events in Egypt has been particularly dangerous.  Photographers and television crews have had to relocate due to hostility from street crowds, while police often do not discriminate between journalists covering a confrontation and the militants themselves.  An AP contract video reporter was detained by the military in Cairo in January, although he managed to convince a senior officer to release him and his equipment.  This is but the latest example of the importance of the training and skills of AP staffers that yield demonstrated value.

30.     The AP's newsgathering activities require it, often at great expense, to protect its journalists who have been detained or imprisoned in other countries and to provide security for

DWT 18759392v12 0025295-000064

its journalists stationed in conflict zones. This investment includes providing helmets and flak jackets to correspondents in war-torn areas, purchasing armored vehicles, and employing security guards. AP also makes a heavy investment in freedom of information, filing hundreds of information requests every year under freedom of information laws in the United States and other nations and often spending heavily to back them up with legal action. Further, in addition to paying salaries to its journalists and photojournalists, the AP must also fund pension and other financial obligations for the men and women who have dedicated their lives—often for relatively modest salaries—to gathering the news worldwide. For those AP journalists who have sacrificed their lives in the service of reporting the news, the AP funds benefits to the families they have left behind.

### *Composition of a Story*

31.     Most stories on the AP wires are based on newsgathering performed by AP staff reporters in bureaus or, quite frequently, directly from the scenes of news conferences, disasters, political events and armed conflicts. The remainder are reported by AP based on the facts contained in news reports furnished by AP members under the AP news cooperative's arrangements with AP members. Even in these instances, while AP reporters and editors start with the information provided by AP members, AP rewrites the text of the stories so that the approach, content, structure and length of the final dispatches meet the AP's requirements. AP reporters often recheck the facts of the stories as well.

32.     Stories on AP services are carefully constructed to be as useful to the reader as possible. Breaking news stories are often structured in what journalists call an "inverted pyramid," with the aim of including as much key information as possible in the "lede," or first portion of the story. An AP story lede is meant to convey the heart of the story, rather than

serving as a teaser for the remainder of the story. Analytical and feature stories are constructed in other carefully conceived forms to convey the issues and personalities involved, along with critical background information and description.

33.     Each AP story is transmitted to AP services with two alternative headlines of varying lengths for use by AP members and subscribers who choose to republish the AP dispatch. AP headlines are crafted by AP reporters and editors to meet AP's high standards. Headlines are often highly creative, and crafting a concise, informative and yet attention-grabbing headline requires art and skill by AP employees.

34.     Because AP reporters are often the first to reach the scene of a news story as it breaks, most AP stories are published in several iterations as the story continues to develop. This process, known as "writing through" a story,  allows AP to provide breaking news quickly to its subscribers and to continue to ensure that subscribers are receiving the most up-to-date and accurate accounts.  On a particularly urgent story, AP may provide first a "NewsAlert" of only a few words, followed by a version 130 words long, followed by longer versions as the story develops. Writing quickly, clearly and accurately to these specific story lengths requires substantial experience and training.

35.     The process for AP news reports begins with the assignment of a story to a reporter and includes ongoing consultations between editor and reporter about how to handle the assignment and how the story should be written.  Reporters may be asked several times to gather additional facts, find additional sources, and re-draft a story before the editor is satisfied that it is sufficiently complete and well-executed.  AP editors also make decisions about the selection, arrangement, style, and presentation of information contained in an AP reporter's story, and make sure that it conforms with AP's editorial policies, listed in AP's publicly available

DWT 18759392v12 0025295-000064

Statement of News Values and Principles, and the style guidelines of the widely respected *Associated Press Stylebook*. Editors then conduct additional reviews for completeness, clarity, balance and accuracy before releasing the story for distribution.

36.     As a result, each AP news report is an original and creative work and reflects significant financial, professional and personal investment by AP and its employees.

### *Subscriptions to the AP Wire*

37.     In the vast majority of instances, AP does not publish its news stories directly to the public. Rather, AP's business model is to license its news reports to a wide range of customers under a variety of arrangements. Many of AP's subscribers are news sources who publish or broadcast the AP stories, including on their websites. These include AP's regular members (including U.S. newspapers) and associate members (including many broadcast media companies). The U.S. government is one of AP's largest customers, and AP's subscriber roster includes nearly 100 government agencies—federal, state, local, and foreign—including the U.S. Senate, the U.S. State Department, the New York City Police Department, and various foreign embassies. These government subscribers often do not publish the stories themselves, but monitor the news wire to stay apprised of timely, accurate news reports as they develop. Furthermore, many private corporations pay valuable consideration to access AP's copyrighted content through subscriptions to LexisNexis and Factiva, which license AP's content to provide companies with timely, pertinent news reports on their areas of interest. AP licensees also include search engines and news aggregation services that in turn provide services to corporations, professional service firms, and information service providers. Finally, licensees may pay à la carte to license individual news reports on a transaction basis.

38.     All subscribers and other licensees are required to sign agreements that limit the uses they may make of the news reports provided by AP.  For example, subscribers are often prohibited from making news stories publicly available for more than 14 days following the receipt of that content and are usually strictly limited in their ability to maintain an archive of AP content.  Licensees are also required to display AP attribution and copyright information when publishing AP content.

39.     As noted above, some subscribers pay to receive AP content delivered via a secure platform in order to monitor the news without the right to distribute it.  These subscribers may choose to subscribe to AP's full news wire, or to AP Industry Alerts, which provide comprehensive, vertically integrated news coverage on a variety of industry-specific topics, including technology, financial services, energy, and entertainment.  Likewise, AP members and licensees such as newspapers and news portals who seek to re-publish AP's stories may subscribe to news streams that are either broad-based or focused on particular topical areas, depending on their needs and audience.  For example, a publication or television subscriber may choose to receive a news wire that focuses specifically on sports; fashion; stocks and business news; national political news; news relating to any of the 50 U.S. states; or in-depth statistical coverage of state and national elections.

