UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ASSOCIATED PRESS,                            :
                                                 :        12 Civ. 1087(DLC)(FM)
                              Plaintiff,          :
                                                 :
        - against -                              :        ECF Case
                                                 :
MELTWATER U.S. HOLDINGS, INC.;                   :
MELTWATER NEWS U.S., INC.; and                   :
MELTWATER NEWS U.S. 1, INC.                      :
                                                 :
                              Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
## OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS AS TO
## <u>DEFENDANTS' COUNTERCLAIMS</u>

Elizabeth A. McNamara
Linda Steinman
Alison B. Schary
Collin J. Peng-Sue
DAVIS WRIGHT TREMAINE LLP
1633 Broadway – 27th Floor
New York, New York 10019
Telephone:      (212) 489-8230
Facsimile:      (212) 489-8340

*Attorneys for Plaintiff The Associated Press*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

     A.   The Parties ................................................................................................. 2

     B.   AP's Lawsuit and Press Release ............................................................... 3

     C.   Meltwater's Counterclaims ....................................................................... 3

ARGUMENT ......................................................................................................................... 5

I.   RELEVANT STANDARD ........................................................................................ 5

II.   MELTWATER'S COUNTERCLAIM FOR LIBEL SHOULD BE DISMISSED
BECAUSE THE PRESS RELEASE IS A FAIR AND TRUE REPORT OF A
JUDICIAL PROCEEDING ....................................................................................... 6

     A.   Privilege Under Section 74 of the New York Civil Rights Law............................. 6

     B.   The Complained-Of Statements In The Press Release Are Absolutely Privileged 8

        1.   Statement 1.................................................................................. 9

        2.   Statement 2.................................................................................. 9

        3.   Statement 3............................................................................... 10

        4.   Statement 4............................................................................... 10

        5.   Statement 5............................................................................... 10

        6.   Statement 6............................................................................... 11

III.   MELTWATER'S COUNTERCLAIM FOR TORTIOUS INTERFERENCE
SHOULD BE DISMISSED .................................................................................... 12

IV.  MELTWATER'S COUNTERCLAIM FOR DECLARATORY JUDGMENT OF SAFE
     HARBOR UNDER DMCA § 512(c) SHOULD BE DISMISSED BECAUSE
     MELTWATER DOES NOT QUALIFY AS A "SERVICE PROVIDER" .......................... 14

     A.   The DMCA's Safe Harbor Provision .................................................... 14

     B.   Meltwater Is Not Eligible For The DMCA Safe Harbor Provision
          Under § 512(c) ............................................................................. 16

CONCLUSION ....................................................................................................... 19

DWT 20479078v2 0025295-000064

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*ALS Scan, Inc. v. RemarQ Communities, Inc.,*
    239 F.3d 619 (4th Cir. 2001) .................................................................................18

*Ashcroft v. Iqbal,*
    556 U.S. 662, 129 S. Ct. 1937 (2009) .....................................................................5

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................5

*Chao v. Mt. Sinai Hosp.,*
    No. 10 Civ. 2869 (HB), 2010 WL 5222118 (S.D.N.Y. Dec. 17, 2010),
    *aff'd*, 476 Fed. Appx. 892 (2d Cir. 2012),
    *cert. denied*, 81 U.S.L.W. 3175 (2012) ................................................................14

*Cleveland v. Caplaw Enters.,*
    448 F.3d 518 (2d Cir. 2006) .....................................................................................5

*D'Andrea v. Rafla-Demetrious,*
    146 F.3d 64 (2d Cir. 1998) .....................................................................................12

*I. Meyer Pincus & Assocs. v. Oppenheimer & Co.,*
    936 F.2d 759 (2d Cir. 1991) .....................................................................................3

*In re Aimster Copyright Litig.,*
    252 F. Supp. 2d 634 (N.D. Ill. 2002),
    *aff'd*, 334 F.3d 643 (7th Cir. 2003) .......................................................................17

*Karp v. Hill & Knowlton, Inc.,*
    631 F. Supp. 360 (S.D.N.Y. 1986) ..........................................................................8

*Krepps v. Reiner,*
    588 F. Supp. 2d 471 (S.D.N.Y. 2008),
    *aff'd*, 377 Fed. Appx. 65 (2d Cir. 2010) ...............................................................14

*Masson v. New Yorker Magazine, Inc.,*
    501 U.S. 496 (1991) ...............................................................................................10

*Matusovsky v. Merrill Lynch,*
    186 F. Supp. 2d 397 (S.D.N.Y. 2002) ......................................................................3

*Rossi v. Motion Picture Ass'n of Am., Inc.,*
    391 F.3d 1000 (9th Cir. 2004) ................................................................................18

iii

*Seymour v. The Lakeville Journal Co. LLC*,
150 Fed. Appx. 103 (2d Cir. 2005)..............................................................................6

*Southridge Capital Mgt., LLC v. Lowry*,
No. 01 Civ. 4880 RO, 2003 WL 68041 (S.D.N.Y. Jan. 7, 2003) ...........................6, 8

*Twelve Inches Around Corp. v. Cisco Sys., Inc.*,
No. 08 Civ. 6896 (WHP), 2009 WL 928077 (S.D.N.Y. Mar. 12, 2009)...............................18

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012)........................................................................................15

## STATE CASES

*10 Ellicott Square Court Corp. v. Violet Realty, Inc.*,
81 A.D.3d 1366, 916 N.Y.S.2d 705 (4th Dep't 2011),
*lv. denied*, 17 N.Y.3d 704, 929 N.Y.S.2d 95 (2011)..............................................13

