DAVID H. KRAMER (admitted *pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300

TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7700

*Attorneys for the Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE ASSOCIATED PRESS,<br><br>Plaintiff,<br><br>v.<br><br>MELTWATER U.S. HOLDINGS, INC.; MELTWATER NEWS U.S., INC.; and MELTWATER NEWS U.S. 1, INC.,<br><br>Defendants. | CASE NO.: 2:12-CV-01087-DLC-FM<br>ECF CASE |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 3

LEGAL STANDARD ..... 4

ARGUMENT ..... 5

I. MELTWATER IS ENTITLED TO JUDGMENT ON THE PLEADINGS ON AP'S HOT-NEWS MISAPPROPRIATION CLAIM ..... 5

A. AP's Hot-News Misappropriation Claim Fails Because AP Does Not Allege That Meltwater Passes Off AP's News Articles As Its Own ..... 7

B. AP's Hot-News Misappropriation Claim Fails Because It Is Based On Material Already Published And Made Freely Available On The Internet ..... 9

C. AP's Hot-News Misappropriation Claim Is Preempted Because It Is Based On Meltwater's Alleged Use Of AP's Literary Expression ..... 12

II. MELTWATER IS ENTITLED TO JUDGMENT ON THE PLEADINGS ON AP'S COPYRIGHT MANAGEMENT INFORMATION CLAIM ..... 15

A. AP Fails To State A Claim Under § 1202(b)(1) ..... 16

1. Section 1202(b)(1) does not allow secondary liability claims ..... 16

2. AP makes no plausible allegation of inducement ..... 18

B. AP Fails To State A Claim Under § 1202(b)(3) ..... 19

1. AP does not plausibly allege that Meltwater actually distributed any AP article from which CMI was actually removed or altered ..... 20

2. AP fails to plausibly allege that Meltwater acted knowing that CMI had been removed or altered without AP's authority ..... 21

C. AP Fails to Plausibly Allege That Meltwater Knew Its Alleged Actions Would Induce, Enable, Facilitate Or Conceal Infringement ..... 22

CONCLUSION ..... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... passim

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
650 F.3d 876 (2d Cir. 2011) ... passim

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ... 4, 22, 23

*Briarpatch Ltd. v. Phoenix Pictures, Inc.*,
373 F.3d 296 (2d Cir. 2004) ... 5, 14

*Cable v. Agence France Presse*,
728 F. Supp. 2d 977 (N.D. Ill. 2010) ... 16

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ... 17

*Doe v. GTE Corp.*,
347 F.3d 655 (7th Cir. 2003) ... 17

*Faulkner v. Nat'l Geographic Enters. Inc.*,
409 F.3d 26 (2d Cir. 2005) ... 19

*Faulkner Press, LLC v. Class Notes, LLC*,
756 F. Supp. 2d 1352 (N.D. Fla. 2010) ... 19, 22

*Financial Information, Inc. v. Moody's Investors Serv., Inc.*,
808 F.2d 204 (2d Cir. 1986) ... passim

*Flava Works, Inc. v. Gunter*,
No. 10 C 6517, 2011 WL 1791557 (N.D. Ill. May 10, 2011) ... 18

*Freeman v. DirecTV, Inc.*,
457 F.3d 1001 (9th Cir. 2006) ... 17

*Goodman v. Merrill Lynch & Co.*,
716 F. Supp. 2d 253 (S.D.N.Y. 2010) ... 4

*Hayden v. Paterson*,
594 F.3d 150 (2d Cir. 2010) ... 4

*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*,
955 F. Supp. 248 (S.D.N.Y. 1997)....................17

*In re Dow Jones & Co.*,
842 F.2d 603 (2d Cir. 1988)....................12

*International News Service v. The Associated Press*,
248 U.S. 215 (1918).................... passim

*IQ Group, Ltd. v. Wiesner Publ'g, LLC*,
409 F. Supp. 2d 587 (D.N.J. 2006)....................16

*Keogh v. Big Lots Corp*.,
No. 3:04-00738, 2006 WL 1129375 (M.D. Tenn. Apr. 27, 2006)....................21

*Mastafa v. Chevron Corp*.,
759 F. Supp. 2d 297 (S.D.N.Y. 2010)....................17

*McClatchey v. The Associated Press*,
No. 3:05-cv-145, 2007 WL 776103 (W.D. Pa. Mar. 9, 2007)....................16

*MGM Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)....................19

*Morris v. Schroder Capital Mgmt. Int'l*,
445 F.3d 525 (2d Cir. 2006)....................4

*NBA v. Motorola, Inc*.,
105 F.3d 841 (2d Cir. 1997).................... passim

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979)....................12

**Statutes**

17 U.S.C. § 102(a)....................13

17 U.S.C. § 301....................5, 13

17 U.S.C. § 1202(b).................... passim

17 U.S.C. § 1202(c)....................15

**Rules**

FED. R. CIV. P. 8(a)(2)....................4

**Other Authorities**

H.R. REP. NO. 94-1476 (1976)....................13

Defendants Meltwater US Holdings Inc., Meltwater News US Inc., and Meltwater News US1 Inc. (collectively, "Meltwater") submit this memorandum of law in support of their motion for judgment on the pleadings as to the Fifth and Sixth Causes of Action in the Amended Complaint ("Am. Compl.") filed by Plaintiff The Associated Press ("AP").

## INTRODUCTION

Based on the pleadings alone, Meltwater is entitled to judgment on AP's claims for "hot-news misappropriation" under New York law and for removal of "copyright management information" ("CMI") under Section 1202(b) of the Digital Millennium Copyright Act ("DMCA") (17 U.S.C. § 1202(b)).

**Hot-News Misappropriation**. In *Barclays Capital Inc. v. Theflyonthewall.com, Inc*., 650 F.3d 876 (2d Cir. 2011), the Second Circuit held that state-law hot-news misappropriation claims are preempted by the federal Copyright Act except in the most limited circumstances. AP cannot plead around *Barclays*, or the other Second Circuit cases confining the hot-news doctrine to the narrow fact-pattern reflected in *International News Service v. The Associated Press*, 248 U.S. 215 (1918) ("*INS*"). Under those decisions, AP's claim is preempted for at least three separate reasons.

