UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| THE ASSOCIATED PRESS, | : | |
| | : | 12 Civ. 1087(DLC)(FM) |
| Plaintiff, | : | |
| | : | |
| - against - | : | ECF Case |
| | : | |
| MELTWATER U.S. HOLDINGS, INC.; | : | |
| MELTWATER NEWS U.S., INC.; and | : | |
| MELTWATER NEWS U.S. 1, INC. | : | |
| | : | |
| Defendants. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**


Elizabeth A. McNamara
Linda Steinman
Alison B. Schary
Collin J. Peng-Sue
DAVIS WRIGHT TREMAINE LLP
1633 Broadway – 27th Floor
New York, New York 10019
Telephone:    (212) 489-8230
Facsimile:    (212) 489-8340

*Attorneys for Plaintiff The Associated Press*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT .................................................................... 1

FACTUAL BACKGROUND ....................................................................... 3

ARGUMENT ............................................................................................. 5

    I.    MELTWATER MISCONSTRUES THE HOT NEWS DOCTRINE ................... 5

        A.    AP Has Adequately Pled A Claim For Hot News Misappropriation......... 5

        B.    The Free Riding Requirement Of The Hot News Doctrine Can Be Met Even If Meltwater Credits AP Articles ....................................................... 7

        C.    Meltwater's Alleged Conduct Is The Exact Free-Riding Prohibited By The Hot News Doctrine .......................................................... 12

        D.    AP's Hot News Claim Is Not Based On Meltwater's Use Of AP's Literary Expression ................................................................... 17

    II.    AP SHOULD BE GRANTED LEAVE TO AMEND THE AMENDED COMPLAINT TO REVISE ITS COPYRIGHT MANAGEMENT CLAIM ....... 18

CONCLUSION .......................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Associated Press v. All Headline News Corp.*,
608 F. Supp. 2d. 454 (S.D.N.Y. 2009)................................................................6, 15, 18, 19

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*,
650 F.3d 876 (2d Cir. 2011)........................................................................... passim

*Fin. Info., Inc. v. Moody's Investors Serv., Inc.*,
808 F.2d 204 (2d Cir. 1986)........................................................................15, 16

*Friedl v. City of New York*,
210 F.3d 79 (2d Cir. 2000)........................................................................19, 20

*International News Service v. Associated Press*,
248 U.S. 215 (1918).................................................................................. passim

*Krumme v. WestPoint Stevens, Inc.*,
238 F.3d 133 (2d Cir. 2000)........................................................................6

*McClatchey v. The Associated Press*,
No. 3:05-cv-145, 2007 WL 776103 (W.D. Pa. March 9, 2007) ..............................19

*Motorola Credit Corp. v. Uzan*,
388 F.3d 39 (2d Cir. 2004)........................................................................6

*National Basketball Association v. Motorola, Inc.*,
105 F.3d 841 (2d Cir. 1997).......................................................................... passim

*Nibbs v. City of New York*,
800 F. Supp. 2d 574 (S.D.N.Y. 2011)................................................................3

*Smith v. Daily Mail Publ'g Co.*,
443 U.S. 97 (1979)....................................................................................16

*X17, Inc. v. Lavandeira*,
563 F. Supp. 2d 1102 (C. D. Cal. 2007) ................................................................6


RULES, STATUTES, AND OTHER AUTHORITIES

17 U.S.C. § 301.......................................................................................6

17 U.S.C. § 1202(b) ...................................................................................18

DWT 20676174v5 0025295-000064

17 U.S.C. § 1202(b)(1) ..............................................................................................18

17 U.S.C. § 1202(b)(3) ..............................................................................................18

17 U.S.C. § 1202(c) ...................................................................................................19

Fed. R. Civ. P. 12(c) ...................................................................................................1

Fed. R. Civ. P. 15(a) ............................................................................................18, 19

H.R. Rep. No. 94-1476 (1976)...............................................................................2, 6

DWT 20676174v5 0025295-000064

Plaintiff and Counterclaim-Defendant The Associated Press ("AP") submits this memorandum of law in opposition to the motion brought by Defendants and Counterclaim-Plaintiffs Meltwater U.S. Holdings, Inc., Meltwater News U.S., Inc., and Meltwater News US1, Inc. (collectively "Meltwater") pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings as to AP's Fifth and Sixth Causes of Action in the Amended Complaint.

## PRELIMINARY STATEMENT

In the landmark case of *International News Service v. Associated Press* ("*INS*"), 248 U.S. 215 (1918), the United States Supreme Court held that breaking news, known as "hot" news, was worthy of protection and that competitors like INS could not simply free ride on the time, money and effort that news organizations such as AP invest in gathering news throughout the world. Nearly a century later, AP faces an equally dire threat from unlicensed commercial digital aggregators like Meltwater who, using today's technology, can immediately scrape AP's news off the Internet and offer it to their subscribers as "Real-Time Information."  Moreover, the technology creates a critical structural problem highly parallel to that in *INS*:  Meltwater, as a digital aggregator re-packaging AP's own news, bears none of the extensive costs of newsgathering, and thus can undercut AP and its licensees in the sale of AP's own information. One of the reasons that the news industry today is facing a period of crisis, with numerous news publications folding or struggling with significantly reduced staffs, is the siphoning off of subscribers by commercial aggregators such as Meltwater who do not bear the burden of editorial costs.

