DAVID H. KRAMER (admitted *pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300

TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7700

*Attorneys for the Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE ASSOCIATED PRESS, | ) |
| Plaintiff, | ) |
| v. | ) |
| MELTWATER U.S. HOLDINGS, INC.; MELTWATER NEWS U.S., INC.; and MELTWATER NEWS U.S. 1, INC., | ) |
| Defendants. | ) |

CASE NO.: 1:12-CV-01087-DLC
ECF CASE

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR JUDGMENT ON THE PLEADINGS AS TO**
**DEFENDANTS' COUNTERCLAIMS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................ii

INTRODUCTION ........................................................................................................................1

ARGUMENT................................................................................................................................3

I.  AP IS NOT ENTITLED TO JUDGMENT ON THE PLEADINGS AS TO
    MELTWATER'S LIBEL *PER SE* COUNTERCLAIM ..........................................................4

    A.  Background on Libel Claim ...................................................................................4

    B.  AP's Press Release Is Not A Fair And True Report Of A Judicial Proceeding
        Because It Accuses Meltwater Of Conduct That Is Different From And More
        Serious Than The Allegations In Its Complaint ..........................................................5

    C.  The Statements In AP's Press Release Impugn Meltwater's Basic Integrity
        And Professionalism And Accuse Meltwater Of Engaging In Unlawful And
        Dishonest Business Practices ........................................................................................8

II. AP IS NOT ENTITLED TO JUDGMENT ON THE PLEADINGS AS TO
    MELTWATER'S TORTIOUS INTERFERENCE COUNTERCLAIM ..............................10

III. MELTWATER IS ELIGIBLE FOR THE DMCA SECTION 512 SAFE HARBOR ...........12

    A.  Background for DMCA Claim...................................................................................12

    B.  Meltwater Does Not Interfere With "Standard Technical Measures" ........................13

CONCLUSION ........................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*534 E. 11th St. Hous. Dev. Fund Corp. v. Hendrick,*
  90 A.D.3d 541 (1st Dep't 2011) ....................................................................10

*Admiral Ins. Co. v. Adges,*
  No. 11-cv-8289 (JPO), 2012 WL 2426541 (S.D.N.Y. June 27, 2012) .........................3

*ALS Scan, Inc. v. RemarQ Communities, Inc.,*
  239 F.3d 619 (4th Cir. 2001) .......................................................................17

*Amaranth LLC v. J.P. Morgan Chase & Co.,*
  71 A.D.3d 40 (1st Dep't 2009) ....................................................................10

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................................3

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................3

*Biro v. Conde Nast,*
  No. 11-cv-4442 (JPO), 2012 WL 3234106 (S.D.N.Y. Aug. 9, 2012) ..........................8

*Calvin Klein Trademark Trust v. Wachner,*
  129 F. Supp. 2d 248 (S.D.N.Y. 2001) .......................................................8, 11

*Celle v. Filipino Reporter Enters. Inc.,*
  209 F.3d 163 (2d Cir. 2000) ..................................................................8, 11

*Chao v. Mount Sinai Hosp.,*
  No. 10-cv-2869 (HB), 2010 WL 5222118 (S.D.N.Y. Dec. 17, 2010) ..........................12

*Corbis Corp. v. Amazon.com, Inc.,*
  351 F. Supp. 2d 1090 (W.D. Wash. 2004) ....................................................15

*Daniel Goldreyer, Ltd. v. Van de Wetering,*
  217 A.D.2d 434 (1st Dep't 1995) ..........................................................5, 7, 9

*Davis v. Ross,*
  754 F.2d 80 (2d Cir. 1985) ...........................................................................8

*Dibble v. WROC TV Channel 8,*
  142 A.D.2d 966 (4th Dep't 1988) ...................................................................5

*Ford v. Levinson,*
  90 A.D.2d 464 (1st Dep't 1982) ....................................................................6

*Four Star Stage Lighting, Inc. v. Merrick*,
   56 A.D.2d 767 (1st Dep't 1977) ........................................................................8, 9

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
   50 N.Y.2d 183 (1980)..........................................................................................10

*Hendrickson v. eBay, Inc.*,
   165 F. Supp. 2d 1082 (C.D. Cal. 2001)...............................................................15

*Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*,
   49 N.Y.2d 63 (1979)..............................................................................................6

*In re Aimster Copyright Litig.*,
   252 F. Supp. 2d 634 (N.D. Ill. 2002)...................................................................16

*In re Aimster Copyright Litig.*,
   334 F.3d 643 (7th Cir. 2003) ...............................................................................16

*Io Grp., Inc. v. Veoh Networks, Inc.*,
   586 F. Supp. 2d 1132 (N.D. Cal. 2008)...............................................................17

*Krepps v. Reiner*,
   588 F. Supp. 2d 471 (S.D.N.Y. 2008)..................................................................12

*Nationwide Tarps, Inc. v. Midwest Canvas Corp.*,
   228 F. Supp. 2d 202 (N.D.N.Y. 2002)...................................................................7

*Pisello v. Town of Brookhaven*,
   933 F. Supp. 202 (E.D.N.Y. 1996) ........................................................................9

*Rossi v. Motion Picture Ass'n of Am. Inc.*,
   391 F.3d 1000 (9th Cir. 2004) .............................................................................17

*Ruder & Finn Inc. v. Seaboard Sur. Co.*,
   52 N.Y.2d 663 (1981)......................................................................................8, 11

*Stapleton Studios, LLC v. City of N.Y.*,
   26 A.D.3d 236 (1st Dep't 2006) ..........................................................................11

