FILED UNDER SEAL

REDACTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE ASSOCIATED PRESS,                          :

                                  :     12 Civ. 1087(DLC)(FM)
                  Plaintiff,               :

                                    :

      - against -                          :     ECF Case

                                    :

MELTWATER U.S. HOLDINGS, INC.;                 :
MELTWATER NEWS U.S., INC.; and                 :
MELTWATER NEWS U.S. 1, INC.                     :

                                    :
                Defendants.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## MEMORANDUM OF LAW OF PLAINTIFF
## THE ASSOCIATED PRESS IN SUPPORT OF ITS MOTION
## FOR SUMMARY JUDGMENT ON ITS COPYRIGHT INFRINGEMENT CLAIM

Elizabeth A. McNamara
Linda Steinman
Alison B. Schary
Collin J. Peng-Sue
DAVIS WRIGHT TREMAINE LLP
1633 Broadway – 27th Floor
New York, New York 10019
Telephone:  (212) 489-8230
Facsimile:    (212) 489-8340

*Attorneys for Plaintiff The Associated Press*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 3

ARGUMENT ........................................................................................................................... 7

I.     MELTWATER HAS DIRECTLY INFRINGED AP'S COPYRIGHTED
CONTENT ...................................................................................................................... 7

     A.     AP Has Established The Elements Of A Copyright Infringement
Claim .................................................................................................................. 7

II.    MELTWATER'S USE IS NOT A FAIR USE ...................................................... 8

     A.     The First Factor:  The Purpose and Character of Meltwater's Use
Weighs Heavily in AP's Favor ..................................................................... 9

          1.     Meltwater's Use Is Commercial ................................................... 10

          2.     Meltwater's News Reports Are Not Transformative .................... 10

          3.     Meltwater News's Search Engine Capabilities Do Not Make
Its Actions A Transformative Use ................................................ 15

     B.     Factor Two:  The Nature of the Copyrighted Work .................................. 21

     C.     Factor Three:  The Amount and Substantiality of the Use ....................... 22

     D.     Factor Four:  The Effect of Meltwater's Use on the Market .................... 25

          1.     The Legal Standard ....................................................................... 25

          2.     Meltwater News Causes Market Harm To AP ............................. 27

     E.     The Aggregate Assessment Strongly Favors AP ...................................... 29

III.   MELTWATER CANNOT DEFEND ITS EXPLOITATION OF AP
CONTENT UNDER A THEORY OF IMPLIED LICENSE ................................ 30

     A.     Meltwater Never Obtained An Implied License From AP ....................... 30

     B.     Meltwater Could Not Have Obtained An Implied Sublicense From AP
Members or Other Licensees and Cannot Possibly Claim An Implied
License Covering the Many Registered Articles Published After Suit
Was Filed ......................................................................................................... 34

CONCLUSION ...................................................................................................................... 35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Geophysical Union v. Texaco,*
  60 F.3d 913, 923 (2d Cir. 1994)........................................................................................12, 26

*Basic Books, Inc. v. Kinko's Graphics Corp.,*
  758 F. Supp. 1522 (S.D.N.Y. 1991)...............................................................................................13

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
  448 F.3d 605 (2d Cir. 2006)............................................................................................... passim

*Blanch v. Koons,*
  467 F.3d 244 (2d Cir. 2006)............................................................................................... passim

*Bourne v. Walt Disney Co.,*
  68 F.3d 621 (2d Cir. 1995)....................................................................................................30

*Campbell v. Acuff-Rose Music, Inc.,*
  510 U.S. 569 (1994)........................................................................................................ passim

*Castle Rock Entm't v. Carol Publ'g Grp.,*
  150 F.3d 132 (2d Cir. 1998).....................................................................................10, 18, 26

*Country Rd. Music v. MP3.com, Inc.,*
  279 F. Supp. 2d 325 (S.D.N.Y. 2003)..............................................................................31, 34

*Design Options Inc. v. BellePoint, Inc.,*
  940 F. Supp. 86 (S.D.N.Y. 1996) .............................................................................................31

*Effects Assocs., Inc. v. Cohen,*
  908 F.2d 555 (9th Cir. 1990) .................................................................................................31

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.,*
  499 U.S. 340 (1991)..................................................................................................................7

*Field v. Google,*
  412 F. Supp. 1106 (D. Nev. 2006)...........................................................................................34

*Fin. Info., Inc. v. Moody's Inv. Serv., Inc.,*
  751 F.2d 501 (2d Cir. 1984)......................................................................................................22

*Harper & Row Publ'rs v. Nation Enter.,*
  471 U.S. 539 (1985)....................................................................................................... passim

*Infinity Broad. Corp. v. Kirkwood,*
  150 F.3d 104 (2d Cir. 1998)............................................................................................. passim

ii

*Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos., Inc.*,
   621 F.2d 57 (2d Cir. 1980)...............................................................................................23, 24

*Ivani Contracting Corp. v. City of New York*,
   103 F.3d 257 (2d. Cir. 1997)...................................................................................................33

*Keane Dealer Servs., Inc. v. Harts*,
   968 F. Supp. 944 (S.D.N.Y. 1997) ..........................................................................................32

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003).................................................................................15, 18, 19, 20

*Korman v. HBC Fla, Inc.*,
   182 F.3d 1291 (11th Cir. 1999) ...............................................................................................31

*Los Angeles News Service v. Reuters Television Int'l Ltd.*,
   149 F.3d 987 (9th Cir. 1998) ..................................................................................................27

*Los Angeles News Service v. Tullo*,
   973 F.2d 791 (9th Cir. 1992) ............................................................................................ passim

*Maas v. Cornell Univ.*,
   94 N.Y.2d 87, 699 N.Y.S.2d 716 (1999) ................................................................................32

*Nihon Keizai Shimbun v. Comline Business Data, Inc.*,
   1998 U.S. Dist. LEXIS 6806 at *39 (S.D.N.Y. April 14, 1998),
   *aff'd*, 166 F.3d 65 (2d Cir. 1999) ..............................................................................10, 12, 22

*On Davis v. The Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001)........................................................................................9, 26, 28

*Ortiz v. Guitan Music Bros., Inc.*,
   No. 07 Civ. 3897, 2009 WL 2252107 (S.D.N.Y. July 28, 2009) .............................................35

*Pacific and Southern Co. v. Duncan*,
   744 F.2d 1490 (11th Cir. 1984) ................................................................................10, 13, 22

*Parker v. Yahoo!*,
   Civil Action No. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008) ...............................34

*Pavlica v. Behr*,
   397 F. Supp. 2d 519 (S.D.N.Y. 2005)................................................................................31, 33

*Perfect 10, Inc. v. Amazon.com*,
   508 F.3d 1146 (9th Cir. 2007).................................................................................15, 18, 19, 20

*Peter F. Gaito Architecture LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010).........................................................................................................7

DWT 20580262v3 0025295-000064

*Princeton University Press v. Michigan Document Services,*
  99 F.3d 1381 (6th Cir. 1981) ........................................................................................12, 21, 22

*Psihoyos v. Pearson Education,*
  855 F. Supp. 2d 103 (S.D.N.Y. 2012) .................................................................................31, 34

*Rogers v. Koons,*
  960 F.2d 301 (2d Cir. 1992) .......................................................................................................23

*Roy Export Co. v. Columbia Broad. Sys.,*
  503 F. Supp. 1137 (S.D.N.Y. 1980),
  *aff'd,* 672 F.2d 1095 (2d Cir. 1982) .....................................................................................23, 24

*Salinger v. Colting,*
  607 F.3d 68 (2d Cir. 2010) ........................................................................................................22

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,*
  211 F.3d 21 (2d. Cir. 2000) .............................................................................................30, 31, 32

*The Authors Guild v. Hathitrust,*
  11 Civ. 6351, 2012 WL 4808939 (S.D.N.Y. October 10, 2012) .............................................16

*Twin Peaks Prods, Inc. v. Publ'ns Int'l, Ltd.,*
  996 F.2d 1366 (2d Cir. 1993) .....................................................................................................21

*U.S. v. ASCAP,*
  599 F. Supp. 2d 415 (S.D.N.Y. 2009) .........................................................................15, 20, 26

*Ulloa v. Universal Music and Video Distrib. Corp.,*
  303 F. Supp. 2d 409 (S.D.N.Y. 2004) .................................................................................31, 34

*UMG Recordings, Inc. v. MP3.com, Inc.,*
  92 F. Supp. 2d 349 (S.D.N.Y. 2000) .........................................................................................13

*Viacom Int'l v. Fanzine,*
  No. 98 Civ. 7448 (KMW), 2000 WL 1854903 (S.D.N.Y. July 12, 2000) .........................31, 32

*Video Pipeline, Inc. v. Buena Vista Home Entm't,*
  342 F.3d 191 (3d Cir. 2003) ................................................................................................12, 26

*Wainright Sec., Inc. v. Wall Street Transcript Corp.,*
  558 F.2d 91 (2d Cir. 1977) .........................................................................................................22

*Weinstein Co. v. Smokewood Entertainment Grp., LLC,*
  664 F. Supp. 2d 332 (S.D.N.Y. 2009) .......................................................................................31

*Weissman v. Freeman,*
  868 F.2d 1313 (2d Cir. 1989) .....................................................................................................22

DWT 20580262v3 0025295-000064

**STATUTES**

17 U.S.C. §101 ....................................................................................................................7

17 U.S.C. § 107 ..........................................................................................................8, 9, 13

17 U.S.C. § 410(c) ...............................................................................................................7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56 ................................................................................................................1

U.S. Const. art. 1, §8 ...........................................................................................................9

DWT 20580262v3 0025295-000064

Plaintiff The Associated Press ("AP") submits this memorandum of law in support of its motion for an order granting summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against Defendants Meltwater U.S. Holdings, Inc., Meltwater News U.S., Inc., and Meltwater News US1, Inc. (collectively "Meltwater" or "Meltwater News") on AP's First Cause of Action for direct copyright infringement and AP's Fourth Cause of Action for a Declaratory Judgment in connection with the Registered Articles.

