DAVID H. KRAMER (admitted *pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300

TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7700

*Attorneys for the Defendants*

**REDACTED**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE ASSOCIATED PRESS, | CASE NO.: 2:12-CV-01087-DLC-FM |
| Plaintiff, | ECF CASE |
| v. | |
| MELTWATER U.S. HOLDINGS, INC.; MELTWATER NEWS U.S., INC.; and MELTWATER NEWS U.S. 1, INC., | **Oral Argument Requested** |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................. iii

TABLE OF ABBREVIATIONS ........................................................................................... vii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 2

    A.    The Meltwater News Search Engine and Research Service ......................... 2

    B.    The Associated Press .................................................................................... 5

    C.    AP's Lawsuit against Meltwater ................................................................... 6

ARGUMENT ........................................................................................................................ 7

I.     MELTWATER IS ENTITLED TO SUMMARY JUDGMENT ON DIRECT
      INFRINGEMENT BECAUSE ITS USE OF THE ARTICLES IN SUIT IS FAIR ................. 7

    A.    The Fair Use Doctrine Protects the Reproduction and Display of Copyrighted
         Material by Internet Search Engines ........................................................... 8

    B.    Factor One Favors Meltwater Because Its Use of the Articles in Suit As Part
         of An Internet Search Engine and News-Research Tool is Highly
         Transformative ............................................................................................. 9

         1.    The use of publicly available news articles in Meltwater's search
               engine is transformative ................................................................. 10

         2.    Meltwater's use of news articles as the raw material for its news-
               related research tool is transformative .......................................... 12

    C.    Factor Two Favors Meltwater Because AP's Factual Works Have Thin
         Copyright Protection and Were Published Widely and Freely on the Internet ........... 13

         1.    As purely factual works, the Articles in Suit are entitled minimal
               copyright protection, and more leeway is allowed for use by others ............. 14

         2.    The fact that the Articles in Suit were widely disseminated over the
               Internet cuts strongly in favor of fair use ...................................... 15

    D.    Factor Three Favors Meltwater Because the Short Snippets Included in Its
         Search Results are Reasonable in Relation to Meltwater's Transformative Use ........ 16

    E.    Factor Four Favors Meltwater Because Its Use Does Not Usurp Any
         Traditional or Customary Market for AP's Articles in Suit ......................... 19

1.    There is no evidence that Meltwater's limited use of the Articles in
      Suit caused AP to lose customers to Meltwater News .................................. 20

2.    AP cannot defeat fair use by trying to develop a licensing market for
      the transformative uses that Meltwater makes of news content ..................... 24

II.   MELTWATER IS ENTITLED TO SUMMARY JUDGMENT ON AP'S
      SECONDARY INFRINGEMENT CLAIMS ......................................................................... 26

   A.  Meltwater Cannot Be Held Secondarily Liable Because There Is No Evidence
       That Any Meltwater User Directly Infringed Any of the Articles in Suit ................. 27

       1.    There is no evidence that any actual Meltwater customer ever stored or
             distributed full text versions of the Articles in Suit ......................................... 27

       2.    The authorized use of the Articles in Suit by AP's agent is not direct
             infringement for which Meltwater can be held secondarily liable ................ 29

   B.  AP's Secondary Infringement Claims Fail Independently of the Absence of
       Direct Infringement ........................................................................................................ 32

       1.    AP's contributory infringement claim fails because there is no
             evidence that Meltwater knew about any infringing use of the Articles
             in Suit ........................................................................................................................... 32

       2.    AP's vicarious liability claim fails because Meltwater gained no
             financial benefit from Mintz's use of the Articles in Suit .............................. 33

   CONCLUSION ...................................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

## **Cases**

*Agence France Presse v. Morel,*
    769 F. Supp. 2d 295 (S.D.N.Y. 2011)................................................................ 34

*Am. Geophysical Union v. Texaco, Inc.,*
    60 F.3d 913 (2d Cir. 1994)...................................................................... 14, 25

*A&M Records, Inc. v. Napster, Inc.,*
    239 F.3d 1004 (9th Cir. 2001)................................................................. 27, 33

*Arica Inst., Inc. v. Palmer,*
    970 F.2d 1067 (2d Cir. 1992).................................................................. 15, 23

*Arista Records LLC v. Lime Group LLC,*
    784 F. Supp. 2d 398 (S.D.N.Y. 2011)............................................................ 33

*A.V. ex rel Vanderhye v. iParadigms, LLC,*
    562 F.3d 630 (4th Cir. 2009)..................................................................... 9, 17

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
    448 F.3d 605 (2d Cir. 2006)................................................................. passim

*Blanch v. Koons,*
    467 F.3d 244 (2d Cir. 2006)................................................................. passim

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994)......................................................................... passim

*Consumers Union of United States, Inc. v. General Signal Corp.,*
    724 F.2d 1044 (2d Cir. 1983)...................................................................... 14

*Dawes-Ordonez v. Realtor Ass'n of Greater Fort Lauderdale, Inc.,*
    No. 09-60335-CIV, 2010 WL 1791754 (S.D. Fla. May 5, 2010)..................... 33, 34

*Duffy v. Penguin Books USA Inc.,*
    4 F. Supp. 2d 268 (S.D.N.Y. 1998) .............................................................. 13

*Ellison v. Robertson,*
    357 F.3d 1072 (9th Cir. 2004) ..................................................................... 33

*Faulkner v. Nat'l Geographic Enters., Inc.,*
    409 F.3d 26 (2d Cir. 2005)..................................................................... 27, 29

*Feist Publ'ns Inc. Rural Tel. Serv. Co., Inc.,*
    499 U.S. 340 (1991).................................................................................. 14

*Field v. Google Inc.*,
   412 F. Supp. 2d 1106 (D. Nev. 2006) ................................................................. passim

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
   443 F.2d 1159 (2d Cir. 1971) ................................................................................ 32, 33

*Harper & Row Publishers, Inc. v. Nation Enters.*,
   471 U.S. 539 (1985) .............................................................................................. 14

*Keane Dealer Servs, Inc. v. Harts*,
   968 F. Supp. 944 (S.D.N.Y. 1997) ....................................................................... 29

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2001) ................................................................................ passim

*Lennon v. Premise Media Corp.*,
   556 F. Supp. 2d 310 (S.D.N.Y. 2008) ................................................................. 9

*Link v. Wabash R.R. Co.*,
   370 U.S. 626 (1962) .............................................................................................. 32

*Mattel, Inc. v. Walking Mountain Prods.*,
   353 F.3d 792 (9th Cir. 2003) ................................................................................ 17

*Matthew Bender & Co., Inc. v. West Publ'g Co.*,
   158 F.3d 693 (2d Cir. 1998) ................................................................................. passim

*Maxtone-Graham v. Burtchaell*,
   803 F.2d 1253 (2d Cir. 1986) ............................................................................... 14, 16

*MGM Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005) .............................................................................................. 34

*Monotype Imaging, Inc. v. Bitstream, Inc.*,
   376 F. Supp. 2d 877 (N.D. Ill. 2005) ................................................................... 33

*Nemaizer v. Baker*,
   793 F.2d 58 (2d Cir. 1986) ................................................................................... 32

*New Era Pub'ns Int'l, ApS v. Carol Publ'g Group*,
   904 F.2d 152 (2d Cir. 1990) ................................................................................. 14, 15

*NXIVM Corp. v. The Ross Inst.*,
   364 F.3d 471 (2d Cir. 2004) ................................................................................. 8, 9, 19

*Olan Mills, Inc. v Linn Photo Co.*,
   23 F.3d 1345 (8th Cir. 1994) ................................................................................ 30, 31

*Perfect 10, Inc. v. Amazon.com, Inc.*,
   508 F.3d 1146 (9th Cir. 2007) .............................................................................. passim

*Psihoyos v. Pearson Educ., Inc.*,
   855 F. Supp. 2d 103 (S.D.N.Y. 2012) ........................................................................ 30

*Resnick v. Copyright Clearance Ctr., Inc.*,
   422 F. Supp. 2d 252 (D. Mass. 2006) ............................................................ 27, 30, 32

*Righthaven LLC v. Democratic Underground, LLC*,
   No. 2:10-cv-01356-RLH (GWF) (D. Nev. Mar. 9, 2012) ........................................ 17

*Righthaven LLC v. Jama*,
   No. 2:10-cv-1322-JCM-LRL, 2011 WL 1541613 (D. Nev. Apr. 22, 2011) .......... 14, 18

*Righthaven LLC v. Realty One Group, Inc.*,
   No. 2:10-cv-1036-LRH-PAL, 2010 WL 4115413 (D. Nev. Oct. 19, 2010) .......... 15, 17

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
   316 F.2d 304 (2d Cir. 1963) ...................................................................................... 33

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ......................................................................................... 15, 29, 30

*Stewart v. Abend*,
   495 U.S. 207 (1990) .................................................................................................. 14

*Swatch Group Mgmt. Servs. v. Bloomberg L.P*,
   861 F. Supp. 2d 336 (S.D.N.Y. 2012) ................................................................. 14, 23

*The Authors Guild, Inc. v. HathiTrust*,
   No. 11-cv-6351(HB), 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012) .................. passim

*Viacom Int'l, Inc. v. YouTube, Inc.*,
   676 F.3d 19 (2d Cir. 2012) ........................................................................................ 33

*Video-Cinema Films, Inc. v. Cable News Network, Inc.*,
   No. 98-cv-7128 (BSJ), 2001 WL 1518264 (S.D.N.Y. Nov. 28, 2001) ...................... 19

*Wolk v. Kodak Imaging Network, Inc.*,
   840 F. Supp. 2d 724 (S.D.N.Y. 2012) ................................................................. 27, 33

## **Statutes**

17 U.S.C. § 107 ......................................................................................... 8, 13, 16, 19

## **Rules**

FED. R. CIV. P. 37(c)(1) ............................................................................................ 23

FED. R. CIV. P. 56(a) ................................................................................................... 7

