REDACTED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

----------------------------------------x

THE ASSOCIATED PRESS,             :

                    Plaintiff,     :

     - against -                   :

MELTWATER U.S. HOLDINGS, INC.;     :
MELTWATER NEWS U.S., INC.; and     :
MELTWATER NEWS U.S. 1, INC.        :

                    Defendants.    :

----------------------------------------x

**FILED UNDER SEAL**

12 Civ. 1087(DLC)(FM)

ECF Case

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Elizabeth A. McNamara
Linda Steinman
Alison B. Schary
Collin J. Peng-Sue
DAVIS WRIGHT TREMAINE LLP
1633 Broadway – 27th Floor
New York, New York 10019
Telephone:     (212) 489-8230
Facsimile:     (212) 489-8340

*Attorneys for Plaintiff The Associated Press*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ................................................................................................................... 4

I.   AP – AND NOT MELTWATER – IS ENTITLED TO SUMMARY JUDGMENT
     ON AP'S CLAIM OF DIRECT COPYRIGHT INFRINGEMENT .................................. 4

   A. First Factor: Meltwater's Use Is Commercial and Is Not Transformative .................. 5

     1. Meltwater's "Search Engine" Argument Ignores Both the Factual Record and
        Controlling Second Circuit Law ............................................................................. 5

        a. Meltwater's Use is Not Transformative Because it Does Not Serve a New
           *Expressive* Purpose ........................................................................................ 9

        b. Meltwater's News Digests Can Serve the Same Purpose as AP Articles ....... 13

        c. Meltwater Acts as a Substitute Since It Does Not Drive Customers to
           Websites ......................................................................................................... 16

     2. Meltwater's Rudimentary "Dashboard Analytics" Cannot Save Its
        Fundamentally Non-Transformative Use ............................................................... 18

   B. Second Factor: The Fact that AP's Articles are Widely Published Does Not
      Authorize Meltwater to Copy and Distribute Them for Commercial Gain Without
      a License ...................................................................................................................... 20

   C. Third Factor:  Meltwater Does Not – and Cannot -- Establish That It Takes Only
      the Amount Necessary for a Fair Use .......................................................................... 22

   D. Fourth Factor: Meltwater Does Not – and Cannot – Establish That It Does Not
      Affect the Potential Market for or Value of AP's Content .......................................... 25

     1. Meltwater Has Deprived AP of Customary Licensing  Fees to Which It Is
        Entitled ................................................................................................................... 25

     2. Meltwater Misconstrues AP's "Lost Customer" Theory of Market Harm ............... 27

II.  MELTWATER IS NOT ENTITLED TO SUMMARY JUDGMENT ON AP'S
     CLAIMS OF SECONDARY COPYRIGHT INFRINGEMENT ..................................... 30

   A. The Record Indicates that Meltwater Regularly Encourages Infringing Acts by its
      Users ............................................................................................................................ 30

   B. There Is Evidence of Direct Infringement by Meltwater News Users........................ 31

   C. Evidence Supports the Other Elements of AP's Secondary Infringement Claims ..... 34

CONCLUSION ................................................................................................................ 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A.V. v. iParadigms, LLC*,
   562 F.3d 630 (4th Cir. 2009) ...............................................................................14

*Am. Geophysical Union v. Texaco*,
   60 F.3d 913 (2d Cir. 1994)...........................................................................13, 25

*Arica Institute v. Palmer*,
   970 F. 2d 1067 (2d Cir. 1992).............................................................................27

*Arista Records LLC v. Lime Group, LLC*
   No. 06 Civ. 5936, 2011 WL 1641978 (S.D.N.Y. Apr. 29, 2011).....................31, 34

*Arista Records v. Usenet.com, Inc.*,
   633 F. Supp. 2d 124 (S.D.N.Y. 2009)..................................................................31

*Atlantic Recording Corp. v. Howell*,
   554 F. Supp. 2d 976 (D. Ariz. 2008) ...................................................................32

*Barclays Capital, Inc. v. Theflyonthewall.com*,
   700 F. Supp. 2d 310 (S.D.N.Y. 2010), *rev'd on other grounds*, 650 F.3d 876
   (2d Cir. 2011).......................................................................................................8

*Basic Books, Inc. v. Kinko's Graphics Corp.*,
   758 F. Supp. 1522 (S.D.N.Y. 1999).....................................................................13

*Bill Graham Archives v. Dorling Kindersley, Ltd.*,
   448 F.3d 605 (2d Cir. 2006)....................................................................10, 18, 26

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006)....................................................................2, 4, 9, 12

*Campbell v. Acuff-Rose Music, Inc.*,
   510 U.S. 569 (1994)..................................................................................*passim*

*Capitol Records, Inc. v. Thomas*,
   579 F. Supp. 2d 1210 (D. Minn. 2008).................................................................32

*Castle Rock Entm't v. Carol Publ'g Group*,
   150 F.3d 132 (2d Cir. 1998)...........................................................................4, 27

*Feist Publ'ns, Inc. v. Rural Tel. Serve. Co., Inc.*,
   499 U.S. 340 (1991).............................................................................................4

ii

*Folsom v. Marsh*,
  9 F. Cas. 342 (1841)..................................................................................................10

*Fox Broad. Co., Inc. v. Dish Network LCC*,
  Civ. No. 12-04529 (DMG), 2012 WL 5938563 (C.D. Cal. Nov. 7, 2012).............................20

*Gershwin Publ'g v. Columbia Artists Mgmt.*,
  443 F.2d 1159 (2d Cir. 1971)........................................................................................35

*Harper & Row Publishers, Inc. v. Nation Enters.*,
  471 U.S. 539 (1985)............................................................................................... *passim*

*Infinity Broad. Corp. v. Kirkwood*,
  150 F.3d 104 (2d Cir. 1998)..................................................................................... *passim*

*Iowa State Univ. v. Am. Broad. Co., Inc.*,
  621 F.2d 57 (2d Cir. 1980).......................................................................................1, 23

*Kelly v. Arribasoft*,
  336 F.3d 811 (9th Cir. 2002) ....................................................................................13, 15

*Leibovitz v. Paramount Pictures Corp.*,
  137 F.3d 109 (2d Cir. 1998)...........................................................................................4

*Lennon v. Premise Media Corp.*,
  556 F. Supp. 2d 310 (S.D.N.Y. 2008)..............................................................................10

*Los Angeles News Serv. v. Reuters Television Int'l Ltd.*,
  149 F.3d 987 (9th Cir. 1998) ........................................................................................28

*Los Angeles News Service v. Tullo*,
  973 F.2d 791 (9th Cir. 1992) ..................................................................................5, 8, 21

*Matthew Bender & Co., Inc. v. West Publ'g Co.*,
  158 F.3d 693 (2d Cir. 1998)...........................................................................................32

*Maxtone-Graham v. Burtchaell*,
  803 F.2d 1253 (2d Cir. 1986)....................................................................................10, 11

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*,
  545 U.S. 913 (2005).................................................................................................34, 35

*New Era Pub'ns Int'l, ApS v. Carol Publ'g Group*,
  904 F.2d 152 (2d Cir. 1990)...........................................................................................10

*Nihon Keizai Shimbun v. Comline Business Data, Inc.*,
  1998 U.S. Dist. LEXIS 6806 (S.D.N.Y. April 14, 1998), *aff'd*, 166 F.3d 65
  (2d Cir. 1999).....................................................................................................5, 8, 20

DWT 20730525v9 0025295-000064

*Olan Mills, Inc. v. Linn Photo Co.*,
  23 F.3d 1345 (8th Cir. 1994) .................................................................................32

*On Davis v. The Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001).............................................................................5, 25

*Pac. and S. Co. v. Duncan*,
  744 F.2d 1490 (11th Cir. 1984) .....................................................................5, 8, 12

*Princeton Univ. Press v. Michigan Document Serv.*,
  99 F.3d 1381 (6th Cir. 1981) ..........................................................................2, 12

*Register.com v. Verio, Inc.*,
  356 F. 3d 393 (2d Cir. 2004)................................................................................22

*Ringgold v. Black Entertainment Television, Inc.*,
  126 F.3d 70 (2d Cir. 1997)..............................................................10, 25, 26, 27

*Rogers v. Koons*,
  960 F.2d 301 (2d Cir. 1992)..........................................................................5, 10, 23

*Roy Export Co. v. Columbia Broad. Sys.*,
  503 F. Supp. 1137 (S.D.N.Y. 1980)......................................................................23

*Sandoval v. New Line Cinema Corp.*,
  147 F.2d 215 (2d Cir. 1998).................................................................................4

*Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*,
  256 F. Supp. 399 (S.D.N.Y. 1966) ......................................................................34

*Smoothline Ltd. v. North Am. Foreign Trading Corp.*,
  No. 00 Civ. 2798 (DLC), 2003 WL 941442 (S.D.N.Y. March 7, 2003) ................17

*Stewart v. Abend*,
  495 U.S. 207 (1990)..............................................................................................4

*Storm Impact v. Software of Month Club*,
  13 F. Supp. 2d 782 (N.D. Ill. 1998). ....................................................................22

*The Authors Guild v. Hathitrust*,
  11 Civ. 6351, 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012) ...................................7

*Twin Peaks Prods. v. Publ. Int'l Ltd.*,
  996 F.2d 1366 (2d Cir. 1993).......................................................................10, 18, 27

*U.S. v. ASCAP*,
  599 F. Supp. 2d 415 (S.D.N.Y. 2009).............................................................13, 14

DWT 20730525v9 0025295-000064

*UMG Recordings, Inc. v. MP3.com, Inc.*,
    92 F. Supp. 2d 349 (S.D.N.Y. 2000)...............................................................................12, 20

*United Feature Syndicate, Inc. v. Koons*,
    817 F. Supp. 370 (S.D.N.Y. 1993) ............................................................................................4

*Video Pipeline v. Buena Vista Home Entm't*,
    342 F.2d 191 (3d Cir. 2003)....................................................................................................12

*Wainwright Sec. Inc. v. Wall Street Transcript Corp.*,
    558 F.2d 91 (2d Cir. 1977).............................................................................................8, 9, 20

## STATUTES

17 U.S.C. § 107(4) ..............................................................................................................................27

17 U.S.C. §106(1)-(3) and (5)...........................................................................................................4

17 U.S.C. § 512(c) ..............................................................................................................................35

## OTHER AUTHORITIES

Fed. R. Civ. P.  26(a) ........................................................................................................................15

Fed. R. Civ. P. 37(c)(1)......................................................................................................................15

Fed. R. Civ. P. 56 ................................................................................................................................1

Fed. R. Civ. P.  56(d) ..................................................................................................................30, 33

Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105 (1990). ..............10, 18, 19

