DAVID H. KRAMER (admitted *pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300

TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7700

*Attorneys for the Defendants*

**REDACTED**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

---

THE ASSOCIATED PRESS,

      Plaintiff,

    v.

MELTWATER U.S. HOLDINGS, INC.;
MELTWATER NEWS U.S., INC.; and
MELTWATER NEWS U.S. 1, INC.,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.: 1:12-CV-01087-DLC
ECF CASE

---

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ii

TABLE OF ABBREVIATIONS ........................................................................................ vi

INTRODUCTION ............................................................................................................. 1

ARGUMENT .................................................................................................................... 2

I.    MELTWATER – NOT AP – IS ENTITLED TO SUMMARY JUDGMENT ON FAIR
      USE BECAUSE EACH OF THE FOUR FACTORS FAVORS MELTWATER .................. 2

      A.    Factor One:  Meltwater's Use Is Transformative ....................................... 2

            1.    Meltwater's commercial status is not inconsistent with fair use ...................... 2

            2.    By using AP's articles for new purposes and to generate new
                  information, Meltwater makes transformative use of those works .................. 3

            3.    Second Circuit law is entirely consistent with the decisions finding that
                  search engines engage in transformative uses .................................. 6

            4.    AP cannot distinguish the other search engine decisions from this case ......... 9

      B.    Factor Two:  AP's Articles Are Factual Works Published Widely And Freely
            Across The Internet ............................................................................. 14

      C.    Factor Three:  The Short Snippets Of News Articles That Meltwater Uses In
            Its Search Engine Directly Advance Its Transformative Purposes ........................ 15

      D.    Factor Four:  Meltwater Does Not Usurp The Market For AP's Works ................... 19

II.   MELTWATER'S AFFIRMATIVE DEFENSES RAISE TRIABLE ISSUES OF FACT ...... 22

      A.    Meltwater's License Defense Precludes Summary Judgment ................................ 22

      B.    Meltwater's Estoppel Defense Precludes Summary Judgment ............................... 26

      C.    Meltwater's Laches Defense Precludes Summary Judgment ................................ 28

      D.    AP's Copyright Misuse Precludes Summary Judgment .............................. 30

CONCLUSION ................................................................................................................ 34

# TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ............................................................................ 4, 16

*American Geophysical Union v. Texaco Inc.*,
  60 F.3d 913 (2d Cir. 1995) ....................................................................................... 19

*Armstrong v. Virgin Records, Ltd.*,
  91 F. Supp. 2d 628 (S.D.N.Y. 2000) .............................................................. 28, 29

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006) ............................................................................ passim

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ...................................................................................... 3, 5

*Byron v. Chevrolet Motor Div. of General Motors Corp.*,
  No. 93-cv-1116 (AJP), 1995 WL 465130 (S.D.N.Y. Aug. 7, 1995) ........................ 28, 29, 30

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) .......................................................................................... 2, 7, 18

*Coleman v. ESPN, Inc.*,
  764 F. Supp. 290 (S.D.N.Y. 1991) ..................................................................... 30, 34

*Costello v. United States*,
  365 U.S. 265 (1961) ....................................................................................................... 28

*Dallal v. The N.Y. Times Co.*,
  No. 05-2924, 2006 WL 463386 (2d Cir. Feb. 17, 2006) ................................... 26, 27

*DeCarlo v. Archie Comic Publ'ns, Inc.*,
  127 F. Supp. 2d 497 (S.D.N.Y. 2001) ...................................................................... 27

*De Forest Radio Tel. & Tel. Co. v. United States*,
  273 U.S. 236 (1927) ................................................................................................ 22, 24

*Field v. Google Inc.*,
  412 F. Supp. 2d 1106 (D. Nev. 2006) ............................................................... passim

*Graham v. James*,
  144 F.3d 229 (2d Cir. 1998) ..................................................................................... 22

*Haas v. Leo Feist, Inc.*,
    234 F. 105 (S.D.N.Y. 1916) ................................................................................................28

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ..................................................................................................2, 14, 17

*Holtzbrinck Pub. Holdings, L.P. v. Vyne Communications, Inc.*,
    No. 97-cv-1082 (KTD), 2000 WL 502860 (S.D.N.Y. Apr. 26, 2000) ................................26

*Infinity Broadcast Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998) ....................................................................................7-9, 16

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012) ................................................................................33

*In re Napster, Inc. Copyright Litig.*,
    191 F. Supp. 2d 1087 (N.D. Cal. 2002) .........................................................................33-34

*Interstate Circuit v. United States*,
    306 U.S. 208 (1939) ...........................................................................................................33

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
    No. 04-cv-7203 (DLC), 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006) ..........................29, 30

*Keane Dealer Servs., Inc. v. Harts*,
    968 F. Supp. 944 (S.D.N.Y. 1997) ..............................................................................22, 27

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ......................................................................................passim

*Lasercomb Am., Inc. v. Reynolds*,
    911 F.2d 970 (4th Cir. 1990) ........................................................................................30, 33

*Los Angeles News Service v. Tullo*,
    973 F.2d 791 (9th Cir. 1992) ............................................................................................5, 6

*Lukens Steel Co. v. Am. Locomotive Co.*,
    197 F.2d 939 (2d Cir. 1952) ..............................................................................................22

*Moody v. Morris*,
    608 F. Supp. 2d 575 (S.D.N.Y. 2009) ................................................................................17

*Morton Salt Co. v. G.S. Suppiger Co.*,
    314 U.S. 488 (1942) ...........................................................................................................30

*Nihon Keizai Shimbum, Inc. v. Comline Business Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999) ..................................................................................5, 6, 14, 15

*NXIVM Corp. v. The Ross Inst.*,
  364 F.3d 471 (2d Cir. 2004) ....................................................................................2

*Pacific & Southern Co. v. Duncan*,
  744 F.2d 1490 (11th Cir. 1984) ............................................................................5, 6

*Parker v. Yahoo!, Inc.*,
  Civ. A. No. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008) ....................24

*Perfect 10, Inc. v. Amazon.com, Inc.*,
  508 F.3d 1146 (9th Cir. 2007) .........................................................................passim

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*,
  121 F.3d 516 (9th Cir. 1997) ............................................................................30, 33

*Price v. Fox Entm't Grp., Inc.*,
  No. 05-cv-5259 (SAS), 2007 WL 241387 (S.D.N.Y. Jan. 26, 2007) ....................27

*Psihoyos v. Pearson Educ., Inc.*,
  855 F. Supp. 2d 103 (S.D.N.Y. 2012) ...............................................................25, 26

*Quinn v. City of Detroit*,
  23 F. Supp. 2d 741 (E.D. Mich. 1998) ..................................................................27

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharmacueticals, Inc.*,
  211 F.3d 21 (2d Cir. 2000) ...............................................................................24-25

*Stewart v. Adidas A.G.*,
  No. 95-cv-4824 (DLC), 1997 WL 65904 (S.D.N.Y. Feb. 13, 1997) .....................29

*Stone v. Williams*,
  873 F.2d 620 (2d Cir. 1989) ..................................................................................30

*The Authors Guild, Inc. v. HathiTrust*,
  No. 11-cv-6351 (HB), 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012) ................4, 19

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948) ................................................................................................33

*Veltri v. Bldg. Serv. 32 B-J Pension Fund*,
  393 F.3d 318 (2d Cir. 2004) ...................................................................................26

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*,
  342 F.3d 191 (3d Cir. 2003) ..................................................................................5-6

*Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*,
  447 F.3d 769 (9th Cir. 2006) ..................................................................................12

*Zappa v. Rykodisc, Inc.*,
    819 F. Supp. 2d 307 (S.D.N.Y. 2011)........................................................................25

**Statutes**

17 U.S.C. § 507(b).........................................................................................................................29

**Rules**

37 C.F.R. § 202.1(a) .....................................................................................................................17

**Other Authorities**

FEDERAL TRADE COMMISSION & U.S. DEP'T OF, JUSTICE,
    *Antitrust Guidelines for Collaborations Among Competitors* § 2.2 (2000)............................31

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Am. Compl. | First Amended Complaint filed by Plaintiff The Associated Press ("AP") (July 13, 2012) |
| AMF | Defendants' Local Rule 56.1 Statement of Additional Material Facts In Opposition to Plaintiff's Motion For Summary Judgment (Dec. 14, 2012) |
| AP MSJ | Memorandum of Law of Plaintiff The Associated Press In Support Of Its Motion for Summary Judgment On Its Copyright Infringement Claim (Nov. 9, 2012) |
| AP SUF | Rule 56.1 Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried In Support of Plaintiff's Motion For Summary Judgment (Dated Nov. 9, 2012) |
| Box Supp. Decl. | Supplemental Declaration of John Box In Support Of Defendants' Opposition To Plaintiff's Motion For Summary Judgment (Dec. 13, 2012) |
| Meltwater Counterstatement | Defendants' Counterstatement To Plaintiff's Rule 56.1 Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried In Support of Plaintiff's Motion For Summary Judgment (Dec. 14, 2012) |
| Curley Decl. | Declaration of Thomas Curley In Support of Plaintiff's Motion For Summary Judgment (Nov. 5, 2012) |
| Fuller Decl. | Declaration of Nick Fuller (Nov. 7, 2012) |
| Geidies Decl. | Declaration of Sebastian Geidies (Dec. 11, 2012) |
| Glunt Decl. | Declaration of Robert A. Glunt In Support of Defendants' Motion for Summary Judgment (Nov. 9, 2012) |
| Grealis Decl. | Declaration of Catherine Grealis In Support of Defendants' Motion for Summary Judgment (Nov. 9, 2012) |
| Klausner Decl. | Declaration of Tonia Ouellette Klausner In Opposition To Plaintiff's Motion for Summary Judgment (Dec. 14, 2012) |
| Lawhon Decl. | Declaration of Cathy Lawhon (Oct. 1, 2012) |

| Meeks Decl. | Declaration of Brock N. Meeks (Oct. 15, 2012) |
|---|---|
| Meltwater MSJ | Memorandum of Law In Support of Defendants' Motion For Summary Judgment (Nov. 9, 2012) |
| Meltwater MTS | Memorandum of Law In Support of Defendants' Motion To Strike Plaintiff's Improper Declarations And 56.1 Statement (Dec. 14, 2012) |
| Meltwater 56(d) Decl. | Declaration of Robert A. Glunt Pursuant to Fed. R. Civ. P. 56(d) (Dec. 14, 2012) |
| Saab SJ Decl. | Declaration of Sara Saab in Support of Defendants' Motion for Summary Judgment (Nov. 7, 2012) |
| SUF | Defendants' Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried (Nov. 9, 2012) |

Defendants Meltwater US Holdings Inc., Meltwater News US Inc., and Meltwater News US1 Inc. (collectively "Meltwater") submit this Opposition to the Motion for Summary Judgment filed by Plaintiff, The Associated Press ("AP").

