

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

**REDACTED VERSION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE ASSOCIATED PRESS,

                    Plaintiff,

   - against -

MELTWATER U.S. HOLDINGS, INC.;
MELTWATER NEWS U.S., INC.; and
MELTWATER NEWS U.S. 1, INC.

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**FILED UNDER SEAL**

12 Civ. 1087(DLC)(FM)

ECF Case

**DECLARATION OF
JOY JONES**

Pursuant to 28 U.S.C. § 1746, I, **JOY JONES**, declare as follows:

    1.      I am the Vice President, Platform Strategy and Operations, for The Associated Press ("AP"), plaintiff in this action. I submit this declaration in support of AP's motion for summary judgment against Defendants Meltwater U.S. Holdings, Inc., Meltwater News U.S., Inc., and Meltwater News US1, Inc. (collectively, "Meltwater"). This declaration is based on my personal knowledge except as otherwise stated.

**A.**     **Introduction and My Background**

    2.      I graduated from the University of California in Los Angeles in 1993 with a Bachelor of Science degree in Mathematics and Applied Sciences. I received a Master's in Business Administration from Stanford Business School in 1995. After several years as a strategy consultant with Cap Gemini and Ernst & Young, I joined the AP as the Vice President of Global Business in 2004. I have been with AP ever since, serving as Vice President of Global Marketing and Operations from 2008-2010 and Vice President of Global Business Operations from 2010-2011. In 2011, I assumed my current position.

3.      Throughout my career at AP, I have been responsible for various aspects of AP's business model and strategies.  In my current role as AP's Vice President, Platform Strategy and Operations, I oversee aspects of AP's digital and new media strategy, including the pursuit of opportunities to monetize AP content in a changing digital landscape by engaging with new media entities.  I am AP's contact with NewsRight, discussed further herein.

4.      AP's core business is to create outstanding news content and to license it for a fee. We expend significant resources to create our content, and we need to be compensated for its commercial use in order to survive as a business and a source of news – a critical function in any democracy.

5.      This Declaration addresses various different approaches that AP has pursued to protect its content published on the Internet.  Viewed collectively, our efforts reflect both the continuing challenges of protecting digital content from unlicensed aggregators and AP's clear intent to prohibit any unlicensed commercial use of our copyrighted works.  In numerous ways, AP makes clear that it does not condone the commercial use of its content without a license.

**B.      AP Protects its Content through Licensing Terms and Terms of Use**

6.      I understand that Meltwater scrapes and indexes numerous AP articles from the websites of AP's members and other licensees, and from "AP Hosted" web addresses accessible through our AP Hosted customers' websites.  This declaration briefly supplements the Sue Cross Declaration regarding the terms of use governing the AP stories posted by our members and explains the AP Hosted content and our efforts to protect it.

**AP Members**

7.      As set forth more fully in the Declaration of Sue Cross ("Cross Declaration"), AP members publishing AP print wire content online are governed by the Digital Use Agreement, which requires that AP members publish AP content online under terms of use that explicitly

2

forbid commercial use of AP content by third parties. Meltwater's commercial use of AP content in its Meltwater News service is a direct violation of these terms. For further clarity, AP also posts "Terms and Conditions Applicable to the Works of The Associated Press Displayed On the Web Or Distributed Via the Internet" on ap.org. Attached as Exhibit 1 is a copy of the "Terms and Conditions Applicable to the Works of The Associated Press Displayed on the Web or Distributed via the Internet," located at http://www.ap.org/termsandconditions as last updated on December 14, 2007 ("AP Internet Terms of Use"). The AP Internet Terms of Use apply to individuals as well as "digital engines of any kind, including without limitation ones that crawl, spider, ingest, index, scrape, copy, store, display, or transmit digital content." The AP Internet Terms of Use grant a license to access and use AP content "for personal non-commercial use only" and specifically forbid a user to "sublicense, market, sell, or distribute the AP Works or any subset thereof or offer to do so in any manner or medium."

### AP Hosted

8.      For AP members who do not have the operational capability or server capacity to host AP content on their own websites, AP offers a white-label, turnkey service called "AP Hosted." The AP Hosted service enables customers to publish continually updated AP news on their websites without having to process the content through their own content-management and publishing systems, and without having to host the content on their own servers. The AP Hosted service is generally used by local newspapers such as the *Times Herald-Record* (Middletown, NY) and the *Virginian-Pilot* (Norfolk, VA).

