UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

**REDACTED VERSION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ASSOCIATED PRESS,

               Plaintiff,

  - against -

MELTWATER U.S. HOLDINGS, INC.;
MELTWATER NEWS U.S., INC.; and
MELTWATER NEWS U.S. 1, INC.

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**FILED UNDER SEAL**

12 Civ. 1087(DLC)(FM)

ECF Case

**DECLARATION OF**
**SUE CROSS**

Pursuant to 28 U.S.C. § 1746, I, **SUE CROSS**, declare as follows:

1.    I am the Senior Vice President, Business Development and Partner Relations for the Americas, for The Associated Press ("AP"), plaintiff in this action. I submit this declaration in support of AP's motion for summary judgment against Defendants Meltwater U.S. Holdings, Inc., Meltwater News U.S., Inc., and Meltwater News US1, Inc. (collectively "Meltwater" or "Meltwater News"). This declaration is based on my personal knowledge except as otherwise stated.

**INTRODUCTION**

    **My Background**

2.    I graduated from The Ohio State University in 1983 with a Bachelor of Science in journalism. I joined the AP that same year as a reporter. After serving as a reporter, editor and newsroom manager in several bureaus, I became the AP's Bureau Chief in Los Angeles in 1998. I have since served as the Vice President, Western Region from 2003-2005; Vice President, Online Services for U.S. Newspapers from 2005-2008; and Senior Vice President, Global New Media and Media Markets for the Americas from 2008-2010 before I took my current position.

3.     Since 1998, I have been responsible for various aspects of AP's business model and strategies. In my current role as AP's Senior Vice President, Business Development and Partner Relations for the Americas, I oversee AP's licensing business throughout the United States, Latin America and Canada to AP's print, broadcast, and digital customers as well as government and some commercial customers.

**Associated Press**

4.     AP is one of the most highly regarded news organizations in the world. AP is known for its high standard of excellence and its ability to cover and break news around the globe, as well as in each state house in this country. AP is able to maintain this high level of journalism by earning license fees from its approximately 8,000 licensees under contract for the use of its content. I am responsible for overseeing AP's approximately REDACT in annual licensing revenues from the Americas. These revenues are the foundation for the vast expenses associated with AP's worldwide news coverage, including the costs of employing and protecting the approximately 2,300 reporters and editors AP has on staff, often reporting from danger zones, to the sophisticated and ever changing technology required to capture and instantaneously transmit the latest news, to the basic training, security, legal and other necessary costs associated with running a global news organization. A financial statement reflecting AP's newsgathering expenses for fiscal years 2008-2011 is attached as Exhibit 32.

5.     AP needs to be compensated for the commercial use of its content to survive as a business and to continue to maintain its critical role as a vital source of accurate, comprehensive news. This obvious principal is recognized across the marketplace. Independent of its agreements with members and associate members, AP has licensing agreements for virtually every conceivable use of AP content. Thus, for example, on one end of the spectrum, AP has longstanding and substantial license agreements with large entities like LexisNexis and Factiva,

2

two well-known electronic services that allow customers to retrieve full AP articles and search AP's archives.  At the other end of the spectrum, AP licenses various AP Headline products consisting of nothing more than headlines of news stories.  AP has many licenses that permit the publication and distribution of excerpts from AP's articles, including our significant license with Google, which covers the use of AP content in Google News as well as in regular search results. In short, commercial and systematic exploitation of AP's content in every conceivable platform and guise should be, and in fact is, regularly licensed.

6.      For more than 150 years, AP articles have largely appeared in print through its members and other authorized licensees.  Attached as Exhibit 1 are selected pages from a document produced by AP listing AP's members and associate members.  (All entities with a 5-letter ID in the "Name" Column of Ex. 1 are AP members and associate members.)  In the vast majority of instances, AP does not publish its news stories directly to the public.  Rather, AP's business model is to license its news products to its members and a wide range of other licensees. Some of these licensees in turn re-distribute AP's news stories; others, like many governmental, non-profit and corporate organizations, merely subscribe to AP's news products to monitor the news and stay apprised of newsworthy events.

7.      Meltwater News competes directly with AP for its government, non-profit and corporate subscriber business.  In fact, as I will explain below, we believe on several occasions AP licensees have terminated their agreements with the AP and moved to Meltwater's services. We, of course, expect competition, and routinely rise to the challenges of competition, yet Meltwater News competes on an unfair playing field:  it does not create or license the news content it sells to its subscribers; nor does it not engage in any commentary or critique of the news.  Instead, Meltwater News' only investment lies in the technology required to scrape and

DWT 20585682v3 0025295-000064

sort news content from the web, a sales staff to market and distribute all this news created by others, and the minimal costs of distribution in the internet age. Meltwater obtains AP and other news content by crawling and searching the websites of AP's members and licensees (like Yahoo News) and then systematically re-packages AP articles to deliver on a daily basis verbatim excerpts from the news to its paying customers.

