WorkingUNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

---------------------------------------------------------------x

THE ASSOCIATED PRESS,                :
                                     :    12 Civ. 1087(DLC)(FM)
                Plaintiff,           :
                                     :
        - against -                  :    ECF Case
                                     :
MELTWATER U.S. HOLDINGS, INC.;       :
MELTWATER NEWS U.S., INC.; and       :
MELTWATER NEWS U.S. 1, INC.          :
                                     :
                Defendants.          :
---------------------------------------------------------------x


# PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR JUDGMENT ON THE PLEADINGS AS TO <u>DEFENDANTS' COUNTERCLAIMS</u>

Elizabeth A. McNamara
Linda Steinman
Alison B. Schary
Collin J. Peng-Sue
DAVIS WRIGHT TREMAINE LLP
1633 Broadway – 27th Floor
New York, New York 10019
Telephone:   (212) 489-8230
Facsimile:   (212) 489-8340

*Attorneys for Plaintiff The Associated Press*

## TABLE OF CONTENTS

**Page**

ARGUMENT ................................................................................................................................. 1

I.   MELTWATER'S COUNTERCLAIM FOR LIBEL SHOULD BE DISMISSED ............ 1

    A.   The Press Release Is Privileged Under the "Fair Report" Privilege ....................... 1

    B.   The Press Release Is Not Defamatory .................................................................... 5

II.  MELTWATER'S COUNTERCLAIM FOR TORTIOUS INTERFERENCE
      SHOULD BE DISMISSED ............................................................................................... 7

III. MELTWATER'S COUNTERCLAIM FOR DECLARATORY JUDGMENT OF
      SAFE HARBOR UNDER DMCA § 512(c) SHOULD BE DISMISSED ......................... 8

CONCLUSION ............................................................................................................................ 10

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................6, 7

*Becher v. Troy Publ'g Co.*, 183 A.D.2d 230, 589 N.Y.S.2d 644 (3d Dep't 1992)..........................2

*Cruz v. Latin News Impacto Newspaper*, 216 A.D.2d 50, 627 N.Y.S.2d 388 (1st Dep't 1995) ..................................................................................................................................7

*Daniel Goldreyer Ltd. v. Van de Wetering*, 217 A.D.2d 434, 630 N.Y.S.2d 18 (1st Dep't 1995) ...............................................................................................................................2, 7

*Dodds v. Am. Broad. Co.*, 145 F.3d 1053 (9th Cir. 1998), *cert. denied*, 523 U.S. 1152 (1999) ................................................................................................................................5

*Dworin v. Deutsch*, No. 06 Civ. 13265(PKC), 2008 WL 508019 (S.D.N.Y. Feb. 22, 2008)..........7

*Ford v. Levinson*, 90 A.D.2d 464, 454 N.Y.S.2d 846 (1st Dep't 1982) .................................2, 4, 6

*Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 392 N.Y.S.2d 297 (1st Dep't 1977) ..................................................................................................................................7

*Freeze Right Refrigeration and Air Conditioning Servs. v. City of New York*, 101 A.D.2d 175, 475 N.Y.S.2d 383 (1st Dep't 1984) ................................................................................2

*Gurda v. Orange County Publ'ns*, 81 A.D.2d 120, *rev'd,* 439 N.Y.S.2d 417, 421-25 (2d Dep't 1981), 56 N.Y. 2d 705, 451 N.Y.S.2d 724 (1982),..........................................................2

*Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 424 N.Y.S.2d. 165 (1979) ....................................................................1, 2, 3

*In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003)................................................................................................................10

*Karp v. Hill and Knowlton*, 631 F. Supp. 360 (S.D.N.Y. 1986)..................................................2, 5

*Kelly v. Schmidberger*, 806 F.2d 44 (2d Cir. 1986).......................................................................5

*Pisello v. Town of Brookhaven*, 933 F. Supp. 202 (E.D.N.Y. 1996) ..............................................7

*Seymour v. Lakeville Journal Co., LLC*, No. 04 CV 4532(GBD), 2004 WL 2848537 (S.D.N.Y. Dec. 9, 2004) *aff'd*, 150 Fed.Appx. 103 (2d Cir. 2005) ..........................................4

*T.S. Haulers, Inc. v. Kaplan*, 295 A.D.2d 595, 744 N.Y.S.2d 193 (2d Dep't 2002) .......................7

