DAVID H. KRAMER (admitted *pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
Telephone:  (650) 493-9300

TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone:  (212) 497-7700

*Attorneys for the Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE ASSOCIATED PRESS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.:  1:12-CV-01087-DLC |
| | ) ECF CASE |
| | ) |
| MELTWATER U.S. HOLDINGS, INC.; | ) |
| MELTWATER NEWS U.S., INC.; and | ) |
| MELTWATER NEWS U.S. 1, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS'**
**MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION..................................................................................................................1

ARGUMENT ........................................................................................................................2

I.      MELTWATER IS ENTITLED TO JUDGMENT ON THE PLEADINGS ON
        AP'S HOT-NEWS MISAPPROPRIATION CLAIM .......................................................2

        A.      AP's Claim Fails Because Meltwater Is Not Passing Off AP's News
                Content As Its Own And Thus Is Not "Free Riding" ...........................................2

        B.      AP's Claim Fails Because Meltwater Delivers Excerpts Of AP Content
                Only After AP Has Made That Content Accessible For Free Over The
                Internet...............................................................................................................4

        C.      AP's Claim Fails Because It Is Based On Meltwater's Alleged
                Distribution of Copyrighted Expression Not Facts ..............................................7

II.     AP IS NOT ENTITLED TO AMEND ITS COPYRIGHT MANAGEMENT
        INFORMATION CLAIM.............................................................................................8

        CONCLUSION ..................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Associated Press v. All Headline News Corp.*,
608 F. Supp. 2d 454 (S.D.N.Y. 2009) .......................................................... 6, 7

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.*
650 F.3d 876 (2d Cir. 2011) ................................................................. passim

*Drumm v. Suny Geneseo Coll.*,
No. 11-2463-CV, 2012 WL 2477015 (2d Cir. June 29, 2012) ........................ 10

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) ............................................................................... 6

*International News Service v. The Associated Press*
248 U.S. 215 (1918) ("*INS*") ................................................................. passim

*Kassner v. 2nd Ave. Delicatessen Inc.*,
496 F.3d 229 (2d Cir. 2007) ...................................................................... 9

*Lerner v. Immelt*,
No. 10 Civ. 1807 (DLC), 2012 WL 2197456 (S.D.N.Y. June 15, 2012) .......................... 9

*NBA v. Motorola, Inc.*,
105 F.3d 841 (2d Cir. 1997) ................................................................... 4, 5

*Parker v. Columbia Pictures Indus.*,
204 F.3d 326 (2d Cir. 2000) ...................................................................... 9

*Sikhs for Justice v. Nath*,
No. 10 Civ. 2940, 2012 WL 4328329 (S.D.N.Y. Sept. 21, 2012) ................................... 10

*Sorrell v. IMS Health Inc.*,
131 S. Ct. 2653 (2011) ............................................................................ 6

*St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*,
745 F. Supp. 2d 303 (S.D.N.Y. 2010) .......................................................... 10

*Wright v. Ernst & Young LLP*,
152 F.3d 169 (2d Cir. 1998) ................................................................... 6, 8

## RULES

Fed. R. Civ. P 15(a) .............................................................................. 9

Fed. R. Civ. P. 16 ............................................................................. 9, 10

Meltwater respectfully submits this reply memorandum of law in further support of its motion for judgment on the pleadings on AP's claims for (1) hot news misappropriation under New York law and (2) removal of "copyright management information" ("CMI") under the Digital Millennium Copyright Act ("DMCA").  AP's arguments cannot save its hot news claim, and there is no basis for allowing AP to amend its concededly deficient DMCA claim.

## INTRODUCTION

*Hot News Misappropriation*.  In each of its cases addressing the hot news misappropriation doctrine, the Second Circuit has rejected the claim, finding it preempted by the federal Copyright Act.  Those rulings, culminating in *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876 (2d Cir. 2011), have narrowed the scope of any possible non-preempted hot news claim to the specific fact pattern of *International News Service v. The Associated Press*, 248 U.S. 215 (1918) ("*INS*").  As explained in Meltwater's Opening Brief, AP's claim here lacks three circumstances present in *INS*, which independently and certainly collectively cause it to fail as a matter of law:  (1) AP does not allege that Meltwater "passes off" AP news content as its own; (2) AP does not allege that Meltwater delivers AP news to its customers before AP has distributed that news to its audience; and (3) AP does not allege that Meltwater misappropriates non-copyrightable *facts*, but instead expressly bases its claim on the distribution of allegedly original *expression*.  AP cannot dispute theses significant differences between its claim and the claim allowed in *INS*.  Instead, AP asks this Court to reject the teachings of *Barclays* and expand the hot news doctrine beyond anything that the Second Circuit has ever allowed.  The Court should reject this invitation and grant judgment to Meltwater.

