UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE ASSOCIATED PRESS,<br><br>    Plaintiff,<br><br>            v.<br><br>MELTWATER U.S. HOLDINGS, INC.;<br>MELTWATER NEWS U.S., INC.; and<br>MELTWATER NEWS U.S. 1, INC.,<br><br>    Defendants. | ECF Case<br><br>Case No. 2:12-cv-1087-DLC-FM |

**BRIEF OF AMICI CURIAE ELECTRONIC FRONTIER FOUNDATION AND PUBLIC KNOWLEDGE IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

STATEMENT OF INTEREST ................................................................................................1

INTRODUCTION ..............................................................................................................1

I.   The Overwhelming Weight of Legal Authority Recognizes that a Use Need
     Not Contain a New Expressive Meaning to be Transformative ...........................................2

     A.   Transformativeness Does Not Turn on the Expressiveness of the
          Secondary Use .................................................................................................2

     B.   Fair Use Must Be Interpreted in Light of Its Purpose: Bringing Copyright
          in Line with the Public Interest ................................................................................6

     C.   Liability for Snippets, Search, and Other "Nonexpressive" Uses Would
          Thwart the Public Interest in Expression and Innovation .........................................8

II.  Factor Three Does Not Automatically Favor News Publishers .........................................10

CONCLUSION ................................................................................................................12

i

# TABLE OF AUTHORITIES

## Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630 (4th Cir. 2009) ................................. 5

*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913 (2d Cir. 1994) ....................................... 7, 12

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003) ........................ 8

*Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832 (Fed. Cir. 1992) ................................ 8

*Authors Guild, Inc. v. Hathitrust,* 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012) .......................... 4

*Baker v. Selden*, 101 U.S. 99 (1879) ............................................................................................. 9

*Barclays Capital Inc. v. Theflyonthewall. com, Inc.*, 650 F.3d 876 (2d Cir. 2011) ....................... 1

*Bateman v. Mnemonics, Inc.*, 79 F.3d 1532 (11th Cir. 1996) ....................................................... 8

*Berlin v. E. C. Publications Inc.*, 329 F.2d 541 (2d Cir. 1964) ..................................................... 7

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006) ....................... 2, 3

*Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006) ............................................................................. 7

*Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003) ................................................................................ 6

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .................................................. 6, 7, 12

*Cartoon Network, LP v. CSC Holdings*, 536 F.3d 121 (2d Cir. 2008) ......................................... 9

*Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132 (2d Cir. 1998) ....................................... 7

*Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) .................................. 11

*Infinity Broadcasting Corporation v. Kirkwood,* 150 F.3d 104 (2d Cir. 1998) ............................ 2

*Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) ......................................................... 4, 5

*Newport-Mesa Unified School Dist. v. State of Calif. Dep't of Educ.*,
    371 F. Supp. 2d 1170 (C.D. Cal. 2005) ................................................................................. 5

*NXIVM v. Ross Institute*, 364 F.3d 471 (2d Cir. 2004) ............................................................... 11

*O'Grady v. Superior Court*, 139 Cal.App.4th 1423 (6th App. Dist. 2006) .................................. 1

*Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701 (9th Cir. 2007) ............................................ 9

*Perfect 10, Inc. v. Amazon.com, Inc.,* 508 F.3d 1146 (9th Cir. 2007) ....................................... 4, 5

*Righthaven LLC v. Democratic Underground LLC*, 791 F. Supp. 2d 968 (D. Nev. 2011) ...... 1, 10

*Righthaven LLC v. DiBiase*, 2011 WL 2473531 (D. Nev. June 22, 2011) ................................... 1

*Rosemont Enters., Inc. v. Random House, Inc.,* 366 F.2d 303 (2d Cir. 1966) ................................ 7

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1993) ................................ 8

*Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596 (9th Cir. 2000) ............................ 8

*Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417 (1984) .............................. 6, 9, 10

