UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ASSOCIATED PRESS,

                Plaintiff,

       v.

MELTWATER U.S. HOLDINGS, INC.;
MELTWATER NEWS U.S., INC; and
MELTWATER NEWS U.S. 1, INC.,

            Defendants.

Case No. 12-cv-1087 (DLC)

 

 

**BRIEF OF *AMICUS CURIAE* COMPUTER &
COMMUNICATIONS INDUSTRY ASSOCIATION IN SUPPORT OF NEITHER PARTY**

Kathleen M. Sullivan (counsel of record)
Jonathan B. Oblak
Todd Anten
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

*Counsel for amicus curiae*

# TABLE OF CONTENTS

**Page**

INTEREST OF *AMICUS CURIAE*....................................................................1

PRELIMINARY STATEMENT .........................................................................2

ARGUMENT .....................................................................................................3

I.   HEADLINES AND WRITING STYLES ARE NOT COPYRIGHTABLE......................3

     A.   News Headlines Alone Are Not Subject To Copyright ...........................4

     B.   An "Inverted-Pyramid" Writing Style Is Not Subject To Copyright.......................5

     C.   Limited Copyright Protection In News Is Consistent With
          International Law ............................................................................7

II.  SEARCH ENGINES ARE TRANSFORMATIVE AND HAVE NO
     MEANINGFUL EFFECT ON THE MARKET FOR NEWS ARTICLES .......................9

     A.   News-Oriented Search Engines Are Transformative Uses..................10

          1.   Courts uniformly recognize search engines to be transformative..............10

          2.   News-oriented search engines are even more transformative
               than standard search engines..........................................11

          3.   Meltwater uses the works at issue for a different purpose than AP..........13

          4.   A different purpose, without more, sufficiently renders a use
               transformative ........................................................14

     B.   News-Oriented Search Engines Have No Meaningful Effect Upon The
          Market For The Original Work..........................................16

III. THE INTERESTS OF SEARCH ENGINES AND NEWS REPORTERS ARE
     BEST BALANCED BY AP MEMBERS' USE OF ROBOTS.TXT
     INSTRUCTIONS, AND NOT BY AP'S ENFORCEMENT OF NON-
     CONSENSUAL BROWSEWRAPS AGAINST SEARCH ENGINES .........................19

     A.   The Installation Of Robots.txt Instructions Is The Most Efficient Way To
          Prevent AP Clients From Having AP Articles Indexed By Search Engines ........20

     B.   Search Engines Cannot Be Bound By Nonconsensual Browsewraps ..................21

CONCLUSION..................................................................................22

# TABLE OF AUTHORITIES

**Page**

## Cases

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
562 F.3d 630 (4th Cir. 2009) ........................................................................15, 16

*Am. Geophysical Union v. Texaco Inc.,*
60 F.3d 913 (2d Cir. 1994)..................................................................................16

*Apollo Theater Found., Inc. v. W. Int'l Syndication,*
No. 02 Civ. 10037(DLC), 2005 WL 1041141 (S.D.N.Y., May 5, 2005) ................4

*Arnstein v. Porter,*
154 F.2d 464 (2d Cir. 1946)..................................................................................4

*Authors Guild, Inc. v. HathiTrust,*
No. 11 Civ. 6351(HB), 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012) .................11, 12, 13, 15

*Barclays Capital Inc. v. Theflyonthewall.com, Inc.,*
650 F.3d 876 (2d Cir. 2011)..................................................................................9

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
448 F.3d 605, 609 (2d Cir. 2006)...........................................13, 14, 15, 16, 17, 18

*Blanch v. Koons,*
467 F.3d 244 (2d Cir. 2006).............................................................................15, 17

*Bond v. Blum,*
317 F.3d 385 (4th Cir. 2003) ...............................................................................12

*Bouchat v. Baltimore Ravens Ltd. P'ship,*
619 F.3d 301 (4th Cir. 2010) ...........................................................................12, 13

*Campbell v. Acuff-Rose Music, Inc.,*
510 U.S. 569 (1994)...........................................................................................9, 14, 17

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.,*
150 F.3d 132 (2d Cir. 1998)..................................................................................17

*Douglas v. Osteen,*
317 Fed. Appx. 97 (3d Cir. 2009) ..........................................................................6

*Ekern v. Sew/Fit. Co., Inc.,*
622 F. Supp. 367 (N.D. Ill. 1985) ..........................................................................6

*Elvis Presley Enters., Inc. v. Passport Video,*
349 F.3d 622 (9th Cir. 2003) ...............................................................................18

*Feist Publ'ns, Inc. v. Rural Tele. Serv. Co., Inc.,*
499 U.S. 340 (1991)...........................................................................1, 2, 5, 6, 7, 9

*Field v. Google Inc.*,
    412 F. Supp. 2d 1106 (D. Nev. 2006) ...................................................................2, 10, 12, 13

*Harper & Row, Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985)..................................................................................................................9, 14

*Infinity Broadcast Corp. v. Kirkwood*,
    150 F.3d 104 (2d Cir. 1998).....................................................................................................13, 14

*In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*,
    Nos. 12 Civ. 325 *et al.*, 2012 WL 4466660 (D. Nev. Sept. 27, 2012)....................................21

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ...................................................................2, 10, 12, 13, 14, 17

*Kregos v. Assoc. Press*,
    937 F.2d 700 (2d Cir. 1991)....................................................................................................5

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) ..................................................................................................3

*McMahon v. Prentice-Hall, Inc.*,
    486 F. Supp. 1296 (D.C. Mo. 1980) .......................................................................................6

*NXIVM Corp. v. Ross Inst.*,
    364 F.3d 471 (2d Cir. 2004)....................................................................................................17

*N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*,
    389 F. Supp. 2d 527 (S.D.N.Y. 2005), *aff'd*, 497 F.3d 109 (2d Cir. 2007) ..............................4

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) ..................................................................................................5

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data*,
    166 F.3d 65 (2d Cir. 1999).......................................................................................................6, 7

*Perfect 10 v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ..................................................................2, 10, 11, 12, 13, 15

