UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

|  |  |
|---|---|
| ‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎x | |

THE ASSOCIATED PRESS,                                    :          **FILED UNDER SEAL**

                                   :          12 Civ. 1087(DLC)(FM)

                Plaintiff,          :

                                   :

       - against -          :          ECF Case

                                   :

MELTWATER U.S. HOLDINGS, INC.;          :
MELTWATER NEWS U.S., INC.; and          :
MELTWATER NEWS U.S. 1, INC.          :

                                   :

            Defendants.          :

‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎‎x

<br>

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON ITS COPYRIGHT INFRINGEMENT CLAIMS

<br>

Elizabeth A. McNamara
Linda Steinman
Alison B. Schary
Collin J. Peng-Sue
DAVIS WRIGHT TREMAINE LLP
1633 Broadway – 27th Floor
New York, New York 10019
Telephone:      (212) 489-8230
Facsimile:      (212) 489-8340

*Attorneys for Plaintiff The Associated Press*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................... 1

I.     MELTWATER'S SALE OF AP ARTICLE EXCERPTS IS NOT A FAIR USE ............ 2

     A.     There Is Nothing Transformative About Article Excerpts That Can And Do Act As A Substitute For The Original ......................................................................... 2

          1.     Convenience and Access Does Not Equal Transformative Use. ................ 3

          2.     Meltwater News Reports Are Readily Distinct From the Images at Issue in *Kelly* and *Perfect 10* and Can Act as a Substitute for the Original ................ 4

     B.     The Second And Third Factors Of The Fair Use Test Favor AP ............................ 7

     C.     Meltwater Continues To Applies The Wrong Standards For Market Harm ........... 8

II.     MELTWATER'S AFFIRMATIVE DEFENSES DO NOT RAISE TRIABLE ISSUES OF FACT ................................................................................................................................ 8

     A.     Meltwater Did Not Obtain An Implied License From AP Or AP's Licensees And Has No Estoppel Defense ......................................................................................... 8

     B.     Meltwater Has No Laches Defense .................................................................... 11

     C.     Meltwater Has No Copyright Misuse Defense ................................................... 12

CONCLUSION ................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*A&M Records v. Napster,*
    239 F.3d 1004 (9th Cir. 2001) ................................................................................13

*Apple v. Psystar Corp.,*
    658 F.3d 1150 (9th Cir. 2011) ....................................................................12, 13, 14

*Authors Guild v. Hathitrust,*
    11 Civ. 6351, 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012). ...................................4

*Basic Books, Inc. v. Kinko's,*
    758 F. Supp. 1522 (1991) ......................................................................................10

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.,*
    441 U.S. 1 (1979) .............................................................................................11, 12

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994) .............................................................................................2, 3

*Castle Rock Entm't v. Carol Publ'g Grp.,*
    150 F.3d 132 (2d Cir. 1998) .....................................................................................7

*DeCarlo v. Archie Comic Publ'ns,*
    127 F. Supp. 2d 497 (S.D.N.Y. 2001) ...................................................................10

*DeForest Radio Tel. v. U.S.,*
    273 U.S. 236 (1927) .................................................................................................9

*Design Options v. BeckPoint,*
    940 F. Supp. 86 (S.D.N.Y. 1996) ............................................................................9

*Field v. Google,*
    412 F. Supp. 2d 1106 (D. Nev. 2006) ...................................................................10

*Gualandi v. Adams,*
    385 F.3d 236 (2d Cir. 2004) .....................................................................................1

*Hines v. Overstock.com, Inc.,*
    380 Fed. Appx 22 (2d Cir. 2010) .............................................................................9

*In re Napster,*
    191 F. Supp. 2d 1087 (N.D. Ca. 2002) .................................................................13

*Infinity Broad. Corp. v. Kirkwood,*
    150 F.3d 104 (2d Cir. 1998)........................................................................ passim

DWT 20852069v8 0025295-000064

*Ivani Contracting Corp. v. City of New York*,
103 F.3d 257 (2d. Cir. 1997) ................................................................10

*Keane Dealers v. Harts,*
968 F. Supp. 944 (S.D.N.Y. 1997) .......................................................10

*Kelly v Arribasoft,*
336 F.3d 811 (9th Cir. 2003) ....................................................1, 3, 4, 5

*Lasercomb Am. Inc. v. Reynolds,*
911 F.2d 970, 979 (4th Cir. 1990). .....................................................12

*Lava Records, LLC v. Amurao,*
354 Fed. Appx. 461 (2d Cir. 2009)......................................................12

*Lotus Development Corp. v. Paperback Software Int'l,*
740 F. Supp. 37 (D. Mass. 1990).........................................................11

*Lukas Steel Co. v. Am. Locomotive Co.,*
197 F.2d 939 (2d Cir. 1952).................................................................9

*Metro-Goldwyn Mayer Studios v. Grokster,*
454 F. Supp. 2d 966 (C.D. Cal. 2006)..................................................13

*Morton Salt Co. v. G.S. Suppiger Co.,*
314 U.S. 488 (1942)..............................................................................13

*Nihon Keizai Shimbun v. Comline Bus. Data,*
166 F.2d 65 (2d Cir. 1999)................................................................6, 7

*Orth-O-Vision v. Home Box Office,*
474 F. Supp. 672 (S.D.N.Y. 1979) ......................................................13

*Parker v. Yahoo!,*
Civ. Action No. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008) ................................10

*Perfect 10 v. Amazon.com, Inc.,*
508 F.3d 1146 (9th Cir. 2007) ...................................................1, 3, 4, 5

*Practice Mgmt. Info. Corp. v. Am. Med. Ass'n,*
121 F.3d 516 (9th Cir. 1997)................................................................12

*Price v. Fox Entm't Grp.,*
No. 05 Civ. 5259 SAS, 2007 WL 241387 (S.D.N.Y. Jan. 26, 2007) ................................10, 11

*Psihoyos v. Pearson Educ.,*
855 F. Supp. 2d 103 (S.D.N.Y. 2012).............................................8, 10

DWT 20852069v8 0025295-000064

*Quinn v., City of Detroit*,
  23 F. Supp. 2d 741 (E.D. Mich. 1998) ...............................................................10

*Register.com v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ..................................................................................9

*S & S Textiles Int'l v. Steve Weave*,
  No. 00 Civ. 8391 DLC, 2002 WL 1837999 (S.D.N.Y. Aug. 12, 2002) ..................9

*Shady Records v. Source Enterprises*,
  No. 03 Civ. 9944 (GEL), 2005 WL 14920 (S.D.N.Y. Jan. 3, 2005) ......................12

*SmithKline Beecham Consumer Healthcare v. Watson Pharm.*,
  211 F.3d 21 (2d. Cir. 2000) ...................................................................................9

