DAVID H. KRAMER (admitted *pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300

TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 497-7700

*Attorneys for the Defendants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THE ASSOCIATED PRESS, <br><br> Plaintiff, <br><br> v. <br><br> MELTWATER U.S. HOLDINGS, INC.; <br> MELTWATER NEWS U.S., INC.; and <br> MELTWATER NEWS U.S. 1, INC., <br><br> Defendants. | CASE NO.: 1:12-CV-01087-DLC <br> ECF CASE |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................................. ii

TABLE OF ABBREVIATIONS ...................................................................................... iv

ARGUMENT .................................................................................................................. 1

I.    MELTWATER IS ENTITLED TO SUMMARY JUDGMENT ON FAIR USE ................... 1

    A.    Meltwater's Use Is Transformative ........................................................ 1

    B.    The Factual Nature And Wide Availability Of AP's Articles Favors Fair Use ........... 6

    C.    Meltwater's Limited Use Of The Articles In Suit Favors Fair Use ............................ 7

    D.    Meltwater's Use Does Not Harm AP's Market For The Articles In Suit .................... 8

II.   AP CANNOT SALVAGE ITS SECONDARY INFRINGEMENT CLAIMS ....................... 10

    A.    There Is No Evidence That Meltwater Users Infringed Any Article In Suit ............. 10

    B.    AP Cannot Show Knowledge Or Financial Benefit .................................................. 14

CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records, Inc. v. Napster, Inc.,*
  239 F.3d 1004 (9th Cir. 2001) ...................................................................................... 14

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
  562 F.3d 630 (4th Cir. 2009) ......................................................................................... 2

*Arica Inst. v. Palmer,*
  970 F.2d 1067 (2d Cir. 1992)........................................................................................ 10

*Arista Records LLC v. Lime Group LLC,*
  No. 06 Civ. 5936, 2011 WL 1641978 (KMW) (S.D.N.Y. Apr. 29, 2011) ..................... 11

*Arista Records LLC v. Usenet.com, Inc.,*
  633 F. Supp. 2d 124 (S.D.N.Y. 2009)............................................................................ 11

*Atl. Recording Corp. v. Howell,*
  554 F. Supp. 2d 976 (D. Ariz. 2008) ............................................................................. 11

*Bill Graham Archives v. Dorling Kindersley Ltd.,*
  448 F.3d 605 (2d Cir. 2006)........................................................................................ 8, 9

*Capitol Records, Inc. v. Thomas,*
  579 F. Supp. 2d 1210 (D. Minn. 2008)........................................................................... 11

*Dawes-Ordonez v. Realtor Ass'n of Greater Fort Lauderdale, Inc.,*
  No. 09-60335-CIV, 2010 WL 1791754 (S.D. Fla. May 5, 2010)..................................... 15

*Field v. Google Inc.,*
  412 F. Supp. 2d 1106 (D. Nev. 2006)............................................................................. 7

*Infinity Broad. Corp. v. Kirkwood,*
  150 F.3d 104 (2d Cir. 1998).......................................................................................... 7, 9

*Jurin v. Google, Inc.,*
  No. 2:09-cv-03065, 2012 WL 5011007 (E.D. Cal. Oct. 17, 2012) ................................ 2

*Matthew Bender & Co. v. West Publishing Co.,*
  158 F.3d 693 (2d Cir. 1998).......................................................................................... 12

*MGM Studios Inc. v. Grokster, Ltd.,*
  545 U.S. 913 (2005).................................................................................................... 14

*Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999)...................................................................................... 7

*Olan Mills, Inc. v. Linn Photo Co.*,
    23 F.3d 1345 (8th Cir. 1994) ................................................................................ 11

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ........................................................................ 2, 14

*Register.com v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004).................................................................................... 7

*Resnick v. Copyright Clearance Ctr., Inc.*,
    422 F. Supp. 2d 252 (D. Mass. 2006) .................................................................. 12

*Ringgold v. BET, Inc.*,
    126 F.3d 70 (2d Cir. 1997)................................................................................. 8, 9

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984).................................................................................... 13, 14

*Stewart v. Abend*,
    495 U.S. 207 (1990)............................................................................................... 6

*Storm Impact, Inc. v. Software of the Month Club, Inc.*,
    13 F. Supp. 2d 782 (N.D. Ill. 1998) ....................................................................... 7

*The Authors Guild, Inc. v. HathiTrust*,
    No. 11-cv-6351 (HB), 2012 WL 4808939 (S.D.N.Y. Oct. 10, 2012) ...................... 2, 8

*Wainwright Securities Inc. v. Wall St. Transcript Corp.*,
    558 F.2d 91 (2d Cir. 1977)..................................................................................... 1

*Wolk v. Kodak Imaging Network, Inc.*,
    840 F. Supp. 2d 724 (S.D.N.Y. 2012)............................................................ 10, 14

## <u>Statutes</u>

17 U.S.C. § 411(a) ....................................................................................................... 14

