UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------

THE ASSOCIATED PRESS,

                    *Plaintiff,*

            v.                                No. 12-cv-1087 (DLC)

MELTWATER U.S. HOLDINGS, INC.,
MELTWATER NEWS U.S., INC. and
MELTWATER NEWS U.S. 1, INC.,

                    *Defendants.*

-------------------------------------------------------


**BRIEF OF *AMICI CURIAE* THE NEW YORK TIMES COMPANY,
ADVANCE PUBLICATIONS, INC., GANNETT CO., INC.,
THE McCLATCHY COMPANY, THE NEWSPAPER ASSOCIATION OF
AMERICA, AND BURRELLES*LUCE,* IN SUPPORT OF PLAINTIFF**


CHARLES S. SIMS
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036

Counsel for *Amici Curiae*


February 25, 2013

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES .............................................................................. ii

INTEREST OF AMICI CURIAE........................................................................1

ARGUMENT ......................................................................................................3

I.  MELTWATER IS NOT A SEARCH ENGINE ......................................3

II.  MELTWATER'S MAKING AND DISTRIBUTING COPIES OF THE AP'S COPYRIGHTED EXPRESSION TO THE AP'S EXISTING OR EXPECTED CUSTOMERS IS NOT TRANSFORMATIVE ........................7

    A.  Meltwater's Repackaging Is Not Transformative.............................7

    B.  Meltwater's Use Is Not For a Different Purpose ..............................8

III.  MELTWATER'S USE HARMS THE AP'S EXISTING AND POTENTIAL MARKETS ......................................................................14

IV.  THE EQUITABLE AND PUBLIC INTEREST CONSIDERATIONS THAT UNDERLIE THE FAIR USE DOCTRINE WEIGH HEAVILY IN FAVOR OF THE AP............................................................................17

V.  IMPLIED LICENSE CANNOT SUCCEED ON THE PRESENT RECORD AND IN ANY EVENT CANNOT DEFEAT PROSPECTIVE RELIEF................19

    A.  There Was No Implied License .......................................................19

    B.  The Implied License Defense Does Not Bar Injunctive or Other Forward-Looking Relief ..................................................................21

CONCLUSION..................................................................................................22

ADDENDUM ....................................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

*Agence Fr. Presse v. Morel,*
   2013 U.S. Dist. LEXIS 5636 (S.D.N.Y. 2013) (Nathan, J.) .....................................................5

*American Geographical Union v. Texaco Inc.,*
   60 F.3d 913 (2d Cir. 1994)..........................................................................................4, 15, 17

*Authors Guild v. Google, Inc.,*
   770 F.Supp.2d 666 (S.D.N.Y. 2011)........................................................................................21

*Basic Books, Inc v. Kinko's Graphics Corp.,*
   758 F.Supp. 1522 (S.D.N.Y. 1991) .........................................................................................15

*Bourne v. Walt Disney Co.,*
   68 F.3d 621 (2d Cir. 1995).......................................................................................................20

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994)...................................................................................................................7

*Feist Publ'ns, Inc. v. Rural Tele. Serv. Co., Inc.,*
   499 U.S. 340 ............................................................................................................................14

*Infinity Broad. Corp. v. Kirkwood,*
   150 F.3d 104 (2d Cir. 1998)................................................................................................9, 10

*Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.,*
   621 F.2d 57 (2d Cir. 1980).......................................................................................................18

*Keane Dealer Servs. v. Harts,*
   968 F. Supp. 944 (S.D.N.Y. 1997) ..........................................................................................22

*Kelly v. Arribasoft,*
   336 F.3d 811 (9th Cir. 2003) ............................................................................................10, 13

*L.A. Times v. Free Republic,*
   2000 U.S. Dist. LEXIS 5669 (C.D. Cal. Apr. 5, 2000) .....................................................11, 12

*Maxtone-Graham v. Burtchaell,*
   803 F.2d 1253 (2d Cir. 1986)...................................................................................................17

*N.Y. Times Co. v. Tasini,*
   533 U.S. 483 (2001).................................................................................................................18

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*,
    166 F.3d 65 (2d Cir. 1999)..................................................................8

*Parker v. Yahoo!, Inc.*,
    2008 U.S. Dist. LEXIS 74512 (E.D. Pa. Sept. 26, 2008) ......................................22

*Perfect 10 v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ................................................................13

*Princeton Univ. Press v. Michigan Document Serv., Inc.*,
    99 F.3d 1381 .................................................................................15

*ProCD, Inc. v. Zeidenberg*,
    86 F.3d 1447 (7th Cir. 1996) .................................................................21

*Psihoyos v. Pearson Educ., Inc.*,
    855 F. Supp. 2d 103 (S.D.N.Y. 2012).........................................................20

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharma., Inc.*,
    211 F.3d 21 (2d Cir. 2000)...................................................................19

*Sony BMG Music Entm't v. Tenenbaum*,
    672 F.Supp. 2d 217 (D. Mass. 2009) ........................................................21

*Stewart v. Abend*,
    495 U.S. 207 (1990)..........................................................................17

*Ulloa v. Universal Music and Video Distrib. Corp.*,
    303 F. Supp. 2d 409 (S.D.N.Y. 2004).........................................................20

*United States v. ASCAP*,
    599 F. Supp. 2d 415 (S.D.N.Y. 2009), *aff'd in part, vacated in part and
    remanded*................................................................................10, 11

*Video Pipeline, Inc. v. Buena Vista Home Entm't Inc.*,
    342 F.3d 191 (3d Cir. 2003), *cert. denied*, 540 U.S. 1178 (2004)...........................11

*Weinstein Co. v. Smokewood Entm't Group, LLC*,
    664 F.Supp. 2d 332 (S.D.N.Y. 2009).........................................................19

**STATUTES**

17 U.S.C. § 107.............................................................................14, 16

17 U.S.C. § 512(d)..........................................................................5, 6

## INTEREST OF AMICI CURIAE

The New York Times Company, Advance Publications, Inc., Gannett, Co., Inc., and The McClatchy Company are news organizations that each publishes, among other things, daily news reports in print and online carrying investigative, war, opinion, and other reporting, Some of the reporting is undertaken by employees and freelancers, and some is researched and written by reporters from other services, including The Associated Press. The Newspaper Association of America ("NAA") is the trade organization representing 2000 additional news organizations in the United States and Canada. *Amici* (including NAA's members) finance this reporting with revenues earned from subscribers, advertisers, and licensees in the belief that vigorous news reporting is essential to our nation and way of life. As James Madison understood, citizens in a democracy "must arm themselves with the power that knowledge gives. A popular government without popular knowledge or the means of acquiring it is but a prelude to a farce or a tragedy or perhaps both." Letter from James Madison to W.T. Barry (Aug. 4, 1822), *in* 9 THE WRITINGS OF JAMES MADISON, 103 (Gaillard Hunt ed.) (1910).

It takes no friend-of-the-court brief for the Court to know that the rise of the Internet has been highly disruptive to the nation's news organizations, as their readers and advertisers have migrated to the Web. In response, the nation's news organizations, including the *amici* on this brief, have at considerable expense developed their own Websites and digital businesses to carry their news reports. These digital businesses are supported by electronic advertising revenue, electronic subscription revenue, and licensing income from other publishers and users and aggregators. None of these revenue streams can be sustained if news organizations are unable to protect their news reports from the wholesale copying and redistribution by free-riders like Meltwater.