40.     Meltwater's news monitoring product competes directly with AP's subscription services.  Meltwater's infringing collection and distribution of AP content from AP member sites directly impacts AP's ability to sell its news wire and industry alert services to potential customers.  AP has lost, and continues to lose, customers to Meltwater over the past several years.  For example, the Department of Homeland Security terminated its contract with AP, choosing instead to receive AP content through Meltwater.  The loss of revenue from these

15

licensees and potential licensees has had, and will continue to have, a direct and negative impact on AP's ability to continue its mission to provide its members, subscribers, and licensees—and thereby the public—with accurate, high-quality and timely news reports from around the world.

**B.     MELTWATER GROUP**

*Overview of Meltwater Group*

41.     Meltwater's first product—and upon information and belief, its core product—is the Meltwater News service ("Meltwater News").  There are four component service offerings within Meltwater News: Global Media Monitoring, Analytics, Newsfeed, and Newsletter.[5]  A basic subscription to Meltwater provides access only to the Global Media Monitoring component, with the other components (Analytics, Newsfeed, and Newsletter) available only upon payment of additional annual fees.

42.     Meltwater News markets itself to potential clients as an updated electronic version of a traditional clipping service.

43.     Meltwater's business model for Meltwater News is built on routinely copying verbatim the heart of the AP's and other publishers' news stories and selling that content to its subscribers for a profit.  It claims to pull its content from 162,000 news sources on the web.  On information and belief, Meltwater does not enter into licensing arrangements with any of these news sources to deliver their original content to its own paying subscribers.

44.     This parasitic business model has been financially successful for Meltwater. Meltwater's website states that Meltwater today is "one of the largest online media monitoring providers, with more than 18,000 customers worldwide."[6]  In 2010, Meltwater made over $100

---

[5] http://www.meltwater.com/products/meltwater-news/detail/
[6] http://www.meltwater.com/products/meltwater-news/about/

DWT 18759392v12 0025295-000064

million in revenue.[7]  Meltwater currently has more than 500 employees and maintains offices in

55 offices on six continents.

45.     This action is not the first time Meltwater's business model has been challenged

as infringing.  In 2009, the District Court in Oslo, Norway, ordered Meltwater to pay a

Norwegian media rights holder organization 3.75 million Norwegian kroner, plus costs of

520,000 Norwegian kroner—a total judgment of approximately $717,00 USD—as compensation

for violating applicable copyright laws.  On July 27, 2011, a U.K. Court of Appeal affirmed a

lower court decision holding that the content provided by Meltwater News to its users required a

license from the publishers of that content.

### *Meltwater News:  Global Media Monitoring Service*

46.     The Global Media Monitoring service offered by Meltwater News is its entry-

level product available to all Meltwater News subscribers.  Meltwater boasts that it has "the

industry's most robust online media monitoring database."[8]  To operate its Global Media

Monitoring service, Meltwater uses computer programs known as "spiders" or "robots" to

"scrape" the contents of the news websites that it monitors.  On information and belief,

Meltwater uses the information gathered by its "spiders" to create an index on Meltwater-owned

or controlled servers of each article's metadata, which includes the position of every word in

every article it retrieves, allowing it to search the full text of these articles and deliver resulting

"hits" to its clients.  In doing so, Meltwater makes and stores copies of the articles it retrieves, or

substantial portions thereof, in its own proprietary database, including the registered AP articles

described below.  Meltwater maintains an archive of stored copies of articles that it has scraped

---

[7] http://www.inc.com/inc5000/profile/meltwater-group; http://blog.meltwater.com/meltwater-places-on-inc-5005000-list
[8] http://www.meltwater.com/products/meltwater-news/detail/

DWT 18759392v12 0025295-000064

from websites since at least 2007, thus allowing current users to retrieve search results from at least 2007 forward.

47.     With Global Media Monitoring, a customer chooses search terms known as "agents" to track various topics. Upon information and belief, an annual subscription to the Global Media Monitoring service including 10 "agents" of a customer's choosing is priced at $5,000.

48.     The "agents" selected by a customer are used to generate a daily email report from Meltwater, which contains a list of all articles retrieved using the selected search terms. The email report includes the headline and lede of each article, along with an additional excerpt from the article comprised of text surrounding the first use of the "agent" in the body of the article. Meltwater customers can click on the headline to link to the full story on its originating website.

49.     In addition to receiving a daily or twice-daily email report, Meltwater customers can log into Meltwater's password-protected site to review all hits returned for their selected "agents," updated in real time to include new stories.

50.     Further, Meltwater customers can perform unlimited searches of Meltwater's news archive using any combination of keywords through the "search" function and receive a similar listing of responsive articles with their headlines, ledes and a further textual excerpt of the text surrounding the search term. The search function includes both basic search capabilities and an advanced search option with Boolean search capabilities. Because a Meltwater customer can run unlimited searches, it is possible to retrieve additional excerpts from the same articles retrieved by earlier searches. For example, if a Meltwater customer searches for an "agent" that is in the second paragraph of a short 3-paragraph AP breaking news story, and then uses the

search function to search for a term that happens to appear in the third paragraph, the customer's combined searches would end up retrieving nearly all of the article.