*Am. Preferred Prescription, Inc. v. Health Mgmt., Inc.*,
252 A.D.2d 414, 678 N.Y.S.2d 1 (1st Dep't 1998) ...................................................12

*Amaranth LLC v. J.P. Morgan Chase & Co.*,
71 A.D.3d 40, 888 N.Y.S.2d 489 (1st Dep't 2009) ...................................................12

*Branca v. Mayesh*,
101 A.D.2d 872, 476 N.Y.S.2d 187 (2d Dep't 1984),
*aff'd*, 63 N.Y.2d 994, 483 N.Y.S.2d 1011 (1984).....................................................7

*Burrowes v. Combs*,
25 A.D.3d 370, 808 N.Y.S.2d 50 (1st Dep't 2006) ..................................................13

*Carvel Corp. v. Noonan*,
3 N.Y.3d 182, 785 N.Y.S.2d 359 (2004) ..................................................................12

*Ford v. Levinson*,
90 A.D.2d 464, 454 N.Y.S.2d 846 (1st Dep't 1982) ..................................................7

*Foster v. Churchill*,
87 N.Y.2d 744, 642 N.Y.S.2d 583 (1996) ................................................................12

*Golub v. Enquirer/Star Group, Inc.*,
89 N.Y.2d 1074, 659 N.Y.S.2d 836 (1997) ..............................................................11

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
50 N.Y.2d 183, 428 N.Y.S.2d 628 (1980) ................................................................13

DWT 20479078v2 0025295-000064

*Gurda v. Orange County Publs. Div.*,
    81 A.D.2d 120, 439 N.Y.S.2d 417 (2d Dep't 1981),
    *rev'd on concurring and dissenting op'n below,* 56 N.Y.2d 705 (1982) .................................6

*Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*,
    49 N.Y.2d 63, 424 N.Y.S. 2d. 165 (1979) ......................................................................6, 7, 10

*Hughes Training Inc., Link Div. v. Pegasus Real-Time Inc.*,
    255 A.D.2d 729, 680 N.Y.S.2d 721 (3d Dep't 1998) ..............................................................8

*Immuno A.G. v. Moor-Jankowski*,
    145 A.D..2d 114, 128, 537 N.Y.S.2d 129, 137 (1st Dep't)
    *aff'd,* 74 N.Y. 2d 548 (1989),
    *vacated,* 497 U.S. 1021 (1990),
    *aff'd,* 77 N.Y.2d 235 (1991),
    *cert denied,* 500 U.S. 954 (1991) ..........................................................................................5

*Jones Lang Wootton USA v. LeBoeuf, Lamb, Greene & MacRae*,
    243 A.D.2d 168, 674 N.Y.S.2d 280 (1st Dep't 1998) ...........................................................13

*Karaduman v. Newsday Inc.*,
    51 N.Y.2d 531, 435 N.Y.S.2d 556 (1980) ...............................................................................5

*Lee v Brooklyn Union Publ. Co.*,
    209 N.Y. 245 (N.Y. 1913) .......................................................................................................6

*Love v. William Morrow & Co., Inc.*,
    193 A.D.2d 586, 587 N.Y.S.2d 424 (2d Dep't 1993) ............................................................10

*Martin v. Beigel*,
    15 Med. L. Rptr. 2261 (Sup. Ct. Columbia Cnty. 1988) .........................................................8

*Nassau Diagnostic Imaging & Radiation Oncology Assocs. v. Winthrop-Univ. Hosp.*,
    197 A.D.2d 563, 602 N.Y.S.2d 650 (2d Dep't 1993) ............................................................13

*Palmieri v. Thomas*,
    29 A.D.3d 658, 814 N.Y.S.2d 717 (2d Dep't 2006) ................................................................7

*White Plains Coat & Apron Co. v. Cintas Corp.*,
    8 N.Y.3d 422, 835 N.Y.S.2d 530 (2007) ...............................................................................12


**STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

17 U.S.C. § 512(i) ...............................................................................................15, 16, 17

17 U.S.C. § 512(c) ..................................................................................................... passim

DWT 20479078v2 0025295-000064

17 U.S.C. § 512(k) ...................................................................................................15

Fed. R. Civ. P. 12(b)(6) ..........................................................................................5, 6

Fed. R. Civ. P. 12(c) ...............................................................................................1, 5

N.Y. Civ. Rights L. § 74 ................................................................................... passim

DWT 20479078v2 0025295-000064

Plaintiff and Counterclaim-Defendant The Associated Press ("AP") submits this memorandum of law in support of its motion for judgment on the pleadings as to the counterclaims for libel, tortious interference, and declaratory judgment of safe harbor under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c), brought by Defendants and Counterclaim-Plaintiffs Meltwater U.S. Holdings, Inc., Meltwater News U.S., Inc., and Meltwater News US1, Inc. (collectively "Meltwater") pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The Associated Press, known worldwide for the quality and breadth of its news reporting, brought this action asserting copyright infringement and related claims against Meltwater. Meltwater is a subscriber only, commercial entity that scrapes news articles from the Internet and systematically delivers to paying customers substantial verbatim excerpts from those articles, including countless AP articles.  On the same day it commenced the action, AP issued a press release that announced and succinctly summarized its filed complaint.