*First*, *Barclays* makes clear that a non-preempted hot-news claim requires free riding by the defendant—that is, "passing off" the plaintiff's information as though the defendant itself had gathered it. AP does not and cannot plead that here. To the contrary, AP acknowledges that Meltwater not only attributes the article snippets used in its search results to their original sources, but also includes hyperlinks that take users directly to the online location where the full articles are made available by their publishers. Because Meltwater does not try to pass off AP's articles or information as its own, as a matter of law it cannot be held liable for hot-news misappropriation.

*Second*, in contrast to *INS*, all the AP articles at issue in this case were published on the Internet and made available to the entire world (without charge) before Meltwater ever accessed them. The free and universal availability of those articles leaves no room for a hot-news

misappropriation claim. Under the Second Circuit's cases, a hot-news claim is potentially viable only where the defendant redistributed the information at issue *before* the plaintiff could finish disseminating it to its intended audience. That is not what Meltwater is alleged to have done. Allowing AP's claim to proceed under these circumstances would be contrary to the basic concept of hot-news misappropriation and would violate the First Amendment.

*Third*, AP's claim, by its terms, is based on Meltwater's purported misuse of AP's allegedly copyright-protected news stories, not the factual information contained in those stories. Indeed, the Amended Complaint disclaims any allegation that Meltwater is "extracting breaking facts from the AP or other news articles it distributes" and instead bases its claim on the contention that "Meltwater lifts and distributes the actual and fully protected, already published texts of the articles." Am. Compl. (Dkt. No. 30) ¶ 90. In enacting the 1976 Copyright Act, however, Congress made clear that this kind of a claim – one based on alleged misappropriation of "literary expression," rather than the "facts" constituting hot news – is preempted.

**Removal of CMI**. AP's attempt to plead a claim under § 1202(b) of the DMCA is likewise deficient in numerous respects. Section 1202(b)(1) only allows claims against those who themselves remove or alter "copyright management information," but AP does not allege that Meltwater did that. Further, even if the secondary liability theory that AP advances were viable, it still would fail because AP alleges no facts suggesting that Meltwater induced any of its customers to remove CMI or that any customer actually removed CMI from any AP article. Insofar as AP wants to proceed under § 1202(b)(3), which covers the knowing distribution of articles from which CMI has been removed, its claim fails both because AP makes no plausible allegation that Meltwater actually distributed any AP article from which CMI had been removed and because AP does not allege the actual knowledge that the statute requires. Finally, AP does not plead any facts supporting the allegation that Meltwater knew or should have known that its actions would induce, enable, facilitate, or conceal an infringement of AP's copyrights – an element of any § 1202(b) claim.

**BACKGROUND**

As part of its "Meltwater News" service, Meltwater operates a specialized news-related Internet search engine. Meltwater indexes news content that has been published on a wide variety of publicly available Internet sites and delivers information about those news items (including short snippets of responsive articles) in response to its customers' search queries. Am. Compl. (Dkt. No. 30) ¶¶ 47-49. At the time they were indexed by Meltwater and made available through the Meltwater News search engine, all of the AP articles at issue in this case had already been published on the Internet by AP and its licensees such that any member of the public could view those articles for free anywhere in the world. *Id*. ¶¶ 46, 90; *cf*. Meltwater Am. Counterclaim (Dkt. No. 35) ¶¶ 4-5, 30. When it delivers search results to its customers, Meltwater not only includes available information about the article's source (such as the name of the publisher), it provides a hyperlink that with the click of a button takes the customer to the webpage on which the article was published. Am. Compl. (Dkt. No. 30) ¶ 48; Meltwater Am. Counterclaim (Dkt. No. 35) ¶¶ 6-7. Meltwater thus does not deliver news content as if it were Meltwater's own work. Am. Compl. (Dkt. No. 30) ¶¶ 48, 52. Instead, it provides information about news items that others have published and informs customers about the origins and location of those items.

AP filed its Complaint on February 14, 2012 and an Amended Complaint on July 13, 2012. Dkt. Nos. 1, 30. The Amended Complaint asserts claims for copyright infringement, along with a claim for hot-news misappropriation under New York law and a claim for removal of CMI under § 1202(b) of the DMCA. Am. Compl. (Dkt. No. 30) ¶¶ 95-149. Meltwater filed its Answer and Counterclaims on April 6, 2012 and an Amended Answer and Counterclaims on August 8, 2012. Dkt. Nos. 13, 35. The parties conducted targeted discovery on AP's copyright infringement claims, but not on the hot-news misappropriation or CMI claims. Instead, the Court allowed Meltwater to file this motion for judgment on the pleadings on the hot-news and CMI claims at the same time as the parties file cross-motions for summary judgment on the infringement claims. Dkt. No. 29.

**LEGAL STANDARD**

The standard for a motion for judgment on the pleadings under Rule 12(c) is the same as the one applicable to a motion to dismiss under Rule 12(b)(6). *Morris v. Schroder Capital Mgmt. Int'l*, 445 F.3d 525, 529 (2d Cir. 2006); *see also, e.g.*, *Hayden v. Paterson*, 594 F.3d 150, 157 n.4 (2d Cir. 2010); *Goodman v. Merrill Lynch & Co.*, 716 F. Supp. 2d 253, 259-60 (S.D.N.Y. 2010). To survive such a motion "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. If "a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).

Moreover, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 (courts "not bound to accept as true a legal conclusion couched as a factual allegation") (citation omitted). A "formulaic recitation" of the elements of a claim is "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. The plaintiff must instead assert "well-pleaded factual allegations" that "plausibly give rise to an entitlement to relief." *Id*. at 679 (internal marks omitted). In short, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557). And "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id*. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

## ARGUMENT

### I. MELTWATER IS ENTITLED TO JUDGMENT ON THE PLEADINGS ON AP'S HOT-NEWS MISAPPROPRIATION CLAIM

The hot-news misappropriation doctrine originated in the Supreme Court's 1918 decision in *INS*, which allowed AP to pursue a misappropriation claim against a rival wire news service as a matter of federal common law. *INS*, 248 U.S. at 229-48; *NBA v. Motorola, Inc*., 105 F.3d 841, 851 (2d Cir. 1997). "*INS* itself is no longer good law," but the case "maintains a ghostly presence as a description of a tort theory." *Barclays*, 650 F.3d at 894.