The "hot news" doctrine set forth in *INS* provides a meaningful and important cause of action to combat such parasitic businesses as Meltwater, and provides essential supplemental protection in addition to the Copyright Act.  Like INS, Meltwater's "purpose [is to] mak[e]

1

merchandise of [AP's stories] as news, with the result of depriving" AP, its members and its licensees "of their reasonable opportunity to obtain just returns for their expenditures." *INS*, 248 U.S. at 241.  Like INS, Meltwater seeks to reap where it has not sown, "with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news."  *Id.* at 240.

Meltwater seeks dismissal on the pleadings of AP's hot news misappropriation claim on the ground that it is preempted by the Copyright Act.  However, as Meltwater acknowledges, both Congress and the Second Circuit have recognized that, "state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting "hot" news, whether in the traditional mold of [*INS*], or in the newer form of data updates from scientific, business, or financial data bases." *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 894 (2d Cir. 2011), citing H.R. Rep. No. 94-1476 at 132 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5748 (footnote omitted).

Meltwater fits squarely within the narrow class of cases where "free riding" activities are actionable.  Meltwater, unlike Fly or Motorola, does not employ a staff that is independently "collecting, collating and disseminating factual information."  *Id.* at 902.  Rather, Meltwater engages in no independent factual assessment and instead is doing nothing more than automatically scraping, repackaging and selling factual information created by AP.  This is the very essence of a hot news claim.  As the Second Circuit has underscored, *INS* "was one of the first cases to address the issues raised by technological advances, although the technology involved in that case was primitive by contemporary standards."  *National Basketball Association v. Motorola, Inc.* ("*NBA*"), 105 F.3d 841, 845 (2d Cir. 1997).  Meltwater's attempt to

2

freeze *INS* to the technologies of 1918 should be rejected.  In sum, AP's complaint provides the factual foundation for a valid hot news misappropriation claim and withstands dismissal.

## FACTUAL BACKGROUND

As alleged in the Amended Complaint, AP was founded in 1846 and is one of the oldest and most highly regarded news organizations in the world.  Am. Compl. (Dkt. No. 30) ¶ 4.[1] AP's mission, as a not-for-profit news cooperative, is to provide fast, accurate, reliable, clear, and unbiased news reports as news breaks around the globe.  *Id.*  "AP collects newsworthy information, creates and edits news stories based on that information, and transmits its news stories in a timely fashion at substantial economic, professional and personal cost."  *Id.* ¶ 132. AP's breaking news is a critical component to the success of its business.  Indeed, in today's world, the AP and its wire service peers are often the only sources for timely, high quality, on-the-ground reporting for news as it breaks around the world.  *Id.* ¶ 27.  AP licenses its news stories to members and other subscribers who re-publish it, as well as to government and corporate subscribers who "monitor the news wire to stay apprised of timely, accurate news reports as they develop."  *Id.* ¶ 37, 39.  Further, many private corporations pay valuable consideration to access AP's news through subscriptions to LexisNexis and Factiva, "which license AP's content to provide companies with timely, pertinent news reports on their areas of interest."  *Id.*

As the Amended Complaint alleges, Meltwater is a closed, commercial media monitoring service.  Meltwater scrapes over 162,000 news sources, including websites publishing AP stories, and delivers to its paying subscribers emailed reports and other search results containing

---

[1] On a motion for judgment on the pleadings, "courts must accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader."  *Nibbs v. City of New York*, 800 F. Supp. 2d 574, 575 (S.D.N.Y. 2011) (internal marks omitted).

DWT 20676174v5 0025295-000064

verbatim excerpts of news articles, including the lede – and hence the facts contained in those excerpts.  Am. Compl. ¶¶ 43, 46-48; Defendants' Amended Answer ("Ans.") (Dkt. No. 35) ¶¶ 43, 46-48; Defendants' Counterclaims ("Countercl.") (Dkt. No. 35) ¶¶ 32, 35-36, 39.  In short, AP publishes highly time sensitive information (Am. Compl. ¶ 133), and Meltwater News re-sells that content to its subscribers – in part by marketing Meltwater's ability to provide "Real Time Information" by "continuously track[ing] news sources, [and] updating its database continuously throughout the day so searches return fresh, relevant content."  Am. Compl. ¶ 51; Ans. ¶ 51 (admitting this quote comes from the Meltwater website).  Meltwater does not independently collect, collate and disseminate the facts from AP stories.  Am. Compl. ¶ 6 (Meltwater "employs no reporters or newsgatherers of its own").  Rather, "Meltwater merely distributes electronically for a fee news content created at the expense and through the labor of others."  *Id.*  "Its business serves no independent purpose other than the distribution of news created by others."  *Id.* ¶ 2.

As the Amended Complaint alleges, "Meltwater's Global Media Monitoring service and associated products are merely a way for Meltwater to free-ride on AP's significant investments in gathering and reporting accurate, timely news, including breaking news."  *Id.* ¶ 88.  Indeed, AP bears "all of the extensive costs associating with creating its content, while Meltwater" – which refuses to pay license fees to its news sources – "bears only the minimal costs of distribution in the Internet age, and thus can undercut the AP with lower subscription rates."  *Id.* ¶¶ 2, 91.  Meltwater "competes directly with AP's own wire service offerings, in particular for AP subscribers such as government agencies who use its services to monitor the news, rather than for publication in their own newspapers or other media."  *Id.* ¶ 92.  As the Amended Complaint further alleges, "AP has already lost significant long-standing clients to Meltwater."