*Twelve Inches Around Corp. v. Cisco Sys., Inc.*,
   No. 08-cv-6896 (WHP), 2009 WL 928077 (S.D.N.Y. Mar. 12, 2009)................17

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
   620 F. Supp. 2d 1081 (C.D. Cal. 2008)................................................................14

*Union Associated Press v. Heath*,
   49 A.D. 247 (1st Dep't 1900) ................................................................................9

*Van–Go Transp. Co. v. N.Y.C. Bd. of Educ.*,
   971 F. Supp. 90 (E.D.N.Y. 1997) ..........................................................................8

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   718 F. Supp. 2d 514 (S.D.N.Y. 2010)............................................................................15

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012)..........................................................................13, 14, 15

*Wolk v. Kodak Imaging Network, Inc.*,
   840 F. Supp. 2d 724 (S.D.N.Y. 2012)........................................................................15

*Wright v. Monroe Cmty. Hosp.*,
   No. 11-3520-cv, 2012 WL 3711743 (2d Cir. Aug. 29, 2012)......................................3

*Zu Guo Yang v. Shanghai Cafe Inc.*,
   No. 10-cv-8372 (LLS), 2012 WL 398641 (S.D.N.Y. Feb. 8, 2012) ..........................5, 7

## Statutes

17 U.S.C. § 512 et seq. .................................................................................................1

17 U.S.C. § 512(c) ...............................................................................................passim

17 U.S.C. § 512(i) ...............................................................................................passim

17 U.S.C. § 512(k)(1)(B) ...........................................................................................15

17 U.S.C. § 512(m) ....................................................................................................18

N.Y. Civ. Rights Law § 74.................................................................................1, 5, 7

## Rules

Fed. R. Civ. P. 12(b)(6) ...............................................................................................3

Fed. R. Civ. P. 12(c) .........................................................................................1, 3, 9

## Other Authorities

3 Melville B. Nimmer and David Nimmer,
   Nimmer on Copyright § 12B.02[B][3][a] (2012) .....................................................15

72 N.Y. Jur. 2d Interference § 24...............................................................................10

H.R. Rep. No. 105-551, pt. 2 (1998)....................................................................14, 15

Lauren G. Gallo, *The (Im)possibility of "Standard Technical Measures" for UGC
   Websites*, 34 Colum. J.L. & Arts 283 (2011)...........................................................15

S. Rep. No. 105-190 (1998) ..................................................................................17, 18

Defendants and Counterclaim-Plaintiffs (collectively "Meltwater") submit this memorandum of law in opposition to Plaintiff and Counterclaim-Defendant's ("AP") Motion for Judgment on the Pleadings as to Meltwater's Amended Counterclaims.

## INTRODUCTION

AP is not entitled to judgment under Federal Rule of Civil Procedure 12(c) on any of Meltwater's Amended Counterclaims: (1) libel *per se*, (2) tortious interference with business relations, or (3) declaratory judgment of safe harbor from infringement claims based upon the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512 et seq.

**Libel *Per Se***.  Meltwater's libel *per se* counterclaim addresses the defamatory statement made by AP in a February 14, 2012 Press Release.  Neither of AP's two arguments for dismissing Meltwater's libel claim has merit.

*First*, AP seeks immunity under Section 74 of the New York Civil Rights Law on the ground that the Press Release was a "fair and true report" of its copyright infringement action filed against Meltwater that same day.  However, Section 74 does not protect any statements that would have a different effect on the reader's mind by suggesting more serious conduct than that actually alleged in AP's Complaint.  AP's Press Release accuses Meltwater of "refus[ing] to license the content that it delivers to its customers," an allegation nowhere to be found in AP's Complaint or Amended Complaint.  AP did not plead the allegation because it had no factual basis to support it.  Before filing its Complaint, AP never even indicated to Meltwater that AP believed Meltwater or its customers needed a license to AP's content to continue using the Meltwater service.  AP never offered Meltwater a license to AP's content, and Meltwater never refused to take one.  By including this accusation in its Press Release, AP gave the false impression that Meltwater needs a license to continue operating its service and is openly flouting the law by "refusing" AP's offer to take a license – an impression that paints Meltwater's business practices as more egregious than the allegations actually made in AP's pleadings.

-1-

*Second*, AP claims that the statement made in its Press Release is not capable of defamatory meaning as a matter of law.  That argument is contrary to well-settled New York law that a statement which tends to injure an entity in its business by impugning its basic integrity and trustworthiness, or imputing any kind of fraud, dishonesty, or misconduct in the course of its trade or profession, is considered defamatory *per se*, and reputational injury is conclusively presumed from the publication itself.  The false accusation that Meltwater "refuses to license the content that it delivers to its customers" is precisely such a statement because it directly accuses Meltwater of engaging in unlawful and dishonest business practices and impugns its basic integrity and respect for the law, which are of particular importance in its industry.

**Tortious Interference**.  Meltwater's tortious interference counterclaim alleges that AP:  (1) conducted a substantial investigation of Meltwater's business and had knowledge of Meltwater's existing customers and prospective contractual relationships by the time AP issued its Press Release; (2) specifically intended to damage those relationships; (3) employed wrongful means of defamation with the specific intent of harming Meltwater; and (4) succeeded in disrupting a number of Meltwater's business relationships by directly causing existing and prospective customers to terminate, not expand, or not commence their Meltwater News subscriptions.  Meltwater's allegations are more than sufficient to satisfy the elements of the claim.