## PRELIMINARY STATEMENT

AP is one of the oldest and most highly regarded news organizations in the world. In order to provide accurate, comprehensive international news coverage, AP expends countless dollars to build and maintain a state-of-the-art newsgathering and distribution infrastructure. It is only able to fund that investment by receiving payment for use of its news content.

Meltwater News is a commercial media monitoring company. It scrapes news articles from the web and delivers to its paying customers "News Reports" consisting of reams of substantial verbatim excerpts from those articles in response to the customers' search terms. Meltwater News provides no commentary or critique concerning the articles, just a systematic news digest of article excerpts. Meltwater not only delivers excerpts from current stories; its ever growing database contains an archive of articles published as early as 2001, which its customers can mine in ad hoc searches on the Meltwater platform. Further, Meltwater offers its customers the ability to save the articles in customer archives on Meltwater's system and re-distribute the text of articles in e-newsletters and newsfeeds. Although the U.S. Meltwater News entity had income of $        2011, it does not pay AP one dime for its systematic distribution of hundreds of thousands of excerpts of AP articles a year.

There can be no dispute that Meltwater's verbatim copying is copyright infringement. (*See* Point I). Instead, Meltwater argues that its actions should be deemed fair use because it acts

1



as a search engine and because its customers allegedly look at the media monitoring reports only to find "mentions" of their companies and their companies' press releases, and not to learn the news. But Meltwater's parasitic business model is a far cry from fair use, a doctrine designed to allow authors, scholars and other creators to use the original work "as raw material, transformed in the creation of … new insights." *Blanch v. Koons*, 467 F.3d 244, 251-22 (2d Cir. 2006). Meltwater cannot bear its burden under the four-factor test for fair use.

First, Meltwater is utterly commercial in the most meaningful way: it directly exploits and profits from the sale of AP content. Nor is its use in any way transformative. Meltwater News adds no "expressive" message or meaning to AP articles; rather, it simply re-packages the articles and then markets the excerpts to consumers so they can "save time" and "avoid copyright fees." Further, Meltwater concedes that it is a "valid use" of its system for customers to use it "to keep abreast of news developments" – the same intrinsic purpose as the AP news products. Indeed, both its customers' search terms and Meltwater's marketing materials make clear that its customers are often using the News Reports to get the news.

The Meltwater News Reports clearly act as a substitute for AP's stories. For AP's shorter articles, the excerpts can constitute between 30-60% of the article. Further, in contrast to Google Alerts, Meltwater takes the opening text – or "lede" – of AP's articles, which are purposefully written to capture the heart of the news story. Meltwater's documents show that it tells customers that its News Reports "save you time so you don't need to read the full article." The click-through rate for the thirty-three sample AP articles named in the Amended Complaint says it all: the Meltwater customers to whom the excerpts were made available clicked through to the original website publishing the AP article less than one-tenth of one percent of the time.

Meltwater's business has had a significant effect on AP's market. It has lost actual

2

licensees to Meltwater and often finds itself competing with Meltwater for customers. Meltwater also competes with AP's authorized licensees, who are properly paying for use of AP's content. In sum, Meltwater's exploitation of AP content, along with its unlimited archiving and re-distribution of content in newsletters and news feeds, is not a fair use. (*See* Point II)

As a tag-along defense, Meltwater also implausibly claims that AP's actions should result in this Court finding that the parties agreed to an implied license. Not only did AP not create the articles for Meltwater or deliver them to Meltwater, there is no logical basis to conclude that there was a "meeting of the minds" whereby AP agreed that Meltwater could systematically take and sell AP content to thousands without any monetary payment. Meltwater's implied license defense should be rejected out of hand. (*See* Point III.) AP respectfully asks this Court to grant its motion for summary judgment based on the undisputed facts.

## FACTUAL BACKGROUND[1]

AP publishes between 1,000-2,000 stories a day. It incurs significant expense to produce and deliver its news products, including costs for personnel, training, security, travel, technology and legal protection. AP stories are licensed to its members and other licensees, including search engines, media monitoring services and government agencies. All told, AP has approximately 8,000 licensees who pay fees to gain legitimate access to AP content, including breaking news reports. AP's ability to report the news turns on the revenues it receives from such membership and license fees. Kent Decl. ¶ 3; Curley Decl. ¶¶ 3, 5-10, 11; Cross Decl. ¶¶ 4-5.

AP has made a substantial investment in categorizing its content, offering segmented news

---

[1] AP only briefly summarizes the relevant facts here. For a full recitation of the facts, we refer the Court to the Declarations of Thomas Curley, executed on November 5, 2012 ("Curley Decl."); Sue Cross, executed on November 8, 2012 ("Cross Decl."); Joy Jones, executed on November 6, 2012 ("Jones Decl."); Thomas Kent, executed on November 6, 2012 ("Kent Decl."); John D. Rizzo, executed on November 7, 2012 ("Rizzo Decl."); Keri McKenzie, executed on November 7, 2012 ("McKenzie Decl."); and Elizabeth McNamara, executed on November 9, 2012 ("McN. Decl."), submitted in support of this motion.

3

products, and developing a distribution platform that allows AP's customers to search for and find the specific AP content they desire. As a first step, every AP news story contains extensive metadata tags identifying the topics covered. AP then segments its news products by category (*e.g.*, Top News); geographic region; and industry, such as AP's Construction Alert, Defense Alert, Technology Alert, and Tobacco Alert, to name but a few. While Meltwater News attempts to distinguish its news service as a search engine, the AP distribution platform "AP Exchange" likewise includes a sophisticated search engine that allows licensed users to locate relevant content by performing Boolean searches on AP stories and storing their search results. Cross Decl. ¶¶ 57-65.

### Meltwater

Meltwater News is a closed, commercial media monitoring service that uses AP content without a license on a massive scale. On a daily or twice-daily basis, Meltwater emails to its customers systematic reports titled "News Reports" of all current news coverage on selected topics in its database in response to their Boolean search terms. The News Reports consist solely of substantial verbatim excerpts from the news articles, including AP articles. The excerpts include the headline, the opening text or lede of the article (up to 300 characters, which generally amounts to one-two sentences), and the hit sentence (up to 140 characters plus one additional word). The News Reports – described by one of Meltwater's sales employees as a "news digest" – can act as a substitute for reading the full licensed stories. Indeed, a script created by a Meltwater salesman suggests telling prospective customers that the News Reports "save you time so you don't need to read the full article" and therefore "saves companies a LOT of money because of copyright fees." This result is not surprising since AP writes its headlines and ledes to capture the essence of the story, and AP breaking stories are often very short. Indeed, the excerpts Meltwater sells can constitute over 50% of the article, as was the case with five of the Registered Articles named in the Amended

4

Complaint. McN. Decl. ¶¶ 9-11, 18-19, 97; Kent Decl. ¶¶ 10-12, 30; McKenzie Decl. ¶¶ 8-9.

Meltwater's News Reports include no commentary, critique or original writing, only article excerpts. Meltwater does no newsgathering and employs no reporters. Although customers can elect to receive some rudimentary and free-standing "dashboard analytics," one of Meltwater's own salesmen concedes that they are "not a primary or central function" of the basic platform, and that he tells prospective customers to take one of the measures with a "grain of salt." Nor does Meltwater drive its customers to AP's licensed websites. Even though the News Reports contain a link to the original article, the evidence produced by Meltwater established that the combined click-through rate on the Registered Articles was less than one-tenth of 1 percent. This paltry result is consistent with the findings of the Copyright Tribunal in the United Kingdom, which found a click-through rate of only 0.5% for the British newspapers. McN. Decl. ¶¶ 8, 36-39, 93.

Meltwater's exploitation of AP news does not end with the News Reports. Meltwater customers can also log onto the Meltwater system to see search results on their agents going back six months, or perform ad hoc searches on all articles in the Meltwater database going back to 2001 (all three types of searches shall be collectively referred to as "Media Monitoring Materials"). Then, Meltwater News customers can save article excerpts (or even full articles) for an unlimited period of time in an unlimited customer archive or re-distribute them to an unlimited number of people by means of emailed newsletters to employees or the public or newsfeeds on their internal or external websites. McN. Decl. ¶ 15, 26, 29, 41-44; McKenzie Decl. ¶¶ 8-9, 12, 14-15, 18 & Ex. 48.

Meltwater obtains news articles for its database by crawling 162,000 news websites, retrieving new content on average every 30 minutes. The Meltwater database includes articles going back to 2001 and continues to grow. A review of the 33 Registered Articles alone – a trifling fraction of even one day of AP output – shows that Meltwater is crawling and indexing AP

5

stories from more than 1,100 AP members and other licensees. Given these figures, Meltwater is no doubt indexing the vast majority of AP stories published by its members and other licensees and is retaining them indefinitely in a vast archive. McN. Decl. ¶¶ 45, 48-49, 53, 78.