**Other Authorities**

2 Howard B. Abrams, *The Law of Copyright* (2006) ........................................................ 13

2 Paul Goldstein, *Copyright* (1996) ............................................................................... 27

4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2012) ........................... 25

Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105 (1990) ......................... 8, 25

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Am. Compl. | First Amended Complaint filed by Plaintiff The Associated Press ("AP"), dated July 13, 2012 (Dkt. No. 30) |
| Box Decl. | Declaration of John Box in Support of Defendants' Motion for Summary Judgment, dated November 6, 2012 |
| Cross Dep. | Deposition of Sue Cross, dated September 21, 2012 |
| Curley Dep. | Deposition of Thomas Curley, dated October 5, 2012 |
| Fuller Decl. | Declaration of Nick Fuller, dated November 7, 2012 |
| Geidies Dep. | Deposition of Sebastian Geidies, dated October 3, 2012 |
| Glunt Decl. | Declaration of Robert A. Glunt in Support of Defendants' Motion for Summary Judgment, dated November 9, 2012 |
| Grealis Decl. | Declaration of Catherine Grealis in Support of Defendants' Motion for Summary Judgment, dated November 9, 2012 |
| Jones Dep. | Deposition of Joy Jones, dated September 24-25, 2012 |
| Lawhon Decl. | Declaration of Cathy Lawhon, dated October 1, 2012 |
| Meltwater | Defendants Meltwater US Holdings Inc., Meltwater News US Inc., and Meltwater News US1 Inc. |
| McKenzie Dep. | Deposition of Keri McKenzie, dated September 28, 2012 |
| Meeks Decl. | Declaration of Brock N. Meeks, dated October 15, 2012 |
| Saab Dep. | Deposition of Sara Saab, dated September 10-11, 2012 |
| Saab SJ Decl. | Declaration of Sara Saab in Support of Defendants' Motion for Summary Judgment, dated November 7, 2012 |
| SUF | Defendants' Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried, dated November 9, 2012 |
| Rizzo Dep. | Deposition of John D. Rizzo, dated September 19, 2012 |

Defendants (collectively "Meltwater") submit this memorandum of law in support of their

Motion for Summary Judgment on AP's copyright infringement claims (the First, Second, Third, and

Fourth Causes of Action in AP's Amended Complaint).

## PRELIMINARY STATEMENT

AP's claims in this case challenge a core function of the Internet.  Search engines provide

information about the existence and location of online content in response to users' search queries.

Meltwater offers just such a search engine, which allows its users to discover, monitor, research, and

analyze information made freely available on news websites across the Internet.  AP contends that

by including short excerpts (or "snippets") of AP articles in its search results, Meltwater infringed

AP's copyrights.  But every court that has addressed the issue has held that the reproduction and

display of copyrighted material by search engines is a fair use.  The same result is warranted here.

Meltwater News informs its users about – and provides direct links to – news articles

published and made freely available by media outlets, including AP and its licensees, on tens of

thousands of websites worldwide.  Meltwater's search engine is not a substitute for those articles,

but instead helps its users find and access them.  Meltwater also uses news items published online as

raw material for an advanced news-research tool that analyzes and compares the volume, tone, and

nature of media coverage across a staggering range of Internet news sources.  Meltwater's limited

use of AP's fact-based articles is highly transformative and has not harmed any traditional or

customary market for those works.  Because Meltwater is engaged in fair use, it is entitled to

summary judgment on AP's direct infringement claims.

AP also asserts secondary infringement claims based on its allegation that Meltwater

customers "may have" used Meltwater's system to save and email full copies of AP articles.

Discovery refuted AP's allegations and confirmed that no actual Meltwater customer ever stored or

distributed a full text version of any of the AP works at issue.  AP tries to save its claims by relying

on the actions of its own investigator, who copied AP articles at the direction of AP's counsel.  But

# REDACTED

the fully authorized use of those articles by AP's agent is not copyright infringement.  And even if it were, Meltwater still would be entitled to summary judgment because AP cannot offer evidence to support other required elements of its contributory and vicarious liability claims.

## FACTUAL BACKGROUND

### A.     The Meltwater News Search Engine and Research Service

Meltwater began offering subscriptions to its Meltwater News service in the United States in late 2005.  SUF ¶ 3.  Meltwater News provides a search engine and research tool that allows users to search for and obtain information about news items that have been made publicly available on the Internet.  SUF ¶¶ 1-2.  Meltwater News has over 4,000 subscribers in the United States, including many large and mid-size businesses in a variety of industries as well as respected non-profit organizations.  SUF ¶ 4 (Meltwater News customers include   REDACTED   the American Diabetes Association, the Consumer Electronics Association, the American Association of Neurological Surgeons, the Los Angeles Philharmonic Association, and Yale University).  Meltwater News' primary customers are communications and public relations departments, who use the service to learn about and track news accounts relevant to their business, discover what is being said about their companies or organizations in a wide variety of online media outlets, and evaluate the success of their marketing and public relations campaigns.  SUF ¶ 5.

Like other Internet search engines, Meltwater News generates a search index by using automated computer programs known as "crawlers" to scan the contents of Internet websites.  SUF ¶ 6; *cf.* Grealis Decl. Ex. 59 (Resp. 3).  Meltwater News focuses on sources that publish news-related items.  Its search index is compiled from more than 162,000 Internet sources in over 190 countries.  SUF ¶ 7.  Those sources include major news outlets, newspapers, trade publications, local and regional journals, blogs, as well as TV and radio transcripts.  *Id.*  In the vast majority of cases, the sources included in the Meltwater News search index make their content available to the public for free and without requiring users to sign in using passwords or other credentials.  SUF ¶ 8.  Where a

publisher has chosen not to make its content freely available to the public on its website, Meltwater will not index content from that website unless it has an agreement with the publisher allowing it to do so.  Saab SJ Decl. ¶ 9; Grealis Decl. Ex. 65 (Geidies Dep. 188:2-191:9).  In addition, many of Meltwater's sources use a standard Internet convention by including "robots.txt" files in the code of their websites to specifically instruct Internet search engines on whether and how to crawl their websites and index content published there.  Glunt Decl. ¶¶ 12-14; Grealis Decl. Ex. 65 (Geidies Dep. 195:5-196:5, 198:3-199:6, 207:5-9); *cf. Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1113 (D. Nev. 2006).

To use the Meltwater News search engine, users formulate search queries to be run against Meltwater's index.  SUF ¶ 11.  There are two ways to run such searches.  First, a user can set up standing search queries, known as "agents."  *Id.*  Meltwater provides users with periodic email updates called Mail Reports that contain search results responsive to their agent queries.  SUF ¶ 12.  Users can also log in to Meltwater's website to view search results from those queries going back several months.  Saab SJ Decl. ¶ 11 & Ex. 5; Grealis Decl. Ex. 66 (Saab Dep. 82:1-3).  Second, a user logged into the Meltwater platform can run "ad hoc" searches – one-off queries for a user's chosen keyword(s).  Saab SJ Decl. ¶ 12 & Ex. 4; Grealis Decl. Ex. 66 (Saab Dep. 198:18-23).

Regardless of how a user searches, the search results that Meltwater returns take the same form.  SUF ¶ 13.  For each article responsive to the user's query, Meltwater's search results include: (1) the headline of the article; (2) information about the article's source (the name of the publisher and the country of origin); and (3) a short snippet from the article, consisting of up to 300 characters (including spaces) from the opening text of the article along with up to 140 characters (not including spaces) surrounding a single appearance of one of the customer's matched search query (the "hit sentence").  *Id.*  The search results thus contain only a limited excerpt from the responsive article – not the article's full text.  SUF ¶ 14.  As in most search engines, every Meltwater search result also includes a link to the webpage from which the article was indexed.  SUF ¶ 16.  Meltwater's search

engine is designed to allow users to learn about the existence and online location of news articles that might be of interest to them. SUF ¶ 3. It is not intended for customers to read the news, as they would in a newspaper or on a publisher's website. SUF ¶ 20. If a particular search result seems of interest to a user, the user can click on the accompanying link to be taken to the webpage where the full text of the article appeared. SUF ¶ 17. Over a six month period in early 2012, Meltwater customers in the United States clicked on such links over 6.7 million times. SUF ¶ 18.

In addition to Meltwater's search engine, a basic subscription to Meltwater News includes access to a suite of tools that provide customers with statistical and other analytic information based on the customer's search results. SUF ¶ 19. Among other things, these "dashboard analytics": (a) analyze the tone and volume of news coverage reflected in a user's search results; (b) provide "word clouds" showing the most frequent words used in responsive articles; and (c) illustrate the geographical distribution of relevant news coverage. *Id.*[1] Meltwater's analytic tools help communications and public relations professionals determine the effectiveness of their campaigns and strategies. SUF ¶ 21. Using Meltwater News, customers can compare how different media outlets are covering – or not covering – particular topics by monitoring the appearance of particular words, names, or phrases across a wide range of news sources. SUF ¶¶ 10, 22. Meltwater News can show, for example, the number of times a particular news item or press release was picked up by different media outlets, and it can analyze the volume and tone of news coverage for particular search terms. SUF ¶ 22; *accord* Lawhon Decl. ¶¶ 2, 4; Meeks Decl. ¶ 3; Fuller Decl. ¶¶ 4-6 (Meltwater customers explaining their use of the service).

The manner in which Meltwater's services operate is confirmed by AP's own documents. An analysis that AP prepared for its CEO described Meltwater News as a service that "delivers

---

[1] Customers can also purchase a separate "Analytics" package that offers even more sophisticated analysis of trends in news coverage. Saab SJ Decl. ¶ 24.

relevant, real-time search results with the industry's most robust online media monitoring database."
Grealis Decl. Ex. 43 (at AP0010189-90).  The report continued:

> Meltwater offers analytics about how organizations are being covered by media
> within a specified time period.  It also helps companies evaluate success and ROI of
> marketing and PR campaigns.  Other added value of the analytics is that this tool
> helps companies determine the prominence of their brands and products within a
> single story, and discern the business value behind its mention.