**Table of Abbreviations**

| Am. Cplt. | First Amended Complaint, dated July 15, 2012 |
|---|---|
| Ans. & Countercl. | Defendants' Answer to Amended Complaint and Counterclaims, dated April 6, 2012 |
| AP Br. | Memorandum of Law of Plaintiff The Associated Press in Support of Its Motion for Summary Judgment on Its Copyright Infringement Claim, dated November 9, 2012 |
| Box Decl. | Declaration of John Box in Support of Defendants' Motion for Summary Judgment, dated November 6, 2012 |
| Box Tr. | Transcript from the Rule 30(b)(6) Deposition of John Ryan Box, dated September 5, 2012 |
| Cross Decl. | Declaration of Sue Cross in Support of Plaintiff's Motion for Summary Judgment, dated November 8, 2012 |
| Cross Tr. | Transcript from the Rule 30(b)(6) Deposition of Sue Cross, dated September 21, 2012 |
| Curley Decl. | Declaration of Thomas Curley in Support of Plaintiff's Motion for Summary Judgment, dated November 5, 2012 |
| Fuller Decl. | Declaration of Nick Fuller in Support of Defendants' Motion for Summary Judgment, dated November 7, 2012 |
| Geidies Tr. | Transcript from the Rule 30(b)(6) Deposition of Sebastian Geides, dated October 3, 2012 |
| Glunt Decl. | Declaration of Robert A. Glunt in Support of Defendants' Motion for Summary Judgment, dated November 9, 2012 |
| Grealis Decl. | Declaration of Catherine Grealis in Support of Defendants' Motion for Summary Judgment, dated November 9, 2012 |
| Houston Tr. | Transcript from the Deposition of David Anthony Houston, dated October 2, 2012 |
| Jones Decl. | Declaration of Joy Jones in Support of Plaintiff's Motion for Summary Judgment, dated November 6, 2012 |
| Kent Decl. | Declaration of Thomas Kent in Support of Plaintiff's Motion for Summary Judgment, dated November 6, 2012 |
| Lawhon Decl. | Declaration of Cathy Lawhon in Support of Defendants' Motion for Summary Judgment, dated October 1, 2012 |
| McKenzie Decl. | Declaration of Keri McKenzie in Support of Plaintiff's Motion for Summary Judgment, dated November 7, 2012 |
| McN. Decl. | Declaration of Elizabeth A. McNamara in Support of Plaintiff's Motion for Summary Judgment, dated November 9, 2012 |
| Meeks Decl. | Declaration of Brock N. Meeks in Support of Defendants' Motion for Summary Judgment, dated October 15, 2012 |
| MW Br. | Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated November 9, 2012 |
| MW SUF | Defendants' Local Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue to Be Tried, dated November 9, 2012 |
| Rizzo Decl. | Declaration of John D. Rizzo in Support of Plaintiff's Motion for |

| | |
|---|---|
| | Summary Judgment, dated November 7, 2012 |
| Rizzo Tr. | Transcript from the Deposition of John D. Rizzo, dated September 19, 2012 |
| Saab Decl. | Declaration of Sara Saab in Support of Defendants' Motion for Summary Judgment, dated November 7, 2012 |
| Saab Tr. | Transcript from the Rule 30(b)(6) Deposition of Sara Saab, dated September 10 and 11, 2012 |
| Schary Decl. | Declaration of Alison B. Schary in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, dated December 14, 2012 |
| Steinman Decl. | Declaration of Linda Steinman in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment, dated December 14, 2012 |
| 56(d) Decl. | Rule 56(d) Declaration of Elizabeth A. McNamara, December 14, 2012 |

vii

Plaintiff The Associated Press ("AP") submits this memorandum of law in opposition to the motion for summary judgment (the "Motion") brought by defendants Meltwater U.S. Holdings, Inc., Meltwater News U.S., Inc., and Meltwater News US1, Inc. (collectively "Meltwater" or "Meltwater News") pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

It should come as no surprise that Meltwater chose to open its summary judgment motion by repeating the same hysterical threat with which it introduced its Answer to AP's Complaint: that AP, by bringing suit against Meltwater for its widescale and systematic commercial distribution of substantial verbatim excerpts of AP content, is somehow challenging "a core function of the Internet." This is nonsense. Notwithstanding Meltwater's strained comparisons, this is not a case about free public search engines. This is a case about Meltwater News: a multimillion-dollar online clipping service whose business model consists of delivering other parties' copyrighted news content to its paying corporate customers, while avoiding both the costs of reporting the news and the costs of licensing it from those who do. Claiming "fair use," Meltwater systematically scrapes thousands of copyrighted AP news reports from the Internet, repackages verbatim excerpts from those reports into Meltwater "News Reports," and distributes them to its subscribers, all without compensation to AP. But "[t]he fair use doctrine is not a license for corporate theft." *Iowa State Univ. v. Am. Broad. Co., Inc.*, 621 F.2d 57, 61 (2d Cir. 1980). The undisputed facts in the record place Meltwater News squarely within a well-established body of case law – in the Second Circuit and elsewhere – holding that commercial abstracting, clipping, and media-monitoring services do not qualify as a fair use.

Both parties have submitted cross-motions for summary judgment addressing AP's copyright claims and Meltwater's defense of fair use. On AP's direct copyright claims, the

DWT 20730525v9 0025295-000064

relevant facts are clear and undisputed.[1]  The parties do not dispute the basic material facts concerning the Meltwater News service, and in fact describe it in a highly similar manner.  The dispute focuses exclusively on the law's application to these undisputed facts.

Yet, the legal precedent is clear: Meltwater's systematic, for-profit distribution of substantial verbatim excerpts of AP's copyrighted content cannot qualify as a fair use.  Meltwater is utterly commercial in the most meaningful way:  it directly exploits and profits from the sale of AP content.  Likewise, harvesting and distributing verbatim excerpts so that paying customers can monitor this news is not transformative under controlling Second Circuit law.  Meltwater provides no commentary or criticism; it does not use the quotations from AP's articles "as raw material, transformed in the creation of new material, new aesthetics, new insights and understandings." *Blanch v. Koons*, 467 F.3d 244, 251-52 (2d Cir. 2006).  Unable to assert an *expressive* purpose to justify its takings, Meltwater argues that it serves a different *functional* purpose, namely allowing its customers to access relevant news coverage.  But "[t]his kind of mechanical 'transformation' bears little resemblance to the creative metamorphosis accomplished by the parodists in the *Campbell* case."  *Princeton Univ. Press v. Michigan Document Serv.*, 99 F.3d 1381, 1389 (6th Cir. 1981).  Moreover, as common sense and Meltwater's own documents reveal, its News Reports often serve the same intrinsic purpose as AP articles – they "save[ ] you time so you don't need to read the full article."  McN. Decl. ¶ 19.  In stark contrast to the Ninth Circuit law on which Meltwater primarily relies, Meltwater concedes that its customers' use of its system "to keep abreast of news developments" is a "valid way to use" it.  *Id.* ¶ 20.  The click-through rate on the Registered Articles of less than one-tenth of one percent sounds the final death knell to

---

[1] In the interest of avoiding repetitive briefing, AP respectfully refers the Court to AP's Motion for Summary Judgment (*see* AP Br. at 3-7 & n.1) and the declarations submitted therewith for a full recitation of the facts relevant to both cross-motions.  AP incorporates by reference all of its declarations in support of its motion for summary judgment in its opposition to Meltwater's summary judgment motion.

DWT 20730525v9 0025295-000064

Meltwater's argument that it qualifies as a transformative use as a so-called search engine.

Meltwater's systematic delivery of hundreds of thousands of article excerpts in comprehensive reports further reinforces that its service is not a fair use.  The Meltwater excerpts include the crucial "lede" of the article and thus concededly allow the Meltwater customer to "know what the article is about."  McN. Decl. ¶ 13; *id.* Ex. 1 [Box Tr.] at 154:18-155:10; *id.* Ex. 2 [Saab Tr.] at 190:13-19.  Moreover, Meltwater delivers comprehensive emailed "News Reports" on at least a daily basis, and it further offers access to a closed platform with both a "continuously" updated database of "fresh, relevant content" and a retrospective archive of "millions" of news articles dating back to 2001.  McN. Decl. ¶¶ 6, 53.  As Meltwater's own documents proclaim, Meltwater offers the "news brought to you," so that "your news is delivered in easy to read morning and/or afternoon reports."  McN. Decl. Ex. 7.  Finally, Meltwater is directly harming AP's market for licensing its news content, both by directly competing for particular customers and by competing with AP licensees, such as Factiva and LexisNexis, whom Meltwater itself acknowledges are its competitors.  As a result, Meltwater cannot meet its burden of demonstrating fair use.

Rather than grappling with directly controlling Second Circuit law, Meltwater bases its argument on Ninth Circuit cases that have never been adopted in this Circuit, and which are highly distinguishable in any event.  And rather than grappling with the documents and testimony in the record, it opts for a parade of misrepresentations and omissions—along with a litigation-inspired makeover.  Thus, Meltwater no longer refers to itself as an "online media-monitoring service," as its website and marketing materials proclaim; instead, its lawyers have rebranded it as the "Meltwater News Search Engine and Research Service."  MW Br. at 2.  Although Meltwater's daily digests of verbatim article excerpts are all prominently titled "**News Report** from Meltwater

News" (McN. Decl. Exs. 84-86, emphasis added), Meltwater has informed this Court that it sends "periodic email updates called 'Mail Reports.'"  MW Br. at 3.  But however Meltwater and its lawyers choose to characterize Meltwater News in their summary judgment papers, the way its service operates remains undisputed—and clearly weighs against a finding of fair use.

In sum, the undisputed factual record and controlling Second Circuit law lead to one conclusion: that AP, and not Meltwater, is entitled to summary judgment on AP's claims of direct infringement.  The existence of material disputed facts, as well as AP's need for further discovery, preclude summary judgment for Meltwater on AP's secondary infringement claims.

## ARGUMENT

**I.    AP – AND NOT MELTWATER – IS ENTITLED TO SUMMARY JUDGMENT ON AP'S CLAIM OF DIRECT COPYRIGHT INFRINGEMENT**

Meltwater does not dispute that AP has established the elements of its direct copyright infringement claims for each of the Registered Articles: (1) ownership of a valid copyright and (2) copying of constituent original elements of the work.  *Feist Publ'ns, Inc. v. Rural Tel. Serve. Co., Inc.*, 499 U.S. 340, 361 (1991).  *See* AP Br. at 7-8.  Rather, Meltwater relies solely on its defense of fair use in its Motion.  Meltwater bears the burden of proving that its use of AP articles is fair.  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994). As set forth below and in AP's opening brief, incorporated by reference herein, Meltwater utterly fails to meet this burden.  It is AP – and not Meltwater – that is entitled to summary judgment on AP's claim of direct copyright infringement under 17 U.S.C. §§106(1)-(3) and (5).[2]

---

[2] Although "[f]air use is a mixed question of law and fact," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985), courts routinely resolve fair use determinations at the summary judgment stage where, as here, "the historical facts underlying the factors are not in dispute … [and] the real dispute focuses on the ultimate conclusions to be drawn from the admitted facts."  *United Feature Syndicate, Inc. v. Koons*, 817 F. Supp. 370, 378-79 (S.D.N.Y. 1993).  *See, e.g., Stewart v. Abend*, 495 U.S. 207 (1990); *Blanch*, 467 F.3d 244; *Castle Rock Entm't v. Carol Publ'g Group*, 150 F.3d 132, 147 (2d Cir. 1998); *Sandoval v. New Line Cinema Corp.*, 147 F.2d 215 (2d Cir. 1998); *Leibovitz v. Paramount Pictures*

A.      **First Factor: Meltwater's Use Is Commercial and Is Not Transformative**

The first factor of Section 107 – the "heart of the fair use inquiry" – focuses on two issues: whether a use is commercial, and whether it is transformative.  *On Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001).  Meltwater does not dispute that its use is commercial.  MW Br. at 9 & n.4.  As set forth in AP's brief, in cases similar to this one involving fee-based media monitoring services, courts have concluded that the services operate for "unabashedly commercial reasons" that weigh against a finding of fair use.  AP Br. at 10, citing *Pac. and S. Co. v. Duncan*, 744 F.2d 1490, 1496 (11th Cir. 1984); *see also Los Angeles News Serv. v. Tullo*, 973 F.2d 791, 797 (9th Cir. 1992).  Meltwater "makes a great deal of money by piggy-backing onto [AP and other newspaper's] labors." *Nihon Keizai Shimbun v. Comline Business Data, Inc.*, 1998 U.S. Dist. LEXIS 6806, at *39 (S.D.N.Y. April 14, 1998) (Cote, J.), *aff'd*, 166 F.3d 65 (2d Cir. 1999).  In other words, it "profit[s] from exploitation of the copyrighted material without paying the customary price."  *Harper*, 471 U.S. at 562.