## INTRODUCTION

AP's motion for summary judgment acknowledges that every case that has addressed copyright infringement claims against an Internet search engine like Meltwater has found that the service engages in fair use by copying and delivering limited amounts of copyrighted material in response to user search queries. Contrary to what AP claims, Second Circuit law is entirely consistent with those cases, and there is no basis for distinguishing them from this one. Nor can AP change the undisputed facts establishing that Meltwater's limited use of the AP Articles in Suit is a fair one: Meltwater transforms AP's works by using them for a new purpose in an information-location tool and to convey new information in connection with its news-research service; AP's articles merit greater fair use leeway because they are factual works published widely and freely across the Internet; Meltwater delivered only short excerpts of the Articles in Suit, which directly furthered its transformative purposes; and there is no evidence that Meltwater's use caused any harm to any traditional or non-transformative market for AP's works. For these reasons, Meltwater – not AP – is entitled to summary judgment on fair use.

Even beyond fair use, AP's motion should be denied. On at least four of Meltwater's affirmative defenses, there are triable issues of fact that preclude summary judgment for AP. *First*, a jury could find that Meltwater's limited use of the Articles in Suit was licensed by virtue of the fact that AP made its works widely available on websites that affirmatively invited indexing by Internet search engines like Meltwater. *Second*, a jury could find that AP is estopped from pursuing infringement claims against Meltwater because for years, and with full knowledge of Meltwater's activities, AP acted (and failed to act) in ways that led Meltwater to believe that AP permitted its use of AP content. *Third*, a jury could find AP's claims are barred by laches because AP inexcusably delayed bringing any action against Meltwater for years, during which time Meltwater invested

-1-

millions of dollars in building its operations in the United States.  *Fourth*, a jury could find that AP, in its dealings with a licensing collective called NewsRight, violated the antitrust laws by sharing pricing information with its competitors and working to fix prices for licenses to its articles.  AP's anticompetitive conduct bars its claims under the doctrine of copyright misuse.

## ARGUMENT

**I.     MELTWATER – NOT AP – IS ENTITLED TO SUMMARY JUDGMENT ON FAIR USE BECAUSE EACH OF THE FOUR FACTORS FAVORS MELTWATER**

### A.     Factor One:  Meltwater's Use Is Transformative

In addressing the first fair use factor, AP recognizes that the "most critical inquiry" is the transformative nature of Meltwater's use, but AP misapplies the transformation inquiry at each turn.  AP unsuccessfully tries to evade the unbroken series of cases holding that search engines make transformative use of content they index and display.  AP also ignores Meltwater's further transformation of news content into "raw material" for a research tool that provides comparative analysis of news coverage.  These new uses tip the first factor decidedly in Meltwater's favor.

1.     Meltwater's commercial status is not inconsistent with fair use

AP begins by arguing that the "commercial reasons" behind Meltwater's service are "inconsistent with the very concept of fair use."  AP MSJ at 10.  But the "Supreme Court in *Campbell* rejected the notion that the commercial nature of the use could by itself be a dispositive consideration."  *NXIVM Corp. v. The Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 584 (1994)).  *Campbell* held that the commercial nature of a use carries no "presumptive force against a finding of fairness," observing that any such "presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107," which "'are generally conducted for profit in this country.'"  *Campbell*, 510 U.S. at 584 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 592 (1985) (Brennan, J., dissenting)).  Since *Campbell*, the Second Circuit repeatedly has found that where a use is transformative, as Meltwater's is, commercial purpose is "properly discounted."  *NXIVM*, 364 F.3d

at 477; *see also Blanch v. Koons*, 467 F.3d 244, 254 (2d Cir. 2006); *Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605, 612 (2d Cir. 2006). Every case addressing the operation of Internet search engines has come to the same conclusion: because search engines are engaged in transformative use, their commercial status is of minimal significance. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1166 (9th Cir. 2007); *Kelly v. Arriba Soft Corp*., 336 F.3d 811, 818 (9th Cir. 2003); *Field v. Google Inc*., 412 F. Supp. 2d 1106, 1119-20 (D. Nev. 2006) ("The fact that Google is a commercial operation is of only minor relevance in the fair use analysis. The transformative purpose of Google's use is considerably more important ....").

> 2. By using AP's articles for new purposes and to generate new information, Meltwater makes transformative use of those works

Meltwater has explained why its limited use of AP's articles in connection with its search engine and news-research tool is significantly transformative. Meltwater MSJ at 10-13. Meltwater does not include excerpts of news articles in its search results so that its users can read the original expression contained within those articles. Instead, like other search engines, Meltwater transforms the underlying works into "pointer[s] directing a user to a source of information" online. *Perfect 10*, 508 F.3d at 1165. In addition, Meltwater's snippets provide "new insights and understandings" about where, when, how often, and in what context particular words or phrases have appeared in a variety of media sources across the Internet. *Blanch*, 467 F.3d at 251-52.

AP claims that none of this matters because, in its view, only a use that adds new *expression* to the original work can be transformative. AP MSJ at 11-12, 16. That misstates the law. While some cases finding transformative fair use have involved new expression, none has imposed the limitation that AP suggests. To the contrary, the case law consistently recognizes that "making an exact copy of a work may be transformative so long as the copy serves a different function than the original work...." *Perfect 10*, 508 F.3d at 1165. This understanding repeatedly has been applied in cases involving search engines. The Ninth Circuit in *Kelly* thus rejected the argument that "because Arriba reproduced [plaintiff's] exact images and added nothing to them, Arriba's use cannot be

transformative" and found that Arriba's thumbnails, although "exact replica[s]," were transformative because they "served an entirely different function than Kelly's original images." *Kelly*, 336 F.3d at 818-19; *see also Perfect 10*, 508 F.3d at 1165 ("Although an image may have been created originally to serve an entertainment, aesthetic, or informative function, a search engine transforms the image into a pointer directing a user to a source of information.").

This same understanding of the transformation inquiry has been adopted in many other recent cases, in this Circuit and elsewhere. In *Bill Graham*, for example, the Second Circuit's finding of transformative use centered on its conclusion that the defendant's "purpose in using the copyrighted images at issue in its biography of the Grateful Dead is plainly different from the original purpose for which they were created." *Bill Graham*, 448 F.3d at 609. Relying on *Bill Graham*, the court in *HathiTrust* held that while a "transformative use may be one that actually changes the original work," a "transformative use can also be one that serves an entirely different purpose." *The Authors Guild, Inc. v. HathiTrust*, No. 11-cv-6351 (HB), 2012 WL 4808939, at *11 (S.D.N.Y. Oct. 10, 2012). Likewise, the Fourth Circuit expressly rejected the argument that AP urges here:

> This argument is clearly misguided. The use of a copyrighted work need not alter or augment the work to be transformative in nature. Rather, it can be transformative in function or purpose without altering or actually adding to the original work. iParadigms' use of plaintiffs' works had an entirely different function and purpose than the original works; the fact that there was no substantive alteration to the works does not preclude the use from being transformative in nature.

*A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009) (citation omitted). In short, AP's assertion that Meltwater's use "is not transformative merely because defendants have not added anything 'new' misses the point." *HathiTrust*, 2012 WL 4808939, at *11.[1]

---

[1] AP claims that *HathiTrust* "has no bearing here" because the book-scanning operation there did not itself provide direct access to the original material. AP MSJ at 16 n.4. But the court did not suggest that a finding of transformative purpose would be precluded (or even affected) where excerpts of the original works *were* made available by the secondary user. To the contrary, *HathiTrust*'s discussion of transformative use approvingly cited and relied upon *Perfect 10* and *Kelly*, both of which involved the display of and access to the original work. *HathiTrust*, 2012 WL 4808939, at *11. The court explained that those cases "upheld wholesale copying of works where the use and purpose for the copies was clearly distinguishable from those

AP also makes the conclusory assertion that "Meltwater News does not use AP's text as raw material to enrich a new creative, expressive work with a further purpose that alters the first with a new meaning." AP MSJ at 14. This is wrong on the law and on the facts. Under the actual test that the Second Circuit has endorsed, a use is transformative where "copyrightable expression in the original work is used as raw material, transformed in the creation of *new information*, new aesthetics, *new insights and understandings*." *Blanch*, 467 F.3d at 251-52 (emphasis added) (internal quotation marks and citations omitted). In its capacity as a news-research and analysis tool, Meltwater does exactly that. It uses news content as raw material, suffused with new understandings about how different media outlets are covering events and new information about the overall extent and nature of news coverage. Meltwater MSJ at 12-13; SUF ¶¶ 1, 21-22; Grealis Decl. 49 (AP analysis describing Meltwater as "particularly valuable for competitive research"). These new uses are far afield from the articles' original purpose and provide insights that the underlying works alone cannot provide. This aspect of the Meltwater service, which AP does not address, confirms the transformative nature of Meltwater's use. *See Field*, 412 F. Supp. 2d at 1118-19 (Google's use of webpages to facilitate comparative analysis is transformative).

For these reasons, AP's reliance (AP MSJ at 12-14) on cases such as cases such as *Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*, 342 F.3d 191 (3d Cir. 2003), *Nihon Keizai Shimbum, Inc. v. Comline Business Data, Inc*., 166 F.3d 65 (2d Cir. 1999), *Pacific & Southern Co. v. Duncan*, 744 F.2d 1490 (11th Cir. 1984), and *Los Angeles News Service v. Tullo*, 973 F.2d 791 (9th Cir. 1992), is misplaced. None of these cases hold that a secondary use that takes material from the original without adding additional commentary or creative expression can never be a fair use. And each addressed a service quite different from Meltwater's search engine and news-research tool. *Buena Vista* involved the unauthorized creation of movie preview clips, which served the same

---

of the original," and it described *Kelly* as "finding that copying to produce exact replicas of artistic works *displayed in thumbnail form on the internet to facilitate searches* was transformative because it was 'unrelated to any aesthetic purpose.'" *Id.* (quoting *Kelly*, 336 F.3d at 818-19) (emphasis added).

purpose as authorized movie trailers offered by the plaintiff and did not convey any new information, insights or understandings about the movies at issue. *Buena Vista*, 342 F.3d at 195-96, 199-200 ("Whatever informational or promotional character and purpose the trailers possess, so do the clip previews."). The court in *Buena Vista* expressly distinguished *Kelly* on the grounds that the defendant provided merely a database, not a search engine that locates data from other websites. *Id.* at 199 & n.7. Likewise, the service at issue in *Nihon* sold unadorned "abstracts" (essentially, translations) of the plaintiffs' news articles. Those abstracts served precisely the same purpose as the original article: news reporting. *Nihon*, 166 F.3d at 72. The defendant was not operating a search service, and its abstracts did not help users find and access the original works. To the contrary, the only purpose and possible effect of the abstracts was to replace the original articles.[2]