9.      The content for the AP Hosted service consists of a selection of national and international AP stories, hosted by AP on its servers and seamlessly integrated into the customer's site with the "look and feel" of the customer's site, including their branding, masthead, and navigational elements, and including the customer's terms of use.

10.     An individual visiting the website of an AP Hosted member will see those stories as integrated into the publication's website; the only indication that these stories are provided through AP Hosted is that the URL for the story often will indicate an AP Hosted domain, as well as an abbreviation for the Hosted customer, rather than the individual publication's domain.

11.     As set forth in the Declaration of Thomas Kent ("Kent Declaration"), several of the Registered Articles were included in the AP Hosted service, among other AP news products.

12.     At the time these articles were published, there was no public-facing AP Hosted webpage publishing the AP Hosted content.[1]  The webpage at http://hosted.ap.org/specials/bluepage.html (the "AP Hosted Landing Page"), displayed only a map of the United States, which included drop-down menus for various states containing links to the websites of AP Hosted customers from those states.  The user who clicked on the link was redirected to that newspaper's branded version of the AP Hosted service (*e.g.*, the *Virginian-Pilot* website), complete with its terms of use.  A screenshot of the AP Hosted Landing Page is attached as Exhibit 2.

13.     The AP Hosted Landing Page displays an AP copyright notice, along with the notice: "All rights reserved. This material may not be published, broadcast, rewritten or redistributed."  Further, the AP Hosted members and associate members who provide access to AP Hosted content through their own websites have terms and conditions set forth on their websites, which prohibit the copying and redistribution of such articles by Meltwater and similar services without permission or license.  Those terms of use widely prohibit republication and commercial use of the website's content and contain numerous other provisions that

---

[1] To avoid any confusion, I should clarify that AP has since launched a public-facing, AP-branded site that displays the content from the AP Hosted service, located at http://hosted.ap.org/dynamic/fronts/HOME?SITE=AP.  This public-facing site was not launched until July 2012, and none of the Registered Articles appeared on this site.

Meltwater blatantly violates by scraping this content and delivering it as part of the Meltwater News service.

14.     AP provides AP Hosted content to AP Hosted customers subject to the terms set forth in the "Internet Supplemental Services Agreement" between AP and the AP Hosted customer.  A sample Internet Supplemental Services Agreement between AP and the Monroe Evening News is attached as Exhibit 3. As set forth in the preamble, the Internet Supplemental Services Agreement incorporates all provisions of the Member Agreement between AP and the AP Hosted customer, including the Digital Use Agreement as described in the Cross Declaration.

15.     Among other relevant provisions, the Internet Supplemental Services Agreement requires that the AP Hosted customer display, with each article, AP's copyright notice and the statement, "All rights reserved.  This material may not be published, broadcast, rewritten or redistributed."  The Internet Supplemental Services Agreement further requires the AP Hosted customer to incorporate a notice into its site containing terms of use for AP content, as set forth in Attachment B to the Internet Supplemental Services Agreement.   Ex. 3, § 8, Attachment B. Additionally, the Internet Supplemental Services Agreement only grants the AP Hosted customer a license to allow its users to "reproduce a single copy of individual items contained in the AP Service for their personal use only and not for resale or redistribution in any manner." Ex. 3, § 1.5 (emphasis added).

16.     Pursuant to the Internet Supplemental Services Agreement, the AP Hosted customer is not allowed to "archive or otherwise retain the AP Service in an on-line electronically retrievable format, or any other format, for more than 14 days without AP's prior written approval."

DWT 20587498v5 0025295-000064

17.     The AP Hosted content is housed on a back-end page buried deep within the AP

website.  It is there only to allow AP to manage the AP Hosted service and is not designed or

intended as a public-facing website.  I do not know whether Meltwater obtained any AP Hosted

content by crawling the AP website, but if it did, AP has "Terms of Use" on its home page,

http://www.ap.org, which govern the AP Hosted content.  Attached as Exhibit 4 is a copy of the

Terms and Conditions located at http://www.ap.org/company/Terms-Conditions (the "AP

Terms of Use").

18.     Among other relevant provisions, the AP Terms of Use expressly prohibit the

precise type of automatic crawling activity employed by Meltwater to create its Meltwater News

database, stating:

> 2.2:     You may not (i) deep link or employ software or any
> automatic device, technology or algorithm, to "crawl", "scrape",
> search or monitor this Site and/or retrieve or copy Content or
> related information . . . [or] (vii) use devices (including software)
> that are designed to provide repeated automated access to this Site,
> other than those made generally available by AP . . . .