8. Despite the fact that many of Meltwater News's competitors in the media monitoring market obtain a license for the use of AP content, I understand that Meltwater contends that its vast appropriation and sale of AP news is justified because the content is available for "free" on the Internet and because it acts as a "search engine" that supposedly performs an independent and distinct function from that provided by the Associated Press. I submit this declaration to explain how fundamentally in error Meltwater is. AP's content appears on the Internet subject to license agreements and terms of use that make it clear that Meltwater is in gross violation of these express terms by its systematic and commercial exploitation of AP's content. And its new-found self-identification as a "search engine" – rather than a modern-day clipping service or media monitoring service – hardly distinguishes Meltwater from services provided by the AP. AP offers licensees its web-based platform "AP Exchange," which features a powerful search engine that enables AP's customers to perform Boolean searches across its news content and to customize the way they receive and manage AP content. Let me explain the facts in more detail.

## DIGITAL EXPLOITATION AND LICENSING OF AP CONTENT

9. The digital age has been both a challenge and an enormous opportunity for AP. The challenge has been in developing the systems to regulate the ways in which AP content is distributed on the Internet and to control the downstream use of its content. The opportunity has been the growth and diversity of AP's client base. AP now earns more than $75 million annually

4

in gross revenues for a vast array of digital and commercial clients.  (Attached as Exhibit 2 is a list of AP's digital and commercial licensing clients.)

### Copyright Statements and Digital Use Agreements

10.     AP has adopted a multi-faceted approach to protect its content on the Internet and to make clear that its intent is to prohibit commercial use of AP's content without a license. First, AP includes in all of its articles a copyright line stating, "Copyright [Year] Associated Press.  All rights reserved.  This material may not be published, broadcast, rewritten or redistributed" (hereinafter the "AP Copyright Statement").

11.     Second, when AP members began to create websites to display their news, AP had to make the decision as to whether it would allow AP content to be displayed on the Internet and, if so, under what terms and conditions.  Ultimately, AP has granted its members the right to publish AP content on the Internet pursuant to a standard form Digital Use Agreement, which has been periodically updated over the years.  Through the Digital Use Agreements, AP has taken significant steps to limit the use and availability of AP content on the Internet.  (A sample of the initial 2005 Digital Use Agreement governing all members is attached as Exhibit 3; a sample of the Digital Use Agreement in effect for all members in June 2010 is attached as Exhibit 4; a sample of the recently updated Digital Use Agreement dated December 2011 in effect for all members is attached as Exhibit 5.)  The Digital Use Agreements were designed to provide the requisite public notice that would hopefully prevent the very activities undertaken by Meltwater:  the scraping, indexing and commercial redistribution, sale and archiving of AP content.

12.     From its earliest inception, the Digital Use Agreement has granted to AP's members only a "non-transferable limited license" to display AP content "for personal, non-commercial use only" and has placed significant restrictions on any copying of AP content by

5

the members' users, including an express prohibition on commercial use.   More specifically, the Digital Use Agreements grant to members the right to "publicly display a selection of AP news material from the AP news services . . . in the Member Digital Services . . . in order to allow individuals ("Users") to access and use the AP Services or the AP Material in the Member Digital Services for personal, non-commercial use only" and the right to allow the members' Users "to reproduce a single copy of individual items contained in the AP Services for their personal use only and not for commercial use, resale or redistribution in any manner" or to forward stories "to individuals for non-commercial personal use only." *See* Ex. 3 at § 1.1.4; Ex. 4 at § 1.1.4; Ex. 5 at § 1.1.4.

13.   The Digital Use Agreements also provide that Members must label AP stories as copyrighted AP material and shall display the AP Copyright Statement recited above with each article.  See Ex. 3 at § 5.1; Ex. 4 at § 5.1; Ex. 5 at § 5.1.  Likewise, the Digital Use Agreements provide that, as a "material part of this Agreement and portion of the consideration to AP from Member," members must post a notice of terms and conditions on their websites forbidding redistribution or commercial use of AP content.   *Id.*  The notice specifies that the terms of use apply to "all Users and other visitors" including "digital engines of a kind that crawls, indexes, scrapes, copies, stores, or transmits digital content."  The notice further states:

> By accessing this Web site or digital service, you specifically acknowledge and agree that: (i) Associated Press text, photo, graphic, audio and/or video material shall not be published, broadcast, rewritten for broadcast or publication or redistributed directly or indirectly in any medium; [and] (ii) No Associated Press materials nor any portion thereof may be stored in a computer except for personal and non-commercial use.

See Ex. 3 at Attachment B; Ex. 4 at Attachment B; Ex. 5 at Attachment B.

14.   Finally, from the outset, the Digital Use Agreements have severely restricted the members' ability to archive AP content.  Specifically, the Digital Use Agreements prevent

6

members from archiving or retaining AP material "in an on-line or wireless electronically retrievable format for retrieval by users for more than 30 days without the express written permission of AP." See Ex. 3 at § 2.2; Ex. 4 at § 2.2; Ex. 5 at § 2.2. As I will discuss in more detail below, the right to archive, or have access to AP's vast archive, is a particularly valuable right which AP closely monitors and enforces.