DWT 20900347v4 0025295-000064

*Twelve Inches Around Corp. v. Cisco Sys., Inc.*, No. 08 Civ. 6896 (WHP), 2009 WL
    928077 (S.D.N.Y. Mar. 12, 2009) ...................................................................................9

*Union Associated Press v. Heath*, 49 A.D. 247, 63 N.Y.S. 96 (1st Dep't 1900) .............................7

*Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427 (S.D.N.Y. 2007) .........................................................5

**STATUTES**

17 U.S.C. § 512(c) .............................................................................................................................1

§ 74 of the New York Civil Rights Law ............................................................................................1

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(c) .........................................................................................................................1

DWT 20900347v4 0025295-000064

AP submits this reply memorandum of law in further support of its motion for judgment on the pleadings as to Defendants' counterclaims for libel, tortious interference, and declaratory judgment of safe harbor under the Digital Millennium Copyright Act, 17 U.S.C. § 512(c), pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[1]

## ARGUMENT

### I.  MELTWATER'S COUNTERCLAIM FOR LIBEL SHOULD BE DISMISSED

#### A.  The Press Release Is Privileged Under the "Fair Report" Privilege

In its Opposition ("MW Opp.") (Dkt. No. 50), Meltwater essentially concedes that five out of the six statements from AP's press release that Meltwater relied on for its defamation claim—Statements 1, 2, 4, 5, and 6—are privileged under Section 74 of the New York Civil Rights Law as a fair and true report of a judicial proceeding.  *See* AP 12(c) Br. at 3-4, 8-11.  In a striking lack of candor, Meltwater does not admit this directly, but it only mounts a defense regarding Statement 3 from the press release.  MW Opp. at 5.  In short, the only remaining defamation claim is premised on AP's statement in the press release that Meltwater "refuses to license the content that it delivers to its customers."  *Id.*  According to Meltwater, Statement 3 does not qualify for the Section 74 fair and true report privilege because it "does not derive clearly and directly from the [Complaint]."  *Id.* at 7.  This is incorrect.

As the New York State Court of Appeals has stated, "[f]or a report to be characterized as 'fair and true' within the meaning of the statute, thus immunizing its publisher from a civil suit sounding in libel, it is enough that the substance of the article be substantially accurate . . . the exact words of every proceeding need not be given if the substance be substantially stated." *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 67, 424 N.Y.S.2d. 165, 167 (1979) (citation omtted).  Courts have repeatedly emphasized that

---

[1] Defined terms are consistent with those found in AP's Opening Brief ("AP 12(c) Br."), Dkt. No. 48.

the "substantially accurate" standard in *Holy Spirit* "is interpreted liberally." *Daniel Goldreyer Ltd. v. Van de Wetering*, 217 A.D.2d 434, 435-36, 630 N.Y.S.2d 18, 22 (1st Dep't 1995).[2]

"When determining whether an article constitutes a 'fair and true' report, the language used should not be dissected and analyzed with a lexicographer's precision." *Holy Spirit*, 49 N.Y.2d at 68, 424 N.Y.S.2d at 168.  Even information that is not contained in a complaint but only "constitutes background to the misconduct" alleged in a complaint comes within the statutory privilege.  *Ford v. Levinson*, 90 A.D.2d 464, 465, 454 N.Y.S.2d 846, 848 (1st Dep't 1982).[3]

Under this standard, it is clear that AP's description of the instant lawsuit in its press release – including the statement that Meltwater "refuses to license the content that it delivers to its customers" – is a substantially accurate summary of its Complaint (McNamara Decl. Ex. B).  The Complaint is a broad, direct attack alleging that Meltwater News' core product constitutes willful copyright infringement and seeks both damages and a permanent injunction against the Meltwater News Service.  It begins, "Meltwater has built its business on the willful exploitation and copying of the AP's and other publishers' news articles for profit.  Compl. ¶ 1.  The Complaint alleges that:  AP owns the copyright in all its stories and holds the exclusive rights to reproduce and distribute them (*id.* ¶ 75); AP requires its licensees to display AP copyright

---

[2] *See also Becher v. Troy Publ'g Co.*, 183 A.D.2d 230, 233, 589 N.Y.S.2d 644, 646 (3d Dep't 1992) ("The case law has established a liberal interpretation of the 'fair and true report' standard"); *Karp v. Hill and Knowlton*, 631 F. Supp. 360, 364 (S.D.N.Y. 1986) ("These decisions evidence a judicial willingness to immunize and even encourage flexible characterization of fraud-like conduct"); *Freeze Right Refrigeration and Air Conditioning Servs. v. City of New York*, 101 A.D.2d 175, 183, 475 N.Y.S.2d 383, 389 (1st Dep't 1984) (an article "need not be a verbatim account or even a precisely accurate report of an official proceeding to be a 'fair and true report'"); *Gurda v. Orange County Publ'ns*, 56 N.Y. 2d 705, 708, 451 N.Y.S.2d 724, 724 (1982), adopting concurring and dissenting opinions of Justices Mollen and Titone at 81 A.D.2d 120, 126-33, 439 N.Y.S.2d 417, 421-25, (2d Dep't 1981) ("in areas of doubt and conflicting consideration, it is almost always preferable to err on the side of free expression").