*DMCA*.  AP concedes that it has failed to plead a viable claim under Section 1202 of the DMCA.  Rather than offer any defense of its claim, AP seeks leave to amend.  That request should be denied.  This Court set a firm deadline of July 13, 2012 for AP to amend its Complaint and made clear that no further amendments would be allowed after that deadline.  AP took advantage of that offer by filing an Amended Complaint, but it did not alter one word of its DMCA claim – even though it was well aware that Meltwater intended to move for judgment on

the pleadings and even though, as AP now admits, that claim was entirely deficient.  AP instead made Meltwater go through the burden of preparing a Rule 12(c) motion and, only now that the Court's deadline has passed, demands another opportunity to amend.  AP offers no legitimate excuse, let alone the good cause required, to revisit the Court's ruling.  Indeed, AP neither attaches a proposed amended complaint, nor sets forth the specific factual allegations it would add that supposedly would satisfy Section 1202.  In sketching out its proposed amendment, AP does nothing more than recite the elements of a DMCA claim, which is insufficient to plausibly state a claim.  It is clear, therefore, that any amendment of AP's claim would be futile, and AP's request for leave should be denied on that ground as well.

ARGUMENT

## I.  MELTWATER IS ENTITLED TO JUDGMENT ON THE PLEADINGS ON AP'S HOT-NEWS MISAPPROPRIATION CLAIM

AP's effort to salvage its hot news misappropriation claim seeks to override the clear limitations that the Second Circuit has imposed on the hot news doctrine.

### A.  AP's Claim Fails Because Meltwater Is Not Passing Off AP's News Content As Its Own And Thus Is Not "Free Riding"

AP's claim fails, first, because it does not and cannot allege that Meltwater "free rides" on AP's newsgathering by attempting to pass off AP news as Meltwater's own.  AP argues that such passing off does not matter in assessing the viability of a hot news claim.  AP is wrong.

A key part of the wrongdoing in *INS* was that the defendant was taking AP's news and "selling it as its own."  *INS*, 248 U.S. at 239-40.  The Supreme Court made clear that this "habitual failure to give credit" was a "significant" factor in its analysis.  *Id.* at 242.  The importance of such passing off became even clearer in *Barclays*, as the Second Circuit confined the hot news doctrine to the circumstances presented in *INS*.  The court explained:

> The *INS* Court defined the "hot news" tort in part as "taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and . . . appropriating it and *selling it as [the defendant's] own* …."  *INS*, 248 U.S. at 239. That definition fits the facts of *INS*:  The defendant was taking news gathered and in the process of dissemination by the Associated Press *and selling that news as*

2

> ***though the defendant itself had gathered it***.  But it does not describe the
> practices of Fly.

*Id.* at 903 (emphases added).  This difference was essential to the result in *Barclays*.  The Second

Circuit expressly held that because the defendant was "attributing the information to its source,"

the plaintiffs could not establish the "free-riding" required for a hot news claim.  *Id.* at 902.

AP has no good response.  It does not even try to argue that Meltwater engaged in *INS*-

style passing off.  To the contrary, it is undisputed that Meltwater (like Fly) properly attributes

the sources of the article headlines, snippets, and links it delivers.  AP instead argues that passing

off was not the basis for the decision in *Barclays*.  AP Opp. at 9.  That simply ignores the Second

Circuit's unequivocal and repeated reliance on the lack of such misattribution.  The passages

quoted above make that clear, but there is more:

- In explaining what constituted "free riding" (and what did not), the Second
  Circuit pointed to the fact that Fly "is hardly selling the Recommendation 'as its
  own,'" but instead "is selling the information with specific attribution to the
  issuing Firm."  *Barclays,* 650 F.3d at 903 (quoting *INS*, 248 U.S. at 239).