*Stern v. Does*, 2011 WL 997230 (C.D. Cal. Feb. 10, 2011) ........................................................... 6

### Statutes

U.S. Const., Art. I, § 8, cl. 8 ................................................................................................................ 7

17 U.S.C. § 102 ................................................................................................................................ 9

### Other Authorities

Bernard Knight, *USPTO Position on Fair Use Copies of NPL Made in Patent Examination* (Jan. 19, 2012) ................................................................................................................ 5

Edward Lee, *Technological Fair Use*, 83 S. C<small>AL</small>. L. R<small>EV</small>. 797 (2010) ........................................... 9

Pierre N. Leval, *Toward a Fair Use Standard*, 103 H<small>ARV</small>. L. R<small>EV</small>. 1105 (1990) .......................... 7

Thomas Rogers & Andrew Szamosszegi, *Fair Use in the U.S. Economy: Economic Contribution of Industries Relying on Fair Use* (CCIA 2010) .................................. 8

Fred von Lohmann, *Fair Use as Innovation Policy*, 23 B<small>ERKELEY</small> T<small>ECH</small>. L.J. 829 (2008) ........... 9

**STATEMENT OF INTEREST**

EFF is a non-profit, member-supported civil liberties organization working to protect rights in the digital world. EFF and its more than 20,000 members have a strong interest in assisting the courts and policy-makers in striking the appropriate balance between intellectual property and the public interest. EFF has been deeply involved in several cases involving fair use and news content,[1] either as amicus or counsel, allowing it to offer the Court a unique viewpoint.

Public Knowledge is a non-profit public interest 501(c)(3) corporation, working to defend citizens' rights in the emerging digital culture. Its primary mission is to promote online innovation, protect the legal rights of all users of copyrighted works, and ensure that emerging copyright and telecommunications policies serve the public interest. Applying its years of expertise in these areas, Public Knowledge frequently files amicus briefs in cases that raise novel issues at the intersection of media, copyright, and telecommunications law.

**INTRODUCTION**

The Associated Press asks this Court to accept a woefully cramped view of fair use (and, in particular, of the first and third statutory factors) that is unsupported by Supreme Court and Second Circuit precedent. If adopted by this or any other court, this view would sharply curtail the essential role fair use plays in facilitating online innovation and expression, restricting the use and development of services that allow users to find, organize and share public information, services that depend on making intermediate copies, and even personal consumer uses such as time-shifting.

---

[1] *See, e.g., Righthaven LLC v. Democratic Underground LLC*, 791 F. Supp. 2d 968 (D. Nev. 2011); *Righthaven LLC v. DiBiase*, 2011 WL 2473531 (D. Nev. June 22, 2011); *Barclays Capital Inc. v. Theflyonthewall. com, Inc.*, 650 F.3d 876 (2d Cir. 2011); *O'Grady v. Superior Court*, 139 Cal.App.4th 1423 (6th App. Dist. 2006).

1

## ARGUMENT

**I.    The Overwhelming Weight of Legal Authority Recognizes that a Use Need Not Contain a New Expressive Meaning to be Transformative**

The Associated Press devotes several pages of its opening brief to one proposition: that the "transformative use inquiry focuses on whether the allegedly infringing work employs the original work to add something new, with a further purposes that alters the first with a new *expressive* meaning or message." AP Mem. of Law ISO MSJ at 11 (Docket #54) (emphasis in original). AP suggests that "use of [an original that] does not serve a different expressive purpose" cannot be transformative. *Id*. at 12. Amici urge the Court to squarely reject AP's theory as both unfounded and dangerous to innovation.

**A.    Transformativeness Does Not Turn on the Expressiveness of the Secondary Use**

AP's theory lacks foundation in law or statute. Of course, a transformative use *may* be one that actually alters the original work with a new expressive meaning or message. However, as the Second Circuit Court of Appeals has recognized, a transformative use can also be one that serves an entirely different *purpose* – even if that purpose is not particularly expressive. *See, e.g., Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605, 609-10 (2d Cir. 2006).