*Ricker v. Gen. Elec.*,
    162 F.2d 141 (2d Cir. 1947).....................................................................................................6

*Salinger v. Random House, Inc.*,
    811 F.2d 90 (2d Cir. 1987).......................................................................................................5

*Sandoval v. New Line Cinema Corp.*,
    147 F.3d 215 (2d Cir. 1998).....................................................................................................3

*Schnabel v. Trilegiant Corp.*,
    697 F.3d 110 (2d Cir. 2012).....................................................................................................21

*Soc'y of Composers, Authors & Music Publishers of Canada v. Bell Canada*,
    [2012] SCC 36 .........................................................................................................................19

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984)..................................................................................7, 17

*Specht v. Netscape Commc'ns Corp.*,
   306 F.3d 17 (2d Cir. 2002)...............................................................................21

*Whitehead v. CBS/Viacom, Inc.*,
   315 F. Supp. 2d 1 (D.D.C. 2004) .......................................................................6

*Wright v. Warner Books*,
   953 F.2d 731 (2d Cir. 1991)..............................................................................16

## Statutes

37 C.F.R. § 202.1(a)..................................................................................................4

37 C.F.R. § 202.1(b)..................................................................................................6

17 U.S.C. § 102(b)....................................................................................................4

17 U.S.C. § 107.....................................................................................................2, 3

## Miscellaneous

Comment, *Copyright Protection in an Opt-Out World: Implied License Doctrine and News
   Aggregators*, 122 Yale L.J. 837 (2012) ...........................................................20

Copyright Office Circular 34 .....................................................................................4

William F. Patry, *Moral Panics and the Copyright Wars* (2009)..........................5, 6, 9

1 Ricketson & Ginsburg, *International Copyright and Neighbouring Rights: The
   Berne Convention and Beyond* (2006) ...............................................................8

1 World Intellectual Prop. Org., *Records of the Intellectual Property Conference
   of Stockholm* (1967) ..........................................................................................8

World Wide Web Found., *Web Index 2012* (Oct. 2012), available at
   http://thewebindex.org/2012/10/2012-Web-Index-Key-Findings.pdf ......................2

## INTEREST OF *AMICUS CURIAE*[1]

The Computer & Communications Industry Association ("CCIA") is an international, nonprofit trade association dedicated to open markets, open systems, and open networks.  CCIA represents large, medium-sized, and small companies in the high-technology products and services sectors, including computer hardware and software, electronic commerce, telecommunications, and Internet products and services—companies that collectively generate more than $250 billion in annual revenues.    A    complete    list    of    CCIA's    members    is    available    at http://www.ccianet.org/members.

Given that the products and services provided by CCIA members are heavily influenced by the scope and extent of copyright law, including the idea-expression dichotomy and the longstanding prohibition on copyrightability of facts, *see Feist Publ'ns, Inc. v. Rural Tele. Serv. Co., Inc.*, 499 U.S. 340, 344-45 (1991), the decision in this case may affect the fundamental nature of CCIA members' activities.  In particular, interpretation of the contours of the more limited scope of copyright protection in news articles and items of press-related information will likely affect the nature of Internet innovation as well as Internet-enabled public discourse.  Accordingly, CCIA members have a substantial, direct interest in the proper interpretation of copyright law in this matter.  Because CCIA presents the Court with a broader perspective than is likely to be supplied by any party to this proceeding, its brief may prove helpful in assisting the Court to rule on the matters at bar.

---

[1]    *Amicus* discloses that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money intended to fund preparing or submitting the brief; and (3) no person other than *amicus* contributed money intended to fund preparing or submitting the brief.

## PRELIMINARY STATEMENT

There are billions of websites on the Internet, and that number continues to grow every day.[2] Search engines such as Google, Yahoo!, and Bing allow users to sift through this deluge of data to find the specific information that interests them.  Similarly, Internet users increasingly depend on social networks to share and circulate news and information.  Such tools are not merely convenient; they are *essential* for navigating the Internet in any meaningful way.  Courts therefore recognize that search engines' continual reproduction of copyrighted content in order to improve access to information is fair use under the Copyright Act, 17 U.S.C. § 107.  *See*, *e.g.*, *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146, 1165-68 (9th Cir. 2007) (search engine's reproduction of copyrighted works held to be fair); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820-22 (9th Cir. 2003) (same); *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1118-23 (D. Nev. 2006) (same).

The boundaries of copyright protection become even more important when users rely on search engines to locate factual information, such as recent news events.  It is axiomatic that facts are not protected by copyright law.  *See Feist Publ'ns, Inc. v. Rural Tele. Serv. Co., Inc.*, 499 U.S. 340, 344-45 (1991).  And although a particular expression of facts in a lengthy news article may, as a whole, qualify for copyright protection, neither headlines nor the general writing style of news articles alone qualify for copyright protection.  In ruling on the parties' respective motions for summary judgment, *amicus* respectfully requests that the Court be mindful to act in accord with these important tenets of copyright law.

Finally, as a separate matter, plaintiff Associated Press ("AP") suggests in its motion for summary judgment that defendants Meltwater U.S. Holdings, Inc., Meltwater News U.S., Inc., and

---

[2]  In 2012, for example, the World Wide Web Foundation reported estimates of over *one trillion* unique Web pages on the Internet.  *See* World Wide Web Found., *Web Index 2012* at 8 (Oct. 2012), available at http://thewebindex.org/2012/10/2012-Web-Index-Key-Findings.pdf.

Meltwater News U.S. 1 (collectively, "Meltwater") may have some form of contractual obligation, based on the terms of AP's licenses with its members, to proactively exclude AP's news articles from its search engine (*e.g.*, by implementing a robots.txt instruction).  Non-consensual or otherwise un-accepted Terms of Use on a website, however, cannot bind a non-party such as a third-party search engine.  This is not a mere detail that can be swept aside; accepting AP's argument that an online service may be bound by contracts to which they have not affirmatively entered would rewrite the rules of the Internet, allowing any visitor to a website to be bound unknowingly to buried terms.