*Storm Impact v. Software of the Month Club*,
  13 F. Supp. 2d 782 (N.D. Ill. 1998) ......................................................................9

*Toshiba Corp. v. Am. Media Int'l*,
  No. 12 Civ. 800 (DLC), 2012 WL 3822759 (S.D.N.Y. Sept. 4, 2012) ..................1

*Twin Peaks Prods. v. Publ'ns Int'l*,
  996 F.2d 1366 (2d Cir. 1993) .............................................................................2, 8

*U.S. v. ASCAP*,
  599 F. Supp. 2d 415 (S.D.N.Y. 2009) ...................................................................6

*Ulloa v. Universal Music & Video Distrib. Corp.*,
  303 F. Supp. 2d 409 (S.D.N.Y. 2004) ...................................................................8

*Viacom Int'l v. Fanzine*,
  No. 98 Civ. 7448 (KMW), 2000 WL 1854903 (S.D.N.Y. July 12, 2000) .............9

*Video Pipeline v. Buena Vista Home Ent't*,
  342 F.3d 191 (3d Cir. 2003) ..................................................................................3

*Zappa v. Rykodisc, Inc.*,
  819 F. Supp. 2d 307 (S.D.N.Y. 2011) ...................................................................9

**STATUTES**

17 U.S.C. §107(4) ..............................................................................................................7

17 U.S.C. 507(b) ..............................................................................................................11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(d) .........................................................................................................1

iv

**Table of Abbreviations**

| | |
|---|---|
| Am. Cplt. | First Amended Complaint, dated July 15, 2012 |
| AP 56.1 | Plaintiff's Rule 56.1 Statement of Material Facts as to Which There is No genuine Issue to Be Tried in Support of Plaintiff's Motion for Summary Judgment, dated November 9, 2012 |
| AP 56.1 Resp. | Plaintiff's Response to Defendants' Local Rule 56.41 Statement of Material Facts as to Which There is No Genuine Issue to be Tried, dated December 14, 2012. |
| AP AMF Resp. | Plaintiff's Response to Defendants' "Local Rule 56.1 Statement of Additional Material Facts in Opposition to Plaintiff's Motion for Summary Judgment," dated January 11, 2013 |
| AP Br. | Memorandum of Law of Plaintiff The Associated Press in Support of Its Motion for Summary Judgment on Its Copyright Infringement Claim, dated November 9, 2012 |
| AP. Op. | Memorandum of Law of Plaintiff The Associated Press in Opposition to Defendants' Motion for Summary Judgment, dated December 14, 2012 |
| AP Reply | Reply Memorandum of Law of Plaintiff The Associated Press in Further Support of Its Motion for Summary Judgment on Its Copyright Infringement Claim, dated January 11, 2013 |
| CPS Decl. | Declaration of Collin Peng-Sue in Further Support of Plaintiff's Motion for Summary Judgment, dated January 11, 2013 |
| Cross Decl. | Declaration of Sue Cross in Support of Plaintiff's Motion for Summary Judgment, dated November 8, 2012 |
| Cross Tr. | Transcript from the Deposition of Sue Cross, dated September 21, 2012 |
| Curley Decl. | Declaration of Thomas Curley in Support of Plaintiff's Motion for Summary Judgment, dated November 5, 2012 |
| Curley Tr.. | Transcript from the Deposition of Thomas Curley , dated October 5, 2012 |
| Geidies Decl. | Declaration of Sebastian Geides in Opposition to Plaintiff's Motion for Summary Judgment, dated December 14, 2012 |
| Geidies Tr. | Transcript from the Deposition of Sebastian Geidies, dated October 3, 2012 |
| Glunt Decl. | Declaration of Robert A. Glunt in Support of Defendants' Motion for Summary Judgment, dated November 9, 2012 |
| Grealis Decl. | Declaration of Catherine Grealis in Support of Defendants' Motion for Summary Judgment, dated November 9, 2012 |
| Jones Decl. | Declaration of Joy Jones in Support of Plaintiff's Motion for Summary Judgment, dated November 6, 2012 |
| Jones Tr. | Transcript from the Rule 30(b)(6) Deposition of Sue Cross, dated September 21, 2012 |
| Kent Decl. | Declaration of Thomas Kent in Support of Plaintiff's Motion for Summary Judgment, dated November 6, 2012 |
| Klausner Decl. | Declaration of Tonia Ouellette Klausner in Opposition to Plaintiff's |

v

| | Motion for Summary Judgment, dated December 14, 2012 |
|---|---|
| McN. Decl. | Declaration of Elizabeth A. McNamara in Support of Plaintiff's Motion for Summary Judgment, dated November 9, 2012 |
| MTS | Memorandum of Law in Support of Defendants' Motion to Strike Plaintiff's Improper Declarations and 56.1 Statement, dated December 14, 2012 |
| MTS Op. | Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Strike, dated January 11. 2013 |
| MW 56.1 | Defendants' Local Rule 56.1 Statement of Material Facts as to Which There is no Genuine Issue to Be Tried, dated November 9, 2012 |
| MW 56.1 Resp. | Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue to be Tried, dated December 14, 2012 |
| MW 56(d) Decl. | Declaration of Robert A. Glunt Pursuant to Fed. R. Civ. P. 56(d), dated December 14, 2012 |
| MW AMF | Defendants' Local Rule 56.1 Statement of Additional Material Facts in Opposition to Plaintiff's Motion for Summary Judgment, dated December 14, 2012 |
| MW Br. | Memorandum of Law in Support of Defendants' Motion for Summary Judgment, dated November 9, 2012 |
| MW Op. | Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment, dated December 14, 2012 |
| Rizzo Decl. | Declaration of John D. Rizzo in Support of Plaintiff's Motion for Summary Judgment, dated November 7, 2012 |
| Rizzo Tr. | Transcript from the Deposition of John D. Rizzo, dated September 19, 2012 |
| Saab SJ Decl. | Declaration of Sara Saab in Support of Defendants' Motion for Summary Judgment, dated November 7, 2012 |
| Saab Tr. | Transcript from the Deposition of Sara Saab, dated September 10, 2012 |
| Schary Decl. | Declaration of Alison B. Schary in Opposition to Defendants' Motion for Summary Judgment, dated December 12, 2012 |
| Schary Supp. Decl. | Supplemental Declaration of Alison B. Schary in Further Support of Plaintiff's Motion for Summary Judgment, dated January 11, 2013 |