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| Am. Compl. | First Amended Complaint filed by Plaintiff The Associated Press ("AP") (July 13, 2012) |
| AP Opp. | Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Dec. 14, 2012) |
| AMF | Defendants' Local Rule 56.1 Statement of Additional Material Facts In Opposition to Plaintiff's Motion For Summary Judgment (Dec. 14, 2012) |
| AP MSJ | Memorandum of Law of Plaintiff The Associated Press In Support Of Its Motion for Summary Judgment On Its Copyright Infringement Claim (Nov. 9, 2012) |
| AP CSUF | Plaintiff's Response to Defendants' Rule 56.1 Statement of Material Facts (Dec. 14, 2012) |
| AP SUF | Rule 56.1 Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried In Support of Plaintiff's Motion For Summary Judgment (Dated Nov. 9, 2012) |
| Box Supp. Decl. | Supplemental Declaration of John Box In Support Of Defendants' Opposition To Plaintiff's Motion For Summary Judgment (Dec. 13, 2012) |
| Cross Decl. | Declaration of Sue Cross (Nov. 8, 2012) |
| Curley Decl. | Declaration of Thomas Curley In Support of Plaintiff's Motion For Summary Judgment (Nov. 5, 2012) |
| Fuller Decl. | Declaration of Nick Fuller (Nov. 7, 2012) |
| Geidies Decl. | Declaration of Sebastian Geidies (Dec. 11, 2012) |
| Glunt Decl. | Declaration of Robert A. Glunt In Support of Defendants' Motion for Summary Judgment (Nov. 9, 2012) |
| Grealis Decl. | Declaration of Catherine Grealis In Support of Defendants' Motion for Summary Judgment (Nov. 9, 2012) |
| Grealis Reply Decl. | Reply Declaration of Catherine Grealis In Further Support of Defendants' Motion for Summary Judgment (Jan. 11, 2013) |

| Klausner Decl. | Declaration of Tonia Ouellette Klausner In Opposition To Plaintiff's Motion for Summary Judgment (Dec. 14, 2012) |
|---|---|
| Lawhon Decl. | Declaration of Cathy Lawhon (Oct. 1, 2012) |
| McNamara Decl. | Declaration of Elizabeth A. McNamara (Nov. 9, 2012) |
| McNamara 56(d) Decl. | Rule 56(d) Declaration of Elizabeth A. McNamara (Dec. 14, 2012) |
| Meeks Decl. | Declaration of Brock N. Meeks (Oct. 15, 2012) |
| Meltwater CSUF | Defendants' Counterstatement To Plaintiff's Rule 56.1 Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried In Support of Plaintiff's Motion For Summary Judgment (Dec. 14, 2012) |
| Meltwater MSJ Opp. | Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (Dec. 14, 2012) |
| Meltwater MTS | Memorandum of Law In Support of Defendants' Motion To Strike Plaintiff's Improper Declarations And 56.1 Statement (Dec. 14, 2012) |
| Meltwater 56(d) Decl. | Declaration of Robert A. Glunt Pursuant to Fed. R. Civ. P. 56(d) (Dec. 14, 2012) |
| Meltwater 56(d) Opp. | Memorandum of Law in Opposition to The F.R.C.P. 56(d) Declaration of Elizabeth A. McNamara (Jan. 11, 2013) |
| MSJ | Memorandum of Law In Support of Defendants' Motion For Summary Judgment (Nov. 9, 2012) |
| MTS | Memorandum of Law In Support of Defendants' Motion to Strike Plaintiff's Improper Declarations and 56.1 Statement (Dec. 14, 2012) |
| RSUF | Defendants' Reply to Plaintiff's Response to Defendants' Rule 56.1 Statement of Material Facts (Jan. 11, 2013) |
| Saab SJ Decl. | Declaration of Sara Saab in Support of Defendants' Motion for Summary Judgment (Nov. 7, 2012) |

| Schary Decl. | Declaration of Alison B. Schary (Dec. 14, 2012) |
|---|---|
| Second MTS | Memorandum of Law In Support of Defendants' Motion to Strike Schary Declaration and Improper Portions of Steinman Declaration (Jan. 11, 2013) |
| Steinman Decl. | Declaration of Linda Steinman (Dec. 14, 2012) |
| SUF | Defendants' Local Rule 56.1 Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried (Nov. 9, 2012) |

AP's effort to resist summary judgment on its direct infringement claim covers the same ground that Meltwater has already responded to in its Opposition to AP's own summary judgment motion. Nothing AP says provides any basis for evading the consistent set of decisions holding that the use of copyrighted material by Internet search engines like Meltwater is fair use. Under settled law, Meltwater did not infringe AP's copyrights by indexing and delivering short snippets of the Articles in Suit in response to its customers' search queries. Meltwater also is entitled to summary judgment on AP's secondary liability claims. AP admits that there is no evidence of the full-text use of the Articles in Suit by Meltwater customers, the conduct that AP has claimed was direct infringement, and AP's reliance on the authorized actions of its own agent cannot make up for that failure of proof.

## ARGUMENT

**I.   MELTWATER IS ENTITLED TO SUMMARY JUDGMENT ON FAIR USE**

### A.   Meltwater's Use Is Transformative

AP spills much ink trying to show that Meltwater's use of the Articles in Suit in its search engine and research tool is not transformative. AP's arguments are familiar – and unpersuasive.

***Meltwater is a search engine engaged in transformative use***. Every case addressing search engines has found they engage in transformative use. Meltwater has already responded at length to AP's arguments that those cases are somehow inconsistent with Second Circuit law or distinguishable from this case. Meltwater MSJ Opp. at 6-14.[1] In addition to rehashing those arguments, AP also suggests that Meltwater News is not a search engine at all. AP Opp. at 5-7. AP offers nothing to support that claim beyond its own rhetoric. In both purpose and operation, Meltwater News does what all search engines do: it indexes publicly available Internet content,

---

[1] *Wainwright Securities Inc. v. Wall St. Transcript Corp.*, 558 F.2d 91, 96 (2d Cir. 1977), did not involve a search engine, but instead addressed a service that created abstracts of institutional research reports, the "obvious intent" of which was "fulfilling the demand for the original work." That decades-old ruling is neither on point here, nor inconsistent with the subsequent cases finding fair use by search engines.