1

Aggregators who believe that the law permits their free-riding (or that it would be too costly for news organizations to establish otherwise through litigation) will simply continue their parasitical behavior to the continuing and increasing harm of the economic incentives copyright is supposed to provide. If the massive, systematic copying of expression engaged in by Meltwater is held to be fair use, the AP (and others) would lose not only the revenues that Meltwater and others of its ilk *should have been* paying, but also the revenue that other media monitoring services and aggregators *have been and are* paying for licenses, based on their correct understanding that the routine commercial copying of the amount of expression taken by Meltwater is not fair use. A holding of fair use here would evaporate those revenues in short order.

*Amici* also have an interest in the continued viability and vibrancy of The Associated Press, which they rely on to maximize the reporting that they can accomplish with their own resources. They (and their readers, and indeed, the nation at large) share an interest in AP's ability to report with its limited resources. Free-riding such as Meltwater engages in directly injures the AP by diminishing the licensing revenue that AP is able to earn from its news reporting. By contrast, a decision that Meltwater's systematic, wholesale, daily commercial copying and reselling of the AP's expression into AP's existing and expected markets is not fair use would not impair Meltwater's ability to serve its customers. It would simply obligate Meltwater to pay for the expressive content that is central to its business, just as it (presumably) pays for other costs (rent, power, insurance) without stealing them, or demanding – on the basis of some imagined public interest – an entitlement to use them without payment.

2

The non-publisher amicus on this brief is a media monitoring company, Burrelles-Luce, which has been an industry leader in licensing news content from the publishers going back to the advent of digital online delivery. BurellesLuce is one of Meltwater's competitors – albeit one that, unlike Meltwater, obtains licenses from the news organizations whose expression it copies and redistributes, and pays required license fees. Having undertaken to pay the licensing fees that Meltwater ignores, BurrellesLuce finds itself at a significant competitive disadvantage. BurrellesLuce expects and hopes the resolution of this dispute will eliminate that disadvantage and make the rules of the copyright road plain, while strengthening the economic health of AP and other news organizations on which it depends for the provision of its own services.

The AP's lawsuit is thus a fight in which *amici*, as well as all the nation's citizens, have a stake.

## ARGUMENT

### I.    MELTWATER IS NOT A SEARCH ENGINE

At the core of Meltwater's arguments is the contention that it should be considered a "search engine." The amicus brief for the Computer and Communications Industry Association ("CCIA"), of which Google is a key member, makes the same assertion. But Meltwater and CCIA never demonstrate why that is so, or why on these cross-motions it should even matter, and the point is mistaken in multiple respects.

First, the assertions that Meltwater is a search engine are just that: completely unsupported assertions, never cited to any authority. No judicial opinion is cited for the proposition that Meltwater is (or should be considered to be) a search engine. No authority is cited that categorizes as a "search engine" a closed-end, commercial content delivery business like Meltwater (whose value proposition is based on selling to its

3

paying customers, at a lower price, the very thing a copyright owner suing for infringement is already selling). Moreover, these assertions are not even supported by Meltwater's own web site. The various pages on its website describing its "news" business (reproduced in the Addendum below) contain no reference whatever to Meltwater being a search engine. Rather, Meltwater touts its "media monitoring service," explaining that it tracks a defined number of news websites and extracts articles for placement into a proprietary database consisting entirely of content copyrighted by genuine news organizations.

There were clipping services (the paper analogues to Meltwater) for decades, and they would not have been excused from buying multiple copies (which they did before photocopying machines) or paying license fees (which they did thereafter, to the Copyright Clearance Center)[1] had they uttered the phrase "search engine" as they collected checks from customers for re-distributing expression created by the news media. No company could undertake to sell consumers selected slices (less than all) of a cable company's channel package and call the process of winnowing out the unwanted channels a "search engine," or defend it as fair use. Nor can Meltwater sell selected slices of AP content (or the content of other news organizations) and immunize itself by calling its copying service a "search engine" or "fair use."

Second, and more fundamentally, nothing in the briefs indicates why classifying Meltwater as a "search engine" should affect the fair use analysis in any way whatever. Fair use depends on factual distinctions, not labels that cover them over. Meltwater's news service is so entirely different from classic search engines that any fair use assessment would have to take into account these extensive distinctions. Usual search

---

[1] *See American Geographical Union v. Texaco Inc.*, 60 F.3d 913, 929 n.16 - 930 (2d Cir. 1994).

4

engines (such as Google's) are available to the world on each user's screen, and can be

used by anyone to search the entire Internet for any purpose at no charge. By contrast,

Meltwater

- ➢ carefully limits those *to whom* it delivers content (its paying clients who have contracted for its services), and is specifically targeted to and used for only business purposes;
- ➢ sharply limits *what it searches* (news articles from a defined list of content providers), and uses that defined content on a regular, continuing, systematic basis, as opposed to the ad hoc searches undertaken through a search engine like Google;
- ➢ defines precisely and advantageously (to its own business) *what it delivers* (news articles or the large chunks thereof), as opposed to links to third party servers on which content resides;
- ➢ promises *to always deliver the headline and the lede of responsive articles*, along with additional content as well (depending on the client's order); and
- ➢ produces click-through rates that are very substantially lower than those produced by other aggregators, suggesting that Meltwater is fully superseding AP (and its licensees) as the source for AP content (and newspaper content generally).[2]

Third, the briefs of Meltwater and CCIA nowhere mention, much less grapple

with, the fact that Congress considered the extent (if any) to which search engines need

statutory protection, and provided only limited protection. *See* 17 U.S.C. § 512(d), which

has no application to this motion or in respect of the copying and distribution Meltwater

massively undertakes, but rather provides a safe harbor from monetary and injunctive

relief only for infringement "by reason of the provider referring or linking users to an

online location containing infringing material or infringing activity, by using information

location tools, including a directory, index, reference, pointer, or hypertext link" under

specified circumstances). *Cf. Agence Fr. Presse v. Morel*, 2013 U.S. Dist. LEXIS 5636,

---

[2] AP's brief reports that the average click-through rate on AP's Registered Articles on Meltwater is roughly 0.08% and the click-through rate for the entire Meltwater system in the UK was only 0.5%. Rule 56.1 Statement, ¶¶ 151-152. By contrast, industry news reports indicate that Google News users access individual news sites at much higher rates. *See, e.g.,* http://techcrunch.com/2010/01/19/outsell-google-news/.

at *49 (S.D.N.Y. 2013) (Nathan, J.) ("search engines" are "information location tools" under § 512(d)).

Meltwater cannot and does not claim the protection that Congress extended to search engines. Meltwater asserts no § 512(d) defense or counterclaim in its Answer or on this motion, and it should not be permitted to stretch fair use doctrine to create additional protection for itself that Congress chose not to provide. On these cross-motions (but not in its marketing materials, see the Addendum *infra*), Meltwater analogizes itself to a search engine, a theme picked up by its *amici*. But the salient differences between Meltwater and classic search engines make plain that the considerations that led Congress to provide in 17 U.S.C. § 512(d) a safe harbor for information location tools simply do not apply to businesses like Meltwater.

Unlike providers of "information location tools," which are typically available to the world-at-large to search the entire web and involve linking and referring, Meltwater's news monitoring services consists principally of copying and distributing the expression of real news organizations and publications on behalf of its own pre-arranged clients, for whom it searches sites that Meltwater has pre-selected or already archived. Meltwater promises its customers expression, not merely facts or links, including the most valuable expression news media create and market, namely headlines and their ledes. Its customers are not interested in merely the facts, but, as Meltwater's own marketing materials reflect, in the expression itself, so that they can gauge tone and resonance and detail. *See, e.g.,* Addendum at 1 ("providing users with foreign character search capability in 25 languages ensures thorough and in-depth results"); *id.* (Meltwater permits tracking of "keywords [and] phrases" and "advanced Boolean search capabilities . . . throughout

6

online publications"); *id.* at 4 ("Meltwater allows customers to assess "tone – evaluate if your coverage . . . is positive, negative or neutral").