51.     The stories Meltwater delivers to its customers through its Global Media Monitoring service include reports that are hot off the AP wires. Meltwater touts this "hot off the wire" feature of its database to attract potential customers, stating that Meltwater News "is the leader in online media monitoring for several reasons," including "Real Time Information: Meltwater News continuously tracks news sources, updating its database continuously throughout the day so searches return fresh, relevant content." [9]

52.     Meltwater encourages its customers to target search results from specific news organizations. Thus, search results can be limited to its list of "top tier publications"—which includes the AP and several AP members. Alternatively, on information and belief, a Meltwater customer could limit its searches only to articles authored by the AP.

53.     On information and belief, all or substantially all of the AP's articles published by any of its subscribers on their websites are copied and stored on Meltwater's media monitoring database. Further, given Meltwater's 18,000-plus customer base, it is likely that a significant percentage of AP's published stories are excerpted for Meltwater customers. Likewise, any given AP article is likely excerpted multiple times given the thousands of Meltwater customers and each of their multiple agents and search terms, thus resulting in a greater cumulative taking of the article. Thus, AP's claim is not only that individual excerpts from individual AP articles are infringing in and of themselves but also that the conduct of Meltwater News's business as a whole has resulted and will continue to result in broad-scale infringement of AP's news wires.

54.     Meltwater offers a trial subscription to potential clients who would like to test its product before signing up for a full paid subscription. An agent for AP's counsel in this action

---

[9] http://www.meltwater.com/products/meltwater-news/about/

received a trial subscription to Meltwater News for ten days in December 2011.  In response to basic search terms, this trial subscription yielded infringing excerpts from numerous AP articles, including each of the AP articles registered with the Copyright Office and listed in Paragraph 78 of this complaint.  Among its search results, Meltwater delivered "AP Exclusive" stories, including the December 8, 2011 story titled "Inside Romania's Secret CIA Prison," by the highly-regarded investigative reporting team of Adam Goldman and Matt Apuzzo.  Goldman and Apuzzo were recently named as finalists for the prestigious Goldsmith Prize for Investigative Reporting, which is awarded annually by the Joan Shorenstein Center on the Press, Politics and Public Policy at Harvard University's Kennedy School of Government.

55.     The excerpts delivered by Meltwater to its customers take protected expression from AP articles and constitute a substantial portion of those articles, quantitatively and qualitatively.  For shorter, "breaking news" items, Meltwater's practice of delivering the headline, lede and an excerpt from within the article that contains the agent or search term often results in customers receiving more than a third of the article's text.  For example, during the agent's trial subscription, Meltwater provided an excerpt from a December 14, 2011 AP article containing the headline ("Help Wanted at New Casino for Toledo, Ohio"), the introductory paragraph ("Job seekers can roll the dice to land work at another of the few casinos coming soon to Ohio") and a 21-word excerpt from within the article containing the search term "security." All told, the initial excerpts returned about 40% of the article.  *See* Exhibit A, with material excerpted by Meltwater News in its email report highlighted in yellow.  After a subsequent search inquiry that picked up another word used in the article, a combined total of 70% of the article was distributed to the user by Meltwater News.  *See* Exhibit A hereto, showing additional excerpting by Meltwater highlighted in blue.  Attached hereto as Exhibits B and C are additional

registered AP articles excerpted by Meltwater News, again with the initial search results highlighted in yellow and the additional excerpting by Meltwater highlighted in blue.[10] Upon information and belief, Meltwater customers often receive more than one excerpt of a given article, since their search terms often pertain to related topics.

56.     Moreover, regardless of an article's length, because it is AP's practice to creatively encapsulate the key points of each story in its headline and its lede, the Meltwater Global Media Monitoring Service delivers to its customers the heart of each AP news story, including the registered articles.  Indeed, upon information and belief, many Meltwater customers find the headline, lede and additional squib connected to their topic of interest to be a close enough substitute for the article that they never receive or read the original article. According to a media research firm's recent report, 44% of readers on news aggregation sites simply scan headlines and ledes rather than clicking through to a full article.[11]

57.     Meltwater's Global Media Monitoring Service adds nothing to the content of the articles it delivers to subscribers.  Its agent and search results deliver a verbatim reproduction of the headline, lede, and text surrounding the keywords.  The Meltwater Media Monitoring Service provides no commentary on the original work, nor does it incorporate the original work within a larger work.  Instead, Meltwater's electronic clipping service merely supersedes the function of the AP wires for those who use it to monitor the news or to follow worldwide developments.

58.     Meltwater does not broaden public access to the news content it delivers to subscribers.  The news content is already available on the Internet through the websites of AP members and licensees.  Moreover, it can be located free of charge through ordinary Internet searches or through AP-licensee aggregators such as Google News and Yahoo News.

---

[10] Where text delivered in the initial search result overlaps with text delivered in the additional search, the text from the additional search is underlined—rather than highlighted—in blue.

[11] *See* http://www.outsellinc.com/press/press_releases/news_users_2009.

*Meltwater's Archive of Articles*

59.     Meltwater's search function is retroactive, allowing users to retrieve search results not only from the news of the day, but also from many older articles archived on Meltwater's system going back to 2007.  Many of the older articles available on Meltwater's Global Media Monitoring Service are no longer freely available on the Internet—either because the original article has been removed from the Internet or placed behind an archive paywall by the hosting website.

60.     Meltwater's ability to retrieve older articles no longer freely available on the Internet demonstrates that Meltwater reproduces copies of articles and saves these copies on its own system, including the registered AP articles identified herein.  Such copying is a willful violation of the exclusive rights of content owners to reproduce these original copyrighted works, including works owned by the AP.  Further, when Meltwater News provides "dead links" for these older articles, no traffic can be driven to the originating site, namely AP's licensee.