Based on nothing more than this routine press release, Meltwater brings counterclaims against AP for libel and tortious interference with contracts.  However, the press release is a classic example of a fair and true report of a judicial proceeding and, as such, is absolutely privileged under Section 74 of New York's Civil Rights Law. Indeed, each challenged statement from the press release is either a verbatim quote from AP's filed complaint or is substantially similar to the complaint.  The libel claim is transparently without merit and must be dismissed. (*See* Point I).

Meltwater's tag-along and duplicative interference claim likewise must be dismissed. Meltwater fails to allege – nor could it – that AP's sole purpose in issuing a press release was to interfere with actual or prospective Meltwater contracts.  Indeed, Meltwater does not even allege

– as required – any actual contracts that were supposedly lost because of AP's press release.  For these independent reasons, Meltwater's interference claims are without merit.  (*See* Point II).

Finally, after this action was commenced, Meltwater belatedly put in place certain actions in an unfounded effort to fold itself into the safe harbor provisions afforded under the Digital Millennium Copyright Act.  Yet, Meltwater is not a "service provider" as defined in the Act. Indeed, the DMCA was never intended to reach and insulate an entity like Meltwater where the infringing acts at issue are exclusively in a closed system, not available for monitoring by AP, or any other news organization.  Meltwater's ill-conceived attempt to stretch the reach of the DMCA to its actions should be rejected.  (*See* Point III).

## FACTUAL BACKGROUND

### A.     The Parties

Meltwater, which describes itself as "an alternative to a traditional clipping service," began offering subscriptions to its Meltwater News product in 2005.  *See* Defendants' Amended Answer ("Ans.") ¶ 42; Defendants' Counterclaims ("Countercl.") ¶ 21.[1]  Meltwater provides its customers with the verbatim text of news articles, including articles created by AP.  Ans. ¶ 60; Countercl. ¶ 39.

AP was founded in 1846 and is one of the oldest and most highly regarded news organizations in the world.  Compl. ¶ 4.[2]  AP's mission, as a not-for-profit news cooperative, is to provide fast, accurate, reliable, clear, and unbiased news reports as news breaks around the globe.  *Id.*

---

[1] A true and correct copy of Meltwater's Amended Answer and Counterclaims, Dkt. No. 35 (excluding exhibits), is annexed as Exhibit A to the November 9, 2012 Declaration of Elizabeth A. McNamara, submitted herewith.

[2] A true and correct copy of AP's initial Complaint, Dkt. No. 1 (excluding exhibits), is annexed to the McNamara Decl. as Exhibit B.

2

**B.**   **AP's Lawsuit and Press Release**

On February 14, 2012, AP filed a complaint against Meltwater in this Court asserting claims for direct, contributory, and vicarious copyright infringement, declaratory judgment, hot-news misappropriation, and removal or alteration of copyright management information. Countercl. ¶ 88; Compl. ¶¶ 92-145.  That same day, AP also issued a press release regarding its lawsuit (the "Press Release").  Countercl. ¶ 107.  A true and correct copy of the Press Release is annexed to the McNamara Decl. as Ex. A.[3]

The Press Release was titled "AP files lawsuit against Meltwater News" and contained only eleven short paragraphs.  It was a public announcement and brief description of the action filed that same day.  The Press Release contains no less than seven separate references to the "suit" or "lawsuit," including specifically attributing certain content to the Complaint ("As AP's complaint alleges"; "Further, the complaint alleges").  Finally, the Press Release included a brief description of the Associated Press, noting that it is a "global news network, delivering fast, unbiased news from every corner of the world to all media platforms and formats…. On any given day, more than half the world's population sees news from AP."

**C.**   **Meltwater's Counterclaims**

In its August 8, 2012 Counterclaims, Meltwater brought two counterclaims, one for libel, and one for tortious interference with contract and business relations, arising from certain statements in the Press Release.  Countercl. ¶¶ 155-69.  Specifically, Meltwater claimed that the following six statements from the Press Release were false:

- Meltwater "has a significant negative impact on the ability of AP to continue

---

[3] *See Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) ("[A] court may consider documents attached to the complaint as exhibits, or incorporated by reference, as well as any documents that are integral to, or explicitly referenced in, the pleading.") (citing *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991)).

DWT 20479078v2 0025295-000064

providing the high-quality news reports on which the public relies."  Countercl. ¶ 109 ("Statement 1").

- Meltwater "facilitates the incorporation of AP articles into customer newsletters to be further distributed" to third parties.  *Id.* ¶ 111 ("Statement 2").

- Meltwater "refuses to license the content that it delivers to its customers."  *Id.* ¶ 113 ('Statement 3").

- "Meltwater is a closed system sold only to subscribers for a fee, and not a means of expanding public access."  *Id.* ¶ 117 ("Statement 4").

- "Meltwater retains a vast archive of AP articles dating back to at least 2007."  *Id.* ¶ 119 ("Statement 5").

- "Meltwater actively facilitates the storage of those and other articles in customer archives on the Meltwater system."  *Id.* ¶ 119 ("Statement 6").

Without identifying a single customer or contract that was lost because of these Statements, Meltwater asserts that the Statements caused "substantial damage" and "lost profits from existing and future business relationships."  Countercl. § 162, 170.

Finally, Meltwater alleges that after AP filed its complaint, Meltwater designated and registered with the U.S. Copyright Office an agent to receive notifications of alleged copyright infringement under section 512(c) of the DMCA.  Countercl. ¶ 138.  Meltwater further alleges that despite a direct contractual relationship with each of its customers, it "does not have the right or ability to control its customers' use of the Archive tool to allegedly store full text versions of AP articles."  *Id.* ¶ 150.  Based on these allegations, Meltwater seeks a declaratory judgment "that it is protected by the [DMCA] safe-harbor provision that applies to 'Information Residing on Systems or Networks At Direction of Users (17 U.S.C. § 512(c))."  Countercl. ¶¶ 135-54.[4]

---

[4] Meltwater also sought a "declaration that neither Meltwater, nor its customers, has infringed any valid copyright owned by AP in any of the Articles in Suit."  Countercl. ¶ 133.  That issue is addressed in AP's motion for summary judgment, submitted concurrently with this motion.