Today, the viability of a state law hot-news misappropriation claim is significantly limited by the express preemption provision of the federal Copyright Act. *Barclays*, 650 F.3d at 896-98. When Congress overhauled the Copyright Act in 1976, it provided that any state-law cause of action that covered the same kinds of works and legal rights protected by the federal statute was preempted. 17 U.S.C. § 301. Section 301 preempts any state-law claim that (a) "seeks to vindicate 'legal or equitable rights that are equivalent' to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106"; and (b) relates to a work that is "within the type of works protected by the Copyright Act under Sections 102 and 103." *NBA*, 105 F.3d at 848. Only state law claims that are "qualitatively different from a copyright infringement claim" will survive preemption, and the Second Circuit takes a "restrictive view" on what extra elements will suffice. *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305-06 (2d Cir. 2004).

The Second Circuit has repeatedly "emphasized the 'narrowness' of the 'hot news' tort exception from preemption." *Barclays*, 650 F.3d at 896 (citing *NBA*, 105 F.3d at 843, 848, 85-52). Indeed, all three Second Circuit decisions addressing the hot-news misappropriation tort have found the claim preempted:

- *Financial Information, Inc. v. Moody's Investors Service, Inc*., 808 F.2d 204 (2d Cir. 1986) ("*FII*"), emphasized that "[t]he 'hot' news doctrine is concerned with the copying and publication of information gathered by another ***before*** he has been able to utilize his competitive edge." *Id*. at 209 (emphasis added). The Second Circuit held that the plaintiff

had not shown "the immediacy of distribution necessary to sustain a 'hot' news claim" where the information was days old by the time the defendant published it. *Id*.

- *NBA v. Motorola*, held that an "indispensible element of an *INS* 'hot-news' claim is free riding by a defendant on a plaintiff's product." 105 F.3d at 854. The court rejected the NBA's claim because there was no indication of any free riding. *Id*.

- In *Barclays*, the Second Circuit likewise found an absence of free riding. The court held that free riding in this context requires an effort by the defendant to pass off the information gathered by the plaintiff "as though the defendant itself had gathered it." 650 F.3d at 903. Because the defendant was not publishing the information as its own, but instead was attributing it to the plaintiffs, this essential element of a hot-news claim was missing. *Id*. at 903-05.

The court's cases also make clear that any potentially non-preempted hot-news misappropriation claim must hew closely to the facts of *INS*. *Barclays*, 650 F.3d at 894, 902-03, 905; *NBA*, 105 F.3d at 850-52 & n.7 ("*INS* has long been regarded with skepticism by many courts and scholars and often confined strictly to its facts.").

Here, three aspects of *INS* are especially significant, as they highlight the considerable difference between that case and this one. *First*, a crucial aspect of the misconduct in *INS* was that the defendant, in republishing AP's articles, was attempting to pass off those articles as its own, without giving credit to AP or indicating that AP was the source of the material. *INS*, 248 U.S. at 242. *Second*, the news content at issue in *INS* was appropriated and republished by the defendant before AP had finished distributing it to its subscribers and before many of its subscribers had the opportunity to publish it themselves. *Id*. at 238-39. *Third*, *INS* did not involve any claim of copyright infringement. The premise of the Supreme Court's decision was that the news matter at issue was not and could not be copyrighted. Thus, the only remedy that AP had for its wrongful republication was under the common law. *Id*. at 233-35.

None of those key elements of *INS* are present in this case: Meltwater is not attempting to pass off AP content as its own; the AP articles at issue were available for free to the whole world before Meltwater accessed them; and AP expressly claims that Meltwater's use of the articles at

issue – the same conduct that allegedly amounts to hot-news misappropriation – is also copyright infringement. As we now discuss, these three aspects of this case leave no room for AP's hot-news misappropriation claim, which as a matter of law is preempted by the Copyright Act.[1]

### A. AP's Hot-News Misappropriation Claim Fails Because AP Does Not Allege That Meltwater Passes Off AP's News Articles As Its Own

In *Barclays*, the Second Circuit held that a hot-news misappropriation claim is preempted where it does not involve "free riding"—that is, the defendant trying to pass off plaintiff's information as the defendant's own. In this case, AP does not and cannot allege that Meltwater ever tried to present AP's information as its own. To the contrary, AP acknowledges that Meltwater attributes the article snippets it delivers to their original sources. The lack of such passing off doomed the hot-news misappropriation claim in *Barclays*, and the same result is required here.

The plaintiffs in *Barclays* alleged that defendant's financial news aggregation service provided subscribers with time-sensitive information about plaintiffs' securities recommendations. *Barclays*, 650 F.3d at 880-83. In finding that claim preempted, the Second Circuit explained that an "indispensible element of an *INS* 'hot-news' claim is free riding by a defendant on a plaintiff's product." *Barclays*, 650 F.3d at 903 (quoting *NBA*, 105 F.3d at 854). The court made clear that "free riding" has a narrow meaning in this context. It does *not* refer to concepts such as "commercial immorality" (*NBA*, 105 F.3d at 851) or whether the defendant made "[u]nfair use of another's 'labor, skill, and money'" (*Barclays*, 650 F.3d at 903 (quoting *INS*, 248 U.S. at 239)). *Id*. at 895 (rejecting "the notion that 'hot-news' misappropriation cases based on the disapproval of the perceived unethical nature of a defendant's ostensibly piratical acts survive preemption").

---

[1] This motion addresses only those deficiencies that cause AP's hot-news misappropriation claim to fail as a matter of law at the pleading stage. Should AP's claim be allowed to proceed, discovery would show that the claim fails for a host of other reasons as well, including: (1) Meltwater is not a direct competitor in AP's primary market; (2) Meltwater's alleged use of AP's news items does not directly compete with AP's own services; and (3) Meltwater's news search engine does not pose a substantial threat to the very existence of AP's product or service. *See Barclays*, 650 F.3d at 898.