4

*Id.* Meltwater "has also had a significant negative effect on sales of key AP licensees, such as Lexis Nexis and Factiva."  *Id.*

As a news wire that generally does not publish its own articles directly, "AP and its fellow wire service providers and licensees are uniquely vulnerable to Meltwater and similar closed aggregation services.  AP's business – and the business of certain of its licensees – is to sell access to its wire service.  If someone else is selling excerpts from and timely access to that same content for a lower price by free-riding on AP's content, AP's business model is directly threatened."  Am. Compl. ¶¶ 93-94.

## ARGUMENT

## I.    MELTWATER MISCONSTRUES THE HOT NEWS DOCTRINE

### A.    AP Has Adequately Pled A Claim For Hot News Misappropriation

The origins of a hot news misappropriation claim are found in the Supreme Court's opinion in *INS*.  In that case, the defendant, INS, was publishing AP news content through, among other means, "copying news from bulletin boards and from early editions of complainant's newspapers" and distributing that news content to competing newspapers.  248 U.S. at 231.  AP brought a claim against INS seeking to enjoin INS from misappropriating its news content.  *Id.*

The Supreme Court affirmed the grant of injunction.  In so holding, the Court held that INS's actions amounted "to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news."  *Id.* at 240.

5

Although *INS* was based on federal common law in the pre-*Erie* era, several states including New York now recognize state law hot news misappropriation claims.[2]  When Congress passed the 1976 Copyright Act, it preempted various causes of action that seek to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law.  17 U.S.C. § 301.  The House of Representative Report regarding the preemption provisions of the 1976 Copyright Act makes clear that state law hot news misappropriation claims akin to the claim in *INS* are not preempted:

> "Misappropriation" is not necessarily synonymous with copyright infringement, and thus a cause of action labeled as "misappropriation" is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by [17 U.S.C. §] 106 [specifying the general scope of copyright] nor on a right equivalent thereto.  For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting "hot" news, whether in the traditional mold of [*INS*], or in the newer form of data updates from scientific, business, or financial data bases.

H.R. Rep. No. 94-1476 at 132 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5748.

---

[2] Meltwater, though arguing that AP's hot news misappropriation claim is preempted by the Copyright Act, does not contest that New York law would apply absent preemption.  "[S]uch 'implied consent . . . is sufficient to establish choice of law.'"  *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) (quoting *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)); *see also Krumme*, 238 F.3d at 138 ("The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'").  Nor would it matter, as California, where Meltwater's headquarters are located (Am. Compl. ¶¶ 16-18), also recognizes the hot news misappropriation tort. *See X17, Inc. v. Lavandeira*, 563 F. Supp. 2d 1102, 1107 (C. D. Cal. 2007) ("California law recognizes the misappropriation tort in the broad sense, of which the 'hot news' tort is a subset") (citing *Balboa Insurance Co. v. Trans Global Equities*, 267 Cal. Rptr. 787 (Cal. Ct. App. 1990)).  To the extent a conflict between New York and California law does exist, however, New York law clearly applies.  *Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d. 454, 460 (S.D.N.Y. 2009) ("New York law governs the plaintiff's [hot news] claims," observing that the plaintiff "is headquartered in New York and suffered the alleged injury in New York" while defendant "is alleged to have maintained an office and/or bureau in New York.")  Here, AP is headquartered in New York, suffered injury here and Meltwater has an office in New York.  Am. Compl. ¶¶ 15, 19.  New York law therefore applies.

DWT 20676174v5 0025295-000064

In *NBA*, 105 F.3d 841, and again in *Barclays*, 650 F.3d 876, the Second Circuit addressed the scope of the hot news misappropriation doctrine in light of potential preemption by the Copyright Act.  While recognizing that hot news misappropriation is a "'narrow' exception to Copyright Act preemption" (*Barclays*, 650 F.3d at 898), the Second Circuit has held that such a claim could survive in a factual situation similar to that in *INS*—when the defendant is "free-riding" on the plaintiff's product.  *See NBA*, 105 F.3d at 845 ("Based on the legislative history of the 1976 amendments, it is generally agreed that a 'hot-news' *INS*-like claim survives preemption."); *Barclays*, 650 F.3d at 902-03 (describing an "*INS*-type non-preempted claim").  As the Second Circuit emphasized in both cases, "An indispensable element of a [non-preempted] *INS* 'hot news' claim is free-riding by a defendant on a plaintiff's product, enabling the defendant to produce a directly competitive product for less money because it has lower costs" – which AP has alleged here.  *Barclays*, 650 F.3d at 905 (quoting *NBA*, 105 F.3d at 854).  In short, AP's Amended Complaint pleads a hot news misappropriation claim consisting of a "consistent pattern of unauthorized appropriation by a competitor of the facts constituting hot news … in the traditional mold of" *INS* and thus is not preempted.

### B.     The Free Riding Requirement Of The Hot News Doctrine Can Be Met Even If Meltwater Credits AP Articles

Meltwater claims that AP's hot news misappropriation claim is "doomed" because AP has not alleged that "Meltwater ever tried to present AP's information as its own."  Meltwater's Opening Memorandum of Law ("Opening Memo") at 7.  Meltwater is incorrect.