AP claims that Meltwater failed to allege "wrongful means" in support of its tortious interference claim.  That is false.  Under New York law, fraudulent and false misrepresentations, including defamatory statements such as that found in AP's Press Release, are predicate wrongful acts which routinely support a tortious interference claim.  Meltwater may state concurrent causes of action for both defamation and tortious interference under separate theories of liability, as long as the tortious interference claim alleges pecuniary – in addition to reputational – injury.  Meltwater alleges precisely such pecuniary injury through the loss of existing, renewable, and prospective subscribers.

**DMCA Safe Harbor**.  AP separately argues that Meltwater is categorically ineligible for protection under the "safe harbor" provision of the DMCA that applies to "[i]nformation residing on

systems or networks at direction of users." 17 U.S.C. § 512(c).  That is so, according to AP, because information residing on Meltwater's system at the direction of Meltwater's users can be accessed only by those users, and not by third-party copyright owners.  AP claims that this aspect of Meltwater's system disqualifies it from the safe harbor because it somehow interferes with a "standard technical measure" that copyright owners use to protect their works.  17 U.S.C. § 512(i)(1)(B).  This argument is without merit.  What amounts to a "standard technical measure" under the DMCA is specifically and narrowly defined by the statute, and AP's ability to visit a Meltwater customer's private archive simply does not meet that definition.  More broadly, AP's claim that Meltwater is disqualified from the safe harbor because it lets users store information in private online accounts fundamentally misunderstands the DMCA.  Nothing in the statute limits its protections to service providers that require their users to make stored material accessible to the world.  And no case has ever even suggested, much less held, anything like that.  AP's approach would undermine the purpose of the statute by stripping protection from a vast array of online services – from email systems like Gmail to cloud-based storage lockers like Dropbox – that similarly allow users to store content in folders that are available only to those users.

## ARGUMENT

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim."  *Wright v. Monroe Cmty. Hosp.*, No. 11-3520-cv, 2012 WL 3711743, at *1 (2d Cir. Aug. 29, 2012) (internal marks and citation omitted).  "On a Rule 12(c) motion, the Court must accept as true the non-movant's allegations and draw all reasonable inferences in the nonmovant's favor."  *Admiral Ins. Co. v. Adges*, No. 11-cv-8289 (JPO), 2012 WL 2426541, at *1 (S.D.N.Y. June 27, 2012).  Meltwater need only plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Wright*, 2012 WL 3711743, at *1 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570) (2007))).

I.   **AP IS NOT ENTITLED TO JUDGMENT ON THE PLEADINGS AS TO MELTWATER'S LIBEL *PER SE* COUNTERCLAIM**

    A.   **Background on Libel Claim**

AP filed its original Complaint on February 14, 2012, asserting direct, contributory, and vicarious copyright infringement of 19 specific AP-owned articles, as well as claims for hot-news misappropriation and removal of Copyright Management Information (Dkt. No. 1).  AP filed an Amended Complaint on July 13, 2012, after which Meltwater filed its Amended Answer and Counterclaims on August 8, 2012 (Dkt. Nos. 30, 35).

The allegations of AP's original Complaint were rife with misrepresentations about Meltwater and its Meltwater News service.  Meltwater Am. Countercl. ¶ 12 (Dkt. No. 35).  Presumably seeking to leverage its media influence to its advantage, AP issued a Press Release regarding its suit that not only repeated the falsehoods in its Complaint but went beyond the Complaint to add a knowingly false and disparaging accusation about Meltwater, claiming it refused to take licenses from AP and others, when Meltwater did no such thing.  *Id.* ¶¶ 13, 106-08.  AP widely distributed its out of court statements in print media, broadcast media, and on the Internet with the specific intent of damaging Meltwater's relationships with existing and potential subscribers and scaring away such customers from doing business with Meltwater.  *Id.* ¶¶ 13-14, 122.  As intended by AP, the Press Release spread rapidly throughout the media and wrongfully caused current and prospective Meltwater customers to question the legitimacy of Meltwater and its business practices.  *Id.* ¶ 123.  Multiple pre-existing and would-be customers have cited – and continue to cite – AP's false accusations as a basis for not renewing their subscriptions to Meltwater News and for otherwise avoiding business relationships with Meltwater.  *Id.* ¶¶ 14, 124-25.  Through its state law counterclaims, Meltwater seeks to correct the falsehoods that AP spread and to obtain compensation for the loss of business that they caused.

**B.**     **AP's Press Release Is Not A Fair And True Report Of A Judicial Proceeding Because It Accuses Meltwater Of Conduct That Is Different From And More Serious Than The Allegations In Its Complaint**

As its first defense to Meltwater's libel claim, AP invokes the "fair and true report" privilege of Section 74 of the New York Civil Rights Law, which provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding …." But AP fails to cite the limiting clause of this provision, which states that "[t]his section does not apply to a libel contained in any other matter added by any person concerned in the publication …." *Id.*

Thus, the "fair and true report" privilege does not apply if the published account of a judicial proceeding would have a different effect on the reader's mind than what is actually suggested in the proceeding:

> The test is whether the published account of the proceeding would have a different effect on the reader's mind than the actual truth, if published.  If the published account, along with the rest of the article, suggests more serious conduct than that actually suggested in the official proceeding, then the privilege does not attach, as a matter of law.

*Daniel Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 435-36 (1st Dep't 1995) (citations omitted); *accord Zu Guo Yang v. Shanghai Cafe Inc.*, No. 10-cv-8372 (LLS), 2012 WL 398641, at *8 (S.D.N.Y. Feb. 8, 2012) (quoting *Daniel Goldreyer, Ltd.*, 217 A.D.2d at 436); *Dibble v. WROC TV Channel 8*, 142 A.D.2d 966, 967 (4th Dep't 1988).