Meltwater crawls, indexes and sells excerpts of AP articles in violation of the terms of use posted by AP and its members and licensees that broadly prohibit the commercial use of the articles. Meltwater disregards these terms of use, citing fair use, even though one of its executives testified that "all companies should where possible follow the laws and rules in the terms of use." Meltwater ignores these terms of use while at the same time it expects its own customers to "review any applicable terms and privacy policy of any Third Party Site before using it." McN. Decl. ¶¶ 59-69; Cross Decl. ¶¶ 10-27; Jones Decl. ¶¶ 6-19.

AP named 33 Registered Articles in the Amended Complaint as a tiny sample to illustrate Meltwater's functions. Discovery showed that Meltwater delivered excerpts from each of these articles to its customers in its Media Monitoring Materials. Indeed, in several instances, Meltwater scraped a given AP Registered Article from more than 200 news websites and made excerpts of the article available to Meltwater customers between 1,000 and 3,500 times. Given that 33 articles is a tiny percentage of the more than 1,000 articles AP publishes each day, it is reasonable to extrapolate that Meltwater is distributing hundreds of thousands of excerpts of AP articles, if not more, on an annual basis. Of further note, given AP's prominent role in the news industry, there are days in which over a third of a Meltwater customer's News Report can consist of AP content. McN. Decl. ¶¶ 73-81, 95.

While Meltwater exploits AP's content without a license, AP has entered into licensing agreements with a broad range of Meltwater's competitors including other media monitoring organizations such as Cision and BurrellesLuce, search engines such as Google and Yahoo!, news

6

aggregators such as InfoDesk and Huffington Post, and news databases such as Factiva and LexisNexis. In short, AP has exploited this very market and customarily receives a fee for these commercial uses of its content. Further, the evidence documents that AP has both lost several customers or prospective customers to Meltwater, and has competed directly with Meltwater for such important customers as the U.S. House of Representatives, to whom both AP and Meltwater submitted a bid. In sum, the damage caused by Meltwater News, built on the back of AP and other news content, is all too real. Curley Decl. ¶¶ 17-19; Cross Decl. ¶¶ 28-56; Rizzo Decl. ¶¶ 3-20.

## ARGUMENT

## I.     MELTWATER HAS DIRECTLY INFRINGED AP'S COPYRIGHTED CONTENT

### A.     AP Has Established The Elements Of A Copyright Infringement Claim

To prevail on a copyright claim, a plaintiff must demonstrate ownership of a valid copyright and copying of constituent elements of original works. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345, 361 (1991) ("[t]he requisite level of creativity [for originality] is extremely low; even a slight amount will suffice."). "[A] plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiffs work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiffs." *Peter F. Gaito Architecture LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010).

AP has established copyright infringement. AP has obtained copyright registrations for each of the Registered Articles, each of which was written by an AP reporter in the course of his or her employment (Kent Decl. ¶¶ 5-6), thus constituting works for hire under the Copyright Act. 17 U.S.C. §101. The Copyright Act makes a certificate of registration from the U.S. Register of Copyrights *prima facie* evidence of the valid ownership of a copyright. 17 U.S.C. § 410(c).

7

Further, Meltwater concedes that it "actually copied" excerpts from the Registered Articles consisting of the headline, lede and hit sentence. McN. Decl. Ex. 5 [Am. Answer] ¶ 48. Among other evidence, Meltwater (i) produced two Excel spreadsheets demonstrating that it scraped nearly 1,200 websites containing one or more of the Registered Articles and delivered or otherwise made available excerpts of all of the recently published Registered Articles to its customers, and (ii) produced News Reports emailed to its subscribers containing excerpts from all of the older Registered Articles. McN. Decl. ¶¶ 73-87 and Exs. 55 & 56.

Finally, there is no issue as to the substantial similarity between the Registered Articles and the excerpts of the Registered Articles that Meltwater provides its customers. Meltwater admits that it distributes verbatim text from AP articles (McN. Decl. Ex. 5, ¶ 48); those portions are therefore not merely "substantially similar," but are identical.

## II.   MELTWATER'S USE IS NOT A FAIR USE

Meltwater News merely repackages excerpts of AP articles and sells them to its customers, adding no new expression or commentary. This entirely commercial enterprise does not qualify as a fair use. Fair use, as codified in 17 U.S.C. § 107, "permits courts to avoid rigid application of the copyright statute when, *on occasion*, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994) (emphasis added). Whether a use of particular copyrighted materials is considered "fair" is a mixed question of fact and law that may be resolved by the Court in the first instance as a matter of law. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006). Meltwater bears the burden of proof on its affirmative fair use defense. *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998) ("*Infinity*").

Under 17 U.S.C. § 107, "the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ..., scholarship, or research, is not an infringement

8

of copyright." The factors that must be considered in determining whether the use of a work is a fair use include:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. Fair use "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." *Campbell*, 510 U.S. at 577.

"All [factors] are to be explored, and the results weighed together, in light of the purposes of copyright. *Campbell*, 510 U.S. at 578. Copyright law aims to "promote the Progress of Science and the useful Arts" (U.S. Const. art. 1, §8) by providing an economic incentive to authors. *Harper & Row Publishers, Inc. v. Nation Enter.*, 471 U.S. 539, 545-47 (1985). Without the limited monopoly conferred by copyright law, content creators would have little "economic incentive to create and disseminate ideas." *Harper*, 471 U.S. at 558. "In our haste to disseminate news, it should not be forgotten that the Framers intended copyright itself to be the engine of free expression." *Id.* at 558. "If every volume that was in the public interest could be pirated away by a competing publisher . . . the public soon would have nothing worth reading." *Id.* at 559 (internal citations omitted).

As discussed in greater detail below, Meltwater cannot carry its burden of demonstrating that any of the four factors weigh in favor of a finding of fair use.

### A. The First Factor: The Purpose and Character of Meltwater's Use Weighs Heavily in AP's Favor

The "heart of the fair use inquiry" is the first factor, namely the "purpose and character of use." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001). It focuses on two issues: whether the use is commercial and whether it is transformative.

9

### 1.    Meltwater's Use Is Commercial

"[T]he fact that a publication [is] commercial as opposed to nonprofit is a ... factor that tends to weigh against a finding of fair use." *Campbell*, 510 U.S. at 585; *accord Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 141 (2d Cir. 1998). "The crux of the nonprofit/profit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper*, 471 U.S. at 562. In cases similar to this one involving fee-based news media monitoring services, courts have concluded that the services operate for "unabashedly commercial reasons" that weigh against fair use. *Pacific and Southern Co. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984); *see also Los Angeles News Service v. Tullo*, 973 F.2d 791, 797 (9th Cir. 1992) (hereinafter "*Tullo*").

Meltwater is a subscriber-only for-fee media monitoring service that has built a business that commoditizes news excerpts created by others and does so on a vast scale. McN. Decl. ¶¶ 2, 7, 8, 45, 53, 81. As with the defendant in *Nihon Keizai Shimbun v. Comline Business Data, Inc.*, Meltwater News' main business "involves the sale and distribution to [its customers] of [portions of] news articles, many of which are [copied from plaintiff's] original articles." 1998 U.S. Dist. LEXIS 6806 at *39 (S.D.N.Y. April 14, 1998) (Cote, J.), *aff'd*, 166 F.3d 65 (2d Cir. 1999). Meltwater thereby "makes a great deal of money by piggy-backing onto [AP and other newspaper's] labors." *Id.* In other words, it "profit[s] from exploitation of the copyrighted material without paying the customary price." *Harper*, 471 U.S. at 562. As such, Meltwater exploits AP articles for "unabashedly commercial reasons" that are inconsistent with the very concept of fair use.

### 2.    Meltwater's News Reports Are Not Transformative

Nor is Meltwater's exploitation transformative, the most critical inquiry under the first

10

factor and the fair use test generally. As the U.S. Supreme Court has instructed, "The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely 'supercede[s] the objects' of the original creation [citations omitted], or instead adds something new, with a further purpose or different character, *altering the first with new expression, meaning or message*; it asks, in other words, whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 579 (emphasis added). As the Second Circuit has clarified:

> If "the secondary use adds value to the original – if [copyrightable expression in the original work] is used as *raw material*, transformed in the creation of new information, new aesthetics, new insights and understandings – this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society."

*Blanch v. Koons*, 467 F.3d 244, 251-52 (2d Cir. 2006) (emphasis added), quoting *Castle Rock*, 150 F.3d at 142 (brackets in original).

In short, at its core, the transformative use inquiry focuses on whether the allegedly infringing work employs the original work to add something new, with a further purpose that alters the first with a new *expressive* meaning or message. Thus, for example, in *Bill Graham Archives*, where the defendant DK published a Grateful Dead biography that combined small images of Grateful Dead posters "with a prominent timeline, textual material and original graphical artwork, to create a collage of text and images on each page of the book," the Second Circuit found a "transformative use" because "DK's layout ensures that the images at issue are employed only to enrich the presentation of the cultural history of the Grateful Dead, not to exploit copyrighted artwork for commercial gain." 448 F.3d at 611. While the original purpose of the posters was artistic and promotional, DK had a separate and distinct *expressive* purpose, namely to "enhance[e] the biographical information" in the book. *Id.* at 610. The Second Circuit also emphasized that the images "constitute an inconsequential portion" of the biography and that, "The extent to which unlicensed material is used in a challenged work can be a factor in

11

determining whether a [defendant's] use of original materials has been sufficiently transformative to constitute fair use." *Id.* at 611.