*Id.*  Likewise, another analysis that AP produced described Meltwater as offering a "news media
research product[]" and "news research service."  Grealis Decl. Ex. 49 (observing that Meltwater is
"particularly valuable for competitive research").  That report explained how Meltwater "lets users
track how often [a] company name or other keyword is mentioned" and "produces a comprehensive
table which shows how many times each source mentions a search term."  *Id.*

### B.     The Associated Press

AP is a news cooperative whose "members" include approximately 1,400 U.S. newspapers
and thousands of television and radio broadcasters.  SUF ¶ 23.  AP's mission "is to provide fast,
accurate, reliable, clear, and unbiased news reports as news breaks around the globe."  *Id.*  AP
licenses its news articles through the "AP wire" to publishers and broadcasters for further
distribution to the public, as well as to other entities, including government agencies, who want to
consume AP news rather than republish it.  SUF ¶ 24.  Licensing AP news content for republication
is AP's traditional business.  SUF ¶ 26.  AP authorizes approximately 3,000 entities, including most
of its 1,400 members and other licensees, to publish the contents of the AP wire online.  SUF ¶ 27.[2]
Not only do AP's publisher-licensees make AP articles available on their websites for free, those
websites often include "share," "email," "save" and similar tools that encourage and authorize users
to save and further distribute those articles.  SUF ¶ 29.  In addition, many of the websites where AP

---

[2] AP also makes some of its articles available for free public viewing on its own websites and through
AP's mobile news application.  Glunt Decl. ¶¶ 9-11 & Exs. 7, 10 & 13; Grealis Decl. Ex. 67 (Cross Dep.
60:11-61:21).

authorizes its content to appear include robots.txt instructions that invite such content to be indexed by Internet search engines like Meltwater's. SUF ¶ 43. As a result of AP's Internet licensing practices, AP's articles can be read free of charge on countless authorized websites. SUF ¶ 28. AP itself has repeatedly recognized the "hyper-availability" of authorized AP content online and the negative effect that such free and ready access has had on AP's ability to license content to those who want only to read the news. SUF ¶¶ 49-50.

### C. AP's Lawsuit against Meltwater

Although AP has been aware of Meltwater at least since 2006 (Grealis Decl. Ex. 51; *id.* Ex. 72 (Rizzo Dep. 46:19-47:8)), AP took no action against it until February 2012 when it filed this lawsuit. In its Amended Complaint, AP identifies 33 specific news articles (the "Articles in Suit") that it contends Meltwater has infringed. SUF ¶ 35. The Articles in Suit are fact-based reports on newsworthy topics. SUF ¶ 36. They range from a few short pieces that are little more than cursory rewrites of third parties' press releases or other publishers' stories (*id.*, Exs. G, H, J, K, S) to lengthy articles well in excess of 1,000 words (*id.*, Exs. I, N, U, X). Grealis Decl. ¶¶ 2-8. The average length of the Articles in Suit is 504 words, or 2,571 characters (not including spaces). SUF ¶ 45. With AP's authorization, all of the Articles in Suit were published by multiple online news outlets, which made (and continue to make) those articles available to the public for free. SUF ¶ 39.

AP asserts claims against Meltwater for direct and secondary infringement of the Articles in Suit. AP's direct infringement claim focuses on Meltwater's delivery of short excerpts of the Articles in Suit in search results that Meltwater returned in response to users' queries. Am. Compl. ¶¶ 83-84, 95-102. AP's secondary infringement claims are based on the allegation that Meltwater customers may have stored full text versions of the Articles in Suit in Meltwater archives or distributed full text versions of those articles by sending emails using Meltwater's newsletter tool. *Id.* ¶¶ 85, 103-120. AP maintains these secondary liability claims even though it had no basis for believing – and has no evidence – that any actual Meltwater customer ever engaged in such conduct.

## ARGUMENT

Summary judgment should be granted where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Courts in the Second Circuit routinely resolve issues of fair use on summary judgment. *See, e.g., Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006); *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 608 (2d Cir. 2006). Here, based on the undisputed evidence, the Court should grant summary judgment to Meltwater on AP's direct infringement claim by finding that Meltwater's limited use of the Articles in Suit is a fair one. Likewise, Meltwater is entitled to summary judgment on AP's secondary infringement claims because: (1) there was no infringement of any of the Articles in Suit by any Meltwater user, and (2) AP can point to no evidence that Meltwater knew about or profited from any imagined infringement of the Articles in Suit by any of its users.

## I.   MELTWATER IS ENTITLED TO SUMMARY JUDGMENT ON DIRECT INFRINGEMENT BECAUSE ITS USE OF THE ARTICLES IN SUIT IS FAIR

AP's direct infringement claim targets Meltwater's delivery of search results that included short snippets of the Articles in Suit in response to customers' search queries. Meltwater is entitled to summary judgment on that claim because this core operation of an Internet search engine and research tool qualifies as a fair use.[3]

---

[3] AP's Amended Complaint alleges in passing that Meltwater copies whole articles in order to create its search index. Am. Compl. ¶¶ 46, 67. Given AP's express disavowal of any suggestion that it seeks to challenge the delivery of headline of or links to AP articles by Internet search engines (*id.* ¶ 13), we do not understand AP as claiming that Meltwater commits direct infringement merely by adding AP articles to its index. Any such claim would be frivolous. The indexing of freely available Internet content – a necessary predicate for any search engine – is a fair use, as every court that has addressed the issue has found. *See, e.g., Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 816-22 (9th Cir. 2001); *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1110-11, 1117-23 (D. Nev. 2006); *The Authors Guild, Inc. v. HathiTrust*, No. 11-cv-6351(HB), 2012 WL 4808939, at *12 (S.D.N.Y. Oct. 10, 2012) (fair use for digital library to make "entire copies" of copyrighted books where doing so was "necessary to fulfill Defendants' purposes of facilitation of searches").

A.      **The Fair Use Doctrine Protects the Reproduction and Display of Copyrighted Material by Internet Search Engines**

The fair use doctrine is "necessary to fulfill copyright's very purpose." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994). The Second Circuit has explained that because "[m]onopoly protection of intellectual property that impeded referential analysis ... would strangle the creative process," fair use should "be perceived as an 'integral part of copyright, whose observance is necessary to achieve the objectives of that law.'" *Blanch*, 467 F.3d at 250 (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1107-08 (1990)).

Section 107 of the Copyright Act provides that the "fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting,... or research, is not an infringement of copyright." 17 U.S.C. § 107. These examples are "illustrative and not limitative." *Campbell*, 510 U.S. at 577. The statute directs courts to consider four factors: (1) the "purpose and character of the use"; (2) the "nature of the copyrighted work"; (3) the "amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and (4) the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. These factors are not to be "treated in isolation" (*Campbell*, 510 U.S. at 578), but instead they all "must be explored and the results weighed together in light of the purposes of copyright and the fair use defense." *NXIVM Corp. v. The Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004). The "ultimate test" is whether "copyright law's goal of 'promoting the Progress of Science and useful Arts' would be better served by allowing the use than by preventing it." *Blanch*, 467 F.3d at 251 (quoting U.S. CONST. art. I, § 8, cl. 8).

Applying these principles, courts consistently have held that the use of copyrighted works by Internet search engines constitutes fair use. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1163-68 (9th Cir. 2007) (search engine's creation and display of thumbnail versions of plaintiff's photographs was fair use); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 817-22 (9th Cir. 2001) (same); *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1117-23 (D. Nev. 2006) (search engine's creation and

display of cached copies of plaintiffs' website was fair use).  The same result is warranted for

Meltwater's search engine, as each of the four factors cuts decisively in favor of a finding of fair use.

**B.     Factor One Favors Meltwater Because Its Use of the Articles in Suit As Part of An Internet Search Engine and News-Research Tool is Highly Transformative**

The primary consideration under the first factor is whether the use is "transformative," *i.e.*,

whether it "merely supersede[s] the objects' of the original creation or instead adds something new,

with a further purpose or different character, altering the first with new expression, meaning, or

message." *Campbell*, 510 U.S. at 579 (citation omitted); *see also Bill Graham*, 448 F.3d at 608.

While some transformative uses may change the original work, that is not necessary, as a

"transformative use can also be one that serves an entirely different purpose." *The Authors Guild,*

*Inc. v. HathiTrust*, No. 11-cv-6351(HB), 2012 WL 4808939, at *11 (S.D.N.Y. Oct. 10, 2012) (full

copies of books made by digital archive were transformative "because the copies serve an entirely

different purpose than the original works"); *accord Bill Graham*, 448 F.3d at 609 (use is

transformative where the defendant's purpose in using images "is plainly different from the original

purpose for which they were created"); *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 324

(S.D.N.Y. 2008) (defendants' use "transformative because they put the song to a different purpose");

*A.V. ex rel Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) (a use "can be

transformative in function or purpose without altering or actually adding to the original work").  As

the Second Circuit has explained, when "the copyrighted work is used as raw material in the

furtherance of distinct creative or communicative objectives, the use is transformative." *Blanch*, 467

F.3d at 253 (internal quotation marks and citations omitted).  Meltwater's use of the Articles in Suit

is highly transformative in at least two distinct ways.[4]

---

[4] Where, as here, the use is transformative, other factors, such as the commercial nature of the use, are
less significant. *See Campbell*, 510 U.S. at 579 (rejecting presumption that commercial uses are unfair);
*NXIVM*, 364 F.3d at 477 ("commercial nature of the use" was "properly discounted" where use was
"substantially transformative").

1.   The use of publicly available news articles in Meltwater's search engine is transformative

First, Meltwater uses items like the Articles in Suit to operate a search engine.  Meltwater indexes freely available news articles published on the Internet.  In response to its users' queries, it delivers search results containing information about the existence and location of those articles, along with a short excerpt and a link to the webpage that published the article.  SUF ¶¶ 13-14. Clicking on those links takes a user to the originating webpage where the full article can be read.[5] SUF ¶ 17.  Thus, like other search engines, Meltwater responds to users' search queries by providing information about where responsive material is available on the Internet, thereby helping users find the content they are looking for.  SUF ¶¶ 2, 9.