As for transformative use, Meltwater relies on two separate theories.  First, Meltwater now calls itself a "search engine," claiming that its use of search technology to deliver article excerpts renders the Meltwater News service transformative because it serves a "different purpose" than AP's content.  Second, Meltwater claims that it is a "news research tool," relying on the rudimentary "dashboard analytics" widgets included in its basic Meltwater News platform – but *not* routinely sent to Meltwater customers along with their daily News Reports.  Based on the undisputed and undeniable facts, both theories of transformative use are unsustainable under Second Circuit law.

1.      **Meltwater's "Search Engine" Argument Ignores Both the Factual Record and Controlling Second Circuit Law**

Meltwater's "search engine" argument fails.  As its name suggests, the "Meltwater News

---

*Corp.*, 137 F.3d 109 (2d Cir. 1998); *Rogers v. Koons*, 960 F.2d 301 (2d Cir. 1992).

Media Monitoring" service (*e.g.*, McN. Decl. Ex. 16) is a commercial, subscriber-only news media monitoring service that is readily distinct from the free and publicly available search engines at issue in *Kelly v. Arribasoft*, 336 F.3d 811, 819 (9th Cir. 2002), and *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). *See, e.g.*, McN. Decl. Ex. 7 (Google is a "**consumer tool** while Meltwater News is a **business tool**."). Instead, Meltwater is – as its founder and CEO envisioned – a modern entrant into the "traditional press-clipping market." McN. Decl. Ex. 9. The core function of a search engine is to assist users in their spontaneous navigation of the vast sea of diverse websites on the worldwide web, including the search for specific known web pages. The critical result of a search engine is that it drives users to destinations they seek on the web. Meltwater serves neither the function nor result of a classic search engine. Rather, it delivers to its paying customers on at least a daily basis systematic, focused "News Reports" with verbatim news digests culled from thousands of news articles on the customer's selected topics, and provides a ready platform for them to obtain updates on news articles as the day progresses. McN. Decl. ¶¶ 9-14. Instead of driving its users to third party websites, as explained below, the evidence shows a paltry, infinitesimal "click-through rate" on the Registered Articles – which is not surprising since Meltwater's news digest is designed as a "time saver" so "you don't need to read the full article." *Id.* Exs. 19, 20. In short, as Meltwater stated in its own document explaining its advantages over Google Alerts, Meltwater offers the "news brought to you," so that "your news is delivered in easy to read morning and/or afternoon reports." *Id.* Ex. 7. Meltwater News bears little relation to a traditional search engine.

Moreover, unlike classic search engines, Meltwater offers "archiving capabilities" and "distribution capabilities" on the Meltwater system (e.g. newsletters) as "Time Savings" -- both of which entail further use of AP's content and alter the nature of Meltwater's role. McN. Decl.

Ex. 7.  Further, Meltwater's database goes back to 2001, and includes content from articles that are no longer publically available; in these instances, it clearly does not serve the core function of a search engine, since the links are "dead."  Schary Decl. Ex. 16 [Box Tr.] at 126:6-127:22.

Of course, AP does not dispute that Meltwater employs <u>search technology</u> in its Meltwater News service.  But Meltwater's mere use of search technology in its service cannot serve as a magic bullet to render its extensive, verbatim and systematic use of AP's protected content transformative. In fact, this basic characteristic does not distinguish Meltwater from any other web-based clipping service or news database.  Factiva and LexisNexis – both of which are AP licensees and both of which are identified by Meltwater as competitors – also offer Boolean search functions for users to find responsive news articles across a vast array of news sources.  Cross Decl. ¶ 65.  Indeed, Meltwater can hardly argue that it serves a "new" transformative purpose when AP's own platform – AP Exchange – includes a Boolean search tool that allows licensees to search AP content so that they can locate articles responsive to their chosen topics and queries.  Cross Decl. ¶¶ 61-64.

Most critically, Meltwater's "search engine" argument is not supported by Second Circuit law.  Meltwater fails to cite a single Second Circuit decision in support of its claim that the mere use of search technology renders the Meltwater News service transformative.  Instead, it relies on two Ninth Circuit cases – *Kelly* and *Perfect 10* – and one District of Nevada case – *Field v. Google*, 412 F. Supp. 2d 1106 (D. Nev. 2006) – none of which have been adopted by the Second Circuit.  All three are in any event fundamentally distinguishable from this case.  AP Br. at 18-20, 34 n.15.[3]  At the same time, Meltwater fails to contend with the substantial body of law holding that clipping services, media-monitoring services, and abstracting services are not

---

[3] Meltwater also cites to *The Authors Guild v. Hathitrust*, 11 Civ. 6351, 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012).  In stark contrast to this case, Judge Baer found the search index at issue there to be transformative only because the index merely showed the relevant page numbers in scanned books and "no actual text from the book is revealed."  *Id.* at *10.

protected by fair use – services that are far more analogous to Meltwater News than free public search engines.  *E.g., Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) (radio monitoring service not a fair use); *Wainwright Sec. Inc. v. Wall Street Transcript Corp.*, 558 F.2d 91, 96-97 (2d Cir. 1977) (publication of abstracts of plaintiff's financial reports not a fair use); *Pac. & S. Co.*, 744 F.2d at 1496 (TV news clipping service not a fair use); *Tullo*, 973 F.2d at 797 (video news clipping service not a fair use); *Nihon*, 1998 U.S. Dist. LEXIS 6806, at *39 (distribution of abstracts from news articles not fair use).[4]

Meltwater's failure to grapple with – or even acknowledge – the Second Circuit's decision in *Infinity* is particularly egregious.[5]  In *Infinity*, the Second Circuit addressed a directly analogous situation:  a radio monitoring service called Dial-Up that re-transmitted free radio broadcasts to paying subscribers.  Dial-Up's customers, some of whom only listened to "mere snippets" of Infinity's broadcasts, hailed from the entertainment and advertising industries and used the service for such purposes as verifying whether commercials had been broadcast correctly, auditioning on-air talent, and copyright enforcement.  150 F.3d at 106.  The Second Circuit resoundingly rejected the defendant's fair use argument – which was remarkably similar to Meltwater's – finding that these were merely "non-transformative retransmissions." *Id.* at 108-09.  Although the Court accepted that the service performed a possibly beneficial function, its usefulness did not render it transformative because, "[Dial-Up] creates nothing and advances no body of knowledge or criticism.  [It] simply takes Infinity's unaltered broadcasts and markets them to a specific clientele."  *Id.* at 109, 111-112.

Meltwater's systematic redistribution for profit of key excerpts from AP articles is also

---

[4] Notably, in one of the most recent Second Circuit cases involving commercial redistribution of "key excerpts" from research reports by a "news aggregator," the defendant ultimately did not dispute its liability for direct infringement.  *Barclays Capital, Inc. v. Theflyonthewall.com*, 700 F. Supp. 2d 310, 328 (S.D.N.Y. 2010) (Cote, J.), *rev'd on other grounds*, 650 F.3d 876 (2d Cir. 2011).  This Court awarded attorney fees, finding that Fly's fair use defense "was rejected decades ago in [*Wainwright*]." *Id.* at 330 (citations omitted).
[5] Meltwater cannot in good faith claim ignorance of this precedent, given that AP has cited it numerous times in previous correspondence with Meltwater and with the Court.

akin to the infringing activity in *Wainwright*.  There, the defendant published abstracts that "appropriated almost verbatim the most creative and original aspects of the reports" from Wainwright's copyrighted financial research reports – reports that had required a "substantial investment of time, money and labor."  558 F.2d at 96.  Just as Meltwater provides its subscribers with "the most news in the most efficient manner" (McN. Decl. ¶ 19, Ex. 19), the defendant in *Wainwright* promised its readers a "fast-reading, pinpointed account of heavyweight reports…" 558 F.2d at 94.  Echoing testimony from the House hearing on the Copyright Act that the fair use doctrine distinguishes between a "true scholar and a chiseler who infringes a work for personal profit," the Second Circuit concluded that the defendant's abstracts were not a fair use: "This was not legitimate coverage of a news event; instead it was, and there is no other way to describe it, chiseling for personal profit."  *Id.* at 96-97; *see also Nihon*, 166 F.3d 65.