    3. <u>Second Circuit law is entirely consistent with the decisions finding that search engines engage in transformative uses</u>

   What is on point here is unbroken line of decisions holding that search engines make transformative use of the content that they index and display. *Perfect 10*, 508 F.3d at 1164-67 (Google's copying of plaintiffs' images and display of thumbnail versions of those images in its search engine is "highly transformative"); *Kelly*, 336 F.3d at 818-20 ("Arriba's use of Kelly's images for its thumbnails was transformative"); *Field*, 412 F. Supp. 2d at 1118-19 ("Because Google serves different and socially important purposes in offering access to copyrighted works through 'Cached' links and does not merely supersede the objectives of the original creations, the Court concludes that Google's alleged copying and distribution of Field's Web pages containing copyrighted works was transformative."). AP claims that these cases should be ignored. AP MSJ at 16-20. First, it argues that the search engine cases "cannot stand" under the Second Circuit's

---

[2] *Duncan* and *Tullo* are equally far afield. Those cases involved services that copied and sold full segments of television broadcasts. As in *Nihon*, the copies that those defendants sold served the same reportorial purpose as the original broadcasts and did not purport to transform those broadcasts into any kind of search or research tool. *Duncan*, 744 F.2d at 1493, 1496; *Tullo*, 973 F.2d at 797-98.

decision in *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998).  Second, AP argues that those cases are factually distinguishable from this one.  AP is wrong on both counts.

*Infinity* did not involve an Internet search engine, or a service analogous to one.  The defendant there (Kirkwood) simply took plaintiffs' radio broadcasts and transmitted them, in full, over a telephone line to its users.  *Infinity*, 150 F.3d at 106.  Those "retransmissions leave the character of the original broadcasts unchanged," and a user could listen over the telephone to as much of the broadcast as he or she wished, for any purpose whatsoever.  *Id.* at 107-08.  Unlike Meltwater, the defendant did not provide brief excerpts of radio broadcasts responsive to specific searches performed by its users; it was not a service designed for users to find and access authorized versions of plaintiff's broadcasts; and it did not embed snippets of broadcasts in a format that allowed its users to perform comparative analyses of radio coverage of a given topic.  All Kirkwood did was "sell access to unaltered radio broadcasts."  *Id.* at 108.  Accordingly, none of the things that give Meltwater and other search engines their claims to fair use were present in *Infinity*.

Unsurprisingly, therefore, the Second Circuit's conclusion that Kirkwood's service was not a fair use does not conflict with the subsequent decisions finding search engines to be transformative.  To the contrary, *Kelly*, *Perfect 10*, and *Infinity* all used the same test for transformative use (derived from the Supreme Court's decision in *Campbell*):  "a 'transformative work' is one that alters the original work 'with new expression, meaning, or message ....'"  *Compare Kelly*, 336 F.3d at 1164-65, and *Perfect 10*, 508 F.3d at 1164-65, *with Infinity*, 150 F.3d at 108.  Applying that test, the Ninth Circuit found that search engines – by "incorporating an original work into a new work, namely, an electronic reference tool" (*Perfect 10*, 508 F.3d at 1165) – *do* make a transformative use by infusing the original with sufficiently new expression, meaning, or message.  "Indeed," as the court explained in *Perfect 10*, "a search engine may be *more transformative* than a parody because a search engine provides an entirely new use for the original work ...."  508 F.3d at 1165 (emphasis added).

*Infinity* is perfectly consistent with that conclusion.  The Second Circuit did not reject the established rule, re-affirmed later in *Bill Graham*, that even verbatim copies can be transformative so

long as they are used for a purpose different from the original.  *Infinity* instead turned on the factual conclusion that the defendant did not actually use the plaintiff's works for a sufficiently different purpose to support a finding of transformation.  *Infinity*, 150 F.3d at 108.  That is confirmed by *Kelly*, which distinguished *Infinity* as "inapposite" on its facts.  *Kelly*, 336 F.3d at 819 (observing that, in *Infinity*, "the resulting use of the copyrighted work … was the same as the original use," whereas Arriba's search engine "created a different purpose for the images").  In this respect, the critical aspect of *Infinity* was that Kirkwood did nothing other than to retransmit complete versions of the plaintiff's broadcasts over the telephone, and "there was nothing preventing listeners from subscribing to the service for entertainment purposes."  *Id.*; *accord Infinity*, 150 F.3d at 106 ("Except for a potentially costly long-distance phone bill … there is nothing to prevent a caller from listening to a particular station 24 hours a day, seven days a week.").

Those facts are readily distinguishable from those at issue in cases involving search engines – and from those at issue in this case.  Both by design and operation, the uses that the Google and Arriba search engines made of the plaintiffs' works were clearly distinct from the original function of those works.  *Perfect 10*, 508 F.3d at 1165; *Kelly*, 336 F.3d at 818.  That decreased the likelihood that users would put the material displayed by the search engine to the same use as the original works.  *Kelly*, 336 F.3d at 818-19; *Field*, 412 F. Supp. 2d at 1119.  The same is true here. Meltwater's search engine converts articles published for their newsworthy expression into a location "tool to help index and improve access to [articles] on the internet and their related web sites."  *Kelly*, 336 F.3d at 818.  Meltwater's search results serve "a different function" than AP's original articles: "improving access to information on the internet" rather than reporting the news (*id.* at 819).  SUF ¶¶ 9, 20, 47.

Moreover, unlike the service at issue in *Infinity* (and indeed unlike the search engines at issue in *Perfect 10*, *Kelly*, and *Field*), Meltwater does not allow its users to access complete versions of the underlying works.  SUF ¶¶ 14, 44.  Meltwater's short snippets thus are a far cry from the undifferentiated and unlimited streams of radio broadcasts that Kirkwood transmitted.  A Meltwater

customer cannot, as one of Kirkwood's customers could, use Meltwater News to receive full copies of the original articles or to recreate the identical aesthetic or informational experience that it would get from receiving those works directly from the plaintiff. Like the thumbnails at issue in *Kelly*, and in contrast to *Infinity*, Meltwater News reports involve something considerably "more than merely a retransmission of [AP's articles] in a different medium." *Kelly*, 336 F.3d at 819.

In sum, *Infinity* does not control this case or provide any basis for this Court to reject the consistent series of decisions finding that search engines like Meltwater are engaged in fair use.

### 4.   AP cannot distinguish the other search engine decisions from this case

AP argues in the alternative that the other search engine cases are "readily distinguishable" from this one. AP MSJ at 18-20. But none of AP's purported distinctions have any legal significance, and any differences between Meltwater News and the search engines addressed in the case law actually cut in favor of fair use here.

***Click-Through Rate.*** AP first argues (AP MSJ at 18) that "evidence" about the "click-through rate" undermines Meltwater's assertion that it provides a search engine akin to those in *Kelly* and *Perfect 10*. AP's emphasis on click-through rates is a red herring. Whatever Meltwater's click-through rate might be, it provides no basis for distinguishing this case from other search engine cases. None of those cases even mentioned a click-through rate, much less relied on such a figure in finding fair use. Their holdings that search engines are transformative are in no way predicated on the *rate* at which users actually clicked on the links delivered to them. Instead, they rest on the very nature of an Internet search engine: "an electronic reference tool" that "direct[s] a user to a source of information" and thereby "provides an entirely new use for the original work...." *Perfect 10*, 508 F.3d at 1165; *accord Kelly*, 336 F.3d at 818; *Field*, 412 F. Supp. 2d at 1119. Meltwater's service does the same thing. SUF ¶¶ 1, 2, 9, 15-17.

It is not surprising that the search engine cases did not rely on data about click-through rates. As the record evidence in this case confirms, there are any number of reasons why a user may not click on a given link that shows up in its search results other than AP's unsupported hypothesis that

user must be using search results as a replacement for the original articles.  Klausner Decl. Ex. 2 (Saab Dep. at 384:18-387:3); Fuller Decl. ¶ 5; Meeks Decl. ¶¶ 3-4; Lawhon Decl. ¶ 5.  A user may never have even looked at many of the individual items included within its results, which often contain hundreds or thousands of items.  Moreover, many articles referenced in a given set of search results are very similar to one another (if not actual duplicates), something particularly common with AP's works, virtually identical versions of which are published on the Internet by many different publishers.  SUF ¶¶ 27-28; AMF ¶ 2; AP SUF ¶ 22.  In other instances, a user may be more interested in the new information conveyed by Meltwater's search results themselves, such as the fact that an article was published, or the total volume of news coverage on a particular word or phrase, than in what any given article conveys.  Or, most obviously, *the result simply may not have been relevant to the user's search or to what the user was actually interested in*.  Whatever the reason, AP's suggestion that any search result that a user does not actually click on necessarily acts as a substitute for the user reading a complete version of the original article is meritless and without support in the record.  Indeed, it is belied by the evidence of how actual Meltwater customers use the service.  SUF ¶¶ 20, 47.

Accordingly, the fact that there may be only a few instances in which Meltwater customers in the United States clicked on the particular AP Articles in Suit proves nothing.  That is especially so given the nature of those articles.  On their face, most are not the kinds of news items in which Meltwater's customers, primarily communications and public relations professionals working for businesses and non-profit organizations (SUF ¶ 5), would have very much interest.[3]  That Meltwater's customers did not click more often on links to articles such as these is far more likely to

---

[3] *See, e.g.*, Am. Compl. Exs. F-H (articles about protests by Sri Lankan fruit vendors and Portuguese drivers); Exs. I, O, U (articles about the plane crash that killed Sen. Ted Stevens); Ex. W (article about early Christmas celebrations); Ex. S (article about security guard's ear being cut off); Ex. P (human-interest story about snowboarder); Ex. DD (article about NASCAR driver not believing in "hexes"); Ex. AA (article about prison release plan in Illinois); Ex. J (article about modern pentathlon's doping policy).  Articles such as these just are "not very business relevant."  Klausner Decl. Ex. 2 (Saab Dep. at 200:24-25).

indicate that they were irrelevant (mere "noise" in their search results) than that the customers were using Meltwater's short snippets as replacements for the full articles as published by AP.