**AP's "The Big Story" Site**

19.     Recently, AP launched a public-facing site called "The Big Story"

(http://bigstory.ap.org), containing a selection of AP articles.  The Registered Article titled

"Fact Check: Romney Misses a Mark on Solyndra Claim" was published on The Big Story site.

No other Registered Article named in the Amended Complaint was published on The Big Story

site.  Articles published on The Big Story site are governed by the terms of use set forth at

http://bigstory.ap.org/content/terms-use.  Attached as Exhibit 5 is a copy of the AP Big Story

Terms of Use located at http://bigstory.ap.org/content/terms-use.  These terms of use provide

that a user "may not copy, reproduce, publish, transmit, transfer, sell, rent, modify, create

derivative works from, distribute, repost, perform, display, or in any way commercially exploit

the Materials carried on this site." The terms of use authorize users to make a "single print copy" of any of the materials on the site "for personal, non-commercial use only." The terms of use also expressly prohibit users from "archiv[ing] or retain[ing] any of the Materials accessed on this Web site without the express written permission of AP."

### AP Mobile

20.     AP also publishes a limited set of AP articles to its AP Mobile app. AP Mobile is a consumer app that delivers AP news content to personal mobile devices and tablets in a format optimized for viewing on those devices. Although AP Mobile is a free consumer service, AP earns advertising revenues from AP Mobile. As set forth in the Kent Declaration, several of the Registered Articles were made available to consumers through the AP Mobile app.

21.     Consumers' access to AP content via the AP Mobile App is governed by the AP Mobile Terms of Use, which can be found at http://getapmobile.com/terms-of-use.html. Attached as Exhibit 6 is a copy of the AP Mobile Terms of Use located at http://getapmobile.com/terms-of-use.html. Among other things, the AP Mobile Terms of Use prohibit users from "employ[ing] software or any automatic device, technology, or algorithm, to "crawl," "scrape," search or monitor this Site and/or retrieve or copy Content or related information."

22.     In short, among other means described below, AP protects its content on the Internet through assorted agreements with its licensees and terms of use which prohibit Meltwater's systematic, commercial use of AP's content in its media monitoring service.

### C.     AP Has Led the News Industry in Responding to the Opportunities and Challenges of the Digital News Environment and Protects Its Content Through Electronic Means

23.     AP has consistently been a leader in the news industry in thinking strategically about opportunities in the digital news environment and developing innovative responses to the

challenges it poses.  Protecting and monetizing its content in the digital space has been a key

strategic focus for AP for many years.  I understand that Tom Curley in his declaration provided

an overview of AP's strategies to protect its content published online and the role played by

NewsRight in licensing content to aggregators and media monitoring entities.  This declaration

briefly supplements Mr. Curley's overview.

      24.     In today's world, digital aggregators providing only headlines and/or excerpts

such as Google News are very popular and often sufficient to satisfy users without their clicking

on the links to the original story.  AP realized early on that news consumption on the Internet

was being diverted to unlicensed aggregators, portals, and search engines, and began developing

a proactive digital strategy to maintain control of its content on the Internet and to reach

licensing deals with the major aggregators whose business models were built on the systematic

scraping and redistribution of AP content.  As early as 2005, AP was focusing on strategies to

curb unauthorized use of its content by unlicensed digital aggregators, portals, and search

engines. AP began developing new licensing models for digital publication and methods to

track content electronically, as well as reaching out directly to scrapers and aggregators in order

to bring their uses of AP content under license.  Attached as Exhibit 7 is a copy of a Power-

Point presentation to the AP Board of Directors from July 2005 describing AP's "Digital

Overview," including its efforts to address unlicensed scraping of AP content.

      25.     In 2007, the AP Board of Directors commissioned several studies by outside

consultants to provide guidance for its digital strategy, and assessed their recommendations.  AP

began developing a plan for a "digital cooperative," working with its members to create an index

of AP and member news content for use in new distribution models, including licensing deals

with online aggregators.

DWT 20587498v5 0025295-000064

**News Registry, hNews Microformat and News Usage Tag**

26.     In April 2009, AP announced publicly in a press release that it would launch an industry initiative to protect news content from online misappropriation.  In July 2009, AP announced the creation of the News Registry, an initiative to tag and track the use of AP's and its members' content online.  The News Registry had a dual purpose – both to ensure compliance with terms of use and to assist in the effort to create new aggregated digital news products and pursue business and licensing opportunities with free-riding scrapers and aggregators.