### Updates to the Digital Use Agreements

15.     As technology has evolved, AP and its members have adapted and updated its Digital Use Agreements. Thus, when members started to use RSS (Really Simple Syndication) feeds, the Digital Use Agreements addressed RSS feeds. The Agreements restrict the amount of AP content available on a Member's RSS or similar feeds to a "summary" that "does not contain sufficient detail to allow a User to receive the full benefit of the story and in no instance shall be longer than 30 words." See Ex. 3 at § 1.1.3; Ex. 4 at § 1.1.3; Ex. 5 at § 1.1.3.

16.     Over the past several years, AP has invested millions in developing technology to be able to better track and organize its content.   To facilitate these developments, in its most recent Digital Use Agreement, AP requires its Members as of June 1, 2012 to adopt and implement metadata microformatting and a web beacon.  This effort is described more fully in the Declaration of Joy Jones.  Briefly stated, the hNews microformat – designed specifically for news content – requires AP members to format AP articles with metadata identifying several important fields, including the AP Copyright Statement.   The web beacon, also called the "News Usage tag," is a small piece of code designed to report to NewsRight's News Registry Service when content is displayed on a third-party website, and thus allows AP to better track and police the usage of its content, and also creates untold new opportunities for marketing AP content to licensees.   See Ex. 5 at § 5.3.

DWT 20585682v3 0025295-000064

**AP Hosted and Yahoo Agreement**

17.    I understand that Meltwater scrapes some AP articles from web addresses with an AP Hosted URL.  AP Hosted is a platform that provides the means for certain AP members to post AP content on their websites under the members' mastheads.  As set forth in the Declaration of Joy Jones, this content is also protected by terms of use similar to the Digital Use Agreements that expressly prohibit commercial use.

18.    Further, I understand that Meltwater News also obtains AP content by crawling Yahoo News.  As with the Digital Use Agreement, the agreement between AP and Yahoo limits Yahoo's license to permitting "Users to download and print portions of the Service available on the System for personal, non-commercial use only."  Attached as Exhibit 6 are selected pages from AP's January 1, 2010 agreement with Yahoo! Inc.; see *id.* at § I.A.  Like the Digital Use Agreement, the AP/Yahoo agreement also provides that Yahoo may not sublicense AP content.  More specifically, it states:

> Nothing in this Agreement shall be construed to constitute or
> appoint either party as the agent or representative of the other party
> for any purpose whatsoever, or to grant either party any rights or
> authority to assume or create any obligation or responsibility,
> express or implied, for or on behalf of or in the name of the other,
> or to bind the other in any way or manner whatsoever.

*Id.* at § XII.B.

**Terms of Use**

19.    In keeping with the Digital Use Agreement, all or virtually all of AP's members post terms of use governing their news websites that are readily available to all users of the sites. Some use the exact language set forth in the Digital Use Agreement; some use their own wording of similar import.  Certainly, it is the general custom and practice of our members to post terms

8

of use forbidding the commercial use of the news stories.  Many also explicitly forbid crawling and indexing of the content.

20.     In addition, the most recent Digital Use Agreement requires members to display a prominent link within the member's own terms and conditions to an electronic page hosted by AP containing the AP terms and conditions applicable to its web content.  See Ex. 5 at § 5.2. (Some of our members have already incorporated the AP link into their terms of use; others are in the process of implementing this direct link to AP's terms of use.)

21.     Here are some representative "terms of use" posted on AP member websites.  I understand that Meltwater scraped a version of at least one of the Registered Articles named in the Amended Complaint from each of these websites.   The publicly available terms of use posted on the *Army Times* website provide a good example of the type of notice provided to all users of AP member sites.  The posted terms of use include the following:

> This Site and all the materials available on the Site are the property of us and/or our affiliates or licensors, and are protected by copyright, trademark, and other intellectual property laws. The Site is provided solely for your personal noncommercial use. …
> [u]nless explicitly authorized in these Terms of Service or by the owner of the materials, you may not modify, copy, reproduce, republish, upload, post, transmit, translate, sell, create derivative works, exploit, or distribute in any manner or medium (including by email or other electronic means) any material from the Site. You may, however, from time to time, download and/or print one copy of individual pages of the Site for your personal, non-commercial use, provided that you keep intact all copyright and other proprietary notices.

A copy of the terms of use for the *Army Times* website, available at http://www.armytimes.com/terms/ (last visited October 31, 2012), is attached as Exhibit 7; see *id.* at 1.  The *Army Times* terms of use also contain a paragraph titled "Limitations on Use of Associated Press Materials," which contains a separate notice regarding AP content and a link to

9

AP's "Terms And Conditions Applicable To The Works Of The Associated Press Displayed On The Web Or Distributed Via The Internet." *Id.* at 2.

22.    Similarly, the publicly-available terms of use for the *San Antonio Express-News* website include the following:

> **Prohibited Use.** Any commercial or promotional distribution, publishing or exploitation of the Web Site, or any content, code, data or materials on the Web Site, is strictly prohibited unless you have received the express prior written permission from authorized personnel of the Newspaper or the otherwise applicable rights holder. Other than as expressly allowed herein, you may not download, post, display, publish, copy, reproduce, distribute, transmit, modify, perform, broadcast, transfer, create derivative works from, sell or otherwise exploit any content, code, data or materials on or available through the Web Site. You further agree that you may not alter, edit, delete, remove, otherwise change the meaning or appearance of, or repurpose, any of the content, code, data, or other materials on or made available through the Web Site.