[3] Thus, in *Holy Spirit*, which concerned the *New York Times*' summary of intelligence documents based in part on unverified and unevaluated claims linking the plaintiff to the Korean intelligence agency, the New York Court of Appeals found that, "While the use of the phrases 'stated as fact' and 'confirmed and elaborated' may denote to some degree a sense of legitimacy which, in hindsight, could be characterized as imprudent given the unverified nature of the reports, this observation does not, in and of itself, render the newspaper articles unfair." 49 N.Y.2d at 68, 424 N.Y.S.2d at 168.

2

information and insert a notice to users of its licensees' websites that the AP material "may not be published, broadcast, re-written for broadcast or publication or redistributed directly or indirectly in any medium (*id.* ¶¶ 38, 77); Meltwater nonetheless uses computer programs known as spiders or robots to scrape the content of AP stories off of news websites (*id.* ¶ 46); "In contrast to the practice of other news sources and news aggregators who deliver the AP news reports to the public, Meltwater does not license the content that it delivers to its subscribers" (*id.* ¶ 8); Meltwater's acts "constitute willful infringement of AP's copyrights in the Registered Articles and broader news service (*id.* ¶ 79); Meltwater's use of the excerpts from AP articles "do not qualify as fair use" (*id.* ¶ 81); and "Defendants' infringements were and are willful and committed with full knowledge and conscious disregard of AP's copyrights and exclusive rights in and to the Registered Articles and the AP content" (*id.* ¶¶ 95, 106, 114).

In an effort to avoid dismissal, Meltwater misinterprets both the press release and the Complaint.  First, Meltwater argues that the Complaint does not allege that it "refused" to license AP's content because the Complaint does not state that AP approached it to engage in licensing discussions prior to filing suit.  But, at best, that is "dissect[ing] and analyz[ing] [the language] with a lexicographer's precision." *Holy Spirit*, 49 N.Y.2d at 68, 424 N.Y.S.2d at 168.  The Complaint plainly alleges that AP and its licensees' websites prohibited the redistribution of AP's content and that Meltwater scraped and distributed it anyway, without obtaining a license, in willful violation of AP's exclusive rights; such conduct can certainly be described as "refusing" to obtain a license under the liberal standards of the fair report privilege.  Moreover, even under Meltwater's strained construction of this phrase, there is no difference in the "sting" of the statement that Meltwater "refused" to obtain a license under all the surrounding circumstances and the Complaint's repeated allegations that Meltwater engaged in "willful

3

infringement" "with full knowledge and conscious disregard of AP's copyrights and exclusive rights" (Compl. ¶¶ 95, 106, 114).  *See Ford*, 90 A.D.2d at 465, 454 N.Y.S.2d at 848 ("When this statement is considered . . . in light of the totality of the circumstances presented, we doubt that it can reasonably be considered . . . a comment that affects in a legally significant way the applicability of the privilege.").

In order to avoid this obvious conclusion, Meltwater resorts to distorting the press release beyond recognition in order to manufacture a greater "sting."  It claims that, merely by stating that Meltwater "refuses to license the content that it delivers to its customers" the press release suggests that "AP engaged in license discussions with Meltwater" and "that even in the face of a reasonable offer from AP, Meltwater refused to license AP's content"  (MW Opp. at 6).  This is sheer fantasy.  Likewise, Meltwater claims that this one phrase in the press release that Meltwater "refuses to license the content"  implies that "Meltwater is deliberately putting its *customers* at risk of copyright liability" (*id*., emphasis added), although the press release makes no conceivable reference to liability for Meltwater customers, as opposed to Meltwater.  Finally, Meltwater claims that, "The distinction between 'not obtaining a license' based on the understanding that one is required and 'refusing to license' *with knowledge that one is required* is sharp and serious" (MW Opp. at 7, emphasis added), and that the press release states the latter.  But there is absolutely nothing in the press release that makes any mention whatsoever of Meltwater's "knowledge" that it has no legal defense.  McNamara Decl. Ex. A.  Meltwater cannot prevail on its defamation claim by inserting words into the press release that do not exist.  *See, e.g.*, *Seymour v. Lakeville Journal Co.*, *LLC*, No. 04 CV 4532(GBD), 2004 WL 2848537, at *4 (S.D.N.Y. Dec. 9, 2004) ("The language is to be afforded its natural meaning reasonably attributable to the intended reader as opposed to a strained, unreasonable or unjustifiable