- The court emphasized (with its own italics) Fly's practice of "*ascribing the
  material to its creator Firm* and author (not selling it as Fly's own)" as
  distinguishing its conduct from INS's.  *Id.* at 903-04.

- The court summarized the essence of a hot news claim as involving information
  gathered by one organization and "taken by another entity and ***published as the
  latter's own*** in competition with the former."  *Id.* at 905 (emphasis added).

The Second Circuit thus could hardly have been clearer that Fly's "accurate attribution" was the

central basis on which it found the hot news claim preempted.  *Id.* at 903.[1]

---

[1] Citing no authority, AP claims that "[p]ublic policy would not condone a standard whereby attribution" defeats a hot news claim. AP Opp. at 11 n.6.  But the Second Circuit's decision reflected the policy choices made by Congress and the Constitution, which AP is not at liberty to second guess.  And there is nothing unreasonable about a rule that looks less favorably on a defendant who tries to pass off someone else's information as its own than one who properly attributes the information to its source.  In any event, *Barclays* makes clear that considerations of the sort AP invokes are not relevant in assessing the viability of a hot news claim.  650 F.3d at 896 ("[U]nfairness alone is immaterial to a determination whether a cause of action for misappropriation has been preempted by the Copyright Act.").

AP claims that this case is different because Flyonthewall was a "legitimate newsgatherer."  AP Opp. at 9.  The Second Circuit did not use that phrase, or suggest that it is relevant in applying the hot-news doctrine whether the defendant acts in the manner of a traditional news organization.  The analysis instead turns on whether the defendant (like INS) is reporting someone else's news as its own or (like Fly) is providing its users with information about what others have reported.  *Barclays,* 650 F.3d at 903 n.36 (explaining that "INS was not … reporting on news AP was making by itself reporting news" but was repackaging AP's news "as though [INS] were 'breaking' news of its own.").  Meltwater clearly does the latter.  Indeed, in all the ways that matter, Meltwater is just like Fly.  It is "collecting, collating and disseminating factual information."  *Id.* at 902.  Meltwater *collects* news articles published on the Internet, *collates* information associated with those articles into an index, and *disseminates* factual information reflecting the articles' existence, location and their use of certain words and phrases.  As in *Barclays,* it is Meltwater's "accurate attribution" of such information that gives it value.  *Id.* at 903.  And all of this requires a "substantial organizational effort."  *Id.* at 905.  In short, Meltwater is not purporting to break AP's news as its own, but instead is reporting to its customers the fact that AP (and other news outlets) have published articles that contain particular words.[2]  That does not give rise to a viable claim for hot news misappropriation.

### B.   AP's Claim Fails Because Meltwater Delivers Excerpts Of AP Content Only After AP Has Made That Content Accessible For Free Over The Internet

---

[2] The discussion in *Barclays* and *NBA v. Motorola¸ Inc.*, 105 F.3d 841 (2d Cir. 1997), of certain hypothetical situations in which a hot news claim "might" exist does not help AP's argument.  AP Opp. at 11.  These courts' dicta in no way undermine *Barclay's* holding that the absence of passing off was fatal to the plaintiffs' hot news claim.  Perhaps if AP were to develop its own service through which it delivered search results informing users about the appearance of words and phrases in articles published in thousands of different online sources, and Meltwater were to copy and deliver those reports as if it had collected the information, AP's claim might stand on different footing.  But that is not the situation here.

Meltwater's Opening Brief explained that AP's claim also fails because Meltwater only distributes snippets from news articles *after* that information has already been widely and freely published on the Internet.  Opening Br. 9-12.

Notwithstanding that undisputed fact, AP claims that this case is on all fours with *INS*. AP Opp. at 13.  That simply is not so.  In *INS*, AP had published its articles in newspapers that were available only on the East Coast when the defendant republished those stories in western newspapers "at least as early as those served" by AP.  248 U.S. at 238-39.  As the Supreme Court explained, the defendant's exploitation of these "time differentials" along with "irregularities in telegraphic transmission on different lines, and the normal consumption of time in printing and distributing the newspaper," were the "peculiar features" of the case that allowed "pirated news to be placed in the hands of defendant's readers sometimes simultaneously with the service of competing Associated Press papers, occasionally even earlier."  *Id.*