AP's approach rests almost entirely on a misguided extension of *Infinity Broadcasting Corporation v. Kirkwood,* 150 F.3d 104 (2d Cir. 1998). That decision is entirely inapposite. The defendant in that case offered a service that permitted customers to listen to entire unaltered radio broadcasts over phone lines. *See id.* at 108 ("all Kirkwood does is sell access to unaltered radio broadcasts"). Meltwater, by contrast, provides at most an excerpt and a link to online articles, acting like a search engine or even an interested friend who wants to share information about articles that are already publicly available on the Internet. It uses only small snippets of copyrighted content to provide its customers with a new, useful tool that helps locate information and directs customers to read news articles at other websites. Meltwater does nothing akin to what the defendant in *Infinity* did.

The leading applicable case in this Circuit is *Bill Graham Archives*, not *Infinity*. There the Second Circuit found a transformative purpose where copyrighted works were used in a different context to serve a different function than the original. The defendant reprinted concert posters in its book "to document and represent the actual occurrence" of concerts, a purpose that was different from the "dual purposes of artistic expression and promotion of the original use." *Bill Graham Archives*, 448 F.3d. at 609. Meltwater's service is similarly transformative. It searches for and delivers short excerpts and links to its customers in order to enhance their understanding of how, and how often, certain issues are covered by various news publications. That purpose is separate and distinct from AP's purpose of gathering and reporting the news.

AP attempts to distinguish *Bill Graham Archives,* insisting that the secondary uses were in fact expressive because they "enhance[d] the biographical information" in the book. AP Mem. of Law ISO MSJ at 11. Placed in context, however, it is clear the Second Circuit did not conclude a substantial expressive purpose was required. Quite the contrary: in *Bill Graham Archives*, the plaintiff asked the court, in essence, to adopt the same fair use standard AP presents, arguing that the secondary use, particularly the use of the posters in a timeline, without any additional commentary, was not transformative. The court disagreed, stressing that the "separate and distinct purpose" the images served sufficed to establish transformativeness. *Bill Graham Archives*, 448 F.3d. at 610.

Moreover, AP's effort to distinguish *Bill Graham Archives* exposes the conceptual incoherence of AP's fair use standard. If the use of an image in a timeline, solely as an "historical artifact graphically representing the fact" that a concert occurred, is sufficiently "expressive" to qualify as transformative in AP's view, why isn't Meltwater's use of a link and a few hundred characters to document the existence of a news article? It is difficult to identify a difference that should make a difference between the respective uses.

3

A recent fair use decision in this District is also on point. In *Authors Guild, Inc. v. Hathitrust,* 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012), the court considered whether digitizing books for purposes of creating a digital research library was transformative. The answer was a resounding yes:

> The use to which the works in the HDL are put is transformative because the copies serve an *entirely different purpose* than the original works: the purpose is superior search capabilities rather than actual access to copyrighted material. . . . I cannot imagine a definition of fair use that would not encompass the transformative uses made by [Defendants].

*Id.* at *11, *14 (emphasis added). Again, the use in question was not particularly expressive or communicative – it involved copying solely for the purpose of creating a massive database of materials, which could then be searched for a variety of purposes. Indeed, the court specifically rejected the plaintiff's complaint that the secondary use added nothing new. *Id*. at *11 ("Plaintiffs' argument that the use is not transformative merely because defendants have not added anything "new" misses the point.") (citing *Perfect 10*, *Inc. v. Amazon.com, Inc.,* 508 F.3d 1146, 1164 (9th Cir 2007)).