Indexing of content, including by search engines and other information tools, has become an indispensable component of the Internet landscape.  Amid an expanding universe of online noise, Internet users turn to search tools, social networks, and other online platforms to help them navigate.  This industry cannot operate under the threat of looming litigation from billions of potential plaintiffs.  It is an even easier case when those services do not replicate the original work in its entirety for public consumption, but rather merely provide a headline and a snippet of context, and direct users to the original source.  While *amicus* takes no position on the ultimate question of liability in this particular lawsuit—*amicus* has not been provided with the factual record in this case beyond what has been disclosed on the public docket—it respectfully urges the Court to take into account the effect its ruling may have on the operation of legitimate online services.

## ARGUMENT

## I.   HEADLINES AND WRITING STYLES ARE NOT COPYRIGHTABLE

Before the Court determines whether Meltwater's search engine makes fair use of AP's materials under 17 U.S.C. § 107, it must first establish that AP has a protected, copyrightable interest in what Meltwater allegedly used.  *See*, *e.g.*, *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998) ("We believe it was error to resolve the fair use claim without first determining whether the alleged infringement was *de minimis*."); *Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 387 F.3d 522, 544 (6th Cir. 2004) (holding that because plaintiff's work "is not copyrightable, we need not consider [defendant's] fair-use defense"); *N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 389 F. Supp. 2d 527, 544 n.13 (S.D.N.Y. 2005) (stating there was no need to address defendant's fair use arguments because "NYMEX's settlement prices are not copyrightable"), *aff'd*, 497 F.3d 109 (2d Cir. 2007); *see also* 17 U.S.C. § 102(b) (specifying limitations on copyright protection).

In this brief, *amicus* does not take the position that AP does not have any copyrightable interest in the entirety of its works, when considered in their full and complete forms.  However, *amicus* urges the Court to bear in mind that the scope of any copyrightable interest AP may have in its articles—particularly given that they are intensively fact-based—is extremely narrow. Specifically, *amicus* respectfully reminds the Court of two fundamental tenets of copyright law: (a) that headlines alone are not within the ambit of copyright protection; and (b) that a method of writing is not a "work" protectable under Title 17.

## A.    News Headlines Alone Are Not Subject To Copyright

"Words and short phrases such as names, titles and slogans" are "not subject to copyright." 37 C.F.R. § 202.1(a).  This holds true "[e]ven if a name, title, or short phrase is novel or distinctive." U.S. Copyright Office Circular 34, *at* http://www.copyright.gov/circs/circ34.pdf.  As this Court has already recognized, "[i]t is well-settled in this Circuit that '[a] title cannot be copyrighted.'" *Apollo Theater Found., Inc. v. W. Int'l Syndication*, No. 02 Civ. 10037(DLC), 2005 WL 1041141, at *16 n.13 (S.D.N.Y., May 5, 2005) (Cote, J.) (quoting *Arnstein v. Porter*, 154 F.2d 464, 474 (2d Cir. 1946)).  Headlines to news articles are nothing more than titles that identify the underlying contents of the story and do not qualify for copyright protection on their own.

Further, as the Court is aware, copyright law denies protection to facts.  *See Feist*, 499 U.S. at 344-45.  This includes common or ordinary ways of expressing those facts.  *See, e.g., Salinger v. Random House, Inc.*, 811 F.2d 90, 98 (2d Cir. 1987) ("ordinary" word combinations lack the "minimum level of creativity necessary for copyright protection"); *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) ("Ordinary phrases are not entitled to copyright protection.").  As AP's own Complaint makes clear, its headlines are nothing more than short, ordinary, fact-based phrases, and thus are not copyrightable.  (*See, e.g.*, Complaint ¶ 78, Ex. I ("Former Alaska Sen. Ted Stevens dies in plane crash"), Ex. S ("Shoplifter chops off Wash. security guard's ear"), Ex. T ("Young office says he's cleared in DOJ probe").)  To deem such short, ordinary, factual fragments as copyrightable would essentially give AP a monopoly over the underlying facts themselves—a violation of the merger doctrine.  *See Kregos v. Assoc. Press*, 937 F.2d 700, 705 (2d Cir. 1991) (expression is not copyrightable where there are "so few ways of expressing [the] idea that protection of the expression would effectively accord protection to the idea itself").  The Court should therefore recognize that, to the extent that an AP news article is protectable under copyright law when considered in its entirety, such protection does not inure in a headline alone.

### B.     An "Inverted-Pyramid" Writing Style Is Not Subject To Copyright

AP claims to have adopted a particular writing style for its news articles—specifically, "an 'inverted pyramid,' with the aim of including as much key information as possible in the 'lede,' or first portion of the story."  (Complaint ¶ 32.)[3]  As AP thus concedes, the inverted-pyramid writing style is not itself a creative expression , but rather a *style* or *method* of organizing facts.  However, "a particular writing style or method of expression standing alone is not protected by the Copyright

---

[3]    For further discussion of the widely used inverted-pyramid writing style in news reporting, including its origins as a reaction by the public against the prevailing ornamental style of writing in the 1800s, *see* William F. Patry, *Moral Panics and the Copyright Wars* 184-89 (2009).

Act." *Whitehead v. CBS/Viacom, Inc.*, 315 F. Supp. 2d 1, 11 (D.D.C. 2004) (citing *Feist*, 499 U.S. at 350); *see also Douglas v. Osteen*, 317 Fed. Appx. 97, 99 (3d Cir. 2009) (unpublished) ("the use of a particular writing style … is not protected by the Copyright Act"); *Ekern v. Sew/Fit. Co., Inc.*, 622 F. Supp. 367, 370 (N.D. Ill. 1985) (Copyright Act does not protect writing styles); *McMahon v. Prentice-Hall, Inc.*, 486 F. Supp. 1296, 1302 (D.C. Mo. 1980) ("A writer may not claim a monopoly on a particular writing style by virtue of a copyright.") (citing *Ricker v. Gen. Elec.*, 162 F.2d 141 (2d Cir. 1947)); *see also* 37 C.F.R. § 202.1(b) (excluding from the scope of copyright "ideas, plans, methods, [and] systems"). Such a position would be akin to claiming a copyrightable interest in the fundamental structure of modern journalism.[4]  The Court should therefore reject any invitation to recognize AP as having a protectable interest in its preferred writing style.