DWT 20852069v8 0025295-000064

## PRELIMINARY STATEMENT

Meltwater's fair use defense boils down to its litigation-inspired claim that it is a search engine that can find a safe harbor under two Ninth Circuit cases, *Kelly v Arribasoft*, 336 F.3d 811 (9th Cir. 2003), and *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) – cited endlessly in its papers.  Yet, the Second Circuit has never held that a different functional purpose is sufficient to qualify as a transformative use, but instead requires that the original work be used for a new expressive purpose.  And even if the Second Circuit would to so hold, Meltwater seeks to go beyond even the holdings of *Kelly* and *Perfect 10*.  *Kelly* held that the search engine at issue served a different, transformative purpose only because the low-resolution thumbnail images returned in search results were not capable of being used for their original aesthetic purpose.  Here, a Meltwater customer reading an excerpt constituting, for example, 25-60% of an AP article undeniably is capable of using it for the same purpose as the original – whether that is to obtain newsworthy information or to see how a company or topic has been covered.  As Meltwater boasts, "The number one reason our clients subscribe to us is because we provide the most news in the most efficient manner."  Rule 56.1 Resp. ¶ 139.  In the end, as *Kelly* holds, "Even [if] the *intended purpose* of [Meltwater's service] may have been different from the purpose of the original [articles]," there is no transformative use if "the *result* was that people could use [the excerpts and the original articles] for the same purpose."  *Kelly*, 336 F.3d at 819. On the undisputed facts and the controlling law, Meltwater's fair use defense fails.  Likewise, each of its additional affirmative defenses fails as a matter of law on the undisputed material facts.[1]

---

[1] Meltwater submits a Fed. R. Civ. P. 56(d) declaration seeking further discovery.  Such a declaration must describe "how the[] facts [sought] are reasonably expected to raise a genuine issue of material fact" and "why the affiant's [prior] efforts [to obtain them] were unsuccessful. *Gualandi v. Adams,* 385 F.3d 236, 244 (2d Cir. 2004); *Toshiba Corp. v. Am. Media Int'l*, No. 12 Civ. 800 (DLC), 2012 WL 3822759, at *4 (S.D.N.Y. Sept. 4, 2012). Here, Meltwater's 56(d) declaration fails to demonstrate how additional facts will raise a genuine issue of material fact, and often offers no good reason why it failed to obtain the desired materials earlier.  Indeed, no further discovery is necessary on the direct infringement claims because the undisputed facts are dispositive as to all of Meltwater's affirmative defenses, including fair use.  Nevertheless, if the Court does grant further discovery, AP reserves the right to request additional discovery.

I.   **MELTWATER'S SALE OF AP ARTICLE EXCERPTS IS NOT A FAIR USE**

   A.   **There Is Nothing Transformative About Article Excerpts That Can And Do Act As A Substitute For The Original**

In AP's earlier briefs, AP established that it is not a transformative use under Second Circuit law merely to harvest and distribute reams of naked, verbatim news excerpts (including headlines) in systematic focused "News Reports" so that paying customers can monitor and archive the news and re-distribute the news excerpts through newsletters and newsfeeds on Meltwater's platform.  AP Br. at 10-18, AP. Op. at 5-20.  Meltwater provides no commentary or analysis or culling of material that evidences any "intellectual labor and judgment."  *Twin Peaks Prods. v. Publ'ns Int'l*, 996 F.2d 1366, 1376 (2d Cir. 1993), *quoting Folsom v. Marsh*, 9 F.Cas. 342, 345 (1841).  As Meltwater aptly observes, its system does nothing more than "appl[y] an algorithm that mechanically excerpts [the headline, hit sentence and] no more than 300 characters from the beginning of each article" in a process that is "blind" to the article's content.  MW Op. at 17.  In short, Meltwater plainly does not alter AP's articles with "new expression, meaning or message" as required by the Supreme Court in *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), and the long line of Second Circuit cases that have applied it.

In opposition, Meltwater argues that it transforms news content into "'raw material' for a research tool that provides comparative analysis of news coverage" and "suffuse[s]" the news content "with new understandings."  MW Op. at 2, 5.  But unadorned, verbatim reproduction in chronological order of someone else's copyrighted content with no commentary or synthesis is not "comparative analysis." A book containing nothing more than unlicensed images of all the paintings at MOMA is not a "comparative analysis."[2]

---

[2] As Meltwater admits, it is Meltwater's *users* that are able to "perform comparative analysis of . . . coverage of a given topic" by reviewing the infringing News Reports (MW Op. at 7), but as the cases make clear, "it is [defendant's] own retransmission of the [content], not the acts of [its] end-users, that is at issue here and all [defendant] does is sell access to unaltered [content]."  *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998).  Further, Meltwater effectively concedes that its rudimentary "dashboard analytics" "do not incorporate – or require delivery of – excerpts from the underlying articles" (MW 56.1 Resp. ¶ 168), and thus they do not inform the transformative use analysis.

DWT 20852069v8 0025295-000064

### 1.   Convenience and Access Does Not Equal Transformative Use

As established in AP's prior briefs, courts in the Second Circuit have uniformly rejected claims of transformative use based on the ready convenience or increased access that a service can provide.  *See* AP Op. at 11-13.  Meltwater studiously ignores *Infinity*'s apt observation that even if a service serves a societal benefit and "sells access" for a different purpose than the original, "difference in purpose is not quite the same thing as transformation, and *Campbell* instructs that transformation is the critical inquiry under this factor." *Infinity,* 150 F.3d at 108.[3]

Meltwater cannot avoid this conclusion merely because it provides a link – often "dead" – or because it acquired the delivered results via search technology.  The Third Circuit in *Video Pipeline v. Buena Vista Home Ent't,* 342 F.3d 191, 199 (3d Cir. 2003), rejected a similar argument:  "a link to a legitimate seller of authorized copies does not…make prima facie infringement a fair use."[4]  Moreover, transformative use is not determined by the means by which content is delivered; it is determined by whether the delivered content "adds something new, with a…different character, altering the first with new expression, meaning, or message." *Campbell,* 510 at 579.  A business that merely provides for systematic delivery of naked article excerpts and links without any surrounding commentary – however convenient for the consumer – is not transformative.  "The clips are part of – not information about – [AP's] expressive [articles]," and "'Any copyright infringer may claim to benefit the public by increasing public access to the copyrighted work.'" *Video Pipeline,* 342 F.3d at 199 n.5, citing *Harper & Row Publishers v. Nation Enters.*, 471 U.S. 539, 547 (1985).

---

[3] Meltwater tries to distinguish *Infinity* by arguing that the service retransmitted the radio broadcasts "in full" and did not "embed snippets of broadcasts" that allowed "comparative analyses."  MW Op. at 7.  But it ignores that the Second Circuit recognized that "mere snippets of Infinity's broadcasts may be retransmitted." *Infinity,* 150 F.3d at 109.  Further, Dial-Up's "different purpose" argument was not substantively different from Meltwater's:  enabling advertisers to confirm that their commercials were properly aired (*id.* at 106) differs little from enabling Meltwater users to see "how different media outlets are covering events."  (MW Op. at 5).