allows users to conduct searches for such content, and delivers search results that include portions of responsive material, along with links to the content on its original online location. *See Jurin v. Google, Inc.*, No. 2:09-cv-03065, 2012 WL 5011007, at *1 (E.D. Cal. Oct. 17, 2012) (explaining operations of a search engine). The only difference between Meltwater and services such as Google or Bing is that Meltwater charges users directly whereas the others earn revenue by advertising to users. But that distinction is of no moment in applying the first fair use factor, which turns on the fact that "a search engine transforms the [content] into a pointer directing a user to a source of information." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007).[2]

**Meltwater uses AP content for new purposes.** AP also repeats its argument that transformative use necessarily requires a new *expressive* purpose (AP Opp. at 9-13), but Meltwater has already refuted that misstatement. Meltwater MSJ Opp. at 3-6. It is well settled that a use made for a different purpose can be transformative even where it does not "alter or augment" the original work. *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009); *The Authors Guild, Inc. v. HathiTrust*, No. 11-cv-6351 (HB), 2012 WL 4808939, at *11 (S.D.N.Y. Oct. 10, 2012). AP also claims that Meltwater's short, non-contiguous snippets can theoretically serve the same purpose as the original articles (AP Opp. at 13-15), but AP's premise is misguided on the law and the facts. There is no requirement that excerpts of content delivered by a search engine be categorically incapable of serving a similar function as the original. The cases have instead found transformation based on the clear difference in intent and effect between the original work and the material contained in the search results. Meltwater MSJ Opp. at 11-13. That is so here as well. There is no evidence of actual or intended substitution; indeed, all the evidence of user behavior – including the declarations from Meltwater's customers – confirm that customers do not use

---

[2] The fact that Meltwater offers some customers the ability to archive search results or create emails that include search results – which users of other search engines can do as well – is equally irrelevant. These additional features have nothing to do with (and do not change) the core operation of Meltwater's search engine. Indeed, AP's direct infringement claim is not even based on those features.

Meltwater's service to read the news, but instead to find relevant articles online, identify trends in news coverage across a variety of media outlets, and gain other comparative insights into how the media is using certain words or phrases in its stories. RSUF ¶¶ 20, 47.[3] The record thus confirms the obvious: that Meltwater's search results serve a different purpose from AP's works and are put to different ends.

*AP's focus on a click-through rate is misplaced.* AP next argues that Meltwater cannot rely on the search engine cases because there is no evidence of its general click-through rate. AP Opp. at 16-17. Meltwater has already explained why that figure is meaningless in this context. Meltwater MSJ Opp. at 9-11. AP offers no new arguments.[4] Instead, it asks the Court to "disregard" evidence about article clicks that clearly *is* relevant: just in the first six months of 2012, U.S. customers clicked on 6.7 million article links in Meltwater search results. RSUF ¶ 18; *see also, e.g.,* Grealis Reply Decl. Ex. 11 (Meltwater "Usage Analysis" showing over 7.2 million "clicks" by U.S.

---

[3] AP recognizes that the customer declarations refute its theory, and so it asks the Court to disregard them. AP Opp. at 15 n.9. But those declarations are procedurally proper, contain admissible evidence, and cannot be ignored just because AP does not like what they show. RSUF ¶ 5. AP also offers baseless conjecture about search terms used by one Meltwater customer REDACTED but those terms are fully consistent with the transformative use that Meltwater has described. The use of the terms "FDA" and "smoking" suggests merely that REDACTED is interested in finding articles relating to those topics, not that it uses the snippets included in Meltwater's search results to replace reading the articles themselves. Meltwater has already responded to AP's reliance on out-of-context statements in isolated Meltwater marketing documents (Meltwater MSJ Opp. at 13 n.4) and the Jones Declaration, which is inadmissible lay opinion (MTS at 11-12).

[4] AP points to a ruling from the U.K. Copyright Tribunal that made reference to a click-through rate associated with a different Meltwater entity serving customers in a foreign country. That figure is unreliable and inadmissible here, but it also is irrelevant for reasons Meltwater has previously discussed: there is no benchmark figure for comparing click-through rates across different search engines (and thus no basis for AP's assertion that the U.K. figure was "infinitesimal"), and there are all sorts of legitimate reasons why many search results that Meltwater (or any search engine) delivers will not result in actual clicks. Meltwater MSJ Opp. at 9-10. Equally misguided is AP's claim about so-called "dead links." The fact that some clicks might direct users to a webpage where the article is no longer available is a feature of all Internet search engines, which reflects the dynamic nature of the Internet. It does not make search engines' use of content any less transformative or more substitutive. In all instances, the search engine transforms the original work into a pointer, directing users to a particular online location where what happens to be displayed at any given time is controlled by the operator of that website. Saab SJ Decl. ¶ 16.

customers in a different six-month period).  AP claims that these figures are meaningless without

information about the total number of search result links delivered, but that simply is not so.  Those

two pieces of data are entirely distinct.  Meltwater maintains information about article "clicks"

because that information is relevant to its business; it shows how customers use the service,

illustrating that Meltwater drives traffic to websites that otherwise might not get those "eyeballs."

Grealis Reply Decl. Ex. 2 (Saab Dep. 120:1-14, 125:10-14).  "Click" data thus is readily accessible

in Meltwater's system, was produced to AP, and bears directly on the fair use inquiry.  In contrast,

Meltwater has never kept records of the total number of search results delivered to its U.S. customers

(or of a click-through rate), because that information has no business relevance.  *Id.* (Saab Dep.

125:5-18).  It is also irrelevant to the fair-use inquiry, as reflected by the fact that no case has cited

data about click-through rates in addressing transformative use.  Nevertheless, in response to AP's

discovery requests, Meltwater made extensive efforts to try and extract such information from its

system, but that proved impossible.  *Id.* (Saab Dep. 125:18-24).[5]  Regardless, the infeasibility of

producing (irrelevant) information about Meltwater's overall *click-through rate* is no basis for the

Court to close its eyes to (relevant) evidence about the fact that Meltwater users regularly click on

the links delivered by Meltwater, much less to draw some kind of adverse inference.[6]  That evidence

illustrates that Meltwater uses article snippets to help users to locate and, if they wish, access

information published across the Internet, thereby aligning Meltwater News with other search

engines and confirming its transformative purpose.