Meltwater's creation of its own long-term archive, and its service of enabling its customers to make further copies of headlines, ledes, and additional content in-house (to their additional employees) and outside (to third parties), add further reason for not characterizing Meltwater as a "search engine." *See* Addendum at 5 (Meltwater enables tits customers to "upload[] articles at a click of a button" so as to "increase traffic to [the customer's] Web site and enhance brand exposure among targeted audiences").

AP is complaining on these cross-motions not of some physical object or some piece of software at all, but of the services Meltwater provides to its paying customers, in the course of which Meltwater itself is copying and distributing the copyrighted work of the AP and others. AP receives license revenue from Google News, but not from Meltwater, even though Meltwater knowingly and intentionally signs up corporate customers (most of whom presumably have been AP customers, directly or indirectly), who then pay Meltwater (at a lower cost, according to Meltwater's marketing materials)[3] for the same content that they would have obtained from AP or its members or licensees. Calling it a search engine makes no difference whatever.

## II. MELTWATER'S MAKING AND DISTRIBUTING COPIES OF THE AP'S COPYRIGHTED EXPRESSION TO THE AP'S EXISTING OR EXPECTED CUSTOMERS IS NOT TRANSFORMATIVE

### A. Meltwater's Repackaging Is Not Transformative

Meltwater's News Reports consist of exact copies of critical portions of AP news stories – the headlines, ledes, and article text. There is nothing transformative about Meltwater's repackaging of the AP's copyrighted content. *See Campbell v. Acuff-Rose*

---

[3] *See* Addendum at 6-9.

*Music, Inc.*, 510 U.S. 569, 588 (1994) ("[A] work composed primarily of an original, particularly its heart, with little added or changed, is more likely to be a merely superseding use, fulfilling demand for the original"); Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990) ("A quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the [transformative use] test").

Meltwater's arguments cannot be reconciled with the holding in *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65 (2d Cir. 1999), where the Second Circuit agreed with the district court that roughly translated articles (inaccurately called "abstracts" by the defendant) were not transformative. The defendant there gathered news articles from a variety of sources and sold rough translations of those articles to its customers. The conversion process, which involved selecting the article, translating it, and revising the translation to achieve a consistent style, took approximately thirty-six minutes per piece. Agreeing with the district court, the Second Circuit observed that these translations were "not in the least transformative." *Id.* at 72. Like the translations in *Nihon*, Meltwater's News Reports lack any transformative quality. Meltwater does not employ abstractors, but instead uses the AP's own expression, relying on technology to compile its reports automatically. This difference in technology does not aid Meltwater. Indeed, the elimination of the human component (and thus the potential for any stylistic or expressive changes) makes Meltwater's reports even less transformative than the translations in *Nihon*.

 B. <u>Meltwater's Use Is Not For a Different Purpose</u>

AP uses its original works to deliver the news; Meltwater uses the AP article excerpts for the same purpose. Notwithstanding the contention of amicus CCIA that

8

Meltwater uses the copyrighted works for a different purpose – saying that "AP's purpose is to *report* the news, while Meltwater's purpose is to help clients determine *how the news is reported*" – that clever phrasing effectively concedes that Meltwater is selling not facts but expression, and undermines Meltwater's fair use argument that the purpose of its use differs from AP's.

*Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104 (2d Cir. 1998), rejected a similar argument. The defendant there argued that its use – a telephonic service that enabled defendants' customers to listen to recordings of selected radio broadcasts – was transformative because its customers used the broadcasts for informative rather than entertainment purposes. The Second Circuit explained that "it [wa]s not clear that all of Kirkwood's target audience 'transforms' the broadcasts as he suggests. Talent scouts, who admittedly would not be listening in order to be entertained themselves, would nevertheless be listening for the entertainment value of the broadcasts rather than the factual content." *Id.* The original broadcast and the rebroadcast could be used for the same purpose. Accordingly, the court found a "total absence of transformativeness in [defendant's] acts of retransmission." *Id.* at 109. Moreover, the court stressed that it was the defendant's "own retransmission of the broadcasts, not the acts of his end-users, that [wa]s at issue [.]" *Infinity*, 150 F.3d at 108. Where "[a]ll [the defendant] d[id wa]s sell access to unaltered radio broadcasts," there could be no transformation. *Id.*

Here, as in *Infinity*, Meltwater is a purely commercial user whose business is re-selling pertinent news articles – including the expression, and not just the facts – to businesses who are interested in what the articles say and how they say it, with some added bells and whistles (analytical tools). Moreover, even if the court were to look to

the purpose of Meltwater's customers' use, and not to Meltwater's own purpose, Meltwater's clients can (and do) use the Meltwater News Reports for the same purpose as the AP's copyrighted works (and those of *amici* as well). Unlike search engines, a news aggregator "serves a similar function to a newspaper's website – to collect and organize news stories so that they can be read . . . ."[4] Meltwater acknowledged that at least some of its subscribers use articles in the Meltwater News Reports "to keep abreast of news developments," and that doing so is "a valid way to use the [Meltwater] system." McNamara Decl. ¶ 20. Meltwater's use supercedes the AP's use: it fulfills the demand for the AP's own content (*i.e.*, its expression). Because the two uses can and do serve the same purpose, the "different purpose" argument advanced by Meltwater and its *amici* should fail.

Meltwater's *amici* argue that *Infinity* is inapposite because it involved unshortened retransmissions and Meltwater does not reproduce entire AP articles. This attempt to distinguish *Infinity* overlooks a critical aspect of the court's reasoning and its decision – namely, that the original broadcasts and the retransmissions could both be used for the same purpose. Although a "difference in purpose is not quite the same thing as transfor- mation," in *Infinity* there was not even a difference in purpose. *Infinity*, 150 F.3d at 108.[5] The same is true here. Similarly, in *United States v. ASCAP*, 599 F. Supp. 2d 415, 424 (S.D.N.Y. 2009), *aff'd in part, vacated in part and remanded* (on other grounds), 627

---

[4] Kimberly Isbell, *The Rise of the News Aggregator: Legal Implications and Best Practices*, at 11 (Berkman Ctr. For Internet & Soc'y, Research Publication 2010); *see also* Keiyana Fordham, *Can Newspapers Be Saved? How Copyright Law Can Save Newspapers from the Challenges of New Media*, 20 Fordham Intell. Prop. Media & Ent. L.J. 939, 983 (2010) ("studies indicate that online readers may use this feature [automatic news aggregation] as a news source instead of a reference tool, which . . . create[s] a news reporting purpose").

[5] Indeed, the language that amicus CCIA quotes from *Kelly v. Arriba Soft Corp.* acknowledges as much: "the result was that people could use both types of transmission for the same purpose." 336 F.3d 811, 819 (9th Cir. 2003).

F.3d 64 (2d Cir. 2010), the infringing works consisted of shortened versions of the original works. Nevertheless, the court reached the same conclusion as the court in *Infinity*.