61.     By way of example, during the trial subscription by the agent, Meltwater delivered excerpts from the following registered AP articles, which are no longer available from the original site listed in Meltwater's search results and thus must have been copied and stored by Meltwater at or around their time of original publication:

- "Young office says he's cleared in DOJ probe," published at The Evening Sun (http://www.eveningsun.com) on August 11, 2010

- "Cold night crept by after crash killed senator," published at The Salinas Californian (http://www.thecalifornian.com) on August 11, 2010[12]

- "Senator Delivered Billions for Alaska's Future," published at CBS Sacramento (http://sacramento.cbslocal.com) on August 10, 2010

- "Alaska reviewing case against ex-VECO CEO Allen," published at The Republic (http://www.therepublic.com) on September 2, 1010[13]

---

[12] Published by The Salinas Californian under the headline "Cold night crept by after crash killed ex-Sen. Stevens."

DWT 18759392v12 0025295-000064

- "Senate upset erases Alaska seniority," published at The Detroit News (http://www.detroitnews.com) on September 16, 2010[14]

- "Former Alaska Sen. Ted Stevens dies in plane crash," published at WSLS 10 (http://www.wsls.com) on August 10, 2010.[15]

62.     Beyond its own archiving of articles in its database, Meltwater also provides an "archive" function for its customers as part of its Global Media Monitoring service. As part of the subscription, Meltwater supplies users with an "Articles Editor" function which allows them to manually archive excerpts or entire articles into folders they create, including AP articles. Users can continue to access their saved articles from the archive folders for as long as they remain Meltwater customers. Meltwater stores the excerpts and full articles saved by users on Meltwater's website under the subdomain "service.meltwaternews.com." Upon information and belief, the subdomain service.meltwaternews.com is hosted on a server operated by Meltwater.

63.     In order to use the "Article Editor" function, a user clicks on a link to "add new article" in the archive folder. When the user clicks that link, Meltwater generates an activity box with several empty cells. A user can choose to copy and paste any portion of the article text into any of the various cells. If the user pastes the full text of any article into the cell labeled "opening text," the user will be able to view the full text of the article on its Meltwater archive page by logging into the site at any time, without clicking through to the website that legitimately published the article. The "Article Editor" tool does not even require a user to insert a link to the original article. On information and belief, with the active assistance of Meltwater sales representatives, full copies of articles, including AP stories, are archived on service.meltwaternews.com. For example, after receiving a demonstration and instructions from

---

[13] Published by The Republic under the headline "Attorney general says Alaska officials reviewing case against former VECO CEO."
[14] Published by The Detroit News under the headline "Alaska's purse strings thinned in Senate losses."
[15] Published by WSLS 10 under the headline "Plane crash kills former Alaska Senator."

DWT 18759392v12 0025295-000064

a Meltwater sales representative, the agent during its trial subscription was able to archive on Meltwater's server copies of the registered articles described herein.

64.     Meltwater knows or has reason to know that its customers archive full text articles in their archive function.  Indeed, Meltwater has purposefully designed its system to permit archiving of full text articles and both provides the means and materially assists in the copying and storage of such full text articles.  Further, Meltwater markets and promotes its service by indicating that its archive function permits archiving of full text articles.  As one Meltwater salesman told a trial subscription customer, "basically it's a copy and paste job."  In a 2008 pitch to the California Urban Water Conservation Council, attached hereto as Exhibit D, Meltwater promised to provide "unlimited archiving (all on our servers)" as part of its subscription packages.

65.     Meltwater's facilitation of copying does not end there.  It also offers customers the option of exporting any information saved in the archive—including the full text of articles, if users have stored the full text in their archive—to an Excel spreadsheet, thereby allowing users to create and save additional copies of the unlicensed content stored by Meltwater in violation of the exclusive reproduction rights of content owners, including AP.  Meltwater's marketing materials tout this "ability to export all articles to Microsoft Excel."

66.     The Meltwater user is even free to alter the text or remove the byline, attribution, and any copyright management information from the article before saving it to his or her Meltwater-hosted archive.  On information and belief, via Meltwater's facilitation and encouragement, Meltwater customers are able to remove copyright management information in connection with various articles, including AP articles, and such articles are stored on Meltwater's system.

DWT 18759392v12 0025295-000064

67.     In sum, Meltwater engages in direct copyright infringement by providing a
service that enables its customers to copy and store unlimited infringing excerpts and full text
articles in an archive, and storing these materials on Meltwater's internal website.  Meltwater
also provides the means and knowingly induces, causes, assists, or materially contributes to these
actions of its users in infringing the exclusive reproduction rights of content owners, including
AP.  Meltwater also enjoys a direct financial benefit from the above-described infringing activity
of its users, which is a draw to subscribers.

### *Meltwater News: Newsletter and Other Services*

68.     For additional subscription fees beyond the basic Global Media Monitoring
package, Meltwater customers can add on its Newsletter service to distribute infringing excerpts
and full-text articles to a broader range of recipients.  Using Meltwater's newsletter templates,
for example, Meltwater customers can create and send branded newsletters to an unlimited
number of their clients, members of their organizations, or their own employees. On information
and belief, users upload a distribution list of recipients for any particular newsletter, and
Meltwater distributes the newsletter to the designated recipients, who do not need to be
Meltwater customers in order to view the content distributed in the newsletter.

69.     Using Meltwater's archive function and "Article Editor" tool, customers can copy
infringing excerpts or the full text of an article and upload it into a branded newsletter created
from a Meltwater template.  Meltwater does not require users to include a link to the original
article in their newsletters.  If the newsletter recipient clicks on the title of a full text article
distributed without a link, this will only bring him to the full text of the article hosted on the
internal Meltwater web page, "service.meltwaternews.com," not the originating news site.  A

true and correct copy of a newsletter created by Meltwater for Travelers Insurance and provided as part of a Meltwater marketing pitch is attached as Exhibit E.