DWT 20479078v2 0025295-000064

**ARGUMENT**

## I.    RELEVANT STANDARD

The standard for Rule 12(c) motions for judgment on the pleadings is the same as that for motions to dismiss under Rule 12(b)(6). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). Accordingly, to survive a motion for judgment on the pleadings, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*, at 1950. When a plaintiff has "not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The New York Court of Appeals has repeatedly recognized that early adjudication of defamation claims is necessary to protect freedom of speech from the chilling effect of unwarranted claims. "To unnecessarily delay the disposition of a libel action is not only to countenance waste and inefficiency but to enhance the value of such actions as instruments of harassment and coercion inimical to the exercise of First Amendment rights." *Immuno A.G. v. Moor-Jankowski*, 145 A.D..2d 114, 128, 537 N.Y.S.2d 129, 137 (1st Dep't) *aff'd*, 74 N.Y. 2d 548 (1989), *vacated*, 497 U.S. 1021 (1990), *aff'd*, 77 N.Y.2d 235 (1991), *cert denied*, 500 U.S. 954 (1991). *See also*, *Karaduman v. Newsday Inc*., 51 N.Y.2d 531, 545, 549, 435 N.Y.S.2d 556, 563, 565-66 (1980) (early adjudication of libel claims should be encouraged in order to protect the "free flow of information" under the First Amendment and to avoid the chilling effect of unwarranted claims on the right to free expression.)

## II.   MELTWATER'S COUNTERCLAIM FOR LIBEL SHOULD BE DISMISSED BECAUSE THE PRESS RELEASE IS A FAIR AND TRUE REPORT OF A JUDICIAL PROCEEDING

### A.   Privilege Under Section 74 of the New York Civil Rights Law

Meltwater cannot state a claim for libel based on any of the statements that it selected from AP's Press Release because the Press Release—which summarized and quoted from AP's complaint—is privileged under Section 74 of the New York Civil Rights Law as a fair and true report of a judicial proceeding.

Under the law of New York State,

> A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding.

New York Civil Rights Law § 74 ("Section 74").  The privilege granted by Section 74 is absolute and unqualified as long as "the substance of the article [is] substantiatively accurate." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co*., 49 N.Y.2d 63, 67, 424 N.Y.S. 2d. 165, 167 (1979).  The purpose of the privilege is "to serve the public interest 'in having proceedings of courts of justice public, not secret.'" *Gurda v. Orange County Publs. Div*., 81 A.D.2d 120, 131, 439 N.Y.S.2d 417, 424 (2d Dep't 1981), *rev'd on concurring and dissenting op'n below,* 56 N.Y.2d 705 (1982) (quoting *Lee v Brooklyn Union Publ. Co*., 209 N.Y. 245, 248 (N.Y. 1913)).

Whether a statement is privileged under Section 74 is a threshold question of law that a court may determine at the pleading stage. Indeed, courts have routinely granted motions to dismiss on Section 74 grounds.  *See, e.g.*, *Seymour v. The Lakeville Journal Co. LLC*, 150 Fed. Appx. 103, 105 (2d Cir. 2005) (affirming Rule 12(b)(6) dismissal of libel action on Section 74 grounds); *Southridge Capital Mgt., LLC v. Lowry*, No. 01 Civ. 4880 RO, 2003 WL 68041, at *2 (S.D.N.Y. Jan. 7, 2003) (dismissing on Section 74 grounds Defendants' defamation counterclaim

arising from Plaintiff's press release describing a pending judicial proceeding); *Palmieri v. Thomas*, 29 A.D.3d 658, 659, 814 N.Y.S.2d 717, 718 (2d Dep't 2006) (affirming dismissal of complaint involving statements about judicial proceedings imposing penal sanctions on plaintiff).

New York law is clear that the standard for whether a report is "fair and true" is a liberal one.  As the New York State Court of Appeals has stated, "[f]or a report to be characterized as 'fair and true' within the meaning of the statute, thus immunizing its publisher from a civil suit sounding in libel, it is enough that the substance of the article be substantially accurate." *Holy Spirit Ass'n*, 49 N.Y.2d at 67, 424 N.Y.S.2d at 167.  The Court further stated that "the exact words of every proceeding need not be given if the substance be substantially stated." *Id.*  Not every statement in a "fair and true report" of a complaint must match an allegation in that complaint.  The individual statements must be considered in light of the "totality of the circumstances" presented in the complaint; as a result, where a statement is related to the conduct alleged in the complaint, it still falls within the privilege even if that particular statement does not refer to a specific allegation. *Ford v. Levinson*, 90 A.D.2d 464, 465, 454 N.Y.S.2d 846, 847-48 (1st Dep't 1982) (statements attributed to defendant describing previous action were privileged as a fair and true report under Section 74, even where one of the statements did not "clearly and directly fall within any of the allegations of the complaint" and instead provided "background to the misconduct" alleged in the complaint).