Instead, "free riding" for purposes of a hot-news misappropriation claim means that the defendant was "passing off" the plaintiff's information as its own. As the Second Circuit explained, the defendant in *INS* "was taking news gathered and in the process of dissemination by the Associated Press and selling that news ***as though the defendant itself had gathered it***." *Barclays*, 650 F.3d at 903 (emphasis added); *see also id.* at 905 ("[T]he *INS* Court's concern was tightly focused on the practices of the parties to the suit before it: news, data, and the like, gathered and disseminated by one organization as a significant part of its business, taken by another entity and ***published as the latter's own*** in competition with the former.") (emphasis added).[2] Based on this, the court in *Barclays* held that the defendant (Flyonthewall) was not free riding because it was not passing off the plaintiffs' recommendations "as its own." Flyonthewall had never claimed that it had gathered the information itself, but instead accurately attributed that information to its original sources. *Id*. at 903 (explaining that defendant "is selling the information with specific attribution to the issuing Firm"). Missing this critical element of passing off, the Second Circuit held that the hot-news claim was preempted. *Id*. at 903-06. *Barclays* thus makes clear that, to fit within the Second Circuit's narrow preemption exception for hot-news claims, the defendant must be "taking material that has been acquired by [the plaintiff], and … appropriating it and selling it as [the defendant's] own." *Id*. at 903 (quoting *INS*, 248 U.S. at 239).

Under this rule, Meltwater cannot be held liable for hot-news misappropriation. Like the plaintiffs in *Barclays*, AP does not and could not make any allegation that Meltwater has ever tried to pass off AP's news content as Meltwater's own. Indeed, that would be contrary to the basic operation of the Meltwater service, which is premised on delivering information about the news

[2] In *INS*, the Supreme Court noted: "The habitual failure to give credit to [AP] for that which is taken is significant. Indeed, the entire system of appropriating [AP's] news and transmitting it as a commercial product to defendant's clients and patrons amounts to a false representation to them and to their newspaper readers that the news transmitted is the result of defendant's own investigation in the field." *INS*, 248 U.S. at 242.

items its customers are searching for, including the identity of the publisher and a link to the full item at the online location where it was published. AP's Amended Complaint thus (accurately) pleads that "Meltwater customers can click on the headline to link to the full story on its originating website" (Am. Compl. (Dkt. No. 30) ¶ 48) and that Meltwater users can target their searches to articles from particular news sources (*id*. ¶ 52). *See also* Meltwater Am. Counterclaim (Dkt. No. 35) ¶¶ 6-7. The fact that Meltwater attributes the snippets it delivers to their sources and links its users directly to the underlying articles as published by AP or its licensees takes this case outside the *INS* model and brings it squarely within the holding of *Barclays*. Because AP cannot allege the critical element of free riding required for any non-preempted hot-news misappropriation claim, AP's claim fails as a matter of law.

### B. AP's Hot-News Misappropriation Claim Fails Because It Is Based On Material Already Published And Made Freely Available On The Internet

Further separating this case from *INS* (and from the narrow class of *INS*-type claims that can survive preemption) is the fact that the articles that Meltwater allegedly misappropriated had already been made available to the general public on the Internet for free by AP and its licensees before they were accessed by Meltwater. As a matter of law, there can be no viable hot-news misappropriation claim in this scenario.

In *INS*, the Supreme Court explained that the basic unfairness with the defendant's practices was that they allowed it to publish AP's news (as defendant's own) ***before or at the same time*** AP and its subscribers were able to do so:

> The peculiar features of the case arise from the fact that, while novelty and freshness form so important an element in the success of the business, the very processes of distribution and publication necessarily occupy a good deal of time. Complainant's service, as well as defendant's, is a daily service to daily newspapers; most of the foreign news reaches this country at the Atlantic seaboard, principally at the [C]ity of New York, and because of this, and of time differentials due to the earth's rotation, the distribution of news matter throughout the country is principally from east to west; and, since in speed the telegraph and telephone easily outstrip the rotation of the earth, it is a simple matter for defendant to take complainant's news from bulletins or

> early editions of complainant's members in the eastern cities and at the mere cost of telegraphic transmission cause it to be published in western papers issued ***at least as early as those served by complainant***. Besides this, and irrespective of time differentials, irregularities in telegraphic transmission on different lines, and the normal consumption of time in printing and distributing the newspaper, ***result in permitting pirated news to be placed in the hands of defendant's readers sometimes simultaneously with the service of competing Associated Press papers, occasionally even earlier***.

*INS*, 248 U.S. at 238-39 (emphases added). These unique temporal circumstances were the basis for the Court's finding that the defendant had made an "unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped." *Id.* at 240.

The Second Circuit has repeatedly emphasized that *INS* turned on the fact that AP had not yet been able to complete distributing its news at the time it was allegedly misappropriated. In *FII*, for example, the court explained:

> In *International News Service*, one wire service tapped the lines of another and printed the fruits of this effort ***at the same time*** the originator of the news reports distributed them to its subscribers. The Supreme Court's remedy was to force the misappropriator to cease publishing the "hot" news until ***after the originator could distribute it***.

808 F.2d at 209 (emphasis added); *see also Barclays*, 650 F.3d at 903 (observing that the defendant in *INS* "was taking news gathered and ***in the process of dissemination*** by the Associated Press") (emphasis added). This is what the Second Circuit had in mind when it indicated that a critical element of a hot-news misappropriation claim is that "the value of the information is highly time-sensitive." *NBA*, 105 F.3d at 852. In *FII*, therefore, the court of appeals rejected a hot-news claim precisely because it lacked the "immediacy of distribution" that the doctrine requires. *FII*, 808 F.2d at 209.

The situation that AP alleges here is entirely different from *INS*. As is clear from the pleadings, the AP articles that Meltwater is alleged to have redistributed had, at the time they were accessed by Meltwater, already been published on the Internet. Am. Compl. (Dkt. No. 30) ¶ 90

(alleging "Meltwater's redistribution of AP stories already published and posted on the Internet"); *cf.* Meltwater Am. Counterclaim (Dkt. No. 35) ¶ 5. Before Meltwater ever came into contact with those articles, AP and its publisher-licensees had already made them widely available for anyone in the world to view for free on a public website. In this case, therefore, the articles at issue are not "in the process of dissemination" by AP when they are accessed by Meltwater. By definition, Meltwater's users could never receive snippets from and links to those articles before they were published by AP in a way that made them available to anyone with an Internet connection.