Meltwater contends that "a crucial aspect of the misconduct in *INS* was that the defendant, in republishing AP's articles, was attempting to pass off those articles as its own, without giving credit to AP or indicating that AP was the source of the material."  Opening Memo at 6.  The Supreme Court, however, made no such ruling.  To the contrary, in *INS* the

7

Supreme Court specifically distinguished the defendant's failure to attribute its news content to AP as a *separate* issue from the hot news misappropriation. *See INS*, 248 U.S. at 242 ("*Besides the misappropriation*, there are elements of imitation, of false pretense, in defendant's practices [and] . . . the habitual failure to give credit to [AP]") (emphasis added). Indeed, the Supreme Court was careful to note that the defendant's false pretenses and "habitual failure to give credit," "although accentuating the wrong, are *not the essence of it*." *Id.* (emphasis added).[3] Rather, the "essence" of a hot news claim focuses on "an unauthorized interference with the normal operation of a complainant's legitimate business [in time sensitive information] precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not; with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news." *Id.* at 240. The Second Circuit well described the heart of a hot news claim in *NBA* and recognized AP's property interest at stake here:

> *INS* is not about ethics; it is about the protection of property rights in time-sensitive information so that the information will be made available to the public by profit seeking entrepreneurs. If services like AP were not assured of property rights in the news they pay to collect, they would cease to collect it. The ability of their competitors to appropriate their product at only nominal cost and thereby to disseminate a competing product at a lower price would destroy the incentive to collect news in the first place. The newspaper-reading public would suffer because no one would have an incentive to collect "hot news."

*NBA*, 105 F.3d at 853.

The Second Circuit in *Barclays* did not disturb this key finding of *NBA*, as Meltwater misleadingly suggests. Meltwater improperly portrays the Second Circuit's decision in *Barclays*

---

[3] As the Supreme Court reiterated, "It is something more than the advantage of celebrity of which complainant is being deprived." *Id.* Meltwater omits these portions of the Supreme Court's holding when citing *INS*. Opening Memo at 8 n.2.

DWT 20676174v5 0025295-000064

as turning on the fact that the defendant in that case, Fly, was not "passing off the plaintiffs' [stock] recommendations 'as its own.'"  Opening Memo at 8.  The court's decision in *Barclays* turned not on a lack of "passing off," however, but instead on the fact that Fly was not "free riding" in the *INS* sense; Meltwater's brief thus improperly equates "free riding" with failure of attribution.  Although its conclusion that Fly was not free riding on the Firm's stock recommendations did reference the fact that Fly was attributing the recommendations to the Firms, the Second Circuit's holding was based principally on its conclusion that Barclays and the other investments firms were "making" news in their stock recommendations and that Fly itself was a legitimate newsgatherer, putting in the time and effort to report in summaries on the news of the plaintiffs' recommendations:

> [T]he Firms' claim is not a so-called *INS*-type non-preempted claim because Fly is not, under *NBA*'s analysis, "free-riding." It is collecting, collating and disseminating factual information — the *facts* that Firms and others in the securities business have made recommendations with respect to the value of and the wisdom of purchasing or selling securities — and attributing the information to its source. The Firms are making the news; Fly, despite the Firms' understandable desire to protect their business model, is breaking it.

650 F.3d at 903 (emphasis original).  The Second Circuit reiterated that the plaintiff Firms' recommendations were not news that the Firms gathered through their own reporting, like ordinary news stories from a journalism organization such as AP, but were instead "something they *create*."  *Id.* (emphasis original).  And, as the Second Circuit repeatedly emphasized, Fly was "reporting financial news—factual information on Firm Recommendations—through a substantial organizational effort."  *Id.* at 905.  Critical to the Court's analysis was its finding that Fly was a legitimate journalistic "news service" (*id.* at 879), with half of its employees involved in the collection of the Firm's recommendations and the drafting of summaries of such recommendations (*id.* at 905), similar to the finding in *NBA* that the SportsTrax service at issue

9

was "bearing [its] own costs of collecting factual information on NBA games." *NBA*, 105 F.3d at 854. It was on this principal basis that the Second Circuit held that "Fly's service – which collects, summarizes and disseminates the news of the Firm's recommendations – is not the '*INS*-like' product that could support a non-preempted cause of action for misappropriation." *Barclays*, 650 F.3d at 905. Indeed, the Second Circuit's conclusion in *Barclays* reads, "We conclude that in this case, a Firm's ability to make news – by issuing a Recommendation that is likely to affect the market price of a security – does not give rise to a right for it to control who breaks the news and how." *Id.* at 907. [4]

In short, the Second Circuit's finding of no "free-riding" in *Barclays* did not turn on whether Fly provided attribution. *Barclays* does not hold as a free-standing requirement that all hot news misappropriation cases require lack of attribution – especially where, in contrast to that case, the Associated Press here is not "making" news, but merely reporting it, and the defendant Meltwater, unlike Fly, is not performing its own journalistic function, but merely re-packaging and exploiting AP's newsgathering efforts so that it can distribute that news content at a lower cost to serve its own profitable ends.[5] Instead, *Barclays* concludes that *INS* must be the touchstone for any hot news misappropriation claim and that "the term free-riding refers explicitly to a requirement for a cause of action as described by *INS*." 650 F.3d at 903. And

_____

[4] Judge Sack, who authored the *Barclays* opinion, is a noted First Amendment scholar, and the opinion is clearly animated by his concern that the "hot news" misappropriation claim not be used as a means to suppress legitimate reporting "respecting current events" – which he quoted *INS* as calling "*publici juris*" and "the history of the day." 650 F.3d at 903, citing First Amendment and quoting *INS*, 248 U.S. at 234. AP's claim against Meltwater does not pose a similar threat to First Amendment values, since Meltwater does no "reporting;" nor does it seek to characterize itself as a news entity. To the contrary, AP's claim serves First Amendment interests by protecting the incentives necessary to the continuing survival of news organizations.