AP's Press Release includes allegations of misconduct that go well beyond those in AP's Complaint.  Specifically, AP's Press Release falsely states that Meltwater "refuses to license the content that it delivers to its customers."  Meltwater Am. Countercl. ¶ 113 (Dkt. No. 35).  AP made no such allegation in either its original Complaint or Amended Complaint.  AP was careful to allege only that Meltwater "does not license" its content and that Meltwater "has neither sought nor obtained a license for its use of AP Content."  Compl. ¶¶ 8, 123 (Dkt. No. 1); Am. Compl. ¶¶ 8, 126 (Dkt. No. 30).  AP's decision not to allege in its Complaint that Meltwater "refused" to license AP's content speaks volumes.  AP knew it had no basis whatsoever to make that allegation.  Prior to suing

-5-

Meltwater, AP never asked Meltwater to take a license in order to continue offering Meltwater News.  Meltwater Am. Countercl. ¶ 116 (Dkt. No. 35).  Indeed, AP never indicated to Meltwater that AP believed Meltwater or its customers infringed AP's copyrights through the Meltwater News service.  *Id.* ¶ 89.  AP knew firsthand that Meltwater had never *refused* to license AP content.  *Id.* ¶ 115.

The false statement that Meltwater "refuses to license the content that it delivers to its customers" would have a different effect on the minds of readers than AP's actual Complaint.  It suggests that AP approached Meltwater with its infringement allegations prior to filing the lawsuit; that AP engaged in license discussions with Meltwater; that even in the face of a reasonable offer from AP, Meltwater refused to license AP's content; and that Meltwater is deliberately putting its customers at risk of copyright liability.  The overarching false impression is that Meltwater is flouting the law.  This paints Meltwater's business practices in a more serious and egregious light in the eyes of its customers and business partners.  Meltwater's service requires the use of Internet news articles.  If a license is required for use of these articles, the notion that Meltwater would "refuse" such a license will discourage – and has in fact discouraged – customers from doing business with it.

AP cites cases for the proposition that a "fair and true report" need not quote, verbatim, the exact words in a pleading.  *See* AP Mem. at 7 (Dkt. No. 41).  But those cases do not help AP, because they demonstrate that each and every statement must derive "clearly and directly" from the pleading.  *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 67 (1979) (no liability where newspaper article did not "assign[] to the intelligence reports allegations not contained in those documents"); *Ford v. Levinson*, 90 A.D.2d 464, 465 (1st Dep't 1982) (comments in newspaper fell "clearly and directly" within the "clearly allege[d]" allegations in the complaint, or otherwise stated non-defamatory background material).  The suggestion here that Meltwater "refuses to license" AP content is nowhere to be found in the Complaint because AP

-6-

knew it had no plausible basis to plead that false accusation.  The statement does not derive "clearly and directly" from the pleading.

The distinction between "not obtaining a license" based on the understanding that one is not required, and "refusing to license" with knowledge that one is required, is sharp and serious.  This accusation, which goes beyond conduct actually alleged in AP's Complaint, creates the sort of "different effect on the reader's mind" that routinely vitiates the Section 74 privilege.  *See, e.g.*, *Zu Guo Yang*, 2012 WL 398641, at *8-9 (statements by former employees that employer "*stole*" workers' tips was not a fair and true report of those employees' labor law action against a restaurant, which alleged that employer "*willfully withheld*" the tips: "the statement here that [employer] stole workers' tips for a long time is not necessarily coextensive with the withholding of tips alleged in the amended complaint.  A reasonable reader could therefore conclude that that statement implies that [employer's] alleged theft went beyond what is alleged in this action …." ) (emphasis added); *Daniel Goldreyer, Ltd.*, 217 A.D.2d at 436-37 (newspaper article describing plaintiff as using "house paint" and "roller brushes" to restore a masterpiece suggested more serious conduct than that alleged in an official proceeding which accused plaintiff of improperly using synthetic paint); *Nationwide Tarps, Inc. v. Midwest Canvas Corp.*, 228 F. Supp. 2d 202, 212-13 (N.D.N.Y. 2002) (where plaintiff alleged insulation-seller falsely represented its product rating, and thereafter sent a letter to consumers saying that their "business may be affected by [the] dispute," the letter could suggest more serious conduct in the minds of consumers and therefore fell outside Section 74 privilege).[1]

Finally, as long as statements in the Press Release could be found by a reasonable juror to go beyond AP's allegations in the Complaint, the question whether they fall within the Section 74

_____

[1] In a footnote, AP also argues that Meltwater has "conceded" the truth of AP's statement that Meltwater "refused" to license AP's content.  AP Mem. at 10 n.5 (Dkt. No. 41).  Meltwater has conceded no such thing.  Quite the opposite.  *See* Meltwater Am. Countercl. ¶ 114 (Dkt. No. 35) ("*That statement* [in the Press Release] *is false*.  In fact, Meltwater has entered into licensing agreements with several major news publishers that expressly authorize Meltwater to access those publishers' content, beyond what would be freely available on the Internet, and deliver it to Meltwater News subscribers.") (emphasis added).

privilege should be allowed to proceed past the pleading stage. *See Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 253 (S.D.N.Y. 2001) (immunity for plaintiff's comments suggesting fraud, counterfeiting, and inferior product quality, which went beyond allegations in the complaint for breach of contract, trademark violations, and unauthorized distribution practices, presented "at best, a jury question and cannot support summary judgment in plaintiffs' favor"). AP's motion for judgment on the pleadings with regard to its libelous Press Release therefore must be rejected.