In a wide variety of contexts, when a secondary work consists primarily of verbatim excerpts from the original work without any commentary – as here – courts find that the use of the original does not serve a different *expressive* purpose and is therefore not transformative. Consider, for example, the two minute "clip previews" from the full length movies at issue in *Video Pipeline, Inc. v. Buena Vista Home Entm't*, 342 F.3d 191 (3d Cir. 2003). There, for a fee, Video Pipeline streamed movie trailers to customers for them to use in connection with movie sales. The Third Circuit contrasted this use with a movie reviewer who used a two-minute segment from a film to provide a critique of the movie, thereby adding a "new expression, message or meaning." It concluded that the "clip previews" were not transformative: "the fact that 'a substantial portion,' indeed almost all, 'of the infringing work was copied verbatim from the copyright work' with no additional creative activity 'reveals a dearth of transformative character or purpose." *Id.* at 200, citing *Campbell*, 471 U.S. at 587. Similarly, translated abstracts closely derived from Japanese news articles and transmitted to paying subscribers were found to be "not in the least transformative." *Nihon*, 1998 U.S. Dist. Lexis 6806 at *39, *aff'd*, 166 F.3d at 72 (agreeing with district court's conclusion). In language that is equally applicable here, this Court observed that the defendant in *Nihon* "in no way 'adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." To the contrary, "the defendant reports the very same news as does Nihon." *Id.*[2]

---

[2] *See also Am. Geophysical Union v. Texaco* (hereinafter *Texaco*), 60 F.3d 913, 923 (2d Cir. 1994) (new uses that "mak[e] some contribution of new intellectual value and thereby foster the advancement of the arts and sciences" are readily distinct from an untransformed copy that "is likely to be used simply for the same intrinsic purpose as the original, thereby providing limited justification for a finding of fair use."); *Princeton University Press v. Michigan Document Services*, 99 F.3d 1381, 1389 (6th Cir. 1981) (university course packs do not constitute a transformative use because "[t]his kind of mechanical

The Second Circuit and other courts have easily concluded that news clipping services and radio monitoring services – uses comparable to Meltwater's media monitoring reports – do not constitute a transformative use for similar reasons. *Infinity*, 150 F.3d at 108, 11-12 (radio monitoring service was not transformative because it "creates nothing and advances no body of knowledge or criticism" and merely "takes *Infinity*'s unaltered broadcasts and markets them to a specific clientele"); *Pacific and Southern Co*, 744 F.2d at 1496 (TV news clipping service was "neither productive nor creative in any way"); *Tullo*, 973 F.2d at 797, 799 (video newsclipping service is not engaged in news reporting and is not fair use). As these and other cases underscore, making a work more accessible or easy to find does not equate with a transformative use. "Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work." *Harper*, 471 U.S. at 569, quoting *Pacific & Southern Co.*, 744 F.2d at 1499-50; *see also UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351-52 (S.D.N.Y. 2000) (noting that the reproduction of audio CDs in MP3 format "simply repackages those recordings to facilitate their transmission through another medium," and that "Copyright ... is not designed to afford consumer ... convenience but, rather, to protect the copyright holders' property interests.").

Here, the Meltwater News service is no more transformative than *Nihon*'s "abstracts" or *Infinity*'s radio monitoring service. In a systematic fashion, Meltwater News delivers to its over 4,000 U.S. customers emailed News Reports and other Media Monitoring Materials containing hundreds of thousands of verbatim, unaltered reproductions of AP's headlines, ledes, and hit sentences. McN. Decl. ¶ 2, 8-15. Meltwater News does not fit within any of the illustrative examples provided in the preamble to § 107, a factor considered under *Campbell*, 510 U.S. at

transformation bears little resemblance to the creative metamorphosis accomplished by the parodists in the *Campbell* case."); *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1530-31 (S.D.N.Y. 1991) ("In this case, there was absolutely no literary effort made by Kinko's to expand upon or contextualize the material copied.")

13

578. *See also Tullo*, 973 F.2d at 797 (video newsclipping service "is no more a 'news reporter' than the [videotape recorder] owner who tapes a publicly broadcast movie is a filmmaker."). Indeed, the Meltwater News service is far removed from these paradigms. Meltwater provides no commentary or critique. Instead, Meltwater delivers reams of excerpts from AP stories that "leave the character of the original [articles] unchanged" for its customers to review, archive indefinitely and re-distribute broadly to unlimited recipients in newsletters and newsfeeds to their employees and the public. *Infinity*, 150 F.3d 108. Meltwater News does not use AP's text as raw material to enrich a new creative, expressive work with a further purpose that alters the first with a new meaning. Rather, it merely re-packages and exploits the excerpts from AP's articles for commercial gain. McN. Decl. ¶¶ 8-17, 26-34, 41-44.

Further, Meltwater's use of the AP article excerpts serves the same intrinsic purpose as the original AP articles, namely to provide newsworthy information. Critically, even Meltwater's 30(b)(6) witness conceded that at least some of Meltwater's subscribers read the article excerpts in their News Reports or other search results "to keep abreast of news developments" – and that this is "a valid way to use the [Meltwater] system." McN. Decl. ¶ 20. Moreover, by duplicating the all-important lede, which captures the essence of the story, Meltwater significantly increases the chances that its Media Monitoring Materials will serve the purpose of informing its subscribers about news developments. *See* Kent Decl. ¶¶ 29-30; McN. Decl. ¶¶ 13, 19. By taking more than is reasonably necessary for its alleged purpose, Meltwater further undermines its claim to a transformative use. *Bill Graham Archives*, 448 F.3d at 611 (defendant used the minimal image size necessary to accomplish its transformative purpose). And when Meltwater then further distributes the excerpts in customer newsletters or newsfeeds, any pretense that this is anything other than the distribution of news is entirely lost. As the Second Circuit discussed in

14

*Infinity*, there can be no finding of a transformative use where, as here, at least some subscribers use the monitoring service for the same intrinsic purpose as the original. 150 F.2d at 108; *see also U.S. v. ASCAP*, 599 F. Supp. 2d 415, 427 (S.D.N.Y. 2009) ("Although the clips are shorter than the full-length versions of the musical works from which they are copied, applicant has not demonstrated that its customers use previews *solely* for information purposes and not also to assess the musical quality and entertainment value of the ringtones") (emphasis added).[3]

### 3. Meltwater News's Search Engine Capabilities Do Not Make Its Actions A Transformative Use

Plainly, Meltwater News is not using AP's articles as raw material to incorporate into a new work with a further expressive purpose. Instead, Meltwater argues that its Meltwater News service constitutes a transformative use because it "offers access to" a search engine that allows its customers to "discover" "information in the news media relevant to their business" and because many of its customers only look for "mentions" of their company or its press releases, rather than the content of the news articles, an allegedly different "purpose." McN. Decl. Ex. 5 at 1. Meltwater bases this argument on two Ninth Circuit cases, *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) and *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146 (9th Cir. 2007), which held the search engines at issue in those cases to be transformative uses as electronic reference tools whose use of thumbnail images of photographs in search results served a different purpose

---

[3] The "dashboard analytics" do not alter this conclusion. These graphs – reflecting such things as the geographical location of articles published with the customer's search terms – are little more than window-dressing. The analytics are extremely rudimentary and even Meltwater's sales representative conceded that the dashboard analytics are "not a primary or central function of the main dashboard or of the basic platform." Critically, the dashboard analytics are not even included in the daily emailed News Report; a subscriber would need to log onto the Meltwater system to find them or could elect to have some of them emailed weekly. Further, unlike a commentator who needs to quote a book to make his point, Meltwater could provide its dashboard analytics without reproducing excerpts from AP's articles; the graphs stand on their own and thus do not justify the extensive use of AP's ledes and other text. McN. Decl. ¶¶ 36-39; Jones Decl. ¶ 49. In sum, the article excerpts remain the central materials delivered by Meltwater News, which fatally undermines its fair use argument. *Bill Graham Archives*, 448 F.3d at 611.

15

than the original.[4] Meltwater's transformative use argument fails factually and legally.

First, Meltwater's argument cannot stand under Second Circuit precedent. The Second Circuit has never found a transformative use when the original work was not incorporated as raw material into a new work with a further *expressive* purpose or new *expressive* meaning, nor has it found that merely making a work more accessible constitutes a transformative use sufficient to justify extensive verbatim use of it.

To the contrary, in *Infinity*, 150 F.3d 104, the Second Circuit addressed and rejected an argument directly analogous to the one Meltwater presses here. There, the defendant Media Dial-Up operated a radio monitoring service that re-transmitted free radio broadcasts to subscribers through the use of special phone lines. Dial-Up was marketed to radio stations, advertisers, talent scouts and performance rights organizations for purposes such as verifying the broadcast of commercials, auditioning on-air talent, and enforcing copyrights. *Id.* at 106. In some instances, Dial-Up customers listened only to "mere snippets of Infinity's broadcasts." *Id.* at 109. Like Meltwater, the defendant in *Infinity* argued that, as a monitoring service, it was using the plaintiff's radio broadcasts for a different purpose – in that case for information about the broadcasts rather than entertainment. The Second Circuit concluded that "difference in purpose is not quite the same thing as transformation and *Campbell* instructs that transformativeness is the critical inquiry under this factor." *Id.* at 108. As it stated:

> Here, as the district judge observed, "Kirkwood's retransmissions leave the character of the original broadcasts unchanged. There is neither new expression, new meaning nor new message." 965 F. Supp. at 557. In short, there is no transformation. As then-District Judge Leval noted in his frequently-cited article on fair use, a use of copyrighted material that "merely

---

[4] In *The Authors Guild v. Hathitrust*, 11 Civ. 6351, 2012 WL 4808939 *10 (S.D.N.Y. October 10, 2012), Judge Baer recently found a search engine to be transformative but only because the results only showed the relevant page numbers in the books scanned and "no actual text from a book is revealed." As he stated, "the purpose is superior search capabilities rather than actual access to copyrighted material." *Id* at *11. For that reason, the *Hathitrust* case has no bearing here.