Meltwater's search engine unquestionably makes transformative use of the news content it references.  As the Ninth Circuit has explained, "a search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool." *Perfect 10*, 508 F.3d at 1165; *see also Field*, 412 F. Supp. 2d at 1110 (search engines "allow Internet users to sift through the massive amount of information available on the Internet to find specific information that is of particular interest to them").  Recognizing that "a search engine provides an entirely new use for the original work," the Ninth Circuit thus has twice held that the copying of entire copyrighted works and the display of "thumbnail" versions of those works by search engines is a transformative fair use.  *Perfect 10*, 508 F.3d at 1165-67 (describing the "significantly transformative nature of Google's search engine"); *Kelly*, 336 F.3d at 818-20 ("Arriba's use of the images serves a different function than Kelly's use – improving access to information on the internet versus artistic expression.").  Likewise, the court in *Field* held that Google's practice of "caching" (creating and storing) copies of plaintiff's webpage to allow its users to view those copies in

---

[5] Even if the article is no longer freely available at that location, a user who clicks the link still will be directed to the publisher's webpage and see whatever other content or information the publisher has chosen to display in place of the original article.  Saab SJ Decl. ¶ 16.

response to search queries was transformative: "Google serves different and socially important purposes in offering access to copyrighted works through 'Cached' links and does not merely supersede the objectives of the original creations." *Field*, 412 F. Supp. 2d at 1118-19.

Meltwater's search engine is transformative for the same reasons. While the original purpose of AP's Articles in Suit was to report the news – to "provide fast, accurate, reliable, clear, and unbiased news reports as news breaks" (SUF ¶ 23) – Meltwater included snippets of them in its search results for very different purposes. Meltwater's search results are designed to inform its users where news articles that may be of interest to them were published and to help users find those items within the Internet's vast expanse. SUF ¶ 9. Like the service at issue in *Kelly*, Meltwater News "functions as a tool to help index and improve access to [items] on the internet and their related web sites." *Kelly*, 336 F.3d at 818.[6] By displaying a short excerpt of each responsive item, Meltwater's search results also allow users to determine why a particular article was responsive and whether the article is germane to their inquiry. SUF ¶ 15; *accord* Lawhon Decl. ¶¶ 4-5; Meeks Decl. ¶¶ 3-4; Fuller Decl. ¶ 5 (Meltwater News customer declarations). Like the thumbnails created by Google's search engine, therefore, Meltwater's snippets advance the "objective of enabling users to more quickly find and access the information they are searching for" – an objective not served by the original articles. *Field*, 412 F. Supp. 2d at 1119 (Google's cached links transformative because they allow "users to understand why a page was responsive to their original query").

Meltwater's transformation of articles from news reports into "a pointer directing a user to a source of information" cuts strongly in favor of fair use. *Perfect 10*, 508 F.3d at 1165. Any other result would contravene all the case law addressing search engines' use of copyrighted content and

---

[6] Each of the millions of clicks on links delivered in Meltwater News search results represents an instance in which a Meltwater user, who might otherwise not have known about the article in question or where it was available on the Internet, was directed to the webpage of the publisher responsible for putting the article online. SUF ¶ 18; *see also* Lawhon Decl. ¶ 5; Meeks Decl. ¶ 4 Fuller Decl. ¶ 5.

undermine a core and socially beneficial feature of the Internet. *Cf. Kelly*, 336 F.3d at 820 (search engines "benefit the public by enhancing information-gathering techniques on the internet").

> 2.   Meltwater's use of news articles as the raw material for its news-related research tool is transformative

Meltwater further transforms news content by incorporating it into a sophisticated research tool that provides users with information about how thousands of different media outlets have used certain words and phrases in news stories. SUF ¶¶ 1-2, 10; Grealis Decl. Ex. 49 (report produced by AP describing Meltwater News as a "news research service" that is "particularly valuable for competitive research"); *id.* Ex. 43 (AP analysis explaining that "Meltwater offers analytics about how organizations are being covered by media within a specified time period"). This aspect of Meltwater News complements, but is distinct from, its role as a search engine and reinforces that Meltwater uses the articles it indexes for a new and different purpose.

With an index comprised of publicly available news content from hundreds of thousands of online media sources, Meltwater can provide a host of new insights about particular words, names, or phrases across a dizzying array of news sources on the Internet. SUF ¶¶ 7, 10; *see generally* Grealis Decl. Ex. 59 (Resp. 3-4). This functionality gives Meltwater customers the ability to research how news is being covered and to compare coverage across the entire media landscape. SUF ¶ 22. It allows customers to track how many stories containing a given word (such as the name of their company, a competitor, or a key product) were published on a given day. Saab SJ Decl. ¶ 20. It can show how often and where particular news items – a press release issued by the customer or an important story about the company or a competitors – were covered by various news outlets. SUF ¶ 22. Meltwater's results likewise give customers a way to track the number of "press mentions" that their company received, which is especially valuable to the communications and public relations professionals that make up Meltwater News' core subscriber base. SUF ¶¶ 5, 21. Other analytic features that Meltwater News provides allow customers to assess the overall volume or tone of news coverage on a particular topic, illustrate the geographic distribution of references for

-12-

a given word or phrase, and identify the most common words that appear in the items responsive to the customer's search queries.  SUF ¶¶ 19, 22.

Meltwater's use of works like the Articles in Suit thus serves a very different purpose than do the original articles.  Meltwater's purpose is not to report the news, but to provide information about how the news is being reported.  SUF ¶¶ 9, 20.  It is not to enable customers to read the news, but to allow customers to research, track, analyze, and compare news coverage.  SUF ¶ 20; *see also* Lawhon Decl. ¶¶ 4, 6; Meeks Decl. ¶ 3; Fuller Decl. ¶¶ 4-5.  In this way, Meltwater uses news articles as "raw material, transformed in the creation of new information, new aesthetics, new insights and understandings."  *Blanch*, 467 F.3d at 251-52 (internal quotation marks and citation omitted).  The transformative nature of Meltwater's research tool further supports a finding of fair use.  17 U.S.C. § 107 (listing "research" as a use presumed to be fair); *see, e.g., Bill Graham*, 448 F.3d at 609-10 (use of concert posters transformative because defendant used images as "historical artifacts to document and represent the actual occurrence of events," not for artistic expression or promotion); *HathiTrust*, 2012 WL 4808939, at *11 (digital repository transformative because it was for purpose of "superior search capabilities rather than actual access to copyrighted material"); *Duffy v. Penguin Books USA Inc.*, 4 F. Supp. 2d 268, 274 (S.D.N.Y. 1998) ("if the defendant's use is for research, this factor will favor the defendant"); *Field*, 412 F. Supp. 2d at 1118-19 (allowing users to compare changes in content over time is transformative fair use).

**C.    Factor Two Favors Meltwater Because AP's Factual Works Have Thin Copyright Protection and Were Published Widely and Freely on the Internet**

The second factor examines the "nature of the copyrighted work."  17 U.S.C. § 107(2). Courts primarily consider (1) whether the work is factual or creative and (2) whether the work was published or unpublished.  *Blanch*, 467 F.3d at 256 (citing 2 Howard B. Abrams, *The Law of Copyright* § 15:52 (2006)).  Because the Articles in Suit are factual works that were made widely and freely available across the Internet by AP and its licensees, this factor strongly favors fair use.

-13-

1.   As purely factual works, the Articles in Suit are entitled minimal copyright protection, and more leeway is allowed for use by others

"[F]air use is more likely to be found in factual works than in fictional works." *Stewart v. Abend*, 495 U.S. 207, 237 (1990); *see also New Era Pub'ns Int'l, ApS v. Carol Publ'g Group*, 904 F.2d 152, 157 (2d Cir. 1990) ("[The scope of fair use is greater with respect to factual than non-factual works."); *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) ("Since the risk of restraining the free flow of information is more significant with informational work, the scope of permissible fair use is greater.").

There can be no dispute that AP's Articles in Suit all are "primarily informational rather than creative." *Consumers Union*, 724 F.2d at 1049. Each of those works is a fact-based news report designed to report information in a straightforward manner, often relying heavily on direct and indirect quotes from third party sources. SUF ¶¶ 36-37.[7] These are not works of "fiction or fantasy." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985); Grealis Decl. Ex. 2 (Kent Dep. 44:5-13); *see, e.g., Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1262-63 (2d Cir. 1986) (book consisting of interviews was "essentially factual in nature" even though it contained "elements of creative journalistic effort"). The "manifestly factual character" of AP's works means that they are not "within the core of copyright's protective purposes." *Swatch Group Mgmt. Servs. v. Bloomberg L.P.*, 861 F. Supp. 2d 336, 341 (S.D.N.Y. 2012) (quoting *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 925 (2d Cir. 1994)). That favors fair use. *See, e.g., Righthaven LLC v. Jama*, No. 2:10-cv-1322-JCM-LRL, 2011 WL 1541613, at *2-3 (D. Nev. Apr. 22, 2011) (second factor favored fair use of newspaper article because it was "informational");

---

[7] Some of the Articles in Suit are little more than cursory rewrites of a third party's press release or news report. Grealis Decl. ¶¶ 2-8. Even assuming that such works are entitled to copyright protection in the first place, what AP would have "is at best a 'thin' copyright." *Swatch Group Mgmt. Servs. v. Bloomberg L.P Swatch*, 861 F. Supp. 2d 336, 341 (S.D.N.Y. 2012) (quoting *Feist Publ'ns Inc. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 349 (1991)).

*Righthaven LLC v. Realty One Group, Inc.*, No. 2:10-cv-1036-LRH-PAL, 2010 WL 4115413, at *2 (D. Nev. Oct. 19, 2010) (finding fair use of "factual news reporting").

> 2.  The fact that the Articles in Suit were widely disseminated over the Internet cuts strongly in favor of fair use

In addition to being factual works, it is undisputed that all of the AP Articles in Suit were published multiple times on third-party websites before Meltwater ever accessed them.  SUF ¶ 42. The scope of fair use is broader with respect to published works than unpublished works.  *Blanch*, 467 F.3d at 256; *New Era*, 904 F.2d at 157; *accord Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992) (second factor favors fair use for "a published work available to the general public").