### a.   Meltwater's Use is Not Transformative Because it Does Not Serve a New *Expressive* Purpose

It is clear why Meltwater so studiously avoids Second Circuit precedent: contrary to Meltwater's theory, the Second Circuit has never found a use transformative where the original work is not incorporated as raw material into a new work with a further *expressive* purpose or new *expressive* meaning.  The Supreme Court set the standard for a transformative use in *Campbell*: "The central purpose of this investigation is to see, in Justice Story's words, whether the new work merely 'supercede[s] the objects' of the original creation [citations omitted], or instead adds something new, with a further purpose or different character, *altering the first with new expression, meaning or message*; it asks, in other words, whether and to what extent the new work is transformative."  510 U.S. at 579 (emphasis added).  In keeping with the plain meaning of this passage, the Second Circuit repeatedly has held that the original work must be "used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings" (*Blanch*, 467 F.3d at 251-52,

9

quoting *Castle Rock*, 150 F.3d at 142) – as it was in that case in an artwork's use of an advertisement to comment on popular culture. Thus, all the Second Circuit cases require a new expressive purpose, including those cited out of context by Meltwater.[6]

Meltwater's fair use claim should be rejected since its media monitoring service does not serve a new *expressive* purpose, as is required. Meltwater tries to argue that it uses AP's articles "as raw material in the furtherance of distinct creative or communicative objectives" (MW Br. at 9, quoting *Blanch*, 467 F.3d at 253), but it provides no evidence to support that conclusion. Meltwater employs no writers or reporters (McN. Decl. ¶ 8), and it does not embed the AP content in surrounding commentary to "criticiz[e] the quoted work, expose the character of the original author … or summariz[e] an idea argued in the original in order to defend or rebut it." Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990). Instead, what Meltwater systematically delivers is row upon row of naked verbatim excerpts from articles with links – and millions of them. Further, Meltwater does not even curate its article excerpts or present them in any configuration that reflects independent "intellectual labor and judgment" (*Folsom v. Marsh,* 9 F. Cas. 342, 345 (1841) (Story, J.)) — instead, Meltwater's system automatically provides the universe of articles containing the user's search terms in reverse chronological order from the more than 160,000 websites it crawls. McN. Decl. Ex. 3 [Geidies

---

[6] *See, e.g.*, *Bill Graham Archives v. Dorling Kindersley, Ltd.*, 448 F.3d 605, 610-11 (2d Cir. 2006) (finding transformative use where small images of concert posters in cultural history of the Grateful Dead had the "separate and distinct" expressive purpose of "enhancing the biographical information" in the book); *Ringgold v. Black Entertainment Television, Inc.*, 126 F.3d 70, 78-79 (2d Cir. 1997) (finding that decorative use of artwork was not transformative, in contrast to use for comment or criticism); *Twin Peaks Prods. v. Publ. Int'l Ltd.*, 996 F.2d 1366, 1374-76 (2d Cir. 1993) (detailed plot summaries serve no transformative function); *Maxtone-Graham v. Burtchaell*, 803 F.2d 1253 (2d Cir. 1986) (use of excerpts from published interviews transformative where they were incorporated into essay about abortion for purposes of critique); *New Era Pub'ns Int'l, ApS v. Carol Publ'g Group*, 904 F.2d 152 (2d Cir. 1990) (use of quotations from L. Ron Hubbard's works in biography criticizing Hubbard transformative); *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310 (S.D.N.Y. 2008) (transformative use where defendant used two topical lines from song in film to comment on the role of religion in society); *Rogers*, 960 F.2d at 309-10 (sculpture was not a fair use of photograph where it did not comment on the photograph itself).

Tr.] at 91:19-92:6.  Even a cursory glance at a Meltwater News Report confirms that rather than a new work of commentary or criticism, this is "merely the facile use of the scissors."  *Maxtone-Graham*, 803 F.2d at 1260 (quoting *Folsom*, 9 F. Cas. at 345).

Instead of serving a new expressive purpose, Meltwater's real argument is that its media monitoring services serves a different *functional* purpose, namely allowing its customers to access relevant news coverage.  Meltwater attempts to argue that its use should be considered transformative because its functional purpose is to serve as an electronic reference tool – *i.e.*, "not to report the news, but to provide information about how the news is being reported."  MW Br. at 13.  But this does not comport with the Supreme Court's articulation of a transformative use in *Campbell,* which requires a further purpose "altering the first [work] with new expression, meaning or message."  510 U.S. at 579.  Indeed, as the Supreme Court there observed, a work "composed primarily of an original, particularly its heart, with little added or changed" "reveal[s] a dearth of transformative character or purpose under the first factor" and "is more likely to be a merely superseding use, fulfilling demand for the original." 510 U.S. at 587-88.

Further, Meltwater's functional argument that the delivery of straight, unaltered verbatim excerpts of news articles with an accompanying link constitutes a transformative use was already foreclosed by *Infinity*.  There, defendant claimed its service was transformative because its customers were using it for "factual" rather than "entertainment" purposes, such as verifying the broadcast of commercials (150 F.3d at 106, 108) – in other words, like Meltwater, to gain "information about" the broadcasts.  The Second Circuit rejected this argument, holding that "difference in purpose is not quite the same thing as transformation, and *Campbell* instructs that transformativeness is the critical inquiry under this [fair use] factor."  *Id.* at 108.  As the Court further explained, the "retransmissions leave the character of the original broadcasts unchanged.  There is neither new expression, new

11

meaning nor new message." *Id.* (citation omitted).  *See also Video Pipeline v. Buena Vista Home Entm't*, 342 F.2d 191, 198-99 & n.5 (3d Cir. 2003) (rejecting the argument that a defendant's movie clip previews were transformative because they allegedly served an "informational and promotional" purpose rather than the movies' "aesthetic and entertainment" purpose, since the previews were "part of – not information about" plaintiff's copyrighted works).

Moreover, the Second Circuit made clear that "it is [defendant's] own retransmission of the broadcasts, not the acts of his end-users, that is at issue here and all [defendant] does is sell access to unaltered radio broadcasts." *Infinity*, 150 F.3d at 108; s*ee also Princeton Univ. Press*, 99 F.3d at 1389 (courts have "properly rejected attempts by for-profit users to stand in the shoes of their customers") (citing W. Patry, *The Fair Use Privilege in Copyright Law*, 420 17.34 (1985)).  Thus, Meltwater's assertions that its customers supposedly use its service to "research, track, analyze and compare news coverage" (MW Br. at 13) are irrelevant since the only issue is how Meltwater uses AP's copyrighted material – and all it does "is sell access to unaltered" excerpts from news articles and "leave the character of the original [articles] unchanged." *Infinity*, 150 F.3d at 108.[7]

In short, the dissemination of substantial unaltered copyrighted material merely to foster easy or improved access is not a transformative use.  "Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work." *Harper*, 471 U.S. at 569, quoting *Pac. & S. Co.*, 744 F.2d at 1499-50.  *See also UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349, 351-52 (S.D.N.Y. 2000) (noting that reproduction of audio CDs in MP3 format "simply repackages those recordings to facilitate their transmission through another medium," and

---

[7] As set forth in AP's earlier brief, the Second Circuit has consistently rejected arguments like Meltwater's based on an allegedly different "purpose" or "function" argument unless the material is used to further a new, distinct expressive purpose.  AP Br. at 18 n.6.  For example, in *Blanch,* the Second Circuit disagreed with a treatise stating that the fair use defense may be invoked if the defendant's work "performs a different function than that of plaintiffs" on the ground that these statements were "in tension with the Copyright Act's express grant to copyright holders of rights over derivative works." 467 F.3d at 252 n.4.

12

that "Copyright … is not designed to afford consumer … convenience but, rather, to protect the copyright holders' property interests."); *Am. Geophysical Union v. Texaco*, 60 F.3d 913, 919 (2d Cir. 1994) ("archival" copy of journal article for "future retrieval and reference" not a transformative use); *Basic Books, Inc. v. Kinko's Graphics Corp.*, 758 F. Supp. 1522, 1531 (S.D.N.Y. 1999) (no transformative use where copying "had productive value only to the extent it put an entire semester's resources in one bound volume for students); *Storm Impact, Inc. v. Software of the Month Club*, 13 F. Supp. 2d 782, 788 (N.D. Ill. 1998) (service delivering free shareware programs more "efficiently" is not transformative since "such mechanical transformation is not fair use").

> **b.    Meltwater's News Digests Can Serve the Same Purpose as AP Articles**

Even assuming, *arguendo*, that a different functional purpose can constitute a transformative use, both *Infinity* and several other courts – including the Ninth Circuit in *Kelly* – have made clear that verbatim excerpts are not transformative where they are capable of being used for the same purpose as the original.  In *Infinity*, the Second Circuit rejected the transformative use argument, among other reasons, because some listeners would be listening to the broadcasts for their entertainment value, not their informational value.  150 F.3d at 108.  In *U.S. v. ASCAP*, 599 F. Supp. 2d 415, 426-27 (S.D.N.Y. 2009), the Southern District held that ringtone previews for cell phones were not transformative in the absence of evidence that customers used the previews "solely" for informational purposes, and not also to assess the "entertainment value" of the ringtones.  Even the Ninth Circuit in *Kelly* endorsed *Infinity*'s conclusion that no transformative use exists where "even though the intended purpose of the retransmission may have been different from the purpose of the original transmission, the result was that *people could use both types of transmissions for the same purpose*."  336 F.3d at 819 (emphasis added).  It found that the Arriba

13

search engine's use of thumbnail images of Kelly's photographs was transformative only because the thumbnails were of such low resolution that they could not be used to fulfill an aesthetic purpose: "any enlargement results in a significant loss of clarity of the image, making them inappropriate as display material." *Id.* at 818-19.[8]

Meltwater cannot bear its burden of proving that its media monitoring product serves an exclusively different purpose than AP's articles.  By their very nature, excerpts consisting of the headline, lede and hit sentence of news articles are easily capable of conveying the newsworthy information contained therein.  Meltwater's 30(b)(6) witness admitted that she had no knowledge of any "systematic study" regarding how Meltwater customers use the platform (McN. Decl. Ex. 2 [Saab Tr.] at 392:11-22); that she could not say every Meltwater subscriber uses the service "solely for PR purposes" given Meltwater's "huge variety of clients" (*id.* 390:18-25); and that it is possible that Meltwater customers use Meltwater News to "keep abreast of news developments," which she characterized as a "valid way to use the system" (*id.* 391:1-7). Indeed, the record makes clear that Meltwater touts the fact that its users can review the article excerpts for their news and informational value.  As detailed further in the McN. Decl. at ¶¶ 18-25, Meltwater's marketing and sales materials advertise that customers can use the service to follow "hot topics on local news (issues, legislation and city concerns)," "industry trends," and "legislation/regulation"; as one Meltwater "Sales Playbook" states, "If they say that they only monitor their own name with the press clippings, this is a great chance to politely inform them … if you wanted to look for competitors, industry news, etc you could do so." *Id.* ¶¶ 23-24.

Meltwater customers have indisputably adopted these marketing suggestions.  The

---

[8] Meltwater cites to *A.V. v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009), in support of its "different function" argument.  There, unlike here, iParadigm's purpose in copying the student papers "was completely unrelated to expressive content and was instead aimed at detecting and discouraging plagiarism." *Id.*

REDACTED

evidence shows that Meltwater customers regularly employ search terms or "agents" on a wide variety of substantive topics (including, e.g. "health care," "fashion," and "tobacco legislation and regulation").  McN. Decl. ¶¶ 21-24.  It completely belies common sense that when Meltwater customer REDA uses the search terms "cigarette, law, smoking, tobacco and FDA" (see McN. Decl. ¶ 22), it does not read the article excerpts in its Meltwater "News Report" to learn the newsworthy developments regarding the FDA and smoking.  As a sales script created by a Meltwater salesman suggests, the News Reports "save you time so you don't need to read the full article."  McN. Decl. Ex. 20; *see also* McN. Decl. Ex. 19 ("The number one reason our clients subscribe to us is because we provide the most news in the most efficient manner"); McN. Decl. Ex. 27 (client proposal with Meltwater newsletter subtitled "A Briefing of News and Happenings for School Nutrition Professionals").  Indeed, "In today's world, digital aggregators providing only headlines and/or excerpts … are very popular and often sufficient to satisfy users without their clicking on the links to the original story."  Jones Decl. ¶ 24.  Even Meltwater's brief concedes that Meltwater's customers use their service to "discover what is being said about their companies or organizations" (MW Br. at 2) – *i.e.*, to learn the content of the articles, content that can certainly be gleaned in part from the headline, lede and hit sentence.  Finally, when Meltwater further distributes the excerpts in customer newsletters or newsfeeds, any pretense that this is anything other than the distribution of news is entirely lost.  In short, in light of both the record evidence and common sense, Meltwater cannot bear its burden of proof since, whatever its supposed intent, "the result was that people could use [the article excerpts] for the same purpose [as the original articles]" (*Kelly*, 336 F.3d at 819) – namely to provide newsworthy information, thereby precluding Meltwater's transformative use argument.[9]  In sum, Meltwater

---

[9] The self-serving client declarations Meltwater submits (Lawhon, Meeks, Fuller) are not only inadmissible as evidence – both because it failed to identify these individuals as witnesses under Rule 26(a) (see Fed. R.

cannot show a transformative use.