AP's assertion that the click-though rate for the Articles in Suit is "remarkably low" also begs the question. Low in comparison to what? AP points to no benchmark suggesting what a "normal" click-through rate might be for an Internet search engine, much less for news items such as the Articles in Suit in the context of a specialized user base like Meltwater's. And, even if such a figure existed, there is no support for AP's suggestion that any service whose rate is lower is not functioning as an actual search engine engaged in a transformative use. Indeed, in its misguided focus on Meltwater's purported click-through rate, AP ignores the one number in the record that actually matters in assessing the nature of Meltwater's use:  the undisputed fact that Meltwater's U.S. customers clicked on Meltwater-delivered article links more than *6.7 million times* in the first six months of 2012 alone.  SUF ¶ 18.  That figure underscores that, like other search engines, Meltwater's search engine "functions as a tool to help index and improve access to [material] on the internet" (*Kelly*, 336 F.3d at 818) and advances the "objective of enabling users to more quickly find and access the information they are searching for" (*Field*, 412 F. Supp. 2d at 1119).

**Snippets v. Thumbnails.**  AP next claims that Meltwater's article snippets – in purported contrast to the "thumbnail" images displayed by certain other search engines – can serve the same purpose as the original works and thus cannot be transformative.  This argument overlooks the significant difference between Meltwater and the search engines addressed in *Kelly* and *Perfect 10*: those services displayed "exact replica[s]" of photographs "as a whole."  *Kelly*, 336 F.3d at 818, 821; *Perfect 10*, 508 F.3d at 1165.  (*Field* similarly addressed Google's display of cached copies of plaintiff's complete webpage.  412 F. Supp. 2d at 1121.)  In contrast to Meltwater, therefore, users of those other search engines were shown the plaintiffs' *full* works, not merely a snippet.  That these cases nevertheless hold that the incorporation of plaintiffs' "entire" works into defendants' search results "does not diminish the transformative nature" of the use (*Perfect 10*, 508 F.3d at 1165) only confirms that Meltwater's far more limited use is transformative.

-11-

Moreover, AP is simply wrong in claiming that the search engine cases turned on a finding that thumbnail versions of photographs could *never* serve the same purpose as the originals. *Kelly* observed only that the differences in scale and quality between the original images and the thumbnails reinforced that the search engine's use was not intended as, and generally would not be effective as, a substitute for the former. *Kelly*, 336 F.3d at 819 ("it would be unlikely that anyone would use Arriba's thumbnails for illustrative or aesthetic purposes"). Likewise, *Field* did not suggest that Google's "Cached" copies *could not* serve the same artistic function as the plaintiff's original webpage. Instead, the court was satisfied that those copies – despite being complete verbatim reproductions – were meant to serve a different purpose, and not "to substitute for a visit to the original page." *Field*, 412 F. Supp. 2d at 1118-19. *Perfect 10* even more clearly rejects AP's argument. That case did not rest on any prediction about whether Google's users might be likely to use the thumbnails for aesthetic purposes. The court found that the thumbnails were transformative simply because they were deployed within "an electronic reference tool" that put them "'in a different context' so that they are 'transformed into a new creation.'" *Perfect 10*, 508 F.3d at 1165 (quoting *Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 778 (9th Cir. 2006)).

Meltwater's use of AP articles is transformative for the same reasons. By displaying only a short excerpt of the responsive article, along with a link that takes the user directly to the webpage where the full article was published, Meltwater indicates that its search results are not intended to replace the original article, but instead to give users enough information to allow them to decide whether they are interested in reading the whole article. SUF ¶ 20; *see also* Klausner Decl. Ex. 2 (Saab Dep. at 117:7-11) ("what we were doing is delivering just enough of a snippet to our clients to catch their eye, affirm that it's an interesting article to them so they will actually click the headline and read the article in the original location"). In this respect, a snippet of a news article compares favorably to a thumbnail of a photograph. Both are degraded versions of the original, designed to provide a mere "peek" into the underlying work that allows users to determine what the original is and whether it is relevant to their search. Both the thumbnail and the snippet diverge in purpose and

-12-

effect from the original work and neither is likely or effectively used as a replacement for it.  With either one, "any user seeking to access the original page has more than ample opportunity to do so."  *Field*, 412 F. Supp. 2d at 1119.  And, as in *Field*, there is no evidence here that any actual Meltwater customer used the snippets "in lieu of visiting those [articles] directly."  *Id.*[4]  The evidence about customer behavior shows the opposite.  SUF ¶ 47; Fuller Decl. ¶¶ 4-6; Meeks Decl. ¶ 3.  Like thumbnails, therefore, Meltwater's snippets "do not supplant the need for the originals," but instead help "enhanc[e] information-gathering techniques on the internet."  *Kelly*, 336 F.3d at 820.[5]

*Commerciality*.  Finally, AP claims (without citing any evidence) that "Meltwater is far more commercial than the free consumer search engines at issue in *Kelly* and *Perfect 10*."  AP MSJ 20.  But the fact that Meltwater earns revenue by selling subscriptions, rather than by displaying advertisements in connection with search results, does not make it any more commercial than other search engines or any less transformative.  Like those defendants, Meltwater is neither using AP's works to promote its service nor directly selling those works.  *Kelly*, 336 F.3d at 818.  As in *Field* and *Kelly*, moreover, the AP works at issue are just a small subset of the "thousands" or "billions" of total works that comprise the Meltwater search engine, which illustrates that the use of those works

---

[4] AP points to a handful of isolated marketing documents stating that Meltwater News "saves you time so you don't need to read the full article."  AP MSJ at 18.  But AP misconstrues what these documents are marketing.  These documents do not say or suggest that the snippet is a substitute for the original article.  Instead, the documents underscore that the short snippet included in Meltwater search results saves users' time by indicating at a glance what each article is and why it was deemed responsive to their search – and indeed may show that the article is not relevant at all.  Klausner Decl. Ex. 3 (Box Dep. at 137:2-138:5); Box Supp. Decl ¶¶ 8-9 (discussing marketing documents); Klausner Decl. Ex. 2 (Saab Dep. at 175:15-176:11) (explaining that "in many cases … the content of the article is not as important to the client as the actual fact of an article's existence in a source because they are doing a trends analysis"); SUF ¶¶ 15, 20.

[5] AP also suggests that Meltwater's search engine is not transformative because AP offers a platform that allows its users to "search for and locate relevant stories through a Boolean search using search terms."  AP MSJ at 20.  The limited search functionality that AP provides to subscribers to an AP-only wire is in no way comparable to an Internet search engine that enables users to find information about news articles posted by multiple publishers on hundreds of thousands of different websites.  Indeed, AP has admitted that it offers no search service remotely comparable to Meltwater's.  SUF ¶¶ 31-34; AMF ¶ 18.  Beyond that, the fair uses found in *Perfect 10* and *Kelly* would not become unfair simply because other search engines exist or because there are other ways to find photographs on the Internet, including tools offered by photographers themselves.

is not "exploitative."  *Field*, 412 F. Supp. 2d at 1119-20; *Kelly*, 336 F.3d at 818.  Accordingly, as in the other search engine cases, the commercial nature of Meltwater's service in no way lessens the transformative use that Meltwater makes or weakens Meltwater's claim to fair use.

**B.      Factor Two:  AP's Articles Are Factual Works Published Widely And Freely Across The Internet**

In discussing the second factor, AP concedes that its works are "factual" and that "the scope of fair use is greater with respect to factual works than fictional works."  AP MSJ at 21.  That is correct.  Meltwater MSJ at 13-15; *Nihon*, 166 F.3d at 72-73 ("predominantly factual news articles" are "less close to the core" of copyright protection and therefore are more likely to allow fair use).[6] But AP minimizes the extent to which this factor favors Meltwater by ignoring the other important consideration in assessing "the nature of the copyright work":  that greater fair use leeway is given in the context of published works than unpublished works.[7]  Here, as Meltwater has explained, AP's Articles in Suit were not just published, they were made widely and freely available across the Internet.  Meltwater MSJ at 15-16.  That undisputed fact puts this case at the opposite end of the spectrum from *Harper & Row*.  There, the unpublished nature of the plaintiff's work was critical because "the author's right to control the first public appearance of his expression weighs against such use of the work before its release."  471 U.S. at 564.  In this case, by contrast, the fact that AP has allowed each of the Articles in Suit to be read by anyone, for free, on multiple websites – including on sites that use "robots.txt" instructions "to ensure that all search engines would include

---

[6] Despite admitting that the factual nature of its articles cuts in favor of fair use, AP tries to undercut that concession with a misleading reference to the Supreme Court's decision in *Harper & Row*.  AP MSJ at 21. *Harper & Row* cast no doubt on the established proposition that factual works like news articles receive less protection under the second fair use factor than other more expressive works.  471 U.S. at 564 (expressly reaffirming that rule).  In the passage that AP quotes, the Court was not discussing the second fair use factor at all, but instead was rejecting the separate argument (one not made here) that the First Amendment gave the defendants, as news reporters, a virtually unfettered right to publish matters of "substantial public import" notwithstanding the ordinary rules of copyright law.  *Id.* at 555-60.

[7] Tellingly, when AP itself was sued for copyright infringement, it argued that the second factor weighed "heavily" in favor of fair use because the material at issue had been previously published and was primarily informational.  Klausner Decl. Ex. 65 (at 12-13).

-14-

[those websites] in their search listings" – makes the second fair use factor tilt even more decisively in Meltwater's favor.  *Field*, 412 F. Supp. 2d at 1120.

### C.    Factor Three:  The Short Snippets Of News Articles That Meltwater Uses In Its Search Engine Directly Advance Its Transformative Purposes

Meltwater has shown why the short snippets included in its search results are sufficiently limited – particularly given the transformative nature of Meltwater's use – that the third factor, "the amount and substantiality of the use," favors fair use.  Meltwater MSJ at 16-19.  AP's discussion of this factor ignores the case law holding that even the use of complete works by search engines is consistent with fair use.  AP's analysis also is premised on other legal and factual mistakes.

The maximum length of Meltwater's snippets is not in dispute, nor is the fact that the actual snippet included in a search result is often significantly shorter than the maximum, or that those snippets are in all cases less than the full article.  SUF ¶¶ 13-14, 44.  AP does not argue that these short snippets represent a quantitatively unreasonable portion of its longer Articles in Suit, many of which are well in excess of 2,500 characters.  Grealis Decl. ¶¶ 9-10 & Ex. 8; *e.g.*, Am. Compl. Exs. N, U, W, X, Z.  AP instead points to the fact that some of the Articles in Suit are quite short, so the snippet represents more of the overall article than it would for a longer piece.  But that is a less significant consideration here given the nature of both the articles at issue and Meltwater's use.