27.     As reflected in a summer 2009 Power Point presentation titled "The New Opportunity for News" presented to AP members, attached as Exhibit 8, AP proposed a three point "solution."  Its first element was to "Protect" content by "Identify[ing], track[ing] and enforc[ing] rights around use of news content online; its second element was to "Point" by "Enabl[ing] customer to locate and navigate to authoritative news sources"; and its third element was "Pay," meaning "Create products and systems that maximize revenue for news content." *Id.*  AP invested significant effort in publicizing the initiative and working with its membership to implement its key components, as reflected in the PowerPoint presentation. *Id.*

28.     AP also invested significant time and money in creating the News Registry.  From its initial development by AP, the News Registry was envisioned as a digital initiative in which news publishers could participate to track and analyze the consumption of their content on the Internet and thereby protect their content.  The News Registry relies on two technological tools developed by AP: the hNews microformat and a web beacon, known as the News Usage Tag.

29.     A microformat is a coding structure – a "digital wrapper" – that adds metadata to content published on the Internet, making it easier for a machine to parse and display to users.  Working with the Media Standards Trust, AP developed hNews, which is a microformat

microformats for content published on the Internet, but it adds several information fields that relate specifically to news content.  These metadata fields in the hNews microformat allow news publishers to provide a map to the various parts of an article.   For example, hNews allows the publisher to indicate that certain text is the byline, headline, or lede of an article.  The hNews microformat also allows for the identification of the copyright statement accompanying the article, thus helping to protect AP content.

30.     In addition to the hNews microformat, AP also developed web beacon technology, called the "News Usage Tag."  The News Usage Tag is a small piece of code embedded in the article formatting text, which is invisible to the eye. It is designed to report when content is displayed on a third-party website.  When a consumer clicks on an hNews-formatted article containing the News Usage Tag, the consumer's Web browser automatically requests an image from the News Registry server.  The image request from the consumer's browser provides the News Registry with enough information to uniquely identify the source and article that the consumer is reading.

31.     The purpose of the News Usage Tag is to allow AP to see how its content is being consumed on the Internet – for example, what types of articles are most widely read and which sites displaying AP content tend to draw the most traffic.  This data will ultimately help AP structure its product offerings, strategize about new areas of product development and news resources, and negotiate more effectively with potential licensees, including aggregators, and advertisers.  The News Usage Tag also will allow AP to monitor whether its content is being published by sites that do not have a license with AP, and thereby seek to bring these parties under license or exercise its rights to curb infringement.

32.     AP began implementation of the hNews microformat and News Usage Tag in late 2009 in AP's "Content API" and its "AP Webfeed" news products, and several of its members began implementing it on AP content on a voluntarily basis from April 2010 to December 2011.

33.     At the end of 2011, AP issued the most recent version of its Digital Use Agreement, which requires AP members to implement many elements of the hNews microformat and the News Usage Tag in AP content published on their websites as of June 1, 2012. AP has been working closely with its members to help them implement these requirements, and approximately one-third have done so already. AP has granted temporary waivers and extensions of the deadline to members who require additional time. We will continue to work with our members to deploy these helpful electronic tools to protect AP content and anticipate they will eventually be very helpful in advancing our goals.

**NewsRight**

34.     In July 2011, after years of investment and development within AP of the News Registry and the development of strategies for a joint licensing venture, AP joined with over two dozen other news publishers to create NewsRight (formerly the News Licensing Group). NewsRight is an independent business venture to streamline the process for third parties – such as commercial aggregators and media-monitoring companies – to license content from a large set of major publishers and to allow both publishers and third-party licensees to track and analyze the use of news content online. When NewsRight was formed as an independent company, AP transferred ownership of the News Registry to NewsRight. NewsRight announced its public launch on January 5, 2012.

35.     Members of NewsRight have entered into an agreement with NewsRight authorizing News Right to license its content on a non-exclusive basis to certain individually selected entities. AP delivered an executed "Agreement to License Content for Enterprise

Subscription Aggregation" ("NewsRight Aggregator License") to NewsRight on November 30, 2011.  A true and correct copy of a November 30, 2011 email to former NewsRight CEO David Westin attaching AP's executed NewsRight Aggregator License is attached hereto as Exhibit 9.

36.   Since its launch, NewsRight's first priority has been to seek licensing deals with unlicensed subscription aggregators servicing commercial enterprise clients.  NewsRight developed a lengthy list of such aggregators and each member decided whether NewsRight should be authorized to pursue a license with that entity on its behalf.  Meltwater is on NewsRight's list, although AP decided to handle its dispute with Meltwater separately.  (AP had no direct contact with Meltwater prior to the filing of this suit except for a casual inquiry in January 2011 as to whether it would be interested in an AP license.)