A copy of the terms of use for the *San Antonio Express-News* website, available at http://www.mysanantonio.com/about_us/terms_conditions/ (last visited October 31, 2012), is attached as Exhibit 8; *see id.* at 1. The *San Antonio Express-News* terms of use also include:

> **Prohibited User Conduct.** You warrant and agree that, while using the Web Site and the various services and features offered on or through the Web Site (including, for example and without limitation, blogs, Podcasts, RSS feeds, video players, photo galleries, chat rooms and other public or open forums), you shall not . . . insert your own or a third party's advertising, branding or other promotional content into any of the Web Site's content, materials or services ... or use, redistribute, reuse, republish, repurpose or otherwise exploit such content or service for any purpose or reason, including without limitation, further commercial or promotional purposes; . . . You also shall not and, by your use of the Web Site, represent and warrant that you are not . . . engaging in spidering, "screen scraping," "database scraping," harvesting of e-mail addresses, wireless addresses or other contact or personal information, or any other automatic means of obtaining lists of users or other information from the Newspaper, including without limitation any information residing on any server or database connected to the Web Site or the services offered on or through the Web Site . . .

DWT 20585682v3 0025295-000064

*Id.* at 2.

23.     There are any number of other examples of publicly available and comparable terms of use from AP member sites that routinely publish AP content.  In each case, the terms of use expressly prohibit the commercial re-use of any content from the site, including the re-sale and archiving of the content.  Notwithstanding these prohibitions, I understand that Meltwater has scraped, indexed, and sold AP content from each of these websites.  Exhibit 9 collects other examples, including a copy of the terms of use from the website of the *Fremont Tribune*, available at http://fremonttribune.com/terms/ (last visited October 31, 2012) and a copy of the terms of use from the website of the *DemocratHerald.com*, available at http://democratherald.com/terms/ (last visited October 31, 2012).

24.     AP's Members are not the only licensees of AP content that forbid commercial use of content appearing on their websites in their terms of use; indeed, my understanding is that it is custom and practice for online news providers to include terms of use on their websites prohibiting commercial use.  For example, as described earlier, AP has a license agreement with Yahoo that allows the display of its content on its site.  Yahoo's terms of use contains a section entitled "NO COMMERCIAL REUSE OF YAHOO! SERVICES" that states, "You agree not to reproduce, duplicate, copy, sell, trade, resell or exploit for any commercial purposes, any portion or use of, or access to, the Yahoo! Services (including Content, advertisements, Software and your Yahoo! ID)."  A copy of Yahoo!'s publicly-available terms of use, available at http://info.yahoo.com/legal/us/yahoo/utos/utos-173.html (last visited October 31, 2012), is attached as Exhibit 10.

25.     Similarly, Google, another AP licensee, also restricts the use of its displayed content – including Google News RSS feeds – for commercial purposes.  Google News, which

11

"aggregates headlines from more than 50,000 news sources worldwide, groups similar stories together and displays them according to each reader's personalized interests" makes clear that:

> [Y]ou may only display Google News content for your own personal use (i.e., non-commercial use) and you may not otherwise copy, reproduce, alter, modify, create derivative works, or publicly display any content. For example, you may not use Google News content to sell a product or service, to increase traffic to your site for commercial reasons, such as advertising sales, take the results from Google News and reformat and display them, or use any robot, spider, other device or manual process to monitor or copy any content from Google News.

A copy of the publicly-available page titled "About Google News" that includes these terms of use, available at http://support.google.com/news/bin/answer.py?hl=en&answer=106259 (last visited October 31, 2012), is attached as Exhibit 11. Google further states: "We invite you to make noncommercial use of Google's RSS feeds on your website" but advises users:

> Once again, you may only display Google News content for your own personal use (i.e., non-commercial use) and you may not otherwise copy, reproduce, alter, modify, create derivative works, or publicly display any content. For example, you may not use Google News content to sell a product or service, to increase traffic to your site for commercial reasons, such as advertising sales, take the results from Google News and reformat and display them, or use any robot, spider, other device or manual process to monitor or copy any content from Google News.

A copy of the publicly-available page titled "Incorporate RSS feeds onto your site" that includes these terms of use, available at http://support.google.com/news/bin/news/bin/answer.py?hl=en&answer=40796 (last visited October 31, 2012), is attached as Exhibit 12.

26.     The New York Times, an AP Member, also prohibits the re-use and commercial distribution of content from its RSS feed. The NYTimes.com RSS feeds terms and conditions state: "[Y]ou may not, directly or indirectly: (a) sell, modify, translate, copy, publish, transmit, distribute or otherwise disseminate the Service or any portion thereof . . . ." A copy of the

12

publicly-available page titled "NYTimes.com RSS feeds – Terms and Conditions," available at http://www.nytimes.com/services/xml/rss/termsconditions.html (last visited October 31, 2012), is attached as Exhibit 13; *see id.* at 1.