4

interpretation") *aff'd*, 150 Fed.Appx. 103 (2d Cir. 2005) (statements privileged under Section 74). [4] Moreover, even accepting Meltwater's misguided argument that the press release could somehow be read to imply that Meltwater is, in fact, "'refusing to license' with knowledge that one is required" (MW Opp. at 7), Section 74 would still apply because the Complaint in fact repeatedly alleges just that – as reviewed above. Compl. ¶¶ 79, 95, 106, 114.

Meltwater's argument echoes that made by the plaintiff in *Karp,* 631 F. Supp. 360. In that case, the defendant's press release referred to a claim that plaintiff had "defrauded" the defendant's client, even though the client's complaint at issue "did not in fact assert a claim for fraud." *Id.* at 363. The court granted the defendant's motion to dismiss on Section 74 grounds, noting that "Section 74 does not require that a defendant report the exact words of the complaint or the exact language of each count. Although [the client] did not purport to state a claim for fraud, [defendant's] characterization of [the client's] claim was substantially accurate." *Id.* at 363-64. In sum, the press release is privileged under Section 74, and Meltwater's defamation claim must be dismissed. [5]

### B. The Press Release Is Not Defamatory

Even assuming, *arguendo*, that Statement 3 of the press release were not privileged under

---

[4] Moreover, Meltwater never stated in its Counterclaim that the press release contained these implications. Under Second Circuit law, "[t]he central concern is that the complaint afford defendant sufficient notice of the communications complained of to enable him to defend himself." *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir. 1986) (citation omitted). By failing to identify these purported implications, Meltwater provided AP with no notice, let alone sufficient notice. Moreover, courts have adopted a heightened standard when a libel plaintiff seeks to base its claim on the theory of libel by implication. To prevail, "'[p]laintiffs typically have to show that Defendants *affirmatively intended* such implication." *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 437 (S.D.N.Y. 2007) (emphasis added). "[A]ll the courts of appeal that have considered cases involving defamation by implication have imposed a similar actual intent requirement." *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1064 (9th Cir. 1998), *cert. denied*, 523 U.S. 1152 (1999). The supposed implication Meltwater seeks to attribute to the press release is never identified in its Counterclaims; accordingly, there is no way that Meltwater has pled that AP "affirmatively intended" that implication.

[5] The cases Meltwater cites are clearly distinguishable. *See* MW Opp. at 7. Unlike here, there was a genuine, material difference between the official proceedings and the allegedly defamatory reports.

5

Section 74, Meltwater's libel claim should also be dismissed because Statement 3 is not defamatory *per se* as Meltwater alleges. *See* AP 12(c) Br. at 11 n.6.[6] In order to sustain its claim based on Statement 3, Meltwater would somehow need to show that the inconsequential single statement that it refused to license AP's content harmed its reputation in some manner over and above any alleged reputational harm caused by AP's broad-sweeping allegations in its Complaint that the Meltwater News Service constitutes willful infringement of AP's rights and should be enjoined. This is insufficient under *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009). Although Fed. R. Civ. P. 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 677-78 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A similar issue arose in *Ford*, where the newspaper article accurately summarized the allegations of a complaint asserting that the Fords willfully sabotaged the operations of the Fame Models agency in an attempt to divert assets to Ford Models, but added a statement not contained in the complaint that Fame Models had been created as a vehicle for getting the models away from another agency. 90 A.D.2d at 464-65, 454 N.Y.S.2d at 484. The court held that when this last statement was considered in light of the totality of facts presented, "we doubt that it can reasonably be considered a separate libel." *Id.* at 465, 454 N.Y.S.2d at 848.

Moreover, the mere refusal to license content does not, despite Meltwater's claims, "impugn[] the basic integrity and professionalism of Meltwater." MW Opp. at 9. Indeed, in today's world, where every teenager watching YouTube knows about fair use, a reasonable reader would assume that Meltwater refused to obtain a license because it believed its actions qualified as fair use. None of the cases Meltwater cites in support of its argument address a

---

[6] Meltwater does not argue that the other five complained-of statements are defamatory. *See* MW Opp. at 8-9.