AP alleges nothing like that here.  To the contrary, AP acknowledges that its news had already been made available over the Internet – without charge or any other restrictions – before Meltwater ever accessed it.  Am. Compl. ¶ 70.  Unlike *INS*'s readers, therefore, *no Meltwater customer could ever obtain AP news from Meltwater before (or even at the same time as) they could have obtained that news from AP*.  Meltwater's delivery of search results referencing AP articles necessary occurs only after those articles have been published in a manner that made them freely accessible to anyone anywhere in the world.  That clearly takes this case outside the *INS* paradigm.  The Supreme Court did not address a scenario where the defendant obtained the supposedly "hot news" simply by accessing a public Internet site.  *INS* thus did not enjoin anything like what AP is asking this Court enjoin here:  the right of a third party to use factual information that has been widely distributed to the public (for free) on the Internet.  AP seeks an *extension* of *INS*, not an *application* of it.  The Second Circuit has made clear that such extensions are not proper.  *Barclays,* 650 F.3d at 905; *NBA*, 105 F.3d at 850-52 & n.7.  That is all

the more so given the serious First Amendment consequences of applying the hot news doctrine to purely factual news content published online.[3]

  AP tries to bring this case within *INS* by arguing that it may not have completed distribution of its articles when Meltwater indexes them.  AP Opp. at 14.  But AP's Amended Complaint makes no such allegation, which makes its speculation as to what discovery might show irrelevant.  *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).  AP's argument is in any event misguided.  Regardless of whether it refers to Meltwater News as a "Real Time" service, Meltwater does not and cannot make text from an AP article accessible to a single person before that person could, with just a few keystrokes, access the very same text from the website of the AP licensee that published it.  That was not the case in *INS*.  No court has ever applied the hot news doctrine to give publishers the right to control the dissemination of factual information after the point at which such information has been made freely available online.[4] And for good reason, as the distribution of news is complete in any relevant sense once it has

---

  [3] AP argues that the First Amendment is inapplicable because Meltwater "cannot be considered a 'newspaper'" or "a member of the press breaking news."  AP Opp. at 16 n.9.  But it is well established that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw."  *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978).  Regardless of whether it is a member of the traditional news media, Meltwater has a First Amendment right to disseminate public information, and that right would unquestionably be limited by AP's invocation of the hot news doctrine.  *See Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2665 (2011) ("An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated.") (internal quotation marks omitted).  Indeed, the Second Circuit in *Barclays* explained that while *INS* was decided before the flowering of modern First Amendment law, courts today would recognize that the Amendment stands opposed to the very argument AP makes here, that "one who might happen to be the first to report a historic event" has "the exclusive right for any period to spread the knowledge of it."  *Barclays*, 650 F.3d at 902-03 (quoting *INS*, 248 U.S. at 234).

  [4] *Associated Press v. All Headline News Corp.*, 608 F. Supp. 2d 454 (S.D.N.Y. 2009) ("*AHN*") is not to the contrary.  That case did not address the argument about Internet distribution that Meltwater makes here and thus offers no substantive support for AP's position.  *AHN*, moreover, was decided before the Second Circuit narrowed the hot news doctrine in *Barclays*, and it relied on a test that *Barclays* rejected.  *Compare id.* at 461 (applying five-part test), *with Barclays*, 650 F.2d at 989-900 (rejecting that test).  The facts alleged in *AHN* were also worlds apart from those here.  Indeed, *AHN* involved precisely the kind of "passing off" that does not exist in this case.  *AHN*, 608 F. Supp. 2d at 457-58.

been published for anyone to read on the Internet.  Accordingly, both the existing limitations on the hot news tort and the overarching constraints of the First Amendment stand in the way of AP's proposed novel and dangerous expansion of the doctrine.

> **C.     AP's Claim Fails Because It Is Based On Meltwater's Alleged Distribution of Copyrighted Expression Not Facts**

Finally, Meltwater explained in its Opening Brief (at 12-14) that AP's claim is preempted because, by its terms, it seeks to premise liability on the distribution of AP's allegedly *original expression* – not factual information.  AP cannot evade this fundamental problem with its claim.