Not surprisingly, appellate courts around the country have rejected theories similar to AP's. For example, the Ninth Circuit has repeatedly found non-expressive uses to be transformative. The leading case is *Perfect 10*, *Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). Plaintiff Perfect 10 marketed and sold copyrighted images of nude models. Other publishers had reproduced some of those images on their own websites, which Google automatically indexed by copying content from the sites into Google's own database. When users entered queries, Google Image Search provided thumbnails (smaller, lower-resolution versions of relevant images, hosted on Google's own servers) from those websites. Clicking on a thumbnail would take the user to the website where the original image could be found. The Ninth Circuit found that Google's use of thumbnails was "highly transformative": it transformed the image into a "pointer directing a user to a source of information." *Id*. at 1165; *see also Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 818 (9th Cir. 2003) (finding use of exact replica thumbnails for image search engine was transformative). The court stressed, moreover, the social benefit of that

transformation. *Perfect 10*, 508 F.3d at 1165. ("[A] search engine provides social benefit by incorporating an original work into a new work, namely, an electronic reference tool."); *see also Kelly*, 336 F.3d at 820 (image search service "promotes the goals of the Copyright Act and the fair use exception [because they] benefit the public by enhancing information-gathering techniques on the internet"). Speaking directly to AP's argument that a search engine like Meltwater's is not transformative because it is not expressive, the Ninth Circuit also noted that "a search engine may be more transformative than a parody because a search engine provides an entirely new use for the original work, while a parody typically has the same entertainment purpose as the original work." *Perfect 10*, 508 F.3d at 1165.

Similarly, in *A.V. ex rel. Vanderhye v. iParadigms, LLC,* 562 F.3d 630 (4th Cir. 2009), the court correctly concluded that copying and archiving of student papers that "was completely unrelated to expressive content and instead aimed at detecting and discouraging plagiarism" was transformative because it served a distinct purpose. *Id*. at 640; *see also Newport-Mesa Unified School Dist. v. State of Calif. Dep't of Educ*., 371 F. Supp. 2d 1170, 1177 (C.D. Cal. 2005) (holding California state statute requiring copies of copyrighted test protocols to be provided to parents of special education students fell within "fair use"; parents' purpose in evaluating children's needs was transformative).

It should not be surprising that court after court has rejected AP's reasoning, for accepting AP's position could lead to absurd results. Consider, for example, the ongoing litigation regarding the submission of articles as prior art in the patent application process.[2] Citing several of the above cases, the United States Patent and Trademark Office has stated that it believes those submissions are protected fair uses, in large part because the copies were made for the purpose of documenting that certain features of an applicant's claim were in the prior art. Like AP's articles, these scholarly works were selected and organized because they contained

---

[2] *See* Bernard Knight, USPTO General Counsel, *USPTO Position on Fair Use Copies of NPL Made in Patent Examination* (Jan. 19, 2012) available at http://www.uspto.gov/about/offices/ogc/USPTOPositiononFairUse_of_CopiesofNPLMadeinPatentExamination.pdf.

5

certain information, and submitted for an entirely different but not particularly "expressive" purpose: to document that information's existence. On AP's theory, that distinct purpose might not be sufficiently transformative to pass muster.³ *See also Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003) (literary works submitted as evidence in court for purpose of factual content instead of expression were fair use); *Stern v. Does*, 2011 WL 997230 *9 (C.D. Cal. Feb. 10, 2011) (forwarding listserv post in email for purpose of informing others of the post was "highly transformative").

In sum, the case law is replete with examples of non-expressive transformative uses. That is as it should be, because any other rule would embody the categorical reasoning that the Supreme Court rejected in *Sony Corp. of Am. v. Universal City Studios, Inc.,* 464 U.S. 417 (1984). In that case, the Court sharply criticized the Court of Appeals for "assum[ing] that the category of 'fair use' is rigidly circumscribed by a requirement that every such use must be 'productive.'" *Id*. at 455 n.40. The Court rejected any such bright line rule:

> Congress has plainly instructed us that fair use analysis calls for a sensitive balancing of interests. The distinction between "productive" and "unproductive" uses may be helpful in calibrating the balance, but it cannot be wholly determinative. Although copying to promote a scholarly endeavor certainly has a stronger claim to fair use than copying to avoid interrupting a poker game, the question is not simply two-dimensional.