As the above principles demonstrate, works that are highly factual hold a special place in copyright law, benefitting only from the narrowest (if any) of copyright protection.  The Second Circuit recognized such circumstances in *Nihon Keizai Shimbun, Inc. v. Comline Business Data*, 166 F.3d 65, 69 (2d Cir. 1999), where the defendant was accused of infringing the plaintiff's copyrights in 22 news articles.  The Second Circuit recognized that one of the defendant's works "only copie[d] the first paragraph of a six-paragraph article" while the others "typically copied well over half of the text of the corresponding articles."  *Id.* at 71.  The Court held that, "[i]n the context of articles such as these, *consisting almost entirely of [plaintiff's] reporting of unprotected facts*, we conclude that this one-paragraph abstract of a six-paragraph article is not substantially similar to the [plaintiff's] article in a quantitative sense."  *Id.* (emphasis added).  The Second Circuit continued:

---

[4]   AP has previously hinted that it has a protectable interest in its inverted-pyramid writing style. For example, Tom Curley, CEO of AP, recently stated that "[a]s early as 1883, AP agents were instructed to put the vital news first and add the story detail later," concluding that "[y]ou can see why AP would complain about the free-riders who claim to be only taking the five Ws of news in real time."  Patry, *Moral Panics*, *supra* n.3 at 184 (quoting Mr. Curley's Nov. 29, 2007 speech).

> [T]he quantitative analysis of two works must always occur in the shadow of their qualitative nature.  For example, different quantities of use may be required to support a finding of substantial similarity depending on whether the use is a direct quotation of a fictional work, or a paraphrase of a factual compilation.  Where, as here, the copyrighted work contains both original and unprotected elements, *a higher quantity of copying is required to support a finding of substantial similarity* than when the infringed work is wholly original.

*Id.* (emphasis added).  Thus, under this Circuit's precedent, the Court should be even more skeptical than usual of claims of copyright infringement where:  (1) the copying was just a small portion of the original work; and (2) the plaintiff's work is highly factual and thus contains unprotected elements.

Search engines for news articles generally provide the headline and just a snippet or two from the article, to provide proper context so that the user can determine if it is the article that she is looking for.  Given that the copying of an entire paragraph of a news article in *Nihon* was found to not even qualify for copyright protection, the Court should find that the provision of a mere snippet of a news article in the context of a search engine does not quantitatively constitute copyright infringement as a matter of law.  As the Supreme Court has held, our copyright laws have "never accorded the copyright owner complete control over all possible uses of his work."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984).

## C.      Limited Copyright Protection In News Is Consistent With International Law

That U.S. copyright law "limits severely the scope of protection in fact-based works," *Feist*, 499 U.S. at 350, is entirely consistent with international copyright law.  The primary international copyright treaty, the Berne Convention for the Protection of Literary and Artistic Works, as last revised July 24, 1971, amended Oct. 2, 1979, S. Treaty Doc. No. 99-27, 828 U.N.T.S. 221 ("Berne Convention"), has always limited the extent to which copyright interests can be given in news.  Today, the Berne Convention circumscribes any copyright in news coverage in two ways: (1) copyright may not be granted in "news of the day," "mere items of press information," or in facts,

and (2) Member Countries are compelled to permit quotations, including in the form of press summaries.

*First*, Berne Convention Article 2(8) states that its protection "shall not apply to news of the day or to miscellaneous facts having the character of mere items of press information." *Id.* art. 2(8). At its drafting, this limitation was construed thusly:

> [T]he correct meaning of this provision is to exclude from protection articles containing news of the day or miscellaneous information, provided such articles have the character of simple press information, since news of this kind does not fulfil [sic] the conditions essential for admission to the category of literary or artistic works.

1 World Intellectual Prop. Org., *Records of the Intellectual Property Conference of Stockholm* 115 (1967) ("*WIPO Records*").  This obligation to exclude these categories from copyright protection represents a commitment binding upon the U.S. Government.

*Second*, the Berne Convention imposes a mandatory quotation right in Article 10.  While it was once limited *only* to "newspaper articles and periodicals," Article 10 mandates today that:

> It shall be permissible to make quotations from a work which has already been lawfully made available to the public, provided that their making is compatible with fair practice, and their extent does not exceed that justified by the purpose, including quotations from newspaper articles and periodicals in the form of press summaries.

*Id.* at 116-17.  Indeed, whereas quotations were once required to be "short," this requirement has since been abolished.[5]

These two constraints—(a) the exclusion of facts, "news of the day," and "mere items of press information"; and (b) the quotation right—constitute the "only two clear imperative restrictions of significance under the present text [of the Berne Convention]."  1 Ricketson & Ginsburg,

---

[5]   This abolition was not accidental; government copyright experts specifically recommended this change, arguing: "Sufficient direction in these various fields [of 'politics, economics, religion, and cultural life'] cannot be achieved unless it is possible to reproduce, in certain cases, fairly considerable portions of articles which constitute the contributions of other newspapers to public discussion."  1 *WIPO Records* at 116.

*International Copyright and Neighbouring Rights: The Berne Convention and Beyond* 331 (2006).

To extend copyright protection to such subject matter would thus contradict the international legal

commitments of the United States, in addition to well-established U.S. precedent.