[4] Further, Meltwater's "pointer" argument is empty, at best.  It acknowledges its links can be "dead" and otherwise refused to supply evidence that could support – but would likely reject – its new thesis that its service drives customers to AP member websites.  MW 56.1 Resp. ¶¶ 156-57; AP Op. at 16-17.  Indeed, the evidence shows an infinitesimally low click-through rate on the Registered Articles.  McN. Decl. ¶¶ 92-94.

DWT 20852069v8 0025295-000064

### 2.    Meltwater News Reports Are Readily Distinct From the Images at Issue in *Kelly* and *Perfect 10* and Can Act as a Substitute for the Original

Meltwater argues that an "unbroken line of cases" – consisting of two Ninth Circuit decisions on similar facts, and a Nevada district court decision that followed them – have held that "search engines make transformative use of content they index and display." MW Op. at 2. While AP contends that these cases are inconsistent with Second Circuit case law, even *Kelly* and its brethren did not render blanket holdings that all search engines are transformative, but rather looked closely at the function and possible uses at issue.[5] The *Kelly* decision turned on its finding that the thumbnail images at issue were "much smaller, lower-resolution images" that made them "inappropriate as display material" and noted that, "in the unique context of photographic images, the quality of reproduction may matter more than other fields of endeavor." 336 F.3d at 818, 821 n.37. It was for this reason – because people could not use the images "for the same [aesthetic] purpose" as the original works – that the court found the images "served an entirely different function then Kelly's original images." *Id.* at 818.

The Ninth Circuit in *Kelly* took pains to try to harmonize its ruling with the Second Circuit's decision in *Infinity*. In order to do so, it emphasized that in *Infinity*, even though the radio broadcasts were transmitted "for the purpose of allowing advertisers and radio stations to check on the broadcast of commercials or on-air talent, *there was nothing preventing listeners from subscribing to the service for entertainment purposes*." *Id.* at 819 (emphasis added). As the Ninth Circuit underscored, "Even though the intended purpose of the retransmission may have been different from the purpose of the original transmission, the result was that people could use both types of transmission for the same purpose." *Id.*[6] *Perfect 10* also involved low resolution

---

[5] Likewise, *The Authors Guild v. Hathitrust* provides no support for Meltwater since the search results at issue there did not provide <u>any</u> "actual access to copyrighted material." 11 Civ. 6351, 2012 WL 4808939 at *10-11 (S.D.N.Y. Oct. 10, 2012). That case is also strongly influenced by the non-profit scholarly aims of the Hathitrust and its mission to assist the blind in gaining greater access to scholarship.

[6] Contrary to Meltwater's suggestion, *Infinity* found that the Dial-Up service served the same purpose as the original <u>not</u> because the broadcasts were full-length, but because, "Talent scouts, who admittedly would not be listening in order to be entertained themselves, would nevertheless be listening for the entertainment value of the broadcasts rather than the factual value." 150 F.3d at 108. Further, as this quote reveals, the Second Circuit looked at purpose at a high level of abstraction.

4

thumbnail images, and the Ninth Circuit over and over again emphasized that a key fact weighing in favor of transformative use was that the public search engine at issue "serves the interest of the public."  508 F.3d at 1164-1166.

Meltwater cannot rely on *Kelly* and *Perfect 10* to establish fair use for two fundamental reasons.  First, the core function of a search engine is to assist users in their spontaneous navigation of the vast sea of billions of diverse websites on the worldwide web, including the search for specific known web pages.  Meltwater is unlike a classic search engine in numerous basic ways:  it is not free to the public, but rather earns substantial fees by selling excerpts of AP's works to its customers; and it scrapes its content exclusively from news sources to provide a systematic, comprehensive report of news coverage, delivered once or twice daily, every weekday of the year.  Rather than acting as a navigational tool for the billions of websites of every stripe on the Internet, Meltwater offers the "news brought to you," so that "your news is delivered in easy to read morning and/or afternoon reports."  McN. Decl. Ex. 7.  Moreover, the record shows that Meltwater takes affirmative steps to show customers that it is scraping and delivering AP content in particular and to allow them to target AP-only content if desired.  A Meltwater "source configuration guide" instructs Meltwater engineers that  REDACTED

The guide states that the purpose for this  REDACTED

" McN. Decl. ¶ 47, Ex. 45 at MW0126222.

More important, unlike the defendants in *Kelly* or *Perfect 10*, Meltwater cannot show that there is "nothing preventing [users] from subscribing to [its] service" to obtain newsworthy information or learn how topics of interest are being covered.  *Kelly*, 336 F.3d at 819.  By their nature, excerpts of news articles containing their headline, lede and hit sentence undeniably are capable of serving a news purpose; unlike in the thumbnail image cases, the excerpts are not

5

"unrelated to any [informational] purpose."  *Id.* at 818.  Moreover, Meltwater completely fails to rebut the extensive evidence contained in AP's moving declarations and brief demonstrating that Meltwater is marketed as a quick and easy way to see the news of interest, not just to count appearances or mentions of a corporation's name or press releases.  (Meltwater News "saves you time so you don't need to read the full article."  Rule 56.1 Resp. ¶ 141; *see also* AP Op. at 14-15.) No matter how Meltwater seeks to recast itself, it completely belies common sense that a Meltwater customer cannot obtain some of the informational content of an AP article by reading an excerpt containing, for example, 20% or 40% of the article, including the headline and lede.  And despite Meltwater's efforts to downplay the testimony from Sara Saab, its Meltwater News Product Lead and 30(b)(6) witness, it cannot deny her critical concession that it is a "valid way to use" the Meltwater News Service to use it "to keep abreast of news developments."  McN. Decl. ¶ 20.[7] Moreover, Meltwater's attempt to argue that its customers use its service merely to discern the nature and extent of the news coverage on topics of interest and thus differ from other readers of AP articles is too thin a distinction.  People routinely read news articles not only to obtain their specific facts, but to discern the nature and extent of news coverage – whether on corporations of interest, topics of interest, or people of interest.  That is part of the informational value of a news article.[8]  In sum, as in *Infinity*, Meltwater's News Reports are capable of serving the same intrinsic informational purpose as the original and accordingly cannot be transformative or support a finding of fair use.

---

[7] Despite Meltwater's attempts to suggest that Ms. Saab was not knowledgeable about this issue, Meltwater's counsel confirmed at her deposition during a discussion of the topics to be covered by Ms. Saab that, "you can certainly ask her questions about the way in which the company handles the . . . different services and products that have been described as relevant to this case."  CPS Decl. Ex. 6 at 17:2-20:4; *see also* Saab SJ Decl. ¶ 2 ("In my role as Meltwater News Product Lead, I was responsible for managing the customer-facing features of the Meltwater News service in the United States, including the Meltwater News search engine and as well as other tools provided in connection with the Meltwater News service").