---

[5] AP cites testimony from a witness who was not involved in Meltwater's attempt to gather this information and who had no actual experience with that issue.  AP Opp. at 17 n.10; *see* Grealis Reply Decl. Ex. 1 (Geidies Dep. 259:19-261:19).  AP ignores the far more relevant testimony from the Meltwater employee directly involved in that effort, who explained in deposition that Meltwater's diligent efforts to extract data from its system that could be used to calculate an overall click-through rate proved to be incredibly time-consuming, burdensome, and ultimately infeasible.  Grealis Reply Decl. Ex. 2 (Saab Dep. 123:5-18, 125:18-23); Grealis Reply Decl. Ex. 7 (Resp. to Rog 12).

[6] AP's effort to manufacture a click-through rate using a back-of-the-envelope methodology is not reliable evidence (Second MTS at 5-6), but it makes no difference.  Whether Meltwater's click-through rate was 3.6%, .36%, or 36%, any of these numbers would demonstrate that millions of articles have been accessed on publisher webpages using Meltwater's search results.

4

*Meltwater is a research tool independent of its "dashboard analytics*." Finally, in response to Meltwater's showing that its transformation of the Articles in Suit into raw material for a news research tool further supports a finding of fair use, AP attacks yet another straw man. AP focuses exclusively on Meltwater's "dashboard analytics" (AP Opp. at 18-19), but the service operates as a research tool independent of that particular suite of analytic tools. As explained in our opening brief, by maintaining an extensive index compiled from tens of thousands of news sources around the world, returning responsive search results that include information about articles that match the user's search term, and including a snippet of each responsive item showing how it used that term, Meltwater communicates insights about the news media that are not conveyed by any individual article (or a wire service like AP's). MSJ at 12-13. In these ways, Meltwater allows comparative analysis of how certain words or phrases are being used, provides insight into the volume and tone of news coverage of particular topics, and allows customers to track the number of press mentions they receive in a given time. SUF ¶¶ 5, 10, 22; Saab SJ Decl. ¶¶ 20-21.[7] This has nothing to do with Meltwater's specialized analytic tools, which supply further intelligence about news coverage, but are not primarily responsible for making Meltwater News a valuable research tool or for effectuating its transformative purpose. In short, AP's narrow arguments about the "dashboard analytics" reveals that it has no response to Meltwater's actual point and cannot dispute the transformative nature of Meltwater's core search engine and news research service.

---

[7] We showed in our opening brief that even AP's own documents have highlighted the value of Meltwater News as a research tool. MSJ at 12 (citing Grealis Decl. Exs. 43, 49). AP's response is more obfuscation. AP Opp. at 19 n.13. Even if some of the language cited in Grealis Decl. Ex. 43 came from Meltwater's website (something that AP does not actually demonstrate), what difference would that make? AP does not and cannot dispute the fact that its report adopted that language as a description of how Meltwater markets itself and what service it actually offers. And AP totally ignores the second document, which (in its own language) describes Meltwater as a "news research service." Grealis Decl. Ex. 49.

**B.      The Factual Nature And Wide Availability Of AP's Articles Favors Fair Use**

In addressing the second fair use factor, AP boxes at shadows.  Meltwater has not argued that

its use is fair *simply because* the works at issue are factual.  But AP cannot dispute the established

rule that "fair use is more likely to be found in factual works than in fictional works." *Stewart v.*

*Abend*, 495 U.S. 207, 237 (1990).  Instead, AP again relies on an out-of-context statement from

*Harper & Row*, which had nothing to do with the second factor and does not help AP here.

Meltwater MSJ Opp. at 14 & n.6.  The factual nature of the Articles in Suit – many of which contain

minimal original expression, or none at all (*id.* at 15-16) – means that this factor favors Meltwater.

Meltwater's fair use claim is even stronger given that those articles were published on

websites that wanted them to be available without charge to as many readers as possible.  RSUF ¶¶

38-40.  Unable to dispute that, AP attacks another straw man.  Meltwater has never claimed that

once a work is published on the Internet, "it has fallen into the public domain" or that any use is fair.

AP Opp. at 21.  The nature of the copyrighted work (including whether and how it is published) is

just one piece of the fair use puzzle.  But the widespread and free availability of the Articles in Suit

here unquestionably means a broader scope for fair use.  MSJ at 15-16.  That is particularly so given

AP's concession that those articles were made available on websites that used the robots.txt protocol

to invite use by search engines like Meltwater.  AP CSUF ¶ 43; AMF ¶¶ 20-36.[8]  AP tries to shift the

focus to the boilerplate "terms of use" on its licensees' websites that purport to bar "commercial use"

of AP content.  But AP does not have standing to enforce those third-party terms of use against

Meltwater, and it identifies no evidence that any of those websites has taken the position that

Meltwater violated their terms by indexing content for its search engine.  Moreover, AP does not

even try to show that Meltwater was aware of the language included in the various terms of use that

it references or could reasonably have understood them to prohibit search engine indexing.  Indeed,

---

[8] AP's suggestion (AP Opp. at 22) that Meltwater "does not routinely follow robots.txt instructions" is contrary to the record, which makes clear that Meltwater's general policy is to "follow" robots.txt instructions. Grealis Decl. Ex. 65 (Geidies Dep. 207:2-7).  AP points to no instance in which Meltwater declined to follow such instructions with respect to any AP content, let alone the Articles in Suit.

even AP's designated 30(b)(6) witness could not coherently answer whether such terms of use apply to search engines. Meltwater MSJ Opp. at 25 n.18.[9] The robots.txt protocol exists precisely because there is no way for automated search engine crawlers to parse the endlessly varied and complex legal language posted on hundreds of thousands of different websites. AMF ¶ 21. AP's decision not to use that protocol to limit search engine activity – and its decision to allow its licensees to use it to expressly *invite* such activity – ensures that AP works will be indexed by search engines without regard to what language buried in nonbinding "terms of use" might say. AMF ¶¶ 27-34. Under the second factor, these facts bolster the case for fair use. *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1120 (D. Nev. 2006).