In *ASCAP*, AT&T Wireless argued that its ringtone and ringback previews were transformative, despite the absence of any expressive changes to the original work, because "the new work ha[d] an entirely different purpose and meaning." *ASCAP*, 599 F. Supp. 2d at 424. According to AT&T Wireless, the previews served the purpose of informing customers, which was different from the entertainment purpose of the original music. The court disagreed. Because AT&T Wireless did not demonstrate that "its customers use previews solely for informational purposes, and not also to assess the musical quality and entertainment value of the ringtones," there was no transformation. *Id.* at 427. *See,* to the same effect, *Video Pipeline, Inc. v. Buena Vista Home Entm't Inc.*, 342 F.3d 191, 200 (3d Cir. 2003) (rejecting defendant's "different purpose" argument and holding that the clip previews were not transformative due to the "the shared character and purpose of the clip previews and the trailers [so that the clips will likely serve as a substitute for the trailers] and the absence of creative ingenuity in the creation of the clips"), *cert. denied,* 540 U.S. 1178 (2004); *L.A. Times v. Free Republic*, 2000 U.S. Dist. LEXIS 5669, at *28 (C.D. Cal. Apr. 5, 2000) (holding that posting entire articles on "bulletin board" website for the purpose of encouraging responses and debate was not transformative because the articles "ultimately serve[d] the same purpose as that for which one would normally seek to obtain the original – to have it available for ready reference").

As in *ASCAP*, Meltwater News reports consist of shortened versions of the original works; they are "previews" or "pertinent passages" of the full news stories. The

shortening does not prevent Meltwater subscribers from using the reports for the same purpose as the originals – reading what the news media are writing about particular topics, persons, or businesses, to understand tone, atmospherics, and approach.

Meltwater and its *amici* rely heavily on *Bill Graham Archives*, 448 F.3d 605 (2d Cir. 2006), but that case is entirely distinguishable and does not support fair use here. The court in *Bill Graham Archives* was faced with a classic example of fair use – reproduction of copyrighted material to illustrate and give texture to a biographical work. The court began its analysis by emphasizing that *Illustrated Trip*, the work at issue, was "a biographical work documenting the 30-year history of the Grateful Dead." *Bill Graham Archives*, 448 F.3d at 609. The court explained that although "there are no categories of presumptively fair use . . . courts have frequently afforded fair use protection to the use of copyrighted material in biographies, recognizing such works as forms of historic scholarship, criticism, and comment that require incorporation of original source material for optimum treatment of their subjects." *Id.* (internal citations omitted). With that backdrop, the court stressed that the images in the biographical work served as "historical artifacts," *id.* at 610, a distinct purpose from the original artistic and promotional purpose of the images. Here, in contrast, the original AP articles and the Meltwater copies serve the same purpose – the delivery of news reporting, with expression intact so as to convey not just discrete facts but tone and tenor. Further, use in a biography or history is a one time occurrence, whereas Meltwater's copying from the AP is routine, systematic, daily, and a substitute for the AP articles themselves. *Bill Graham Archives* is thus inapposite.

Meltwater's and its *amici*'s reliance on *Perfect 10 v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), and *Kelly v. Arribasoft*, 336 F.3d 811 (9th Cir. 2003), is also

12

misplaced. Those cases concerned visual images which were delivered in degraded form unsuited for any use other than identifying the destination websites where useful images could be licensed and purchased. The entire basis for the Court's ruling was that the images displayed by search engines were *not* substitutes for the use of the originals, but rather served a distinct purpose, namely to lead the user to the "original." Here, Meltwater's use of the AP copyrighted content can and does serve as a substitute for the original AP articles, and more than 99% of the time Meltwater's customers never click-through to the underlying publication. Nor did the use in those cases present anything comparable to Meltwater's copying of the lede from every AP article copied.

Meltwater and its *amici* also err when they argue for fair use on the basis that Meltwater's clients are interested only in facts (which are not subject to copyright protection) and not AP's expression (which of course is). First, if it were true that Meltwater's clients are interested in only the facts– and it is not – then presumably Meltwater would convey only facts, not (as it does) unaltered, unparaphrased AP expression. But Meltwater's own marketing materials concede – indeed, they tout – that its customers want expression, not just facts. *See* Addendum at 4 ("With Meltwater News, users can examine . . . [t]one – evaluate if your coverage or media response is positive, negative or neutral); *id.* at 5 (touting the "Newsfeed," which "provides RSS feeds for employees, investors, suppliers, board members, journalists and the general public" and "highlight[s] positive coverage").

Second, the lesser protection accorded to factual materials derives from a policy desire to ensure that other publications can write about and analyze the news itself, without hamstringing them by copyright enforcement. *See Feist Publ'ns, Inc. v. Rural*

*Tele. Serv. Co., Inc.*, 499 U.S. 340, 349-50 (explaining that the inherent tension between the unprotected status of facts and protected status of fact compilations can be understood through the fact/expression dichotomy; "copyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work"). But here, Meltwater does not provide its own news reporting, and does nothing more than repackage and retransmit the AP's original content (with some added bells and whistles that the user may or may not even use, and which AP does or can offer in any event). Since the only reporting of news is AP's, and Meltwater does not need to use so much of the AP's expression on such a systematic basis in order to report the facts (if that was what it sought to do), the underlying policy reasons for affording lesser protection to factual works are wholly absent here.

## III. MELTWATER'S USE HARMS THE AP'S EXISTING AND POTENTIAL MARKETS

The contention of Meltwater and its amici that the fourth fair use factor does not weigh against Meltwater ignores the leading authorities on fourth factor market harm, which make plain that Meltwater's use is in fact a classic superseding use that aims to supplant AP's own existing and normal markets and its reasonable expectations.

The fourth fair use factor is the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Properly applied, the fourth factor requires a court to consider "whether unrestricted and widespread conduct of the sort engaged in by the defendant (whether in fact engaged in by the defendant or by others), would result in a substantially adverse impact on the potential market for, or value of, the plaintiff's present work." 4 MEVILLE B. NIMMER AND DAVID NIMMER, NIMMER ON COPYRIGHT, §13.05[A][4](2012); *see Princeton Univ. Press v. Michigan Document Serv.,*

*Inc.*, 99 F.3d 1381, 1386-1387 (to negate fair use, the plaintiff need only show that "if the challenged use should become widespread, it would adversely affect the potential market for the copyrighted work."); *Basic Books, Inc v. Kinko's Graphics Corp.*, 758 F.Supp. 1522, 1534 (S.D.N.Y. 1991) (same).

Additionally "neither copyright law nor copyright principle draws a line between markets entered and markets not entered." 2 PAUL GOLDSTEIN, GOLDSTEIN ON COPYRIGHT, §12.2.2.4 (3d ed. 2013). Thus courts have also examined the impact on traditional, reasonable or likely to be developed markets when examining and assessing a secondary use's effect upon the potential market for or value of the copyrighted work. *Texaco*, 60 F.3d at 930; *Princeton Univ. Press*, 99 F.3d at 1387 (explaining that where the copyright holder has an interest in exploiting a market, and especially when the copyright holder has successfully done so, potential licensing revenues should be included in the fair use analysis).

The summary judgment record reflects that the AP sells in precisely the same submarket that Meltwater tries to carve out as its own: the market for digitally delivered news reporting generally, and specifically, the market for media monitoring services. The AP has entered into licenses with entities that Meltwater has identified as competitors, including LexisNexis, Factiva, BurrellesLuce, and other entities that deliver news articles to subscribers based on subscriber-set criteria. *See* McNamara Decl. ¶ 5, Exs. 10-15; *id.* Ex. 1 at 77:23-78:12; Countercl. ¶ 3. The AP and some of its licensees have lost customers to Meltwater due to Meltwater's ability to offer AP content at reduced prices. ADD CITE. This loss of potential royalty and licensing revenues in the AP's main marketplace is precisely the type of harm that precludes a fair use defense.