70.     Upon information and belief, Meltwater and its users regularly engage in the infringing conduct described above and include excerpts from AP stories or full text AP articles in newsletters.

71.     Meltwater engages in direct copyright infringement through its actions in connection with its newsletter functions.  It also has knowledge of the infringing uses in its client's newsletters, provides the means for such infringing uses, and induces, causes, assists or materially contributes in the infringing conduct of its customers in their newsletters.  Finally, Meltwater directly benefits from the infringing newsletters, which are a draw to its services, including the separately priced newsletter option.

72.     Meltwater also provides its customers with the ability to create derivative works by translating any article retrieved through the agent or search functions into another language. On information and belief, Meltwater offers a built-in translation function that covers 22 languages.  On information and belief, a user may click on a link to "translate" any search result. When the user clicks the "translate" link, a second window appears with the URL of the site to be translated.  When the user chooses the desired language and clicks the "translate" button, the full translated text of the article appears on Meltwater's internal website, under the subdomain URL "service.meltwaternews.com."

73.     Upon information and belief, Meltwater has infringed AP's rights through translation of its copyrighted articles.

74.     Upon information and belief, Meltwater also offers additional services to its customers that result in the infringement of AP's rights in its copyrighted articles.

C.    **MELTWATER'S INFRINGEMENT OF AP'S COPYRIGHTS**

75.    All news stories carried on the AP wires constitute original works of authorship subject to copyright protection.  AP owns the copyright in all stories on its news wires.  As the copyright owner, AP has the exclusive right, *inter alia*, to reproduce, distribute, display and/or prepare derivative works based upon those stories.

76.    Each AP story that is transmitted by the AP to its members and subscribers contains copyright management information, as defined in 17 U.S.C. § 1202(c), including identification of the AP as the author and/or copyright owner of the story.  This copyright management information also ordinarily appears in AP stories when they are republished by AP members and subscribers.

77.    In addition, AP requires its licensees to insert a notice to users of the licensee's website that the AP material on that site may not be published, broadcast, rewritten for broadcast or publication, or redistributed directly or indirectly in any medium.

78.    AP has filed for and/or obtained copyright registrations for the articles listed below ("Registered Articles").  True and correct copies of the Registered Articles and their corresponding copyright registrations or applications are attached as Exhibits F through X.

- "Sri Lankan fruit traders protest new basket rule," Registration No. TX 7-461-521 (Dec. 29, 2011), attached hereto as Exhibit F;

- "Help wanted at new casino for Toledo, Ohio," Registration No. TX 7-460-774 (Dec. 29, 2011), attached hereto as Exhibit G;

- "Portugal highway toll booths torched, shots fired," Registration No. TX 7-461-520 (Dec. 29, 2011), attached hereto as Exhibit H;

DWT 18759392v12 0025295-000064

- "Former Alaska Sen. Ted Stevens dies in plane crash," Registration No. TX 7-460-773 (Dec. 29, 2011), attached hereto as Exhibit I;

- "Modern pentathlon tightens anti-doping policy," Registration No. TX 7-460-772 (Dec. 29, 2011), attached hereto as Exhibit J;

- "Albert King gets marker on Mississippi Blues Trail," Registration No. TX 7-460-574 (Dec. 29, 2011), attached hereto as Exhibit K;

- "Polls open in second wave of Egypt parliament vote," Registration No. TX 7-460-775 (Dec. 29, 2011), attached hereto as Exhibit L;

- "Senate upset erases Alaska seniority," Registration No. TX 7-460-770 (Dec. 29, 2011), attached hereto as Exhibit M;

- "AP Exclusive: Inside Romania's secret CIA prison," Registration No. TX 7-460-771 (Dec. 29, 2011), attached hereto as Exhibit N;

- "Cold night crept by after crash killed senator," Registration No. TX 7-460-823 (Dec. 29, 2011), attached hereto as Exhibit O;

- "Sun shines on the mountain and Pearce rides again," Registration No. TX 7-460-776 (Dec. 29, 2011), attached hereto as Exhibit P;

- "Wednesday is 1-year mark of border agent's death," Application No. 1-706092833 (filed Jan. 3, 2012), attached hereto as Exhibit Q;

- "WikiLeaks suspect's trial near super-secret NSA," Application No. 1-706092768 (filed Jan. 3, 2012), attached hereto as Exhibit R;

- "Shoplifter chops off Wash. security guard's ear," Application No. 1-706092732 (filed Jan. 3, 2012), attached hereto as Exhibit S;

DWT 18759392v12 0025295-000064

- "Young office says he's cleared in DOJ probe," Application No. 1-705981803 (filed Jan. 3, 2012), attached hereto as Exhibit T;

- "Senator delivered billions for Alaska's future," Application No. 1-705981728 (filed Jan. 3, 2012), attached hereto as Exhibit U;

- "Alaska reviewing case against ex-VECO CEO Allen," Application No. 1-705981693 (filed Jan. 3, 2012), attached hereto as Exhibit V;

- "When the most wonderful day of the year comes late," Application No. 1-705981618 (filed Jan. 3, 2012), attached hereto as Exhibit W;

- "WikiLeaks suspect seen as hero, traitor," Application No. 1-705981582 (filed Jan. 3, 2012), attached hereto as Exhibit X.

79.     Meltwater's acts as described above constitute willful infringement of AP's copyrights in the Registered Articles and its broader news service in at least four distinct ways listed below.