It is likewise well-established that Section 74's protection is not limited to reports by disinterested third parties; it also includes reports by parties to the litigation.  *Branca v. Mayesh*, 101 A.D.2d 872, 873, 476 N.Y.S.2d 187, 189 (2d Dep't 1984) (fair and true report of proceeding under § 74 may be published by "any person, including those connected with the suit" (internal

marks omitted)), *aff'd*, 63 N.Y.2d 994, 483 N.Y.S.2d 1011 (1984).  As a result, courts have

repeatedly found that a litigant's press release or other document describing the allegations in its

lawsuit is protected as a fair and true report under Section 74.  *See, e.g., Southridge Capital*,

2003 WL 68041, at *2 (granting motion to dismiss on Section 74 grounds because "Southridge's

press release of February 26 of what the agreement provided and that the motion was pending,

was literally true"); *Karp v. Hill & Knowlton, Inc.*, 631 F. Supp. 360, 363-64 (S.D.N.Y. 1986)

("fair and true" characterizations of litigant's complaint contained in press release by litigant's

public relations agency were absolutely privileged under Section 74); *Hughes Training Inc., Link

Div. v. Pegasus Real-Time Inc.*, 255 A.D.2d 729, 730, 680 N.Y.S.2d 721, 723 (3d Dep't 1998)

(memorandum posted by employer on its bulletin boards describing its lawsuit against former

employees privileged as a "fair and true" report under Section 74); *Martin v. Beigel*, 15 Med. L.

Rptr. 2261, 2263 (Sup. Ct. Columbia Cnty. 1988) (press release and statements to press

characterizing and describing complaint filed in federal court were absolutely privileged under

Section 74).

Each of the challenged statements from the Press Release derive directly from the

allegations in AP's Complaint and are absolutely privileged under New York's Civil Rights Law.

### B.     The Complained-Of Statements In The Press Release Are Absolutely Privileged

Each of the six statements identified by Meltwater in its counterclaim for libel is a

substantially accurate description – and sometimes a verbatim quote – of allegations in AP's filed

complaint.  As a result, none of these statements can support a claim for libel as they are

absolutely privileged under Section 74.  .

8

### 1.    Statement 1

Statement 1, that Meltwater "has a significant negative impact on the ability of AP to continue providing the high-quality news reports on which the public relies," comes directly from the allegations in AP's Complaint and is privileged.  *See, e.g.*, Compl. ¶ 40 ("Meltwater's infringing collection and distribution of AP content from AP member sites directly impacts AP's ability to sell its news wire and industry alert services to potential customers.  AP has lost, and continues to lose, customers to Meltwater over the past several years. . . . The loss of revenue from these licensees and potential licensees has had, and will continue to have, a direct and negative impact on AP's ability to continue its mission to provide its members, subscribers, and licensees – and thereby the public – with accurate, high-quality and timely news reports from around the world.").  *See also, e.g.*, Compl. ¶¶ 12, 89, 132-33.

### 2.    Statement 2

Statement 2, that Meltwater "facilitates the incorporation of AP articles into customer newsletters to be further distributed" to third parties, is also privileged.  The full sentence from the Press Release makes this absolutely clear: "*As AP's complaint alleges*, Meltwater also offers its customers the ability to store these excerpts, as well as full-text articles, in a customer archive housed on Meltwater's server and facilitates the incorporation of AP articles into customer newsletters to be further distributed."  *See,* Exhibit A at 1 (emphasis added).  And, as indicated in the release, Statement 2 comes directly from AP's Complaint.  *See also* Compl. ¶ 9 ("Meltwater News customers can also incorporate the infringing content – including the full text of AP articles – into a branded newsletter through the Meltwater News platform.  These newsletters are then stored on the Meltwater system for further dissemination to subscriber employees or third parties.  Meltwater facilitates the dissemination of such excerpts or entire articles . . . .");  Compl. ¶¶ 68-71.

9

### 3.    Statement 3

Statement 3, that Meltwater "refuses to license the content that it delivers to its customers," is privileged as well.  In the Press Release, this statement is included in a paragraph contrasting Meltwater to other news aggregators including Yahoo, Google and AOL, all of whom have licenses for AP content.  *See* Exhibit A at 1.  These statements are nearly identical to AP's Complaint, where AP alleges as follows: "In contrast to the practice of other news sources and news aggregators who deliver AP's news reports to the public, Meltwater does not license the content that it delivers to its subscribers."  Comp. ¶ 8.[5]

### 4.    Statement 4

Statement 4, that "Meltwater is a closed system sold only to subscribers for a fee, and not a means of expanding public access" is a verbatim recitation of an allegation in AP's complaint, which states: "Most notably, Meltwater is a closed system sold only to subscribers for a fee, and not a means of expanding public access."  Compl. ¶ 13; *see also* Compl. ¶¶ 58, 87.  Accordingly, this Statement is privileged as well.

### 5.    Statement 5

Statement 5, that "Meltwater retains a vast archive of AP articles dating back to at least 2007," is also a verbatim recitation of an allegation in AP's complaint, which states:  "It is also

---

[5] Indeed, Meltwater's challenge to this Statement is all the more bewildering because Meltwater has *conceded* that Statement 3 is substantially true.  *See Holy Spirit Ass'n*, 49 N.Y.2d at 67, 424 N.Y.S.2d at 167; *see also Love v. William Morrow & Co., Inc.*, 193 A.D.2d 586, 587, 587 N.Y.S.2d 424, 426 (2d Dep't 1993) (truth need not be established to an "extreme literal degree;" if the statement is substantially true, the defamation claim "must fail"); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) (where the "gist" or "sting" of a statement is accurate, "minor inaccuracies do not amount to falsity").  In its Answer, Meltwater admitted that it "has neither sought nor obtained a license for its use of AP Content."  Compl. ¶ 123, Ans. ¶ 123; *see also* Am Compl. (Dkt No. 30) ¶ 126, Am. Ans. (Dkt. No. 35) ¶ 126.  Meltwater further admitted that it does not enter into licenses for content that it scrapes from publicly available websites.  Counterclaim ¶ 34.  Whether Meltwater "does not license" AP content, has "neither sought nor obtained a license" for AP content, or "refuses" to license AP content, the result is the same: the statement is not actionable under New York law.