There is no basis for allowing a hot-news claim to proceed in these circumstances. No court has ever suggested that the hot-news doctrine can be applied to restrict the use of news material once it has been made available to the world on the Internet. The unprecedented expansion that AP seeks here is inconsistent with the conceptual underpinnings of the hot-news doctrine and with the Second Circuit's repeated efforts to narrowly confine its scope. The doctrine allows a news organization a limited window to capitalize on its investment in newsgathering by distributing time-sensitive information to its subscribers or intended audience without interference by competitors. But once that distribution is complete – and particularly once the information at issue has been published on the Internet for the public to see for free – that window is closed. From that point on, the hot-news doctrine can no longer restrict the right of third parties to use that publicly available information in their own operations. *FII*, 808 F.2d at 209 (explaining that the "'hot' news doctrine is concerned with the copying and publication of information gathered by another before he has been able to utilize his competitive edge"). In short, AP's claim goes well beyond the facts of *INS* and beyond any legitimate application of the hot-news misappropriation doctrine.

Beyond these intrinsic problems with extending the doctrine to restrict the use of information that has been freely published online, recognizing a hot-news claim in these circumstances would raise serious constitutional problems. The First Amendment does not allow AP to invoke state law to prevent third parties from accessing and using factual information that is available to the general

public on the Internet. *See Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979) (where an entity "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order"); *In re Dow Jones & Co.*, 842 F.2d 603, 608 (2d Cir. 1988) ("The most offensive aspect of a prior restraint is the censorship involved by forbidding the dissemination of information already known to the press and therefore public."). Thus, even if the hot-news doctrine itself somehow allowed AP to enjoin the use of AP's news reports that had already been published for all the world to see (and it does not), that expansive and novel application of the doctrine would be at odds with the First Amendment. Either way, AP's claim fails as a matter of law.

### C. AP's Hot-News Misappropriation Claim Is Preempted Because It Is Based On Meltwater's Alleged Use Of AP's Literary Expression

Finally, AP's hot-news misappropriation claim is preempted because, by its terms, it seeks to premise liability on the copying and distribution of the allegedly original expression – rather than the non-copyrightable facts – contained in AP's articles.

The requirement that a hot-news misappropriation claim be based on the misappropriation of factual information, which is not protected by copyright law, rather than literary expression originates with the Supreme Court's decision in *INS*. *INS* was decided on the premise that the "news is not within the operation of the copyright act." *INS*, 248 U.S. at 233. The Court recognized the "dual character" of news matter, "distinguishing between the substance of the information and the particular form or collocation of words in which the writer has communicated it." *Id*. at 234. Whereas the latter could be copyrighted, the former could not. *Id*. Given the nature of the factual information at issue, AP could not assert a claim against INS for copyright infringement. The hot-news claim that the Court recognized was designed to allow AP to get around that problem by giving it a way to target the misappropriation of the uncopyrightable news element of its articles. But that tort was not intended to protect "literary productions" that could be copyrighted. *Id*.

Congress confirmed that when it enacted the Copyright Act's preemption provision in 1976. That provision expressly preempted state-law causes of action that could be brought as copyright claims. 17 U.S.C. § 301(a); H.R. REP. NO. 94-1476, at 130 (1976) ("The intention of section 301 is to preempt and abolish any rights under the common law or statutes of a State that are equivalent to copyright and that extend to works coming within the scope of the Federal copyright law."). While Congress left some room for the state-law misappropriation claims based on *INS*, it explained that any hot-news claims needed to closely follow the *INS* model to escape preemption:

> "Misappropriation" is not necessarily synonymous with copyright infringement, and thus a cause of action labeled as "misappropriation" is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by section 106 nor on a right equivalent thereto. For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a ***consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting "hot" news***, whether in the traditional mold of *International News Service v. Associated Press*, 248 U.S. 215 (1918), or in the newer form of data updates from scientific, business, or financial data bases.

H.R. REP. NO. 94-1476, at 132 (emphasis added).

This legislative history is the basis for allowing a narrow category of hot-news misappropriation claims to survive preemption. *NBA*, 105 F.2d at 850; *FII*, 808 F.2d at 209. But the passage makes clear that the only claims that can even potentially survive preemption are those that, like *INS* itself, involve allegations of the misappropriation of purely factual information, not literary expression. The reason for that limitation is clear: while "[f]acts may not be copyrighted" (*FII*, 808 F.2d at 207), literary expression falls squarely within the subject matter of copyright (17 U.S.C. § 102(a)). A claim targeting the alleged misappropriation of the literary expression of "hot news" thus is exactly what the Copyright Act was intended to preempt.

That is just the type of claim that AP makes here. AP does not allege that Meltwater has engaged in a pattern of misappropriating "facts" that AP has gathered. Indeed, the Amended Complaint expressly *disclaims* any suggestion that Meltwater is "extracting breaking facts from the

AP or other news articles it distributes." Am. Compl. (Dkt. No. 30) ¶ 90. "Instead," AP alleges, "Meltwater lifts and distributes the actual and fully protected, already published texts of the articles." *Id*. By its terms, therefore, AP's hot-news claim targets Meltwater's alleged reproduction and distribution of the text of AP's actual news stories – stories that AP alleges to constitute "original works of authorship subject to copyright protection." *Id*. ¶ 77. And AP attacks Meltwater's "redistribution" of those stories (*id*. ¶ 90), a right that AP acknowledges is one of the rights protected by the Copyright Act (*id*. ¶ 77). The legal theory described in the Amended Complaint is at the core of what the Copyright Act preempts and cannot be saved by reference to the House Report. Because AP's hot-news claim is explicitly based on allegations of unauthorized copying and distribution of the expression contained in AP articles, it is not "qualitatively different" than AP's copyright infringement claim and thus is preempted. *Briarpatch*, 373 F.3d at 306.[3]

* * *

For these reasons, the hot-news misappropriation claim that AP asserts here departs fundamentally from the claim allowed in *INS* and falls well outside the "'narrow' exception to Copyright Act preemption" that the Second Circuit has recognized. *Barclays*, 650 F.3d at 898. As a matter of law, AP's claim is preempted and Meltwater is entitled to judgment on the pleadings.