[5] The *Barclays* court went out of its way to distinguish the Firms' actions from traditional news reporting of the AP, which is the foundation to an INS claim: "In pressing a "hot news" claim against Fly, the Firms seek only to protect their Recommendations, something they *create* using their expertise and experience rather than *acquire* through efforts akin to reporting." *Barclays,* 650 F.3d at 903 (emphasis in original).

10

critically, as outlined above, *INS* makes plain that lack of attribution is "not the essence" of a hot news misappropriation claim.  248 U.S. at 242.

This conclusion is illustrated by the hypothetical valid hot news claims identified in *Barclays* and *NBA*.  In *NBA*, for example, the Second Circuit observed:  "To be sure, if appellants in the future were to collect facts from an enhanced [NBA] pager to retransmit them to [Motorola's] pagers, that would constitute free riding[.]"  *NBA*, 105 F.3d at 854.  Similarly, in *Barclays*, the Court opined that if a Firm developed a service disseminating facts about securities recommendations and "were Fly to copy the facts contained in the Firm's hypothetical service, it might be liable to the Firm on a "hot news" misappropriation theory."  *Barclays*, 650 F.3d at 905-06.  These hypotheticals do not in any way turn on a lack of attribution, but both describe precisely Meltwater's actions:  Meltwater copies the facts contained in AP's news articles and sells them as its own service to its subscribers.  Thus, the allegations of AP's hot news claim do contain the "essence" of an INS-like claim.[6]

AP today – as in 1918 – invests substantial resources in order to publish time sensitive information.  AP predominantly "breaks" news, rather than making news in its own right.  *See Barclays*, 650 F.3d at 902 n.36.  As the Amended Complaint alleges, instead of employing any independent news gatherers or exercising any independent news judgment by extracting breaking facts from the AP and other news articles it distributes, Meltwater uses today's technology to scrape AP stories off the Internet without AP's consent and, through an automated system, delivers excerpts to its paying customers.   Am. Compl. ¶¶ 2, 6, 43, 46-48, 51, 135.  In other words, Meltwater's automatic system is inflicting the same type of harm inflicted by INS a

---

[6] Public policy would not condone a standard whereby attribution is the silver bullet preventing liability, as Meltwater suggests.  Logically it would make no sense to insulate the competitive sale of an overt appropriation of a creator's factual output, simply by crediting the creator.  Yet, that is what Meltwater is asking this Court to condone as a matter of law.

century earlier by "taking material that has been acquired by [AP] as the result of organization and the expenditure of labor, skill and money" and systematically re-selling it without any journalistic input and without permission or compensation to AP. *INS*, 248 U.S. at 239; Am. Compl. ¶¶ 132-135. As such, Meltwater is "interfer[ing] with the normal operation of [AP's] legitimate business precisely at the point where profit is to be reaped, in order to divert a material portion of the profit" from AP, which has earned it, to Meltwater, which has not. *See INS*, 248 U.S. at 240. In the end, the critical distinguishing feature of any hot news claim exists here: Meltwater has the special advantage in its competition with AP and its licensees because it does not need to bear the significant costs of newsgathering but rather only the minimal costs of marketing and distribution in the digital age. *Id.*; Am. Compl. ¶ 2.

In sum, AP's allegations are sufficient to state a claim for hot news misappropriation that is not preempted by the Copyright Act, and *Barclays* does not hold otherwise. In fact, *Barclays* goes to great lengths to describe the limited nature of a circuit court's "holdings" that are binding on district courts and insists that "appellate judges cannot make law except insofar as they reach a conclusion based on the specific facts and circumstances presented to the court in the particular appeal." 650 F.3d at 809. Here, Meltwater's attempt to derive a "holding" from *Barclays* divorced from all its key facts should be rejected.

### C.    Meltwater's Alleged Conduct Is The Exact Free-Riding Prohibited By The Hot News Doctrine

Meltwater also seeks dismissal of AP's hot news misappropriation claim on preemption grounds based on the argument that this case is not similar to *INS* because "the articles that Meltwater allegedly misappropriated had already been made available to the general public on the Internet for free by AP and its licensees before they were accessed by Meltwater." Opening Memo at 9.

12

Meltwater's argument echoes the same argument made unsuccessfully by the defendant in *INS*.  In *INS*, the defendant argued that "by issuing [the news] to newspapers and distributing it indiscriminately, complainant no longer has the right to control the use to be made of it."  *INS*, 248 U.S. at 239.  The Supreme Court soundly rejected that argument, holding:

> The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of it, may be admitted; but to transmit that news for commercial use, in competition with complainant—which is what defendant has done and seeks to justify—is a very different matter.