### C.   The Statements In AP's Press Release Impugn Meltwater's Basic Integrity And Professionalism And Accuse Meltwater Of Engaging In Unlawful And Dishonest Business Practices

AP argues that none of the statements in its Press Release is actionable because none is defamatory as a matter of law. AP Mem. at 11 n.6 (Dkt. No. 41). The argument is meritless.

It is well-settled under New York law that "[w]here a statement impugns the basic integrity … of a business, an action for defamation lies and injury is conclusively presumed." *Ruder & Finn Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670 (1981); *accord, e.g.*, *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 179 (2d Cir. 2000) ("'[A] writing which *tends* to disparage a person in the way of his office, profession or trade' is defamatory *per se* and does not require proof of special damages.") (emphasis in original; citations omitted); *Biro v. Conde Nast*, No. 11-cv-4442 (JPO), 2012 WL 3234106, at *8 (S.D.N.Y. Aug. 9, 2012); *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir. 1985); *see also Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 768 (1st Dep't 1977) ("[W]ords are libelous if they affect a person in his profession, trade, or business, by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof …."); *Van–Go Transp. Co. v. N.Y.C. Bd. of Educ.*, 971 F. Supp. 90, 98 (E.D.N.Y. 1997) ("Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties.").

The statement that Meltwater "refuses to license the content that it delivers to its customers" is defamatory *per se* because it directly accuses Meltwater of engaging in illegal and otherwise

wrongful business practices.  If taken as true by readers, the statement impugns the basic integrity and professionalism of Meltwater and can foster the reputation that Meltwater willfully disregards intellectual property rights and engages in misconduct.  New York courts routinely deem such statements to be defamatory *per se*.  *See, e.g.*, *Union Associated Press v. Heath*, 49 A.D. 247, 253-54 (1st Dep't 1900) (allegation published by Associated Press that plaintiff, who was in the business of collecting news and furnishing it to other newspapers, had tapped the wires used by AP, was a "direct attack upon [plaintiff's] business methods, and, if believed, necessarily injures its business" and was "clearly libelous *per se*"); *Four Star Stage Lighting*, 56 A.D.2d at 768 (defendant's letter to third party accusing plaintiffs of leasing certain equipment which they had no right to lease "would tend to indicate that plaintiffs were not entirely honest" and was therefore libelous); *Pisello v. Town of Brookhaven*, 933 F. Supp. 202, 218 (E.D.N.Y. 1996) (where defendant wrongfully accused plaintiff of disregarding the Town's permit procedures and Code, "this misleading portrayal of the facts, which lead to the defendants' conclusions that the plaintiff conducts his business 'affairs in complete disregard for the standards of the law that are in place' states a cause of action for defamation sufficient to survive a Rule 12(c) motion"); *Daniel Goldreyer, Ltd.*, 217 A.D.2d at 437 (newspaper article stating that art restorer used a roller brush and house paint on a million dollar abstract masterpiece would be seen, in the context of plaintiff's profession, as "highly unprofessional conduct" and was therefore libelous *per se*) (internal marks and citations omitted).

Finally, AP argues that the statements made in its Press Release – "even if false" – are not capable of defamatory meaning because "[t]hey simply describe Meltwater's operations …."  AP Mem. at 11 n.6 (Dkt. No. 41).  The argument is nonsensical.  If a statement is false – as Meltwater specifically alleges in its Amended Counterclaim – then it clearly *does not* describe Meltwater's operations.

Meltwater has properly pleaded a claim for libel *per se*, and AP's motion for judgment on the pleadings as to that claim should be denied.

-9-

## II.   AP IS NOT ENTITLED TO JUDGMENT ON THE PLEADINGS AS TO MELTWATER'S TORTIOUS INTERFERENCE COUNTERCLAIM

An action for tortious interference with prospective business, economic, or contractual relations, has five elements: "(1) the defendant's knowledge of a business relationship between the plaintiff and a third party; (2) the defendant's intentional interference with the relationship; (3) that the defendant acted by the use of wrongful means or with the sole purpose of malice; and (4) resulting injury to the business relationship." *534 E. 11th St. Hous. Dev. Fund Corp. v. Hendrick*, 90 A.D.3d 541, 542 (1st Dep't 2011).  AP argues that Meltwater's claim for tortious interference with business relations[2] is deficient in only one respect, namely that it fails to allege the third element— that AP interfered with Meltwater's business relations by wrongful or "unlawful" means.  AP Mem. at 13 (Dkt. No. 41).  That argument should be rejected because Meltwater's counterclaims allege AP's defamation statement as a form of unlawful means in support of the tortious interference claim. Meltwater Am. Countercl. ¶¶ 106-25, 167 (Dkt. No. 35).