16

> repackages or republishes the original" is unlikely to be deemed a fair use.
> Leval, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990).

*Id.* The Second Circuit also rejected Dial-Up's argument – like Meltwater's – that its service

was of "substantial benefit to society," holding that the public benefit could be accomplished by

other means and was not, in any event, enough to justify its "non-transformative

retransmissions." *Id.* at 108-09.

In sum, *Campbell* instructs that a transformative use must "add something new, with a

further purpose or different character, altering the first with new expression, meaning or

message," and *Infinity* requires that the standard not be truncated at the word "purpose."

Without "new expression, meaning or message," there is no transformation. Moreover, as the

*Infinity* court concluded in words equally applicable here, "it is [defendant's] own retransmission

of the broadcasts, not the acts of its end-users, that is at issue here and all [defendant] does is sell

access to unaltered radio broadcasts." 150 F.3d at 108. Thus, even if it were true that

Meltwater's customers only used Meltwater News to check for "mentions" of a press release –

which is belied by Meltwater's own press materials, its testimony and the search agents used by

its customers[5] – any analysis performed by Meltwater's subscribers based on the article excerpts

delivered by Meltwater is wholly irrelevant; the only relevant fact is that Meltwater gives "access

to unaltered" article excerpts. *Id.* As *Infinity* instructs, "simply tak[ing] [plaintiff's] unaltered

[works] and market[ing] them to a specific clientele" – like Meltwater does – is not a fair use

---

[5] *See* McN. Decl. ¶¶ 18-24. The Meltwater marketing materials and the broad search terms employed by numerous Meltwater customers – such as "Medicare fraud," "FDA," and "fracking" – directly contradict Meltwater's litigation-inspired argument that its subscribers use Meltwater News merely to determine if their press releases have been mentioned. Rather, the evidence establishes that Meltwater provides "unlimited search capabilities" allowing the customer to track their "company names[,] competitors[,] industry trends[,] key issues[,] legislation/regulation[, and] partnerships," and "allows [the user] to maximize the service's potential by searching ... all of your competitors, including news and unlimited research topics." *Id.*

17

because it "advances no body of knowledge or criticism." *Id.* at 111-12.[6]

Second, Meltwater's "search engine argument" fails because this case is readily distinguishable from *Kelly* and *Perfect 10*. If the Second Circuit were *ever* to hold that a search engine constituted a transformative use or that a new *expressive* meaning or message was not required, this is not the case to do so for several reasons:

(a) Meltwater's whole "search engine defense" rests on its assertion that it serves as an electronic reference tool that provides a link and sends interested users to the original website. But, the evidence shows the exact opposite. The combined "click-through" rate on the Registered Articles shows that Meltwater customers only clicked-through to the posted articles on the web in less than one-tenth of one percent of instances. This remarkably low click-through rate is consistent with the U.K. Tribunal's finding of a 0.5% click-through rate for British newspapers. McN. Decl. ¶¶ 91-94. Even Meltwater's own documents reveal that it boasts to its customers that the News Reports "save[] you time so you don't need to read the full article" and therefore "saves companies a LOT of money because of copyright fees." McN. Decl. Ex. 20. As one sales representative told a prospective client, "many clients like yourself use us as a time saver and way to get a comprehensive, customized news digest to the appropriate people internally." McN. Decl. Ex. 19. The foundational question in any fair use analysis is "whether the new work merely supersedes the objects of the original creation." *Campbell*, 510 U.S. at 579 (internal marks

---

[6] The Second Circuit has consistently rejected arguments like Meltwater's based on an allegedly different "purpose" or "function" argument unless there is a new expressive purpose. In *Blanch*, for example, the Second Circuit expressed hesitation with any analysis focused solely on purpose, including the different purposes of an advertisement and a painting, stating that, "We have declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work." 467 F.3d at 252. It likewise took issue with a Seventh Circuit decision holding that the exploitation of "new, complementary markets" qualified as fair use and with a treatise stating that the fair use defense may be invoked if the defendant's work "performs a different function than that of plaintiffs" on the ground that these statements were "in tension with the Copyright Act's express grant to copyright holders of rights over derivative works." *Id.* at 252 n.4. *See also Castle Rock*, 150 F.3d at 142-43 (quiz show book called "Seinfeld Aptitude Test" not transformative when its purpose was to "repackage [the television show] Seinfeld to entertain Seinfeld viewers").

omitted). Meltwater has not and cannot establish that its systematic use of critical excerpts from tens of thousands of AP articles – including the lede – in its emailed News Reports and other search results do not serve as a substitute for the products of AP and its licensees. Unlike *Kelly* and *Perfect 10*, where the search engines were found to actually improve access to the images in the vast worldwide web, Meltwater's aim is not to help its users find websites they are seeking to locate; rather, its aim is to provide its customers with a systematic report of all relevant news coverage. Thus, Meltwater exploits, rather than transforms, the original news stories.

(b) In stark contrast to *Kelly*, the article excerpts delivered by Meltwater News are capable of serving the same intrinsic informational purpose as the original news articles. *Kelly* turned on the Ninth Circuit's finding that the use of the images was "not superseding" because the thumbnail images returned by the Arriba search engine were of such low resolution that they could *not* serve an aesthetic function and thus that the user interested in the aesthetic aspects of the photograph would *need* to click through to the original website. As it stated: "any enlargement results in a significant loss of clarity of the image, making them inappropriate as display material." 336 F.3d at 818. *Perfect 10* likewise involved "reduced, lower-resolution versions of full-sized images." 508 F.3d at 1155. Here, in sharp contrast, the headline, lede and hit sentences from the AP articles undeniably are capable of providing the Meltwater customers with critical newsworthy information, their original purpose; indeed, in today's world, consumers routinely obtain their news from products providing only headlines and brief excerpts. This is all the more true with AP articles, since Meltwater provides the lede "for context" and the lede is written to provide the heart of the article. McN. Decl. ¶ 19; Jones Decl. ¶ 24; Kent Decl. ¶¶ 29-30. Indeed, Meltwater has admitted that using the Meltwater News Reports "to keep abreast of news developments" is both a possible and "valid way to use the system." McN. Decl.

19

¶ 20. As *Kelly* itself recognized, "reproducing news footage into a different format does not change the ultimate purpose of informing the public about current affairs." 336 F.3d at 819.[7]

(c) Meltwater News and its search engine also "adds [nothing] new, with a further purpose," since AP's platform (AP Exchange) provides similar search capabilities, as do the search functions offered by AP's licensees including other media monitoring organizations and databases. In other words, AP itself offers a platform with its news products that, like Meltwater News, permits its subscribers to search for and locate relevant stories through a Boolean search using search terms. Sue Cross Decl. ¶¶ 57-65. Indeed, Meltwater's search engine is not especially sophisticated. Their own witness confirmed that, while the technology used could sort results by relevance, Meltwater did not do that; instead, articles are only presented in reverse chronological order, with the most recent articles appearing at the top of the report. McN. Decl. ¶ 12.

(d) Meltwater is far more commercial than the free consumer search engines at issue in *Kelly* and *Perfect 10*. As the Kelly court observed, "while such use of Kelly's images was commercial, it was more incidental and less exploitative in nature than more traditional types of commercial use. Arriba was neither using Kelly's images to directly promote its web site nor trying to profit by selling Kelly's images." 336 F.3d at 818. Here, Meltwater's business consists of little more than selling access to AP's stories and other news articles for its own profit.

For all these reasons, *Kelly* and *Perfect 10* are readily distinguishable.

Finally, it is undeniable that, at its core, the transformative use doctrine is designed to protect uses akin "to the creative metamorphosis accomplished by the parodists in the *Campbell*

---

[7] *Kelly* also endorsed *Infinity*'s conclusion that there can be no finding of transformative use if "[e]ven though the intended purpose of the retransmission may have been different from the purpose of the original, the result was that people could use both types of transmissions for the same purpose." *Kelly*, 336 F.3d at 819, citing *Infinity*; *see also ASCAP*, 599 F. Supp. 2d at 427 (distinguishing *Kelly* where applicant had not demonstrated that its customers used ringtone previews "solely" for informational purposes and not also to assess entertainment value).

case" (*Princeton University Press,* 99 F.3d at 1389), and that Meltwater's claim of

"transformativeness" based on its function as a search engine is, at best, at the outer edge of the

doctrine. The transformative use analysis is not an "all or nothing matter" but rather focuses on

whether the challenged work serves the purposes of the Copyright Act "to an insignificant or

substantial extent." *Twin Peaks Prods, Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d 1366, 1374 (2d Cir.

1993). Here, Meltwater merely re-packages the original AP stories in a manner that "save[s] time

so you don't need to read the full article" (McN. Decl. Ex. 20) and without "distinct creative or

communicative objectives." *Blanch*, 467 F.3d at 253. As Justice Story reiterated, fair use involves

"real, substantial condensation of the materials, and intellectual labor and judgment bestowed

thereon; and not merely the facile use of the scissors; or extracts of the essential parts, constituting

the chief value of the original work." *Twin Peaks Prods.*, 996 F.2d at 1376, (quoting *Folsom v.

Marsh,* 9 F. Cas. 345). In sum, the first factor weighs heavily in AP's favor.