The Articles in Suit offer an unusually strong basis for fair use because they were published by AP and its licensees in a way that made them widely available to the public without charge over the Internet.  SUF ¶ 39.[8]  Courts have pointed to the fact that a plaintiff's works "appeared on the internet" before they were included in a search engine as favoring fair use.  *Kelly*, 336 F.3d at 820; *Field*, 412 F. Supp. 2d at 1120.  Indeed, even in the context of creative works made available only to paid subscribers, the Ninth Circuit held that once the plaintiff put its images on the Internet, it was "no longer entitled to the enhanced protection available for an unpublished work." *Perfect 10*, 508 F.3d at 1167.  Meltwater's claim to fair use is even stronger for the AP articles at issue here – factual works published online for the world to see for free.  *Cf. Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 449-50 (1984) (fact works at issue were ones that users "had been invited to witness in [their] entirety free of charge" militated in favor of fair use).

AP's approach to the dissemination of its works is especially significant in light of Meltwater's policy of not indexing content from websites that are available only to paying subscribers or that have imposed other access-controls, such as requiring a username and password.

---

[8] Each of the Articles in Suit remains publicly available for free on the websites of AP licensees.  Glunt Decl. ¶¶ 3, 15-47.

Saab SJ Decl. ¶ 9; Grealis Decl. Ex. 65 (Geidies Dep. 188:1-190:18, 194:14-195:8).  Had AP published its works on websites that made content available only to subscribers (and not for free to anyone with an Internet connection), those articles would not have been included in Meltwater's search engine in the first place, at least not unless there was an agreement between Meltwater and the publisher on which that article appeared.  *Id.*  Furthermore, AP chose to authorize the publication of the Articles in Suit through websites that included robots.txt files specifically instructing Internet search engines to index their content and often directing them on how best to do so.  SUF ¶ 43; *see also* Grealis Decl. Ex. 65 (Geidies Dep. 195:5-196:5, 198:3-199:6, 207:5-9).  AP's articles thus not only were widely published online, they were published in a way that invited search engines to include them in their indexes.  Under these circumstances, the second factor overwhelmingly supports a finding of fair use.  *Field*, 412 F. Supp. 2d at 1120 (plaintiff's use of robots.txt file instructing search engines to index his website, thereby making "his works available to the widest possible audience for free," favored fair use).

### D.   Factor Three Favors Meltwater Because the Short Snippets Included in Its Search Results are Reasonable in Relation to Meltwater's Transformative Use

The third fair use factor examines the "amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  It requires an examination of both the "quantitative and qualitative aspects of the portion of the copyrighted material taken."  *Bill Graham*, 448 F.3d at 613.  "The question is whether 'the quantity and value of the materials used are reasonable in relation to the purpose of the copying.'"  *Blanch*, 467 F.3d at 257 (quoting *Campbell*, 510 U.S. at 586) (internal quotation marks and citation omitted).  "There are no absolute rules as to how much of a copyrighted work may be copied and still be considered a fair use."  *Maxtone-Graham*, 803 F.2d at 1263.  Instead, "the third-factor inquiry must take into account that 'the extent of permissible copying varies with the purpose and character of the use.'"  *Bill Graham*, 448 F.3d at 613 (quoting *Campbell*, 510 U.S. at 586-87).  This factor favors Meltwater because its search results

include only short excerpts of the Articles in Suit, and Meltwater's use of such snippets "is tailored to further its transformative purpose." *Id.*

Meltwater carefully limits the length of the snippets it includes in its search results. The *maximum* length of any Meltwater snippet is 300 characters (including spaces) from the opening text of the article, plus a "hit sentence" of 140 characters (not including spaces) from the text immediately surrounding one appearance of the user's search query in the article. SUF ¶ 13. In many cases, including many involving the Articles in Suit, the snippet actually delivered by Meltwater for a given search result will be well short of the maximum length allowed. Saab SJ Decl. ¶ 14; Grealis Decl. ¶¶ 10-11 & Ex. 8. Meltwater's approach generally results in a snippet of approximately two or three (typically non-contiguous) sentences being returned in connection with a given search result. Saab SJ Decl. ¶ 14 & Exs. 3, 5; Grealis Decl. ¶¶ 10 & Ex. 8. While the precise calculation varies for each work, for the vast majority of the Articles in Suit, the snippets that Meltwater delivered represent only a small portion of the article. SUF ¶¶ 44-46; Grealis Decl. Ex. 8 (chart comparing sample Meltwater snippets to Articles in Suit and explaining that the average length of the Articles in Suit is 504 words/2,500 characters).

The size of Meltwater's excerpts is well within – indeed, considerably less than – what courts have found to be fair use in connection with published news articles. *See, e.g., Righthaven v. Realty One Group, supra*, 2010 WL 4115413, at *2 (where defendant "reproduced only the first eight sentences of a thirty sentence news article," this amount "weighs in favor of fair use"); *Righthaven LLC v. Democratic Underground, LLC*, No. 2:10-cv-01356-RLH (GWF), slip op. at 3 (D. Nev. Mar. 9, 2012) (attached hereto as Exhibit A) (posting of five sentence excerpt of 50 sentence article was fair use). In fact, use of a *whole* work can support a fair-use finding, when doing so is reasonably necessary to accomplish a transformative purpose. *Bill Graham*, 448 F.3d at 613; *iParadigms*, 562 F.3d at 642; *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 n.8 (9th Cir. 2003) ("entire verbatim reproductions are justifiable where the purpose of the work differs from the original");

*Righthaven v. Jama, supra*, 2011 WL 1541613, at *2 (posting entire news article was fair where defendant's purpose was to educate public about immigration).

Other cases involving search engines thus have held that copying and displaying plaintiffs' works in their entirety does not weigh against fair use because doing so was necessary in light of the use that the defendants were making. As the Ninth Circuit explained in *Kelly*:

> It was necessary for Arriba to copy the entire image to allow users to recognize the image and decide whether to pursue more information about the image or the originating web site. If Arriba only copied part of the image, it would be more difficult to identify it, thereby reducing the usefulness of the visual search engine.

*Kelly*, 336 F.3d at 821; *see also Perfect 10*, 508 F.3d at 1167-68; *Field*, 412 F. Supp. 2d at 1121.

Against this backdrop, Meltwater's delivery of short excerpts of articles as part of the search results returned in connection with its news-related search engine and research tool strongly favors fair use. The "hard limits" that Meltwater imposes on the length of its snippets (Saab Dep. 180:24-181:17) illustrate that Meltwater is not a full-text service delivering search results intended to replace the original articles. SUF ¶¶ 14, 20, 47. To the contrary, Meltwater's far more limited approach underscores its transformative purpose. By including a short excerpt of multiple responsive articles, Meltwater informs the user about those articles' existence and possible relevance, explains why they matched the user's search query, and helps the user analyze the overall extent, tone, and/or nature of media coverage related to a given keyword or set of keywords. SUF ¶ 15.[9] The portion of the work that is displayed allows Meltwater's users to recognize the articles that are deemed responsive to their queries and decide whether to pursue more information about those articles by viewing them (in full) on their originating websites. SUF ¶¶ 15, 17. The snippets also give context to the appearance of the user's search term(s), providing valuable insight into how, where, and with what

---

[9] That is true even for articles that may be very short. Meltwater's search results provide no information to users about the length of the original article. Saab SJ Decl. ¶ 17. A user interested in the article thus would not be able to assume that the snippet is a significant portion of the article. The user could find that out only by clicking on the link to be taken to a version of the full article on the publisher's website. *Id.*

-18-

frequency the user's selected words were used across a broad range of news sources, facilitating comparative analysis of media coverage. Saab SJ Decl. ¶¶ 20-21. Returning short snippets as part of its search results thus advances Meltwater's transformative uses without creating a plausible substitute for the original article, which remains just a click away.

Because the excerpts that Meltwater used from AP's Articles in Suit were "reasonable in relation to the purpose of the copying," the third factor "weighs distinctly in" Meltwater's favor. *Blanch*, 467 F.3d at 258 (quoting *Campbell*, 510 U.S. at 586).

### E.     Factor Four Favors Meltwater Because Its Use Does Not Usurp Any Traditional or Customary Market for AP's Articles in Suit

The fourth factor considers the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). "The focus here is on whether defendants are offering a market substitute for the original," *i.e.*, "whether the secondary use usurps the market of the original work." *NXIVM*, 364 F.3d at 481-82; *see also Campbell*, 510 U.S at 593 (fourth factor concerned only with "the harm of market substitution"); *Video-Cinema Films, Inc. v. Cable News Network, Inc.*, No. 98-cv-7128 (BSJ), 2001 WL 1518264, at *8 (S.D.N.Y. Nov. 28, 2001) (question is "whether the challenged use competes with, by providing a substitute for," the original work). "A transformative work is less likely to have an adverse impact on the market of the original than a work that merely supersedes the copyrighted work." *Kelly*, 336 F.3d at 821; *see also Perfect 10*, 508 F.3d at 1168. In fact, the Second Circuit has expressly held that this factor requires "impairment to a traditional, as opposed to a transformative market." *Bill Graham*, 448 F.3d at 614; *see also HathiTrust*, 2012 WL 4808939, at *13. This last factor favors Meltwater because there is no evidence from which a jury could find that Meltwater's limited use of the Articles in Suit usurped a traditional, non-transformative market for AP's works.

AP has advanced two theories of market harm. Grealis Decl. Ex. 61 (Resp. 8); *id.* Ex. 67 (Cross Dep. 235:23-236:17). The first relates to the licensing market for AP's wire service. But

AP's claim to have lost customers in that market because of Meltwater's limited use of AP's articles is facially implausible and unsupported by the record. AP also ignores the simple explanation for its customer attrition in recent years – AP's decision to allow its licensees to make AP articles "hyper-available" for free on the Internet. AP's second market-harm theory is addressed to the supposed market for licensing the use of article headlines and snippets by search engines like Meltwater. As a matter of law, however, any supposed loss of licensing fees for such transformative uses is not cognizable in a fair use analysis.