> **c.    Meltwater Acts as a Substitute Since It Does Not Drive Customers to Websites**

In addition to these fundamental flaws in Meltwater's argument, Meltwater's whole search engine defense rests on its assertion that it acts as a "pointer" and thereby regularly sends interested users to the original website, despite its excerpting of headlines, ledes and text that often range between 30-60% of an AP article.  MW Br. at 11.  The problem for Meltwater is that it has provided no evidence to support its burden to prove this contention; indeed, the evidence shows the opposite.  For the Registered Articles, the "click-through rate" was <u>one-tenth of one percent,</u> despite their widely varying topics and length.  McN. Decl. ¶ 93.  The infinitesimal click-through rate for the Registered Articles is consistent with the U.K. Tribunal's finding of a 0.5% click-through rate for U.K. news sources.  *Id.*  And, in the case of older articles, the "pointer" defense is often not even possible, since Meltwater often directs the customer to a "dead link" because the article in question has been removed from the Internet (but Meltwater continues to exploit the excerpts).  McN. Decl. ¶ 27, Ex. 3 [Geidies Tr.] at 235:7-13, 236:24-237:17, 241:18-242:2.

Not surprisingly, Meltwater ignores the damning click-through rate for the Registered Articles and instead misleadingly tries to suggest that it is consistently driving customers to external websites because it has recorded "6.7 million clicks" by U.S. customers on any Meltwater-delivered links to any websites over a six-month period in 2012.  *See* MW Br. at 4, 11 n.6, 20.  However, the Court should disregard this figure since it is entirely out of context without the relevant denominator – *i.e.*, the total number of links Meltwater delivered to U.S. customers in that same time period (the "Total Links").  Only with the Total Links could one ascertain to what

---

Civ. P. 37(c)(1)) and to produce the declarations in response to document requests for all evidence to be used in support of Meltwater's claim (Schary Decl. Ex. 8, Request No. 49) – but also prove nothing other than the supposed practices of these three clients.  It is telling that only one declarant submits its News Reports, which would reveal its agents and expose whether they are limited to PR purposes.

degree the News Reports drive users to third party sites or to what degree users are sated with the News Reports.  However, during discovery, Meltwater refused to produce the Total Links for a corresponding six month period, arguing, alternatively, that it was too "burdensome" to do so, or that this information was "not relevant to any of the claims and defenses to be adjudicated in Phase I" of this case.  Schary Decl. Ex. 13.[10]  Meltwater cannot have it both ways:  having taken the position in discovery that the denominator is "not relevant," it should be precluded from only now attempting to impart relevance to the numerator of the equation, or, in the alternative, have an adverse inference drawn against it.  *See Smoothline Ltd. v. North Am. Foreign Trading Corp.*, No. 00 Civ. 2798 (DLC), 2003 WL 941442, at *2 (S.D.N.Y. March 7, 2003) (Cote, J.).[11]

Notwithstanding Meltwater's failure of proof, AP conservatively estimates based on the approximately 1,000-plus News Reports produced by Meltwater that the Total Links delivered by Meltwater in a six-month period likely exceeds 188 million for the News Reports alone (not counting the ad hoc search results or the updated reports on the Meltwater platform) – resulting in a click-through rate no higher than 3.6% and likely considerably lower.  Schary Decl. ¶¶ 4-5.  This finding that would support the same conclusion reached by the U.K. tribunal, namely that "users of Meltwater's service do not generally use it in order to actually go on and read the underlying articles referred to in the Monitoring Report."  McN. Decl. Ex. 83 at ¶¶ 85-87; McN. Decl. ¶¶ 91-94.

---

[10] As for its first excuse, Meltwater's own technology witness admitted that the number of links delivered could be determined by writing a software program that would need approximately "24 to 36 hours" to run.  McN. Decl. ¶ 91, Ex. 3 [Geidies Tr.] at 256:19-260:5.  As for the second, AP served multiple discovery requests seeking click-through data, including the Total Links in the relevant six-month time period.  AP warned Meltwater that if it failed to produce an overall click-through rate or the Total Links, it should be precluded from arguing that its system as a whole serves a transformative use by sending users to the original articles.  Ultimately, Meltwater refused to produce the data on the ground that it was "not in any way related to AP's infringement claims regarding the Registered Articles or to Meltwater's general 'practices and procedures regarding the operation of its search engine" and "is by definition not relevant to any of the claims and defenses to be adjudicated in Phase I." Steinman Decl. ¶¶ 2-15; Schary Decl. Ex. 13.  Meltwater should not be heard now to trumpet supposed evidence that not only tells half a story – and thus is meaningless – but which it represented was "not relevant."

[11] An appropriate adverse inference would be a determination that the overall click-through rate for the Meltwater News service in the United States is unfavorable to Meltwater's transformative use argument.

DWT 20730525v9 0025295-000064

### 2.   Meltwater's Rudimentary "Dashboard Analytics" Cannot Save Its Fundamentally Non-Transformative Use

Meltwater's second theory is equally flawed since Meltwater's "dashboard analytics" cannot transform Meltwater's fundamentally non-transformative use into a fair one.  As Judge Leval explained in his seminal law review article on fair use, the question is not the existence in the abstract of an identifiable transformative objective, but whether the full extent of the usage at issue serves that transformative purpose.  103 Harv. L. Rev. at 1111-13; *see also Bill Graham Archives*, 448 F.3d at 611 (small images of Grateful Dead concert posters in illustrated timeline were the "minimal … size necessary to accomplish its transformative purpose); *Twin Peaks*, 996 F.2d at 1375-76 ("detailed report of the plots goes far beyond merely identifying their basic outline for the transformative purposes of comment").

Meltwater's recent addition of "dashboard analytics" hardly rescues its crass exploitation of AP excerpts in its News Reports.[12]  First, they were only just added to the Meltwater News basic platform in August 2011 and thus bear no relation to the older Registered Articles.  Saab Decl. ¶ 22; Am. Cplt. Exs. I, M, O, T, U, V, FF.  Next, the documents show that these analytics consist of a handful of rudimentary widgets that display a visual "bird's eye overview" of the hits on a customer's selected "agents."  The various widgets provide no more "analysis" than, for example, a world map showing the location of hit articles or an extremely broad-brush overview of "sentiment" based on all hit articles in Meltwater's system indicating generally whether the coverage as a whole is "positive" or "negative," or a so-called "word cloud" showing, for example, Barack Obama and Mitt Romney's names in varying font sizes.  McN. Decl. Ex. 41 at MW0126319; Saab Ex. 6; Schary Ex. 2.  Critically, regardless of what information they impart,

---

[12] It is important to distinguish the "dashboard analytics" from Meltwater's expensive "Analytics" service that is sold separate and apart from its Media Monitoring service.  McN. Decl. ¶ 40; Saab Decl. ¶ 7.  Meltwater does not, and cannot, base its transformative use argument on this separate Analytics service, subscribed to by only about REDA of Meltwater customers.  McN. Decl. ¶ 40, Ex. 6.

REDACTED

the dashboard analytics are *not even included* in the emailed News Reports in the usual default setting.  McN. Decl. ¶ 38.  Thus, it is hardly surprising that AP has encountered only one example of these dashboard analytics in the 1,000-plus News Reports produced by Meltwater.  Schary Decl. ¶ 6.  Even Meltwater's own witness admitted that these analytics are "not a primary or central function of the main dashboard or of the basic platform" and that he has told customers to take the "sentiment analysis" with a "grain of salt."  McN. Decl. Ex. 4 [Houston Tr.] at 103:2-12, 111:10-17.  Meltwater does not even discuss the "dashboard analytics" in Meltwater News Proposals sent to prospective clients.  *See id.* Ex. 18 at MW0026269; McKenzie Decl. Ex. 48 at AP0004854. [13]

AP does not dispute that a service providing the "dashboard analytics" <u>on their own</u> would likely qualify as a fair use.  But whatever their value, if any, they do not rely on or justify the entirely independent and systematic delivery of substantial verbatim excerpts – including the ledes – from thousands of articles on a daily basis.  The excerpts in each customer's News Reports are not tied directly to the simple analytics, but exist independently.  Unlike a biographer who needs to set forth its subject's writing to demonstrate that he made bigoted pronouncements (Leval, 103 Harv. L. Rev. at 1113), Meltwater's widgets stand on their own and do not specifically reference or justify the extensive use of AP content.  A map showing the general geographical origin of relevant media coverage or a bar graph showing the dates of coverage is not explicated by the select quotations from the articles sent to any one customer.  Instead, it is

---

[13] In a highly disingenuous fashion, Meltwater implies that AP performed an "analysis" recognizing the added value of its search technology and transformative nature of Meltwater's dashboard analytics.  MW Br. at 4-5, 12, citing Grealis Decl. Ex. 43.  But what Meltwater fails to disclose is that the cited lines from AP's so-called "analysis" are direct quotations or near-verbatim paraphrasing of language that comes *directly from the Meltwater website*.  This hardly reflects AP's independent assessment of Meltwater's system.  Schary Decl. ¶ 2, Ex. 1.  Moreover, since the "analysis" is dated December 2010 – nearly a year before the "dashboard analytics" feature was introduced in the basic Meltwater subscription -- the cited language clearly pertains to Meltwater's add-on Analytics service, as is also evident from the website.  *Id.*; Saab Decl. ¶ 22; Grealis Decl. Ex. 43.

19

clear that the dashboard analytics are window dressing on the "central function" of the Meltwater News service – namely delivering article excerpts on subscribers' selected topics.