Addressing a similar issue, the Second Circuit has found as a matter of law that copying only the first paragraph of a six-paragraph news article was not sufficiently substantial "in a quantitative sense" even to constitute infringement in the first place.  *Nihon*, 166 F.3d at 71.  The court explained that "quantitative analysis of two works must always occur in the shadow of their qualitative nature."  *Id*.  And it held that "[w]here, as here, the copyrighted work contains both original and unprotected elements, a higher quantity of copying is required to support" a finding of infringement "than when the infringed work is wholly original."  *Id*.  Like the news articles at issue in *Nihon*, AP's Articles in Suit – particularly the short articles (*e.g.*, Am. Compl. Exs. F, H, J) – consist largely of "reporting of unprotected facts."  *Id*.; *accord* Grealis Decl. ¶¶ 3-5 (describing how some of AP's short Articles in

Suit were lifted almost entirely from third-party sources).  To the extent there is any original expression in articles like these, Meltwater has not copied a quantitatively significant amount of that expression to constitute infringement, much less to cut against it on the third fair use factor.[8]

AP's argument also ignores the fact that "the extent of permissible copying varies with the purpose and character of the use."  *Kelly*, 336 F.3d at 820; *see also iParadigms*, 562 F.3d at 642.  Given the transformative purpose of search engines, courts repeatedly have held that even the display of "entire" copyrighted works is reasonable under the third factor.  *Perfect 10*, 508 F.3d at 1167; *Kelly*, 336 F.3d at 821 ("It was necessary for Arriba to copy the entire image to allow users to recognize the image and decide whether to pursue more information about the image or the originating web site."); *Field*, 412 F. Supp. 2d at 1121 ("Google's use of entire Web pages in its Cached links serves multiple transformative and socially valuable purposes.").  The conclusion that the use of whole works is consistent with fair use "in light of the purpose of a search engine" (*Perfect 10*, 508 F.3d at 1167) applies all the more powerfully here, where Meltwater displays only a limited excerpt of the original article.[9]

---

[8] AP's reliance on the length of a few of its Articles in Suit also ignores the fact that, as discussed in Meltwater's summary judgment brief (at 18 n.9), there is no way for a Meltwater customer to know, based on the search results it receives, the length of the original article.  AMF ¶ 3.  The only way a customer can determine how much of the article is actually reflected in the snippet is to click on the link and view the complete article on its originating website.  *Id.*  That substantially diminishes the likelihood that a Meltwater customer will rely on the snippet as a substitute for a visit to the full article.  Any customer actually interested in the article based on the search result cannot assume that the snippet represents a significant portion of the whole and would have to go to the original webpage to see what was missing.

[9] Relying on *Infinity*, AP claims that the "potential scope" of Meltwater's use cuts against fair use.  AP MSJ at 24.  But, as explained above, this case differs significantly from *Infinity*.  The key fact in applying the third factor in that case was that Kirkwood's service "permits essentially unlimited access to radio broadcasts … and there is thus the potential for retransmission of entire copyrighted programs."  *Infinity*, 150 F.3d at 110.  Unlike in *Infinity*, Meltwater does not allow unlimited access to news articles and its users cannot obtain whole articles through the ordinary operations of the service.  AP vaguely alludes to the ability of Meltwater users to do "follow-up ad hoc searches," but there is absolutely no evidence – or even any reason to suspect – that any actual Meltwater customer has done the kind of searches that AP speculates about (searches aimed at generating an additional snippet from an article already referenced in the customer's search results).  *Accord* Klausner Decl. Ex. 2 (Saab Dep. at 200:7-15 (explaining that Meltwater customers "really don't use the [ad hoc] Search tab very much')).

AP next argues that Meltwater's snippets are qualitatively significant under *Harper & Row*. AP focuses on the "opening text" portion of Meltwater's snippets, claiming that "Meltwater copies 'the heart' of the copyrighted work—in this case the headline and opening or lede of AP's articles, which are written to capture the essence of the story." AP MSJ at 24.[10]   There are multiple problems with this argument.   *First*, the factual finding in *Harper & Row* that the defendant "took what was essentially the heart of the book" was premised on the fact that the defendant deliberately selected from President Ford's manuscript the specific passages it believed were the "most powerful" and that best "qualitatively embodied Ford's distinctive expression."   471 U.S. at 564-65.   Meltwater does no such thing:  it applies an algorithm that mechanically excerpts no more than 300 characters from the beginning of each article included in a customer's search results.   SUF ¶ 13.   The process is blind to what that opening text contains.   Meltwater makes no attempt to select out the "heart" of the work (or even the actual "lede"); instead, its system includes whatever happens to be within the first 300 characters of the article.   Grealis Decl. Ex. 8 (examples of opening text returned by Meltwater's system for each Article in Suit).   In contrast to the defendant in *Harper & Row*, therefore, Meltwater is not trying to use an excerpt that best embodies the original publisher's "distinctive expression."

*Second*, AP's claim that its ledes represent the "heart" of its articles simply is not accurate, at least with respect to many of the Articles in Suit.   Here, for example, is the "lede" sentence for the article attached as Exhibit W to AP's Amended Complaint:   "*When Emily Russell's two young sons wake up on Christmas morning, they'll find that Santa left them a note instead of the videogames they requested*."   Similarly, the first sentence of the article attached as Exhibit U reads:   "*To much of the nation, Ted Stevens was the crotchety senator who famously referred to the Internet as 'a series*

---

[10] AP's reference to headlines should be disregarded.   AP has expressly disclaimed any attack on the display of headlines by Meltwater or other search engines.   Am. Compl. ¶ 13.   And for good reason: Headlines are just titles, and "it is axiomatic that words, short phrases, titles, and slogans are not subject to copyright …."   *Moody v. Morris*, 608 F. Supp. 2d 575, 579 (S.D.N.Y. 2009); *cf*. 37 C.F.R. § 202.1(a) (prohibiting registration of "[w]ords and short phrases such as names, titles and slogans" for copyright protection).   The fact that Meltwater includes article headlines in its search results thus is irrelevant to the fair use analysis, because it does not implicate AP's copyrights in the first place.

*of tubes' and fought to build the 'Bridge to Nowhere*." Ledes such as these are not summaries.[11]  At most, they are teasers, and it simply is not plausible to suggest, as AP does (AP MSJ at 24-25), that they "capture the essence of the story" or would be an effective "substitute for the full article."

*Third*, and perhaps most importantly, AP fails to come to terms with why Meltwater includes "opening text" in its snippets.  AP cites deposition testimony that the opening text provides "context" for why the article was responsive and helps the customer understand "what the article was about."  AP MSJ at 24 (quoting Box Dep. at 154:18-155:10).  Why AP thinks this testimony helps its argument is a mystery, as it explains exactly why the use of the snippets advance Meltwater's legitimate transformative purpose.  It is consistent with fair use under the third factor for a search engine to display part or *all* of the original work to allow users (a) "to recognize the [work]" (*Perfect 10*, 508 F.3d at 1167 (quoting *Kelly*, 336 F.3d at 821)); (b) to "decide whether to pursue more information about" it by clicking on the link included with the search result (*id.*); (c) engage in a "comparative" analysis (*Field*, 412 F. Supp. 2d at 1121); and (d) "understand why a Web page was deemed germane" to the user's search query (*id.*).  Meltwater's "opening text" serves exactly those objectives, and does so without displaying anything like the entirety of the underlying work.  SUF ¶¶ 15, 21-22, 47; *see also* Klausner Decl. Ex. 2 (Saab Dep. at 190:4-19).

Under established law, therefore, Meltwater's snippets are both qualitatively and quantitatively "reasonable in relation to the purpose of the copying" (*Campbell*, 510 U.S. at 586), and this factor thus favors Meltwater.[12]

---

[11] *See also, e.g.*, Am. Compl. Ex. N ("In northern Bucharest, in a busy residential neighborhood minutes from the center of Romania's capital city, is a secret that the Romanian government has tried for years to protect"), Ex. O ("Former Sen. Ted Stevens lay dead in the mangled fuselage of the plane.  A 13-year-old boy escaped death but his father died a few feet away.  Medical workers spent the miserable night tending to survivors' broken bones amid a huge slick of fuel that coated a muddy mountainside."); Ex. P ("Basking in the sun and snow, surrounded by his fans and friends, Kevin Pearce carved sweet turns down a gentle run called 'Springmeier' kicking up just enough powder behind him to remind people that, yes, this kid can still ride."), Ex. DD ("Jimmie Johnson doesn't go in for superstitions or curses or hexes.  The five-time defending NASCAR champion now enters black-cat territory.  He's on the cover of Sports Illustrated.").

[12] The manner in which other businesses in the Meltwater family (who are not parties to this litigation) operate their services in foreign countries, subject to different legal regimes and different business realities,

**D.      Factor Four:  Meltwater Does Not Usurp The Market For AP's Works**

AP's discussion of the final fair use factor again misstates the law and distorts the facts. AP's claim of "lost licensing revenue" ignores the established rule that a copyright owner cannot defeat fair use by claiming a diminished ability to license a transformative use.  And its claim of "market substitution" is not supported by the record; indeed, it is affirmatively refuted by it.

AP first argues that Meltwater has failed to pay licensing fees for the use that it makes of AP's content.  AP MSJ at 27-28.  But, as discussed in Meltwater's summary judgment brief (at 24-26), AP does not suffer any cognizable market harm based on the loss of such fees.  Here, in contrast to *American Geophysical Union v. Texaco Inc*., 60 F.3d 913 (2d Cir. 1995), on which AP relies, Meltwater's use of AP's works is "transformatively different" from those articles' original purpose. *Bill Graham*, 448 F.3d at 614 (distinguishing *Texaco*).  As the Second Circuit has explained:

> In a case such as this, a copyright holder cannot prevent others from entering fair use markets merely by developing or licensing a market for parody, news reporting, educational or other transformative uses of its own creative work.  ***[C]opyright owners may not preempt exploitation of transformative markets*** . . . .

*Id*. at 614-15 (internal citations and quotation marks omitted) (emphasis added); *accord HathiTrust*, 2012 WL 4808939, at *13 (a "use that 'falls within a transformative market' does not cause the copyright holder to 'suffer market harm due to the loss of license fees'") (quoting *Bill Graham*, 448 F.3d at 615).  Applying this principle to search engines, *Field* rejected the argument that Google harmed the market for plaintiff's works "by depriving him of revenue he could have obtained by licensing Google the right to present 'Cached' links for the pages containing his works." *Field*, 412 F. Supp. 2d at 1121 n.9.  This rule, which AP does not address, fully disposes of the argument that Meltwater's failure to take a license for its transformative uses harms the market for AP's works.

---

has no bearing on whether Meltwater's U.S. operation is engaged in a fair use under U.S. law.  Likewise, there is no admissible evidence about how "Google Alerts" actually work, what their function is, or why they might operate as they do.  AP's attempt to draw a contrast between Google's service and Meltwater's lacks foundation and should be disregarded.  *Accord* Meltwater MTS at 12, 14.