37.   As a start-up, NewsRight has begun research on and discussions with a broad array of subscription aggregators.  To date, it has entered into two license agreements with two subscription aggregators, namely Moreover Technologies and, very recently, Cision – both of which are direct competitors with Meltwater.  Neither license includes AP content, because AP – which already has an agreement with Burrelles/Luce that is serviced by Moreover Technologies and an agreement with Cision – did not authorize NewsRight to license AP content to Moreover or Cision.  To my knowledge, NewsRight is continuing its efforts to reach agreement with unlicensed aggregators.

38.   As referenced above, NewsRight is now responsible for the continuing development and operation of the News Registry.  NewsRight initially reported to its members the preliminary data collected through implementation of the News Usage Tag.  It has temporarily suspended that beta-level reporting, but eventually we anticipate the data will provide important information to AP regarding the use of its content.

39.     AP also has been actively involved in further developments to tag its content.  It is working on the development of rNews, another microformatting standard for annotating news-specific metadata that is being developed by the International Press Telecommunications Council (IPTC), an international consortium of major news agencies, publishers, and industry vendors.  rNews allows a publisher to use metadata to identify the same fields as the hNews microformat, along with several additional fields including usage terms.

40.     Other technology is underway.  AP and Getty are actively working with the IPTC to develop a new machine-readable language called RightsML, which would allow publishers to express licensing terms embedded in a news item's metadata.  For example, using RightsML, a publisher could indicate in a machine-readable format that a particular photo can only be licensed for use in certain geographic areas.  Once the RightsML technology is sufficiently advanced, it is AP's hope and intent to deploy it in connection with its news content.

41.     The News Registry and NewsRight represented a major shift in the way that news organizations operate online.  The goals that AP has been working toward over the past decade – ensuring that its content is widely available through licensed channels, and curbing unauthorized redistribution – cannot be accomplished overnight.  They require the cooperation of many different news organizations, some of whom have limited budgets to implement significant operational changes in a short time frame.  Nevertheless, AP's proactive and ongoing efforts in this area are helping to ensure that AP and its members are able to continue their crucial newsgathering function into the future and combat the threat posed by unauthorized commercial scrapers such as Meltwater.

## D.     Robots.txt is Not Well-Suited to Protecting AP Content Online

42.     I understand that Meltwater contends that AP should employ Robot Exclusion Protocols – also known as "robots.txt" instructions – to restrict access to AP content published

13

on the Internet.  Robots.txt is a convention used by website owners to indicate to cooperating automatic crawlers which sub-sections of a website may not be crawled.  To do this, a website owner posts a robots.txt file on the website directory containing a set of instructions.

43.     Robots.txt instructions were originally developed to manage bandwidth on a website by controlling traffic to certain areas of the site that could cause the site to crash.  To my knowledge, robots.txt instructions are not widely used by newspaper or other news websites to prevent crawling of news articles by commercial news aggregators. Moreover, the Meltwater website does not include any directions indicating that websites that do not wish to be scraped by Meltwater should employ robots.txt instructions or that such instructions will be followed by Meltwater.

44.     Robots.txt is ill-suited as a viable means for AP to control Meltwater's exploitation of its content.  Instead, after careful analysis, we believe that our combined reliance on terms of use, microformatting, and the News Usage tag, as well as our continued work on developing RightsML technology and seeking licenses from aggregators on our own and through NewsRight, are a better path toward protecting our content.

45.     First, robots.txt instructions do not create a physical or technological barrier to scraping content from a website.  A crawler can simply choose to ignore the robots.txt instructions and scrape the content regardless.  Given Meltwater's aggressive and public stance concerning its right to scrape the Internet and sell news created by others, I would not expect Meltwater to be among those entities that would always follow robots.txt instructions.

46.     Second, robots.txt is a blunt instrument that is ill-suited to convey the full range of licensing terms that govern the use of AP content by third-party consumers.  All that a robots.txt file can do is indicate that certain directories or files on a website should not be accessed at all,

14

either by a particular named crawler or all crawlers. Terms of use allow a publisher to convey licensing terms in a far more specific and nuanced fashion, and the microformats and RightsML expression language discussed above provides more specific copyright ownership information.