27.      Meltwater is a sophisticated consumer of intellectual property content. Its business is built on the backs of news content reported, edited and distributed by others. It cannot claim ignorance of the basic principles and practices surrounding the exploitation of news content created by others. Indeed, I understand that Meltwater has been embroiled in two previous copyright actions – one in its original home base, Norway, and the other more recently in England – where courts found Meltwater's media monitoring reports to require a license. It is inconceivable to me that Meltwater is not fully aware of the general practice of most websites to include in their terms of use a strict prohibition on the commercial use of content obtained from the websites, as well as other critical restrictions routinely violated by Meltwater. Nor can Meltwater plausibly claim that it believed that the AP content that appears on its members and licensees' websites is free for the taking and not subject to express terms and conditions that it routinely violates.

## AP'S EXPLOITATION OF THE MARKET

28.      AP has been directly harmed by Meltwater's failure to pay a licensing fee to AP for its use of AP content. Further, if Meltwater's activities are left unchallenged, the unrestricted and widespread conduct of the sort engaged in by Meltwater would result in a substantial adverse impact on the potential market for and value of AP's copyrighted works. There can be no dispute that AP already has numerous license agreements in place that cover activities of the same nature as Meltwater News' provides. Indeed, the market occupied by Meltwater has been a traditional market for AP for some time. AP has broadly exploited the market for distribution of every aspect of its content in nearly every medium, including the digital realm. See Ex. 2 (list of

13

AP's digital and commercial market licensees). This includes not only the full text of AP articles, but also excerpts from its articles and headlines.

### AP Has License Agreements with Key Aggregators of Content

29.    In addition to copyright statements and terms of use, AP's licensing practices communicate a powerful and consistent message to the market: commercial use and exploitation of AP content must be under license. As I noted above, AP has had longstanding license agreements with LexisNexis, Factiva and other entities that deliver news articles to subscribers via search queries. In addition, several years ago, as the use of AP content began to grow on the web, AP targeted significant players in that market, such as Yahoo! and Google News, and negotiated agreements with them to reinforce the message to the public and the marketplace that its content has value and that systematic, material use of its content, including in search results, must be licensed. AP also entered into significant agreements with AOL (including Huffington Post) and Microsoft which reinforce the corporate recognition of the value of AP content.

30.    The Google agreement is particularly instructive. Negotiations between AP and Google were long and hard-fought, but the two companies were ultimately able to reach an agreement whereby Google was able to officially license AP content. Google has adopted a very public stance that its use of others' copyrighted works – whether in search results, Google News, or any of its developing products – is a fair use and that they do not require licenses for their various exploitations. AP took an equally public position that the commercial use of its content needed to be pursuant to licenses, including Google's uses. Ultimately, Google and AP came to terms.

31.    AP's current agreement with Google, the August 27, 2010 Amended and Restated Content License Agreement, reaffirms the basic principle that AP content must be licensed. (A copy of the August 27, 2010 Amended and Restated Content License Agreement between AP

14

and Google is attached as Exhibit 14.)  Under this agreement, AP grants Google a  REDACT

REDACTED

*Id.* at

§ 2.1.                                          REDACTED

*Id.* at § 11.1.

32.                             REDACTED

15

**AP Has Broadly Exploited the Digital Market**

33.    AP has broadly exploited the digital market, including entering into licenses with many of Meltwater's competitors.  Meltwater's most direct competitors in the media monitoring space include Cision (formerly known as Bacon's) and BurrellesLuce.  AP has license agreements with both Cision and BurrellesLuce (which operates with Moreover).  AP's current agreement with Cision is in the process of renegotiation to better reflect the value of Cision's current use of AP content.  (The September 9, 1996 agreement between Cision and AP and the relevant December 1, 2008 amendment to that agreement are attached as Exhibit 15; the December 19, 2002 agreement between BurrellesLuce and AP and relevant June 1, 2012 amendment to that agreement are attached as Exhibit 16.)

34.    These agreements cover similar rights as Meltwater is exploiting, but without a license.  Thus, the 1996 agreement between Cision and AP grants Cision the right to use AP content for its "press clipping service that delivers, on a delayed basis, clippings from newspapers and newswires such as the Associated Press."  See Ex. 15 at § I, Attachment B.  The 2008 amendment specifically grants Cision the right to distribute "AP text scraped from third party AP licensee websites ("AP Articles") . . . as well as links to AP Articles and excerpts of AP articles."  See Ex. 15 at AP0000875.

35.    Similarly, the June 2012 amendment to the December 2002 agreement between AP and BurrellesLuce specifically grants BurrellesLuce the right to redistribute "Snippets"— defined as "headlines and leading 140 characters from AP content"— "as part of an aggregated feed of licensed content" directed toward a primary market of "Media Monitoring & Evaluation ("MME") companies, who specifically cater to internal corporate communications and PR professionals and their external agents."  Ex. 16 at AP0011141, §§ 1.9, 2.1, 4.1.

36.     While Google's services are consumer based (rather than the government and corporate market exploited by Meltwater), Meltwater on some level also competes directly with Google News and/or Google Alerts.  Google News is a computer-generated news site that aggregates headlines from news sources worldwide, groups similar stories together, and displays them according to each reader's personalized interests.  Google Alerts is a product offered by Google that emails a user when Google finds new results – such as web pages, newspaper articles, or blogs – that match the user's search term.  In the case of news articles, the email from Google Alerts will include the headline and a short excerpt from the hit sentence where the search term appears.  As stated above, AP has entered into a "Content License Agreement" with Google, which covers Google's Google News and Google Alerts products.  See Ex. 14 at §§ 1.6, 1.7, 2.1, 4.1.