6

business's decision not to take a license or a similar factual setting. *See id.* Instead, they discuss far more serious accusations such as wiretapping (*Union Associated Press v. Heath*, 49 A.D. 247, 63 N.Y.S. 96 (1st Dep't 1900)); an explicit accusation that the plaintiff conducts his "business affairs in complete disregard for the standards of law" (*Pisello v. Town of Brookhaven*, 933 F. Supp. 202, 208 (E.D.N.Y. 1996)); the improper leasing of equipment (*Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 392 N.Y.S.2d 297 (1st Dep't 1977)); and statements that implied that plaintiff's actions "warranted possible criminal charges" (*Daniel Goldreyer,* 217 A.D.2d at 437, 630 N.Y.S.2d at 23. [7] None of those circumstances are present here, and the Court should dismiss Meltwater's libel counterclaim.[8]

## II.  MELTWATER'S COUNTERCLAIM FOR TORTIOUS INTERFERENCE SHOULD BE DISMISSED

Meltwater concedes that the only predicate wrongful act supporting its counterclaim for tortious interference with business relations is the alleged defamation.[9] MW Opp. at 10. As it

---

[7] On a separate note, Meltwater's oblique suggestion that Statement 3 is inherently defamatory simply because it is false (MW Opp. at 9), misunderstands the law. Falsity and defamatory meaning are two separate elements of a defamation claim. *See Dworin v. Deutsch*, No. 06 Civ. 13265(PKC), 2008 WL 508019, at *6-7 (S.D.N.Y. Feb. 22, 2008) (concluding that non-opinion statements, even if false, were not defamatory and thus non-actionable); *Cruz v. Latin News Impacto Newspaper*, 216 A.D.2d 50, 51, 627 N.Y.S.2d 388, 389 (1st Dep't 1995) ("New York does not recognize a tort for reporting inaccurate, but not defamatory information"); *T.S. Haulers, Inc. v. Kaplan*, 295 A.D.2d 595, 598, 744 N.Y.S.2d 193, 196, (2d Dep't 2002) ("a false assertion that the plaintiff sponsored a race car team is not defamatory").

[8] Meltwater's counterclaim for libel should also be dismissed because Meltwater's counterclaim fails to identify Statement 3 as a statement that, standing alone, caused it alleged damage. Here, Meltwater brought its counterclaim for libel alleging "substantial damage to its reputation" because the six complained-of statements "were a substantial factor in inducing others not to do business with Meltwater, and in inducing others to limit their business relationships with Meltwater." Countercl. ¶¶ 160-61. As discussed above, however, Meltwater has conceded that five out of the six complained-of statements are privileged under the fair report privilege. And Meltwater has not attributed any of its alleged harm to Statement 3 alone. Indeed, it is entirely implausible on its face under *Iqbal* that a customer would withdraw its business from Meltwater because of this one statement, as opposed to the fact that AP had brought a serious copyright infringement claim directed to core of the Meltwater News business. For that additional reason, the Complaint is deficient and should be dismissed.

[9] Meltwater also argues that "it did not seek to plead a claim for interference with existing contracts." MW Opp. at 12 n.3. While this is dubious in light of the actual language of Meltwater's allegations ("AP intended to disrupt Meltwater's contractual relationships," Countercl. ¶ 167), the parties are nevertheless

7

further concedes, "if the predicate libel claim is dismissed and there is no other wrongful conduct supporting the tortious interference claim, the tortious interference claim should be dismissed." MW Opp. at 11-12.  That is exactly the case here.  As discussed above, there is no basis for Meltwater to maintain its libel claim since the complained-of statements from the press release are both privileged under Section 74 and not defamatory.  Accordingly, Meltwater's tortious interference counterclaim must be dismissed as well for failure to allege a wrongful act.

### III. MELTWATER'S COUNTERCLAIM FOR DECLARATORY JUDGMENT OF SAFE HARBOR UNDER DMCA § 512(c) SHOULD BE DISMISSED

Meltwater's counterclaim for declaratory judgment under the safe harbor provision of DMCA § 512(c) should also be dismissed because Meltwater does not qualify for the safe harbor provision of § 512(c).[10]  As an initial matter, Meltwater does not contest that because it did not designate an agent to receive notifications of infringement until March 26, 2012—over a month after AP filed its initial complaint—it may not claim protection for any secondary infringement arising from materials stored on its system by any Meltwater user prior to that date.  *See* AP 12(c) Br. at 16.