AP devotes virtually its entire response to the argument a plaintiff can plead a hot news misappropriation claim at the same time as a copyright infringement claim.  That is a straw man. The issue here is not whether, in theory, the two claims can coexist, but whether AP has actually pleaded a viable hot news claim.[5]  It has not.  As Congress explained in enacting the Copyright Act's preemption provision, a bedrock requirement of any potentially viable hot news claim is that it be based on the misappropriation of the "facts (*i.e.*, not the literary expression) constituting 'hot' news."  H.R. REP. NO. 94-1476, at 132 (1976).  Such literary expression is what copyright law protects, and a claim targeting the use of such expression is necessarily preempted.  *Id.*  AP does not dispute that, but argues that its claims are based on the use of factual information.  AP Opp. at 17-18.  Its own complaint says otherwise.  There, AP expressly disavowed any claim that Meltwater is "extracting breaking facts" from AP articles, and instead alleged that "Meltwater lifts and distributes the actual and fully protected, already published texts of the articles."  Am.

---

[5] AP cites *INS* and *Barclays* in service of its argument that claims for copyright infringement and hot news misappropriation can be based on the same conduct, but neither case helps AP.  There was no copyright claim in *INS* because, as AP itself argued "news is not within the operation of the copyright act."  *INS*, 248 U.S. at 233.  Even if there had been such a claim, preemption would not have been an issue because the applicable copyright statute at the time did not include a preemption provision.  And in *Barclays*, of course, the court found the hot news claim preempted, and the case thus provides no support for an argument that such claims can coexist with copyright claims.  AP also cites *AHN*, but the defendant there was alleged to have rewritten AP stories, so the allegations did not rely exclusively on "verbatim reproduction."  Am. Compl. ¶ 59; *AHN*, 608 F. Supp. 2d at 457.  Indeed, AP can point to no case endorsing a hot news claim based on the kind of "verbatim copying" of original expression alleged here.

Compl. ¶ 90.  While AP now seeks to retreat from that allegation, "a party is not entitled to amend its complaint through statements made in motion papers." *Wright*, 152 F.3d at 178 (citation omitted).  The complaint is binding, and it expressly contradicts any viable theory of hot news misappropriation.  In any event, AP's allegation is no mere slip of the pen.  It reveals what AP thinks this case is about.  The essence of this case, according to AP, is not that Meltwater is distributing "hot" factual information, but rather that Meltwater has reproduced what AP considers its original expression.  That is a copyright infringement claim, and the assertion of such a claim in the guise of state law is precisely what Section 301 of the Copyright Act forbids.

## II.    AP IS NOT ENTITLED TO AMEND ITS COPYRIGHT MANAGEMENT INFORMATION CLAIM

AP concedes that it has failed to state a claim for removal of copyright management information ("CMI") under Section 1202(b) of the DMCA.  It offers no response to the multiple pleading deficiencies Meltwater identified with that claim.  *See* Opening Br. at 15-23.  Rather than make any effort to defend its claim as pleaded, AP makes a half-hearted request for leave to amend its complaint.  AP Opp. at 19.  That request is meritless.

The deadline that the Court imposed for any amendment to the pleading has long passed. Meltwater made clear from the start of the case that it intended to seek dismissal of AP's DMCA claim.  The parties' joint letter to the Court about a proposed discovery schedule thus explained that Meltwater intended to file a motion for judgment on the pleadings on the DMCA claim. Grealis Reply Decl. Ex. 8.  The Court adopted that schedule in its May 14 Scheduling Order. Dkt. No. 18.  In that Order, the Court also decreed that "[n]o additional parties may be joined or pleadings amended after July 6, 2012."  *Id.*  (At AP's request, that deadline was subsequently extended to July 13.)  AP took advantage of that window by filing an amended complaint, which added new Articles in Suit and made various other changes.  But AP let the deadline pass without so much as mentioning an interest in amending its DMCA claim.  It was not until it filed its opposition brief that AP first mentioned any desire to amend.  That request simply comes too late.  If AP wanted to amend its complaint in an effort to state a viable claim under the DMCA, it

had every opportunity to do so within the generous time limit that the Court set.  Its failure to do so precludes its request for leave to amend at this late date.

AP apparently hopes the liberal standards of Rule 15(a) will excuse its delay.  AP Opp. at 19.  But, because AP's leave request comes after the scheduling order deadline, Rule 16(b), rather than Rule 15(a), governs any application for leave to amend.  *Lerner v. Immelt*, No. 10 Civ. 1807 (DLC), 2012 WL 2197456, at *1 (S.D.N.Y. June 15, 2012).  As this Court has recognized, "[d]isregarding the instructions of a scheduling order would undermine the court's ability to control its docket, disrupt the agreed-upon course of the litigation, and reward the indolent and the cavalier.  Rule 16 was drafted to prevent this situation."  *Id.* (internal quotation omitted).  And, under Rule 16, "good cause" must be shown for any amendment.  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).  AP cannot come close to meeting that standard.