*Id*. The Court elaborated on its fair use analysis later, in *Campbell*, to clarify that "transformativeness" was important to the fair use analysis – but it did not, in the process, mandate a rigid definition of that term. *See Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 577 (1994) (fair use analysis "is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis").

### B. Fair Use Must Be Interpreted in Light of Its Purpose: Bringing Copyright in Line with the Public Interest

There is a reason *transformativeness* does not necessarily turn on *expressiveness*: if it did, many beneficial secondary uses could invite copyright liability. That in turn, would prevent fair

---

³ In fact, the USPTO's use would run even further afoul of AP's theory, as the articles are frequently submitted *in toto*, rather than excerpted.

6

use from serving one of its most important roles: protecting the public interest.

The Second Circuit, among others, has stressed the importance of copyright's public purpose:

> the law of copyright "is intended to motivate the creative activity of authors and inventors by the provision of a special reward . . . . The monopoly created by copyright thus rewards the individual author in order to benefit the public."

*Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1108 (1990)) (ellipsis in original). Thus, "courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry." *Rosemont Enters., Inc. v. Random House, Inc.,* 366 F.2d 303, 307 (2d Cir. 1966) (quoting *Berlin v. E. C. Publications Inc.*, 329 F.2d 541, 544 (2d Cir. 1964)).

Fair use is crucial to that purpose, because it helps ensure that copyright does not unduly impede expression and innovation. "From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Campbell*, 510 U.S. at 575 (quoting U.S. Const., Art. I, § 8, cl. 8) (alteration in original); *see also Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 141 (2d Cir. 1998) ("The ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and the Useful Arts would be better served by allowing the use than by preventing it.") (citations and quotations omitted).

Moreover, consideration of the public interest is a particularly relevant to the first fair use factor. Even in cases where, as here, the user has a commercial motive, courts give precedence to a significant public benefit. In *Blanch v. Koons*, for example, the Second Circuit held that the first factor favored the defendant despite his commercial and profitable use of the plaintiff's image in a "pop art" painting, noting that, "courts are more willing to find a secondary use fair when it produces a value that benefits the broader public interest." *Blanch*, 467 F.3d at 253 (quoting *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994)); *see also Rosemont*, 366 F.2d at 307 ("[W]e conclude that whether an author or publisher has a

commercial motive or writes in a popular style is irrelevant to a determination of whether a particular use of copyrighted material in a work which offers some benefit to the public constitutes a fair use.").

### C. Liability for Snippets, Search, and Other "Nonexpressive" Uses Would Thwart the Public Interest in Expression and Innovation

Keeping the role of fair use in protecting the public interest firmly in view, amici note that ramifications of adopting AP's unfounded approach to the first fair use factor go well beyond this case. AP attempts to dismiss Meltwater's value with the pejorative term "parasitic." But there are other common phrases for services and technologies that build on existing works – including helping people find and organize those works: "secondary uses" or "add-on innovation."

Every day, technology companies and garage inventors make non-transformative copies as they test and develop their innovative services. Courts have repeatedly found such uses to be fair. *See, e.g., Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1993); *Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 350 F.3d 640 (7th Cir. 2003) (copying of a database in order to obtain the underlying data protected fair use); *Sony Computer Entm't, Inc. v. Connectix Corp.*, 203 F.3d 596, 603–05 (9th Cir. 2000) (holding that reverse engineering of a video game was fair use); *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532 (11th Cir. 1996) (recognizing that reverse engineering of a computer program to uncover the original source code from the object code may constitute fair use); *Atari Games Corp. v. Nintendo of Am. Inc.*, 975 F.2d 832, 843–44 (Fed. Cir. 1992) (reverse engineering process to derive an object code from a computer chip was fair use). And that is a good thing, as these innovative activities benefit the public by offering new technologies and services and, often, stimulating economic growth. *See generally* Thomas Rogers & Andrew Szamosszegi, *Fair Use in the U.S. Economy: Economic Contribution of Industries Relying on Fair Use* (CCIA 2010), available at http://www.ccianet.org/CCIA/files/ccLibraryFiles/Filename/000000000354/fair-use-study-final.pdf (detailing the economic contributions of industries relying on fair use for these kinds of uses).