## II.   SEARCH ENGINES ARE TRANSFORMATIVE AND HAVE NO MEANINGFUL EFFECT ON THE MARKET FOR NEWS ARTICLES

*Amicus* does not dispute here that entire news articles, in their full and complete forms, may

in some cases qualify for some copyright protection, although "inevitably … the copyright in a

factual compilation is thin." *Feist*, 499 U.S. at 349.  However, the Supreme Court has warned that

"copyright does not prevent subsequent users from copying from a prior author's work those

constituent elements that are not original—for example, quotations borrowed under the rubric of fair

use from other copyrighted works, facts, or materials in the public domain—as long as such use does

not unfairly appropriate the author's original contributions." *Harper & Row Publishers, Inc. v.*

*Nation Enters.*, 471 U.S. 539, 548 (1985).[6]

Fair use is an unconsented-to, uncompensated use, for which no permission need be sought—

"[i]f the use is otherwise fair, then no permission need be sought or granted." *Campbell v. Acuff-*

*Rose Music, Inc*., 510 U.S. 569, 585 n.18 (1994).  That Meltwater did not seek AP's permission is

not, therefore, relevant to the fair use analysis.  For the purposes of this brief, *amicus* seeks to focus

the Court's attention on two important principles of fair-use law as they pertain to news-oriented

---

[6]   In the same speech as that referenced above, *see supra* n.4, Mr. Curley stated that "[a] lot of this aggregation … of AP content in new business models occurs without our permission.  Basically, these new models free ride on the investment and efforts of AP."  Patry, *Moral Panics*, *supra* n.3 at 185 (quoting Mr. Curley's Nov. 29, 2007 speech).  However, the Second Circuit's decision in *Barclays Capital Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876 (2d Cir. 2011) likely precludes AP from bringing a successful claim of "hot news" misappropriation against "news aggregators."  Through lawsuits such as the instant one, AP no doubt seeks to gain what the *Barclays* court denied.

search engines: (1) the transformative nature of search engines; and (2) the effect of the use on the potential market for AP's works.

News articles exist to be read.  Search engines exist to help readers find those articles.  Like a paper index or a card catalogue, search engines that return snippets from news articles do not substitute for reading the articles themselves—no more of the article than is necessary to create a searchable index is copied, and no more of the work than is necessary to allow readers to determine whether the article might be of interest to them is displayed.  Further, there is no economic harm flowing directly from scanning the work, creating the index, or displaying snippets of text.  To the contrary, search engines benefit authors by helping members of the public locate their works.

**A.      News-Oriented Search Engines Are Transformative Uses**

**1.      Courts uniformly recognize search engines to be transformative**

Every court to address the issue has (properly) concluded that, because the reproduction of a work in a search engine has an entirely different purpose than that of the original work—*i.e.*, to help users find information and not to exploit the expressive qualities of the underlying content—search engines are transformative uses under the first fair-use factor.  In *Kelly*, for example, defendant Arriba's search engine "made exact replications of Kelly's images."  336 F.3d at 818.  Nonetheless, the Ninth Circuit concluded that Arriba's search engine

> served an entirely different function than Kelly's original images.  Kelly's images are artistic works intended to inform and to engage the viewer in an aesthetic experience. … Arriba's use of Kelly's images in the thumbnails is unrelated to any aesthetic purpose.  Arriba's search engine functions as a tool to help index and improve access to images on the internet and their related web sites.

*Id.*  Subsequent courts agree, holding that search engines make transformative uses of the works they index and organize.  *See*, *e.g.*, *Perfect 10*, 508 F.3d at 1165 (Google's copying of images was transformative because "a search engine transforms the image into a pointer directing a user to a source of information"); *Field*, 412 F. Supp. 2d at 1119 (Google's use of cached links was

transformative "[b]ecause Google serves different and socially important purposes in offering access to copyrighted works through 'Cached' links and does not merely supersede the objectives of the original creations").  And just two months ago in this Court, in *Authors Guild, Inc. v. HathiTrust*, No. 11 Civ. 6351(HB), 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012), Judge Baer found search engine indexing to be a transformative use, stating that "[t]he use to which the works in the [search engine] are put is transformative because the copies serve an entirely different purpose than the original works: the purpose is superior search capabilities rather than actual access to copyrighted material." *Id.* at \*11.[7]  As these cases confirm, a search engine serves a different purpose than the materials it indexes and organizes, and no court has ever come to a contrary conclusion.  This Court should therefore reject any invitation to create an inter-Circuit and intra-Circuit split of authority on this issue.

### 2. News-oriented search engines are even more transformative than standard search engines

News-oriented search engines are even stronger candidates for recognition as transformative uses than a typical search engine because (1) news-oriented search engines typically do not use the entirety of the work, and (2) news-oriented search engines necessarily include fact-intensive works, which already receive the barest (if any) protection by copyright law.

---

[7]    AP states that *HathiTrust* found the search engine at issue to be transformative "only because the results only showed the relevant page numbers in the books scanned and 'no actual text from [the] book is revealed.'"  (AP Br. at 16 n.4 (quoting *HathiTrust*, 2012 WL 4808939 at \*10).)  This is wrong for two reasons.  *First*, the quoted language addressed the "character of the use," not the "purpose of the use."  *See HathiTrust*, 2012 WL 4808939 at \*10.  *Second*, AP fails to acknowledge the full sentence:  "[N]o actual text from the book is revealed, *except to print-disabled library patrons at UM*."  *Id.* (emphasis added, citation omitted).  The Court went on to find that the provision of text to such patrons was transformative because "the provision of access for them was not the intended use of the original work."  *Id.* at \*12 (citing *Perfect 10*, 508 F.3d at 1165).  Thus, *HathiTrust* squarely addressed—and agreed—that a search engine that reproduces "actual text" is still a transformative use.

*First*, the above-referenced line of cases, which deemed search engines to be highly transformative, all involved reproduction of the original works *in their entirety*.  *See*, *e.g.*, *Kelly* (entire images); *Perfect 10* (entire images); *HathiTrust* (entire books); *Field* (entire webpages).  By contrast, news-oriented search engines and online news-sharing tools generally provide users with only the headline of news articles and a snippet of its contents for the purpose of helping the user determine if she is interested in the content at issue.  In this case, for example, the parties appear to agree that Meltwater does not display to the public the entirety of AP's news articles.  (*See* Meltwater Br. at 3-4 (Meltwater copies, at most, the headline, the first 300 characters of the article, and 140 characters surrounding the search query).)[8]

*Second*, given the prohibition against copyrighting facts, the communication of factual content is more likely to be a fair use than the communication of fictional content.  For example, the Fourth Circuit recently recognized that use of a copyrighted logo in conveying factual information (specifically, facts surrounding the Ravens' 1996 team) was a transformative use, serving a different purpose than the original purpose of the logo (specifically, to identify teams on the field).  *See Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 314 (4th Cir. 2010) (use of plaintiff's copyrighted work was transformative because the work "is used 'not for its expressive content, but rather for its … factual content'") (quoting *Bond v. Blum*, 317 F.3d 385, 396 (4th Cir. 2003)).  Similarly, use of news articles in a search engine is not for the purpose of replicating the expressive content of the articles, but rather for communicating factual content—*i.e.*, the *fact* that the user's search query appeared in a news article.