[8] *See also U.S. v. ASCAP*, 599 F. Supp. 2d 415 (S.D.N.Y. 2009).  There, AT&T argued that its customers listened to the ringtone previews for informational purposes to determine whether to purchase one.  The court rejected AT&T's argument, holding that, "Although the clips are shorter than the full-length versions of the musical works from which they are copied, applicant has not demonstrated that its customers use previews *solely* for informational purposes and not also to assess the musical quality and entertainment value of the ringtones...before making purchases."  *Id.* at 427 and n.11.

DWT 20852069v8 0025295-000064

### B.     The Second And Third Factors Of The Fair Use Test Favor AP

Meltwater's opposition brief only serves to underscore AP's argument under the second factor of the fair use analysis.  As is evident from Meltwater's lack of citations, there is no Second Circuit support for its argument that just because AP's articles are widely published on the Internet and are free to consumers, factor two favors their commercial use for monetary gain. Copyright law does not focus on the extent of distribution; the only distinction drawn is between unpublished and published works – a distinction based on "the author's right to control the first public appearance of his expression."  MW Op. at 14, quoting *Harper*, 471 U.S. at 564.

As for the third factor, Meltwater fails to rebut the evidence establishing that Meltwater's taking of AP's content is significant – both quantitatively and qualitatively.[9]  *See* AP Br. at 22-25.  Instead, it tries to absolve itself of responsibility by depicting its taking of the lede of all news articles as the workings of a "mechanical[]" "algorithm" that is "blind" to the article contents (MW Op. Br. at 17) – yet, it is Meltwater itself that has purposefully designed its algorithm to deliver the lede, precisely because it provides the necessary "context" of the article. McN. Decl. Ex. 1 at 154:18-155:10.  Further, Meltwater's argument that the ledes of AP's breaking news stories do not constitute the heart of the article are quickly belied by the articles, including those cited in footnote 11 of Meltwater's Opposition Brief (*e.g.*, "Former Sen. Stevens lay dead in the mangled fuselage of the plane …).  *See* Kent Decl. ¶ 10, Ex. 4.  Meltwater also fails to rebut AP's showing that the amount of AP content taken is "more than necessary to further" its alleged purpose as a "pointer" to the article (*Castle Rock Entm't v. Carol Publ'g Grp.*, 150 F.3d 132, 144 (2d Cir. 1998)), since Google Alerts concededly does not deliver the lede, and Meltwater's UK and Canadian services concededly use less text.  MW 56.1 Resp. ¶ 122-25.

---

[9] Meltwater argues that its excerpts are not quantitatively significant under *Nihon Keizai Shimbun v. Comline Bus. Data*, 166 F.2d 65 (2d Cir. 1999), but the main take-away from that case is that the overwhelming majority of the article abstracts were found to be infringing.  Further, it is of little relevance that the court found that it was a "close call" whether one article was substantially similar to the original on a quantitative basis since *Nihon* involved *abstracts* of articles that had been translated and rewritten (*id.* at 69, 71) – whereas, this case involves *verbatim* quotation, and thus the permissible amount that can be taken is less.  Further, there was no discussion in *Nihon* of whether the first paragraph of that particular article was the "heart" of the story – as is the case with AP's articles.

DWT 20852069v8 0025295-000064

**C.      Meltwater Continues To Applies The Wrong Standards For Market Harm**

For all the reasons set forth in AP's Opposition Brief, AP has demonstrated "exploitation of the copyrighted material without paying the customary price" – and thus has proven its first theory of market harm.  AP Op. at 26, citing *Ringgold v. Black Entm't Television*, 126 F.3d 70, 81 (2d Cir. 1997).  Meltwater concedes that AP has entered into licenses with its competitors including Cision, BurrellesLuce, and LexisNexis, and while it tries to nitpick by arguing that AP's Google and Yahoo! licenses do not specifically authorize scraping, it does not contest that these search engines license their use of AP content from AP.  MW 56.1 Resp. ¶¶ 31, 36, 53, 248, 251-52, 276.

As for AP's second theory of market harm, Meltwater is still using the erroneous legal standard – namely requiring, as in a damages inquiry, that AP prove a causal link for lost customers rather than merely showing that Meltwater affects the "potential market for or value of" AP's copyrighted works.  17 U.S.C. §107(4).  Given that Meltwater concedes that it convinced REDACTED to "change [ ] their mega-contract from Lexis Nexis" – AP's licensee – "to Meltwater News for a cool $150,000 contract" (MW 56.1 Resp. ¶ 309), it is hard to imagine how Meltwater claims that it has not "risk[ed] impairment of the market" for the AP works. *Twin Peaks,* 996 F.2d at 377.  Likewise, given that Meltwater admits that AP and Meltwater both submitted contracts for the same U.S. House of Representatives proposal (MW 56.1 Resp. ¶¶ 297-300), there is no basis for Meltwater to claim that it is not competing with AP in the copyright owner's rightful market with respect to AP stories.  *Infinity*, 150 F.2d at 111.  For all these reasons, Meltwater has not sustained its burden of demonstrating fair use.

**II.      MELTWATER'S AFFIRMATIVE DEFENSES DO NOT RAISE TRIABLE ISSUES OF FACT**

**A.      Meltwater Did Not Obtain An Implied License From AP Or AP's Licensees And Has No Estoppel Defense**

Meltwater asks this Court to find an implied license allowing it to commercially exploit all AP content scraped from the Internet simply because AP does not demand that its licensees use a robots.txt protocol – a protocol that Meltwater itself does not even uniformly follow.  MW

56.1 Resp. ¶ 199.[10]  Meltwater concedes that it has had no interactions with AP and therefore no

relationship that could possibly give rise to a "meeting of the minds" between the parties "to

permit the particular usage at issue." *Psihoyos v. Pearson Educ.,* 855 F. Supp. 2d 103, 124

(S.D.N.Y. 2012); *Ulloa v. Universal Music & Video Distrib. Corp.*, 303 F. Supp. 2d 409, 416

(S.D.N.Y. 2004).  It does not dispute that AP has publicly and prominently made clear that its

content cannot be exploited commercially without a license in numerous ways – from its

copyright notices prohibiting redistribution, to the terms of use expressly prohibiting commercial

use of AP content posted on its members' websites per AP's Digital Use Agreements with them,

to AP's public stance and prior litigations evidencing its steadfast objection to the commercial

use of AP articles by aggregators, portals and search engines.  MW 56.1 Resp. ¶¶ 41-57,

332-335.[11]  Nor does Meltwater dispute that it obtains most of its content by scraping the

Internet sites of AP's licensees, but that such licensees do not have the contractual right to

sublicense AP's content – and hence Meltwater's exploitation.  *Id.* at ¶¶ 43, 55.[12]

No court in the Second Circuit has ever found an implied copyright license where the

parties had no relationship with each other, let alone no clear evidence documenting that "the

---

[10] Meltwater's implied license argument cannot apply to the Registered Articles published after the filing of the initial Complaint.  AP Br. at 35.  Meltwater tries but fails to rebut the argument that the filing revoked any implied license by alleging that Meltwater confers a benefit on AP, but in the very testimony Meltwater cites as support, AP's witness rejected that notion. Klausner Decl. Ex. 5, Cross Dep. at 133:17-134:16.