### C.    Meltwater's Limited Use Of The Articles In Suit Favors Fair Use

Meltwater has already answered AP's arguments about the third fair use factor. Meltwater MSJ Opp. at 15-18. AP again emphasizes Meltwater's inclusion of "opening text" but ignores the Second Circuit's express holding that a defendant's copying the "first paragraph of a six-paragraph article" did not even "meet the threshold for copyright infringement" in the first place. *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 71 (2d Cir. 1999). It follows from *Nihon* that Meltwater's use of portions of the "ledes" of the Articles in Suit does not count against it in the fair-use inquiry.[10] Beyond that, nothing AP says changes the fact that Meltwater included only a

---

[9] AP's reliance on *Storm Impact, Inc. v. Software of the Month Club, Inc.*, 13 F. Supp. 2d 782 (N.D. Ill. 1998) and *Register.com v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004), is misplaced. Neither case holds that a search engine is bound by unaccepted terms of use restrictions, and certainly not in the face of a robots.txt instruction expressly inviting search engine use. *Storm Impact* did not involve search engines or robots.txt instructions, but instead a defendant that knowingly violated an express and prominently displayed restriction. *Register.com* – which is not a copyright case and has nothing to do with fair use – involved a defendant who knowingly ignored an express restriction delivered to the defendant in response to its queries.

[10] AP also continues to misrepresent the decision in *Infinity*. As we have explained (Meltwater MSJ Opp.16 n.9), the Second Circuit's ruling regarding the third factor turned on the fact that the defendant's service gave any user "essentially unlimited" access to complete radio broadcasts, "24 hours a day, seven days a week," and thus simply by using the service for longer periods of time a user would receive "entire copyrighted programs." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 110 (2d Cir. 1998). It was for that reason that the Second Circuit found the "potential scope of [the] retransmission" particularly significant. *Id.* But there is nothing like that in this case. Here, moreover, in contrast to *Infinity*, there *is* comprehensive evidence of the extent to which the Articles in Suit were used in Meltwater's search results. Grealis Decl. Exs.

limited (and often non-contiguous) portion of each Article in Suit in its search results or that those snippets were used in ways that directly advance Meltwater's transformative purposes. Nor does AP have any response to the cases holding that even the use of *complete* copyrighted works, including by Internet search engines, is consistent with fair use. MSJ at 17-18.[11] Those cases confirm that the third factor favors Meltwater's far more limited use.

> ### D.     Meltwater's Use Does Not Harm AP's Market For The Articles In Suit

Meltwater has explained why neither of AP's theories of market harm holds water. MSJ at 19-26; Meltwater MSJ Opp. at 19-22. AP does nothing to revive them.

*First*, AP's "lost licensing revenue" theory is just the kind of effort to "preempt exploitation of transformative markets" that the Second Circuit and other courts repeatedly have rejected. *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 615 (2d Cir. 2006); *see also HathiTrust*, 2012 WL 4808939, at *13. AP returns to its claim that Meltwater's use is not transformative, but that is wrong for reasons we have already discussed. AP also tries to distinguish *Bill Graham* on its facts, which AP says involved a "classic transformative use." AP Opp. at 26. But, while Meltwater's use may be transformative in a different way than in *Bill Graham*, the Second Circuit made clear that where a use is transformative (regardless of what makes it so), a copyright owner cannot establish market harm based on the loss of license fees.[12] AP cites *Ringgold v. BET, Inc.*, 126

---

80-81. This evidence confirms that Meltwater customers did not receive anything like the full text of any of those articles. AP CSUF ¶ 44.

[11] The only cases that AP even tries to distinguish are the *Righthaven* decisions (AP Opp. at 24 n.17), but the plaintiff's questionable litigation tactics were irrelevant to the courts' holdings that the defendants' copying of longer portions of articles than occurred here favored fair use.

[12] AP's factual distinction is also unpersuasive. AP claims that the use in *Bill Graham* "was not at the heart of plaintiff's business model." AP Opp. at 26. Nothing in the Second Circuit's ruling supports that assertion. To the contrary, the court accepted that the plaintiff had "established a market for licensing its images" and had regularly licensed those images. *Bill Graham*, 448 F.3d at 614 & n.6. Beyond that, search engine licensing is not at the heart of AP's business, which involves selling subscriptions to AP wire services to news organizations. RSUF ¶ 26. Indeed, as we have shown, there is far less than meets the eye to AP's argument that it has created a genuine licensing market for the use by search engines of AP content posted freely on the Internet. Meltwater MSJ Opp. at 20 nn. 13-14.

F.3d 70 (2d Cir. 1997), but the use at issue there was decidedly non-transformative, so the court had no occasion to address the rule that decided *Bill Graham* – and that governs this case.