15

As demonstrated by the record, the AP is already in the process of exploiting the market for digital excerpts of its content, and it will continue to further develop its reach in this market. Indeed, the AP has successfully negotiated licensing agreements for the very content that Meltwater is reselling. The AP has also entered into licensing agreements with several digital aggregators, digital portals, search engines, and mobile applications. Cross Decl. ¶ 40. For example, AP has licensing agreements with Cision, LexisNexis, and BurrellesLuce granting these companies general distribution rights for the use of its content. *See* AP 56.1 ¶ 256, 258, 262 (the agreement with Cision gives it the right to use AP content for its "press clipping service," and the LexisNexis licensing agreement permits it to "reproduce, display, [and] distribute...authorized use of AP materials) (internal quotations omitted).[6] The very text of the statutory fourth factor, as explained in both the Nimmer and Goldstein treatises, directs that copyright law reserves to owners not only their existing markets and customers but also "potential markets" (*see* 17 U.S.C. § 107; NIMMER § 13.05[A][4]). That rule forecloses Meltwater's attempt to separate its licenses of AP's work from those that the AP is exploiting and entitled to exploit. This is especially true because Meltwater is selling to individuals at the core of the market for newspaper content.

Because courts have consistently protected the copyright holder's right to exploit not only existing markets, but also ones that are "traditional, reasonable, or likely to be developed," *Texaco*, 60 F.3d at 930, and because Meltwater's copying and distribution, especially if it becomes even more widespread, will heavily damage, if not largely

---

[6] AP's expected license income is also harmed by Meltwater's facilitation for its customers of uses that the AP does not allow. *See* A.P. 56.1 ¶¶ 266-73 (restricting licensees from engaging in specific uses of AP content, largely related to archiving).

destroy, the licensing market that has developed in recent years, the fourth factor strongly

weighs in the copyright owner's favor.

## IV. THE EQUITABLE AND PUBLIC INTEREST CONSIDERATIONS THAT UNDERLIE THE FAIR USE DOCTRINE WEIGH HEAVILY IN FAVOR OF THE AP

The Supreme Court has repeatedly made clear that the four statutory fair use factors

are not the only considerations to be weighed.  Fair use is an "equitable rule of reason,"

whose "ultimate aim" is the stimulation of further expression and publication "for the

general public good."  *Texaco*, 60 F.3d at 940 (1994) (quoting *Fogerty v. Fantasy, Inc.*,

510 U.S. 517, 526-27 (1994) and *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151,

156 (1975)); *see also, e.g., Stewart v. Abend*, 495 U.S. 207, 236 (1990) (precluding rigid

application of the statutory factors and requiring consideration of the public interest in the

fair use analysis because fair use is an equitable rule of reason); *Maxtone-Graham v.

Burtchaell*, 803 F.2d 1253, 1258 (describing the "essential character" of the fair use

doctrine as "an equitable rule of reason") (2d Cir. 1986).  Indeed, in *Harper & Row*, the

Court rejected a news magazine's argument that the public interest in broad news

publication supported fair use, concluding that "the Framers intended copyright itself to

be the engine of free expression.  By establishing a marketable right to the use of one's

expression, copyright supplies the economic incentive to create and disseminate ideas."

471 U.S. at 559.

As in *Harper & Row*, the case here strongly implicates public interest considerations,

and those considerations strongly weigh against – not in favor of – excusing the

defendant's copying as fair use.  The economic incentives of those in (or considering

being in) the news (or reporting) business are considerably less strong than they had

been, in large part because of the copying by freeriders, including Meltwater, who defend

17

their uses as "fair" in the face of an alarming shrinkage of newsgathering resources.
"[N]ot all effects of even beneficial technologies are socially desirable when counter-
balanced by the negative impact they may have on the rights of other parties, including
copyright owners." Keiyana Fordham, *Can Newspapers Be Saved?  How Copyright Law
Can Save Newspapers from the Challenges of New Media*, 20 Fordham Intell. Prop.
Media & Ent. L.J. 939, 983-4 (2010) (citing Raymond T. Nimmer, Content Protection
and Copyright, 984 PLI/Pat 81, 87 (2009) (discussing *N.Y. Times Co. v. Tasini*, 533 U.S.
483 (2001))); *see also Iowa State Univ. Research Found., Inc. v. Am. Broad. Cos.*, 621
F.2d 57, 61 (2d Cir. 1980) ("The fair use doctrine is not a license for corporate theft,
empowering a court to ignore a copyright whenever it determines the underlying work
contains material of possible public importance.").  The benefits which Meltwater and its
amici claim justify its fair use defense must be weighed against the detriment to the rights
of other parties, and the impact on copyright incentives generally.  *Harper & Row, supra.*

Bearing in mind that "the ultimate aim is, by this incentive, to stimulate [the creation
of useful works] for the general public good," *Harper & Row*, 471 U.S. at 558 (quoting
*Twentieth Century Music Corp.*, 422 U.S. at 156), it is patently clear that it is the AP –
not Meltwater, which engages in no newsgathering whatever – that serves "the general
public good" and therefore needs to be incentivized and not have its revenues and
licensing revenues imperiled.  Any other conclusion would threaten the AP's ability to
continue serving the general public good as it has for more than a century, in just the way
Madison anticipated.

Nor is there force to the contention that enforcing the AP's copyright will stifle
technological innovation.  Many other news aggregators, including the Huffington Post,

LexisNexis, Factiva, Cision and BurrellesLuce, are able to use the same type of "innovative" technology that Meltwater uses without violating copyright law, by taking licenses from AP and other news organizations whose expression they copy and resell. Both NewsRight and the Copyright Clearance Center, which was discussed at some length in *Texaco* as a viable licensing mechanism, offers modern on-line licensing.[7] The difference between Meltwater and these other aggregators lies simply in Meltwater's refusal to pay for copyrighted content, as well as the extent and comprehensiveness of its copying. There is no evidence that requiring Meltwater to pay a licensing fee, or stop using the AP's content, would have any impact on technological innovation.

## V. IMPLIED LICENSE CANNOT SUCCEED ON THE PRESENT RECORD AND IN ANY EVENT CANNOT DEFEAT PROSPECTIVE RELIEF

### A.    There Was No Implied License

The Second Circuit has cautioned that implied licenses are limited to "narrow circumstances," *SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharma., Inc.*, 211 F.3d 21, 25 (2d Cir. 2000) (internal quotations omitted), and should be found "only when a copyright owner creates a work at the request of the licensee and with the intention that the licensee exploit it." *Weinstein Co. v. Smokewood Entm't Group, LLC*, 664 F.Supp. 2d 332, 334 (S.D.N.Y. 2009). It is Meltwater's burden to prove the existence of an implied license. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).

Some courts have "relaxed" the traditional requirements of the implied license test. *See Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 121 (S.D.N.Y. 2012) (discussing the tests applied by various courts). These courts tend to focus on the plaintiff's

---

[7]  *See*, for example, http://www.newsright.com/Products (licenses for AP and other content, plus analytical tools, available from NewsRight); http://www.copyright.com/search.do?operation=detail&item=149193374 &detailType=advancedDetail (AP content available for CCC licensing).

knowledge of, and acquiescence to, a defendant's use. *Id.* But, "whichever test is applied, the question comes down to whether there was a 'meeting of the minds' between the parties to permit the parties to permit the particular usage at issue." *Id.* at 124 (quoting *Ulloa v. Universal Music and Video Distrib. Corp.*, 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004)). This means that regardless of the particular version of the test the court applies, Meltwater "must prove that there was a meeting of the minds" in order to demonstrate the existence of an implied license. *Ulloa*, 303 F. Supp. 2d at 416. Given the record in this case, Meltwater cannot meet this burden. The AP prominently displays its copyright notices, and the AP's terms of service expressly prohibit commercial use of AP content posted on member websites. Meltwater selects the particular news sources to include its database, *see* A.P. Reply at 10 n.14. Having been sued in various jurisdictions, including the U.K., Meltwater's executives knew that the AP and other principal news organizations presented content with restrictive terms of service, but it deliberately chose to ignore the terms of service. There is no basis for finding a meeting of the minds of the two parties.