80.     First, on information and belief, Meltwater has willfully reproduced and stored copies of all or substantial portions of AP news articles in Meltwater's Global Media Monitoring database or related websites operated by Meltwater, including the Registered Articles and thousands, if not tens of thousands, of AP articles dating back to at least 2007.

81.     Second, with regard to excerpts, upon information and belief, Meltwater has copied and distributed protected portions of the Registered Articles in excerpts for users of the Meltwater News Global Media Monitoring service and for further distribution to non-subscribers via Meltwater's Newsletter function.  In many cases the excerpts distributed by Meltwater constitute more than 30% of the article and necessarily include the "heart" of the articles.  Such excerpting constitutes willful infringement in violation of AP's exclusive rights of reproduction,

29

distribution, and display, and the right to prepare derivative works.  Furthermore, upon

information and belief, through similar acts and practices, Meltwater has similarly infringed

AP's copyrights in other AP stories thousands, if not tens of thousands, of times.  The excerpts

produced by Meltwater in its Global Media Monitoring service are substantially similar to the

original articles and do not qualify as fair use of those works.  Meltwater's use of the articles in

its Global Media Monitoring service is not transformative and inflicts significant harm on AP's

market for its original works.

       82.     Third, with regard to full text, on information and belief, Meltwater has willfully

copied, stored, displayed and distributed or caused to be copied, stored, displayed and distributed

full text versions of the Registered Articles in user archives and newsletters, including through

use of the "Article Editor" tool and archive functions to store full-text articles on the subdomain

"service.meltwaternews.com" and affiliated websites owned and operated by Meltwater, in

violation of AP's exclusive rights of reproduction, distribution, and display, and the right to

prepare derivative works.  Further, upon information and belief, Meltwater has similarly

infringed AP's copyrights in other AP stories thousands, if not tens of thousands, of times

through similar acts and practices.

       83.     Fourth, on information and belief, Meltwater has violated AP's right to create

derivative works of its original articles through Meltwater's full-text translation function.

       84.     All such infringing actions are continuing and will continue in the future so long

as Meltwater News remains in operation.

## D.    MELTWATER'S MISAPPROPRIATION OF AP'S "HOT NEWS" CONTENT

       85.     Meltwater's Global Media Monitoring service and associated products are merely

a way for Meltwater to free-ride on AP's significant investments in gathering and reporting

accurate, timely news, including breaking news.  Meltwater earns substantial fees for distributing

premium news content while bearing none of the costs associated with gathering, creating, or even licensing that content.  Moreover, Meltwater free-rides on a grand scale, selling excerpts from and access to all AP stories accessible on the Internet.

86.    Meltwater's product—what it offers to its customers and touts in its marketing materials—is the timely, reliable, professional news content that subscribers receive through its service.  Without AP and other providers of this news content, Meltwater's Global Media Monitoring Service has nothing to deliver to its paying subscribers.

87.    Moreover, Meltwater performs no journalistic function at all.  It does not take information from AP's stories and incorporate that information into articles of its own preparation.  Instead, it is merely a naked aggregator delivering someone else's content to the copyright owner's own customers or potential customers. Meltwater's redistribution of AP stories already published and posted on the Internet serves no journalistic purpose. Meltwater is not "breaking" news.  Nor is it extracting breaking facts from the AP or other news articles it distributes.  Instead, Meltwater lifts and distributes the actual and fully protected, already published texts of the articles.  Finally, Meltwater News is a closed system available only to paying subscribers, not a means of expanding public access.

88.    As described above, AP's license fees for its wire services reflect the substantial costs of maintaining a worldwide newsgathering, reporting and distribution infrastructure. Meltwater's "no copyright fees" business model is premised on <u>not</u> paying content providers, including AP, for the content it delivers to its subscribers.  As a result, Meltwater is able to offer its Global Media Monitoring service, along with related products, at a price point far below what AP can offer to potential subscribers.

DWT 18759392v12 0025295-000064

89.     The Meltwater News service competes directly with the AP's own wire service offerings, in particular for AP subscribers such as government agencies who use its services to monitor the news, rather than for publication in their own newspapers or other media.  AP has already lost significant long-standing clients to Meltwater.  Because most customers desiring to monitor the news need only subscribe to a single comprehensive news service, AP has and will have great difficulty selling its wire service to government offices or private corporations that subscribe to the Meltwater News service, since they are essentially getting AP's wire service from Meltwater.  Meltwater has not only encroached on direct sales of licenses of AP's content, it has also had a significant negative effect on sales of key AP licensees, such as Lexis Nexis and Factiva.

90.     Indeed, as a news wire, and thus a business that does not generally publish its own articles directly, AP and its fellow wire service providers and licensees are uniquely vulnerable to Meltwater and similar closed aggregation services.  AP's business—and the business of certain of its licensees—is to sell access to its wire service.  If someone else is selling excerpts from and timely access to that same content for a lower price by free-riding on AP's content, AP's business model is directly threatened.

91.     If Meltwater is not enjoined from misappropriating AP's news reports, the acts of Meltwater and others poised to follow its lead will reduce AP's incentive and threaten its ability to continue to invest in its newsgathering activities and deliver to AP members, subscribers, and the public at large the same high level of news reports and services that is has offered throughout its long history.

DWT 18759392v12 0025295-000064

## FIRST CAUSE OF ACTION

### (Copyright Infringement)

92.     AP repeats and realleges each and every allegation in ¶¶ 1-91 above as if fully set forth herein.

93.     AP holds all right, title and interest in and to the copyrights of each of the Registered Articles, as well as all news articles on the AP wires ("AP Content"). Pursuant to 17 U.S.C. § 106, AP has the exclusive right to reproduce, distribute, display, and/or prepare derivative works from the Registered Articles, as well as the AP Content.