10

evident that Meltwater retains a vast archive of AP articles dating back to at least 2007, many of which are no longer publicly available on the Internet."  Compl. ¶ 13.  *See also, e.g.*, Compl. ¶ 59.  Thus, this Statement is privileged.

### 6.     Statement 6

Finally, Statement 6, that "Meltwater actively facilitates the storage of those and other articles in customer archives on the Meltwater system," is also privileged.  The paragraph in the Press Release containing Statement 6 begins "[f]urther, the complaint alleges . . . ," and, not surprisingly, the complaint itself contains this very allegation.  *See* Compl. ¶ 63 ("On information and belief, with the active assistance of Meltwater sales representatives, full copies of articles, including AP stories, are archived on service.meltwaternews.com."); Compl. ¶ 64 ("Indeed, Meltwater has purposefully designed its system to permit archiving of full text articles and both provides the means and materially assists in the copying and storage of full text articles.").

In sum, each of the challenged Statements from the Press Release is a substantially accurate or verbatim quote from allegations in AP's complaint.  Accordingly, the Statements are privileged under Section 74 of the New York Civil Rights Law, and Meltwater's counterclaim for libel must be dismissed.[6]

---

[6] While the Court need not reach this issue since it is so evident that the challenged statements are all absolutely privileged and the libel claim must be dismissed, the claim fails for the independent reason that – even if false – none of the challenged Statements are remotely defamatory.  A defamatory statement is one that "tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community." *Golub v. Enquirer/Star Group, Inc.*, 89 N.Y.2d 1074, 1076, 659 N.Y.S.2d 836, 837 (1997) (internal quotation omitted). Whether particular words are capable of a defamatory meaning is a question of law for the court to decide. *Id.*

Here, none of the statements meet this threshold.  They simply describe Meltwater's operations—a far cry from exposing Meltwater to "hatred, contempt or aversion." *See, e.g.* Statement 2 (Meltwater "facilitates the incorporation of AP articles into customer newsletters to be further distributed"), Statement 4 ("Meltwater is a closed system sold only to subscribers for a fee, and not a means of expanding public access.").

11

**III.    MELTWATER'S COUNTERCLAIM FOR TORTIOUS INTERFERENCE
SHOULD BE DISMISSED**

Meltwater's counterclaim for "tortious interference" based on AP's dissemination of its

Press Release is similarly meritless.  Meltwater did not—and cannot—allege the required

elements of tortious interference with either existing or prospective business relations under New

York law.

To state a claim for tortious interference with an existing contract, a plaintiff must allege

facts satisfying four elements: (1) the existence of a contract between plaintiff and a third party;

(2) defendant's knowledge of the contract; (3) defendant's intentional and improper procuring of

a breach; and (4) damages resulting therefrom. *White Plains Coat & Apron Co. v. Cintas Corp.*,

8 N.Y.3d 422, 426, 835 N.Y.S.2d 530, 532 (2007); *Foster v. Churchill*, 87 N.Y.2d 744, 749-50,

642 N.Y.S.2d 583, 586 (1996); *Am. Preferred Prescription, Inc. v. Health Mgmt., Inc.*, 252

A.D.2d 414, 417, 678 N.Y.S.2d 1, 4 (1st Dep't 1998).

To state a claim for intentional interference with business relations, a plaintiff must show

that (1) the plaintiff had a business relationship with a third party; (2) the defendant knew of that

relationship and intentionally interfered with it; (3) defendant acted solely out of malice or used

improper or illegal means that amounted to a crime or independent tort; and (4) defendant's

interference caused injury to the relationship with the third party. *Amaranth LLC v. J.P. Morgan

Chase & Co.*, 71 A.D.3d 40, 47, 888 N.Y.S.2d 489, 494 (1st Dep't 2009) (citing *Carvel Corp. v.

Noonan*, 3 N.Y.3d 182, 189, 785 N.Y.S.2d 359, 361-62 (2004)) (emphasis added).

Meltwater has not alleged any existing contract that was breached, and even if it did

make such an allegation, it has not and could not possibly allege that AP's Press Release was the

sole, "but-for" cause of any such breach.  *See D'Andrea v. Rafla-Demetrious*, 146 F.3d 64, 66

(2d Cir. 1998) (actual breach of contract required for tortious interference claim under New York

law); *Burrowes v. Combs*, 25 A.D.3d 370, 373, 808 N.Y.S.2d 50, 53 (1st Dep't 2006) (to support

a claim for tortious interference, plaintiff must allege that contract would not have been breached

"but for" defendant's conduct); *Jones Lang Wootton USA v. LeBoeuf, Lamb, Greene & MacRae*,

243 A.D.2d 168, 183, 674 N.Y.S.2d 280, 290  (1st Dep't 1998) (dismissing claims for

defamation and tortious interference based on remarks made during settlement negotiations;

statements were privileged under New York law, and plaintiffs failed to demonstrate that these

remarks were the cause of any breached contracts).