---

[3] Rejecting AP's effort to use state law to backstop its copyright claim also supports the policy considerations that underlie Section 301. That provision is aimed at ensuring "legal uniformity where Congress has acted nationally." *Barclays*, 650 F.3d at 897. As the Second Circuit has explained, a "pressing concern when considering the 'narrow' 'hot news' misappropriation exemption from preemption" is that allowing a broader exception will increase "the likelihood that protection of works within the 'general scope' of the copyright and of the type of works protected by the Act will receive disparate treatment depending on where the alleged tort occurs and which state's law is found to be applicable." *Id*. That is the situation here. Allowing AP to assert a state-law claim based on Meltwater's alleged distribution of AP's "actual and fully protected, already published texts" would directly undermine the "uniform nationwide scheme" that the Copyright Act is intended to provide. That result would suggest that Melwater's "actions may have different legal significance from state to state – permitted, at least to some extent, in some; prohibited, at least to some extent, in others. It is this sort of patchwork protection that the drafters of the Copyright Act preemption provisions sought to minimize." *Id*. at 897-98.

## II. MELTWATER IS ENTITLED TO JUDGMENT ON THE PLEADINGS ON AP'S COPYRIGHT MANAGEMENT INFORMATION CLAIM

Meltwater is also entitled to judgment on the pleadings on AP's claim for alleged removal of "copyright-management information" under § 1202(b) of the DMCA. The Amended Complaint fails to allege critical elements of a claim under that provision or to allege facts that plausibly suggest that Meltwater violated the statute.

Section 1202(b) provides as follows:

> **Removal or alteration of copyright management information.**—No person shall, without the authority of the copyright owner or the law—
>
> (1) intentionally remove or alter any copyright management information,
>
> (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
>
> (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law,
>
> knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

17 U.S.C. § 1202(b). There are four elements of a claim under this provision. *First*, there must be a copyrighted work (or works) that contained "copyright management information" (CMI), as defined in § 1202(c). *Second*, the CMI must have been removed from that work or altered without the permission of the copyright owner. *Third*, the defendant must have either intentionally removed or altered the CMI (for a claim under § 1202(b)(1)) or must have distributed, imported, or publicly performed the work knowing that the CMI was removed or altered without the copyright owner's authority (for a claim under § 1202(b)(3)). *Fourth*, the defendant must have acted knowing, or having reasonable grounds to know, that its actions would induce, enable, facilitate, or conceal an infringement of copyright in the underlying work.

It is unclear from the Amended Complaint whether AP is attempting to assert a claim against Meltwater under § 1202(b)(1) (for removal of CMI) or § 1202(b)(3) (for distributing works from which CMI has been removed). Am. Compl. (Dkt. No. 30) ¶ 146. The question is ultimately academic, as AP fails to state a viable claim under either provision.[4]

### A. AP Fails To State A Claim Under § 1202(b)(1)

Insofar as AP is attempting to proceed under § 1202(b)(1), its claim fails for several reasons: (1) that provision allows claims only against those who actually removed or altered CMI, which Meltwater is not alleged to have done; (2) even assuming that a secondary liability claim were allowed, AP does not allege facts sufficient to make it plausible either that (a) Meltwater induced any customer to remove or alter CMI or (b) any Meltwater customer actually removed or altered CMI on the AP works at issue here.

#### 1. Section 1202(b)(1) does not allow secondary liability claims

Section 1202(b)(1) applies to a defendant who "intentionally remove[s] or alter[s]" CMI. But AP does not allege that Meltwater ever actually removed or altered CMI from any of its works – much less that it did so "intentionally." Instead, AP alleges that Defendants "have caused and induced others to intentionally remove and/or alter copyright management information from AP news reports." Am. Compl. (Dkt. No. 30) ¶ 146. That does not state a claim under § 1202(b)(1).

Section 1202(b)(1) does not provide for secondary liability. The statute makes it unlawful to "intentionally remove or alter" CMI. The provision thus clearly identifies both the conduct that

[4] The courts are divided as to whether the kind of information at issue (AP's name and a copyright notice) (Am. Compl. ¶ 145) qualifies as CMI. *Compare IQ Group, Ltd. v. Wiesner Publ'g, LLC*, 409 F. Supp. 2d 587, 597 (D.N.J. 2006) (holding that the statutory definition of CMI "should be construed to protect copyright management performed by the technological measures of automated systems") *with Cable v. Agence France Presse*, 728 F. Supp. 2d 977, 979-81 (N.D. Ill. 2010) (holding that CMI includes the copyright owner's name and copyright notice). AP has previously argued that such material is not CMI – a result that would doom its claim here right out of the gate. *McClatchey v. The Associated Press*, No. 3:05-cv-145, 2007 WL 776103, at *5 (W.D. Pa. Mar. 9, 2007). This Court need not resolve that issue here, however, because AP fails to state a claim under § 1202(b) regardless of whether the information at issue actually constitutes CMI.

amounts to a violation and the category of actors who can be sued. Those who merely encourage others to remove or alter CMI are not included in what the statute prohibits. And, under established principles of statutory interpretation, § 1202(b)(1) cannot be extended beyond its terms to allow for secondary liability. The Supreme Court has made clear that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994). The Court rejected the "vast expansion of federal law" that would result from holding that "aiding and abetting should attach to all federal civil statutes, even laws that do not contain an explicit aiding and abetting provision." *Id*. at 183. Federal courts thus must normally "refrain from creating secondary liability that is not specified by statute." *Doe v. GTE Corp*., 347 F.3d 655, 658 (7th Cir. 2003). "When 'a statute is precise about who ... can be liable' courts should not implicitly read secondary liability into the statute." *Freeman v. DirecTV, Inc*., 457 F.3d 1001, 1006 (9th Cir. 2006) (quoting *Doe*, 347 F.3d at 659).