*Id.*  The Supreme Court continued:

> The contention that the news is abandoned to the public for all purposes when published in the first newspaper is untenable. Abandonment is a question of intent, and the entire organization of the Associated Press negatives such a purpose. . . . [P]ublication by each member must be deemed not by any means an abandonment of the news to the world for any and all purposes, but a publication for limited purposes; for the benefit of the readers of the bulletin or the newspaper as such; not for the purpose of making merchandise of it as news, with the result of depriving complainant's other members of their reasonable opportunity to obtain just returns for their expenditures.

*Id.* at 240-41.

In other words, while AP today, as in *INS*, may have made its news content available for public consumption "for limited purposes," that does not mean that a third party such as Meltwater can "transmit that news for commercial use, in competition with complainant."  And, in fact, that is exactly what AP has pled here.  *See, e.g.*, Am. Compl. ¶ 92 ("The Meltwater News service competes directly with the AP's own wire service offerings").  Meltwater's conduct is, therefore, exactly what the Court enjoined in *INS*, and Meltwater cannot claim that AP's prior publication of its news content forecloses a hot news claim.

DWT 20676174v5 0025295-000064

In a related fashion, Meltwater attempts to limit the applicability of *INS* here by arguing that "unique temporal circumstances were the basis for the Court's finding."  Opening Memo at 10.  It quotes a passage from *INS* noting that INS, by reviewing early editions of AP member newspapers or AP bulletin boards, was able to publish in west coast newspapers "simultaneously" with the delivery of the AP member newspapers and alleges that this case is different because AP's "distribution is complete" once a story has been published on the Internet.  Opening Memo at 11.  Based on this passage, Meltwater argues that the hot news doctrine only "allows a news organization a limited window to capitalize on its investment in newsgathering" and makes the broad statement—without reference to any legal authority—that "once the information at issue has been published on the Internet for the public to see for free – that window is closed."  *Id.* at 11.

As an initial matter, Meltwater has no basis to assert (based on the Amended Complaint) that AP and its members' "distribution is complete" at the point that Meltwater  redistributes AP's news; as in *INS*, the fact that an AP story was posted by one or more AP members on the Internet certainly does not mean that all of AP's members and other licensees – including small-time local papers, west coast papers or newspapers publishing in hard copy only – have published the AP story at that point.[7]  More importantly, the key allegation here is that Meltwater is offering a "Real Time" service (Am. Compl. ¶ 51), providing factual information *close enough in time* to initial publication to substitute for the reading of AP member publications, and to compete with AP in its licenses to government subscribers, and in Factiva and LexisNexis's licenses to corporate subscribers, for which AP receives licensing fees.  As the Supreme Court

---

[7] Indeed, discovery will no doubt prove this point.  AP expects to be able to establish that Meltwater's robots are scraping content from AP licensed sites so frequently that it does actually scoop first publication by legitimate licensees of AP's work, thereby robbing them of the economic value of the licenses.

stated in *INS*, the hot news doctrine is concerned principally with giving news providers the "reasonable opportunity to obtain just returns for their expenditures." *INS*, 248 U.S. at 241.  The doctrine "postpones participation by complainant's competitor in the process of distribution and reproduction of news that it has not gathered . . . to the extent necessary to prevent that competitor from reaping the fruits of complainant's efforts and expenditure, to the partial exclusion of [AP]." *Id.*  Here, Meltwater's service misappropriates the news gathered by AP and denies it the "reasonable opportunity to obtain [its] just returns."  *Id.*

Indeed, Meltwater's assertion that, "No court has ever suggested that the hot-news doctrine can be applied to restrict the use of news material once it has been made available to the world on the Internet" (Opening Memo at 11) is simply false.  In *All Headline News*, 608 F. Supp. 2d 454 (S.D.N.Y. 2009), the Southern District did just that.  In that case, AP alleged that defendant's employees were finding "news stories on the internet" and preparing them for republication under its own banner, either by rewriting the text or copying the stories in full, and the Southern District found that the complaint alleged a viable, non-preempted hot news claim. *Id*. at 457.  In *Barclays*, the Second Circuit favorably cited *All Headline News* as an example of a case where "the plaintiff may have had a non-preempted 'hot news' cause of action."  *Barclays*, 650 F.3d at 906.  And in *NBA*, where Motorola's reporters obtained the facts it disseminated by watching the NBA games freely available on television or radio (*see* 105 F.3d at 855), the court never suggested that this fact was an impediment to the hot news claim.  In the face of this case law and any sense of public policy, Meltwater cannot plausibly claim that AP's hot news misappropriation claim is foreclosed by publication of its stories on the Internet.