AP argues that the tortious interference claim should be dismissed as improperly "duplicative" of the libel *per se* claim.  AP Mem. at 14 (Dkt. No. 41).  That argument borders on the frivolous.  Under New York law, "[d]efamation is a predicate wrongful act for a tortious interference claim."  *Amaranth LLC v. J.P. Morgan Chase & Co.*, 71 A.D.3d 40, 48-49 (1st Dep't 2009) (plaintiff hedge fund stated claim for tortious interference where defendant's executives made defamatory statements to a third-party investor that questioned the hedge fund's solvency and possibly its honesty in doing business).  In fact, New York courts consistently allow parties to state concurrent claims for defamation *and* tortious interference under separate yet simultaneous theories of liability, as long as the tortious interference claim alleges some pecuniary injury in addition to

---

[2] AP also argues that Meltwater failed to plead a claim for tortious interference with existing contractual relationships.  Meltwater's complaint did not include a claim for interference with existing contracts that have been breached, only a claim for interference with business relationships.  *See* Meltwater Am. Countercl. ¶¶ 162-69 (Dkt. No. 35).  Contracts terminated at will or not renewed, although not breached, are classified as prospective contractual relations for purposes of this tort.  *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 192 (1980); 72 N.Y. Jur. 2d Interference § 24.

reputational harm.  *Calvin Klein*, 129 F. Supp. 2d at 253 ("[Defendants allege] a loss of jeanswear sales to potential customers as a direct result of [Calvin Klein's] interview.  Even though defendants' defamation claims also refer to this same loss of business as a form of damages … there is no reason why defendants should be precluded from seeking compensation for such damage under two distinct legal theories, so long as no double recovery is permitted."); *Stapleton Studios, LLC v. City of N.Y.*, 26 A.D.3d 236, 237 (1st Dep't 2006) (plaintiff stated cognizable claims for both business defamation and tortious interference with prospective business advantage based on the same statements made to the press by defendant's representatives).

Meltwater alleges the requisite reputational and pecuniary injury for both claims.  The reputational injury flowing from the Press Release, which accuses Meltwater of dishonesty and misconduct in its business practices, is "conclusively presumed" and requires no allegation or proof of special damages.  *E.g.*, *Ruder & Finn*, 52 N.Y.2d at 670; *Celle*, 209 F.3d at 179.  In addition to reputational injury, Meltwater alleges that existing and prospective customers have cited and continue to cite AP's accusations as a basis for terminating their relationships with Meltwater or declining to subscribe to Meltwater News.  Meltwater Am. Countercl. ¶¶ 123-25 (Dkt. No. 35); *see also id.* ¶ 168.  Meltwater has also alleged pecuniary injury "in the form of lost profits from existing and future business relationships."  *Id.* ¶ 169.  This was the precise effect intended by AP in issuing its Press Release.  *Id.* ¶ 121 (AP made the statements "specifically intending to harm Meltwater's ability to do business with existing and prospective customers"); *id.* ¶ 106 ("AP … sought to use its press influence to create a false public impression of Meltwater."); *id.* ¶ 167 ("AP intended to disrupt Meltwater's contractual relationships and business expectancies with … current and potential Meltwater customers.").

The two cases cited by AP do not support its claim that the tortious interference claim must be dismissed if it is "based on the same facts as [the] defamation claim."  AP Mem. at 14 (Dkt. No. 41).  They demonstrate only that if the predicate libel claim is dismissed, and there is no other wrongful conduct supporting the tortious interference claim, the tortious interference claim should

be dismissed.  *Chao v. Mount Sinai Hosp.*, No. 10-cv-2869 (HB), 2010 WL 5222118, at *12-13 (S.D.N.Y. Dec. 17, 2010) ("Where tort claims essentially restate a defamation claim *that has been dismissed* on a motion to dismiss, the tort claims must also be dismissed.") (emphasis added); *Krepps v. Reiner*, 588 F. Supp. 2d 471, 485 (S.D.N.Y. 2008) (dismissing a claim for tortious interference with prospective business advantage where it was based on an allegedly defamatory letter that the court found insufficient to state a cause of action for defamation).  Those cases have no application here.[3]

     For these reasons, AP's motion for judgment on Meltwater's claim for tortious interference with business relations should be denied.

### III.     MELTWATER IS ELIGIBLE FOR THE DMCA SECTION 512 SAFE HARBOR

#### A.     Background for DMCA Claim

     Section 512(c) of the DMCA gives "online service providers" immunity against damages for copyright infringement claims that arise "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider …."  17 U.S.C. § 512(c)(1).  To qualify for this "safe harbor" protection, a service provider must meet certain statutory conditions, including registering an agent to receive "notifications of claimed infringement" from copyright owners (§ 512(c)(2)), responding to such notifications by "expeditiously" removing allegedly infringing material brought to their attention (§ 512(c)(1)(C)), having a policy for terminating the accounts of "repeat" infringers of copyright (§ 512(i)(1)(A)), and

---

     [3] AP argues that Meltwater failed to allege a claim for tortious interference with existing contract because it did not allege "any existing contract that was breached."  AP Mem. at 12 (Dkt. No. 41).  As discussed *supra* at 10 n.2, Meltwater did not seek to plead a claim for interference with existing contracts, only one for interference with business relations.  Meltwater need not allege "any existing contract that was breached" to state a claim for interference with business relations.  AP Mem. at 12 (Dkt. No. 41).  In support of that claim, Meltwater alleged that "[s]everal of Meltwater's existing and potential customers have cited AP's misrepresentations as the basis for their decisions to terminate, not to expand, or not to commence a business relationship with Meltwater," and "AP's knowingly false public statements about Meltwater have caused Meltwater substantial damages in the form of lost profits from existing and future business relationships."  Meltwater Am. Countercl. ¶¶ 168-69 (Dkt. No. 35).

accommodating and not interfering with "standard technical measures" as defined by the statute (§ 512(i)(1)(B)).  *See Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 26-27 (2d Cir. 2012).

As set out in Meltwater's counterclaim, Meltwater registered a DMCA agent on March 26, 2012 and complies with all of the other prerequisites for DMCA protection.  Meltwater Am. Countercl. ¶¶ 66-69 (Dkt. No. 35).  Meltwater seeks a declaration that, as of the date of registration, the DMCA protects it against damages liability for the secondary infringement claims that AP makes based on Meltwater users' storage of allegedly infringing material on Meltwater's system.