## B.     Factor Two: The Nature of the Copyrighted Work

The second factor of the fair use analysis, the nature of the copyrighted work, should

have little impact on this Court's analysis. While the scope of fair use is greater with respect to

factual than fictional works, this does not mean that factual works are not entitled to robust

copyright protection. To the contrary, as the Supreme Court eloquently expressed in *Harper*, the

aim of copyright is "to stimulate the creation of useful works for the general public good," and

"This principle applies equally to works of fiction and nonfiction." 471 U.S. at 546, 558. "It is

fundamentally at odds with the scheme of copyright to accord lesser rights in those works that

are of the greatest importance to the public" – such as news articles. *Id.* at 559.

As the Second Circuit has observed:

> [I]n considering the copyright protections due a report of news events or
> factual developments, it is important to differentiate between the substance of
> the information contained in the report, i.e., the event itself, and the particular

21

> form or collocation of words in which the writer has communicated it. What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments. Thus, the essence of infringement lies not in taking a general theme or in coverage of the reports as events, but in appropriating the particular expression through similarities of treatment, details, scenes, events and characterization.

*Wainright Sec., Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 95-96 (2d Cir. 1977) (internal citations omitted), *abrogated on other grounds, Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010).

In light of these considerations, many courts analyzing fair use in the context of factual works have declined to find that the second factor weighs in favor of the defendant.[8]

Here, while AP's articles are admittedly factual, rather than fictional, they contain extensive creative input and editorial judgment. It takes great art and skill to write a clear, concise, balanced, and effective news story, and AP's reporters and editors focus carefully on organization, word choice and tone—the very manner of expression copyright seeks to protect. Kent Decl. ¶¶ 7-26, 31. This Court should therefore find that the second factor cuts slightly against a finding of fair use or is, at worst, neutral here.[9]

## C.     Factor Three: The Amount and Substantiality of the Use

The third factor, the amount and substantiality of the use, clearly weighs in favor of AP.

Consideration of the third factor "calls for thought not only about the quantity of the materials

---

[8] *See, e.g., Harper*, 471 U.S. at 563-64 (drawing distinction between "sparsely embellished maps and directories" and biographies, and finding that use of President Ford's biography is "difficult to characterize as fair" under second factor); *Weissman v. Freeman*, 868 F.2d 1313, 1325 (2d Cir. 1989) (in case involving academic paper, holding that the second factor does not tip decidedly in favor of either party."); *Nihon*, 166 F.3d at 72-73 (while the works at issue were "predominantly factual news articles," the second factor was "at most neutral on the question of fair use."); *Princeton Univ. Press*, 99 F.3d at 1389 (in case involving scholarly works, finding that the second factor "cuts against a finding of fair use").

[9] In the unlikely event this Court determines that the second factor weighs in favor of fair use, it should follow the lead of the Second Circuit and other Circuit courts and give this factor very little weight. *See, e.g., Fin. Info., Inc. v. Moody's Inv. Serv., Inc.*, 751 F.2d 501, 509 (2d Cir. 1984); *Pacific and Southern Co*, 744 F.2d at 1497 (pointing out the "necessarily limited impact of this second factor" in case involving news clipping service); *Tullo*, 973 F.2d at 799 (finding that defendants' clips of plaintiffs' news footage was not fair use; while the second factor weighed in favor of fair use, "the remainder . . . argue[d] strongly to the contrary").

DWT 20580262v3 0025295-000064

used, but about their quality and importance, too." *Campbell*, 510 U.S. at 587. "[M]ore critical than the quantity is the qualitative degree of the copying: what degree of the essence of the original is copied in relation to its whole." *Rogers v. Koons*, 960 F.2d 301, 311 (2d Cir. 1992). Moreover, fair use requires that "the quantity and value of the materials used are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586.

In *Harper*, the Supreme Court found that even though only 300 words of President Ford's book-length memoir had been copied, those words amounted to "'the heart of the book,' the part most likely to be newsworthy and important in licensing serialization." *Campbell*, 510 U.S. at 587 (citing *Harper*, 471 U.S. at 564-66, 568). *See also Roy Export Co. v. Columbia Broad. Sys.*, 503 F. Supp. 1137, 1145 (S.D.N.Y. 1980) (finding that CBS's use of fifty-five seconds, or 1.03%, of a one hour and twenty-nine minute film, was qualitatively substantial for purposes of the third factor), *aff'd*, 672 F.2d 1095 (2d Cir. 1982), *cited with approval, Harper*, 471 U.S. at 565; *Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos., Inc.*, 621 F.2d 57, 61-62 (2d Cir. 1980) ("*Iowa State*") (ABC's copying of two and a half minutes, or 8%, of a 28-minute film qualitatively essential). Moreover, "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." *Harper*, 471 U.S. at 565.

Here, the third factor weighs heavily against a finding of fair use because Meltwater's infringement is both quantitatively and qualitatively significant. AP's articles are often very short, at times consisting of only a headline and an article of only 130 words. By copying the headline and up to 440 characters of an article, Meltwater often copies a substantial percentage of the underlying article. Kent Decl. ¶¶ 11, 27-28; McN. Decl. ¶ 97(providing examples in which

23

Meltwater copied between 40 and 60% of several Registered Articles). Even lower percentages are far greater than the 1% copied in *Roy Export Co.*, or the 8% copied in *Iowa State.*

Importantly, Meltwater's taking of AP content should not be viewed solely from the narrow prism of an article-by-article analysis. Meltwater engages in a systematic massive taking of AP content. Again, *Infinity* provides critical guidance. As the Second Circuit held there, considering the potential scope of retransmissions is even more relevant than evidence of the actual retransmissions. And a court must look at "the collective action of a plurality of subscribers," not just individual subscribers. 150 F.3d at 110. As in *Infinity*, given the total number of Meltwater subscribers and their ability to do follow-up ad hoc searches on the Meltwater system that yield additional excerpts of a given article, "the more successful [Meltwater] becomes in selling [its] service to interested parties, the more likely it is that [Meltwater will distribute collectively to its subscribers] most or all of a given [article.]" *Id.* As the *Infinity* court concluded, in such circumstances, a party cannot demonstrate that "no more was taken than necessary" – whatever the public benefit of the service. *Id.*

Meltwater's copying is qualitatively significant as well, even in the context of lengthier AP articles. The News Reports are comprised almost exclusively of excerpts of news articles. *See* McN. Decl. Exs. 84-86. Selling news excerpts is Meltwater's business. Further, like the defendant in *Harper*, Meltwater copies "the heart" of the copyrighted works—in this case, the headline and opening or lede of AP's articles, which are written to "capture the essence of the story." Kent Decl. ¶¶ 29-31. Indeed, as Meltwater has admitted, the reason it includes the lede sentence in its article excerpts is to provide "context" so that the customer "know[s] what the article is about." McN. Decl. ¶ 13, Ex. 3 [Box Tr.] at 154:18-155:10. Thus, under *Harper*, there is clear evidence of the "qualitative value of the copied material." 471 U.S. at 565.

24

The evidence also establishes that Meltwater takes more AP content than is necessary for its purpose. By its own admission, Meltwater delivers only the headline of stories scraped from Canadian sources, while in the United Kingdom Meltwater displays a far shorter excerpt than in the United States. In both locations, despite the far more limited content delivered to its customers, Meltwater continues to maintain viable businesses. McN. Decl. ¶ 100. In addition, Google's product "Google Alerts," which serves a similar news monitoring function as Meltwater, does not return the lede of the news article in its search result "alerts" (unless the search term is in the lede). This difference is extremely significant from AP's perspective, since the inclusion of the article lede in the Meltwater News Reports and its other search results greatly increases the likelihood that the excerpt will substitute for the full article. Jones Decl. ¶¶ 51-52. If Meltwater can maintain its business in the United Kingdom and Canada using less content, and Google can provide a similar product without the lede, it logically follows that Meltwater's use of AP's content is not reasonable in relation to its purported purpose in copying it. For all these reasons, the third factor weighs strongly against fair use.

## D.   Factor Four: The Effect of Meltwater's Use on the Market

### 1.   The Legal Standard

The fourth fair use factor is "the effect of the use upon the *potential* market for or value of the copyrighted work." § 107(4) (emphasis added). "It requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (citations omitted). "Isolated instances of minor infringements, when multiplied many times, become in the aggregate a major inroad on copyright that must be prevented." *Harper*, 471 U.S. at 569, quoting S. Rep. No. 473, 94th Cong., 1st Sess. 65 (1975) ("Senate Rep."). "The enquiry

25

'must take account not only of harm to the original but also of harm to the market for derivative works.'" *Campbell*, 510 U.S. at 590, quoting *Harper*, 471 U.S. at 568. Further, where, as here, a secondary use is not transformative, it is more likely to serve as a market replacement for the original. *Video Pipeline*, 324 F.3d at 202; *ASCAP*, 599 F. Supp. 2d at 432.

Courts recognize two related but distinct forms of market harm, namely lost licensing revenue and market substitution – both of which are present here. To start with the first, "it is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work . . . and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Texaco*, 60 F.3d at 929. The only relevant limit on a plaintiff's right to receive "potential licensing revenues" is that courts will only consider "traditional, reasonable or likely to be developed markets." *Id.* at 930. Thus, for example, in both *Texaco, id.* at 929-31, and *Davis,* the Second Circuit found that the fourth factor favored the copyright owner because the defendant failed to pay "the customary price" or licensing fee in a market exploited by the plaintiff. *Davis*, 246 F.3d at 176 ("[Plaintiff] suffered market harm through his loss of royalty revenue to which he was reasonably entitled in the circumstances.")