> 1.    There is no evidence that Meltwater's limited use of the Articles in Suit caused AP to lose customers to Meltwater News

The "traditional market" for AP's wire service is made up of news outlets that publish or broadcast AP stories. SUF ¶ 26. Meltwater's use of short snippets of the Articles in Suit in search results does not impair that market in any way, and AP has not suggested otherwise. That is not surprising. As the Ninth Circuit explained in holding that the display of thumbnail versions of photographs by a search engine did not cause market harm:

> By showing the thumbnails on its results page when users entered terms related to Kelly's images, *the search engine would guide users to Kelly's web site rather than away from it*. Even if users were more interested in the image itself rather than the information on the web page, they would still have to go to Kelly's site to see the full-sized image.

*Kelly*, 336 F.3d at 821 (emphases added); *see also Bill Graham*, 448 F.3d at 614 n.5 (no market harm from display of reduced-size photographs, which offered a mere "peek" that "might have garnered interest in the original images in full size"). The same is true here. Meltwater locates news articles published online, gives users no more than a "peek" into those articles, and provides links that take users directly to the websites containing the full articles. In just the first six months of 2012, Meltwater's U.S. customers clicked on those links more than 6.7 million times, contributing page views to publishers and bolstering the traditional market for AP wire subscriptions. SUF ¶ 18;

Grealis Decl. Ex. 67 (Cross Dep. 49:4-51:21); *see also* SUF ¶ 17.  Those facts are inconsistent with any claim of market harm.

AP nevertheless contends that it has lost a different kind of licensing customer to Meltwater. AP has identified certain entities (mostly federal and state governmental agencies) that cancelled or declined to purchase subscriptions to the AP wire and, AP alleges, became Meltwater subscribers. Grealis Decl. Ex. 61 (Resp. 8).  These customers do not publish the news, but, according to AP, subscribe to the AP wire to read the news as AP reports it.  Am. Compl. ¶ 37.  AP claims that these customers left AP because they "are essentially getting AP's wire service from Meltwater."  *Id.* ¶ 92. AP's "lost customer" theory does not make sense on its face.  It ignores the fundamental differences between Meltwater News and the AP wire – differences that belie any notion that a party would simply swap one service for the other.

Through the AP wire, AP offers its customers access to the full text of AP articles on broad ranging topics such as local, state, national, and international news.  SUF ¶ 30.  Meltwater provides nothing like that.  A customer that wanted to consume the news as AP reports it – by reading AP articles on subjects of interest – would not do that using Meltwater's service.  Meltwater News provides search results that include only short snippets of responsive items (those containing specific search terms) published across tens of thousands of different online media sources.  Unlike Meltwater News, the AP wire does not allow customers to search for news stories from many different publishers that reference a specific topic.  *Compare* SUF ¶ 32 *with* Saab SJ Decl. ¶¶ 8, 20. Customers cannot use the AP wire, as they use Meltwater News, to compare coverage of a given issue across a broad range of media sources or gain a synoptic overview of how different outlets have used certain words or phrases in their stories.  *Compare* SUF ¶ 31 *with* Saab SJ Decl. ¶¶ 20-21; Box Decl. ¶ 8; Lawhon Decl. ¶¶ 2, 4, 6; Meeks Decl. ¶ 3; Fuller Decl. ¶¶ 5-6.  Nor does an AP subscription offer any tools for determining, for example, the "sentiment" of media coverage or how many news outlets have picked up a given press release or reported on a company's product launch.

*Compare* SUF ¶ 33 *with* Saab SJ Decl. ¶¶ 20-24. In short, the AP wire is nothing like Meltwater's search engine and news-research tool. The two services use news content in very different ways to very different ends. They are not viable substitutes for one another, and there is no indication that customers perceive them as such. To the contrary, all the evidence in the record indicates that Meltwater customers do not use Meltwater News to read the news and do not view the short snippets included in Meltwater search results as replacements for the full articles that would be delivered via the AP wire or published by one of AP's licensees. SUF ¶¶ 20, 47.

It is predictable, therefore, that AP's "lost customer" theory collapses before the actual facts. During discovery, AP identified 28 customers that it claims to have lost to Meltwater (Grealis Decl. Ex. 61 (Resp. 8)), but the vast majority of those turn out never to have been Meltwater subscribers. SUF ¶ 48 (explaining that 22 of the 28 entities on AP's list of "lost" customers are not and never have been Meltwater customers). If they never subscribed to Meltwater News, those entities obviously were not using the service as a substitute for the AP wire.

Even as to the remaining six entities on AP's list, there is no support for AP's market harm argument. AP seems to believe that it can simply compare its roster of former subscribers and prospects with Meltwater's customers and declare that any overlap demonstrates substitution. That is sophistry. AP's claim to have "lost" the University of California at Irvine as a customer to Meltwater illustrates why. In 2008, AP licensed the UC-Irvine student newspaper to republish articles from the AP wire, and the newspaper later dropped that subscription. Grealis Decl. Ex. 77. Meanwhile, UC-Irvine's Media Relations and Community Outreach Department had been a Meltwater News customer since June of 2007 and has never had a subscription to the AP wire. Lawhon Decl. ¶¶ 2, 4; Box Decl. ¶ 14. There is nothing to suggest that UC-Irvine's student newspaper and its Media Relations department were even aware of one another's activities, that their decisions had anything to do with one another, or that absent access to Meltwater News, the Media Relations Department would have purchased a subscription to the AP wire. To the contrary, such a

subscription would not have been of use to that department.  Lawhon Decl. ¶ 7.  Yet in AP's original

interrogatory responses, "UC-Irvine" is listed as a "lost customer" for which AP blamed Meltwater

(together with several other entities that have never had a subscription to Meltwater News).  Grealis

Decl. Ex. 63 (Resp. 8); *cf.* Box Decl. ¶¶ 13-14.

Plainly then, it is not enough for AP to show that a former AP customer or prospective

customer is or was a Meltwater subscriber.  AP must instead offer admissible evidence showing a

causal link between its loss and Meltwater's alleged infringement – *i.e.*, that Meltwater's inclusion

of short snippets of AP articles in its search results is the reason that the entity did not purchase an

AP wire subscription.  *Cf. Arica*, 970 F.2d at 1078; *Swatch*, 861 F. Supp. 2d at 342.  No such

evidence exists.  AP made no effort to take discovery from any of the supposedly "lost" customers to

determine why they stopped subscribing to the AP wire.  And the limited documents that AP self-

selected from its own files about the few entities who were also Meltwater customers do not suggest

that those customers understood Meltwater's snippets of AP's articles as substitutes for obtaining

full versions of those articles from AP.  To the extent those documents shed any light at all, they

indicate that AP lost those customers for reasons having nothing to do with Meltwater News.  For

example, AP's internal notes reflect that the Department of Energy Office of Public Affairs (which

has never been a Meltwater News customer (SUF ¶ 48)), although other Energy Department entities

are) cancelled its wire subscription because "nobody was using it."  Grealis Decl. Ex. 46.  And AP

cannot now conjure up additional evidence on this point because its designated witness on market

harm was instructed not to answer when asked in deposition to describe AP's basis for contending

that the "lost customers" it identified were using Meltwater as a substitute for the AP wire.  Grealis

Decl. Ex. 67 (Cross Dep. 254:15-255:18).  *Cf.* FED. R. CIV. P. 37(c)(1).

AP's inability to blame Meltwater News for its loss of wire subscribers is unsurprising given

the far more obvious explanation for AP's difficulties:  AP's own decision to allow its publisher-

licensees to make AP content widely available to the public for free across the Internet.  With AP's

-23-

blessing, its licensees publish AP articles on countless websites, where those works can be read without charge by anyone with an Internet connection. SUF ¶ 28. Many of those websites also allow users to share or email AP articles with as many people as they like. SUF ¶ 29 AP's own witnesses and documents confirm that, unsurprisingly, this "hyper-availability" of free and licensed AP content online has harmed AP's ability to sell non-publisher subscriptions to its wire service. SUF ¶¶ 49-50; *e.g.*, Grealis Decl. Ex. 47 (internal AP email: "we should point out that the general availability for free of AP material on the web, including the Mobile News network is threatening the health of that business"). Former and prospective AP customers have told AP that they would not subscribe to the AP wire precisely because they can already read AP articles online for free on the websites of AP's publisher-licensees. SUF ¶ 51. Insofar as AP has had trouble retaining or attracting customers, therefore, the record indicates that it is due not to the limited and transformative use made of AP articles by Meltwater News, but rather from AP's decision to allow its licensees to make those articles ubiquitously available for free. In short, the real substitute for AP wire subscriptions is AP's own licensing practices. That is not market harm for which Meltwater can be held responsible or which can deprive Meltwater of its fair use defense.

2.   AP cannot defeat fair use by trying to develop a licensing market for the transformative uses that Meltwater makes of news content

Lacking logic and evidence to support its "lost customer" theory, AP offers an alternative claim of market harm. AP argues that because Meltwater did not obtain a license for the snippets of AP's articles included in its search results, AP was deprived of licensing revenue it might otherwise have extracted for that use. Grealis Decl. Ex. 61 (Resp. 8). In other words, AP claims to have been harmed by losing the ability to license Meltwater's transformative use. The law is clear, however, that this kind of alleged "market harm" is not cognizable under the fourth factor.