*     *     *

Ultimately, it is clear that Meltwater News fails the foundational inquiry under the fair use test: "whether the new work merely supersedes the objects of the original creation." *Campbell*, 510 U.S. at 579 (internal marks omitted). Meltwater cannot establish that its systematic delivery of verbatim excerpts from thousands of AP news articles does not serve as a substitute for AP's own news products and those of its licensees, and it therefore cannot show that its use is transformative.[14]

### B. Second Factor: The Fact that AP's Articles are Widely Published Does Not Authorize Meltwater to Copy and Distribute Them for Commercial Gain Without a License

Meltwater's arguments regarding the second factor are similarly weak. While AP does not dispute that its news reports describe factual events, the Second Circuit has never found the systematic commercial distribution of verbatim news content to be fair use simply because the articles are news reports rather than fiction. *Wainwright*, 558 F.2d at 95-95; *Nihon*, 166 F.3d at 72-73. To the contrary, as the Supreme Court expressed in *Harper*, the aim of copyright is "to stimulate the creation of useful works for the general public good," and "This principle applies equally to works of fiction and nonfiction." 471 U.S. at 546, 558. "It is fundamentally at odds with the scheme of copyright to accord lesser rights in those works that are of the greatest

---

[14] While both parties' motions have focused on the services provided by Meltwater News, AP does not agree with Meltwater's contention that its copying of entire AP articles to create its index may not form the basis of a direct infringement claim. MW Br. at 7 n.3. Since Meltwater's service is not a transformative use of AP content under Second Circuit law, its copying in support of that use is therefore not excused as fair. *UMG Recordings*, 92 F.Supp.2d at 351 n.2 (declining to follow *Sega Entertainment* line of cases regarding "intermediate" copies where defendant "copied [works] onto its servers not to create any new form of expression but rather to retransmit the same expression in a different medium"); *Fox Broad. Co., Inc. v. Dish Network LCC*, Civ. No. 12-04529 (DMG) (SHx), 2012 WL 5938563, at *11-12 (C.D. Cal. Nov. 7, 2012). Nevertheless, the Court need not reach this issue in the instant cross-motions given their focus.

importance to the public" – such as news articles.  *Id.* at 559.  *See also* AP Br. at 22 n.8 (citing several cases in the non-fiction context in which courts have declined to find that the second factor weighs in favor of the defendant.)  This Court should find that the second factor cuts against a finding of fair use or is, at worst, neutral here.

Under the second factor, courts recognize that the scope of fair use for unpublished works is narrower. Meltwater takes this well-accepted proposition and twists it into an erroneous assertion that AP's articles offer an "unusually strong basis" for fair use because they are widely available to the public without charge on the Internet.  MW Br. at 15.  The sole reason that unpublished works receive greater protection is to protect "the author's right to control the first public appearance of his expression" (*Harper*, 471 U.S. at 564); once a work is published, that rationale disappears, but other rights under the Copyright Act remain fully in play.  Just because a work is made available to consumers for viewing without charge on the Internet or elsewhere does not mean it has fallen into the public domain or now can be freely sliced and diced for commercial profit.  No one would plausibly argue that excerpts from a highly successful reality TV show freely available on CBS could be systematically sold to third parties without the permission of CBS.  As the Ninth Circuit aptly observed in the context of a video news clipping service in words equally applicable here, "[w]hile a viewer is 'invited to witness a telecast program in its entirety free of charge' and may therefore do so at a time the viewer finds convenient, the viewer is *not* invited to sell copies of the program." *Tullo*, 973 F.2d at 798 n.7 (emphasis original). Taken to its logical conclusion, Meltwater is making the quite remarkable – and wholly unsupported – claim that a copyright owner cannot allow individual users to view its works on the Internet for non-commercial purposes without simultaneously granting companies like Meltwater the right to make wholesale, competing commercial use of this same content without paying a dime.

Next, Meltwater's argues that AP's articles "are published in a way that invited search engines to include them in their indexes."  MW Br. at 16.  Yet, the record establishes that AP licenses its works for publication on the internet under stringent "Digital Use Agreements" prohibiting commercial use of its content, and its articles are published on its members' websites under posted terms of use that also broadly prohibit such commercial use.  Jones Decl. ¶¶ 8-18; Cross Decl. ¶¶ 10-27; Schary Decl. ¶¶ 7-11; AP Br. at 32-33.[15]  AP and its members have every right to choose this well-accepted mode of communicating their limitations on usage rather than employing robots.txt instructions, which AP finds an impractical, blunt instrument for the reasons set forth in the Jones Decl. (*see* ¶¶ 44-48).  It is particularly remarkable that Meltwater makes this argument since it does not routinely follow robots.txt instructions but rather "reserves the right not to follow [robots.txt] instructions" where a website has chosen to "exclude[e] only certain user agents."  McN. Decl. ¶ 59, Ex. 3 at 208:3-22, 209:22-210:3.  In sum, the fact that AP, like most publishers, has moved into the digital age and embraced the publication of its stories on the Internet does not mean that it loses the protections of the Copyright Act, which remain essential in providing the necessary incentives to fund a robust news organization.

## C.   Third Factor:  Meltwater Does Not – and Cannot -- Establish That It Takes Only the Amount Necessary for a Fair Use

As AP explained in its Opening Brief, the amount of text taken by Meltwater is both qualitatively and quantitatively significant, weighing heavily against a finding of fair use by

---

[15] The court in *Storm Impact v. Software of Month Club*, 13 F. Supp. 2d at 791, expressly rejected a fair use argument parallel to Meltwater's.  The court there found that where a party distributed its work on the Internet with an express reservation of rights prohibiting commercial distribution, such a reservation of rights was "valid, enforceable, and militate[d] against a finding of fair use" by defendants, who had distributed the plaintiff's free software for a fee.  *Id.*  The Court flatly rejected the defendant's claim that by posting its work on the Internet for non-commercial distribution, it had allowed the defendants to distribute it commercially, finding that "[the defendant] unquestionably violated the express restrictions of [the works], eviscerating any claim that [Plaintiff] effectively consented to unlimited distribution of its products by posting them on the Internet."  *Id.*; *cf. Register.com v. Verio, Inc.*, 356 F. 3d 393 (2d Cir. 2004) (corporate defendant who repeatedly accessed plaintiff's website was bound by plaintiff's terms of use despite not being required to assent to such terms in advance).

DWT 20730525v9 0025295-000064

Meltwater.  *Campbell*, 510 U.S. at 587.  The Second Circuit has held that of these two measures, it is the "qualitative degree of the copying" – *i.e.*, "what degree of the essence of the original is copied" – that is the "more critical" factor.  *Rogers*, 960 F.2d at 311.  Meltwater does not contest that the amount of content it takes is "qualitatively" significant.  MW Br. at 16-19.  Nor could it. Meltwater admits that it systematically delivers the opening text or "lede" of AP's articles – which is meant to "capture the essence of the story" (Kent Decl. ¶ 12) – so that the customer is able to "know what the article is about."  McN. Decl. ¶ 13, Ex. 1 [Box Tr.] at 154:18-155:10.  By systematically distributing the ledes of AP articles, Meltwater takes the qualitatively significant "heart" of these copyrighted works.  *Harper*, 471 U.S. at 564-65.

Meltwater instead relies on two arguments: that its taking is not quantitatively significant, and that the portion taken is "reasonable" in relation to its purpose.  The first theory is belied by the evidence: Meltwater often delivered between 30 and 60% of AP's shorter Registered Articles and can take around 15% of AP's mid-length Registered Articles.  Schary Decl. ¶¶ 12-14.[16] Even these amounts do not tell the full story.  As Meltwater admits, its customers can obtain additional text from any given article in ad hoc searches or other agent searches.  McN. Decl. ¶¶ 28, 99.  These results are hardly a "small portion" as Meltwater claims, and are far larger than other amounts of copying deemed excessive by this Circuit.  *Harper*, 471 U.S. at 548-49 (300 words of book-length memoir not fair use); *Roy Export Co. v. Columbia Broad. Sys.*, 503 F. Supp. 1137, 1145 (S.D.N.Y. 1980) (55 seconds, or 1.03%, of one hour and twenty-nine minute film not fair use); *Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos., Inc.*, 621 F.2d at

---

[16]  Meltwater strains to rebut this evidence by including a chart showing a handpicked "sample" of excerpts delivered from the Registered Articles.  *See* Grealis Decl. Ex. 8.  Notably, this "sample" includes many excerpts where the opening text and hit sentence are the same.  *See* Schary Decl. Ex. 5 for chart showing other samples.  But even accepting this evidence, it still demonstrates that Meltwater delivers significant portions of many short articles and the all-important lede of the articles, allowing these excerpts to serve as substitutes for AP's products.

23

61-62 (two and a half minutes, or 8%, of a 28-minute film not fair use).[17]

Meltwater's taking of AP content should not be viewed solely from the narrow prism of an article-by-article basis.  Meltwater engages in a systematic, massive taking of AP content and to fully appreciate the level of its taking, one must consider Meltwater's business as a whole.  As the Second Circuit held in *Infinity*, a court must look at "the collective action of a plurality of subscribers," not just individual subscribers, as well as the potential scope of retransmissions, not just actual transmissions.  150 F.3d at 110.  Here, since excerpts from the same AP article can be sent to hundreds of subscribers, each with different search terms, and there is no absolute limit on the text that can be delivered in multiple searches, the potential scope of the taking by all of Meltwater's subscribers is the full text of any article.  *See* McN. Decl. ¶ 28 ("where a customer subsequently runs a search for a term that happens to appear in a different paragraph, the customer's combined searches could end up retrieving nearly all of the article"), Exs. 29-36.

Finally, Meltwater's claim that it takes no more than necessary for its purpose is similarly without merit.  To the contrary, Meltwater admits that it can – and does – achieve its media monitoring purpose while delivering far less content.  Meltwater maintains viable businesses in Canada and the United Kingdom, despite delivering only the headlines of stories scraped from Canadian news sources and significantly shorter excerpts from U.K. stories.  McN. Decl. ¶ 100. Meltwater also delivers more content than Google's free news-monitoring tool Google Alerts, which does not deliver the lede of an article unless the user's search term appears there.  Jones Decl. ¶ 52.  In sum, given Meltwater's utter lack of transformative purpose (*see* Section I.A *supra*) and its taking of the heart of AP's articles, Meltwater cannot justify its quantitatively and

---

[17] Meltwater attempts to bolster its case by citing to *Righthaven* decisions from Nevada.  These *sui generis* cases involved a plaintiff company that had purchased no underlying rights in the news articles except the right to sue for copyright infringement, and whose serial litigation tactics were roundly condemned by the Nevada bar and courts.  All these cases involved a single use of one news article on an individual's website, in contrast to the systematic commercial distribution of content from thousands of articles at issue in this case.

qualitatively significant taking.  This factor also strongly weighs in AP's favor.

> **D.     Fourth Factor: Meltwater Does Not – and Cannot – Establish That It Does Not Affect the Potential Market for or Value of AP's Content**

The fourth factor of the fair use test weighs heavily against Meltwater and in favor of AP. The law is clear that <u>Meltwater</u> bears the burden of demonstrating lack of market harm– not vice versa.  *Infinity*, 150 F.3d at 111.  In its opening brief, AP detailed two related theories of market harm: (1) that Meltwater has failed to pay AP the "customary price" or licensing fee in a market that AP has exploited; and (2) that Meltwater News serves as a market substitute for AP's news products, as well as those of its licensees such as Lexis and Factiva.  In its Motion, Meltwater misapprehends the governing caselaw and simply ignores the damning evidence in the record. Among other errors, Meltwater acts as if AP were required at this stage to prove damages, rather than market harm – a far different standard.