# REDACTED

That is true even if AP has tried to create a new licensing market for such uses and even if it has actually persuaded other services to participate in that market.[13]   That was exactly the situation in *Bill Graham*.  The plaintiff there claimed to have "established a market for licensing its images" and had "expressed a willingness to license [its] images" to the defendant.  *Bill Graham*, 448 F.3d at 607, 614.  Indeed, other publishers had purchased similar licenses, and the defendant itself had licensed other images used in its book.  *Id.* at 614.  The Second Circuit made clear that none of that mattered:  "a publisher's willingness to pay license fees for reproduction of images does not establish that the publisher may not, in the alternative, make fair use of those images."  *Id.* at 615.[14]

AP's second theory fares no better.  AP posits that Meltwater is usurping the market for AP's works by taking customers away from AP's wire services.  AP MSJ at 28-29.  This claim too was refuted in Meltwater's summary judgment motion.  Meltwater explained that AP's "lost customer" argument:  (1) fails to account for the clear differences between the AP wire and Meltwater's search engine, differences that make it implausible that customers would swap one for the other; (2) is not supported by the record, as there is no evidence of any AP customers that substituted Meltwater News for a subscription to the AP wire; and (3) ignores the evidence showing that AP's difficulties

---

[13] AP admits that its effort to manufacture a licensing market for search engines is a recent development, part of AP's deliberate legal and business strategy (a "multi-year campaign") to "reinforce the message that AP must be compensated" for any use of its content.  AP MSJ at 27-28.  This understates the point of AP's efforts:  AP's documents make clear that its goal has been to defeat fair use claims by creating a new market for transformative uses that previously had (appropriately) gone unlicensed.  AMF ¶ 17.  *Cf.* Meltwater 56(d) Decl. ¶¶ 7-13.  AP's effort to undermine fair use in this way should be rejected.

[14] While the legal infirmity of AP's theory is enough to defeat it, it is misleading for AP to claim that it has successfully licensed other services for the uses at issue here.  AP's experiences with Google, Microsoft, and Yahoo! – the operators of the largest Internet search engines – are instructive.

REDACTED

AMF ¶ 6.                                    REDACTED

                              AMF ¶ 8.        REDACTED
              AMF ¶ 7.                    REDACTED
                                                      AMF ¶¶ 13-
14.                          REDACTED
         AMF ¶ 15.  In short, AP's purported licensing market for search engines' transformative uses is largely fictive.  *See also* AMF ¶¶ 16-17.

retaining customers stem from its own business decisions to make AP content "hyper-available" across the Internet.  Meltwater MSJ at 20-24.  AP's motion ignores the third point and does not meaningfully discuss the first.  Rather than address the obvious differences in design and operation between Meltwater News and the AP wire, AP invokes its "deep-seated conviction" that as a matter of "basic common sense," Meltwater must be hurting its business.  AP MSJ at 27.  But AP's conviction, no matter how sincerely felt, is not evidence.  And AP points to nothing in the record to show that customers actually perceive or use Meltwater's limited snippets as a substitute for licensing full articles from AP.  *Cf.* Meltwater MTS at 8-9, 12 & n.12, 13-15.  The evidence that does exist shows exactly the opposite.  SUF ¶ 47; Fuller Decl. ¶¶ 4, 6-7.

Finally, AP's cursory discussion of its supposedly "lost" customers only confirms that AP cannot lay any customer attrition at Meltwater's feet.  Despite AP's dramatic claims early in this case (*e.g.*, Am. Compl. ¶ 40), AP's brief identifies just a single customer that it claims to have lost to Meltwater:  the Mississippi Development Authority ("MDA").  But even as to that entity, AP's claim of usurpation dissolves when faced with the actual record.  MDA had been a Meltwater News customer long before it left AP in March 2009.  AMF ¶ 4.  And even the limited and incomplete documents that AP produced reveal the reason MDA cancelled its AP wire subscription:  "Claims not to utilize the service."  AMF ¶ 19.  There is no basis for attributing AP's loss to Meltwater, much less for suggesting that MDA substituted Meltwater's delivery of AP-related search results for its (apparently useless) AP wire subscription.  *Cf.* Meltwater MTS at 10 & n.10, 16-18 (evidentiary objections to AP's "lost customer" evidence); Meltwater 56(d) Decl. ¶¶ 14-24.[15]

---

[15]  AP also claims (AP MSJ at 28) that Meltwater bid for the same contract with the House of Representatives on which AP also bid.  But it is undisputed that neither Meltwater nor AP won that contract.  Meltwater Counterstatement ¶ 301.  Meltwater's bid in no way suggests either that it usurped the market for AP's works or that the House viewed Meltwater News as a substitute for the AP wire.  Indeed, AP's proposal acknowledged that AP could not provide the type of service the House was looking for.  AMF ¶ 18.  Likewise, there is not a shred of evidence that Meltwater's supposed competition with services like Cision, Factiva, and LexisNexis has anything to do with the availability of AP content through those services or with those services paying license fees to use such content that Meltwater does not pay.

For these reasons, and those in Meltwater's motion for summary judgment, Meltwater's limited use of the Articles in Suit has not harmed any established, non-transformative market for AP's works.  The fourth factor, like each of the other factors, thus favors Meltwater.  The Court should deny AP's motion for summary judgment and find that Meltwater's use is a fair one.

## II.   MELTWATER'S AFFIRMATIVE DEFENSES RAISE TRIABLE ISSUES OF FACT

Even apart from fair use, AP's motion for summary judgment should be denied.  Based on the limited discovery that has occurred to date, triable issues of fact preclude summary judgment for AP on at least four of Meltwater's other defenses:  license; estoppel; laches; and copyright misuse.

### A.   Meltwater's License Defense Precludes Summary Judgment

A license is a complete defense to a copyright infringement claim.  *Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998).  Courts in this Circuit and elsewhere have held that words or conduct from which another can reasonably infer consent to use intellectual property creates a nonexclusive license to such use.  *See, e.g.*, *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927); *Graham*, 144 F.3d at 235; *Lukens Steel Co. v. Am. Locomotive Co.*, 197 F.2d 939, 941 (2d Cir. 1952); *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997) ("[C]onsent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing.").  In this case, AP's licensees, with AP's approval, have granted Meltwater a license to use the Articles in Suit in its search engine through the well-known "robots.txt" protocol.

Recognizing the critical functions that search engines play on the Internet, and in light of the impossibility of search engine operators personally interacting with innumerable website publishers, the Internet industry developed the robots.txt standard.  AMF ¶ 20.  The standard gives websites a simple and effective way to communicate its permissions, restrictions, and preferences regarding search engines' use of the site's content in a manner that automated software programs (known as "crawlers") can understand.  AMF ¶ 21.  For a site to instruct a search engine on whether it wants its content to be used, the site need only include the appropriate, basic syntax in a "robots.txt" file.

-22-

AMF ¶ 22; Geidies Decl. ¶¶ 12-13 (explaining how easy it is to implement robots.txt instructions).[16] Robots.txt files also can contain "sitemaps" – instructions that expressly inform search engines how best to find and use a website's content.  AMF ¶ 25.  In return for making their content accessible, sites receive a benefit from search engines by having users routed to their sites, growing the sites' audience and increasing advertising revenues.  AMF ¶ 26.

It would be easy for AP's licensees to use robots.txt instructions to inform search engines not to index AP content.  AMF ¶ 27 ("If a site does not want a search engine to index some particular type of content (e.g. AP content), the site can put that content into an identifiable directory and then include that directory in the list of directories placed off limits by its robots.txt instructions.").  Indeed, AP contemplated requiring its licensees to prevent search engines from accessing AP content through the use of robots.txt instructions, but ultimately decided not to do so.  AMF ¶ 28.  And AP knows that its licensees routinely make AP content accessible to search engines, either by posting robots.txt instructions authorizing search engines to use the content, or by failing to employ robots.txt instructions at all.  AMF ¶¶ 29-31.  AP appreciated the implications of not requiring licensees to prohibit use of AP content through robots.txt instructions.  As AP's then-General Counsel explained:  "If technology provided tools to control the unauthorized exploitation of news content, and a news provider didn't use those tools, the legal system is unlikely to come to the defense of the news provider."  Klausner Decl. Ex. 41.  He was correct.  Both the presence of robots.txt instructions granting permissions to use AP content and the absence of robots.txt instructions identifying restrictions on the use of that content constitute licenses from sites to Meltwater and other search engines to use that content in their search results.  *See Field v. Google*

---

[16] A web site could, for example, include a robots.txt file containing the following instructions to inform search engines that the content of the site is not to be used by them:  [*User-agent: * Disallow: /*].  A search engine would understand this instruction to mean that all access to the site by all crawlers is disallowed.  AMF ¶ 23.  A site can just as easily instruct search engines that they are not restricted from using the site's contents by using the following instruction:  [*User-agent: * Disallow:*].  This instruction grants permission for crawlers to access and index the site's contents.  AMF ¶ 24.

*Inc.*, 412 F. Supp. 2d 1106 (D. Nev. 2006); *Parker v. Yahoo!, Inc.*, Civ. A. No. 07-2757, 2008 WL 4410095, at *1, 4 (E.D. Pa. Sept. 25, 2008).

*Field* is instructive.  The plaintiff there had posted robots.txt instructions allowing search engines to utilize the content on his web site, but had not included proscriptions on use of the content in Google's "Cache" functionality.  *Field*, 412 F. Supp. 2d at 1114, 1116.  The court concluded that the absence of such proscriptions was "reasonably interpreted as the grant of a license to Google for that use."  *Id.* at 1116.[17]  Likewise, the *Parker* court held that the plaintiff's knowledge of, and failure to implement, robots.txt protocols to prevent his website from being crawled by search engines, "conclusively establishes" a license.  2008 WL 4410095, at *4 ("[T]he defendants could properly infer that [plaintiff] knew of and encouraged the search engines' activity, and … they could reasonably interpret [plaintiff's] conduct to be a grant of a license for that use.").  Here too, Meltwater could cite the absence of robots.txt restrictions on websites publishing AP content as establishing a license from those websites for use of that content in its search engine.  But this case is even a stronger one for a license defense.  Here, AP's Articles in Suit all were made available on websites containing robots.txt instructions and sitemaps *affirmatively and expressly* informing search engines like Meltwater that the contents of the site could be indexed, and telling them how best to do so.  SUF ¶ 43.  Through these instructions, the websites granted Meltwater a license to use the sites' content in its search engine.  *Accord De Forest Radio*, 273 U.S. at 241.