47.     Third, and perhaps most important, robots.txt instructions targeted exclusively to AP content would not technologically work on the vast majority of Internet sites publishing AP content under license from the AP. AP's members and other licensees – not AP – are the primary publishers of its content on the Internet. Robots.txt instructions can *only* restrict access to either an entire website or to content that is segregated in a certain identified subdomain. However, AP members and licensees are responsible for their own website structure and maintenance, and in the vast majority of instances, they elect to display AP content on their websites intermixed with their own content and organized by topic, rather than in a special segregated AP section. Thus, unless AP content is segregated into a separate section, with a unique subdomain, only robots.txt instructions preventing the crawling of the entire member website could even arguably deter Meltwater. But, AP cannot dictate how these publishers structure their websites or that they exclude crawlers from their site as a whole, simply because the website includes some AP content. It would be commercially unreasonable for AP to make such demands of its members and other licensees. Instead, AP requires that its members and licensees include AP copyright information and terms of use that indicate, among other things, that AP content may not be commercially exploited without a license.

48.     Finally, Meltwater does not need robots.txt instructions to learn of a news website's prohibitions against commercial use of its news stories. I understand Meltwater News specifically targets individual news websites for crawling and adds them to their database. There is no doubt a human component to this decision. Meltwater is a sophisticated user (or

15

exploiter) of news content and is surely aware that the Internet sites it crawls all have terms of use.  Indeed, as set forth more fully in the Cross Declaration, AP members overwhelmingly publish terms of use that are publicly available on their websites.  Even by reviewing the terms of use on only a handful of the AP member sites, Meltwater would know that its systematic commercial re-distribution of AP content is forbidden by those terms of use.  Meltwater does not need robots.txt instructions to pick up this message – which Meltwater has decided to disregard in any event.

E.    **Meltwater's Analytics**

49.    I would also like to address two aspects of the Meltwater News service, namely its basic analytics and its distribution of the lede from AP articles in contrast to Google Alerts.  I understand that Meltwater's basic media monitoring package includes a basic set of analytics related to the customer's search results consisting of a world map of geographic coverage; a list of the top few publications with hits on a particular topic or "agent"; a high-level snapshot of the number of hits on a particular topic; a "word cloud" of frequent words, and a "sentiment meter" indicating whether coverage on a particular topic tends to be negative or positive.  *See* McNamara Declaration for screenshots of these analytics.  Based on my experience in the industry working with AP, NewsRight, and AP's licensees on digital strategy, these analytical offerings are extremely rudimentary and unsophisticated.  They do not provide for rich correlation of data nor do they include more predictive analytics.  Furthermore, I am at a loss should Meltwater try to argue that including these very basis "analytics" somehow excuses their systematic taking and selling of AP content.  These analytics are completely free-standing. Unlike a book review or a movie review in which quotes are integrated into the larger review, Meltwater could readily supply its customers with such rudimentary statistics like the top publications that used a particular "agent" without copying and distributing the extensive

16

excerpts from AP articles in its News Reports and other search results. These "analytics" provide little more than graphic window dressing.

50.     I understand that Meltwater offers a more substantial suite of analytical tools in exchange for additional subscription fees, but these are not included in the basic media monitoring package.

**F.     Meltwater provides more text than Google in its Google Alerts**

51.     I have reviewed some Meltwater News Reports. In addition to the headline and the sentence(s) surrounding where a customer's "agent" or keyword appears in an article, the excerpts of AP articles delivered by Meltwater in its News Reports and on its platform include the lede of every article regardless of whether the lede contains a search term selected by the user. As set forth in the Kent Declaration, AP stories are constructed to convey the essence of the news story in the lede. Accordingly, the excerpts delivered by Meltwater through its platform and in the daily emailed New Reports allow its users to receive the essence of AP stories without having to access the full stories at the original website.

52.     I understand that Meltwater has sought to compare its News Reports with Google Alerts. Setting aside that Google licenses the use of AP content, a review of Google Alerts helps to underscore that Meltwater's taking of content is more significant and goes beyond what is necessary to "alert" a customer to an article that she may want to read. Google Alerts delivers only a short excerpt containing the user's selected keyword, and does <u>not</u> include the lede (unless the keyword is in the lede). A copy of several Google Alerts I received recently, illustrating the difference between the two services, is attached as Exhibit 10. Attached as Exhibit 11 are screenshots of the articles excerpted in these Google Alerts, with the excerpted sections highlighted. Common sense dictates that without the lede, the user is far more likely to

DWT 20587498v5 0025295-000064

click though to the original websites to learn the context of the hit and the news developments being reported.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on November **6**, 2012.

JOX JONES

DWT 20587498v5 0025295-000064