37.     Meltwater also competes in the marketplace with AP's longstanding licensees, Factiva and LexisNexis.  Because their services are more expensive than Meltwater's, both Factiva and LexisNexis have told us that they believe they have lost business to Meltwater.  (A copy of an email chain reflecting discussions with Factiva about their competition with Meltwater is attached as Exhibit 17.)  And, to the degree that their businesses suffer, that also has a direct effect on AP in terms of potential royalty and licensing revenues.

38.     AP has a substantial license with Factiva.  (The February 26, 2003 agreement between Factiva and AP and the relevant August 6, 2009 amendment to that agreement are attached as Exhibit 18.)  Thanks to its license, Factiva is permitted to redistribute AP content, in part or in whole, to Factiva's users over the Internet.  Id. at § 2(a), Schedule D.  Factiva is also allowed to use "automated systems to deliver portions of the Information in headlines delivered in response to a search request."  Id. at § 2(e).  And, pursuant to the August 2009 amendment,

17

Factiva is permitted to make "snippets" of AP content available to its users "in response to search requests." *Id.* at AP0001511.

39.     LexisNexis has been a long-standing and significant licensee of AP's.  (A copy of the current February 1, 2005 agreement between LexisNexis and AP is attached as Exhibit 19.) This agreement permits LexisNexis to "reproduce, display, [and] distribute … authorized use of" AP materials "and any portion thereof through [LexisNexis's] products and services." Ex. 19 at § I.A.  The license includes allowing LexisNexis customers to redistribute AP content for promotional purposes on the customers' public websites (*id.* at § I.E) as well as permitting LexisNexis to distribute AP content in newsletters and other formats to general, business, legal, government, and academic professionals (*id.* at Schedule H).

40.     AP has entered into licensing agreements with a broad array of other digital aggregators, digital portals, search engines, mobile applications, and other digital licensees. These include, without limitation, agreements with  InfoDesk (content management and delivery platform for businesses, including tools for email alerts and customer newsletters), Flipboard (mobile application for display of content in a magazine-like format), Newsbank Media Services (searchable online news database), NewsCred (aggregator of news content), Acquire Media (provides real-time news management and redistribution tools for businesses, including NewsEdge and News Trade), EBSCO (online research database), Interactive Data Real Times Services (financial information system), Yellowbrix (business intelligence platform including real-time content delivery, distribution tools, and analytics), ProQuest (online research database), Highbeam Research, Inc. (searchable online content archive), Newser (aggregator and portal site, formerly part of Highbeam Research), Captivate Network (curated display of news, including headlines and photographs, in elevator display screens), JumpTap (mobile platform and search

18

engine), Navy Federal Credit Union (display of headlines on digital screens at credit union),

Motricity (wireless platform).  Examples of these licenses are attached as Exhibits 20 (April 30,

2007 agreement with Captivate Network), 21 (March 1, 2010 agreement with the Navy Federal

Credit Union) and 22 (November 21, 2005 agreement with InfoDesk, Inc.).

  41.  In each of these licenses, AP carefully restricts the use of its content.  Further, as

noted above, AP's Digital Use Agreements with its members allow excerpts of AP articles (not

to exceed 30 words) in RSS feeds.

  42.  Finally, AP also grants licenses for excerpts of its copyrighted content in non-

digital markets through The YGS Group, which generates approximately $100,000 per year in

revenue for AP.  For example, AP recently licensed an approximately 450-word excerpt  from

the August 9, 1927 article entitled "Warns Aliens Not to Join in Sacco parades" to the Center for

Learning for use in the publication titled *Boom and Bust: The 1920s*.  A copy of the June 6, 2012

email from The YGS Group granting this licensing use is attached Exhibit 23.

  43.  In sum, Meltwater has failed to pay AP the customary fee for its use of AP

content in a market that AP actively exploits.

### Meltwater News Offers Features That Are Strictly Controlled By AP and Only Licensed For Valuable Consideration

  44.  Aggravating the fact that Meltwater does not license the AP content it exploits

and sells is that it also offers various features, touted widely in its marketing materials, which AP

licenses for valuable additional consideration.  Of particular import is that Meltwater News

offers its customers the ability to search for and obtain excerpts from news articles in a database

dating back as far as 2001 that includes AP articles; as it states in a "Meltwater News Service

Breakdown" (attached as Exhibit 24), Meltwater "[a]llows access to Meltwater News' archive

containing millions of articles dating back to 2001."  Then, Meltwater News also provides a

19

customer archive function, a newsletter and newsfeed function, and a translation function.  Each of these subsidiary markets is exploited by AP.  In other words, AP either grants or limits these rights as part of the overall calculation of the license fee.  Meltwater simply takes and exploits these valuable rights for free.