Turning to the merits, Meltwater offers no real response to AP's argument that Meltwater may not avail itself of the DMCA's safe harbor provision, § 512(c), because it interferes "with the most basic measure used by copyright owners to identify copyrighted works—the ability to view the allegedly infringing content in the first place."  AP 12(c) Br. at 16.  Instead, Meltwater offers the conclusory statement that "viewing content on an online service is not even a

---

in agreement that there is no counterclaim for tortious interference with contract.  *See* AP 12(c) Br. at 12.

[10] For clarity's sake, AP reiterates that both parties agree that Meltwater's declaratory judgment claim under the DMCA only pertains to AP's *secondary* infringement claims that Meltwater is liable under contributory or vicarious copyright liability theories for the actions of Meltwater's users and does not pertain to AP's claim for direct copyright infringement.  *See* MW Opp. at 13 ("Meltwater seeks a declaration that, as of the date of registration, the DMCA protects it against damages liability for the secondary infringement claims that AP makes based on Meltwater users' storage of allegedly infringing material on Meltwater's system.").

8

'technical' measure as the statute uses that term." MW Opp. at 16. Meltwater cites no authority for that statement, and offers no reason why the simple ability to access the allegedly infringing content is not the most basic of "standard technical measures" contemplated by the statute.

Finally, Meltwater claims that "AP's argument is contrary to the purpose of the statue," and attempts to frame AP's argument as an attack on such online services as email services, photo-storing services, and cloud-based storage lockers. MW Opp. at 17. But Meltwater is *none of those things*. To the contrary, it is *Meltwater* whose actions are contrary to the purpose of the DMCA's safe harbor provision—to "preserve strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." *Twelve Inches Around Corp. v. Cisco Sys., Inc.*, No. 08 Civ. 6896 (WHP), 2009 WL 928077, at *4 (S.D.N.Y. Mar. 12, 2009) (citation omitted)  Critically, Meltwater users do not copy, store and re-distribute AP content on their own initiative without any substantive role being played by Meltwater. It is Meltwater that is initially responsible for crawling the more than 162,000 global news sources in 190 countries and 100 languages in order to provide search results responsive to its users' search queries and who delivers verbatim text from news articles, including AP content, to its subscribers (Am. Ans. ¶ 43; *see also* Countercl. ¶¶ 6, 32) – the necessary predicate before the Meltwater users take further actions. And it is Meltwater who then provides the means for its users to store that verbatim content, and whatever additional content the user desires, in customer archives and re-distribute it in newsletter and newsfeeds on the Meltwater platform – all for a fee that redounds to Meltwater's benefit. *See* Countercl. ¶¶ 40-50; *see also* Ans. ¶¶ 47, 70-71.[11]

Further, Meltwater likens itself to "the many socially beneficial Internet services that

---

[11] For these reasons, Meltwater is also far from the mere "electronic storage locker" it claims to be. *See* MW Opp. at 13-14 (citing *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012)).

9

allow their users to store material," but Meltwater is a closed system sold only to subscribers for a fee.  Indeed, though Meltwater claims that *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003) offers no guidance, that case is indeed helpful.  *Aimster* stands for the proposition that a defendant cannot avail itself of the DMCA's safe harbor provision while simultaneously thwarting the spirit of cooperation that safe harbor provision meant to foster.  *See* MW Opp. at 17-18.  That is exactly what Meltwater seeks to do here, and for that reason this Court should deny its request for declaratory judgment of safe harbor under the DMCA.

## CONCLUSION

For the reasons set forth above and in its opening memorandum of law, plaintiff The Associated Press respectfully requests that the Court grant its motion for judgment on the pleadings and dismiss Meltwater's Counterclaims for libel, tortious interference, and declaratory judgment of safe harbor under DMCA § 512(c) in their entirety with prejudice, together with costs, attorneys' fees, and such other relief as the Court deems appropriate.

Dated:  New York, New York
January 11, 2013

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:    s/ Elizabeth A. McNamara
Elizabeth A. McNamara
Linda Steinman
Alison B. Schary
Collin J. Peng-Sue
1633 Broadway – 27th Floor
New York, New York 10019
Telephone:    (212) 489-8230
Facsimile:    (212) 489-8340

*Attorneys for Plaintiff The Associated Press*

10