"In determining whether a party has shown good cause, 'the primary consideration' is whether the movant has been diligent.  Another relevant factor is prejudice to the defendants."  *Lerner*, 2012 WL 2197456, at *2 (quoting *Kassner*, 496 F.3d at 244).  Both factors are against AP here.  Despite knowing from the start that Meltwater would be moving for judgment on the pleadings on the DMCA claim, and despite not being able to offer any substantive defense of that claim as pleaded, AP made not the slightest effort to amend that claim – *even though it actually filed an amended complaint*.  Nor did AP say anything about amending its DMCA allegations in the months that followed, instead waiting until after Meltwater's motion was filed to first raise the issue.  That approach evinces a total lack of diligence.  And Meltwater was prejudiced by AP's delay.  Meltwater invested considerable time in preparing its motion for judgment on the pleadings based on the DMCA claim set forth in the Amended Complaint.  AP's belated request for leave would render that work a nullity and force Meltwater to prepare an

entirely new motion.  That is unwarranted.  Indeed, AP offers no credible explanation for why it waited so long, much less the "good cause" that Rule 16 requires.[6]

Finally, AP's request for leave to amend is deficient because AP has failed to submit a proposed amended complaint or otherwise describe the allegations it would add to rectify the deficiencies with its claim.  *See, e.g.*, *Sikhs for Justice v. Nath*, No. 10 Civ. 2940, 2012 WL 4328329, at *29 (S.D.N.Y. Sept. 21, 2012) (denying leave for amendment in the absence of a proposed amended complaint); *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, 745 F. Supp. 2d 303, 315-16 (S.D.N.Y. 2010) (same).  AP merely parrots back a list of those shortcomings and says without further explanation or elaboration that it will correct them.  AP Opp. at 19.  It offers no new factual allegations and does not explain how it could plausibly allege what the DMCA requires.  But an amendment merely reciting elements of a statutory claim could not survive a motion for judgment on the pleadings, and thus would be futile.  *See, e.g.*, *Drumm v. Suny Geneseo Coll.*, No. 11-2463-CV, 2012 WL 2477015, at *1 (2d Cir. June 29, 2012) (affirming denial of leave to amend where proposed new allegations were "conclusory and therefore insufficient to satisfy her pleading burden").  In short, AP's claim fails as a matter of law, and no opportunity for amendment should be allowed.

## CONCLUSION

For these reasons, Meltwater is entitled to judgment on the pleadings.

---

[6] In a single sentence, AP says that it learned in discovery of a basis to allege that "Meltwater itself copies and distributes the full text of articles without regard to AP's CMI."  AP Opp. at 20.  But the two pieces of "evidence" AP cites reflect no such thing.  McNamara Ex. 41 is a document that explains the various charts, maps, tables, and tags that are displayed on the Meltwater user dashboard.  It is totally irrelevant to this issue.  McNamara Ex. 43 is an email from a Meltwater sales person to a potential customer explaining that a user can upload full text of articles that are its internally produced content or for which the user has a subscription.  Neither of these documents remotely supports a claim that Meltwater is removing CMI from AP articles, much less that it does so with the mental state required to state a claim under Section 1202.  In any event, Meltwater produced those documents to AP *six months ago*.  Grealis Reply Decl. ¶¶ 2-3.  Any suggestion that these unremarkable documents provide a basis to amend to add an entirely new theory of liability under the DMCA could have and should have come long ago, and certainly before Meltwater's motion was filed.

Dated:  January 11, 2013               Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By: s/ Tonia Ouellette Klausner
    TONIA OUELLETTE KLAUSNER
    BRIAN M. WILLEN
    CATHERINE GREALIS
    1301 Avenue of the Americas, 40th Floor
    New York, New York 10019
    Telephone:  (212) 497-7700

    DAVID H. KRAMER (admitted *pro hac vice*)
    650 Page Mill Road
    Palo Alto, California 94304
    Telephone:  (650) 493-9300

    *Attorneys for the Defendants*

11