In AP's view, however, this kind of socially beneficial copying could subject an innovator to liability, particularly if a copyright owner could gin up some type of licensing system to try to manufacture a species of market harm. That, in turn, would give copyright owners a veto right over new technologies and services – precisely the kind of patent-like power forbidden by the Copyright Act and Supreme Court precedent. *See generally* 17 U.S.C. § 102; *Baker v. Selden*, 101 U.S. 99 (1879); *see also* Edward Lee, *Technological Fair Use*, 83 S. CAL. L. REV. 797, 820-21 (2010). This Court should be very careful not to sanction any such development.

What is more, a ruling in AP's favor could undermine legal protections for personal nonexpressive copying. Certainly many fair uses are made by remix artists and parodists, but many more are made by private citizens who simply wish to backup the music in their iPod, watch lawfully obtained content on a different device, or use a DVR to watch "Game of Thrones" at midnight instead of its regularly scheduled time. *See* Fred von Lohmann, *Fair Use as Innovation Policy*, 23 BERKELEY TECH. L.J. 829, 830 (2008) ("For every unauthorized copy made by a 'transformative' or 'productive' user – a parodist, pundit, researcher, critic, or 'remixer' – certainly thousands are made by 'home tapers,' iPod owners and TiVo subscribers."). Fair use protects such non-transformative copying and thereby ensures that technology companies will have the incentive to create services and technologies that enable it. *See, e.g., Sony*, 464 U.S. at 448-50 (holding home taping of broadcast television is a fair use despite lack of transformative use).

Indeed, personal non-transformative copying goes a good deal further: Internet users regularly make copies of creative online material on their computers in the course of browsing the web, and those copies are not always transitory. *Cf. Cartoon Network, LP v. CSC Holdings*, 536 F.3d 121, 130 (2d Cir. 2008) (buffer copies that existed for only 1.2 seconds not "fixed" within the meaning of the Copyright Act). Courts have held that such copying is transformative and fair, *see, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 726 (9th Cir. 2007), but if

9

AP is right, the first, second and third fair use factors could weigh against a fair use defense in an incredibly wide range of commonly accepted, beneficial technological uses.

Finally, accepting AP's theory could undermine the sharing of news snippets by private citizens who simply wish to prompt discussion or educate a given constituency – but do not necessarily make "expressive" transformative uses. For example, in 2010 and 2011, 275 copyright infringement lawsuits were filed by an entity named Righthaven, purportedly acting on behalf of a news publisher. The lawsuits targeted small bloggers, political campaigns, and political fora based on excerpts of news articles found on their websites. *See generally* Righthaven Stories, *Las Vegas Sun,* (available at http://www.vegasinc.com/news/legal/righthaven/); *see, e.g., Righthaven v. Democratic Underground*, LLC, 791 F. Supp. 2d 968 (D. Nev. 2011). A key aspect of Righthaven's business model was finding those who had casually or inadvertently posted a news article (all or just excerpts) or photo online and were unlikely to be able to afford copyright counsel. Righthaven then purchased the right to sue and sued the poster, demanding $150,000 for the single post.

In every one of the cases that were actually tested in court, Righthaven lost on fair use or other grounds, but the expense of litigation (compounded by the risk of statutory damages) forced many to settle rather than fight. As this sorry example suggests, where potential fair uses are under threat, courts must take care not to construe copyright law expansively, but rather hew closely to copyright's original purpose. *See generally Sony,* 464 U.S. at 455 n. 40 ("a teacher who copies for the sake of broadening his personal understanding of his specialty[; o]r a legislator who copies for the sake of broadening her understanding of what her constituents are watching; or a constituent who copies a news program to help make a decision on how to vote" are examples of fair use.)