---

[8]   While AP's Complaint alleges that Meltwater induces its clients to reproduce the full text of entire AP articles (*see*, *e.g.*, Complaint ¶¶ 9, 13, 64), this allegation does not appear in AP's brief.  To the extent that AP still contends Meltwater engages in such activities, *amicus* takes no position on whether such acts render Meltwater liable for copyright infringement.

### 3.       Meltwater uses the works at issue for a different purpose than AP

Facing the above legal propositions, and in an effort to distinguish *Kelly*, *Perfect 10*, *Field*, and *HathiTrust* from the instant case, AP tries to characterize Meltwater as nothing more than a "news clipping service."  In addressing this argument, the Court should, at a minimum, recognize that Meltwater's services, as advertised, are functionally similar to an advanced search engine that provides analytics.

The most obvious distinction between the services provided by AP and Meltwater is that AP's purpose is to *report* the news, while Meltwater's purpose is to help clients determine *how the news is being reported*.  To accomplish this transformative purpose, Meltwater employs advanced analytics that, *inter alia*, provide clients with statistical information relating to their search terms across multiple sources.  (*See* Meltwater Br. at 3-4.)  AP does not provide any of these services.  That Meltwater may incidentally reproduce the headline and a few snippets from the articles it searches while accomplishing this transformative purpose does not disqualify it from fair-use protection, as such use is not for the purpose originally conceived by AP.  *See Bouchat*, 619 F.3d at 314 (citing *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006)).

To this end, AP's heavy reliance on *Infinity Broadcast Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998) is not on point.  In *Infinity*, the defendant simply provided customers with access to unaltered radio broadcasts.  *Id.* at 109.  The case, however, did not involve a search engine, which courts have since deemed to implicate a transformative purpose.  And the complaint in *Infinity* was filed in 1996, years before modern search engines began assisting users with the difficult process of navigating more than one trillion websites.  Indeed, the Ninth Circuit in *Kelly* specifically addressed *Infinity*, explaining why it has no relevance in a search engine setting:

> Even in [*Infinity*], where the retransmission of radio broadcasts over telephone lines
> was for the purpose of allowing advertisers and radio stations to check on the
> broadcast of commercials or on-air talent, there was nothing preventing listeners

> from subscribing to the service for entertainment purposes.  Even though the intended purpose of the retransmission may have been different from the purpose of the original transmission, the result was that people could use both types of transmissions for the same purpose.

336 F.3d at 819.  In this case, there is no dispute that Meltwater provides only the headline, a snippet from the first line of the article, and a shorter snippet where the client's search query appears.  (*See* Meltwater Br. at 3.)  Clients therefore have no opportunity to enjoy the entirety of the article because they get, at most, a headline and a fragment or two—they certainly cannot be used for the "same purpose."  (Otherwise, AP would merely publish headlines and a lede.)  This simply cannot be compared to the radio listeners in *Infinity* who had full access to the entirety of retransmitted radio broadcasts.[9]

### 4.    A different purpose, without more, sufficiently renders a use transformative

As a final matter, *amicus* respectfully corrects a legal error in AP's submission.  AP suggests that, under the law of this Circuit, to qualify for fair use the original work must be "incorporated as raw material into a new work with further *expressive* purpose or new *expressive* meaning."  (AP Br. at 16.)  Nowhere in Second Circuit law does such a requirement exist; to the contrary, this statement contradicts the law of this Circuit.

In *Bill Graham Archives*, the Second Circuit stated that a new or different purpose is all that is required to render a use transformative.  *See* 448 F.3d at 609 (finding defendant's use to be transformative because its "purpose in using the copyrighted images at issue in its biography of the

---

[9]    While Meltwater's use of AP articles is for a different purpose than the original, and therefore transformative, *amicus* takes no position on whether the transformative nature of Meltwater's use alone would be dispositive here.  As the Supreme Court has recognized, "[s]ection 107 requires a case-by-case determination of whether a particular use is fair," *Harper & Row*, 471 U.S. at 549, and the four fair-use factors are not to "be treated in isolation," but rather, "[a]ll are to be explored, and the results weighed together," *Campbell*, 510 U.S. at 578.

Grateful Dead is plainly different from the original purpose for which they were created"). Indeed, the Second Circuit specifically stated that the defendant's use of the images was transformative "both when accompanied by referencing commentary *and when standing alone*." *Id.* at 611 (emphasis added).

The Second Circuit thereafter confirmed that a new or different purpose and nothing more is sufficient to render a use transformative. *See Blanch v. Koons*, 467 F.3d 244, 252-53 (2d Cir. 2006) (recognizing that Koons's "purposes in using Blanch's image are sharply different from Blanch's goals in creating it," and holding "[t]he sharply different objectives … confirms the transformative nature of the use" (citing *Bill Graham Archives*, 448 F.3d at 609)). And as Judge Baer recently recognized, "a transformative use can also be one that serves an entirely different purpose." *HathiTrust*, 2012 WL 4808939 at *11 (citing *Bill Graham Archives*, 448 F.3d at 609). There is no question that in the Second Circuit, just as in other Circuits, a transformative purpose alone is sufficient, and there is no requirement that the original work "be incorporated as raw material" into another work. The Court should reject AP's attempt to insert additional requirements into the transformation inquiry and reaffirm that a secondary work that has a different function or purpose than the original is all that is required to be transformative.