[11] AP and its members have every right to use terms of use and other methods to communicate their prohibitions on commercial use.  As Meltwater does not dispute, AP content on its licensees' sites is generally not segregated into a separate directory, and therefore robots.txt instructions would not work unless the entire site was restricted – something AP cannot control.  Jones Decl. ¶¶ 44-48; MW 56.1 Resp. ¶ 105-106.  Meltwater's conscious decision to ignore the posted terms of use – even though it visits each website individually before including it in its service – does not excuse its violation of those terms.  *See, e.g.*, *Storm Impact v. Software of the Month Club*, 13 F. Supp. 2d 782, 791 (N.D. Ill. 1998); *cf. Register.com v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004).  *Hines v. Overstock.com, Inc.*, 380 Fed. Appx 22, (2d Cir. 2010), which Meltwater cites, is distinguishable.  That case involved individuals, and the court found there was no constructive knowledge of the Terms and Conditions.  Meltwater, in contrast, is a sophisticated corporation operating a business based on scraping websites that understands that "all companies should where possible follow the laws and rules in the terms of use." McN. Decl. ¶ 60, Ex. 1 at 184:15-185:14; Ex. 2 at 65:15-23.

[12] Meltwater argues that these licensees nonetheless had "apparent authority" to sub-license – both before and after the filing of the complaint.  MW Br. at 26.  The law is clear, however, that "[f]or apparent authority to exist, there must be '*words or conduct of the principal,* communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction' on behalf of the principal."  *S & S Textiles Int'l v. Steve Weave,* No. 00 Civ. 8391 DLC, 2002 WL 1837999, at *7 (S.D.N.Y. Aug. 12, 2002) (Cote, J.) (citing *Std. Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 551 (1997)) (emphasis original).  No such evidence exists here.

9

parties manifested mutual assent to a licensing arrangement giving defendant unfettered, and free, permission to commercially exploit [AP's works] through [the particular products] at issue here." *Viacom Int'l v. Fanzine*, No. 98 Civ. 7448 (KMW), 2000 WL 1854903 at *3 (S.D.N.Y. July 12, 2000). Meltwater scoffs at the Second Circuit's observation that an implied copyright license will be found "only in 'narrow' circumstances where one party created a work at the other's request and handed it over, intending that the other copy and distribute it," *SmithKline Beecham Consumer Healthcare v. Watson Pharm.*, 211 F.3d 21, 25 (2d. Cir. 2000), but makes no effort to distinguish the panoply of cases that have followed *SmithKline*'s direction cited by AP. AP Br. at 31 n.12. Moreover, even accepting that implied licenses have occasionally been found in more "varied contexts," Meltwater does not dispute that in every controlling case where an implied license has been found, there must be evidence that "both parties to the transaction, not just the defendant, intended that the defendant could use or copy the plaintiff's work without liability for copyright infringement." *Design Options v. BeckPoint*, 940 F. Supp. 86, 92 (S.D.N.Y. 1996).[13]

 The fallacy of Meltwater's argument is revealed by its sweeping ramifications. In effect, Meltwater asks for a court-ordered rule that all Internet sites must follow a particular protocol or otherwise lose all control over the use of their copyrighted content, in whole or in part and for commercial or non-commercial ends.[14] There is simply no authority for the proposition that robots.txt instructions are the *only* means by which content providers may prevent unauthorized

---

[13] Meltwater relies on *Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307 (S.D.N.Y. 2011), but fails to note that the court followed the *SmithKline* standard and the facts showed a delivery of the music to the defendant and cooperation by the plaintiffs in its use. *Id.* at 319. In *DeForest Radio Tel. v. U.S.*, 273 U.S. 236, 241 (1927), and *Lukas Steel Co. v. Am. Locomotive Co.*, 197 F.2d 939, 941 (2d Cir. 1952), the evidence showed extensive affirmative actions by the plaintiffs that evidenced licenses. *See also Psihoyos*, 855 F. Supp. 2d at 124 (evidence that plaintiff delivered photos and extensive "course of conduct" between the parties supported a "meeting of the minds").

[14] To support this bold theory, Meltwater relies exclusively on *Field v. Google*, 412 F. Supp. 2d 1106 (D. Nev. 2006) and *Parker v. Yahoo!*, Civ. Action No. 07-2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008), but neither case forecloses the possibility that a content provider can manage its content through other means besides robots.txt. *Field* and *Parker* also are clearly distinguishable (AP Br. at 34 n.15). Here, unlike the public search engines in *Field* and *Parker* that crawled the *entire* Internet, Meltwater specifically chooses a limited number of news websites to crawl, and Meltwater's source configuration guide instructs its engineers to individually visit a source's website. McN. Decl. Ex. 45 at MW0126220.

exploitation of their copyrighted works.[15]

## B. Meltwater Has No Laches Defense

Laches cannot apply to the Registered Articles as a matter of law.  There is a circuit split on the issue of whether laches is available at all as a defense in copyright infringement actions, and the Second Circuit has been silent on the issue.  *Price v. Fox Entm't Grp.*, No. 05 Civ. 5259 SAS, 2007 WL 241387, at *2 (S.D.N.Y. Jan. 26, 2007).  In *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257 (2d. Cir. 1997), however, the Second Circuit noted that the "prevailing rule ... is that when a plaintiff brings a federal statutory claim seeking legal relief, laches cannot bar that claim, at least where the statute contains an express limitations period within which the action is timely." *Id.* at 260.  Accordingly, as Judge Scheindlin observed, when a plaintiff brings a claim within three years of initial infringement, "the inevitable conclusion is that the express statute of limitations in the Copyright Act precludes the use of the laches defense *in toto,* regardless of the relief sought." *Price*, 2007 WL 241387, at *3.  Here, it is undisputed that all of the Registered Articles (except for Am. Compl. Ex. FF) were published on or after August 4, 2010.  *See* Am. Compl. Exs. F-EE, GG-LL.[16]  AP filed its initial complaint on February 14, 2012, and the Amended Complaint on July 13, 2012 – well within the three-year statute of limitations under the Copyright Act.  17 U.S.C. 507(b).  Accordingly, laches cannot bar AP from bringing its infringement claim.[17]