*Second*, AP's "lost customer" theory is doomed by the utter lack of evidence that Meltwater's limited use of AP content *replaces* AP as a supplier of that content. AP makes only a half-hearted claim that any actual customers substituted Meltwater News for the AP wire. AP Opp. at 28.[13] And it ignores the evidence that any impact on the market for AP wire services stems from AP's own decisions to make its content widely and freely available online. MSJ at 23-24. Unable to show any actual market harm attributable to Meltwater's use of AP content, AP argues that such a showing is unnecessary because it can imagine some theoretical possibility that substitution might occur. But AP's offer of conjecture in lieu of evidence is not supported by the case law and should be rejected. AP cites *Infinity*, but the outcome there was based on the fact that the plaintiff offered the very same "listen line" service as the defendant, making it logical to conclude that the defendant's use would substitute for the plaintiff's. 150 F.3d at 111. The clear differences between Meltwater News and the AP wire point in the opposite direction here. AP also relies on *Ringgold*, but (as discussed) that case addressed market harm stemming from the defendant's failure to pay the customary licensing fee for its own *non-transformative* use, which the court explained would necessarily diminish plaintiff's licensing market. *Ringgold*, 126 F.3d at 81. In contrast to the lost licensing revenue theory refuted above, which is based on *Meltwater's* failure to pay licensing fees,

---

[13] Meltwater has already responded to AP's claims about the House of Representatives proposal and the Mississippi Development Authority. Meltwater MSJ Opp. at 21 & n.15; AMF ¶¶18-19. The Department of Homeland Security was never a Meltwater News customer (and AP's "evidence" about DHS's reasons for cancelling its AP wire subscription is inadmissible hearsay). RSUF ¶ 48; MTS at 9-10. The only other customer AP mentions is the New York Department of Correctional Services, but even the limited evidence that AP produced contradicts any claim of loss attributable to Meltwater. Cross Decl. Ex. 29 (stating "[c]ustomer is not using service" as reason for cancellation of AP subscription). Moreover, as discussed in Meltwater's opening brief, AP instructed its 30(b)(6) witness not to provide testimony on this issue, claiming that such evidence was privileged. MSJ at 23. AP's response – that Meltwater designated its customer list as "Attorney's Eyes Only" (AP Opp. at 28 n.19) – is a non-sequitur: Meltwater's designation had nothing to do with AP's ability to prepare its own market harm witness to testify about the customers that AP believed it had lost and what basis it had for attributing that loss to Meltwater. AP's invocation of privilege to block that testimony forecloses AP from now presenting such evidence in an effort to avoid summary judgment.

9

AP's "lost customer" theory relies on the claim that *third parties* are supposedly obtaining AP content from Meltwater rather than AP itself. In that context, there is no basis for simply assuming that such substitution has occurred or likely will.[14] The lack of any evidence of actual harm is unsurprising. As we have shown, Meltwater News is so different from an AP wire that a claim of substitution is implausible on its face. MSJ at 21-22; RSUF ¶¶ 31-34. AP offers no response. It gives no reason why anyone would perceive the services as equivalent and fails to rebut the evidence that users do not see them as such. In short, Meltwater has shown that there is no record of substitution, no reason to think such substitution likely, and ample evidence of an alternative explanation for any harm to AP's market. The fourth factor, like all the others, thus favors fair use.

## II.    AP CANNOT SALVAGE ITS SECONDARY INFRINGEMENT CLAIMS

### A.    There Is No Evidence That Meltwater Users Infringed Any Article In Suit

AP's secondary claims founder on the bedrock requirement that "to hold a defendant secondarily liable someone else must have directly infringed on the copyright holder's rights." *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 750 (S.D.N.Y. 2012); *see also* MSJ at 27. AP concedes that it "did not discover any instance in which a Meltwater user saved the *full text* of a Registered Article in a customer archive or redistributed the full text of a Registered Article in a Meltwater Newsletter or newsfeed ...." McNamara 56(d) Decl. ¶ 6; *see also* AP CSUF ¶¶ 60-61.

---

[14] The example of UC Irvine, which AP claims to find "inexplicabl[e]," shows why. AP Opp. at 29 n.20. The fact that AP erroneously identified UC Irvine as a lost customer, only to abandon that allegation once the actual facts came to light, underscores that AP needs more than the fact that the same organization at times subscribed to the AP wire and to Meltwater News to make a viable claim of market substitution. *See Arica Inst. v. Palmer*, 970 F.2d 1067, 1079 (2d Cir. 1992) (no market harm where defendant's use would have a "negligible effect" on the market for plaintiffs' work). AP tries to distinguish *Arica* on the grounds that the use at issue was a minor part of the defendant's work as a whole. AP Opp. at 27 n.18. But *Arica* is not so limited. The case stands for the proposition that a claim of market substitution cannot succeed without some real basis for concluding that the defendant's "use" of the plaintiff's original expression (not the defendant's work "as a whole" or some other independent factor) actually impaired the market for the plaintiff's work. *Arica*, 970 F.2d at 1078-79. But even if AP's characterization of *Arica* were correct, it would not provide a basis for distinguishing this case. Meltwater's use of any original expression in AP snippets *is* a minor component of the Meltwater News service, which indexes news content and delivers search results from over 162,000 news sources around the world. SUF ¶¶ 2, 7.

That admission alone entitles Meltwater to summary judgment. AP expressly told the Court that its "secondary infringement claims are based on the use of the *full text* of AP articles, whereas the direct liability claims are based on the use of *excerpts* from AP articles." Grealis Decl. Ex. 57. Yet it now acknowledges that there is no evidence that any such full text use ever occurred. AP offers several arguments for keeping its claims alive in the face of this failure of proof. None succeeds.