In addition, the court should reject Meltwater's attempt to turn the narrow doctrine of implied use into a mandatory opt-out scheme. Broadening the doctrine in this way would require a complete departure from the most basic of copyright principles, which affords no license absent permission from the owner. *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1454 (7th Cir. 1996) ("Copyright law forbids duplication, public performance, and so on, unless the person wishing to copy or perform the work gets permission; silence means a ban on copying"); *Authors Guild v. Google, Inc.*, 770 F.Supp.2d 666 (S.D.N.Y. 2011) ("[I]t is incongruous with the purpose of the copyright laws to place the onus on

copyright owners to come forward to protect their rights[.]"); GOLDSTEIN at §7.0.1

("Copyright law's exclusive rights, including the authorization right, entitle a copyright

owner to refuse to license use of its work for any reason ..."); GOLDSTEIN at §7.0.1

("[T]he protection accorded literary property would be of little value if . . . insulation

from payment of damages could be secured by a publisher merely refraining from

making inquiry" (citing *Acosta v. Brown*, 146 F.2d 408 (2d Cir. 1944), *cert denied*, 325

U.S. 862 (1945)).

Nothing enacted by Congress deprives content owners of their exclusive rights when

they decline to insert robot.txt notices. "The mere act of producing and releasing artistic

works where there is a known risk of piracy cannot amount to a deliberate waiver of

copyright." *Sony BMG Music Entm't v. Tenenbaum*, 672 F.Supp. 2d 217, 233-4 (D.

Mass. 2009) (rejecting defendant's assertion of plaintiff's acquiescence to copyright

infringement). This especially holds true when the content appears on sites that are

controlled by others, as is the case here, depriving the copyright owner of the practical

ability to insert a robot.txt instruction in order to opt out.

B.   The Implied License Defense Does Not Bar Injunctive or Other Forward-
     Looking Relief

Even where implied license is a defense to a damages action, a nonexclusive implied

license can be revoked. *Parker v. Yahoo!, Inc.*, 2008 U.S. Dist. LEXIS 74512, at *16

(E.D. Pa. Sept. 26, 2008) ("a nonexclusive implied license can be revoked where no

consideration has been given for the license."); NIMMER at § 10.02[B][5] ("It remains true

that nonexclusive licenses are revocable absent consideration."). When an implied

license is revocable, "the institution of [a] lawsuit . . . constitute[s] revocation." *Keane*

*Dealer Servs. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997); *see also Parker*, 2008.

U.S. Dist. LEXIS 74512, at *16 (explaining that "initiation of a lawsuit itself may constitute revocation of an implied license if there was no consideration for the license."). Here, AP's suit made it abundantly clear that AP objects to Meltwater's conduct and revoked whatever implied license Meltwater may have imagined it had. Even if the court were to find that an implied license existed, that would not bar injunctive relief or relief for infringement occurring after the filing of this lawsuit on February 14, 2012.

## CONCLUSION

*Amici* themselves rely extensively on fair use, and note that there is nothing *inherently* infringing about news aggregation: news aggregators differ in various respects, including (among others) the extent of the taking of expression, the amount of original material added, the human effort expended, whether there is a charge for the service, and the markets served. But it is clearly infringing when it amounts, as Meltwater's business does, to the systematic, daily unlicensed copying of textual expression for sale in the same markets as those that are, or are likely to be, exploited by the copyright owner. For all the foregoing reasons, *amici* respectfully urge this court to grant the AP's motion for summary judgment, and to deny Meltwater's cross-motion.

Respectfully submitted,

Charles S. Sims
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
Counsel for *amici curiae*

February 25, 2013

22

**<u>ADDENDUM</u>**

customer login    🇬🇧 english







Meltwater **BUZZ**

**Meltwater NEWS**
  About Meltwater NEWS
  media monitoring
  Product Detail
  Client Testimonials
  Client Quotes

Meltwater **PRESS**

Meltwater **REACH**

Meltwater **DRIVE**

Meltwater **TALENT**

home » products » meltwater news

Follow us:

# meltwater news

Recommend 121

Meltwater News is more than a traditional media monitoring service, combining the industry's broadest search capabilities, exclusive analytical tools and a consultative relationship with its clients. Meltwater News delivers the business critical information that executives in organizations worldwide require to gain, and maintain, their competitive edge.

With Meltwater News' expansive international coverage and robust search capabilities, users can find the information they need, when they need it, via an easy-to-use, Web-based interface. Meltwater News' interactive analytical capabilities enable users to get even more value from their media mentions by evaluating trends, mapping press activity, identifying target markets and measuring the ROI of marketing and public relations campaigns.

## Product Overview

Play slideshow



- Track keywords, phrases, and topics in over 192,000 sources from over 190 countries and 100 languages, monitored consistently throughout the day
- Use advanced Boolean search capabilities to search unlimited keywords throughout online publications globally
- Receive daily reports at the timing and frequency of your choosing, collated into easily digested categories

## Contact us about NEWS

✉

## customer login

user name

password

☐ I'm still on the old platform
submit ▸





- Leading global online media monitoring solution
- Monitor over 162,000 online publications
- Analysis, Newsfeed, and Newsletter capabilities
- Intuitive and easy-to-use platform
- Easily scaled and tailored to your organization
- Unlimited consultation from Meltwater for lifetime of subscription

Privacy Policy | Copyright | Sitemap
© 2013 Meltwater Group. All Rights Reserved.
Meltwater and the stylized logo are among the trademarks and/or registered trademarks of Meltwater Group in the United States and other countries.

**Addendum 1 of 9**

customer login   english







Meltwater BUZZ

Meltwater NEWS

   About Meltwater
   NEWS

   media monitoring

   Product Detail

   Client Testimonials

   Client Quotes

Meltwater PRESS

Meltwater REACH

Meltwater DRIVE

Meltwater TALENT

home > products > meltwater news > about meltwater news media monitoring software

Follow us:



# meltwater
## news

## About Meltwater News Media Monitoring Software

Meltwater News is a pioneer in real-time, online media monitoring, developing its Web-based news search platforms as early as 2001. Today Meltwater News is one of the largest online media monitoring providers, with more than 18,000 customers worldwide.

*Meltwater News is the leader in online media monitoring for several reasons:*

- **Ease of Use** – Meltwater News offers an intuitive Web-based interface that is accessible via any Internet-enabled computer or mobile device.
- **Expansive International Coverage** – Today Meltwater News delivers information from more than 162,000 global news sources in 190 countries and 100 languages, with translation capabilities.
- **Real Time Information** – Meltwater News continuously tracks news sources, updating its database continuously throughout the day so searches return fresh, relevant content.
- **Consultative Approach** – The Meltwater News team works closely with each client to strategically turn online news coverage into actionable business intelligence.
- **Scalable** – Meltwater News' platform makes it easy to add users or change searches with a few simple keystrokes. Accounts can be tailored not only to an organization's needs, but also to individual users in different divisions.
- **Robust Search Capabilities** – Meltwater News enables users to go beyond the basic keyword search, employing sophisticated Boolean logic to generate precisely targeted results.
- **Interactive Analysis** – With Meltwater News' analytical capabilities, users can visualize the news, creating graphs and charts to determine trends, map press activity and identify target markets.
- **Seamless Distribution** – Meltwater News allows users to automatically filter specific news results to different individuals; establish newsfeeds for an intranet, a Web site or delivery via email; and create customized newsletters.