94.     By the actions alleged above, Defendants have infringed and will continue to infringe AP's copyrights in each of the Registered Articles, as well as the AP Content by (i) unlawfully reproducing, distributing, and displaying all or infringing portions of the Registered Articles, as well as the AP Content, without the permission of AP, and (ii) creating, and causing or inducing others to create, derivative works from the Registered Articles, as well as the AP Content, all in violation of AP's exclusive rights under 17 U.S.C. § 106.

95.     Defendants' infringements were and are willful and committed with full knowledge and conscious disregard for of AP's copyrights and exclusive rights in and to the Registered Articles and the AP Content.

96.     Defendants' infringements were and are conducted without AP's consent and are not otherwise permissible under the Copyright Act.

97.     AP is entitled to recover from Defendants the profits made by them from infringements of the Registered Articles and AP's damages therefrom, or, at AP's election, statutory damages pursuant to 17 U.S.C. § 504.

98.     AP is also entitled to recover from Defendants costs and attorneys' fees pursuant to 17 U.S.C. § 505.

33

99.    Defendants' infringements have caused, and, unless restrained by this Court, will continue to cause, irreparable injury to AP not fully compensable in monetary damages.  AP is therefore entitled to a preliminary and permanent injunction enjoining Defendants from further infringements.

**SECOND CAUSE OF ACTION**

**(Contributory Copyright Infringement)**

100.    AP repeats and realleges each and every allegation in ¶¶ 1-99 above as if fully set forth herein.

101.    By the actions alleged above, Defendants' customers have directly infringed and will continue to infringe AP's copyrights in and to the Registered Articles, as well as the AP Content.

102.    By the actions alleged above, Defendants have induced, caused, assisted, or materially contributed to the infringing conduct of users of their Meltwater News service.

103.    By the actions alleged above, Defendants have provided the means for the infringing conduct of users of their Meltwater News Service.

104.    Defendants know or have reason to know of the actual or imminent infringing conduct of others, including users of their Meltwater News service.

105.    The infringements that Defendants induced, caused, assisted, or materially contributed to through the conduct described above were without AP's consent and are not otherwise permissible under the Copyright Act.

106.    Defendants' infringements were and are willful and committed with full knowledge and conscious disregard of AP's copyrights and exclusive rights in and to the Registered Articles, as well as the AP Content.

DWT 18759392v12 0025295-000064

107.   AP is entitled to recover from Defendants the profits made by them from infringements of the Registered Articles and AP's damages therefrom, or, at AP's election, statutory damages pursuant to 17 U.S.C. § 504.

108.   AP is also entitled to recover from Defendants costs and attorneys' fees pursuant to 17 U.S.C. § 505.

109.   The infringements that Defendants induced, caused, assisted, or materially contributed to through the conduct described above have caused, and, unless restrained by this Court, will continue to cause, irreparable injury to AP not fully compensable in monetary damages.  AP is therefore entitled to a preliminary and permanent injunction enjoining Defendants from further infringements.

## THIRD CAUSE OF ACTION

### (Vicarious Copyright Infringement)

110.   AP repeats and realleges each and every allegation in ¶¶ 1-109 above as if fully set forth herein.

111.   By the actions alleged above, Defendants' customers have directly infringed and will continue to infringe AP's copyrights in and to the Registered Articles, as well as the AP Content.

112.   Defendants enjoy a direct financial benefit from their users' infringing activities.

113.   Defendants have the right and ability to supervise, control and prevent their users' infringing activity, but have failed or refused to exercise supervision or control over their users' infringing activities.

114.   Defendants' infringements were and are willful and committed with full knowledge and conscious disregard for of AP's copyrights and exclusive rights in and to the Registered Articles, as well as the AP Content.

DWT 18759392v12 0025295-000064

115.   AP is entitled to recover from Defendants the profits made by them from infringements of the Registered Articles and AP's damages therefrom, or, at AP's election, statutory damages pursuant to 17 U.S.C. § 504.

116.   AP is also entitled to recover from Defendants costs and attorneys' fees pursuant to 17 U.S.C. § 505.

117.   Defendants' infringements have caused, and, unless restrained by this Court, will continue to cause, irreparable injury to AP not fully compensable in monetary damages.  AP is therefore entitled to a preliminary and permanent injunction enjoining Defendants from further infringements.

## **FOURTH CAUSE OF ACTION**

### **(Declaratory Judgment)**

118.   AP repeats and realleges each and every allegation in ¶¶ 1-117 above as if fully set forth herein.

119.   As alleged in greater detail above, in operating its subscription-based Meltwater News service, Meltwater delivers to its subscribers headlines, ledes, and substantial excerpts of original works created by publishers, including AP.

120.   As alleged in greater detail above, in order to deliver this content, Meltwater maintains a continuously updating database of the full text of every article its software "scrapes" from countless websites, including AP Content.

121.   As alleged in greater detail above, Defendant Meltwater has also built into its Meltwater News system a way for its customers to capture, save and store the infringing excerpts and full text of retrieved news articles in Meltwater's database, including AP articles.

DWT 18759392v12 0025295-000064

122.    As alleged in greater detail above, Meltwater has built into its Meltwater News System a way for its customers to translate AP articles into foreign languages and thus to create infringing derivative works.

123.    Meltwater has neither sought nor obtained a license for its use of AP Content.

124.    Meltwater's business model is premised upon charging substantial fees to its subscribers while incurring no cost to create or license content from publishers, including the AP.