      Similarly, Meltwater did not—and cannot—allege that the "sole purpose" of AP's Press

Release was to harm Meltwater or that it was otherwise "unlawful or improper."  *Nassau*

*Diagnostic Imaging & Radiation Oncology Assocs. v. Winthrop-Univ. Hosp.*, 197 A.D.2d 563,

563-64, 602 N.Y.S.2d 650, 651 (2d Dep't 1993); *Guard-Life Corp. v. S. Parker Hardware Mfg.*

*Corp.*, 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 632 (1980).  As set forth above, AP's Press

Release is a fair and true report of its lengthy complaint in its lawsuit against Meltwater for

copyright infringement and other claims, and is therefore privileged under Section 74 of New

York's Civil Rights Law.  The Press Release transparently was issued to inform the public that

"AP files suit against Meltwater News" – a perfectly legitimate reason, that is not remotely

"unlawful or improper."

      For the Press Release to be considered somehow "unlawful or improper," AP's

underlying suit against Meltwater would need to be entirely frivolous and filed as a pretext for

gathering press.  Nothing could be further from the truth.  *See 10 Ellicott Square Court Corp. v.*

*Violet Realty, Inc.*, 81 A.D.3d 1366, 1367, 916 N.Y.S.2d 705, 707 (4th Dep't 2011) (for a

tortious interference claim, "civil suits and threats thereof constitute 'improper means' only if

such tactics are frivolous"), *lv. denied*, 17 N.Y.3d 704, 929 N.Y.S.2d 95 (2011).  As a result,

DWT 20479078v2 0025295-000064

Meltwater cannot meet the stringent pleading requirements for claims of tortious interference under New York law.

It is clear that Meltwater's tortious interference claim—based on the same Press Release that is the subject of its libel claim—is merely an attempt to plead around a defective claim for libel based on speech that is privileged under New York law.  Courts routinely recognize these types of claims as attempted end-runs around the protections afforded to speech.  As a result, courts do not hesitate to dismiss tortious interference and other tort claims as duplicative where, as here, they are based on the same facts as a defamation claim.  *See, e.g.*, *Chao v. Mt. Sinai Hosp.*, No. 10 Civ. 2869 (HB), 2010 WL 5222118, at *11 (S.D.N.Y. Dec. 17, 2010) (dismissing claims for tortious interference and other torts as duplicative of defamation claim; "[w]here tort claims essentially restate a defamation claim that has been dismissed . . . the tort claims must also be dismissed"), *aff'd*, 476 Fed. Appx. 892 (2d Cir. 2012), *cert. denied*, 81 U.S.L.W. 3175 (2012); *Krepps v. Reiner*, 588 F. Supp. 2d 471, 485 (S.D.N.Y. 2008) ("Plaintiff is not permitted to dress up a defamation claim as a claim for intentional interference with a prospective economic advantage."), *aff'd*, 377 Fed. Appx. 65 (2d Cir. 2010).

For these several and independent reasons, Meltwater's interference claim must be dismissed.

**IV.   MELTWATER'S COUNTERCLAIM FOR DECLARATORY JUDGMENT OF SAFE HARBOR UNDER DMCA § 512(c) SHOULD BE DISMISSED BECAUSE MELTWATER DOES NOT QUALIFY AS A "SERVICE PROVIDER"**

Finally, Meltwater's claim for declaratory judgment under the safe harbor provision of DMCA § 512(c) should also be dismissed because it does not qualify as a "service provider" within the meaning of the statute.

**A.     The DMCA's Safe Harbor Provision**

"The DMCA was enacted in 1998 to implement the World Intellectual Property

Organization Copyright Treaty and to update domestic copyright law for the digital age."

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 26-27 (2d Cir. 2012) (internal marks and

citations omitted).  Of relevance here, § 512(c) of the DMCA protects service providers from

liability for copyright infringement "by reason of the storage at the direction of a user of material

that resides on a system or network controlled or operated by or for the service provider," so long

as the service provider satisfies both the specific requirements of § 512(c) and the general

requirements set by other provisions of § 512 and applicable to all of its safe harbors.  In sum, a

party must meet all of the following requirements:

> 1.  It must be a service provider, as defined in § 512(k)(1)(B);
>
> 2.  It must store material on its system at the direction of a user, § 512(c);
>
> 3.  It must (a) not have actual knowledge of the allegedly infringing materials on its site; (b) not be aware of facts or circumstances from which infringing activity was apparent; and (c) remove or disable access to the allegedly infringing material "expeditiously" when notified, §§ 512(c)(1)(A); 512(c)(1)(C);
>
> 4.  It must not receive a "financial benefit directly attributable to the infringing activity," where it has the right and ability to control such activity," § 512(c)(1)(B); and
>
> 5.  It must satisfy the technical requirements of the statute: (a) designate an agent to receive statutorily-compliant notifications of infringement, § 512(c)(2), § 512(c)(3); (b) adopt and reasonably implement a policy to terminate repeat infringers, § 512(i)(1)(A); and (c) not interfere with "standard technical measures" that are "used by copyright owners to identify or protect copyrighted works." § 512(i)(1)(B); § 512(i)(2).[7]

---

[7] Were this claim to proceed – which it should not – discovery would ultimately show that Meltwater could not possibly establish that it does not have the right or ability to control how its customers archive AP and other news content.  Not only does Meltwater have a direct contractual relationship with every customer, but technology could readily be deployed to prevent the infringements at issue.  Further, the evidence will show that Meltwater representatives actively encourage the challenged behavior.  Finally, evidence will show that Meltwater representatives had actual knowledge of infringing actions and that it directly profits from the actions.