Applying this rule, this Court has construed other federal statutes that create civil liability not to apply to those who merely assist or abet the primary violators. *See, e.g.*, *Mastafa v. Chevron Corp*., 759 F. Supp. 2d 297, 300 (S.D.N.Y. 2010) (holding that Torture Victims Protection Act does not allow for secondary liability because plain language of statute covers only those have actually committed torture); *Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, 955 F. Supp. 248, 255-56 (S.D.N.Y. 1997) (rejecting private civil cause of action for aiding and abetting RICO violation exists because the text says nothing about secondary liability). The same result is warranted here. Nothing in the text, structure, or legislative history of § 1202(b) supports extending the statute to create liability against anyone other than the "person" who actually and intentionally "remove[d]" or "alter[ed]" CMI. No court has ever held that § 1202(b) permits secondary liability or allowed a

secondary liability claim to proceed. AP's effort to go beyond the text of the statute to hold Meltwater liable on such a theory should be rejected as a matter of law.

2. <u>AP makes no plausible allegation of inducement</u>

Even assuming *arguendo* that secondary liability were possible under § 1202(b)(1), AP's claim still would fail. AP does not allege any facts from which it plausibly could be concluded either that Meltwater's conduct rose to the level of inducement or that, based on Meltwater's supposed actions, any of its customers actually removed or altered CMI from any of the AP works at issue in this case (or indeed from any works at all).

*First*, AP's allegations regarding Meltwater's supposedly inducing conduct are totally insufficient. AP offers nothing more than the conclusory assertion that Defendants "have caused and induced others to intentionally remove and/or alter" CMI. Am. Compl. (Dkt. No. 30) ¶ 146. AP's only other reference to inducement is equally unelaborated: "On information and belief, via Meltwater's facilitation and encouragement, Meltwater customers are able to remove copyright management information in connection with various articles." *Id.* ¶ 68. The Amended Complaint does not elaborate on the nature or substance of Meltwater's alleged inducement. Nowhere does AP put forward any factual allegations regarding or supporting this supposed "facilitation and encouragement." AP offers nothing to suggest what Meltwater might have said or done to encourage its customers to remove CMI or any allegations that would remotely support a claim that it acted with the deliberate intent to bring about such conduct. AP's allegations are precisely the sort of "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" that "do not suffice" to state a legally viable claim. *Iqbal*, 556 U.S. at 678; *see, e.g.*, *Flava Works, Inc. v. Gunter*, No. 10 C 6517, 2011 WL 1791557, at *6 (N.D. Ill. May 10, 2011) (dismissing inducement of copyright infringement claim where "Plaintiff pleads merely a formulaic recitation of inducement but no facts that plausibly suggest that it is entitled to relief on this theory").

*Second*, AP does not plausibly allege a basic prerequisite for any secondary infringement claim – that some Meltwater customer actually committed a primary violation of the statute by intentionally removing or altering CMI from some AP work. *Cf. MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 940 (2005) ("[T]he inducement theory of course requires evidence of actual infringement by [users] of the device…."); *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 40 (2d Cir. 2005) ("[T]here can be no contributory infringement absent actual infringement…."). The Amended Complaint does not allege that any Meltwater customer ever removed or altered CMI from any AP works. Instead, AP alleges merely that "Meltwater customers ***are able to remove***" CMI "in connection with various articles, including AP articles." Am. Compl. (Dkt. No. 30) ¶ 68 (emphasis added). That is not an allegation that CMI was actually removed by a customer, just that it could have happened. That is not enough to plead a primary violation. *See Faulkner Press, LLC v. Class Notes, LLC*, 756 F. Supp. 2d 1352, 1359 (N.D. Fla. 2010) ("An action for removal of copyright management information requires the information to be removed from a plaintiff's product or original work."). Beyond that, AP alleges no facts to suggest that any (hypothetical) removal of CMI was done *intentionally* and without its authority. But, of course, only the intentional removal of CMI could even potentially violate the statute. In short, AP makes no plausible factual allegation that any Meltwater customer actually violated § 1202(b)(1) and would therefore fail to state a secondary liability claim against Meltwater, even if such a claim were legally cognizable.[5]

**B. AP Fails To State A Claim Under § 1202(b)(3)**

The Amended Complaint makes passing reference to § 1202(b)'s distribution provision (17 U.S.C. § 1202(b)(3)), but any claim under this provision fails because (1) AP makes no plausible

[5] Any inducement claim would also require a proper allegation of causation, *i.e.*, that Meltwater's conduct actually induced or resulted in a customer's violation of the statute. *Accord Grokster*, 545 U.S. at 919 (an inducer "is liable for the ***resulting*** acts of infringement by third parties.") (emphasis added). AP's claim fails on that score as well; the Amended Complaint does not allege any facts suggesting that any Meltwater customer removed CMI from an AP work *because of* Meltwater's supposed inducement.

allegation that Meltwater *actually distributed* any work from which CMI had been removed; and (2) AP does not allege that Meltwater distributed any article *knowing* that CMI had been removed.

1. AP does not plausibly allege that Meltwater actually distributed any AP article from which CMI was actually removed or altered

Section 1202(b)(3) requires that the defendant actually "distribute, import for distribution, or publicly perform works" from which CMI had been removed or altered. AP fails to make any plausible allegation that Meltwater did so.

The only reference in the Amended Complaint to this element appears in Paragraph 146, which alleges that after supposedly inducing "others" to remove or alter CMI from unidentified works, Meltwater "has thereafter distributed said works." AP alleges nothing else about Meltwater's supposed distribution of works from which CMI had been altered or removed. And it offers no factual support whatsoever for its barebones recital that Meltwater distributed works from which CMI had been removed. AP does not allege what actions by Meltwater constituted the purported "distribution," points to no examples of articles that were actually distributed without or with altered CMI, and does not indicate what CMI was removed or altered from what articles or in what way that removal or alteration was accomplished. Indeed, AP's allegation is at odds with the facts as pleaded in Paragraph 68 of the Amended Complaint. There, AP says nothing at all about distribution. It alleges only that "Meltwater's customers are able to remove copyright management information in connection with various articles, including AP articles, ***and such articles may be stored on Meltwater's system***." Am. Compl. (Dkt. No. 30) ¶ 68 (emphasis added). But storing articles from which CMI has been removed does not amount to *distributing* those articles. In setting out its factual allegations, therefore, AP deliberately stopped short of suggesting that Meltwater distributed any article from which CMI had supposedly been removed. In short, AP's assertion about distribution is a bare legal conclusion unsupported by any factual allegations, and thus is "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 681.