Nor does the case law that Meltwater relies on offer any guidance on this matter.  In *Fin. Info., Inc. v. Moody's Investors Serv., Inc.* ("*FII*"), 808 F.2d 204, 209 (2d Cir. 1986), the Second

15

Circuit specifically noted that "to the extent that Moody's did copy from FII, the information it published would have been at least ten days old."  The fact that the Second Circuit held that ten days was sufficient for the plaintiff to "utilize his competitive edge" and therefore preclude a hot news misappropriation claim (*id*.) is hardly determinative here.  And in *NBA*, because the defendants in that case were found not to be "free riding," the court never addressed whether the plaintiff had had a "reasonable opportunity" to exploit its newsgathering efforts.  105 F.3d at 854.[8]

Here, AP has pled facts that establish that Meltwater is free riding on AP's newsgathering efforts, enabling Meltwater to produce a directly competitive product at a lower cost and thus depriving AP of a reasonable opportunity to exploit those efforts or to meaningfully "utilize [its] competitive edge."  *FII*, 808 F.2d at 209.  AP has pled facts that fall well within the scope of a non-preempted *INS* hot news claim, and Meltwater's motion should therefore be denied.[9]

---

[8] Significantly, none of the cases Meltwater cites ruled on the hot news claim on a motion to dismiss or motion for judgment on the pleadings.  Indeed, to the extent a determination of whether AP had a "reasonable opportunity" to obtain just returns for its expenditures before Meltwater copied and distributed its news content is necessary, such a determination is an issue of fact appropriate on a motion for summary judgment or at trial, rather than on a motion for judgment on the pleadings.

[9] Meltwater also makes a half-hearted effort to argue that AP's hot news claimed is barred by the First Amendment, citing cases in wholly inapposite circumstances.  For example, Meltwater cites *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979) (Opening Memo at 12), while omitting the fact that the case addressed a matter of public record and the Supreme Court specifically narrowed its holding to "the power of a state to punish the truthful publication of an alleged juvenile delinquent's name lawfully obtained by a newspaper."  *Smith*, 443 U.S. at 105-106.  Indeed, as alleged in AP's Amended Complaint, Meltwater cannot be considered a "newspaper," as it employs no reporters or newsgatherers of its own and its business serves no independent purpose other than the distribution of news created by others.  Am. Compl.  ¶¶ 2, 6.  Meltwater is not a member of the press breaking news, nor is it even a public search engine.  Rather, in the words of *INS*, Meltwater is using AP news as "merchandise" being transmitted for a "commercial use."  *INS*, 248 U.S. at 236, 239.  As *INS* further discussed, there is a world of difference between "the utilization of tips" to foster additional reporting "and the bodily appropriation of news matter…without independent investigation and verification."  *Id.* at 243-44.  Here, unlike in *Barclays*, AP is not "making news" and Meltwater is serving no journalistic function but instead merely commoditizing the products of AP and other news sources.  In short, a cause of action restricting the unfair appropriation of hot news as a commodity, containing the stringent elements of a hot news claim, does not offend the First Amendment, especially when Meltwater is not serving a journalistic function.

**D.      AP's Hot News Claim Is Not Based On Meltwater's Use Of AP's Literary Expression**

Finally, Meltwater claims that AP's hot news misappropriation claim is preempted because the Amended Complaint also seeks to protect AP's literary expression and references the verbatim use of AP's published texts.  Opening Memo at 12.  Meltwater's argument is frivolous:  AP can certainly assert simultaneously that Meltwater commits copyright infringement by copying the literary expression in its articles and commits hot news misappropriation by appropriating the time sensitive information contained within its articles.

Meltwater's argument flies in the face of both *INS* and *Barclays*.  In *INS*, the defendant was found to have committed "bodily appropriation of a statement of fact *or a news article, with or without rewriting*."  248 U.S. at 243 (emphasis added).  The Supreme Court recognized that AP had a copyright interest in its news articles:  "[n]o doubt news articles often possess a literary quality . . . nor do we question that such an article, as a literary production, is the subject of copyright."  *INS*, 248 U.S. at 234.  But, as the Court reasoned, the focus of a hot news misappropriation claim is the *news* or information, not the protected expression in the article, and was therefore a separate and distinct claim.  *Id.* at 234-35.  In other words, the hot news misappropriation claim was still viable even though INS's activities included copying news articles without rewriting them.  Accordingly, AP's hot news claim here is entirely consistent with *INS*.

Similarly, in *Barclays*, the plaintiff Firms brought claims for both copyright infringement and hot news misappropriation.  650 F.3d at 880.  The Firms' copyright claims were based on the "verbatim copying and dissemination" of portions of seventeen of the Firms' financial reports. *Id.*; *see also* the underlying Complaint in *Barclays*, Case No. 1:06-cv-04908-DLC, Dkt. No. 1

17

¶¶ 22, 24, 30. [10]  The Firms' hot news claim, however, was based on "Fly's continual electronic publication of the Firms' Recommendations"—apparently including publication through some of the same "verbatim copying and dissemination" that formed the basis of the Firms' copyright claims.  *Barclays*, 650 F.3d at 880; McNamara Decl. Ex. A ¶¶ 33-38.  Indeed, the Second Circuit expressly recognized that the "firms have been entirely successful on these copyright claims." *Barclays*, 650 F.3d at 880.  Yet, it did not rule that the Firms' hot news claim was preempted because the Firms also sought copyright protection.  Instead, it undertook the preemption analysis and based its determination on the fact that Fly was not "free riding" in the *INS* sense, but was instead "reporting financial news."  *Id.* at 902, 905.  Finally, in *All Headline News*, the court similarly rejected a motion to dismiss a hot news misappropriation claim without mentioning as an obstacle that AP had simultaneously filed a copyright infringement claim.  608 F. Supp. 2d at 457, 461. [11]

Accordingly, Meltwater's contention that AP's hot news claim is foreclosed simply because AP also seeks to protect its literary expression in its copyright claims is contrary to law and entirely without merit.