AP now asks for judgment on the pleadings on Meltwater's DMCA claim.  The only argument AP makes in support of that result is to assert that Meltwater "interfere[s] with standard technical measures" in violation of § 512(i)(1)(B) of the DMCA.  AP Mem. at 16-18 (Dkt. No. 41). That is so, according to AP, because Meltwater operates a private, subscriber-based service, whereby material stored by users on Meltwater's system can be viewed only by Meltwater customers, and not by third-parties.  AP's argument is contrary to the DMCA's text, legislative history, and case law.  It would also undermine the basic purpose of the statute by rendering safe harbor protection unavailable for the many socially beneficial Internet services that allow their users to store material in ways that are not readily available to outsiders – including email systems, cloud-based storage lockers, and private online message boards.

**B.      Meltwater Does Not Interfere With "Standard Technical Measures"**

AP's only argument for taking Meltwater out of the DMCA is that it supposedly interferes with "standard technical measures" because it allows users to store content on its system in ways that third-party copyright owners cannot see.  The argument is entirely without merit.

As an initial matter, AP's effort to categorically exclude services like Meltwater from the 512(c) safe harbor is contrary to the very nature of that provision.  By its terms, the statute applies to claims that arise by reason of the "storage" on a service provider's system of material at the direction of its users without regard to whether the material is accessible to others.  17 U.S.C. § 512(c)(1). Infringement by means of such storage is exactly what AP alleges here, and that is what the safe

harbor is expressly intended to protect.  In a decision that AP inexplicably ignores, the Second

Circuit held recently "that § 512(c) 'is clearly meant to cover *more than* mere electronic storage

lockers.'" *Viacom*, 676 F.3d at 39 (quoting *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F.

Supp. 2d 1081, 1088 (C.D. Cal. 2008)) (emphasis added).  In so holding, the court necessarily

assumed that the provision applies to services that actually *are* mere storage lockers.[4]

AP cannot achieve a different result by invoking the DMCA's "standard technical measures"

provision, which says that service providers must "accommodate[]" and "not interfere with standard

technical measures."  17 U.S.C. § 512(i)(1)(B).  The statute clearly defines what constitutes a

"standard technical measure":

> (2) **Definition.**—As used in this subsection, the term "standard technical measures"
> means technical measures that are used by copyright owners to identify or protect
> copyrighted works and –
>
> > (A) have been *developed pursuant to a broad consensus of copyright owners
> > and service providers in an open, fair, voluntary, multi-industry
> > standards process*;
> >
> > (B) are available to any person on reasonable and nondiscriminatory terms;
> > and
> >
> > (C) do not impose substantial costs on service providers or substantial
> > burdens on their systems or networks.

17 U.S.C. § 512(i)(2) (emphasis added).  As the legislative history explains, this provision:

> is explicitly limited to "standard technical measures" that have been developed
> pursuant to a broad consensus of both copyright owners and service providers in an
> open, fair, voluntary, multi-industry standards process.  The Committee anticipates
> that these provisions could be developed both in recognized open standards bodies or
> in ad hoc groups, as long as the process used is open, fair, voluntary, and multi-
> industry ….

---

[4] *Viacom* rejected the flip-side of the argument that AP makes here – that § 512(c) protection is
available *only* to service providers that actually operate as storage lockers, *i.e.*, services that allow users to
privately store material but not to make it accessible to others.  *Viacom*, 676 F.3d at 39 (holding that "the §
512(c) safe harbor extends to software functions performed 'for the purpose of facilitating access to user-
stored material'") (quoting *UMG Recordings*, 620 F. Supp. 2d at 1088).  It is ironic that – now that it has
become clear that the 512(c) safe harbor applies to service that offer more than just private storage of user-
submitted content – AP comes along to argue that the statute does not apply to services that *only* do that.

H.R. REP. No. 105-551, pt. 2, at 61-62 (1998). Under this definition, a copyright protection measure counts as a "standard technical measure" only if it has been developed and approved as part of the "multi-industry standards" process described in the statute and its legislative history. *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 744-45 (S.D.N.Y. 2012). To date, however, no such measures have actually been adopted under the process that Congress contemplated. *See* 3 Melville B. Nimmer and David Nimmer, NIMMER ON COPYRIGHT § 12B.02[B][3][a] (2012); Lauren G. Gallo, *The (Im)possibility of "Standard Technical Measures" for UGC Websites*, 34 COLUM. J.L. & ARTS 283, 300 (2011). Unsurprisingly, therefore, no case has ever found that a service provider is excluded from DMCA protection for failing to accommodate a standard technical measure. *See, e.g.*, *Wolk*, 840 F. Supp. 2d at 745 (rejecting argument that service provider interfered with standard technical measures).[5]

Disregarding all of this, AP claims that merely because the archive folders on which Meltwater users can store content are private and not accessible to third parties, Meltwater "interferes with" the ability of copyright owners to view their works on Meltwater's system. AP Mem. at 16 (Dkt. No. 41). AP does not explain how copyright owners' ability to view information stored in private folders on an online system satisfies the DMCA's strict definition of "standard