Second, the fourth factor is concerned with secondary uses that usurp or substitute for a market that properly belongs to the copyright holder, including a derivative market that the copyright owner "would in general develop or license others to develop." *Castle Rock*, 150 F.3d at 145, quoting *Campbell,* 510 U.S. at 592; *see also Infinity*, 150 F.3d at 110-11.[10] As *Infinity* demonstrates, the question is far broader than whether the copyright owner has lost customers to the secondary user but rather focuses instead on whether the secondary user is competing in the

---

[10] Indeed, the Second Circuit "has sometimes found that the fourth factor favors the plaintiff even in the absence of evidence that the plaintiff has tapped, or even intends to tap, a derivative market" in recognition of the fact that "copyright law must respect that creative and economic choice." *Blanch*, 467 F.3d at 258 n. 9, citing *Castle Rock,* 150 F.3d at 145-46.

DWT 20580262v3 0025295-000064

copyright owner's rightful market. In that case, plaintiff Infinity had only offered listening lines to its customers at no additional cost, but the Second Circuit still found that the fourth factor weighed in its favor because "[the defendant radio monitoring service] is selling Infinity's copyrighted material in a market that Infinity, as the copyright owner, is exclusively entitled to exploit. . . . [Defendant] replaces *Infinity* as the supplier of those broadcasts to meet the demand of [its] customers. This is precisely the kind of harm the fourth factor aims to prevent." *Infinity*, 150 F.2d at 111. *See also Los Angeles News Service v. Reuters Television Int'l Ltd.*, 149 F.3d 987, 994-95 (9th Cir. 1998)(fourth factor favored plaintiff despite no proof of loss of actual sales because both parties were in the business of providing audiovisual news material to the media).

2.    **Meltwater News Causes Market Harm To AP**

AP brought this lawsuit as a result of a deep-seated conviction, born of experience, that unlicensed media monitoring organizations and other commercial aggregators, including Meltwater, that scrape tens of thousands of AP articles from the web and redistribute critical components from its articles harms its business. This is confirmed by the remarkably low click-through rate for the Registered Articles on Meltwater News. AP, as a news organization, must bear the significant costs of newsgathering, whereas aggregators like Meltwater only bear the minimal costs of distribution, and thus can undercut AP in the market. Curley Decl. ¶ 13-28; Rizzo Decl. ¶ 4; McN. Decl. ¶¶ 92-94. As Meltwater highlights on its Meltwater News Pricing Proposals, it charges "**No copyright** fees." McKenzie Decl. Ex. 48. At the most fundamental level, it is basic common sense that if there were unrestricted and widespread conduct of the sort engaged in by Meltwater, namely the broad, unlicensed redistribution of critical components of AP stories, including stories going back to 2001, this necessarily would hurt AP, its members and AP licensees, who all must pay for AP content and many of whom compete with Meltwater.

In recognition of the reality that unlicensed aggregators harm its business, AP launched a

27

multi-year campaign several years ago to gain control of its news content online and to reinforce the message that AP must be compensated for the commercial exploitation of its news. AP entered into licenses with the most prominent search engines, including Google, AOL and Yahoo, and most well-known aggregators, like the Huffington Post. Critically, AP also has entered into a number of licenses with media monitoring services that directly compete with Meltwater, including Cision and Moreover/BurrellesLuce. AP likewise has long-standing agreements with the electronic databases Factiva and LexisNexis. The vast majority of these licenses include the right to post or otherwise deliver excerpts of AP content, including in response to customer searches. *See* Curley Decl. ¶¶ 13-23; Cross Decl. ¶¶ 28-43.

This licensing history amply demonstrates that AP has broadly exploited for significant license fees the use of its articles, in whole or in part, across a broad platform of uses. In other words, the evidence establishes that AP is routinely paid for the very uses of its content that Meltwater exploits. Further, Meltwater exploits derivative rights to AP articles which are strictly limited by AP and only licensed at significant cost. Most importantly, AP closely guards archiving of its content. Meltwater is not only creating an ever growing archive of AP content that it provides to its customers, but it also allows its customers to archive AP content on the Meltwater platform for unlimited periods of time. Then, it also sells – for additional fees – the ability to redistribute AP articles in newsletters or on RSS feeds, as well as providing translations. Cross Decl. ¶¶ 44-53; McN. Decl. ¶¶ 29-31, 35, 41-44, 53. Accordingly, the fourth factor strongly favors AP because Meltwater has failed to pay "the customary price" or licensing fee for its use of AP's articles, including the Registered Articles, in a market broadly exploited by AP. *Davis*, 246 F.3d at 176.

Further, Meltwater is usurping a market that properly belongs to AP. Several AP customers have terminated their AP licenses and instead obtained a Meltwater subscription, including the

28

Mississippi Development Authority. Further, Meltwater has competed with AP on some of its most major accounts. For instance, both AP and Meltwater submitted bids in response to an RFP issued by the House of Representatives in 2009, a substantial customer that AP had served for over a decade. Cross Decl. ¶¶ 54-56, Rizzo Decl. ¶¶ 3-20, McN. Decl. ¶¶ 105-110. Meltwater is also competing with AP's licensees to its advantage since it does not incur the license fees they pay for AP content. The undisputed evidence shows that Meltwater regards Cision, BurrellesLuce, Google Alerts, Factiva and LexisNexis – all AP licensees – as its competitors. Indeed, Meltwater documents boast that it took an account worth $150,000 away from LexisNexis, and Factiva has complained to AP about its loss of customers to Meltwater. Cross Decl. ¶ 37; McN. Decl. ¶ 5. Thus, Meltwater affects the potential market for or value of AP's copyrighted articles by drawing customers away from both AP and AP's licensees. "'[A] use that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement.'" *Harper*, 471 U.S. at 568, quoting Senate Rep., p. 65. The fourth factor weighs heavily in AP's favor.

## E.     The Aggregate Assessment Strongly Favors AP

When the factors are viewed in the aggregate, they strongly favor AP. Meltwater is a parasitic business that aims to profit from the news content created by others. Its claim that it should be protected as an electronic reference tool rings hollow given the pitifully low click-through rates it generates and the fact that its search engine is similar to search functions that AP licenses in its AP Exchange. Meltwater does not use the AP articles "as raw material" "in furtherance of a distinct creative or communicative objective" (*Blanch*, 467 F.3d at 253), but merely serves as a substitute, usurping the market that properly belongs to AP as the exclusive copyright holder. For all these reasons, this Court should reject Meltwater's fair use defense.[11]

---

[11] The initial phase of this litigation is to address liability only. At a subsequent phase of this litigation, AP will argue that it is entitled to both damages and injunctive relief broadly barring Meltwater's

## III.   MELTWATER CANNOT DEFEND ITS EXPLOITATION OF AP CONTENT UNDER A THEORY OF IMPLIED LICENSE

Meltwater argues that it is entitled to make a massive, systematic, commercial use of AP content because "AP makes its content freely available for public access on a variety of Internet sites" and because AP allegedly "does not attempt to limit others from locating and providing links to such content," including through the use of robots.txt instructions. McN. Decl. Ex. 5 [Am. Answer] at p. 28. Thus, Meltwater claims an implied license resulting from "AP's acquiescence to Defendants' allegedly infringing conduct" that entitles it to use and exploit AP articles cost free. *Id.* at p. 29. As the party seeking to prove the existence of a license, Meltwater bears the burden of proof. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).

Meltwater's implied license argument, if accepted, would have extraordinary and far-reaching implications. A copyright owner does not lose its copyright protection against broad-scale commercial use of its work merely because individual consumers can view it for free on the internet for individual, non-commercial use only. Under Meltwater's flawed logic, the fact that individuals can take a book out of the public library for free would mean that they could copy it multiples times and distribute it commercially. As the United States Court of Appeals for Ninth Circuit observed in the context of a video news clipping service in words equally applicable here, "[w]hile a viewer is 'invited to witness a telecast program in its entirety free of charge' and may therefore do so at a time the viewer finds convenient, the viewer is *not* invited to sell copies of the program." *Tullo*, 973 F.2d at 798 n.7 (emphasis original).

### A.   Meltwater Never Obtained An Implied License From AP

In *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.*, 211 F.3d 21, 25 (2d. Cir. 2000), the Second Circuit followed the lead of other circuits and cautioned that in the

---

practices in connection with all AP articles.

copyright context, an implied license will be found "only in 'narrow' circumstances where one party created a work at the other's request and handed it over, intending that the other copy and distribute it." *Id.*, citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) and *Korman v. HBC Fla, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Several district courts in the Southern District have followed *SmithKline* strictly and will only find an implied copyright license if both these conditions are met. [12]  Informing virtually all findings of an implied license is the finding that, absent the license, the work at issue would be of "minimal value" or "rendered worthless." *Effects Assocs.*, 908 F.2d at 558; *Design Options Inc. v. BellePoint, Inc.*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996) (Sweet, J.).