The Second Circuit has recognized the fallacy in the argument AP advances: "[W]ere a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the

fourth fair use factor would *always* favor the copyright holder." *Bill Graham*, 448 F.3d at 614
(quoting *Texaco*, 60 F.3d at 930 n.17).[10]  Thus, for example, the use of portions of a work for
purposes of criticism – a paradigmatic fair use – does not become unfair merely because a copyright
owner might try to create a market for licensing that use.  To ensure that this kind of circular
reasoning does not undermine legitimate fair use claims, the Second Circuit has held that courts
should not find harm to a licensing market for plaintiff's works merely because the defendant did not
pay to use those works.  *Id.*  As a matter of law, a "use that 'falls within a transformative market'
does not cause the copyright holder to 'suffer market harm due to the loss of license fees.'"
*HathiTrust*, 2012 WL 4808939, at *13 (quoting *Bill Graham*, 448 F.3d at 615).  Put simply: "A
copyright holder cannot preempt a transformative market." *Id.*[11]

　　　This is precisely what AP is attempting to do.  AP contends that Meltwater's actions
undermine the supposed licensing market for the delivery of headlines and snippets of AP articles by
Meltwater and other news-related Internet search engines and media-monitoring services.  Grealis
Decl. Ex. 61 (Resp. 8).  AP's effort to lay claim to this transformative market is improper.  A
"copyright holder cannot prevent others from entering fair use markets merely by developing or
licensing a market for parody, news reporting, educational or other transformative uses of its own
creative work." *Bill Graham,* 448 F.3d at 614-15 (internal quotation marks omitted).  As discussed,
the uses that Meltwater made of the Articles in Suit in connection with its search engine and news-

---

[10] *See also Field*, 412 F. Supp. 2d at 1121 n.9 ("Under this view, the market for a copyrighted work is
always harmed by the fair use of the work because it deprives the copyright holder of the revenue it could
have obtained by licensing that very use.  The Supreme Court has explained that the fourth fair use factor is
not concerned with such syllogisms.") (citing *Campbell*, 510 U.S. at 592); 4 Melville B. Nimmer & David
Nimmer, *Nimmer on Copyright* § 13.05 [A][4] (2012) ("[I]t is a given in every fair use case that plaintiff
suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very
use at bar"); Leval, *supra*, 103 HARV. L. REV. at 1124 ("[E]very fair use involves some loss of royalty
revenue because the secondary user has not paid royalties.").

[11] Applying this principle to search engines, *Field* rejected the argument that Google harmed the market
for plaintiff's writings "by depriving him of revenue he could have obtained by licensing Google the right to
present 'Cached' links for the pages containing his works." *Field*, 412 F. Supp. 2d at 1121 n.9.

research tool are entirely distinct from the articles' original purpose of reporting the news.  Because Meltwater's use "falls within a transformative market," AP cannot legitimately claim to "suffer market harm due to the loss of license fees."  *Id.* at 615; *HathiTrust*, 2012 WL 4808939, at *13.

It makes no difference in this respect whether AP was willing to license its works for Meltwater's limited use, or whether other entities similar to Meltwater actually paid licensing fees for that use.  Each of those things was true in *Bill Graham*, yet the Second Circuit still held that the copyright owner could not make out a claim of market harm.  *Bill Graham*, 448 F.3d at 614-15.  The court explained that these do not show "impairment to a traditional, as opposed to a transformative market" (*id.* at 614) and that "a publisher's willingness to pay license fees" for a transformative use of a given set of works "does not establish that the publisher may not, in the alternative, make fair use of those" works (*id.* at 615).  This is enough to dispense with AP's claim that it was deprived of the ability to license Meltwater's use of snippets of the Articles in Suit in its search results.

* * *

For the reasons above, each of the four fair use factors tips decisively in Meltwater's favor.  Meltwater is therefore entitled to summary judgment that its limited use of the Articles in Suit is a fair use and does not infringe AP's copyrights in those works.

## II.   MELTWATER IS ENTITLED TO SUMMARY JUDGMENT ON AP'S SECONDARY INFRINGEMENT CLAIMS

AP also asserts two secondary infringement claims, which are based on the alleged storage and distribution of full-text versions of the Articles in Suit by Meltwater customers.  Am. Compl. ¶¶ 103-20.  These claims fail for multiple reasons.  Most fundamentally, AP cannot show that any Meltwater user actually infringed the Articles in Suit.  Recognizing that none of Meltwater's customers stored or distributed full-text copies of the Articles in Suit, AP tries to base its claims on the conduct of its own agent, the James Mintz Group ("Mintz").  But Mintz's use of those articles was expressly authorized by AP's counsel on behalf of AP.  What Mintz did is not copyright

infringement and provides no basis for holding Meltwater secondarily liable. Beyond that, there is

no evidence from which a jury could find other required elements of AP's secondary liability claims.

### A. Meltwater Cannot Be Held Secondarily Liable Because There Is No Evidence That Any Meltwater User Directly Infringed Any of the Articles in Suit

"For a defendant to be held contributorily or vicariously liable, a direct infringement must

have occurred." *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998)

(quoting 2 Paul Goldstein, *Copyright* § 6.0 (1996)).[12] AP's claims fail this requirement because

there is no evidence of any direct infringement of the Articles in Suit by Meltwater users.

1.  There is no evidence that any actual Meltwater customer ever stored or distributed full text versions of the Articles in Suit

The conduct underlying AP's secondary liability claims is Meltwater customers' alleged

storage and distribution of full-text versions of the Articles in Suit. Some Meltwater News

customers have access to an "Archive" feature that allows them to save selected search results in

private folders for later review. SUF ¶ 53. In addition to storing search results, Meltwater News

customers can also use the Article Editor to archive items of their own creation. SUF ¶ 54. The

Article Editor is merely a set of empty text boxes that appear in a pop-up window when a user clicks

on a button labeled "New Article." SUF ¶ 55. A customer can enter text of its choosing into those

boxes, which can then be stored at the customer's direction in an archive folder. SUF ¶ 56. The

purpose of the Article Editor is for users to save their own original content (such as company press

releases), or other text that that the customer has the right to copy and store. *Id.* Meltwater's Terms

---

[12] *See also Faulkner v. Nat'l Geographic Enters., Inc.*, 409 F.3d 26, 40 (2d Cir. 2005) ("[T]here can be no contributory infringement absent actual infringement."); *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012) ("[T]o hold a defendant secondarily liable someone else must have directly infringed on the copyright holder's rights."); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n. 2 (9th Cir. 2001) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party."); *Resnick v. Copyright Clearance Ctr., Inc.*, 422 F. Supp. 2d 252, 258 (D. Mass. 2006) ("A defendant is not liable under a contributory or vicarious theory of liability unless plaintiffs show direct infringement by a third party.").

of Use make clear that customers must have the necessary rights to use third party content in that way.  SUF ¶ 59.

AP nevertheless contends that Meltwater users, without AP's authorization, might have copied the full text of AP articles from the third-party websites where those articles are published and then used the Article Editor to save that text in an Archive folder.  AP also suggests that users might have included the full text of Articles in Suit in "Newsletter emails" that can be sent from the Meltwater platform.[13]  According to AP, any such full-text copying and storing of the Articles in Suit by Meltwater users would amount to direct infringement for which Meltwater is secondarily liable.  Am. Compl. ¶¶ 64-66, 70-73, 85.  But AP's secondary infringement claims fail for a simple reason: *there is no evidence that any Meltwater customer ever stored the full text of an Article in Suit in a Meltwater Archive or included the full text of any Article in Suit in a newsletter email.*[14]

During discovery, Meltwater conducted an extensive investigation of its records to determine what, if any, text from the Articles in Suit Meltwater users may have stored in Archive folders or included in newsletter emails.  Saab SJ Decl. ¶ 37.  With the exception of text stored and used by AP's own investigative agent (discussed below), no full-text versions of any of the Articles in Suit were found in any Meltwater customer's Archives or newsletter emails.  SUF ¶¶ 60-61.  Because AP can offer no evidence of any actual Meltwater customer who engaged in the conduct that would supposedly amount to direct infringement of its Articles in Suit, Meltwater is entitled to summary

---

[13] The Newsletter tool allows customers to create and deliver via email a branded newsletter to recipients of their choosing.  SUF ¶ 57.  Customers can choose to populate their newsletter emails with selected Meltwater search results or articles that they themselves created using the Article Editor.  SUF ¶ 58  Only a small minority of Meltwater News customers in the United States (approximately 447 of more than 4,000 total customers) have subscriptions that even give them access to the Newsletter email feature.  Saab SJ Decl. ¶ 33.

[14] AP has made clear that its secondary infringement claims are based only on Meltwater customers' alleged use of full-text versions of the Articles in Suit and *not* on customers archiving or including in newsletter emails any *snippets* of those articles that they receive in their search results.  Grealis Decl. Ex. 57 (Letter to the Hon. Denise Cote from Elizabeth McNamara at 2 n.1 (September 21, 2012)).

judgment on AP's secondary infringement claims. *See, e.g.*, *Faulkner v. Nat'l Geographic Enters, Inc.*, 409 F.3d 26, 40 (2d Cir. 2005) (dismissing secondary claim for lack of actual infringement); *Matthew Bender*, 158 F.3d at 706 (no contributory infringement where plaintiff "failed to identify any primary infringer").

Even if it had occurred, moreover, the conduct that AP alleges – a Meltwater customer copying the text of an article that was freely available on a public website (using functions available on any Internet browser)[15] and pasting that text into a private archive folder for storage or inclusion in an email – would likely be a fair use, and thus not infringing at all. *Sony*, 464 U.S. at 447-56 (fair use for individual viewers to record TV programs they "had been invited to witness in [their] entirety free of charge" in order to watch those programs later); Grealis Decl. Ex. 69 (Curley Dep. 82:21-84:17 (AP CEO agreeing that it was "perfectly permissible" for AP employees to copy and send full text of third-party news stories to others)).[16] But this Court need not decide that hypothetical question here because there simply is no evidence that any Meltwater customer copied, stored, or emailed full-text versions of the AP's Articles in Suit. That alone is enough to rejefct AP's secondary infringement claims.

>   2.    The authorized use of the Articles in Suit by AP's agent is not direct infringement for which Meltwater can be held secondarily liable

Recognizing the total absence of evidence that any actual Meltwater customer infringed the Articles in Suit, AP has indicated that it intends to pursue its claims based entirely on the actions that

---

[15] The ability to copy and paste text from third-party websites is not a feature provided by or special to Meltwater. It is a standard feature of the Internet, enabled by the user's Internet browser, and generally as simple as highlighting the text on the webpage and using a mouse click or keyboard command. Grealis Decl. Ex. 71 (McKenzie Dep. 192:15-196:12, 208:8-209:9); Saab SJ Decl. ¶ 34.