> **1.     Meltwater Has Deprived AP of Customary Licensing Fees to Which It Is Entitled**

Meltwater's unlicensed use of AP content in the Meltwater News service deprives AP of its customary license fee in a digital licensing market that AP has actively entered and exploited. *Davis*, 246 F.3d at 176; *Texaco*, 60 F.3d at 929-31; *Ringgold*, 126 F.3d at 81; AP Br. at 27-28.  A plaintiff may show market harm through the loss of "potential licensing revenues" where those revenues stem from "traditional, reasonable or likely to be developed markets."  *Texaco*, 60 F.3d at 929-30; *Ringgold*, 126 F.3d at 81.  The evidence here makes crystal clear that AP has a robust digital licensing business and licenses the use of its content to many of Meltwater's peers and acknowledged competitors.  Jones Decl. ¶¶ 6-18; Cross Decl. ¶¶ 28-53; McN. Decl. ¶ 5.

Meltwater does not contest that AP has exploited the market by licensing to a wide range of entities that compete with Meltwater, including commercial media monitoring services, web portals, search engines, and other digital businesses.  Instead, its argument is that AP cannot

claim the right to a licensing fee for a transformative, rather than a traditional, use.  MW Br. at 20, 25-26.  However, as set forth above, Meltwater's delivery of verbatim excerpts of AP content is not a transformative use under established Second Circuit law.  Moreover, its abstract click data – which fails to provide the necessary "click-through" percentage that would reveal whether Meltwater actually drives customers to third party sites beyond the paltry .08% demonstrated by the Registered Articles – does not change this conclusion.

Meltwater relies for its argument on *Bill Graham*, 448 F.3d 605, but this case is very different from *Bill Graham*, and far more like *Ringgold*, 126 F.3d 70.  *Bill Graham* involved a use of a small image of a Grateful Dead poster within the larger context of a full-length biography.  Not only was this a classic transformative use falling within one of the illustrative uses listed in the preamble to Section 107, unlike this case, but it was a "one-off" use that was not at the heart of plaintiff's business model.  Here, in stark contrast, the evidence shows that AP routinely licenses as part of its core business the very same uses of its content that Meltwater exploits -- including the right to display excerpts of AP content; to archive AP content; and to allow downstream users to redistribute AP content in newsletters and newsfeeds.  AP has actively exploited this market by entering into substantial licenses with public search engines such as Google, Yahoo and AOL; with aggregators such as the Huffington Post; with electronic databases such as Factiva and Lexis; and with media-monitoring services that are Meltwater's direct competitors, such as Cision and BurrellesLuce.  *See* Cross Decl. ¶¶ 29-43.  Thus, as the Second Circuit concluded in *Ringgold* based on a similar record, this is a situation in which a plaintiff "is not alleging simply loss of the revenue she would have earned from a compensated copying; she is alleging an 'exploitation of the copyrighted material without paying the *customary* price.'"  126 F.3d at 81 (emphasis in original), citing *Harper*, 471 U.S. at 562.

## 2.    Meltwater Misconstrues AP's "Lost Customer" Theory of Market Harm

As for AP's second theory, Meltwater fundamentally misconstrues the relevant legal inquiry on AP's argument that Meltwater News serves as a market substitute for AP's news products, as well as those of its licensees such as Lexis and Factiva. It is simply not the case, as Meltwater asserts, that AP must prove a "causal link" between its loss of any particular customer and Meltwater's infringing conduct in order to demonstrate market harm under the fair use analysis. MW Br. at 23. What Meltwater describes in its brief is a <u>damages</u> inquiry, not a market harm analysis under the fourth factor. As the Second Circuit specifically held in *Ringgold*, requiring a plaintiff "to show a decline in the number of licensing requests" for her work attributable to the defendant's use "confuses" "specific damages with lack of adverse impact on a potential market." *Ringgold*, 126 F.3d at 81. [18]

Under well-established law, the correct inquiry is whether Meltwater News affects the "potential market for or value of" AP's copyrighted works. 17 U.S.C. § 107(4). The fourth factor is concerned with secondary uses that usurp or substitute for a market that properly belongs to the copyright holder, including a derivative market that the copyright owner "would in general develop or license others to develop." *Castle Rock*, 150 F.3d at 145, quoting *Campbell*, 510 U.S. at 592. *See also Twin Peaks*, 996 F.2d at 1377 (in contrast to works of criticism, detailed summaries "risk impairment of the market" for the works). The fourth factor strongly favors AP. As *Infinity* demonstrates, the question is far broader than whether the copyright owner has lost customers to the secondary user but focuses instead on whether the secondary user is competing

---

[18] *Arica Institute v. Palmer*, 970 F. 2d 1067 (2d Cir. 1992), does not support Meltwater's theory. The court there did not consider whether particular individuals <u>actually</u> declined to buy the plaintiff's book because of the defendant's allegedly infringing work; instead, the court concluded as a matter of law that the infringing passages "will have a negligible effect on the market for [plaintiff's work]" based solely on the fact that they constituted such a minor portion of the defendant's work. *Id.* at 1078-79. AP's articles do not constitute a minor portion of Meltwater's News Reports. Indeed, AP has demonstrated that excerpts from AP articles can constitute as much as one-third of any given News Report. McN. Decl. ¶ 95, Exs. 84-86.

in the copyright owner's rightful market.  There, plaintiff Infinity had only offered listening lines

to its customers at no additional cost, but the Second Circuit still found that the fourth factor

weighed in its favor because defendant was "selling Infinity's copyrighted material in a market

that Infinity, as the copyright owner, is exclusively entitled to exploit …. [Defendant] *replaces*

Infinity as the supplier of those broadcasts to meet the demand of [its] customers." 150 F.2d at

111 (emphasis original). *See also Los Angeles News Serv. v. Reuters Television Int'l Ltd.*, 149

F.3d 987, 994-95 (9th Cir. 1998) (no fair use despite no proof of loss of actual sales because both

parties were in the business of providing audiovisual news material to the media). Further, the

fourth factor "requires courts to consider not only the extent of market harm caused by the

particular actions of the alleged infringer, but also whether unrestricted and widespread conduct

of the sort engaged in by the defendant … would result in a substantially adverse impact on the

potential market for the original." *Campbell*, 510 U.S. at 590 (citations omitted).

AP readily establishes market harm under this analysis, and in fact even provides

customer-specific evidence – all of which Meltwater ignores.  For example, the evidence shows

that AP and Meltwater both submitted proposals for the exact same substantial U.S. House of

Representatives contract (McN. Decl. ¶ 107); that the Mississippi Development Authority

cancelled its AP subscription to the Mississippi State Wire and shortly thereafter became a

Meltwater News customer (McN. Decl. ¶ 106); and that the New York State Department of

Correctional Services became a Meltwater customer just a few months before cancelling its AP

subscription to various AP news products (McN. Decl. ¶ 108).  The Department of Homeland

Security, which also cancelled its AP subscription, compared AP to Meltwater and was keenly

aware of its lower cost.  Rizzo Decl. ¶¶ 7-13.[19]  Plainly, whatever Meltwater's theories about the

---

[19] Meltwater misleadingly portrays an instruction to an AP witness not to answer questions, an instruction
based on attorney-client privilege grounds.  MW Br. at 23.  Moreover, the larger context was that

differences in AP's news products and its service, Meltwater is competing directly with AP in its own rightful market—which is "precisely the kind of harm the fourth factor aims to prevent." *Infinity*, 150 F.2d at 111.  Further, the undisputed evidence shows that Meltwater regards Cision, BurrellesLuce, Google Alerts, Factiva and LexisNexis as its competitors, and each of these entities is an AP licensee, from which it earns fees.  Meltwater's own documents boast that it took an account worth $150,000 away from LexisNexis, AP's licensee. McN. Decl. ¶5; Cross Decl. ¶ 37. "[A] use that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement."  *Harper*, 471 U.S. at 568.[20]

In sum, Meltwater tells its prospective customers in bold letters that its service features "**No copyright** fees."  McKenzie Decl. Ex. 48.  It should be no surprise that some customers are willing to receive only the headline, lede and hit sentence of AP articles for much reduced rates, rather than paying the fees charged by AP or its licensees, who must bear the costs of newsgathering.

\*        \*        \*

The law and undisputed facts plainly demonstrate that Meltwater's large-scale, systematic, commercial distribution of substantial verbatim excerpts from AP stories cannot be excused as fair use.  AP therefore respectfully requests that summary judgment on AP's direct copyright claim be granted in favor of AP, and not Meltwater.

---

Meltwater had designated the identity of its customers as "Attorney's Eyes Only" and therefore significant *lost customer* information could not be shown to the AP witness in preparation for her deposition.  *See* Schary Decl. ¶ 23, Ex. 15 [Cross Tr.] at 251:18-253:22.

[20] Instead of acknowledging this documented evidence showing market harm, Meltwater inexplicably focuses on disproving that the University of Irvine is a lost customer.  Yet, well before briefing, AP put Meltwater on notice that it was not pursuing UC-Irvine as a "lost customer" because it had determined that UC-Irvine had only a student newspaper subscription with AP, in contrast to Meltwater News. Schary Decl. Ex. 14.  Further, there are undoubtedly other customers that AP lost to Meltwater or situations in which the parties directly competed, but Meltwater has resisted this line of discovery at every turn, including by refusing to produce any lists of its former customers. Schary Decl. ¶¶ 17-21. Obviously, then, the examples for which AP offers evidence in its opening motion are not exhaustive. Nevertheless, these examples plainly put the lie to Meltwater's claim that that it serves a "totally different purpose" from AP—and instead demonstrate that Meltwater has directly competed with AP and AP's licensees, especially in the government and corporate market.

## II.   MELTWATER IS NOT ENTITLED TO SUMMARY JUDGMENT ON AP'S CLAIMS OF SECONDARY COPYRIGHT INFRINGEMENT

There are material questions of fact regarding Meltwater's liability for secondary infringement.  And, as set forth in the accompanying Rule 56(d) Declaration of Elizabeth McNamara ("56(d) Decl."), AP is seeking additional discovery relevant to these claims.  Throughout this first phase of discovery, Meltwater has wielded its closed system as both a sword and a shield.

### A.   The Record Indicates that Meltwater Regularly Encourages Infringing Acts by its Users

After Phase I of discovery, there is already significant evidence in the record that, as part of its regular practices, Meltwater promotes its customers' ability to archive "unlimited" numbers of articles on the Meltwater system and distribute content via Meltwater Newsletters to "unlimited" third parties.  McN. Decl. ¶¶ 29, 42.  Sales documents and training materials note the ability to "store articles inside the platform indefinitely" as a feature that sets it apart from competitors with "limited archiving capability."  *Id.* ¶ 31.  In its proposals to potential customers, Meltwater also highlights the "ability to export all articles to Microsoft Excel."  McKenzie Decl. ¶ 19, Ex. 48.  In other documents, Meltwater describes the add-on Newsletter and Newsfeed functions as a way for Meltwater customers to "display news" and "distribute news."  McN. Decl. Ex. 18.  Meltwater advertises the newsfeed as a way to "add[] credibility to your site" by "posting third-party articles."  *Id.* Ex. 37, at MW0062703.