AP's challenges to Meltwater's license are unavailing.  First, relying on *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharmacueticals, Inc.*, 211 F.3d 21 (2d Cir. 2000), AP argues that an implied license can exist only where content has been created for and delivered to a defendant.  But the statement in *SmithKline* that AP relies upon was *dicta*.  *Id.* at 25.  Moreover, the

---

[17] Contrary to AP's claim (AP MSJ at 15), *Field* did not hinge on a finding that the plaintiff had attempted to manufacture a claim against Google.  The critical point in *Field* was that the plaintiff failed to implement industry-standard mechanisms to indicate the lack of permission for the search engine use at issue, and "instead made a conscious decision to permit it."  *Field*, 412 F. Supp. 2d at 1116.

single sentence in *SmithKline* does not account for the host of cases, both before and after, recognizing that implied licenses arise in far more varied contexts. *See supra*; *see also Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 121 (S.D.N.Y. 2012) (holding that fact issue precluding summary judgment existed on license defense based on "plaintiff's knowledge of, and acquiescence to a defendant's use" of plaintiff's works). Indeed, *SmithKline* only purports to reference cases involving licenses implied by conduct, not cases like this one in which permission was expressly granted. Even if AP's preferred test did govern, moreover, AP licensees actually did deliver the Articles in Suit to Meltwater, sending them over the Internet in response to requests from Meltwater's crawler, just as they would send them to any Internet user. AMF ¶ 35; *see Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307, 319 (S.D.N.Y. 2011) (implied license could be found based on plaintiff's delivery of copyrighted work to defendant and cooperation in defendant's use thereof). In short, *SmithKline* does not preclude the finding of a license in this case.

AP also argues that boilerplate in terms of service on its licensees' websites purporting to prohibit commercial use of their content, rather than the robots.txt standard, should govern the behavior of search engines. AP MSJ at 32-33. But requiring that search engines parse hundreds of thousands or millions of legal documents that impose (in myriad languages and legalese) an endless combination of conditions and restrictions on the use of content (based on content type, user, intended use, location, date, etc.), would bring their operations to a halt. The robots.txt standard exists for just that reason. AMF ¶¶ 20-22.[18] Whether by employing that standard to permit search engines to crawl the content of their sites, or by failing to use the standard at all, sites granted Meltwater a license to use that content in its search engine. *Cf.* Meltwater 56(d) Decl. ¶¶ 25-32.

---

[18] Even AP's own corporate designee on licensing was unable to provide a coherent explanation of how AP's "commercial use" proscription applied to search engines, testifying first that "businesses operating search engines [are] making commercial use of AP content," then contradicting herself moments later saying "I don't think a search engine is necessarily commercial use," then claiming "I am not a lawyer," then "I don't know how you define a search engine," and concluding with a statement that her lawyer was kicking her under the table for thinking aloud. Klausner Decl. Ex. 5 (Cross Dep. at 125:12-128:24).

Finally, AP argues that its licensees could not grant licenses to search engines because of a supposed restriction in AP's contracts with those licensees. AP MSJ at 34. But AP's corporate designee could not identify any such restriction. *Supra* n.18. In truth, AP's agreement with its licensees clearly contemplates that they will make AP content accessible to search engines. AMF ¶ 32. Although AP has the right under that agreement to ask a licensee to block a search engine's access, AP has never made such a request. AMF ¶¶ 33-34. Thus, despite having full knowledge that its licensees were expressly or impliedly instructing search engines that they could use AP content on their sites, AP took no action to stop them from doing so. AP's course of conduct gave its licensees the apparent authority to license search engines to use that content. *See Psihoyos*, 855 F. Supp. 2d at 125-29 (denying summary judgment based on license defense predicated on apparent authority of agent to grant license and course of conduct).[19] At minimum, therefore, there is a triable issue of fact on Meltwater's license defense, which bars summary judgment for AP.

### B.   Meltwater's Estoppel Defense Precludes Summary Judgment

AP does not discuss Meltwater's estoppel defense, but it likewise precludes summary judgment. A plaintiff is estopped from asserting a copyright claim where doing so "would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Dallal v. The N.Y. Times Co.*, No. 05-2924, 2006 WL 463386, at *1 (2d Cir. Feb. 17, 2006) (quoting *Veltri v. Bldg. Serv. 32 B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004)). Estoppel requires a showing that: "1) the plaintiff had knowledge of defendant's infringing acts, 2) the plaintiff either intended that defendant rely on his acts or omissions or acted or failed to act in such a manner that defendant had a right to believe that it was intended to rely on plaintiff's conduct,

---

[19] AP argues that even if Meltwater had been licensed, that license was revoked by the filing of this lawsuit. It is not at all clear that AP can revoke such a license given that Meltwater provided a benefit in return. AMF ¶ 26; *see, e.g., Holtzbrinck Pub. Holdings, L.P. v. Vyne Communications, Inc.*, No. 97-cv-1082 (KTD), 2000 WL 502860, at *5 (S.D.N.Y. Apr. 26, 2000). In any event, long after AP filed this suit, the websites from which Meltwater obtained access to the Articles in Suit still used robots.txt files inviting search engines to use of their content. AMF ¶ 36.

3) the defendant was ignorant of the true facts, and 4) the defendant relied on plaintiff's conduct to its detriment." *Dallal*, 2006 WL 463386, at *1. The evidence here supports all four elements.

*First*, AP does not dispute that it has had knowledge of Meltwater's operation and conduct for many years. AP SUF ¶¶ 336-38; AMF ¶ 37-38.[20] *Cf.* Meltwater 56(d) Decl. ¶ 34-35.

*Second*, AP acted in a manner such that Meltwater had a right to believe that AP did not object to its use. AP did not require its licensees to put AP content behind a paywall, require registration for access, or to use robots.txt instructions to inform search engines that AP content was off limits. AMF ¶ 44-45. Instead, AP specifically permitted its licensees to post AP content online in ways that invited search engine crawling, knowing that Meltwater and other search engines would be able to index AP articles on those websites. AMF ¶¶ 29-35, 46. AP's actions satisfy the second estoppel factor. *See Field*, 412 F. Supp. 2d at 1117 (second factor satisfied where plaintiff could have prevented use of website content through instructions to Google's crawler); *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 753 (E.D. Mich. 1998) ("[A] plaintiff may be estopped from asserting his rights under a copyright if he has aided the defendant in infringing or otherwise induced it to infringe ...."). Moreover, until it filed suit in 2012, AP never told Meltwater that it objected to its use of AP content. AMF ¶ 43. AP's silence in the face of its knowledge of Meltwater's use of its content was "conduct on which [defendant] was entitled to rely." *Keane*, 968 F. Supp. at 947; *see also DeCarlo v. Archie Comic Publ'ns, Inc.*, 127 F. Supp. 2d 497, 510 (S.D.N.Y. 2001).

*Third*, Meltwater was unaware of AP's current position that Meltwater's use of AP articles obtained from AP licensee websites that invited Meltwater's crawling was not permitted. AMF ¶ 43. To the contrary, Meltwater operated its service based on its good-faith belief that its limited use of articles freely available on such websites was fully consistent with U.S. copyright law. AMF ¶ 52.

---

[20] "Whether plaintiffs had *all* of the evidence that ultimately would be required at trial is not material. To hold otherwise would preclude equitable estoppel in all cases where discovery is needed . . . ." *Price v. Fox Entm't Grp., Inc.*, No. 05-cv-5259 (SAS), 2007 WL 241387, at *4 (S.D.N.Y. Jan. 26, 2007).

*Finally*, Meltwater detrimentally relied upon AP's conduct.  Meltwater's crawler met no paywalls or login requirements, and followed the robots.txt instructions on AP's and its licensees' websites, thereby including AP articles in Meltwater's search index.  AMF ¶¶ 35-36, 47; Geides Decl. ¶ 5; SUF ¶¶ 40-43.  Had AP instructed its licensees to put AP content behind a paywall, or to require a login to obtain access to AP content online, or to use the robots.txt convention to tell search engines not to crawl AP their websites, Meltwater would not have included AP content in its index. Grealis Decl. Ex. 65 (Geidies Dep. at 194:20-195:8).  By failing to take these measures, AP induced Meltwater to detrimentally rely on its ability to index content for its search engine from the websites of AP's licensees.  *See Field*, 412 F. Supp. 2d at 1117 (search engine detrimentally relied on site's failure to use standard Internet protocols, including robots.txt, to prevent indexing of site's content). Meltwater further detrimentally relied on AP's lack of objection by investing millions in expanding its service and promoting its Meltwater News product in the United States.  AMF ¶¶ 51-52.

Accordingly, a reasonable jury could find Meltwater's estoppel defense meritorious.

### C.      Meltwater's Laches Defense Precludes Summary Judgment

Meltwater's laches defense also raises triable issues of fact that warrant denial of AP's motion.  A claim is barred by laches where the defendant shows both "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Armstrong v. Virgin Records, Ltd*., 91 F. Supp. 2d 628, 643 (S.D.N.Y. 2000) (quoting *Costello v. United States*, 365 U.S. 265, 282 (1961)).  As Judge Learned Hand has observed, laches prevents copyright plaintiffs from unjustly delaying their claims in the hope of receiving a windfall:

> It must be obvious to every one familiar with equitable principles that it is inequitable for the owner of a copyright, with full notice of an intended infringement, to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proved a success.  Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win.

*Haas v. Leo Feist, Inc.*, 234 F. 105, 108 (S.D.N.Y. 1916); *see also Byron v. Chevrolet Motor Div. of General Motors Corp.*, No. 93-cv-1116 (AJP), 1995 WL 465130, at *6 (S.D.N.Y. Aug. 7, 1995).

That is what happened here.  As one of AP's own witnesses admitted:  "[The news industry] did tolerate people using its content in the hopes that it would gain readers online and that it would drive traffic to them."  Klausner Decl. Ex. 5 (Cross Dep. at 223:7-25).

In assessing delay, courts focus not on the number of years, but on the reasonableness of the delay.  *Armstrong*, 91 F. Supp. 2d at 644; *Byron*, 1995 WL 465130, at *6.  In an action involving alleged continuing infringement, a delay longer than the statute of limitations period creates a presumption that the delay is unreasonable, which the plaintiff can only overcome by proving the absence of prejudice to the defendant.  *Stewart v. Adidas A.G.*, No. 95-cv-4824 (DLC), 1997 WL 65904, at *3 (S.D.N.Y. Feb. 13, 1997); *Byron*, 1995 WL 465130, at *6.  AP has known about Meltwater's use of AP content since at least 2006.  AMF ¶¶ 37-38.  *Cf.* Meltwater 56(d) Decl. ¶¶ 33-37.  Yet it waited until 2012 before suing.  The statute of limitations for a copyright claim is three years, 17 U.S.C. § 507(b), and AP's delay thus is presumptively unreasonable.