45.     The right to create an archive is a particularly valuable right and one that AP carefully manages.  As indicated above, the Digital Use Agreements limit members' ability to archive AP content by expressly restricting the archiving or retaining of articles for more than 30 days, without written permission from AP.  *See, e.g.*, Ex. 3 at § 2.2, Ex. 4 at § 2.2, Ex. 5 at § 2.2.  Similarly, the agreement with Google limits Google's ability to archive AP content by restricting the availability of that content to 30 days.  Ex. 14 at § 3.4.

46.     Likewise,  the Cision agreement prohibits Cision from building "archival files" and states that no portion of AP's content shall be held in Cision's "computers or stored in another medium for more than fourteen (14) days."  See Ex. 15 at § III.E.  The 2002 BurrellesLuce agreement also provides that BurrellesLuce "will not build archival files using the Service and/or AP Content, or any portion thereof."  Ex. 16 at § 4.3.  The 2002 agreement further states that "No individual component of the Service and/or AP Content, will be held in [BurrellesLuce] computers or stored in another medium for more than 30 days." *Id.*

47.     AP imposes these archiving restrictions on its licensees because AP earns substantial revenues by licensing to LexisNexis and other library databases the right to host an archive of its articles.  See Ex. 19.

48.     AP's licenses with news aggregators, like its licenses with members and other organizations, also place limitations on their users' abilities to both store and re-distribute AP content.  Thus, while Meltwater News customers can store and re-distribute AP content through

their individual customer archive, electronic newsletter and newsfeed functions, AP's license with Cision for Cision's "news clipping service" requires that Cision's subscribers agree in writing (a) not to distribute AP content "in any medium" (except that corporate, governmental, and institutional subscribers can use "portions" of the service "for internal printed communications and memoranda"), and (b) not to store "all or any portion" of the service "in any permanent form," including archives and computer files. See Ex. 15 at § III.C.

49.     AP's license with BurrellesLuce contains similar provisions that restrict the use of AP content. The June 2012 amendment to the December 2002 agreement requires that BurrellesLuce's contracts with its "MME" (Media Monitoring & Evaluation) customers include "language that forbids any systematic archiving of, or further commercial use of, the AP's content, including internet or intranet posting of the content." Ex. 16 at AP0011142, § 5.3.

50.     AP also licenses its content for companies to use in their extranets in limited circumstances. For example, its agreement with LexisNexis permits AP content to be posted on a LexisNexis customer's extranet if: (1) the extranet is controlled-access and only available to a customer's employees; (2) the extranet is available to the general public for promotional purposes only, in which case no more than 10 stories may be provided; or (3) the extranet is controlled-access and available to individuals who have a "direct relationship" with the customer and AP approves of that use. Ex. 19 at § I.E.

51.     Some of AP's content is also subject to restrictions imposed by agreements between AP and its members that restrict some AP content to distribution by members only. For example, only AP members have the right to distribute AP's state news reports to the public, unless particular stories are on a national product, like AP Top News. AP is not permitted to sell to non-members for public display content that only appears in state news reports; instead, it is

21

limited to selling that content to desktop clients, like government agencies, for internal use and to LexisNexis on a time delay. Thus, it is of significant concern that Meltwater sells this restricted category of AP content to its customers. In particular, some of the articles at issue in this lawsuit derive from the state wires that are contractually restricted to AP members, such as "Albert King gets marker on Mississippi Blues Trail" (Am. Cplt. Ex. K); "Wednesday is 1-year mark of border agent's death" (*id.* Ex. Q); "Illinois House approves early prison release plan" (*id.* Ex. AA); and "LA pastor sentenced to 15 years in Medicare fraud" (*id.* Ex. KK).

52.     Finally, AP licenses the right to distribute translations of AP content – as, for example, in its agreement with Yahoo. See Ex. 6 at § I.C. Yet, without any license from the AP, Meltwater also provides a translation service to its customers.

53.     In short, Meltwater has failed to pay the customary fee for these additional features of its Meltwater News service, including its archive of articles dating back to 2001, its customer archives, its newsletter and newsfeed functions and its translation function.

## "LOST CUSTOMERS" AND COMPETITION WITH MELTWATER FOR ACCOUNTS

54.     I understand that in his declaration, David Rizzo will discuss federal government accounts for which AP has competed with Meltwater. In the past several years, AP has also lost accounts with state and local agencies and organizations, many of which were receiving our state wire products.

55.     In March 2009, the Mississippi Development Authority, an AP customer since 2002, terminated its AP subscription with an effective date of February 15, 2009. At the time it cancelled its AP service, the Mississippi Development Authority was receiving the AP Mississippi State Wire and Daybook via AP Exchange, a subscription valued at approximately REDA on an annualized basis. AP's billing contact at the Mississippi Development Authority was Paula Travis. Attached as Exhibit 25 is a screenshot from AP's customer database, showing

22

the internal termination order for the Mississippi Development Authority, including a copy of an internal email exchange filed along with the termination order. Attached as Exhibit 26 is a screenshot from AP's customer database showing AP's service history record for the Mississippi Development Authority, and attached as Exhibit 27 is the initial February 15, 2002 agreement between AP and the Mississippi Development Authority.