**II.     Factor Three Does Not Automatically Favor News Publishers**

Amici also urge the Court to reject AP's "heart of the work" theory, which would effectively eliminate analysis of the third fair use factor for news content. On AP's account, sharing excerpts of a news article would weigh against fair use if those excerpts contain the lede.

10

But of course in most instances the lede (1) is primarily factual; and (2) contains precisely the *information* the user wishes to make known to others – indeed, that is the point of a lede.

This type of excerpting is very different from that at issue in *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539 (1985) (setting forth the heart of the work doctrine). In *Harper & Row*, the Court found that The Nation magazine's use of less than 400 words from President Ford's memoir by a news magazine infringed because those few words represented "the heart of the book" and were, as such, substantial. The Court was careful to emphasize the importance of the expression in the excerpt, noting that "[t]hough billed as 'hot news,' the article contained no new facts" about Ford pardoning former president Nixon (*id*. at 544) and that The Nation had "quoted these passages precisely because they qualitatively embodied Ford's distinctive expression." *Id.* at 565.

The Second Circuit's opinion in *NXIVM v. Ross Institute*, 364 F.3d 471 (2d Cir. 2004) is closely on point. In that case, the defendants had copied several excerpts from a seminar manual, in order to comment on them. Plaintiffs argued that the excerpts were "the heart of the work." The district court and appellate courts rejected the theory, finding that there was no "objective core of *expression*" in the excerpts used:

> Even plaintiffs reveal their appreciation of this fact when they charge defendants principally with copying the heart of their "services." Such services, however, are not copyrightable expression. *See* 17 U.S.C. § 102(b) (withholding copyright protection from any "idea, procedure, process, system, method of operation, concept, principle, or discovery").

*Id*. at 481 (emphasis added).

Here, as in *NXIVM*, the copied material is unlikely, in many if not all cases, to involve a "core" of protectable expression. Indeed, this case illustrates why the heart of the work doctrine does not mesh well with highly factual, published, news articles. When it comes to news articles, an excerpt that is shared will very often be the most "important" aspect of the work – but that importance will derive from the uncopyrightable factual content, not the expression. It is not the expressive heart of the work, but a piece of the factual skeleton upon which the expression hangs. If the facts are nonetheless treated as "the heart of the work," factor three of the fair use

11

analysis must always favor news publishers, no matter how short the excerpt. That outcome, too, creates an impermissible "bright-line rule."

Further, the "heart of the work" inquiry does not end the analysis of the third factor; rather, courts must still consider "whether the quantity of the material used was reasonable in relation to the purpose of the copying." *Am. Geophysical Union*, 60 F.3d at 926 (quoting *Campbell*, 510 U.S. at 586). While amici do not have access to the full record, it appears likely that the headline of an article, as well as a short excerpt, is precisely the amount needed to accomplish the purpose of communicating the article's topic.

## CONCLUSION

For the reasons stated above, amici respectfully urge this court to deny the Associated Press' motion for summary judgment.

Dated: January 17, 2013                    Respectfully submitted,

By: /s/ Julie A. Ahrens

Julie A. Ahrens
Stanford Law School
Center for Internet & Society
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-2511
jahrens@stanford.edu

Corynne McSherry
Kurt Opsahl
Electronic Frontier Foundation
454 Shotwell Street
San Francisco, CA 94110-1914
(415) 436-9333
corynne@eff.org

Sherwin Siy
PUBLIC KNOWLEDGE
1818 N Street, NW Suite 410
Washington, DC 20036
Tel: (202) 861-0020
Email: ssiy@publicknowledge.org

*Attorneys for Amici Curiae*