*A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009), though arising in another Circuit, is particularly instructive on this point. There, the defendant provided plagiarism detection software to schools and archived processed essays in a database. Several students subsequently filed suit, claiming that when the software copied and archived their essays, it infringed their copyrights. The Fourth Circuit held that even though the entirety of the students' essays were copied and archived without alteration, the use was fair because it was for a different purpose:

The use of a copyrighted work need not alter or augment the work to be transformative in nature. *Rather, it can be transformative in function or purpose without altering or actually adding to the original work. See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (concluding that Google's use of copyrighted images in thumbnail search index was "highly transformative" even though the images themselves were not altered, in that the use served a different function than the images served). iParadigms' use of plaintiffs' works had an entirely different function and purpose than the original works; *the fact that there was no substantive alteration to the works does not preclude the use from being transformative in nature.*

*Id.* at 639 (emphases added). This is conceptually identical to Meltwater's use of news articles—whether the transformative use is to detect plagiarism or to detect the number of times a search query appears, that use is entirely different in function and purpose from AP's goal of creating a compelling piece of writing to communicate news.

**B.    News-Oriented Search Engines Have No Meaningful Effect Upon The Market For The Original Work**

Copyright owners often argue that if the defendant had not used their works without payment, they might have been able to charge for those uses, even though there is no licensing market in which authors are paid for the inclusion of news article in indices or search results. The Second Circuit has rejected this circular argument, because "[b]y definition every fair use involves some loss of royalty revenue because the secondary user has not paid royalties." *Bill Graham Archives*, 448 F.3d at 614 (citation omitted). There are no "traditional, reasonable, or likely to be developed markets" for the copying of works for purposes of indexing and snippet display. *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994). Nor has AP provided competent evidence that any such market will ever exist. Harms that are "theoretical and speculative" are not considered in the fourth factor analysis. *iParadigms, LLC*, 562 F.3d at 644; *see also Wright v. Warner Books*, 953 F.2d 731, 739 (2d Cir. 1991) (speculative nature of alleged potential harm tilted fourth factor in favor of fair use). Here, there is no non-speculative evidence that a licensing market for indexing and snippet display would come into being but for a finding of fair use.

16

Nor does the commercial nature of the entity engaging in indexing and snippet display affect the fair-use analysis. Fair use has frequently been found by the Second Circuit even in cases where the defendant directly benefited commercially by selling content that referenced or included the plaintiff's work explicitly (which is not the case here). *See*, *e.g.*, *Blanch*, 467 F.3d at 248, 253-54 (defendant paid $2 million for art work found to be fair use); *Bill Graham Archives*, 448 F.3d at 612 (defendant's publication of book containing copyrighted images was "a commercial venture" but nonetheless fair); *see also Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 142 (2d Cir. 1998) (Second Circuit does "not give much weight to the fact that the secondary use was for commercial gain"); *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477-78 (2d Cir. 2004) (same).

The transformative purpose of news-oriented search engines supports the lack of any market harm. News-oriented search engines do not reproduce to the public news articles in their entirety; rather, they generally provide the original headline and a snippet to give context as to what the article contains, along with a link that directs the user to the webpage where the original article can be found. Under such circumstances, there is no realistic risk that news-oriented search engines have any legitimate effect on the market for the original source material they index and organize. But even copying of entire works can be fair use under certain circumstances, such as in order to create an index. *See*, *e.g.*, *Sony Corp. of Am.*, 464 U.S. at 449-50; *Bill Graham Archives*, 448 F.3d at 613. As the Second Circuit explained (citing favorably the Ninth Circuit's search engine opinion in *Kelly*), "copying the entirety of a work is sometimes necessary to make a fair use of the [work]." *Bill Graham Archives*, 448 F.3d at 613. Three principles further support such treatment.

*First*, the Court should note that, if it determines that Meltwater makes transformative use of AP's works, then such a finding weighs against there being any effect on AP's market for its articles. *See*, *e.g.*, *Campbell*, 510 U.S. at 591 ("when … the second use is transformative, market substitution

17

is at least less certain, and market harm may not be so readily inferred" because a transformative use and original use "serve different market functions"); *Bill Graham Archives*, 448 F.3d at 615 (a use that "falls within a transformative market" does not cause the copyright holder to "suffer market harm due to the loss of license fees"); *Elvis Presley Enters., Inc. v. Passport Video*, 349 F.3d 622, 631 (9th Cir. 2003) ("The more transformative the new work, the less likely the new work's use of copyrighted materials will affect the market for the materials.").   Because Meltwater's use is transformative, the Court should recognize that its clients pay *not* for access to alerts for breaking news articles (which could be found at no cost on other publicly available platforms), but rather for Meltwater's analytic services, including, *e.g.*, the ability to quickly determine how many times a particular search query has appeared across a wide range of sources, the tone of such uses, and the geographic distribution of such uses.   (Meltwater Br. at 4.)   These transformative uses do not interfere with AP's services—they are not even available from AP.   Thus, if the Court determines that Meltwater makes transformative use of AP's articles, the Court should likewise recognize that there is no real effect on AP's market for its articles.

*Second*, notwithstanding the transformativeness inquiry, the parties appear to agree that Meltwater does not display the entirety of AP's news articles to the public,[10] but rather only the headline, up to 300 characters of the first line of the article, and up to 140 characters surrounding a search query "hit."   The headlines are not protectable (*see supra* Part I.A) and there is no possible legitimate market for snippets.   In particular, given that Meltwater has a narrow 300-character limit

---

[10]   *See supra* n.8 and accompanying text.

(including spaces), such snippets inevitably would cut off mid-sentence or even mid-word.  At most, Meltwater provides a preview into the contents of articles.[11]

*Third*, AP implicitly concedes that Meltwater does not harm AP's market for its news articles.  Specifically, AP complains that click-through rates of Meltwater's links to AP news articles are "less than one-tenth of 1 percent."  (AP Br. at 18.)  Assuming this is correct, it is difficult to understand how Meltwater has interfered with AP's market—this *absence* of a meaningful click-through rate establishes that Meltwater has not usurped or otherwise substituted its own services in place of AP's.  If anything, the meager click-through rate corroborates that Meltwater's clients use its services for an entirely different purpose than that of AP—*i.e.*, not to read articles, but to receive analytics about how their search queries appear.