---

[15] Meltwater's estoppel defense is highly similar to its implied license argument and fails for the same reasons.  The defense of equitable estoppel is a "drastic remedy and must be utilized sparingly."  *Keane Dealers v. Harts,* 968 F. Supp. 944, 948 (S.D.N.Y. 1997).  Further, Meltwater had a duty to use "due care and not fail to inquire as to its rights where that would be the prudent course of conduct."  *Id.* at 948; s*ee also Basic Books, Inc. v. Kinko's,* 758 F. Supp. 1522 (1991) (failure to act for years despite notice of defendant's copying does not establish that plaintiffs "intended their inaction to be interpreted as a 'license' to infringe").  The cases on which Meltwater relies (*see* MW Op. at 27) bear no relation to the facts here.  In *DeCarlo v. Archie Comic Publ'ns,* 127 F. Supp. 2d 497 (S.D.N.Y. 2001), the plaintiff maintained his "silence throughout decades of [defendant's] use of the characters as well as two written agreements."  *Id.* at 511.  In *Quinn v., City of Detroit*, 23 F. Supp. 2d 741, 745 (E.D. Mich. 1998), the defendant's employees used the plaintiff's copyrighted computer program "with his knowledge and assistance and ... he encouraged such use."  *See also* AP Br. at 32 n.13 (distinguishing *Keane*).

[16] Article FF was published on Aug. 10, 2008.  Meltwater's practice of failing to retain *ad hoc* search results sent to its customers has prevented AP from discovering whether Meltwater delivered excerpts from this article within three years of the filing of the Complaint.  McN. Decl. ¶¶ 83-84, Ex. 2 at 203:20-204:14.

[17] Even if laches could somehow apply, any delay by AP was reasonable.  As an initial matter, Meltwater's reference to a "six-year delay" (*see* MW Op. at 30) is wrong.  As Mr. Rizzo testified when asked about the very email Meltwater cites, he first learned of Meltwater's operations in the U.S. when contacted by the Senate about Meltwater – which was in 2008.  Rizzo Decl. ¶ 5; CPS Decl. Ex. 5 at 46:1-48:18.  Moreover, despite Meltwater's

### C.     Meltwater Has No Copyright Misuse Defense

AP vehemently denies Meltwater's irresponsible allegations that AP has engaged in *per se* illegal price-fixing activities in connection with NewsRight.[18]  MW Op. at 31.  Most importantly, as a matter of law, the copyright misuse doctrine has no applicability here.  First, Meltwater is again attempting to foist Ninth Circuit law upon this Court.  But "[w]ithin the Second Circuit, misuse or abuse of copyright is not firmly established as either a counterclaim or

---

assertion that the "only reason AP has offered for not pursuing a claim earlier is 'that AP has limited resources to devote to litigation'" (MW Br. at 29), Mr. Curley's declaration speaks broadly of AP's earlier priorities in combatting the use of its content by aggregators, the delay occasioned by the fact that, "since [Meltwater] is a closed, subscriber-only entity, it was difficult to obtain concrete information on how it was exploiting AP content and the actual content being exploited," and AP's belief that Meltwater would change its operations in response to proceedings in the UK. Curley Decl. ¶¶ 25-27.  In barring a laches defense in a copyright action, courts have recognized the validity of such discretion:  "Prudent business judgment, Rule 11 and basic common sense required [plaintiff] first to ascertain that the threat to its intellectual property interest was serious and that its legal position was sound before filing suit."  *Lotus Development Corp. v. Paperback Software Int'l*, 740 F. Supp. 37, 82 (D. Mass. 1990).

[18]  Meltwater's allegations are entirely unsupported by the law and the facts, as set forth more fully in the AP AMF Resp. at ¶¶ 54-72.  First, the record plainly shows that the licensing framework suggested by Ms. Jones, as described in Mr. Curley's email to Ms. Barrett (who was the chair of the NewsRight revenue committee), is <u>not</u> the final licensing framework adopted by NewsRight and signed by participating publishers, which had an entirely different structure.  *Compare* Klausner Decl. Ex. 25 at AP0010076-77 (suggesting three segments to aggregator market based on <u>characteristics of aggregator and its clients</u> ("top players," "premium institutional specialists," and "PR community/press clipping services") and potential minimum parameters ranging from     REDACTED *with* Jones Decl. Ex. 9 at AP0009640 (     REDACTED

For this reason alone, Meltwater's allegations are wholly specious.  Second, contrary to Meltwater's allegation that Ms. Jones provided NewsRight with information on "existing fees paid [to] AP" (MW Op. at 32), Mr. Curley's email says the exact opposite; it states that Ms. Jones "did <u>not</u> share the revenues AP is earning" with NewsRight but instead merely extrapolated from them to come up with a broad-based three-tier scheme with potential minimum parameters (which was ultimately not adopted).  Klausner Decl. Ex. 25 at 0010076-77; *see also* AP AMF Resp. ¶ 68.  Moreover, Ms. Jones' testimony makes clear that NewsRight, not AP, "determine[s] the price to be charged for the inclusion of AP content in a catalog license that NewsRight is offering." CPS Decl. Ex. 3 at 215:10-15.  Third, it is settled antitrust law that it is not *per se* illegal for providers of content to come together to create a new product with that content – here, a license covering aggregated news content from participating publishers – and for the collective licensing agency to set a price for it.  *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 21-24 (1979) (holding that blanket license fees offered by ASCAP and BMI for music content did not constitute *per se* price-fixing).  This is not just settled law, but also common sense – without a price, there would be no product to sell.  *Id.* at 23 (noting that "joint ventures and cooperative arrangements" are not generally unlawful as price-fixing schemes "where the agreement on price is necessary to market the product at all").  Furthermore, NewsRight's role is in fact <u>procompetitive</u> – not anticompetitive – because it adds a new product to the market without eliminating any existing products.     REDACTED     publishers can still license their content individually to any aggregator, regardless of whether NewsRight is authorized to negotiate an aggregated content license with that aggregator. Jones Decl. Ex. 9 at § 2.3 (AP0009635).  As a result, NewsRight's licensing framework simply creates a new product – a license to content from multiple publishers – without eliminating existing products.  Further, the Department of Justice ("DOJ") letter that is the lynchpin of Meltwater's argument sought approval for a contemplated news licensing group *within* AP; that plan was abandoned and replaced by NewsRight, an independent entity, so the DOJ letter is "moot."  AP AMF Resp. ¶ 56.