*First*, AP contends that the use of certain of the Articles in Suit by its own agent (Mintz) amounts to direct infringement. But, as we have explained, every instance in which Mintz copied, pasted, or stored the text of an AP article in connection with its trial account was expressly authorized by AP through its counsel. MSJ at 29-32. AP admits as much (AP CSUF ¶¶ 70-71), but argues that "the fact that Mintz was acting as an investigator for AP's counsel is not fatal to AP's claim." AP Opp. at 31-32. AP is wrong. No case has ever allowed a copyright owner to manufacture a secondary infringement claim, as AP has tried to do, merely by instructing an agent to copy its works using tools provided by the defendant. The cases that AP relies on address the very different situation where a defendant (or its actual users) engaged in direct infringement by making or distributing unauthorized copies of the plaintiff's material in response to a request from an investigator.[15] That is not what happened here. AP is not seeking to use Mintz's actions to expose acts of infringement committed by Meltwater or its customers. Instead, AP claims that Mintz's actions, *by themselves*, amounted to direct infringement. Nothing in the law allows AP to convert Mintz's authorized conduct into infringement for which Meltwater can be held secondarily liable.

---

[15] Thus, in *Olan Mills*, *Howell*, and *Thomas*, which involved claims of direct (not secondary) infringement, the investigator caused the defendant to copy or deliver unauthorized versions of the work, which was used to establish that the defendant itself (not the investigator) had infringed. *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345, 1348 (8th Cir. 1994); *Atl. Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 978 (D. Ariz. 2008); *Capitol Records, Inc. v. Thomas*, 579 F. Supp. 2d 1210 (D. Minn. 2008). In *Usenet* and *Lime Group*, the investigator obtained unauthorized copies of the plaintiff's work from other users of the defendant's service, which was used to show that *those users* (not the investigator) were engaged in direct infringement for which the defendant could be held secondarily liable. *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 150 (S.D.N.Y. 2009); *Arista Records LLC v. Lime Group LLC*, No. 06 Civ. 5936, 2011 WL 1641978 (KMW), at *7-8 (S.D.N.Y. Apr. 29, 2011). Mintz's actions in this case fit neither scenario.

Instead, this case is controlled by the Second Circuit's decision in *Matthew Bender & Co. v. West Publishing Co.*, 158 F.3d 693, 706 (2d Cir. 1998), which makes clear that where (as here) there is no evidence of direct infringement by the defendant's actual users, secondary liability cannot be established by an agent for the plaintiff engaging in the conduct that supposedly infringes.  MSJ at 30-32 (also relying on *Resnick v. Copyright Clearance Ctr., Inc.*, 422 F. Supp. 2d 252 (D. Mass. 2006)).[16]  AP claims in a footnote that *Matthew Bender* applies only where the allegedly infringing conduct performed by the plaintiff's agent was "far outside the normal use" of the defendant's product by "an ordinary user."  AP Opp. at 32 n.22.  AP has invented this limitation out of whole cloth.  The Second Circuit's ruling did not turn on the "normal use" of the product, but instead on the fact that the plaintiff "has failed to identify any primary infringer" other than the plaintiff's own lawyer.  *Matthew Bender*, 158 F.3d at 706.  The same is true here.  AP's attempted distinction also fails on its own terms:  the direct infringement that AP has "hypothesized" *is* outside the normal use of Meltwater's service.  That is confirmed by the fact that AP has failed to uncover a single Meltwater customer who used the full text of any AP article in an archive, newsletter, or newsfeed. AP Opp. at 33.  Mintz thus did not use Meltwater's tools as an "ordinary" user would.  To the contrary, the whole reason AP has been forced to rely on Mintz's use of full text Articles in Suit is because there is no evidence that any real customer did anything like that.

*Second*, ignoring its own representation to the Court limiting the secondary liability claims to the use of *full text* versions of the Articles in Suit, AP now changes tune and argues that its claims also are based on Meltwater customers' storing and emailing mere *snippets* of those articles.  AP Opp. at 32.  This about-face is improper:  AP cannot tell the Court and Meltwater that its claims are confined to full-text usage, and when that theory proves unsupported by the facts, salvage those

---

[16] AP ignores *Resnick*, even though that case rejected the very argument AP makes here.  As the court explained: "Where the person making the copies has been authorized by the copyright owner to use the copyrighted work, he has not infringed.  Thus, [the investigator's] work does not constitute direct infringement by a third party."  *Resnick*, 422 F. Supp. 2d at 258 (internal citation and quotation omitted).

claims based on a very different theory.  AP's argument also fails on the merits.  AP offers nothing

beyond its own say-so to support the idea that a customer infringes by storing or sharing a short

snippet of an AP article in a private archive folder or email.  As we have shown, such conduct is

likely fair use even if it had involved full articles (MSJ at 29), and that is all the more clear when

what is at issue is merely a user's private, personal storage or sharing of short snippets.  Even AP's

own former CEO described this practice as "perfectly permissible."  Grealis Decl. Ex. 69 (Curley

Dep. 82:21-84:17).  Such limited, non-commercial use is directly analogous to television users'

recording for later viewing programs that they "had been invited to witness in its entirety free of

charge."  *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 447-56 (1984).  The case

for fair use here is even stronger, given that the websites publishing the AP articles at issue often

invite readers to save or email those articles.  SUF ¶ 29; *e.g.*, Grealis Decl. Ex. 73 (¶ 4).  Thus,

notwithstanding AP's *ipse dixit*, the isolated instances in which users stored or emailed snippets of

the Articles in Suit did not infringe AP's copyrights, and thus provide no basis for holding Meltwater

secondarily liable.[17]

    *Third*, effectively acknowledging that it cannot prove its claims as to the Articles in Suit, AP

asks for further discovery into whether Meltwater customers might have made full-text use of *other*