Contact us about NEWS

## customer login

user name

password

☐ I'm still on the old platform

submit



- Leading global online media monitoring solution
- Monitor over 162,000 online publications
- Analysis, Newsfeed, and Newsletter capabilities
- Intuitive and easy to use platform
- Easily scaled and tailored to your organization
- Unlimited consultation from Meltwater for lifetime of subscription

Privacy Policy | Copyright | Sitemap
© 2013 Meltwater Group. All Rights Reserved.
Meltwater and the stylized logo are among the trademarks and/or registered trademarks of Meltwater Group in the United States and other countries.

**Addendum 2 of 9**



customer login    english

   

Meltwater BUZZ

Meltwater NEWS

   About Meltwater NEWS

   media monitoring

   Product Detail

   Client Testimonials

   Client Quotes

Meltwater PRESS

Meltwater REACH

Meltwater DRIVE

Meltwater TALENT

home > products > meltwater news > meltwater news media monitoring and analytical tools

Follow us:

# meltwater
## news

## Meltwater News Media Monitoring and Analytical Tools

Technology is radically transforming the media monitoring market. Gone are the days of physical newspaper clippings, which were costly, took too much time to manually sort and often were last week's news by the time they arrived.

In a global marketplace—where 24-hour news cycles and exclusive online content are vital for day-to-day business—search technology is giving companies the power to find exactly the information they need, when they need it.

Online media monitoring offers a number of benefits to any organization, regardless of size. With the flexibility of online media monitoring, everyone—from the CEO to a junior PR staffer, from the executive vice president of sales to the head of R&D—can quickly and easily stay abreast of the latest trends, get an insight on what competitors are doing and track what's being said about their business. Online media monitoring also helps organizations measure their media coverage to evaluate the success of their marketing and public relations programs and ensure they are receiving the best return on their investment.

Contact us about NEWS 

customer login

user name

password

I'm still on the old platform

submit ▸



- Leading global online media monitoring solution
- Monitor over 162,000 online publications
- Analysis, Newsfeed, and Newsletter capabilities
- Intuitive and easy to use platform
- Easily scaled and tailored to your organization
- Unlimited consultation from Meltwater for lifetime of subscription

Privacy Policy  |  Copyright  |  Sitemap
© 2013 Meltwater Group. All Rights Reserved.
Meltwater and the stylized logo are among the trademarks and/or registered trademarks of Meltwater Group in the United States and other countries.

**Addendum 3 of 9**

customer login   english

    

**Meltwater BUZZ**

**Meltwater NEWS**
  About Meltwater NEWS
  media monitoring
  **Product Detail**
  Client Testimonials
  Client Quotes

**Meltwater PRESS**

**Meltwater REACH**

**Meltwater DRIVE**

**Meltwater TALENT**

home > products > meltwater news > meltwater news media monitoring product details

Follow us:

# meltwater news

## Meltwater News Media Monitoring Product Details

Meltwater News' online media monitoring service is comprised of four key components, which enable users to securely access, analyze and distribute customized search results from any Internet-enabled computer or mobile device.

### Global Media Monitoring

Meltwater News delivers relevant, real-time search results with the industry's most robust online media monitoring database.

- Tracks more than 180,000 global news sources in 190 countries and 100 languages
- News sources include major news outlets, trade publications, local and regional journals, weekly newspapers, tenders, influential blogs, as well as TV and radio transcripts
- Strong international focus, providing users with foreign character search capability in 25 languages ensures thorough and in-depth results
- Instant translation to and from English and 15 other languages
- Easy-to-use interface enables users to quickly build Boolean searches to receive pertinent and critical information while filtering out irrelevant noise

### Analytics

Meltwater News offers both quantitative and qualitative analytical capabilities, delivering statistical analysis across diverse parameters, from outlet type to geographical regions. With Meltwater News, users can examine:

- Coverage – quantify and contextualize the amount of coverage your organization receives during a specified time period to evaluate the success and measure ROI of marketing and PR campaigns
- Product & Brand – analyze how products are performing and your brand is resonating with its intended audience by measuring coverage in the media
- Prominence – more granular analysis of stories enables users to determine the prominence of their brands and products within a single story, and discern the business value behind its mention
- Resonance – discover how your message is traveling across various media outlets, both regionally and globally. By doing so, you can measure whether your message is reaching intended targets, and identify key trends to gain control of how your message is delivered in the media
- Tone – evaluate if your coverage or media response is positive, negative or neutral

### Contact us about NEWS

### customer login

user name

password

I'm still on the old platform

submit



- Leading global online media monitoring solution
- Monitor over 162,000 online publications
- Analysis, Newsfeed, and Newsletter capabilities
- Intuitive and easy to use platform
- Easily scaled and tailored to your organization
- Unlimited consultation from Meltwater for lifetime of subscription

**Addendum 4 of 9**

Meltwater and the stylized logo are among the trademarks and/or registered trademarks of Meltwater Group in the United States and other countries.

- Exposure – Meltwater's integrated viewership data enables users to get an in-depth look into the quality of exposure and the online audience numbers their coverage receives
- Topic and Trend – identify changes and developments in an industry, as well as new sources, to implement more effective communications strategies and campaigns
- Competition – analyze competitors to identify their strengths and weaknesses, and gain a better understanding how they stack up against other brands and products across the globe

## Newsfeed

Meltwater News enables customers to build customized newsrooms and newsfeeds that.

- Increase traffic to Web site and enhance brand exposure among targeted audiences
- Deliver information to intranets for local or global internal communications
- Highlight positive coverage from press releases and consumer-generated content
- Manage website content and uploads articles at a click of a button
- Provide RSS feeds for employees, investors, suppliers, board members, journalists and the general public

## Newsletter

Meltwater News offers a newsletter tool for building customized, corporate-branded newsletters designed to keep executives, employees, partners and investors updated on relevant news.

Meltwater News is mindful of all copyright laws and regulations, making sure that all reports produced using our solutions adhere to these standards.

customer login   english







Meltwater **BUZZ**

Meltwater **NEWS**

   About Meltwater NLWS

   media monitoring

   Product Detail

   Client Testimonials

   **Client Quotes**

Meltwater **PRESS**

Meltwater **REACH**

Meltwater **DRIVE**

Meltwater **TALENT**

home > products > meltwater news > quotes from clients using meltwater news

Follow us:

## meltwater news

# Quotes From Clients Using Meltwater News



**6th World Water Forum**
"Meltwater News is a very high-performing tool, which, combined with a great quality of services and consultants, has allowed us to complete our communication strategy on the Internet."

**Alba Glass & Claudine Chilinski**
Webmaster & Marketing & Communication PR Director



**Advent**
"Advent uses Meltwater News as a source of breaking insurance news to help keep track of emerging risks to our business. The newsfeed also acts as a strong draw to our website and since its introduction we have found the traffic levels have been running well above our expectations. Overall the Meltwater suite of products has proved valuable to our organisation."

**Neil Ewing**
Company Secretary



**Airtran Airways**
"Before using Meltwater News, we were just checking main news Web sites, subscribed for breaking news alerts, and relied on our PR agency to feed information to us. It was not real time and didn't cover our competitors. Now we receive Meltwater News clips to not only monitor what is happening in the news regarding our company, but also our competitors and suppliers. It is the only way we can monitor the news about our company and industry effectively and conclusively."