125.    The registered AP articles named herein represent only a tiny sample of the thousands of unlicensed, copyrighted AP articles that Meltwater copies, stores, and distributes to users on a continuous basis in the course of operating its Meltwater News service.

126.    By reason of the foregoing, there now exists between the parties an actual and justiciable controversy concerning whether the business practices of Meltwater News as set forth in this complaint constitutes an infringement of AP's copyright in any AP Content.

127.    Accordingly, the AP seeks, pursuant to 28 U.S.C. §§ 2201 and 2202, a declaration and judgment from this Court that the business practices of Meltwater News as set forth in this complaint constitutes an infringement of AP's copyright in any AP Content.

## FIFTH CAUSE OF ACTION

### ("Hot News" Misappropriation Under New York Common Law)

128.    AP repeats and realleges each and every allegation in ¶¶ 1-127 above as if fully set forth herein.

129.    AP collects newsworthy information, creates and edits news stories based upon that information, and transmits its news stories in a timely fashion at substantial economic, professional, and personal cost. AP reports news; it does not "make" news, except on rare occasion.

130.    The value of the news stories that AP gathers, creates and transmits is highly time sensitive.

131.    As described above, Defendants' use of AP's news stories constitutes free riding on AP's significant, costly efforts to generate its news stories.

132.    Defendants' Meltwater News service uses AP news stories in a "news monitoring" service that is sold to a similar customer base as AP's Wire Services, including without limitation to governmental divisions and agencies and private corporations.  Defendants' Meltwater News service competes directly with AP's own wire service offerings, which are the basis for its continued financial viability.

133.    The ability of Meltwater and other parasitic electronic clipping services to free ride on AP's significant, costly efforts to collect, report, edit and transmit news stories would so reduce AP's incentive to produce its news wires that their existence or quality would be substantially threatened.

134.    Indeed, if anybody and everybody were permitted to make indiscriminate distribution without license of AP's news stories in the same fashion as Defendants for purposes of profit in competition with AP, it would render publication of the news stories so little profitable as in effect to cut off the service by rendering the cost prohibitive in comparison to the return.

135.    As alleged above, Defendants' acts constitute "hot news" misappropriation under New York State common law.

136.    Defendants' conduct has damaged AP while unjustly enriching Defendants.

137.    As alleged above, Defendants have acted in bad faith, maliciously, willfully, and without due regard for AP's rights.

138.    AP is entitled to injunctive relief, compensatory and punitive damages, and any other remedies available under New York law.

## SIXTH CAUSE OF ACTION

### (Removal or Alteration of Copyright Management Information)

139.    AP repeats and realleges each and every allegation in ¶¶ 1-138 above as if fully set forth herein.

140.    In all of its news reports transmitted on the AP wires, AP includes a credit line and copyright notice.

141.    The inclusion of AP's name and copyright information in all of its news reports constitutes "copyright management information" as defined in 17 U.S.C. § 1202(c).

142.    Defendants, without authority of AP or the law, have caused and induced others to intentionally remove and/or alter copyright management information from AP news reports, including the Registered Articles, and has thereafter distributed said works, knowing or having reason to know that the copyright management has been removed or altered without authority of the copyright owner or law, having reasonable grounds to know that it will induce, enable, facilitate, or conceal an infringement of copyright under Title 17 of the United States Code, in violation of 17 U.S.C. § 1202(b).

143.    Such removal or alteration of copyright management information from AP news reports, including the Registered Articles, and subsequent distribution of the reports, including the Registered Articles, as alleged above, was willful and intentional, and was committed with full knowledge of and disregard for of AP's rights under copyright law.

144.    AP is entitled to recover actual damages suffered as a result of the violation and any profits of Defendants attributable to such violation or, at AP's election, statutory damages pursuant to 17 U.S.C. § 1203(c).

DWT 18759392v12 0025295-000064

145.    AP is entitled to recover costs and attorneys' fees from Defendants pursuant to 17 U.S.C. §  1203(b)(4) and (5).

WHEREFORE, AP demands judgment against Defendants as follows:

a.   Declaring that the business practices of Meltwater News as set forth in this complaint constitute an infringement of AP's copyright in any AP Content;

b.   Preliminarily and permanently enjoining Defendants and all those acting at their direction or pursuant to their control from (i) infringing AP's copyrights in its past and future articles through Defendants' Meltwater News Service, including through direct, contributory and vicarious infringement of AP's exclusive rights; (ii) misappropriating AP's "hot-news" content; and (iii) removing or altering AP's copyright management information;

c.   Ordering Defendants to delete from its database and all computers under Defendants' control all copyrighted materials owned by AP and all AP news reports;

d.   Awarding AP its actual or statutory damages, in an amount to be determined at trial;

e.   Awarding AP any profits made by Defendants attributable to their violations not taken into account when computing AP's actual damages;

f.   Awarding AP, on its Fifth Cause of Action, punitive damages in an amount to be determined at trial;

g.   Awarding AP its costs of prosecuting this action, including reasonable attorneys' fees;

h.   Directing Defendants to file with this Court within 30 days after the entry of final judgment a written statement, under oath, setting forth in detail the manner in which they have complied with the Judgment of the Court; and

DWT 18759392v12 0025295-000064

i.   Awarding AP such other and further relief that this Court deems just,

proper and equitable.

Dated: New York, New York
       February 14, 2012

                                        DAVIS WRIGHT TREMAINE LLP

                                        By: _____
                                             Elizabeth A. McNamara
                                             Linda Steinman
                                             Alison B. Schary

                                        *Attorneys for The Associated Press*
                                        1633 Broadway, 27th floor
                                        New York, New York 10019
                                        (212) 489-8230