DWT 20479078v2 0025295-000064

**B.    Meltwater Is Not Eligible For The DMCA Safe Harbor Provision Under § 512(c)**

Here, Meltwater does not qualify for the safe harbor provision of § 512(c).  As an initial matter, Meltwater admits in its Counterclaims that it did not designate an agent to receive notifications of infringement until March 26, 2012—over a month after AP filed its initial complaint.  Countercl. ¶ 66.  Accordingly, Meltwater may not claim protection for any infringement arising from materials stored on its system by any Meltwater user prior to that date.

More importantly, the DMCA Safe Harbor Provisions have no logical application to Meltwater's closed, subscriber-only system.  At the heart of the DMCA is the ability of copyright owners to provide take-down notices to service providers when they become aware that infringing material has been posted on a site available to the public. Yet, here, Meltwater admits that information stored in its customer's archive, including "any text the user has chosen to enter," is "stored on Meltwater's system in private folders that can be viewed only by someone logged into that customer's Meltwater news account."  Countercl. ¶¶ 43-44.  In other words, Meltwater prevents anyone but its customers to view what content has been stored on Meltwater's system.  In short, Meltwater does not qualify for the safe harbor provision of § 512(c) because it does not satisfy one of the conditions for eligibility set forth in § 512(i):  the requirement that it not interfere in standard technical measures used by copyright owners to identify or protect copyrighted works.  *See* § 512(i)(1)(B); § 512(i)(2).

By preventing any third party from viewing the information stored on an individual customer's account, Meltwater has undoubtedly interfered with the most basic measure used by copyright owners to identify copyrighted works—the ability to view the allegedly infringing content in the first place.  Accordingly, there is no way any copyright owner—including AP— would be able to identify what works Meltwater's customers have impermissibly copied or

where they are located.  Meltwater's system therefore prevents those owners from issuing a notice of infringement that includes "[i]dentification of the material that is claimed to be infringing . . . and information reasonably sufficient to permit the service provider to locate the material," as required by § 512(c)(3)(iii).

The United States District Court for the Northern District of Illinois addressed a similar situation involving the implementation of a policy to terminate repeat infringers, as required by § 512(i)(1)(A), in *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003).  In that case, defendants' file sharing service, Aimster, enabled users to transfer copyrighted works residing on their individual hard drives.  252 F. Supp. 2d at 640.  Aimster's encryption protocol, however, made it "impossible to ascertain which users are transferring which files."  *Id.* at 659.  Thus, while Aimster had adopted a repeat infringer policy, it was impossible to implement.  *Id.*  The court therefore ruled that Aimster was not entitled to the DMCA safe harbor.  In so holding, the court noted that "[a]dopting a repeat infringer policy and then purposely eviscerating any hope that such a policy could ever be carried out is not an 'implementation' as required by § 512(i)."  *Id.*

The logic of *Aimster* applies in this case as well.  Allowing Meltwater to take shelter in the § 512(c) safe harbor would produce a perverse result, encouraging service providers to create closed systems that prevent copyright owners from locating and identifying misappropriated works, thereby permitting service providers to evade liability by preventing owners from issuing notices compliant with § 512(c)(3)(iii).  This cannot be the result Congress intended.  As Judge Pauley observed in holding that the DMCA does not apply to claims of trademark infringement:

> In passing the DMCA, Congress explained that the purpose of Section 512 was to "preserve strong incentives for *service providers and copyright owners to cooperate* to detect and deal with copyright infringements that take place in the digital networked environment."

*Twelve Inches Around Corp. v. Cisco Sys., Inc.*, No. 08 Civ. 6896 (WHP), 2009 WL 928077, at

*4 (S.D.N.Y. Mar. 12, 2009) (emphasis added) (quoting H.R. Rep. 105-551, pt.2, at 49 (1998);

*see also Rossi v. Motion Picture Ass'n. of Am., Inc.*, 391 F.3d 1000, 1003 (9th Cir. 2004) ("Title

II of the DMCA contains a number of measures designed to enlist the *cooperation of Internet*

*and other online service providers* to combat ongoing copyright infringement.") (emphasis

added); *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001)

(recognizing the DMCA's goal of "preserving the strong incentives for service providers and

copyright owners to *cooperate to detect and deal with copyright infringements* that take place in

the digital networked environment") (internal marks omitted, emphasis added).  Meltwater's

closed system actively discourages the cooperation Congress intended, and this Court should not

allow Meltwater to hide behind the § 512(c) safe harbor.

18

## CONCLUSION

For the reasons set forth above, plaintiff The Associated Press respectfully requests that

the Court grant its motion for judgment on the pleadings and dismiss Meltwater's Counterclaims

for libel, tortious interference, and declaratory judgment of safe harbor under DMCA § 512(c) in

their entirety with prejudice, together with costs, attorneys' fees, and such other relief as the

Court deems appropriate.

Dated:  New York, New York
   November 9, 2012

              Respectfully submitted,

              DAVIS WRIGHT TREMAINE LLP

              By:  s/ Elizabeth A. McNamara
                 Elizabeth A. McNamara
                 Linda Steinman
                 Alison B. Schary
                 Collin J. Peng-Sue

              1633 Broadway – 27th Floor
              New York, New York 10019
              Telephone:  (212) 489-8230
              Facsimile:  (212) 489-8340

              *Attorneys for Plaintiff The Associated Press*

19