2. <u>AP fails to plausibly allege that Meltwater acted knowing that CMI had been removed or altered without AP's authority</u>

Section 1202(b)(3) includes a strict scienter requirement: the defendant must have distributed the work "***knowing*** that copyright management information has been removed or altered without authority of the copyright owner or the law." (Emphasis added.) AP fails to plead that Meltwater acted with such knowledge. Paragraph 146 contains the Amended Complaint's only reference to Meltwater's supposed knowledge. It asserts that Meltwater has "distributed said works, knowing ***or having reason to know*** that the copyright management has been removed or altered without authority of the copyright owner or law." Am. Compl. (Dkt. No. 30) ¶ 146 (emphasis added). This allegation fails for two independent reasons.

*First*, § 1202(b)(3) imposes an actual knowledge standard, which is not satisfied merely by constructive knowledge. *See Keogh v. Big Lots Corp*., No. 3:04-00738, 2006 WL 1129375, at *2 (M.D. Tenn. Apr. 27, 2006) (explaining that the plain language of § 1202(b)(3) "makes clear that constructive knowledge is not enough, there must be actual knowledge"). By its terms, the statute requires that the defendant act "knowing" that CMI has been removed. That is a reference to actual knowledge. Had Congress wanted a more relaxed knowledge standard (such as "having reason to know") to suffice, it would have said so.[6] And AP does not plead that Meltwater had the actual knowledge that the statute requires. It instead alleges that Meltwater knew *or had reason to know* of the fact that CMI had been removed from the works it supposedly distributed. Am. Compl. (Dkt. No. 30) ¶ 146. That is not enough to allege a violation of § 1202(b)(3). Indeed, from what AP has

[6] Congress did specify that constructive knowledge was an acceptable alternative to actual knowledge in § 1202(b)'s other scienter requirement. Beyond having actual knowledge of the removal of CMI, a defendant must have acted "knowing, ***or, with respect to civil remedies under section 1203, having reasonable grounds to know***," that its actions will induce, facilitate, or conceal an infringement of copyright. 17 U.S.C. § 1202(b) (emphasis added). The contrast between this knowledge standard and the one imposed by § 1202(b)(3) is significant. In (b)(3), Congress deliberately refrained from including the kind of "reasonable grounds to know" alternative to actual knowledge. This confirms that (b)(3)'s scienter requirement is satisfied only by actual knowledge.

pleaded, it would be equally plausible to conclude that Meltwater did *not* have actual knowledge that any CMI had been removed. AP's allegation of Meltwater's scienter thus fails as a matter of law.

*Second*, even if constructive knowledge were sufficient, AP's scienter allegation still would fail because it is unsupported by any factual allegations. Under *Twombly* and *Iqbal*, the unadorned assertion in Paragraph 146 that Meltwater knew or had reason to know that CMI had been removed is not entitled to a presumption of truth. At best, that allegation is merely a "formulaic recitation" of an element of the claim. That is not enough to get AP's claim past the pleading stage. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. And other than this insufficient recital, AP alleges nothing that bears on Meltwater's knowledge. No matter what knowledge standard § 1202(b)(3) imposes, therefore, AP does not satisfy it.

### C. AP Fails to Plausibly Allege That Meltwater Knew Its Alleged Actions Would Induce, Enable, Facilitate Or Conceal Infringement

Finally, any claim under § 1202(b) requires the plaintiff to establish that the defendant acted knowing, or having reasonable grounds to know, that its conduct "will induce, enable, facilitate, or conceal an infringement of any right under this title." 17 U.S.C. § 1202(b); *e.g.*, *Faulkner*, 756 F. Supp. 2d at 1360 (rejecting CMI claim for failure to show that the defendant "altered the information with intent to aid infringement"). AP incants this element but pleads no facts to support it.

AP's allegation regarding Meltwater's knowledge that its conduct would lead to an infringement of copyright appears solely in Paragraph 146 of the Amended Complaint. But that allegation does nothing more than recite the element of the claim. AP offers nothing to support its assertion of knowledge. It does not even try to explain why Meltwater's alleged conduct likely would have induced, enabled, facilitated, or concealed copyright infringement, much less why Meltwater would or should have known that it would do so. AP does not elaborate on its allegation in any way beyond repeating the language of the statute. As with AP's other such allegations, this threadbare recital is "conclusory and not entitled to be assumed true." *Iqbal*, 556 U.S. at 664.

AP's assertion is also implausible on its face. On AP's apparent theory, Meltwater's conduct consists of allowing its users to archive articles from which CMI might have been removed. Am. Compl. (Dkt. No. 30) ¶ 68. As discussed, AP does not point to any specific articles that were stored on Meltwater's system with their CMI intentionally removed. Nor does AP allege that Meltwater actually knew that CMI was removed from any article that was stored on (or distributed using) its system, assuming that anything like that ever happened. Given that, it simply is not plausible that Meltwater knew or should have known that its actions regarding those articles would induce or enable infringement of their copyrights. But even assuming that there were specific articles from which CMI had been removed, which Meltwater knowingly allowed its customers to store or distribute, how would that support an inference that Meltwater did so knowing or having reason to know that its conduct would facilitate infringement? There is no logical connection between a user's storage of articles in a private Meltwater archive without AP's name and copyright information and any subsequent infringement of AP's copyright in those articles. As in *Twombly* and *Iqbal*, therefore, AP "would need to allege more by way of factual content to 'nudg[e]'" its claim "'across the line from conceivable to plausible.'" *Iqbal*, 556 U.S. at 683 (quoting *Twombly*, 550 U.S. at 570). AP's failure to plausibly allege this element dooms its § 1202(b) claims.

**CONCLUSION**

For the reasons given above, Meltwater is entitled to judgment on the pleadings on AP's claims for hot-news misappropriation under New York law and for removal of copyright management information under § 1202(b) of the DMCA.

Respectfully submitted,

Dated: November 9, 2012

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: s/ Tonia Ouellette Klausner

TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7700

DAVID H. KRAMER (admitted *pro hac vice*)
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300

*Attorneys for the Defendants*