## II.   AP SHOULD BE GRANTED LEAVE TO AMEND THE AMENDED COMPLAINT TO REVISE ITS COPYRIGHT MANAGEMENT CLAIM

In its Opening Memo, Meltwater argues that AP's claim under 17 U.S.C. § 1202(b) should be dismissed.  Specifically, Meltwater argues that AP's claim under 17 U.S.C. § 1202(b)(1) is improperly pled because AP fails to allege that Meltwater itself removes AP's

---

[10] A true and correct copy of the underlying Complaint in *Barclays* is annexed to the December 14, 2012 Declaration of Elizabeth A. McNamara, submitted herewith ("McNamara Decl."), as Exhibit A.

[11] Meltwater tries to create confusion about the nature of AP's hot news misappropriation claim by quoting out of context certain allegations in AP's Amended Complaint (*see* ¶ 90), but in context the full pleading makes very plain that AP's hot news claim is based on Meltwater's use of its news or factual information, not its expression.  *See, e.g.*, Amended Complaint ¶¶ 88, 132 ("Meltwater's Global Media Monitoring service and associated products are merely a way for Meltwater to free-ride on AP's significant investments in gathering and reporting accurate, timely news, including breaking news.")

DWT 20676174v5 0025295-000064

copyright management information ("CMI"), and, therefore, that AP's claim under 17 U.S.C. § 1202(b)(3) fails because AP did not allege that Meltwater had knowledge that AP's CMI had been removed.

To the extent the allegations contained in the Amended Complaint are insufficient, AP respectfully requests that it be permitted to amend the Amended Complaint pursuant to Fed. R. Civ. P. 15(a) to allege that:  (1) Meltwater itself removed AP's CMI from AP's articles without AP's permission; (2) Meltwater distributes AP's articles and/or portions thereof without AP's CMI; (3) Meltwater, having itself removed AP's CMI from AP's articles, has knowledge that the CMI has been removed; and (4) Meltwater has acted knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of AP's rights under the Copyright Act.

Under Fed. R. Civ. P. 15(a)(2), a "court should freely give leave [to amend the complaint] when justice so requires."  "In general, district courts should not deny leave unless there is a substantial reason to do so, such as excessive delay, prejudice to the opposing party, or futility."  *Friedl v. City of New York*, 210 F.3d 79, 87 (2d Cir. 2000).

Here, amending the Amended Complaint would be well within the interests of justice. Meltwater's answer alleges that, in response to its customers' search queries, it provides the article headline, the opening text of the article, and the hit sentence containing the customer's key words.  Ans. ¶ 48.  Tellingly, Meltwater has not alleged that it provides the customer with the copyright notice. [12]  Additionally, discovery in this case has provided evidence that

---

[12] Meltwater claims that "courts are divided" as to whether CMI, as defined in 17 U.S.C. § 1202(c), includes a copyright owner's name and copyright notice, and that because "AP has previously argued [in another case] that such material is not CMI" any such claim would be "doom[ed] . . . right out of the gate." Opening Memo at 16 n.4 (citing *McClatchey v. The Associated Press*, No. 3:05-cv-145, 2007 WL 776103, at *5 (W.D. Pa. March 9, 2007).  Meltwater grossly mischaracterizes AP's argument in *McClatchey*.  In that case, the CMI at issue was a copyright notice found on a printed photograph and was

Meltwater itself copies and distributes the full text of articles without regard to AP's CMI.  *See* November 9, 2012 Declaration of Elizabeth A. McNamara, submitted with AP's motion for summary judgment, Exs. 41, 43.

Courts have permitted amendment of a complaint in situations similar to this.  In *Friedl*, for example, the Second Circuit held that the plaintiff should have been permitted to amend his complaint because "there has been no showing of either undue delay, given that the amendment was proposed only after discovery revealed additional relevant facts, or prejudice to the defendants, given the minimal extent of the proposed changes."  210 F.3d at 88.  So too here, there has been no undue delay or prejudice to Meltwater, and AP should be permitted to amend the Amended Complaint.

---

alleged to have been cropped.  *Id.* at *2.  AP argued that the notice was not CMI under § 1202(c) because it was not "digital," not because such information could never constitute CMI.  *Id.* at *5.

Moreover, courts in this district are not "divided" on this issue; as Judge Castel held in *All Headline News*, identification of the AP as the owner and author of published articles qualifies as CMI, at least for the purpose of deciding a motion to dismiss.  608 F. Supp. 2d. at 461-62.

## <u>CONCLUSION</u>

For the reasons set forth above, plaintiff The Associated Press respectfully requests that

the Court deny Meltwater's motion for judgment on the pleadings under Rule 12(c) and grant AP

leave to amend the Amended Complaint in connection with its claim under 17 U.S.C. § 1202(b).

Dated:  New York, New York
       December 14, 2012

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:    s/ Elizabeth A. McNamara
       Elizabeth A. McNamara
       Linda Steinman
       Alison B. Schary
       Collin J. Peng-Sue

1633 Broadway – 27th Floor
New York, New York 10019
Telephone:    (212) 489-8230
Facsimile:     (212) 489-8340

*Attorneys for Plaintiff The Associated Press*

DWT 20676174v5 0025295-000064