_____

[5] AP suggests in passing that Meltwater "does not qualify as a 'service provider' within the meaning of the statute." AP Mem. at 14 (Dkt. No. 41). AP offers no support for this suggestion. Indeed, it fails even to mention the text of the DMCA, which expressly defines what constitutes a "service provider" for purposes of the § 512(c) safe harbor: "the term 'service provider' means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A)." 17 U.S.C. § 512(k)(1)(B); *Viacom*, 676 F.3d at 39 (explaining and applying the "service provider" definition). Meltwater certainly provides online services to its users; AP does not and could not argue otherwise. Meltwater therefore qualifies as a service provider under the DMCA's broad definition – just like other online services, including YouTube, Amazon.com, and eBay. *See, e.g.*, *Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 518 (S.D.N.Y. 2010) ("YouTube is a service provider for purposes of § 512(c)."), *aff'd in part, vacated in part*, 676 F.3d 19 (2d Cir. 2012); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1100 (W.D. Wash. 2004) (explaining that the DMCA's definition "encompasses a broad variety of Internet activities" and that "there is no doubt that Amazon fits within the definition"); *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1088 (C.D. Cal. 2001) ("eBay clearly meets the DMCA's broad definition of online 'service provider.'").

technical measure."  Indeed, AP does not even acknowledge the existence of that definition.  But viewing content on an online service is not even a "technical" measure as the statute uses that term.  And it certainly is not one that has been "developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process."  § 512(i)(2)(A).  AP therefore cannot exclude Meltwater from the DMCA based on the "standard technical measure" provision.

AP relies almost exclusively on *In re Aimster* (AP Mem. at 17 (Dkt. No. 41)), but that case does not remotely support its argument.  *Aimster* did not even address standard technical measures, much less hold that a service provider is disqualified under that provision because content that users store on the service is not accessible to third parties.  *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634 (N.D. Ill. 2002) ("*Aimster I*"), *aff'd*, 334 F.3d 643 (7th Cir. 2003) ("*Aimster II*").  *Aimster*, which involved a file-sharing service used overwhelmingly to transfer infringing music files, held that the defendant failed to comply with a different provision of the DMCA (one not at issue here) that requires service providers to adopt and implement a repeat infringer policy.  *Aimster II*, 334 F.3d at 655.  AP cites a passage in *Aimster* referring to the defendant's "encryption" protocol, which made it "impossible to ascertain which users are transferring which files."  *Aimster I*, 252 F. Supp. 2d at 659.  But that language does not help AP.  Aimster was not disqualified from the DMCA safe harbor because it prevented *copyright owners* from seeing what material on the service was infringing.  Instead, Aimster's encryption technology made it impossible *for Aimster itself* to know what files its users were exchanging.  *Aimster II*, 334 F.3d at 650 ("[T]he encryption feature of Aimster's service prevented [the defendant] from knowing what songs were being copied by the users of his system ….").  It was on that basis that Aimster was found not to have implemented an appropriate policy for identifying and terminating repeat infringers.  *Id.* at 653 ("[B]y teaching its users how to encrypt their unlawful distribution of copyrighted materials [Aimster] disabled itself from doing anything to prevent infringement."); *Aimster I*, 252 F. Supp. 2d at 659 ("Adopting a

repeat infringer policy and then purposely eviscerating any hope that such a policy could ever be carried out is not an 'implementation' as required by § 512(i).").   There is nothing like that here.

AP cites various other cases that refer to the DMCA's notice-and-takedown process as trying to foster "cooperation" between rights holders and service providers.   Those cases in no way suggest that the safe harbors are not available to service providers that allow users to store content in private folders.   Indeed, none even addressed that issue.   *See Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000 (9th Cir. 2004) (addressing standard for when a copyright owner acts reasonably in sending a DMCA takedown notice); *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001) (addressing whether service provider can maintain DMCA defense after failing to respond to a defective DMCA notice); *Twelve Inches Around Corp. v. Cisco Sys., Inc.*, No. 08-cv-6896 (WHP), 2009 WL 928077 (S.D.N.Y. Mar. 12, 2009) (addressing whether the DMCA applies to trademark infringement claims).   These cases thus are irrelevant to the issue raised in AP's motion.

Finally, beyond finding no support in the statute's text, legislative history, or case law, AP's argument is contrary to the purpose of the statute.   "The DMCA was intended to facilitate the growth of electronic commerce, not squelch it."   *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1154 (N.D. Cal. 2008).   Yet that is precisely what AP's approach would do by limiting safe-harbor protection to services that make user-submitted content publicly available for inspection by copyright holders.   AP's argument would categorically exclude from the DMCA a countless array of online services that allow users to store content outside the detection of content owners – including email services (Gmail, Yahoo Mail, and Hotmail), photo-storing services (Shutterfly and Flickr), cloud-based storage lockers (such as DropBox and Box), and any private material posted and stored on services such as YouTube or Facebook.   That would undermine the statute's avowed goal of ensuring "that the variety and quality of services on the Internet will continue to expand."   S. REP. NO. 105-190, at 8 (1998).   It would also have devastating consequences for user privacy.   AP's position would, for example, require email service providers to give every copyright holder access to all email messages stored on their systems because failure to do so would amount to "interfering

-17-

with" measures that those rights holders could use to identify potentially infringing material emailed by users.  But the DMCA aims to "protect the privacy of Internet users," not eviscerate it.  *Id.* at 55; *accord* 17 U.S.C. § 512(m).  The statute does not require service providers to eliminate the private storage of user-submitted content as a basis for availing themselves of the safe harbor.

## CONCLUSION

For the reasons given above, AP is not entitled to judgment on the pleadings as to any of Meltwater's Amended Counterclaims.

Respectfully submitted,

Dated:  December 14, 2012

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:   s/ Tonia Ouellette Klausner
TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 497-7700

DAVID H. KRAMER (admitted *pro hac vice*)
650 Page Mill Road
Palo Alto, California 94304
Telephone:  (650) 493-9300

*Attorneys for the Defendants*

-18-