In all circumstances, the critical predicate to any finding of implied license is the conclusion that there was a "meeting of the minds" between the parties "to permit the particular usage at issue." *Psihoyos*, 855 F. Supp. 2d at 124; *Ulloa*, 303 F. Supp. 2d at 416. There must be evidence that "*both parties* to the transaction, not just the defendant, intended that the defendant could use or copy the plaintiff's work without liability for copyright infringement. . . . [A]n implied license to use a copyrighted work cannot arise out of the unilateral expectations of one party." *Design Options*, 940 F. Supp. at 92; *see also Viacom Int'l v. Fanzine*, No. 98 Civ. 7448 (KMW), 2000 WL 1854903 at *3 (S.D.N.Y. July 12, 2000) (Wood, J.). There must be "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Ulloa*, 303 F. Supp. at 417. Thus, as in *Viacom*,

---

[12] *See Weinstein Co. v. Smokewood Entertainment Grp., LLC*, 664 F. Supp. 2d 332, 344 (S.D.N.Y. 2009) (Buchwald, J.) ("the basic requirement remains clear: an implied non-exclusive license will only be found when a copyright owner creates a work at the request of the licensee and with the intention that the licensee exploit it."); *see also Pavlica v. Behr*, 397 F. Supp. 2d 519, 526 (S.D.N.Y. 2005) (Chin, J.); *Ulloa v. Universal Music and Video Distrib. Corp.*, 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004) (Jones, J.); *Country Rd. Music v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 328 (S.D.N.Y. 2003) (Rakoff, J.). At least one court in this district dropped the "creation" requirement and was willing to find an implied license in the copyright context when the plaintiff delivered the works to the defendant with the intent that defendant copy and distribute them. *See, e.g.*, *Psihoyos v. Pearson Education*, 855 F. Supp. 2d 103, 118 (S.D.N.Y. 2012) (Oetken, J.).

Meltwater would need to prove that "the parties manifested mutual assent to a licensing arrangement giving defendant unfettered, and free, permission to commercially exploit [AP' works] through [the particular products] at issue here." 2000 WL 1854903 at *3.[13]

Here, Meltwater's "implied license" theory fails at every level of the analysis: AP most certainly never created its news stories at the request of Meltwater; nor did it deliver its articles to Meltwater, let alone with the intent that Meltwater re-package and sell them to customers. Indeed, AP had no dealings whatsoever with Meltwater. Jones Decl. ¶ 36. Put simply, no one could plausibly argue that the requisite "meeting of the minds" existed between AP and Meltwater whereby the parties mutually understood that Meltwater could systematically exploit AP's content for its own commercial benefit, free of charge and to AP's direct financial harm.

To the contrary, the evidence establishes that AP and its members made clear in innumerable and public ways that commercial exploitation of AP's content on AP member or AP sites was strictly prohibited, including the archiving or re-distribution of the content. Thus, for example, AP includes in all of its articles and on the AP Hosted homepage a copyright line stating, "All rights reserved. This material may not be published, broadcast, rewritten or redistributed." When AP enters into Digital Use Agreements permitting its members to post AP articles on the Internet, these agreements contain extensive provisions requiring the members to include the above-quoted copyright language with AP articles and to include terms of use on their websites

---

[13] *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944 (S.D.N.Y. 1997), decided before *SmithKline*, does not articulate a clear standard for implied license but nonetheless also involved a meeting of the minds and delivery of the software at issue. There, the evidence established that a very conscious decision was made to permit the allegedly infringing use. As Lehman's counsel testified, "[t]he conclusion that was reached was that we would not object to Smith Barney's use of the system" and the term was "a tacit or explicit quid pro quo [during our discussions] that our not objecting to the use of the SLBX system would be helpful in other aspects of the relationship between the two firms." *Id.* at 946 (internal marks omitted). Likewise, even outside the copyright context, the New York Court of Appeals has made clear that an implied license will arise only "from a mutual agreement and an intent to promise, when the agreement and promise simply have not been expressed in words." *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 94, 699 N.Y.S.2d 716, 719-720 (1999) (citations omitted). "This type of contract still requires such elements as consideration, mutual assent, legal capacity and legal subject matter." *Id.*

32

prohibiting commercial use of the content. Consistent with these agreements, AP's members prominently post terms of use on their websites prohibiting commercial use of the content; such terms are a standard practice in the industry for AP's members and often include specific prohibitions against redistribution or crawling. In addition, both the AP website and the AP Hosted subscriber websites have terms of use forbidding commercial use of news content. Cross Decl. ¶¶ 10-27; Jones Decl. ¶¶ 8-18 and Ex. 2. *See Pavlica*, 397 F. Supp. 2d at 526-27 (denying defendant's motion for summary judgment where plaintiff's manual contained a statement prohibiting reproduction without permission). Finally, well before Meltwater's infringement of the Registered Articles, AP was prominently on the public record steadfastly opposing the commercial use of AP articles by aggregators, portals and search engines and had equally publicly brought the most prominent of those entities under license. Curley Decl. ¶¶ 14-23; Jones Decl. ¶¶ 26-27. In sum, there is no basis for this Court to find that AP and Meltwater had mutually agreed that Meltwater could sell and exploit AP content without a license.

Meltwater will no doubt argue that somehow because AP permits its Members to post AP stories on the Internet for "free," or waited years before deciding to incur the substantial costs and resources required for this litigation (*see* Curley Decl. ¶¶ 25-27),[14] or choose not to employ robots.txt instructions – which are but one method among many to convey AP's prohibition against unlicensed commercial use of its content (Jones Decl. ¶¶ 44-48) – that AP has somehow acquiesced in Meltwater's appropriation of its content. Yet, no analysis of the undisputed facts could support a finding that AP intended to permit systematic commercial re-distribution of its

---

[14] Copyright law establishes a three year statute of limitations and, unlike trademark, there is no affirmative obligation to police the use of one's copyrighted work. It would be contrary to the underlying policies reflected in the statute of limitations to construe a delay in filing as evidence of an implied contract where the plaintiff files within the statutory period. After all, many copyright plaintiffs know of an alleged infringement, but for all sorts of legitimate reasons wait some time before timely filing suit. *Cf. Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 260 (2d. Cir. 1997) (laches case).

content, including by for-profit media monitoring organizations like Meltwater, without liability for copyright infringement. In sum, there is no evidence to support Meltwater's burden of showing a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Ulloa,* 303 F. Supp. at 417.[15]

## B.   Meltwater Could Not Have Obtained An Implied Sublicense From AP Members or Other Licensees and Cannot Possibly Claim An Implied License Covering the Many Registered Articles Published After Suit Was Filed

There are two additional barriers to Meltwater's implied license defense. First, Meltwater obtained the Registered Articles primarily by scraping the websites of AP's members or other licensees such as Yahoo. McN. Decl. ¶¶ 77-78, Exs. 55 & 56. Meltwater cannot claim that it copied this AP content pursuant to an implied sublicense granted by AP members or other AP licensees (collectively, the "Permitted Licensees"), because under the explicit terms of the AP Digital Use Agreement and AP's other licenses, the Permitted Licensees do not have the authority to sublicense AP content. Cross Decl. ¶¶ 12, 18. In such circumstances, a defendant cannot claim it received an implied sublicense. *Country Rd. Music,* 279 F. Supp. 2d at 328 ("[T]his line of cases [recognizing an implied right of limited reproduction] is inapposite here, where MP3.com ... obtained a license from parties who could not grant a reproduction right"); *see also Psihoyos,* 855

---

[15] Meltwater undoubtedly will rely on *Field v. Google,* 412 F. Supp. 2d 1106 (D. Nev. 2006), to support its claim that AP has granted it an implied license. However, *Field's* analysis is inconsistent with Second Circuit law, and its unique facts are readily distinguishable from the evidence here. In *Field,* the plaintiff was familiar with Google's notice to website owners whereby they could prevent the "caching" of content and "decided to manufacture a claim for copyright infringement against Google in hopes of making money from Google's standard practice." *Id.* at 1113. He rapidly created 51 registered works, and created a robots.txt file for his site that allowed all robots to visit and index all of the pages of his website; Google then indexed and displayed his website with cached links, "as Field intended." On these facts, the court found an implied license. *Id.* at 1116. *See also Parker v. Yahoo!,* Civil Action No. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008). Here, of course, no one could argue that AP "manufactured" this claim or created the works at issue to support it. Nor does Meltwater post instructions for websites who do not want to be scraped. Jones Decl. ¶ 43. Meltwater also does not routinely abide by robots.txt instructions. McN. Decl. Ex. 3 [Geidies Tr.] at 209:22-210:3 (Meltwater "reserves the right not to follow [robots.txt] instructions" where a robots.txt file is used to "exclud[e] only certain user agents.") Indeed, the evidence shows that a robots.txt file "doesn't create a technical boundary to crawling." In any event, it would not be possible for AP to dictate that its members exclude Meltwater since AP content largely does not reside in segregated files on its members sites. Jones Decl. ¶¶ 45, 47 ; McN. Decl. ¶ 58.

F. Supp. 2d at 123-24.

Second, Meltwater's implied license defense cannot apply to the 12 Registered Articles published after February 14, 2012, the date of the original Complaint. *See* Am. Cplt. Exs. Y-DD, EE, GG-JJ, LL. Even if an implied license ever existed – and plainly it did not – "[a]n implied license is revocable . . . where" – as here – "no consideration has been given for the license." *Ortiz v. Guitan Music Bros., Inc.*, No. 07 Civ. 3897, 2009 WL 2252107, at *3 (S.D.N.Y. July 28, 2009). Further, "by instituting this action, Plaintiff revoked any license that may have existed between him and Defendants." *Id.* at *4.

## CONCLUSION

For the reasons set forth above, plaintiff The Associated Press respectfully requests that the Court grant its motion for summary judgment against Meltwater on AP's First Cause of Action for Direct Copyright Infringement and AP's Fourth Cause of Action for a Declaratory Judgment of infringement as to the Registered Articles.

Dated: New York, New York
      November 9, 2012

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:

Elizabeth A. McNamara
Linda Steinman
Alison B. Schary
Collin J. Peng-Sue
1633 Broadway – 27th Floor
New York, New York 10019
Telephone: (212) 489-8230
Facsimile: (212) 489-8340

*Attorneys for Plaintiff The Associated Press*

DWT 20580262v3 0025295-000064