[16] That is particularly so given that each of the Articles in Suit was published on multiple websites that specifically enabled and encouraged users to "save" and "share" (by email) those articles. Glunt Decl. ¶ 5; Grealis Decl. Ex. 73 (¶ 4 & Ex. 1); *accord* SUF ¶ 29. For a user to do precisely what the website publishing the article invited that user to do cannot be deemed infringement. *Keane Dealer Servs, Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997).

its counsel carried out through an investigator, the James Mintz Group. This effort fails because Mintz was fully authorized – and directed by AP's own counsel – to use the Articles in Suit as it did. Mintz's actions thus do not amount to direct infringement for which Meltwater can be held liable.

"[A]nyone who is authorized by the copyright owner to use the copyrighted work ... is not an infringer of the copyright." *Sony*, 464 U.S. at 433; *see, e.g., Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 119 (S.D.N.Y. 2012). For that reason, the authorized conduct of a copyright owner's attorney/agent cannot amount to an act of direct infringement on which a secondary infringement claim can be based. The Second Circuit made that clear in *Matthew Bender*. The plaintiff in that case (West) alleged that defendants' databases allowed users to "retrieve and print cases in the order in which they appear in West's case reporters." *Matthew Bender*, 158 F.3d at 706. The court agreed that a user "who replicated the West compilation in that way would be an infringer," but rejected plaintiff's contributory infringement claim because "West has failed to identify any primary infringer, ***other than Mr. Trittipo, West's counsel***." *Id.* (emphasis added). Similarly, in *Resnick v. Copyright Clearance Center, Inc.*, 422 F. Supp. 2d 252 (D. Mass. 2006), the court granted summary judgment to the defendant on secondary liability where the only evidence that plaintiffs offered of direct infringement was the activities of plaintiffs' own investigator. The court explained that because those "activities were authorized by plaintiffs themselves," they could "not constitute direct infringement by a third party." *Id.* at 258. These cases make clear that where none of the defendant's actual users engaged in the supposedly infringing conduct, a copyright owner cannot manufacture a secondary liability claim by authorizing its agents to do what real users have not.[17]

---

[17] AP may try to rely on cases holding that certain kinds of "investigative schemes" can be used to establish copyright infringement. *See, e.g., Olan Mills, Inc. v Linn Photo Co.*, 23 F.3d 1345 (8th Cir. 1994). Those cases, none of which was decided by the Second Circuit, are not on point here. They do not hold or suggest that an investigator's authorized conduct can in and of itself constitute the direct infringement required for a secondary infringement claim.

AP's reliance on Mintz's use of the Articles in Suit to support its secondary infringement claims is misguided for exactly this reason. Mintz's conduct was expressly authorized by AP through its counsel, Davis Wright Tremaine. AP retained Davis Wright to represent AP in the Meltwater matter, placing no restrictions on what it could do in connection with that representation. SUF ¶¶ 62-63. Davis Wright in turn hired Mintz to conduct an investigation of Meltwater, which was intended to "assist" Davis Wright "in rendering legal advice" to AP. SUF ¶ 65. As part of that investigation, Mintz obtained a free Meltwater trial account, which was active for approximately two weeks in December 2011. SUF ¶ 67. During that time, Mintz – at Davis Wright's behest – copied a few of the Articles in Suit from websites where those articles were published, pasted the text of those articles in Meltwater's Article Editor, and instructed Meltwater's system to save that text in archive folders. Grealis Decl. Ex. 58; *id.* Ex. 79 (video); *id.* Ex. 71 (McKenzie Dep. 186:3-25, 187:12-193:3, 210:19-211:22, 215:20-216:3). Mintz also created newsletter emails that included some of the AP articles it had saved, though Mintz never actually sent those emails to anyone. Grealis Decl. Ex. 71 (McKenzie Dep. 250:10-251:19, 258:10-14, 263:3-21).[18]

Mintz's use of the Articles in Suit is not infringement. AP has admitted that every occasion on which Mintz copied or distributed AP content, including the Articles in Suit, in connection with the Meltwater trial account "was authorized by AP's counsel." SUF ¶ 70. In instructing Mintz to copy the articles as it did, Davis Wright was acting as AP's agent and on its "behalf." SUF ¶ 71. Indeed, Davis Wright's engagement letter with Mintz explained that Mintz would "undertake only such work as is authorized by [AP's counsel] and will work under [Davis Wright's] direction and control." Grealis Decl. Ex. 44; *see also id.* Ex. 71 (McKenzie Dep. 35:14-36:15, 38:21-41:2). The record thus could not be clearer that every time Mintz copied the text of an Article in Suit, stored

---

[18] Mintz's conduct involved only 16 of the 33 Articles in Suit. For the remaining 17 articles (Exhibits I, L, T, and Y-LL to AP's Amended Complaint), there is no evidence that Mintz saved full-text copies or included full-text copies in a newsletter. SUF ¶ 72. With respect to those 17 articles, therefore, AP has nothing at all to say in support of its secondary infringement claims.

that text in a Meltwater archive, or included that text in a Newsletter, it was acting as AP's agent in connection with an investigation conducted for the benefit of AP itself.  SUF ¶¶ 70-71.

Because Mintz was authorized to act as it did, it did not infringe AP's copyrights when it copied the text of the Articles in Suit into archive folders and newsletter emails.[19]  Mintz's actions therefore cannot serve as the basis for a secondary infringement claim against Meltwater.  As in *Matthew Bender* and *Resnick*, AP's inability to establish that any actual Meltwater users infringed its works entitles Meltwater to summary judgment.

**B.      AP's Secondary Infringement Claims Fail Independently of the Absence of Direct Infringement**

Even putting aside the lack of evidence of any underlying infringement of the Articles in Suit, summary judgment for Meltwater is required because AP has failed to adduce evidence of other required elements for claims of contributory and vicarious infringement.

1.      AP's contributory infringement claim fails because there is no evidence that Meltwater knew about any infringing use of the Articles in Suit

"Assuming there is a class of primary infringers, then a party 'who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer.'"  *Matthew Bender*, 158 F.3d at 706 (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).  The plaintiff bears the burden of establishing the defendant's knowledge, which must be "of specific and identifiable infringements of individual items, not a general awareness that there are infringements."

---

[19] While AP has admitted that its counsel authorized Mintz to use to the Articles in Suit, it has suggested that it may try to argue that Mintz's conduct was not authorized *by AP itself* and thus could somehow still qualify as infringement.  Any such argument would be specious.  A "party is deemed bound by the acts of his lawyer-agent" and a client therefore cannot "avoid the consequences of the acts or omissions" of its freely selected attorney.  *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633-34 (1962); *see also Nemaizer v. Baker*, 793 F.2d 58, 62 (2d Cir. 1986) ("[A] person who selects counsel cannot thereafter avoid the consequences of the agent's acts or omissions.").  Accordingly, what Davis Wright knew about Mintz's use of the Articles in Suit – and what it authorized Mintz to do with those Articles on AP's behalf – is attributable to AP itself.

*Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 751 (S.D.N.Y. 2012) (internal quotation marks and citation omitted); *see also, e.g., A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001) ("absent any specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows" users to infringe).

AP cannot meet that burden.  It can point to no evidence that Meltwater had knowledge that any of its users had engaged in the conduct that AP contends amounts to infringement – copying, storing, and/or distributing full-text versions of the Articles in Suit without authorization.  SUF ¶ 73. That total failure of proof entitles Meltwater to summary judgment on contributory infringement. *See, e.g., Wolk*, 840 F. Supp. 2d at 750-51 (granting summary judgment on contributory infringement where plaintiff failed to adduce evidence that defendant knew that its users were infringing plaintiffs' works); *Dawes-Ordonez v. Realtor Ass'n of Greater Fort Lauderdale, Inc.*, No. 09-60335-CIV, 2010 WL 1791754, at *3 (S.D. Fla. May 5, 2010) (same); *Monotype Imaging, Inc. v. Bitstream, Inc.*, 376 F. Supp. 2d 877, 887 (N.D. Ill. 2005) (no contributory liability where plaintiff presented no evidence that defendant knew that its users were engaged in the conduct that plaintiff argued was infringing).

###### 2.    AP's vicarious liability claim fails because Meltwater gained no financial benefit from Mintz's use of the Articles in Suit

"[O]ne may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Gershwin*, 443 F.2d at 1162; *see also Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 36 (2d Cir. 2012) (one element of vicarious infringement is that defendant have "an obvious and direct financial interest in the exploitation of copyrighted materials'") (quoting *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)).  This claim "requires showing a 'causal relationship between the infringing activity and any financial benefit [the] defendant reaps.'" *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir.

2004)).  AP cannot make that showing.  As discussed, the only "infringing activity" that AP alleges in support of its vicarious liability claim is Mintz's authorized use of some of the Articles in Suit.  But Meltwater received no financial benefit whatsoever – much less an "obvious and direct" one – from Mintz's conduct.  Meltwater never received a single dollar from Mintz, which paid nothing for its trial account and never became a Meltwater subscriber.  SUF ¶¶ 67-69.  Nor did Meltwater receive any other financial consideration or advantage as a result of Mintz's use of the service, let alone from Mintz's full-text use of the Articles in Suit.  SUF ¶ 69.  Because Meltwater did not "profit from" Mintz's allegedly infringing conduct (*MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)), it cannot be held vicariously liable.  *See, e.g.*, *Agence France Presse v. Morel*, 769 F. Supp. 2d 295 (S.D.N.Y. 2011); *Dawes-Ordonez*, 2010 WL 1791754, at *3.

## CONCLUSION

For the reasons given above, Meltwater is entitled to summary judgment on all of AP's copyright infringement claims.

Respectfully submitted,

Dated: November 9, 2012

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: _____
TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
1301 Avenue of the Americas, 40th Floor
New York, New York  10019
Telephone:  (212) 497-7700

DAVID H. KRAMER (admitted *pro hac vice*)
650 Page Mill Road
Palo Alto, California 94304
Telephone:  (650) 493-9300

*Attorneys for the Defendants*