Further, discovery to date has revealed that Meltwater employees specifically have promoted the Newsletter function as a way to distribute the *full* or substantial text of news articles.  Meltwater has told potential customers that, "the Newsletter allows users to upload the full text of any external content directly to the Platform (whether it be subscription or internally produced content)" and that the customer "would have the ability … to insert entire articles/press releases into the body of the

30

Newsletter." McN. Decl. ¶ 43, Exs. 42 & 43.  In one instance, to meet the request of a potential customer who wanted substantial text in a newsletter, a Meltwater employee demonstrated that this could be accomplished by copying "huge amounts of article text (all of it in some cases)" into the customer's archive to create the desired newsletter format.  McN. Decl. Ex. 44.  Moreover, when Meltwater was pitching its Newsletter function to the James Mintz Group ("Mintz"), it sent a sample newsletter containing a section featuring full text articles.  McKenzie Decl. ¶ 21, Ex. 51.

### B.  There Is Evidence of Direct Infringement by Meltwater News Users

Meltwater incorrectly claims that AP's secondary liability claims must fail for lack of evidence of direct infringement of the Registered Articles by Meltwater News users.  First, as Meltwater acknowledges, during its trial subscription Mintz saved copies of each of the Registered Articles in its Meltwater customer archive[21] and included text from the Registered Articles in seven Meltwater newsletters.  McN. Decl. Ex. 81, ¶ 6.  Mintz's acts are sufficient to satisfy the direct infringement element of AP's contributory claim, and the fact that Mintz was acting as an investigator for AP's counsel is not fatal to AP's claim.  In fact, "courts routinely base findings of infringement on the actions of plaintiffs' investigators."  *Arista Records v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 150 n.16 (S.D.N.Y. 2009) (rejecting as "without merit" defendants' argument that action of plaintiff's investigator did not constitute proof of unauthorized copying for purposes of secondary liability claim against defendants).  *See also, e.g., Arista Records LLC v. Lime Group LLC*, No. 06 Civ. 5936, 2011 WL 1641978, *7-8 (S.D.N.Y. Apr. 29, 2011) (noting that "[c]ourts have consistently relied upon evidence of [acts] by a plaintiff's investigator to establish both unauthorized copying and distribution of a

---

[21] Meltwater contends, incorrectly, that Mintz only copied 16 of the original Registered Articles.  But Meltwater's spreadsheet shows that Mintz saved the full text of the article at Am. Cplt. Ex. I in its customer archive.  McN. Decl. Ex. 55, Tab "Ex. I" at lines 54-55.  Mintz also saved the full text of the article at Am. Cplt. Ex. L in its customer archive and included that full text in a branded email newsletter sent through the Meltwater News platform.  McKenzie Decl. ¶¶ 17-18, Exs. 38 & 47.

DWT 20730525v9 0025295-000064

page 40 of 43

plaintiff's work"); *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1347-48 (8th Cir. 1994);

*Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210, 1215 (D. Minn. 2008); *Atlantic*

*Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 985 (D. Ariz. 2008).[22]

Even if the Court disregards the actions of Mintz, other evidence in the record

demonstrates that Meltwater customers have saved and redistributed multiple excerpts from the

Registered Articles, as well as other AP content.[23]   Meltwater incorrectly claims that AP's

secondary infringement claims are based "only" on the use of full-text versions of the Registered

Articles, but the Amended Complaint repeatedly and clearly alleges that Meltwater's customers

use the customer archive and newsletter tools to copy, store and distribute "infringing excerpts

and full-text articles."   *See* Am. Cplt. ¶¶ 69-72 (emphasis added).   Thus, while it is clear that

Meltwater has encouraged its customers to save and re-distribute full text articles, at a minimum

the record already supports the fact that Meltwater customers have copied, stored and re-

distributed infringing excerpts of the Registered Articles.   The Saab Declarations admit that

Meltwater customers distributed at least 10 newsletters with text from two of the Registered

Articles.   McN. Decl. Ex. 81, ¶ 3; McN. Decl. Ex. 82, ¶¶ 3-5.   The spreadsheets that Meltwater

produced indicate that at least two Registered Articles were saved in internal archives and at least

one was included in a newsfeed.   Schary Decl. ¶ 27.   Meltwater also produced customer

---

[22] Meltwater's reliance to the contrary on *Matthew Bender & Co., Inc. v. West Publ'g Co.*, 158 F.3d 693 (2d Cir. 1998) is misplaced.   There, the plaintiff "hypothesized" an infringing use as a basis for its contributory claim that was clearly far outside the normal use of the defendant's CD-ROM product and offered no evidence that any actual customer would engage in that arduous task besides its own attorney. *Id.* at 706.   In contrast, Mintz simply used the Article Editor, Archive, and Newsletter tools offered by Meltwater News as an ordinary user would, following the example of a sample newsletter provided to Mintz by Meltwater that included a section of "full text" content.   McKenzie Decl. ¶ 21, Ex. 51.
[23] AP's direct copyright infringement claim against Meltwater includes Meltwater's liability for providing a media monitoring service that features customer archiving, newsletters and newsfeeds – all essential elements of the service.   In the alternative, the actions of Meltwater's customers in copying and distributing infringing text from copyrighted news articles in archives, newsletters and newsfeeds can form the underlying infringing acts for AP's secondary infringement claims against Meltwater.

DWT 20730525v9 0025295-000064

newsletters for the Office of Alaska Governor Sean Parnell that contained multiple excerpts from two of the Registered Articles, and branded "News Clips" reports for the San Diego County Regional Airport Authority that contained a version of one of the Registered Articles.  Schary Decl. ¶ 28, Exs. 17-20.  Finally, Meltwater is not entitled to summary judgment because it admits that it has produced only incomplete evidence of Meltwater customers' use of the Registered Articles in newsfeeds and customer archives, as detailed in the Schary Declaration.  In short, AP has produced sufficient evidence of an underlying direct infringement to survive dismissal. Further, as set forth in the accompanying Rule 56(d) Declaration, AP seeks additional discovery to address any deficiencies in the record on its contributory and vicarious infringement claims.

AP has been placed in an unusual position with respect to its secondary infringement claims. AP publishes over 1,000 articles on a daily basis (Kent Decl. ¶ 3), and Meltwater scrapes the vast majority of these articles from thousands of publishing websites.  McN. Decl. ¶ 45.  Yet because the Copyright Office has made clear that AP does not qualify for any of the bulk registration procedures, it is not financially feasible for AP to register each of its articles at a cost of $65 per article for a standard registration and $760 per article for an expedited registration.  AP therefore has been limited to listing a small sample of Registered Articles in its complaint.  It is not surprising that with a miniscule sample of only 33 articles AP did not receive evidence of Meltwater users other than Mintz using the full text of Registered Articles in archives, newsletters, and newsfeeds.  However, as detailed above, even this tiny sample demonstrates that Meltwater customers save excerpts from AP content in Meltwater customer archives, distribute them to third parties in Meltwater newsletters, and incorporate them into Meltwater newsfeeds.  Moreover, Meltwater's marketing documents promoting the ability to distribute full text news articles in Meltwater Newsletters argues strongly in favor of further discovery to determine whether AP articles have been distributed in full.

### C.    Evidence Supports the Other Elements of AP's Secondary Infringement Claims

Meltwater's argument that AP's contributory infringement claim fails because there is no evidence that Meltwater had the requisite level of knowledge is also wrong.  "[O]ne infringes contributorily by intentionally inducing or encouraging direct infringement." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster*, 545 U.S. 913, 930 (2005).  Inducement of copyright infringement may be found where a defendant "advertis[es] an infringing use" or "instruct[s] how to engage in an infringing use." *Id.* at 936.  As set forth above, the record indicates that Meltwater directly promotes its Archive, Newsletter, and Newsfeed tools as a way to save "unlimited" numbers of articles and distribute content to "unlimited" third parties, including full text articles.  The record also shows that Meltwater customer service representatives "work very closely with [their] clients."  Schary Decl. Ex. 16 [Box Tr.] at 187:6-14; McN. Decl. Ex. 48.  At the very least, this evidence creates a material issue of fact as to whether Meltwater may be held secondarily liable for the infringements of its users based on an inducement theory of contributory infringement.

A defendant may also be liable for contributory copyright infringement if it "know[s] or has reason to know" of direct infringement of another and "materially contributes" to that infringing conduct.  *Lime Group*, 784 F. Supp. 2d at 432 (citing *Matthew Bender*, 158 F.3d at 706).  A contributory claim based on "material contribution" does <u>not</u> require that the defendant intended to foster infringement.  *Id.*  Constructive knowledge of the infringing activity is sufficient to constitute knowledge, *id.* at 432, and may be demonstrated by circumstantial evidence.  *Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.*, 256 F. Supp. 399, 404 (S.D.N.Y. 1966).[24]  The record evidence discussed above at a minimum creates a dispute of

---

[24] Meltwater's citation to *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 724 (S.D.N.Y. 2012) for the claim that Meltwater must be made aware of "specific and identifiable infringements" is without merit. The particular language quoted – which comes from the district court's decision in *Viacom v. Youtube*, 718

material fact as to whether Meltwater meets this constructive knowledge requirement.

Finally, Meltwater incorrectly argues that AP's vicarious liability argument fails because Meltwater gained no financial benefit from Mintz's use of the Registered Articles. A defendant is liable for vicarious copyright infringement where it "profit[s] from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930. As discussed, the record shows that Meltwater customers other than Mintz have copied, stored and distributed excerpts from the Registered Articles in Meltwater Newsletters and Newsfeeds. Meltwater charges extra fees for customers to use the Newsletter and Newsfeed tools and thus has a "direct financial interest" in such activities. *Gershwin Publ'g v. Columbia Artists Mgmt.*, 443 F.2d 1159, 1162 (2d Cir. 1971). Further, the mere fact that Mintz was a prospective customer does not mean that Meltwater does not have a direct financial interest in wooing prospective customers through an infringing service.

## CONCLUSION

For the reasons set forth above, plaintiff The Associated Press respectfully requests that the Court deny defendants' motion for summary judgment on AP's copyright infringement claims.

Dated:  New York, New York
        December 14, 2012

     Respectfully submitted,
     DAVIS WRIGHT TREMAINE LLP

     By: _____

       Elizabeth A. McNamara
       Linda Steinman
       Alison B. Schary
       Collin J. Peng-Sue

     1633 Broadway – 27th Floor
     New York, New York 10019
     Telephone:  (212) 489-8230
     Facsimile:  (212) 489-8340
     *Attorneys for Plaintiff The Associated Press*

---

F. Supp. 2d 514 (S.D.N.Y.2010) – refers to the requisite knowledge threshold for overcoming the DMCA safe harbor at 17 U.S.C. § 512(c). Furthermore, in contrast to the record in *Wolk*, the record in this case includes substantial evidence that Meltwater has sought to promote its service as a way to avoid "copyright fees" (McN. Decl. ¶¶ 18, 19) and encouraged customers to use its archive, newsletter and newsfeed functions to save and distribute copyrighted news content.