AP's delay also lacks any legitimate excuse.  When Meltwater's use of AP content was brought to the attention of an AP executive by a sales agent in 2006, the executive "waived [him] off."  AMF ¶ 39.  That sales agent thereafter tracked Meltwater, reported to his manager what he was learning, and forwarded to him Meltwater News reports he received from friends and family.  AMF ¶ 40.  Laura Malone, AP's current General Counsel, began watching Meltwater as well.  AMF ¶ 41.  But AP decided not to reach out to Meltwater and instead to "take a different tact."  AMF ¶ 42.  The only reason that AP has offered for not pursuing a claim earlier is "that AP has limited resources to devote to litigation."  Curley Decl. ¶ 27.  Courts repeatedly have rejected that excuse.  *See, e.g.*, *Byron*, 1995 WL 465130, at *7 ("Supreme Court precedent dating back over 100 years holds that a plaintiff's assertion of poverty is inadequate justification for delay in bringing a law suit.") (citing cases).  As this Court explained in addressing a laches defense, "a lack of finances alone cannot excuse a failure to object."  *Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04-cv-7203 (DLC), 2006 WL 1012939, at * 34 (S.D.N.Y. Apr. 19, 2006).  And a claim of poverty by AP, an organization that generates hundreds of millions in annual revenues, rings particularly hollow.  AP SUF ¶ 34.

-29-

# REDACTED

Meltwater has been significantly prejudiced by AP's presumptively unreasonable six-year delay.  In 2005, Meltwater began offering its service in the United States.  AMF ¶ 48.  Since then, Meltwater has invested millions developing its product and brand recognition in the U.S., and expanding its U.S. presence from four employees to four hundred.  AMF ¶¶ 49-50.  It has invested over REDACTEDin its US operations since January 2006.  AMF ¶ 51.  Meltwater made these investments on the understanding that its use of news content was permissible under U.S. copyright law.  AMF ¶ 52.  That understanding was and is consistent with all legal authority addressing search engines' use of copyrighted content.  Neither AP nor any publisher sued Meltwater in six years.  *Cf. Stone v. Williams*, 873 F.2d 620, 625-26 (2d Cir. 1989) (unexcused five-year delay established laches as a matter of law).  Had AP taken any action to protect its rights earlier, Meltwater could have modified its service or made alternative investment decisions.  AMF ¶ 53.  This is precisely the kind of prejudice that establishes laches.  *See, e.g., Juicy Couture*, 2006 WL 1012939, at *34; *Byron*, 1995 WL 465130, at *8.  AP's motion should be denied for this reason as well.

### D.      AP's Copyright Misuse Precludes Summary Judgment

"The defense of copyright misuse prevents a copyright owner from recovering for infringement where he has impermissibly extended the copyright monopoly in a manner which constitutes an unreasonable restraint of trade."  *Coleman* v. *ESPN, Inc.*, 764 F. Supp. 290, 295 (S.D.N.Y. 1991); *see also Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520 (9th Cir. 1997); *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 977-79 (4th Cir. 1990).[21]  Here, AP has done just that through its formation and domination of the entity known as NewsRight.

NewsRight, originally named News Licensing Group ("NLG"), is a joint venture among otherwise competing news organizations formed in an effort to extract licensing revenues from news

---

[21] A defendant need not have suffered injury from copyright misuse in order to assert the defense. *Lasercomb*, 911 F.2d at 979.  As the Supreme Court has explained, "[i]t is the adverse effect upon the public interest of a successful infringement suit in conjunction with the [rights holder's] course of conduct which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse . . . ."  *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488, 494 (1942).

# REDACTED

search and information services. AMF ¶ 54. While collective licensing ventures do not necessarily violate the antitrust laws, they present the opportunity for illicit price fixing among competing participants. *See* FEDERAL TRADE COMMISSION & U.S. DEP'T OF JUSTICE, *Antitrust Guidelines for Collaborations Among Competitors* § 2.2 (2000) (explaining that "[c]ompetitor collaborations may harm competition and consumers" where they "facilitate explicit or tacit collusion through facilitating practices such as the exchange or disclosure of competitively sensitive information"). AP took advantage of that opportunity, dictating minimum prices for the collective and passing sensitive pricing information through it to competitors. Such behavior is a *per se* violation of the antitrust laws and constitutes copyright misuse.

In founding NewsRight, AP hoped that by combining AP's copyrighted content with that of other news reporting services, the new entity could demand that services like Meltwater take licenses from the collective. AMF ¶ 55. Recognizing the antitrust implications of such collective action, AP sought approval from the U.S. Department of Justice ("DOJ") for its initial vision of this licensing body. AMF ¶ 56. To assuage anti-competitive concerns, AP made a variety of representations about how the collective would operate – including that the licensing entity would "require each participating content owner not to set, formulate, benchmark, or suggest licensing terms, including pricing terms, for content made available through the Registry from any other participating content owner." AMF ¶ 57. AP also promised that it would be "designed to deny access via the Registry to competitively sensitive information (such as content usage data and licensing terms) belonging to other participants." AMF ¶ 58. DOJ specifically highlighted these representations as conditions for giving abstract approval to AP's original concept. AMF ¶ 59. But the actual implementation of NewsRight bore no resemblance to what DOJ approved.

NewsRight launched with AP taking a <sup>REDACTED</sup> stake and sharing ownership, board seats, and control with its direct competitors in the market for news reporting. AMF ¶¶ 61-63. This created a near certainty that competitively sensitive information would be exchanged among participants. And it was. Based on its market research, NewsRight developed a pricing model for the blanket

copyright licenses it would grant online services to use participants' news articles. AMF ¶ 64. But AP and its CEO, Tom Curley, concluded that the prices that NewsRight had come up with were too low. AMF ¶ 65. In an email to Donna Barrett – CEO of another NewsRight participant – Mr. Curley decried NewsRight's proposed prices as having been heavily influenced by a conversation with one potential licensee "seeking the lowest possible cost" and as leading to "revenues that at least two critical participants thought were below existing rates." AMF ¶ 66. Mr. Curley explained that he had directed AP executive Joy Jones to examine AP's own licenses with "similarly situated AP clients" in order to "find actual parameters on the marketplace" and develop alternative (and higher) "target minimums" for NewsRight's blanket licenses. AMF ¶ 67. Ms. Jones then provided NewsRight with information on "existing fees paid [to] AP" by news search services, and "suggested" "minimum target" prices for NewsRight to charge various tiers of licensees. AMF ¶ 68. Jones and Curley also provided AP's "price comparisons" to both NewsRight and Ms. Barrett, informing them of specific licensing deals that AP had secured for itself at roughly the minimum prices it devised for NewsRight. AMF ¶ 69. In the next iteration of its pricing model, NewsRight adopted AP's tiered pricing approach with "minimum" prices that were substantially higher than those in NewsRight's earlier proposal. AMF ¶ 70.

By foisting a pricing structure and minimum target prices upon a licensing entity, and by sharing its own pricing information with NewsRight and its participants, AP flouted the very conditions it had proposed to the DOJ to avoid collusion in the operation of its licensing collective. AMF ¶¶ 56-59. Even worse, AP acted to fix prices. As a "critical participant" in NewsRight, AP "suggested" that the nominally independent company charge online services specific (and higher) "minimum target" prices for blanket licenses to all participants' copyrighted works. AMF ¶¶ 68, 71-72. AP thus leveraged its own copyrights to influence the prices NewsRight would charge for

licenses covering others' copyrighted works.  It also gave its competitors the ability (and comfort) to demand AP-level prices in their own individual licensing negotiations.[22]

AP's conduct violates the antitrust laws.  *See, e.g.*, *Interstate Circuit v. United States*, 306 U.S. 208, 214-18 (1939) (efforts to coordinate prices for movie theaters illegal *per se*); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 141-44 (1948) (coordination of film license prices illegal *per se*); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 685 (S.D.N.Y. 2012) (horizontal price agreements among competitors are illegal *per se*).  It also constitutes copyright misuse.  *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1108-10 (N.D. Cal. 2002) (ordering discovery on copyright misuse defense based on price coordination among plaintiffs who participated in collective licensing body and denying plaintiffs' motion for summary judgment on that basis); *Lasercomb*, 911 F.2d at 978 (finding copyright misuse based on non-compete clause); *Practice Mgmt. Info.*, 121 F.3d at 521 (copyright misuse found where party sought to leverage its copyright to restrict a licensee from developing a competing product).

*Napster* is especially instructive.  There, several record companies sought summary judgment against an online service they accused of copyright infringement.  The service, citing the companies' collective copyright licensing activities, invoked copyright misuse.  The court denied the labels' summary judgment motion and ordered that discovery proceed on the misuse defense.  *Napster*, 191 F. Supp. 2d at 1110.  It recognized that by engaging in joint licensing activities, the record companies would "necessarily meet and discuss pricing and licensing, raising the specter of possible antitrust violations."  *Id*. at 1108-09.  Such "joint ventures bear the indicia of entities designed to allow plaintiffs to use their copyrights and extensive market-power to dominate the market for digital music distribution."  *Id*. at 1109-10 ("Even on the undeveloped record before the court, these joint ventures look bad, sound bad and smell bad.").  In *Napster,* the mere prospect of price

---

[22] After sending its initial request for a business review letter, AP did not inform DOJ that it would be using NewsRight to share pricing information or assisting NewsRight in setting minimum prices, nor did AP seek DOJ approval for NewsRight's actual operation.  AMF ¶ 60.

collaboration among competitors was sufficient to justify denial of the copyright holders' summary judgment motion on grounds of copyright misuse. *Id.* In this case, despite an almost complete lack of discovery on this issue, Meltwater can already show that misuse in the form of price collaboration and price fixing has actually taken place.[23] AP undeniably shared pricing information with other news reporting services, and not so subtly engineered minimum prices that NewsRight would charge for blanket licenses covering other participants' content. AMF ¶¶ 68-72. At a minimum, therefore, Meltwater's copyright misuse defense "presents an issue of fact not resolvable on a motion for summary judgment." *Coleman*, 764 F. Supp. at 295.

## CONCLUSION

For the reasons given above, AP's motion for summary judgment should be denied.

---

[23] The Court limited discovery in the initial phase of the case to Meltwater's operations and the applicability of the fair use doctrine to AP's claims. Meltwater has not yet sought, and AP has not produced any other information regarding this episode, other instances of impropriety, or any information about AP's dealings with DOJ. *Accord* Meltwater 56(d) Decl. ¶¶ 38-41.

Dated:  December 14, 2012       Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:  _____

TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
1301 Avenue of the Americas, 40th Floor
New York, New York  10019
Telephone:  (212) 497-7700

DAVID H. KRAMER (admitted *pro hac vice*)
650 Page Mill Road
Palo Alto, California 94304
Telephone:  (650) 493-9300

*Attorneys for the Defendants*