56.    In March 2008, the New York State Department of Correctional Services terminated its AP subscription. The New York State Department of Correctional Services had been an AP customer since at least 2002, receiving AP's Crime Alert, Metro Wire, and New York State Report via the AP Exchange platform (which was called AP Accessa at the time). At the time the New York State Department of Correctional Services cancelled its service, its subscription was valued at approximately REDA on an annualized basis. Attached as Exhibit 28 is the April 1, 2005 contract between AP and the New York State Department of Correctional Services for five years of service. Attached as Exhibit 29 is a screenshot from AP's customer database, showing the internal termination order for the New York State Department of Correctional Services. Attached as Exhibit 30 is a screenshot from AP's customer database showing AP's service history record for the New York State Department of Correctional Services.

## INDUSTRY-SPECIFIC AP NEWS PRODUCTS AND THE AP EXCHANGE SEARCH ENGINE ALLOW LICENSEES TO TARGET RELEVANT STORIES

57.    I understand that Meltwater seeks to justify its Meltwater News service on the ground that it functions like a search engine, allowing its customers to target articles of interest. Yet, this does not distinguish Meltwater from AP. AP has invested substantial time and effort into categorizing and organizing its content, offering segmented news products, and developing a

23

distribution platform so that AP's customers can search for and find the specific AP content they desire.

58.     Every AP news story contains metadata tags for various different categories of information.  Stories are analyzed by the AP Tagging Service, which first analyzes the story and automatically returns relevant metadata.  The process identifies people, companies, geographic locations, organizations, and a wide array of subjects. Although the system will recognize and return specific entities that it finds in the submitted content (aka "text extraction"), it also goes beyond that, using human-created semantic rules to identify topics that may not be explicitly mentioned in the text at all.  For example, a story about a particular country music star can trigger the "Country music" subject, even if the word "music" does not appear in the story.

59.     After all the matching metadata values have been identified, the service checks for additional standardized names and IDs based on relationships. For instance, any item tagged with "Food safety" will also be tagged with "Health," and any content that picks up a sports league will be tagged with the relevant sport subject.  Finally, the metadata output is enhanced with additional data properties. For example, companies will be given a ticker; athletes will be associated to their teams; and geographic locations will get latitude and longitude data.

60.     Because AP content is so thoroughly tagged, AP is able to offer a wide range of products in various categories in addition to its general or breaking news service.  Some of AP's products provide news for a particular geographic region, such as AP's National News, Latin American News, Asia-Pacific News, Europe News, Mideast News, World News, and news products for each of the fifty states in the United States.  Other AP products are geared towards providing news about various industries or areas of study, such as AP's Business Alert, Crime

24

Alert, Construction Alert, Defense Alert, Medical Alert, Transportation Alert, Legal Alert, Technology Alert, and Tobacco Alert, to name but a few.

61.     In addition, many of AP's licensees receive these news products through its web-based platform "AP Exchange," which features a powerful search engine that enables AP's customers to customize the way in which they receive and manage AP content. More specifically, AP Exchange allows AP's licensees to perform both simple and advanced searches to locate the news stories of interest on the AP news products. The "simple" search function permits an AP customer to type any term or name in the "Search" box and receive responsive AP articles. Using the "Advanced Search" function, an AP customer can conduct a Boolean search and receive responsive AP articles. For example, AP customers can obtain search results with all of the search terms listed, with an exact phrase, with at least one of the listed search terms, and/or without listed words. Further, AP customers have several further options to narrow their search results, including by identifying the specific media type, story release date and AP news product. Attached as Exhibit 31 is the AP Exchange Quick Start Guide, which AP distributes to licensees to explain the AP Exchange platform.

62.     For example, an organization interested in sporting events in Miami could filter their AP Florida News Wire to include only AP articles discussing "Sports" and "Miami." If that same organization wanted to further filter its search results to exclude football games, they could run another search to include only articles discussing "Sports" and "Miami," but not articles about football. Similarly, a state government agency focused on developments in Florida's infrastructure outside of Miami in 2012 could search the AP Florida, Construction, and Transportation News Wires for AP articles released in the last year discussing "Florida," "Roads," "Bridges," "Tunnels," Ports," but not "Miami."

63.     AP Exchange also allows customers to save those searches, and customize an AP Exchange Homepage so that they receive their customized search results on an ongoing basis, rather than having to search every time they log in.  Not dissimilar to Google Alerts or Meltwater's parallel function, AP Exchange customers can also choose to receive alerts via e-mail when new stories responsive to their custom search requests are published.  For any given story, AP Exchange also permits its customer to email or print the article, as well as download it to a desktop, shared folder, or network folder.

64.     While AP Exchange is one vehicle that permits AP licensees to locate relevant content, several of AP's customers use their own proprietary software to filter the AP products they receive and to target articles of interest.  These include federal governmental agencies in the defense and intelligence communities, such as the CIA and NSA.

65.     Finally, AP has licensed its content to several third parties who in turn permit their users to search for AP articles using keyword search terms.  These include search engines (e.g. Yahoo and Google), aggregators like InfoDesk (in which AP owns a minority interest), and digital databases like LexisNexis and Factiva.  In short, there are multiple products with licensed AP content that permit the user to search for our content.  Even if one were to accept that Meltwater functions as a search engine, that type of functionality would not distinguish it from AP services.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed on November _6_, 2012.

SUE CROSS

26