## III.   THE INTERESTS OF SEARCH ENGINES AND NEWS REPORTERS ARE BEST BALANCED BY AP MEMBERS' USE OF ROBOTS.TXT INSTRUCTIONS, AND NOT BY AP'S ENFORCEMENT OF NON-CONSENSUAL BROWSEWRAPS AGAINST SEARCH ENGINES

As a final matter, AP appears to suggest that search engines and similar information tools have some form of contractual obligation, based on agreements between AP and its members, to proactively exclude captured AP articles by implementing a robots.txt instruction.  (*See* AP Br. at 33.)  To the extent that AP is advancing such an argument, it should be soundly rejected by the Court.[12]

---

[11]   This is consistent with a recent decision from the Supreme Court of Canada, which ruled in July 2012 that 30- to 90-second previews of songs on iTunes are a form of "research" conducted by prospective purchasers and thus not covered by its copyright laws.  *See Soc'y of Composers, Authors & Music Publishers of Canada v. Bell Canada*, [2012] SCC 36, *available at* http://scc.lexum.org/decisia-scc-csc/scc-csc/scc-csc/en/item/9996/index.do.   Similarly, a short snippet of a news article is nothing more than a preview of its contents.

[12]   While AP makes several references to robots.txt instructions, it is notable that AP did not include in its Complaint claims of breach of contract, inducement of others to breach contract, trespass to chattel, or unauthorized access to a protected computer under the Computer Fraud and Abuse Act.

### A.     The Installation Of Robots.txt Instructions Is The Most Efficient Way To Prevent AP Clients From Having AP Articles Indexed By Search Engines

To the extent AP wishes its news articles to not be indexed by search engines or other information tools, AP's own members (not search engines) are in the best position to prevent such indexing through robots.txt instructions.[13]  The Robot Exclusion Standard, also known as the Robots Exclusion Protocol or robots.txt protocol, is used "to prevent cooperating web crawlers and other web robots from accessing all or part of a website which is otherwise publicly viewable."[14]  The protocol was developed in 1994, by consensus, by industry groups.  As explained by Robots.txt.org:

> Web site owners use the /robots.txt file to give instructions about their site to web robots; this is called *The Robots Exclusion Protocol*.
>
> It works like this: a robot wants to visits [sic] a Web site URL, say http://www.example.com/welcome.html.  Before it does so, it firsts checks for http://www.example.com/robots.txt, and finds:
>
> ```
> User-agent: *
> Disallow: /
> ```
>
> The "User-agent: *" means this section applies to all robots. The "Disallow: /" tells the robot that it should not visit any pages on the site.[15]

Robots.txt is extremely simple to use and gives copyright owners complete control over who may access their sites and what they may do if access is allowed.  Hundreds of millions of websites use it successfully every day, and all major search engines honor the protocol.  AP should not be permitted an end-run around this widely used, industry-adopted standard.

---

[13]   *See* Comment, *Copyright Protection in an Opt-Out World: Implied License Doctrine and News Aggregators*, 122 Yale L.J. 837, 849 (2012) (arguing that an opt-out system based on robots.txt is "a win for aggregators and news providers alike").

[14]   http://en.wikipedia.org/wiki/Robots.txt.

[15]   http://www.robotstxt.org/robotstxt.html.

### B.       Search Engines Cannot Be Bound By Nonconsensual Browsewraps

Given that robots.txt makes it easy for the *AP member* to ensure that AP articles cannot be captured by search engines, there is no duty for the *search engine* to implement a robots.txt instruction to comply with a website's "Terms of Use," which inform visitors as to certain conditions that must be accepted before using the site.  Two types of Terms of Use are most prevalent on the Internet: a "browsewrap" and a "clickwrap":

> With a browsewrap agreement, a website owner seeks to bind website users to terms and conditions by posting the terms somewhere on the website, usually accessible through a hyperlink located somewhere on the website; in contrast, a "clickwrap" agreement requires users to expressly manifest assent to the terms by, for example, clicking an "I accept" button.

*In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, Nos. 12 Civ. 325 *et al.*, 2012 WL 4466660, at *3 (D. Nev. Sept. 27, 2012) (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 22 n.4 (2d Cir. 2002) (Sotomayor, J.)).  In this Circuit, for a website's Terms of Use to be valid and binding on its visitors, it must either be a clickwrap agreement (where the user affirmatively clicks on a button or link indicating assent to the terms) or the user must have had "actual or constructive knowledge of the site's terms and conditions, *and* have manifested assent to them."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 129 n.18 (2d Cir. 2012) (internal quotation marks omitted).

By aggregating news articles from across the Internet, neither Meltwater nor other online information tools should be held to be unknowingly bound by Terms of Use to which *AP members* have agreed.  For example, an online tool that searches for and organizes information from millions of webpages cannot conceivably have "actual" or "constructive" knowledge of the Terms of Use of every site it indexes, let alone affirmatively manifest assent to every site's Terms.  To the extent that AP wishes that its members not make AP news articles available to search engines, AP should place such language in its contracts with members and enforce those contracts when members fail to abide by such terms.

The repercussions of binding visitors to a website's hidden Terms of Use would be staggering—it would essentially rewrite the rules for the Internet by permitting parties to be bound to contracts that they did not affirmatively accept.  And such an approach would certainly doom search engine technology, which is almost entirely automated and thus not susceptible to manifesting "assent" in any form.

### CONCLUSION

Search engines are an indispensable feature of the Internet, and they will only become more important as the Internet grows and technology improves.  This is all the more true when users seek out facts related to recent news events—facts which no one owns.  This Court should ensure that the repercussions of AP's arguments not undermine the important freedoms that many online services—and Internet users in general—have come to rely upon.


Dated: January 18, 2013
       New York, New York

                              Respectfully submitted,

                              /s/ Kathleen M. Sullivan
                              Kathleen M. Sullivan (counsel of record)
                              kathleensullivan@quinnemanuel.com
                              Jonathan B. Oblak
                              jonoblak@quinnemanuel.com
                              Todd Anten
                              toddanten@quinnemanuel.com
                              QUINN EMANUEL URQUHART & SULLIVAN, LLP
                              51 Madison Avenue, 22nd Floor
                              New York, NY 10010
                              Tel: (212) 849-7000
                              Fax: (212) 849-7100

                              *Attorneys for amicus curiae Computer &
                              Communications Industry Association*