DWT 20852069v8 0025295-000064

an affirmative defense." *Shady Records v. Source Enterprises*, No. 03 Civ. 9944 (GEL), 2005 WL 14920, at *15 (S.D.N.Y.  Jan. 3, 2005); *see also Lava Records, LLC v. Amurao*, 354 Fed. Appx. 461, 463 (2d Cir. 2009) (declining to recognize copyright misuse as an independent cause of action).  Even if recognized, recent court decisions have only applied the doctrine "sparingly" and only in a very narrow context, namely when a copyright holder is "leveraging their limited monopoly to allow them control of areas outside the monopoly" and "restraining development of competing products." *Apple v. Psystar Corp.,* 658 F.3d 1150, 1157-58 (9th Cir. 2011), *quoting A&M Records v. Napster*, 239 F.3d 1004, 1026 (9th Cir. 2001).

Thus, for example, in *Lasercomb Am. Inc. v. Reynolds,* relied on by Meltwater, the Fourth Circuit found the copyright holder misused its copyright in software by including in licensing agreements a provision that barred the licensee from developing competing goods for the term of the agreement.  911 F.2d 970, 979 (4th Cir. 1990).  "The misuse arises from Lasercomb's attempt to use its copyright in a particular expression, the Interact software, to control competition is an area outside the copyright, i.e., the idea of computer-assisted die manufacture." *Id.* at 979.  Moreover, the licensing provisions "aimed at preventing the creation of competing software." *Apple*, 658 F.3d at 1157.  *See also Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520-21 (9th Cir. 1997) (AMA's license agreement prohibiting licensees from using any other coding system except the AMA's amounted to copyright misuse because the AMA was "us[ing] the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office.").  The misuse defense applies "only if a copyright is leveraged to undermine the Constitution's goal of promoting invention and creative expression." *Metro-Goldwyn Mayer Studios v. Grokster,* 454 F. Supp. 2d 966, 995 (C.D. Cal. 2006)(*"Grokster"*).[19]

Here, however, Meltwater does not – and could not – assert that AP is "leveraging [its] limited monopoly" over the expression in its articles to allow it "control of areas outside the

---

[19] The copyright misuse doctrine finds its origins in the patent misuse doctrine and the holding in *Morton Salt Co. v. G.S. Suppiger Co.*, 314 U.S. 488 (1942), cited by Meltwater, that the "improper tying of a patented product and an unpatented product constituted misuse." *Apple*, 658 F.3d at 1157.

monopoly." *Apple,* 658 F.3d at 1157.  Meltwater's price-fixing argument echoes the exact

argument rejected as copyright misuse in *Grokster.*  454 F. Supp. 2d 966 (C.D. Cal. 2006).  There,

StreamCast, a file-sharing service, argued that "any use of copyright in violation of public policy is

sufficient" to trigger the misuse defense, and that the plaintiff copyright owners had "engaged in

retail and wholesale price-fixing with respect to both compact discs and online media distribution."

*Id.* at 995, 997.  The court, reviewing the same cases that Meltwater cites, rejected StreamCast's

argument, concluding instead that "the existing case law teaches that the misuse defense applies

only when a copyright holder leverages its copyright to restrain creative activity."  *Id.* at 997.

> [T]hese price-fixing allegations do not implicate the policy concerns that motivate
> the misuse doctrine.  Price-fixing, in and of itself, does not restrict competitors or
> the public from engaging in creative activity.  Nor does it extend Plaintiffs'
> copyrights into non-copyrighted ideas and expressions. Indeed, collusive pricing
> is not "connected to any copyrighted work, but [is] merely conduct in which the
> providers of any good or service, copyrighted or not, could engage."[20]

So too, here, Meltwater has failed to identify any misuse of AP's copyrights beyond their proper

scopes that stifles creative activity.  Nor can it.  Whether or not AP colluded to set minimum

prices for licenses through NewsRight to redistribute its news articles (and it did not), this would

not entail leveraging its copyright in news articles to embrace content (like facts or ideas) outside

its monopoly or in any way restrict others from competitively reporting the news.  The alleged

violation does not involve the leverage of AP's copyright to control competition outside of AP's

---

[20] *Id.* at 998 (citing *Arista Records  v. Flea World*, 356 F. Supp. 2d 411, 430 (D.N.J. 2005 ) (similarly denying
misuse defense predicated on price fixing allegations in the compact disc market when the allegations "have nothing
to do with Plaintiffs' copyrights"); *see also Orth-O-Vision v. Home Box Office*, 474 F. Supp. 672, 688 (S.D.N.Y.
1979) (rejecting copyright misuse defense where antitrust allegations do not relate to "use [of] legal monopoly over
copyrighted material to exert anticompetitive power over non-copyrighted material" or "beyond their proper
scopes").  Meltwater cherry picks allegations from *In re Napster*, 191 F. Supp. 2d 1087 (N.D. Ca. 2002), to support
its argument, but ignores that the Ninth Circuit has subsequently reiterated that the "sparingly applied" misuse
doctrine is only applicable when the copyright holder improperly uses its rights to "extend a copyright monopoly to
other products or works" and "involves restraining development of competing products."  *Apple,* 658 F.3d at 1157-
1158.  *Napster* itself recognized that in 2002, the doctrine "remain[ed] largely undeveloped with little case law to
aid this court in its inquiry."  *Id.* at 1103. Further, even *Napster* held that "generalized anti-trust violations will not
suffice.  Napster must establish a nexus between … alleged anticompetitive actions and plaintiffs' power over
copyrighted material."  *Id.* at 1108.  In that case, Napster alleged that the plaintiff record companies had formed a
joint venture to directly compete with Napster in the music streaming business.  Here, NewsRight is <u>not</u> a media
monitoring organization competing with Meltwater, but instead a licensing arm for news publishers, and thus there
is no "nexus" between the alleged price-fixing and AP's copyright infringement claims.

rights or any restraint on the development of competing products to AP's news wire – and, as such, falls outside the narrow copyright misuse doctrine.

## CONCLUSION

For the reasons set forth above, plaintiff The Associated Press respectfully requests that the Court grant its motion for summary judgment against Meltwater on AP's First and Fourth Causes of Action and dismiss Meltwater's affirmative defenses.

Dated:  New York, New York
          January 11, 2013

Respectfully submitted,
DAVIS WRIGHT TREMAINE LLP

By: _Elizabeth McNamara_
      Elizabeth A. McNamara
      Linda Steinman
      Alison B. Schary
      Collin J. Peng-Sue

1633 Broadway – 27th Floor
New York, New York 10019
Telephone:    (212) 489-8230
Facsimile:     (212) 489-8340
*Attorneys for Plaintiff The Associated Press*

DWT 20852069v8 0025295-000064