---

[17] For example, AP cannot plausibly argue that the          REDACTED          is a direct infringer
merely because it stored in a private archive folder a Meltwater search result that included a short snippet of a
lengthy AP article about Wikileaks suspect Bradley Manning.  Schary Decl. ¶ 27(a).  That, and the other
private acts of storage AP references (*id.* ¶ 27), are paradigmatic fair uses.  But even if there were some merit
to AP's legal theory, its claims still would fail as to the overwhelming majority of the Articles in Suit.  AP
points to only *six* of the 33 Articles in Suit excerpts of which were stored in Meltwater archives or included in
newsletter emails.  Schary Decl. ¶¶ 27-28 (discussing Am Cplt., Exs. I, M, U, X, FF, and JJ).  The actual
number of Articles affected is five, as AP's claim about Exhibit I is misguided.  RSUF ¶ 72; *see also* Second
MTS at 6 & Ex. 1 (explaining that the newsletters attached to Exs. 17-20 to Ms. Schary's declaration are
inadmissible).  As to the remaining Articles in Suit, there is no evidence whatsoever of any storage or
sharing – even of snippets – by any Meltwater customer.  AP claims that Meltwater has produced "incomplete
evidence" of how Meltwater customers have used the Articles in Suit.  AP Opp. at 33.  That is not so.
Meltwater's investigation into the interactions between customers' use of the Meltwater system and the
Articles in Suit has been comprehensive.  *See* Saab SJ Decl. ¶¶ 37-43; McNamara Decl. Exs. 55-56; Grealis
Decl. Exs. 73-74.  Simply put, there is no further discovery to be had on that subject, and AP cannot avoid
summary judgment on this basis.  *See* Meltwater 56(d) Opp. at 5-11.

articles that AP has not registered with the Copyright Office. AP Opp. at 33. But this Court has already refused AP's bid for such discovery. That ruling was correct (*see* 17 U.S.C. § 411(a)), and AP's effort to relitigate this issue is meritless. *See* Meltwater 56(d) Opp. at 2-5. Because AP may not sue based on unregistered articles, the only works implicated by its secondary liability claims are the Articles in Suit. AP's inability to establish direct infringement of those works means that Meltwater is entitled to summary judgment on secondary infringement – not that AP is entitled to a new round of discovery about works that are not, and cannot be, part of this case.

### B.  AP Cannot Show Knowledge Or Financial Benefit

Meltwater has explained that the secondary infringement claims fail even apart from AP's inability to show direct infringement. MSJ at 32-34. AP offers nothing to change that.[18] AP's cursory argument that Meltwater had knowledge of infringement is wrong on the law and the facts. AP tries to evade the established rule that the knowledge required for contributory infringement must be that of "specific and identifiable infringement," claiming that is only the showing needed to overcome the DMCA safe harbors. AP Opp. at 34 n.24. That is incorrect. In *Wolk*, Judge Sweet granted summary judgment on contributory liability precisely because the plaintiffs could not establish that the defendant had such specific knowledge. *Wolk*, 840 F. Supp. 2d at 751.[19] So too here, AP points to not a shred of evidence from which a jury could find that Meltwater was aware of

---

[18] AP claims that evidence about Meltwater's promotional materials creates a material fact as to whether Meltwater can be held liable on an inducement theory. AP Opp. 30-31, 34. But "the inducement theory of course requires evidence of actual infringement" by users of the defendant's product. *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 940 (2005). AP cannot make that showing. Regardless, AP's evidence does not establish inducement. Telling customers about Meltwater's archive, newsletter, and newsfeed tools – which unquestionably have myriad non-infringing uses (RSUF ¶¶ 53-59) – is not "purposeful, culpable expression" affirmatively "taken to foster infringement." *Id.* at 937. The materials that AP relies on merely reflect "ordinary acts incident to product distribution," which is not enough to support an inducement claim. *Id.* Indeed, this case is like *Sony*, where "[a]lthough Sony's advertisements urged consumers to buy the VCR to 'record favorite shows' or 'build a library of recorded programs,' neither of these uses was necessarily infringing." *Id.* at 931 (quoting *Sony*, 464 U.S. at 424, 454-55, 459).

[19] AP also ignores cases like *Napster* and *Perfect 10*, which hold that knowledge of "specific" infringing material is required for a "computer system operator" to be held liable for contributory infringement. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021-22 (9th Cir. 2001); *Perfect 10 v. Amazon*, 508 F.3d at 1172.

specific instances in which its users allegedly infringed the Articles in Suit.  Indeed, AP admits that

no such evidence exists in the record (AP CSUF ¶ 73), and its request for more discovery on this

issue is entirely without merit.  *See* Meltwater 56(d) Opp. at 11-13.

Similarly misguided is AP's claim that a jury could find that Meltwater earned a direct

financial benefit from its users' alleged infringement of the Articles in Suit.  AP Opp. at 35.  It is not

enough for AP to show that Meltwater financially benefits from its service as a whole or from selling

access to neutral features like newsletter emails or newsfeeds.  Instead, AP must establish that

Meltwater has a direct financial interest *in the infringing activity* at issue.  MSJ at 33-34.  AP has not

even tried to make that showing.  As AP concedes, Meltwater never received a dime from Mintz.

AP CSUF ¶ 73.  In short, there is no evidence that Meltwater "profited directly from the alleged

infringement." *Dawes-Ordonez v. Realtor Ass'n of Greater Fort Lauderdale, Inc.*, No. 09-60335-

CIV, 2010 WL 1791754, at *3 (S.D. Fla. May 5, 2010).

## CONCLUSION

For these reasons, as well as those in Meltwater's opening brief and its opposition to AP's

own motion, Meltwater's motion for summary judgment should be granted.

Dated:  January 11, 2013

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:  _____

TONIA OUELLETTE KLAUSNER
BRIAN M. WILLEN
CATHERINE GREALIS
1301 Avenue of the Americas, 40th Floor
New York, New York  10019
Telephone:  (212) 497-7700

DAVID H. KRAMER (admitted *pro hac vice*)
650 Page Mill Road
Palo Alto, California 94304
Telephone:  (650) 493-9300

*Attorneys for the Defendants*

16