**Judy Graham-Weaver**
Manager of Public Relations



**Ariba**
"Beyond just a clip service, Meltwater News is a strategic tool that allows us to track and manage our messaging on a global scale and adjust our communications strategy as needed to ensure that we achieve our objectives . "

**Karen Master**
Senior Director , Corporate Communications



**AVEVA**
"We use Meltwater News to report on our online press activity They have met our requirement to make this process easier. Their on-going flexible support has meant we have been able to customise the service to meet our global needs and they

Contact us about NEWS

customer login

user name

password

I'm still on the old platform

submit



- Leading global online media monitoring solution
- Monitor over 162,000 online publications
- Analysis, Newsfeed, and Newsletter capabilities
- Intuitive and easy-to use platform
- Easily scaled and tailored to your organization
- Unlimited consultation from Meltwater for lifetime of subscription

Meltwater and the stylized logo are among the trademarks and/or registered trademarks of Meltwater Group in the United States and other countries

have provided resolutions when we have raised any issues. We find them very accessible and always willing to listen."

**Kate Magill**
Communications Manager



**BloodSource**

"Meltwater News allows us to know what is being said about BloodSource and what is happening within our industry, with our customers, our donors and our competitors – everyday, wherever we have interests. The delivery of service by Meltwater News is consistently excellent, personal and tailored to our changing needs. Quite simply – you just won't find better."

**Leslie Botos**
Vice President, Public Affairs



**BravoFly Group**

"Meltwater News is the most reliable and trustworthy instrument we use to gauge what is being said about us over the Internet. It provides us a prompt and attentive overview on articles dealing with our sector & brands. We can easily set words, and sources we want to be monitored and, when needed, our client representative is always ready to help. This service is extremely important for an Internet company like BravoFly."

**Simona Rigamonti**
Press Office



**CARE**

"Meltwater's media monitoring is case-sensitive, which is critical for an organization such as ours. And the easy-to-search journalist database allows us to find out quickly who is reporting on the issues that are most important to us."

**Brian Feagans**
Media Officer, CARE

 **Child Growth Foundation**

"The value of Meltwater News to our organization can't be quantified. It is priceless in terms of the ability it gives us to be an authority on child growth disorders and maintain our high profile in the media. Being without the service would be like losing an arm. "

**Tam Fry**
Honorary Chairman



**Communication Workers Union**

"Meltwater News is an important tool for us in terms of staying abreast of national and regional news that is relevant to the CWU. Detailed analytics from Meltwater also show how much coverage our media campaigns generate. This type of information is invaluable, as it means we can make better informed decisions when forward planning."

**Sian Jones**
Acting Head of Communications Communications Workers Union



**Council of Academic Hospitals of Ontario**

"What sets Meltwater apart is its customer service – the team is approachable and they understand our needs. Meltwater News allows us to monitor stories that are relevant in a cost-effective and real-time way. It is crucial to our business that we are up-to-date and informed in our respective disciplines both nationally and internationally."

**Amanda McWhirter**
Director, Communications and Public Affairs



**Cryo-Save Group N.V.**

"We experience Meltwater as a young and dynamic company that provides a professional and personalized service. As the leading international family stem cell bank it is crucial for (top) management to be the first to read critical information on the



get on a daily basis. We love the flexibility it gives us in terms of being able to change search terms and the close working relationship we have with the Meltwater team in Gothenburg.'

**Julia Vasilis**
Communications Manager



**Maclay Murray & Spens LLP**

"We use Meltwater News to track our clients in the press and to ensure we are abreast of the challenges and developments they face in their markets and industries. As such it is a key element in support of the client account process we run. The elegance of the alerts system and the intuitive interface makes it easy to use and the support we have received from the team at Meltwater has been excellent."

**David Sanders**
Director of Marketing



**Mears Group Market Analysis**

"Our Account Manager from Meltwater News provides an outstanding service - always ready to help answer the difficult questions."

**Stephen Walkin**



**Medela**

"With the help of Meltwater News, we've been able to cut through the noise and discover more about the things that really matter to our brand – what's being said, what our competitors are saying and where we stand. It has quickly become a very powerful tool for us "

**Veronika Studer-Bärlocher**
International Communications Manager



**Merlin**

"For us, Meltwater News is an easy-to-use media monitoring tool that helps to keep track of relevant news - national and international. It provides a wealth of information, so we're confident that we're up to date on all of the important stories The information we get back is precise and helps us with our planning."

**Louise Halfpenny**
Media Manager



**Metro Toronto Convention**

"The Meltwater team offers high levels of customer service. Sometimes, I might ask them to help me find a specific story or to set the parameters for a search, and it is clear they are prepared to go the extra mile to help me."

**Christine Tsa**
Marketing Manager

**Octopus Communications**

"For us, Meltwater represents the complete package. We're able to present definitive results back to our clients thanks to the comprehensive news monitoring services, while at the same time keeping our finger on the pulse of what's going on in the social space. At the end of the day, it helps us do more for our clients, and that's invaluable."

**Jen Andersson**
Account Manager

OSLO HANDELSKAMMER
Oslo Chamber of Commerce

**Oslo Chamber of Commerce**

"News and information travels so fast these days, it is almost impossible to keep track of it unless you subscribe to a specialist service like Meltwater News. With Meltwater I can follow the latest news about our key accounts and stay abreast of the latest business trends. This is all vital for me and, ultimately, means we can be proactive in the advice and service we offer. What's more, the service is not that expensive and is something most companies could afford. "

**Lars-Kåre Legernes**
Managing Director

 RiceMason

**RiceMason PR**

"We run the media programmes for several international medical conferences, for which the coverage can be enormous. The Meltwater News newsletter helps us collate it properly and send it in a useable form to our clients and the speakers who have been the subjects of our press releases. We'd particularly like to mention the help we have had from our account managers, who have been invaluable in guiding us through the intricacies of using the Meltwater system."

*Mary Rice and Emma Mason*

**SIEMENS**

**Financial Services**

**Siemens Financial Services**

"Whilst looking for a way to enable our colleagues to access business relevant news via the Siemens intranet, we came across Meltwater News. Their combination of quality, reach, and cost efficiency was very attractive. Additionally, Meltwaters quick, easy-to-use and creative consultancy on all kinds of technical matters made things very efficient for the team."

**Diana Schauer**
Strategic Development, Communications

 sportscotland
the national agency for sport

**SportScotland**

"I had been aware of Meltwater and the services they provide for some time before eventually taking the opportunity to work with them following my appointment to sportscotland. Following an initial discussion in 2009 we agreed a partnership for a two year period that would provide us with an online clippings service which was a departure from our previous practice of receiving hard copy clippings. As well as providing a more streamlined and efficient service we managed to reduce costs and benefit from the associated tools on offer from Meltwater News that allowed us to evaluate media coverage. Throughout the period of the partnership the team at Meltwater have been supportive as we have refined the service to meet our needs culminating in our decision recently to agree to additional services that will include media distribution and database management and access to their significant list of journalistic contacts. The services provided have added a new dimension to the work of the media team inside sportscotland which includes the ability to enhance media activity reports for internal use and inform media strategy based on the reach of our media activity."

**Alan Miller**
Communications Manager

The Christie **NHS**
NHS Foundation Trust

**The Christie NHS Foundation Trust**

"Meltwater News helps us monitor news reports where The Christie is mentioned in the local, regional, national and international media. It helps us compare ourselves with other organisations and compile graphs for analysis. Meltwater is an important daily resource for our department and our work."

**Maria Jackson**
Communications Department

△ TÜVRheinland®

**TÜV Rheinland**

"Meltwater News provides us with an all in-one service for our global news monitoring needs. It gives us timely access to a range of information that is of vital importance to both our company and our industry."

**Herr Rolf Vesenmaia**
Press Officer

**VERIVOX**
the best of choices

**Verivox**

"For us, Meltwater News' power lies in the fact that we're able to use it for so many different things. It helps us keep up to date with the market, to provide visitors with the information that helps them to make choices, to monitor our competitors. It makes a real difference to how we work."