```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
THE ASSOCIATED PRESS,                  :
                     Plaintiff,        :
                                       :     12 Civ. 1087 (DLC)
          -v-                          :
                                       :     OPINION AND ORDER
MELTWATER U.S. HOLDINGS, INC.;         :
MELTWATER NEWS U.S., INC.; and         :
MELTWATER NEWS U.S. 1, INC.,           :
                                       :
                     Defendants.       :
                                       :
-------------------------------------- X
```

Appearances:

For the Plaintiff:

Elizabeth McNamara
Alison Brooke Schary
Colin James Peng-Sue
Linda Jane Steinman
Davis Wright Tremaine LLP
1633 Broadway
New York, NY 10019

For the Defendants:

David Kramer
Brian Willen
Catherine Grealis
Tonia Klausner
Wilson Sonsini Goodrich & Rosati
1301 Avenue of the Americas
New York, NY 10019

Amici Curiae:

Charles S. Smims, Proskauer Rose LLP, New York, NY for amici
curiae the New York Times Company, Advance Publications, Inc.,
Gannett Co., Inc., the McClatchy Company, the Newspaper
Association of America, and BurrellesLuce, in support of
plaintiff.

Julie A. Ahrens, Stanford Law School, Center for Internet &
Society, Standard, CA (Corynne McSherry and Kurt Opsahl,
Electronic Frontier Foundation, San Francisco, CA, and Sherwin
Siy, Public Knowledge, Washington, DC, on the brief) for amici
curiae Electronic Frontier Foundation and Public Knowledge in
support of defendants.

Kathleen M. Sullivan, Quinn Emanuel Urquhart & Sullivan, LLP,
New York, NY (Jonathan B. Oblak and Todd Anten on the brief) for
amicus curiae Computer & Communications Industry Association in
support of neither party.

DENISE COTE, District Judge:

      This Opinion addresses cross-motions for summary judgment

filed by The Associated Press ("AP"), a news cooperative, and

Meltwater US Holdings Inc., Meltwater News US Inc., and

Meltwater News US1 Inc. (collectively "Meltwater"), an Internet

media monitoring service.  In this action, AP principally

contends that Meltwater is infringing AP's copyright in its

published news stories.  Meltwater uses a computer program to

scrape news articles on the web and, among other things,

provides excerpts of those stories, including many AP stories,

in reports it sends each weekday to its subscribers.  Meltwater

does not dispute that it has taken expressive content from AP

stories that is protected by the Copyright Act, but has

interposed five defenses to AP's copyright infringement claim.

      Meltwater's principal defense against the infringement

claim is that its excerpting of AP news stories is a fair use.

Even though Meltwater's service is a closed system for subscribers only, Meltwater equates itself with Internet search engines.  It argues that search engines transform the work they take from Internet news sites by using that content for a new purpose, that is, as an integral part of an information-location tool.  According to Meltwater, this transformative purpose qualifies as a fair use of the copyright-protected material.  It will be assumed for purposes of this Opinion that Internet search engines are a transformative use of copyrighted work.  Nonetheless, based on undisputed facts, AP has shown that it is entitled to summary judgment on its claim that Meltwater has engaged in copyright infringement and that Meltwater's copying is not protected by the fair use doctrine.

This Opinion begins with a description of the facts taken from the parties' submissions on these cross-motions for summary judgment.  The facts are largely undisputed; where there are factual disputes, those will be noted.  Following a description of AP's business as it relates to these claims, and then Meltwater's, there will be a brief description of the procedural history of this lawsuit.  The next sections of the Opinion will analyze the legal issues.  They will include a discussion of Meltwater's five affirmative defenses to the claim of copyright infringement: fair use, implied license, equitable estoppel,

3

laches, and copyright misuse.  Finally, this Opinion will
address Meltwater's motion for summary judgment on AP's
secondary infringement claims and some of Meltwater's
evidentiary objections.


BACKGROUND

I. AP

    AP was established in 1846; it is owned by over 1,400
newspapers across the United States and employs a staff of
approximately 3,700 people.  On any given day it produces
between 1,000 and 2,000 news articles.

    Each article is the result of a process that involves a
number of creative decisions by AP reporters and editors.
First, AP must select the topic to be covered in the article.
The selection process can involve sifting through numerous press
releases, comments made by politicians, and news tips received
by AP in order to decide which topics are worthy of coverage.
The actual writing of the story is often an iterative process,
involving consultations between the reporter and editor about
how to handle the assignment.  During this process, the articles
are reviewed for "completeness, clarity, balance and accuracy."
The structure of a news article is itself the product of
strategic and stylistic choices.  For instance, breaking news

4

stories are traditionally organized in the form of an "inverted triangle."  The purpose of the "inverted triangle" structure is to include "as much key information as possible in the 'lede,' or first portion of the story."  As AP's Standards Editor has explained, an AP story lede "is meant to convey the heart of the story, rather than serving as a teaser for the remainder of the story."  In connection with this action, the AP obtained copyright registrations for thirty-three of its articles ("Registered Articles").[1]

The news products that AP offers take many forms.  For instance, subscribers can choose to subscribe to a regional news product, like AP's Latin American News, or Asia-Pacific News. Alternatively, a subscriber can select an AP product that is

---

[1] Each Registered Article is appended to the plaintiff's amended complaint.  They include stories on a diverse set of subjects, as the following examples illustrate: exhibits F (Sri Lankan fruit traders); G (Casino jobs in Ohio); H (anti-austerity protests in Portugal); I, O, U (life and death of former Alaska Senator Ted Stevens); J (anti-doping rules for pentathlon); K (Mississippi Blues Trail marker for deceased singer); L (parliamentary vote in Egypt), M ("Senate upset erases Alaska seniority"); N (secret CIA prison in Romania); P (snowboarder Kevin Pearce); Q (one-year anniversary of border agent's death); R & X (WikiLeaks suspect); S (security guard's ear cut off); T (Congressman cleared in DOJ probe); V (case against VECO CEO); W (late Christmas celebrations); Y ($5B deal between Northeast Utilities & NStar); and Z (fact check of Romney's Solyndra claim).  The Appendix gives three examples of the Registered Articles chosen for their differences in length and shows an excerpt copied and distributed by Meltwater from these three examples.

focused on a particular industry, like AP's Business Alert, Defense Alert, or Technology Alert.

Each of the thirty-three Registered Articles at issue in this lawsuit was written by an AP reporter. Most of articles authored by AP reporters are published by its members or licensees and not by AP itself. Thus, a principal component of AP's revenue comes from licensing fees it earns by licensing uses of its news products to its roughly 8,000 licensees. AP earns hundreds of millions of dollars in licensing fees annually.

In the digital age, AP's license agreements have expanded to permit the publication of its articles on the Internet. AP's license agreements with its digital and commercial clients account for more than $75 million of AP's annual gross revenue. Many of the websites on which AP content appears permit readers to access the articles without paying any fee.

AP's licensing agreements are crafted around the kind of redistribution rights the licensee wishes to have. For instance, AP's licensing agreements with LexisNexis and Factiva permit those services to give their customers access to full AP articles and to search through AP's archives. AP also has licensing agreements that permit the distribution of excerpts from or snippets of its articles. The license agreements

between AP and three news clipping services that are competitors of Meltwater are examples of this kind of license.  One such license granted the Internet news clipping service a license to distribute "AP text scraped from third party AP licensee websites ("AP Articles") . . . as well as links to AP Articles and excerpts of AP Articles."  In a second such license, AP permits the Internet news clipping service to redistribute "Snippets" of AP articles "as a part of an aggregated feed of licensed content," to a primary market of Media Monitoring & Evaluation companies who cater to "Internal corporate communications and PR professionals and their external agents." This license defines "Snippets" to mean "headlines and leading 140 characters from AP content."  In a final example, the licensing agreement allows the news clipping service to make available directly or via its affiliate "snippets of [certain AP content] in response to search requests."

AP also offers a web-based platform known as AP Exchange to its licensees, which permits the licensees to search AP articles by keywords.  Each AP article contains metadata tags.  These tags attach to certain information appearing in AP articles including people, companies, geographic locations, and organizations.  Through AP Exchange, customers can run either simple or advanced searches to locate AP news stories.  This

platform also allows AP's customers to save their searches and
to receive search results on an ongoing basis.  AP's customers
can receive email alerts when an article that is responsive to
one of their custom searches has been published.  In addition,
AP has licensed its content to customers that, in turn, permit
their users to search for AP articles using keyword search
terms.

II. Meltwater News

Meltwater is an international "software as a service"
("SaaS") company that operates in twenty-seven countries.  It
was founded in 2001 in Norway.  Its United States subsidiaries
currently have four hundred employees, nine U.S. offices, and an
annual income of [REDACTED] of dollars.

In 2005, Meltwater began offering a news monitoring service
to subscribers in the United States called Meltwater News.
Meltwater News now has more than [REDACTED] customers in the
United States.  Its U.S. customers are businesses, non-profit
organizations, and government agencies.  An annual subscription
fee costs thousands of dollars.

Meltwater News subscribers have access to Meltwater's
"Global Media Monitoring" product, which offers a suite of
online services.  The Global Media Monitoring product enables
users to monitor the news based on the presence of certain words

or phrases in news articles appearing on the Internet and to receive excerpts of those news articles.  Meltwater uses automated computer programs or algorithms to copy or "scrape" an article from an online news source, index the article, and deliver verbatim excerpts of the article to its customers in response to search queries.[2]  Through this automated mechanism, Meltwater copied each of the thirty-three Registered Articles at issue in this litigation and delivered excerpts from them to subscribers.

Meltwater markets its services to communications and public relations professionals as a tool that will assist them in locating "mentions" of their businesses in the media, in tracking their company's press releases, and in conducting comparative research.  Some of Meltwater's marketing materials and sales representatives also advertise Meltwater News as a useful tool for staying informed of general news developments.  One Meltwater sales representative described Meltwater News as "provid[ing] the most news in the most efficient manner" and

---

[2] Meltwater purports to dispute that the excerpts that Meltwater distributed from the Registered Articles can be found verbatim in the Registered Articles.  While it is undisputed that Meltwater's excerpts do not contain the complete article, a comparison of the excerpts with the Registered Article shows that the excerpts were taken word-for-word from the original.  There is, therefore, no genuine dispute that the excerpts are taken verbatim from the AP articles.  See, e.g. Appendix.

referred to the Meltwater News Reports as "customized news digest[s]."  Another Meltwater employee has recommended telling customers that a Meltwater News excerpt "saves you time so you don't have to read the full article."

Meltwater competes with AP and its licensees for business. Meltwater identifies companies and services like LexisNexis, Cision, Google News, and BurrellesLuce as its competitors.  Each of these companies has held an AP license.  Meltwater has succeeded in winning what it described as a "mega-contract" away from an AP licensee, and both AP and Meltwater have submitted bids to the same potential customers.  In 2010, for instance, both AP and Meltwater submitted proposals to the House of Representatives in response to an "official solicitation for proposals to provide web based delivery of local, national and international news."

Like Internet search engines, Meltwater News employs automated computer programs known as "crawlers" to scan the Internet for news.  Meltwater's crawlers scan approximately 162,000 online news websites from over 190 countries each day to create an index of the websites' content.  The program usually crawls a news website at roughly [REDACTED] intervals.  Most of these websites make their articles available to readers without charge.

10

The crawlers extract and download content from the websites.  The downloaded content is organized into a structured internal format that has seven fields, including a timestamp reflecting when the document was first seen by the crawler.  The extracted content is then placed in a queue for indexing.  Using an Application Programming Interface or API, an index is created that links or "maps" most of the words in the document to the document.

A. News Reports

Meltwater's creation of the index permits its subscribers to search for and request delivery of information that is responsive to their search queries.  Its subscribers can conduct two types of searches of the index.

First, a customer can use the Meltwater News platform to set up standing search queries known as "agents."  An agent is a single string of words or phrases that will be used in searching Meltwater's index of online news content.  For example, a customer interested in obtaining information on education policy might create an agent that reads: "("teachers" or "students") and education* and policies."  The creation of an agent query allows the particular search to be conducted automatically on a recurring basis.  A basic subscription offers a customer the ability to create five standing agent queries.

11

Customers receive agent search results in two ways.  Most customers receive emails every weekday that contain the excerpts responsive to their standing search requests.  These are labeled "News Reports."  Customers can also view those same search results by logging onto their Meltwater News online account, where they can see all of their News Reports from the last seven months.

A typical News Report takes the following form.  At the top of the News Report a banner appears that reads "News Report from Meltwater News."  Directly beneath the banner appears a table entitled "Report Overview."  The Table ordinarily consists of two columns; the first column contains the name of the "agent" query that retrieved hits; the second displays the raw number of hits in a given period of time (such as 3 in 1 day, or 635 in 23 hours).

The actual search results follow the Report Overview.  They are organized in subcategories based on the agent query to which they respond.  Within each agent category, the results appear in reverse chronological order, with the excerpt of the most recently published article appearing first.[3]  Three icons appear

---

[3] If a responsive article was published on more than one website, the News Report will often retrieve duplicate results.  When a result is a duplicate it is clustered with the other identical results.  The most recent publication of the article will be the

next to each search result; they read, "Translate," "Share," and "Archive."  AP articles account for over a third of the search results in some News Reports.

Each search result in the News Report generally includes the following text: (1) the headline or title of the article and a hyperlink to the URL for the website from which the article was indexed; (2) information identifying the article's source, such as the publisher and the country of origin; and (3) usually two excerpts from the article.  The first excerpt consists of up to 300 characters (including white space) from the opening text of the article or lede.  The second excerpt is shorter and is known as the "Hit Sentence."  It is approximately 140 characters (not including white spaces) "surrounding a single, algorithmically chosen appearance of one of the customer's matched search keywords."  If the keyword appears in the lede, then the lede is repeated twice.

On occasion, the hyperlink to the article no longer leads to the article because the article has been removed from the web.  Meltwater contends that when that occurs, the hyperlink will lead the Meltwater subscriber to the website where the

---

hit that is initially visible in the News Report.  To the left of the headline of the visible result is a plus sign.  Clicking the plus sign permits the subscriber to see the duplicate results.

article originally appeared, and the reader will see whatever content the operator of the webpage has chosen to display in place of the original article.

B. Analytics

A Meltwater News subscriber can choose to have certain charts and graphs included in their News Reports.  These charts and graphs -- known as "Dashboard Analytics" or "Mail Analytics" -- provide additional information about the search results.  For instance, customers who opt to have Mail Analytics included in their daily News Report will see a pie chart showing the three or four countries that have had the highest coverage of a particular agent.  They also have a choice of seeing an "up-and-down coverage" chart that indicates whether the volume of coverage has gone up or down during a certain period of time, or a "word cloud" illustrating certain buzz words appearing in the search results.

A subscriber can also view additional analysis of its agent searches by logging on to the Meltwater News platform.  When it logs on, it encounters a "dashboard" page containing five tools; some of these tools overlap with the tools that can be delivered in the News Reports.  Using the dashboard, the customer can view (1) a "tone analysis" tool, which analyzes whether the tone of the news coverage is negative, positive, or neutral; (2) a "word

14

cloud" graphic, which illustrates the frequency with which a keyword appears in the search results; (3) a list of the "top publications" providing the most coverage of a given agent query; (4) an "up-and-down trend analysis" chart, which indicates "whether the volume of media coverage related to a given search query has increased or decreased over a given period;" and (5) a map that illustrates the "geographical distribution of relevant news coverage."

C. Ad Hoc Searches

The second way in which customers can conduct searches of the Meltwater News index is through an "ad hoc" search.  To perform an ad hoc search, a Meltwater News subscriber logs on to its Meltwater account, clicks on a "Search" tab, and types in keywords of its choice.

Ad hoc searches do not generate News Reports, but the format for presenting the results generated by an ad hoc search is identical to that in News Reports.  The results of ad hoc searches are not saved on the Meltwater system unless the subscriber saves them to the subscriber's own archive folder. There is no limit on the number of ad hoc searches that a subscriber can perform.

D. Archiving

A subscriber with a basic subscription has the ability to

15

archive material in two ways.  First, subscribers can archive
any of their search results in a personal archive stored on
Meltwater's database.  For instance, as described above, an
"Archive" button appears next to each excerpt contained in a
Meltwater News Report.  Clicking this button archives the search
result.  When a search result is archived in this way, the
information stored in the archive includes (1) the headline or
title of the article and the URL link; (2) a description of the
source of the article; (3) an excerpt of the article, consisting
only of the opening text; and (4) any text the user has typed or
pasted into a comment box.  In other words, the Hit Sentence is
not automatically archived.

Second, Meltwater offers a tool called "Article Editor"
that is accessible from the Meltwater News online platform.
Clicking on the Article Editor tool causes a pop-up window to
appear.  The window contains boxes with the labels "Date, Title,
Opening Text, Body Text, URL, Name of Publisher, and Country."
The subscriber can type text into these boxes or can copy and
paste text from other websites.  For instance, if a customer
clicks on a hyperlink provided as part of a search result, the
customer can proceed to copy the article from the publishing
website and paste the text into the Article Editor.  The text
can be saved in an "external archive folder" on Meltwater's

16

system for as long as the subscriber remains a customer.

E. Newsletter and Newsfeed

For an additional fee, Meltwater News assists its subscribers in creating their own newsletters.  Material that has been saved in a subscriber's archive folder -- search results or material entered into the Article Editor -- can be incorporated into a "Newsletter" and sent to third-party recipients.

Alternatively, subscribers can elect to have their search results incorporated into a Newsfeed on their internal or external website.  Meltwater describes the Newsfeed as a "dynamic list of search results, including links to full articles."

III. The Thirty-Three Registered Articles

Meltwater delivered excerpts of each of the thirty-three Registered Articles to its customers in News Reports as a result of agent searches.[4]  Meltwater scraped the Registered Articles from roughly 1,200 websites -- including the websites of AP's licensees and AP Hosted, which is a private label website where AP hosts content for its members.  Twenty-four of the thirty-

---

[4] Meltwater does not retain ad hoc search results as part of its ordinary business practices.  Therefore, there is no evidence in the record indicating whether any excerpts from the thirty-three Registered Articles were provided to Meltwater subscribers in response to ad hoc searches.

three articles were published within six months of the date
Meltwater responded to a discovery request in this action. As a
result, Meltwater was able to calculate from its records that it
made at least 22,297 excerpts from the twenty-four Registered
Articles available to its customers in the United States in
response to agent queries.

The parties have not calculated the percentage of each
original AP news story that was excerpted and delivered in each
of the News Reports, but it probably ranged from as low as 4.5%
to slightly over 60%. There are several factors that affect the
calculation of the percentage. One is the length of the
Registered Article. The average length of the full text of the
thirty-three Registered Articles is 2,571 characters (not
including spaces), or 504 words. But, some of the articles are
short and some are long; they vary in length from 75 words to
1,321 words. Moreover, if the keyword that is searched appears
in the lede, then the lede and Hit Sentence will overlap. AP
has shown that with respect to some of the Registered Articles,
a single Meltwater excerpt consisted of more than 30% of the
text of the article and in at least one instance it constituted
61% of the article's text.

For example, from the shortest Registered Article --
entitled "Modern pentathlon tightens anti-doping policy" --

18

Meltwater delivered the following excerpt:

> MONACO (AP) -- Modern pentathlon has joined other
> sports in adopting a "no needles" policy as part of
> its anti-doping rules ahead of the 2012 London
> Olympics.
> . . . says athletes can receive injections only from a
> "certified medical professional" after an appropriate
> diagnosis and only if there is no alternative.

The full text of the Registered Article reads as follows:

> MONACO (AP) -- Modern pentathlon has joined other
> sports in adopting a "no needles" policy as part of
> its anti-doping rules ahead of the 2012 London
> Olympics.
> Governing body UIPM says athletes can receive
> injections only from a "certified medical
> professional" after an appropriate diagnosis and only
> if there is no alternative.
> The UIPM says all injections must be reported to
> competition doctors.
> Governing bodies in cycling, gymnastics and rowing
> have also introduced "no needles" rules this year.

Some of Meltwater's customers have received multiple
excerpts from the same AP article, apparently in a single News
Report.  In such instances, the percentage of the article that
is provided to the Meltwater customer may increase since the Hit
Sentence in the various excerpts can change.

Excerpts from the Registered Articles were also included in
ten Newsletters created by Meltwater customers in the United
States.  There is no evidence, however, that any Meltwater
subscriber used the Meltwater Newsletter feature to cut and
paste a complete copy of any of the thirty-three Registered

Articles into its customized newsletter.

Finally, Meltwater subscribers only clicked on the hyperlinks for seven of the thirty-three Registered Articles. The average click-through rate for the thirty-three Registered Articles is roughly 0.08%.[5]  Meltwater has not provided any information on any other measure of its click-through rates.[6]

---

[5] For twenty-six of the Registered Articles, Meltwater's investigation in response to AP's discovery requests uncovered no clicks.  For these articles, regardless of the number of times a hyperlink was presented to a customer, the click-through rate is 0%.  The click-through data for the remaining seven articles is as follows: (1)"AP Exclusive: Inside Romania's secret CIA prison" was provided to Meltwater subscribers 134 times, and the accompanying links were clicked on two occasions, resulting in a 1.5% click-through rate; (2) "When the most wonderful day of the year comes late": 3,081 links, 1 click, 0.03% click-through rate; (3) "Wikileaks suspect seen as hero, traitor": 1,668 links, 1 click, 0.06% click-through rate; (4) "Northeast Utilities, NStar close $5B deal": 2,917 links, 1 click, 0.03% click-through rate; (5) "Apple lent weight to dividend comeback in 1Q": 1,552 links, 1 click, 0.06%; (6) "7 accused of $375M Medicare, Medicaid fraud": 1,313 links, 12 clicks, 0.91% click-through rate; (7) "Things are looking up for state budgets": 2,361 links, 3 clicks, 0.13% click-through rate.

[6] AP made repeated requests during the discovery period for additional data on Meltwater's click-through rates.  Meltwater indicated that it was not surprised by a click-through rate of .05% and refused to provide additional data.  It took the position that it would be burdensome to obtain more click-through rate data since it does not keep such data in the normal course of its business.  Its Technical Manager of SaaS Operations opined that it might take twenty-four to thirty-six hours to run the necessary queries against its database and that it might also be prudent to copy the data first onto a separate set of servers so that the queries would not interfere with the performance of Meltwater's system.

PROCEDURAL HISTORY

On February 14, 2012, AP filed this action against Meltwater.  AP's amended complaint asserts six causes of action with respect to the Registered Articles: (1) copyright infringement; (2) contributory copyright infringement; (3) vicarious copyright infringement; (4) declaratory judgment of copyright infringement; (5) "hot news" misappropriation under New York common law; and (6) removal or alteration of copyright management information.  In response, Meltwater has raised four counterclaims: (1) declaratory judgment of non-infringement; (2) declaratory judgment of safe harbor from infringement claims based upon the Digital Millennium Copyright Act ("DMCA"); (3) libel per se; and (4) tortious interference with business relations.

At a pretrial conference held on April 20, 2012, the Court proposed that the parties conduct an initial phase of discovery focused on Meltwater's liability on AP's copyright claims based on the nineteen articles identified in its original complaint.  The parties thereafter agreed on a schedule that would permit them to focus on the core discovery needed to allow early briefing of the central legal issues in this case.  At a May 11 conference, the Court determined that AP should be permitted to take targeted discovery not only of Meltwater's alleged

infringement with respect to the Registered Articles, but also broader discovery of Meltwater's general practices and procedures.

On July 13, AP filed an amended complaint in which it included fourteen additional articles -- bringing the total number of Registered Articles at issue to thirty-three. Discovery proceeded on all thirty-three articles and broader issues to permit the parties to litigate through summary judgment practice the copyright infringement claim and Meltwater's affirmative defenses to that claim.

Both sides filed the instant cross-motions for summary judgment on November 9.[7] AP and Meltwater both move for summary judgment on Meltwater's fair use defense.  AP has also moved for summary judgment on Meltwater's implied license defense.  Each of Meltwater's affirmative defenses is implicated by this motion practice since Meltwater also contends that there are triable issues of fact on its affirmative defenses of implied license, equitable estoppel, laches, and copyright misuse that prevent

---

[7] Meltwater has also moved for judgment on the pleadings with respect to AP's claims of "hot news" misappropriation and removal or alteration of copyright management information.  AP has in turn moved for judgment on the pleadings as to Meltwater's counterclaims for libel, tortious interference, and declaratory judgment of safe harbor under the Digital Millennium Copyright Act, 17 U.S.C. § 512(c).  Those motions are not addressed in this Opinion.

summary judgment from being entered for AP.  Meltwater has also moved for summary judgment on AP's contributory and vicarious copyright infringement claims.

These motions were fully submitted on January 23, 2013. Redacted sets of these motion papers were publicly filed in December 2012 and January 2013.  The defendants also filed on December 26, 2012 and January 24, 2013, two motions to strike certain declarations submitted by the plaintiff and the plaintiff's Fed.R.Civ.P. 56.1 Statement.

Three amici curiae briefs were accepted for filing. Computer & Communications Industry Association ("CCIA") represents that it is not filing in support of either AP or Meltwater.  Electronic Frontier Foundation and Public Knowledge have filed in support of Meltwater; the New York Times Company, Advance Publications, Inc., Gannett Co., Inc., the McClatchy Company, the Newspaper Association of America, and BurrellesLuce have filed in support of AP ("New York Times, et al.").


DISCUSSION

The parties have cross-moved for summary judgment.  Summary judgment may not be granted unless the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Rule 56(c), Fed. R. Civ. P.  The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination the
court must view all facts in the light most favorable to the
nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 247 (1986); Celotex Corp v. Catrett, 477 U.S. 317, 323
(1986); Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir.
1994) ("[T]he court must resolve all ambiguities and draw all
reasonable inferences in favor of the nonmoving party.").  When
the moving party has asserted facts showing that the nonmovant's
claims cannot be sustained, the opposing party must "set forth
specific facts showing that there is a genuine issue for trial,"
and cannot rest on the "mere allegations or denials" of his
pleadings. Rule 56(e), Fed. R. Civ. P.  See also Goenaga v.
March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.
1995).  In deciding whether to grant summary judgment,
therefore, this Court must determine (1) whether a genuine
factual dispute exists based on the evidence in the record, and
(2) whether the fact in dispute is material based on the
substantive law at issue.

     In this case, the substantive law governing the parties'
dispute is found in the law of copyright.  The Copyright Act of
1976 invests a copyright holder with a bundle of exclusive

rights.  17 U.S.C. § 106 et seq.  This bundle consists of the
rights to "reproduce, perform publicly, display publicly,
prepare derivative works of, and distribute copies of" the
copyrighted work.  Arista Records v. Doe 3, 604 F.3d 110, 117
(2d Cir. 2010); see also 17 U.S.C. § 106.  "The principle
purpose of the Copyright Act is to encourage the origination of
creative works by attaching enforceable property rights to
them."  Matthew Bender & Co., Inc. v. West Pub. Co., 240 F.3d
116, 122 (2d Cir. 2001).

To prevail on a claim of copyright infringement, "two
elements must be proven: (1) ownership of a valid copyright, and
(2) copying constituent elements of the work that are original."
Arista Records, 604 F.3d at 117 (citation omitted).  A
certificate of copyright registration is prima facie evidence of
both valid ownership of copyright and originality.  See Scholz
Design, Inc. v. Sard Custom Homes, LLC, 691 F.3d 182, 186 (2d
Cir. 2012); see also Boisson v. Banian, 273 F.3d 262, 268 (2d
Cir. 2001).  The copying of the constituent elements of the work
that are original can be established through direct or indirect
evidence.  Boisson, 273 F.3d at 267.

The reporting of facts is not protectable under the
Copyright Act since facts are "never original to an author."
Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc., 166

F.3d 65, 70 (2d Cir. 1999).  But compilations of facts may be protected under the Act since the arrangement or presentation of facts "can display originality."  Id.  There is even more room for originality in descriptions of facts.  Id.  Thus, news articles may be entitled to protection under the Copyright Act to the extent they contain original expression.  Id.

AP has carried its burden to show both its ownership of a valid copyright in the Registered Articles and Meltwater's copying of protected elements of those works.  Meltwater does not contest this showing, but relies instead on five affirmative defenses.  Its principal defense is that it made fair use of the Registered Articles.  It also contends that there are triable issues of fact that require a trial as to four additional defenses: its possession of an implied license, estoppel, laches, and copyright misuse.  Each of these defenses will be addressed in turn, but none of them prevents the issuance of summary judgment in AP's favor based on its copyright claim.

I. Fair Use

Meltwater contends that its use of the Registered Articles is fair because Meltwater News functions as an Internet search engine, providing limited amounts of copyrighted material to its subscribers in response to their queries and thereby pointing its subscribers to a source of information online.  It contends

26

that this service is transformative of the original works. Based on undisputed evidence, Meltwater's fair use defense fails.

Notwithstanding the copyright protections guaranteed by Section 106 of the Copyright Act, the law of copyright recognizes the need for "breathing space."  Campbell v. Acuff-Rose Music, 510 U.S. 569, 579 (1994); see also On Davis v. The Gap, Inc., 246 F.3d 152, 174 (2d Cir. 2001).  Thus, even where a plaintiff has established a prima facie case of copyright infringement, liability is excused where the defendant demonstrates that he made "fair use" of the plaintiff's copyrighted work.  Because fair use is an affirmative defense, the burden of proof rests with party relying on the defense.  Infinity Broadcast Corp. v. Kirkwood, 150 F.3d 104, 107 (2d Cir. 1998).  The availability of a fair use defense permits courts to avoid the "rigid application of the copyright statute" when "it would stifle the very creativity which the law is designed the foster."  Campbell, 510 U.S. at 577.

The fair use doctrine, although of common law origin, has been codified at 17 U.S.C. § 107.  This section provides that

> [n]otwithstanding the provisions of sections 106 and
> 106A, the fair use of a copyrighted work . . . for
> purposes such as criticism, comment, news reporting,
> teaching . . . scholarship, or research, is not an
> infringement of copyright.

27

17 U.S.C. § 107.  The applicability of the fair use defense is a mixed question of law and fact.  Bill Graham Archives v. Dorling Kindersley, Ltd., 448 F.3d 605, 608 (2d Cir. 2006).  The issue of fair use may be resolved on summary judgment where the court determines that there is no genuine dispute of material facts. Id.

In determining whether a defendant has made fair use of the plaintiff's copyrighted work, the court is guided by four non-exclusive statutory factors:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  No single factor is determinative.  "All are to be explored, and the results weighed together, in light of the purpose of copyright."  Campbell, 510 U.S. at 578.  At bottom, "[t]he ultimate test of fair use is whether the copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it."  Bill Graham Archives, 448 F.3d at 608 (citation omitted).

When these four factors are examined in light of the

28

purpose of the copyright law, AP has shown through undisputed evidence that Meltwater's copying is not protected by the fair use doctrine.  Each of these four factors will be examined in turn.

A. Purpose and Character of the Use

The first factor of the fair use analysis poses a deceptively simple question.  It asks

> whether the new work merely supersedes the objects of
> the original creation, or instead adds something new,
> with a further purpose or different character,
> altering the first with new expression, meaning or
> message; it asks, in other words, whether and to what
> extent the new work is transformative.

Campbell, 510 U.S. at 579 (citation omitted).  A decision on whether a work is transformative need not be an all-or-nothing assessment.  Nihon, 166 F.3d at 72.  The inquiry asks not merely whether the new work is transformative, but also the extent to which it transforms the copyrighted work.  "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use."  Campbell, 510 U.S. at 579.  The inquiry into the transformative nature of the work is "guided by" the preamble to § 107, which directs attention to whether the use of copyrighted material is for the several listed purposes, among them news reporting and research.  Id. at 578.  But, the list of

fair uses included in the preamble of section 107 is only

"illustrative."  Infinity Broadcast Corp., 150 F.3d at 107

(citation omitted).  Nonetheless, "the illustrative nature of

the categories should not be ignored."  Id.

Of course, not all alterations of a copyrighted work are

"transformative."  A "use of copyrighted material that merely

repackages or republishes the original is unlikely to be deemed

a fair use" and a "change of format, though useful" is not

transformative.  Infinity Broadcast Corp., 150 F.3d at 108 & n.2

(citation omitted).  On the other hand, if copyrightable

expression in the original work is used as "raw material,

transformed in the creation of new information, new aesthetics,

new insights and understandings -- this is the very type of

activity that the fair use doctrine intends to protect for the

enrichment of society."  Pierre N. Leval, Toward a Fair Use

Standard, 103 Harv. L. Rev. 1105, 1111 (1990); see also Castle

Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 142

(2d Cir. 1998).  In considering whether the second work has

transformed the original, it is appropriate to consider the

percentage of the allegedly infringing work that is made up of

the copyrighted work since this offers some indication of

whether the defendant's use of the "original materials has been

30

sufficiently transformative."[8]  Bill Graham Archives, 448 F.3d at

611.

Another aspect of the first fair use factor is the extent

to which the new work has a commercial or non-profit educational

purpose.  The commerciality of the use must be considered with

care.  After all, not-for-profit enterprises may infringe

copyrights, and conversely, if

> commerciality carried presumptive force against a
> finding of fairness, the presumption would swallow
> nearly all of the illustrative uses listed in the
> preamble paragraph of § 107, including news reporting,
> comment, criticism, teaching, scholarship, and
> research, since these activities are generally
> conducted for profit in this country.

Campbell, 510 U.S. at 584 (citation omitted).  The fact that a

given use is profit-driven is not the focus of the commerciality

inquiry.  Instead, the "crux of the profit/nonprofit distinction

is . . . whether the user stands to profit from the exploitation

of the copyrighted material without paying the customary price."

Harper & Row Publishers, Inc. v. Nation Enterp., 471 U.S. 539,

562 (1985).  Thus, the fair use doctrine "distinguishes between

a true scholar and a chisler who infringes a work for personal

gain."  Id. at 563 (citation omitted).

---

[8] Where the copyrighted work constitutes a greater percentage of
the secondary work, the latter work is more likely to be non-
transformative.  This inquiry is distinct from the analysis in
the third factor, part of which considers what portion or
percentage of the copyrighted work was used in the second work.

A determination of whether a use "exploits" a copyrighted work calls for a careful exploration of the link between the defendant's precise use of the copyrightable elements of the plaintiff's work and the defendant's financial gain.  Where a defendant did not gain "direct or immediate commercial advantage" from the copying, its status as a for-profit enterprise is less relevant.  Am. Geophysical Union v. Texaco, Inc., 60 F.3d 913, 921 (2d Cir. 1994).  Conversely, "when the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material" a finding of fair use is less likely.  Blanch v. Koons, 467 F.3d 244, 253 (2d Cir. 2006).  Of course, a use that generates value for the "broader public interest" weighs in favor of fair use.  Id.

In analyzing the purpose of the use, a court may consider as well other aspects of a defendant's purpose.  For instance, was the copying intended to supplant the copyright holder's "commercially valuable right of first publication."  Harper & Row, 471 U.S. at 562.  As the term itself suggests, "[f]air use presupposes good faith and fair dealing."  Id. (citation omitted).

Neither the purpose nor use of the Meltwater News Reports, nor its excerpts from the Registered Articles in the News Reports, is transformative.  Meltwater uses its computer

32

programs to automatically capture and republish designated
segments of text from news articles, without adding any
commentary or insight in its News Reports.  Meltwater copies AP
content in order to make money directly from the undiluted use
of the copyrighted material; this is the central feature of its
business model and not an incidental consequence of the use to
which it puts the copyrighted material.  Thus, it is not
surprising that Meltwater's own marketing materials convey an
intent to serve as a substitute for AP's news service.
Meltwater describes its Meltwater News products as "News at a
glance" and "News brought to you."  They trumpet that "Meltwater
News continuously tracks news sources, updating its database
continuously throughout the day so searches return fresh,
relevant content," and advertise that "your news is delivered in
easy to read morning and/or afternoon reports."

    Nor is Meltwater's taking of copyrighted material more
defensible because its business relates to news reporting and
research -- two of the purposes of the fair use doctrine
captured in the statute's preamble.  The news reporting and
research upon which Meltwater relies was not done by Meltwater
but by AP; the copyrighted material that Meltwater has taken is
the news reporting and research that AP labored to create.

    For this same reason, the examination of the public

interest weighs against Meltwater.  Paraphrasing James Madison, the world is indebted to the press for triumphs which have been gained by reason and humanity over error and oppression. Investigating and writing about newsworthy events occurring around the globe is an expensive undertaking and enforcement of the copyright laws permits AP to earn the revenue that underwrites that work.  Permitting Meltwater to take the fruit of AP's labor for its own profit, without compensating AP, injures AP's ability to perform this essential function of democracy.

While commercial Internet news clipping services like Meltwater perform an important function for their clients, the public interest in the existence of such commercial enterprise does not outweigh the strong public interest in the enforcement of the copyright laws or justify allowing Meltwater to free ride on the costly news gathering and coverage work performed by other organizations.  Moreover, permitting Meltwater to avoid paying licensing fees gives it an unwarranted advantage over its competitors who do pay licensing fees.[9]

As will be further explored below, Meltwater characterizes itself as an Internet search engine and emphasizes the importance of search engines to the operation of the Internet.

---

[9] Meltwater has entered into very few licenses to obtain content.

34

Together, search engines and the Internet have delivered the
world's knowledge to the fingertips of multitudes across the
globe.  There is a strong public interest in preserving this
democratic, instantaneous, and efficient access to information.
But, there is no necessary tension between these two important
public goods:  news reporting and search engines.  Quite to the
contrary, these interests are complementary.  The Internet would
be far poorer if it were bereft of the reporting done by news
organizations and both are enhanced by the accessibility the
Internet provides to news gathered and delivered by news
organizations.  Neither Meltwater nor its amici have shown that
a finding that Meltwater's activities do not amount to fair use
threatens Internet search engines in any way.  For all of these
reasons, the first factor in the fair use analysis decidedly
favors AP.

Meltwater's argument that its use of the Registered
Articles is transformative is premised on a single contention.
It characterizes Meltwater News as a search engine that directs
users to a source of information online and whose search results
provide insight into "where, when, how often, and in what
context" certain words or phrases appear on the Internet.
Meltwater defines a search engine as a system that by design and
operation improves access to information that is available on

the Internet.  According to Meltwater, the design and function
of a search engine should decrease the likelihood that users
would put the material displayed by the search engine to the
same use as the original works.

But, as can be gleaned from the discussion of Meltwater's
operations in earlier sections of this Opinion, Meltwater's own
description of Internet search engines does not correspond to
how Meltwater News itself functions.[10]  Meltwater News is an
expensive subscription service that markets itself as a news
clipping service, not as a publicly available tool to improve
access to content across the Internet.  And, as further
confirmation that Meltwater News is neither designed nor
operated to improve access to the complete, linked news story,
Meltwater has chosen not to offer evidence that Meltwater News
customers actually use its service to improve their access to
the underlying news stories that are excerpted in its news
feed.[11]

---

[10] Relying on the publicly available filings in this case, the
CCIA pointedly does not take a position on the ultimate question
of whether Meltwater's copying of expressive content created by
AP is a fair use.  It simply asks the Court to take into account
the effect that any ruling may have on the operation of
"legitimate" online services.  That the Court has done.

[11] While Meltwater asserts that its U.S. subscribers clicked-
through to the underlying story millions of times during just
the first six months of 2012, it has not placed that figure in

As far as the thirty-three Registered Articles are concerned, customers rarely clicked-through to the underlying AP article.  It occurred just 0.08% of the time.  In her deposition, a Meltwater executive testified that a click-through rate of 0.05% would be consistent with her expectations.  The click-through rate for the thirty-three Registered Articles is also consistent with a UK tribunal's finding that Meltwater's services produced a click-through rate of 0.5% for certain UK news sources.[12]  Meltwater has not offered any evidence that this seemingly small click-through rate is equivalent to that experienced by any of the Internet search engines to which it compares itself.[13]  While it might be more telling to learn what the click-through rate is for any single Meltwater News Report, rather than for a single article excerpted in a News Report,

_____

context by disclosing the rate of click-throughs that this number represents.  Moreover, it rebuffed AP's repeated requests for data on click-through rates and as a result cannot fairly rely on this raw number.

[12] In litigation in Great Britain, the click-through rate was calculated during litigation over licensing fees to be paid for services rendered by media monitoring companies.  During the litigation, a Meltwater affiliate agreed to pay a web database license and lost its argument that it was unnecessary to have a license as well for end users of its service.

[13] Amici Curiae New York Times, et al., has referred to an article summarizing a 2010 report that found the click-though rate for Google News was 56%, a rate that the author of the article believed was probably an understatement.  See http://techcrunch.com/2010/01/19/outsell-google-news/.

Meltwater has not provided that information either.  Nor has it offered a comparison between the click-through rate for any single News Report and the rate for a single Google News search or any other search for news conducted through a recognized Internet search engine.[14]

This was a conscious decision on Meltwater's part.  During the discovery period, AP repeatedly requested additional data about Meltwater's click-through rate in anticipation of any argument by Meltwater that Meltwater News directs traffic to the original websites for the news articles.  Meltwater took the position that the data was not relevant to these summary judgment motions and refused to provide this discovery.  The upshot is that Meltwater has no evidence that its system systematically drives its customers to third-party websites.

Instead of driving subscribers to third-party websites, Meltwater News acts as a substitute for news sites operated or licensed by AP.  Meltwater always reprints the story's title and lede, as well as material surrounding one targeted keyword. Just as a news clipping service should do, Meltwater

---

[14] In its Rule 56(d) motion, Meltwater has not suggested that it needs further discovery regarding click-through rates from third parties before these cross-motions for summary judgment may be decided.  Quite the contrary, in its own summary judgment motion, Meltwater takes the position that it is entitled to judgment on its fair use defense based on the record submitted.

systematically provides its subscribers with what in most instances will be the essence of the AP article relevant to that reader.[15]  And again, despite the obvious point of comparison given its characterization of itself as a search engine, Meltwater does not attempt to show that the extent of its taking from the copyrighted articles is no greater than that customarily done by search engines.  AP, in contrast, has offered evidence that Google News Alerts do not systematically include an article's lede and are -- on average -- half the length of Meltwater's excerpts.[16]

Rather than offering any evidence from which to compare its actual performance with that of Internet search engines, Meltwater has chosen to rely on two decisions from the Ninth Circuit Court of Appeals.  Meltwater argues from these two decisions that the extent of its copying of the underlying work is irrelevant to the fair use analysis since even the copying of the full work can be transformative when done by an Internet search engine.  Those two decisions, however, provide little

---

[15] While not all of this content is expressive or protected by copyright law, Meltwater has not disputed that some portion of it is.

[16] The sample Google News Alert excerpts provided with this motion are on average roughly 207 characters long (not including white spaces).

comfort to Meltwater.

In Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146 (9th Cir. 2007), the Ninth Circuit vacated a preliminary injunction and held that Google was likely to succeed in showing at trial that the display of small images called "thumbnails," which were reduced, lower-resolution versions of the plaintiff's copyrighted photographs of nude models, on Google Image Search webpages was a fair use of the images.  Id. at 1154-55, 1168. The court found that Google's use of thumbnails was "highly transformative" since its function was to serve as a pointer to a source of information rather than serving as a form of entertainment.  Id. at 1165.

Similarly, in Kelly v. Arriba Soft Corp., 336 F.3d 811 (9th Cir. 2003), the Court of Appeals for the Ninth Circuit held that the display of small low-resolution pictures, again called thumbnails, on the website of an Internet search engine constituted a fair use of the plaintiff's photographs of the American West.  Id. at 815.  The search engine in Kelly produced only thumbnails in response to a user's query, and no text.  The court found that the use of the thumbnails was transformative because their use was "unrelated to any aesthetic purpose" since any enlargement "results in a significant loss of clarity of the image, making them inappropriate as display material."  Id. at

818.  The display of thumbnails did not "stifle artistic creativity" or "supplant the need for the originals."  <u>Id</u>. at 820.

There are several distinctions to be drawn between the instant dispute and the issues at stake in <u>Perfect 10</u> and <u>Kelly</u>. The first and most obvious is that it was undisputed in both cases that the fair use defense was being applied to a search engine engaged in a transformative purpose.  Unlike the searches in <u>Perfect 10</u> and <u>Kelly</u>, Meltwater's searches are not publicly available and are run against a defined list of content providers.  As already noted, Meltwater has also not offered evidence that it actually functions like a search engine in other important respects.  In short, use of an algorithm to crawl over and scrape content from the Internet is surely not enough to qualify as a search engine engaged in transformative work.

The second observation that should be made is that the two Ninth Circuit decisions on which Meltwater relies provide little support for its argument that the reprinting of the entirety of a copyrighted work is a fair use so long as the reprinting is done by a search engine.  The works at issue in the two Ninth Circuit decisions were photographs, which by their nature are indivisible.  Neither <u>Perfect 10</u> nor <u>Kelly</u> can be fairly read to

41

support Meltwater's claim that it is irrelevant how much of the
Registered Articles it displayed in its search results.  By
emphasizing the small size and low resolution of the thumbnails,
the Ninth Circuit relied on the fact that the thumbnails could
not substitute adequately for the copyrighted works.  If
Meltwater captured and displayed the complete text of
copyrighted news stories, it could no longer attempt to defend
its business model as simply a search engine that aims to direct
readers to the underlying story.

Moreover, Meltwater's discussion of search engines is to
some extent beside the point.  While it is important to
understand how Meltwater News functions, even if it were a
search engine it would still be necessary to examine whether
Meltwater had acted to violate the Copyright Act.  The fact that
Perfect 10 and Kelly addressed the issue of the fair use defense
in the context of webpages created by a search engine, and found
the defense available to those defendants, does not relieve
Meltwater of its independent burden to prove that its specific
display of search results for its subscribers qualifies as a
fair use.  In other words, using the mechanics of search engines
to scrape material from the Internet and provide it to consumers
in response to their search requests does not immunize a
defendant from the standards of conduct imposed by law through

42

the Copyright Act, including the statutory embodiment of the fair use defense.

By the same token, even though it could be said that a search engine merely "repackages" the original work, Infinity Broadcast Corp., 150 F.3d at 108 & n.2., and does not transform it in the sense of adding "new expression, meaning or message," Campbell, 510 U.S. at 579, that does not mean that its taking is ineligible for protection under the fair use defense.  Where a defendant's use "is plainly different from the original purpose" for which the work was created, that use may be transformative. Bill Graham Archives, 448 F.3d at 609 (approving reproduction of a small image of poster along a timeline in a biography).  As described by amici, the purpose of search engines is to allow users to sift through the deluge of data available through the Internet and to direct them to the original source.  That would appear to be a transformative purpose.  But, as discussed above, Meltwater has not shown that that is how it functions.

Based on the undisputed facts in this record, Meltwater provides the online equivalent to the traditional news clipping service.  Indeed, Meltwater has described itself as adding "game-changing technology for the traditional press clipping market."  There is nothing transformative about that function. See, e.g., Video Pipeline, Inc. v. Buena Vista Home Entm't,

43

Inc., 342 F.3d 191, 199 (3d Cir. 2003) (clip previews of movies); Nihon, 166 F.3d at 72 (abstracts of news articles); Infinity Broadcast Corp., 150 F.3d at 108 (radio monitoring service); Los Angeles News Service v. Tullo, 973 F.2d 791, 797, 799 (9th Cir. 1992) (video news clipping service.); Pacific and Southern Co., Inc. v. Duncan, 744 F.2d 1490, 1496 (11th Cir. 1984) (TV news clipping service).

Finally, Meltwater seeks to defend its copying of the Registered Articles by pointing out that it used the content it takes from the Internet to also provide its subscribers with services like Dashboard Analytics.  Meltwater argues that this use of the material constitutes a transformative use.  This lawsuit does not challenge the display of any of Meltwater's analytics to its subscribers.  AP has not argued that the analysis of its publicly available content through these tools violates it rights.  The display of that analysis -- whether it be a graphic display of geographic distribution of coverage or tone or any other variable included by Meltwater -- is an entirely separate service, however, from the publishing of excerpts from copyrighted articles.  The fact that Meltwater also offers a number of analysis tools does not render its copying and redistribution of article excerpts transformative. In sum, the purpose and character of Meltwater's use of AP's

44

articles weigh against a finding of fair use.

B. Nature of the Copyrighted Work

The second factor -- the nature of the copyrighted work --
considers principally two characteristics of the copyrighted
work.  First, this factor calls for consideration of "whether
the work is expressive or creative, such as a work of fiction,
or more factual."  Blanch, 467 F.3d at 256 (citation omitted).
Works of fiction are "closer to the core of intended copyright
protection" than are works that are predominantly factual.
Infinity Broadcast Corp., 150 F.3d at 109 (citation omitted).
Accordingly, the scope of fair use is broader with respect to
factual works than it is with respect to works of fiction.  See
Nihon, 166 F.3d at 73.

The second characteristic of the copyrighted work that is
relevant to this factor is whether the work is published or
unpublished.  The right of first publication is an important
right held by the copyright owner and "the scope of fair use is
narrower with respect to unpublished works."  Wright v. Warner
Books, Inc., 953 F.2d 731, 737 (2d Cir. 1991) (citation
omitted).

AP's articles are news stories and therefore more
vulnerable to application of the fair use defense than works of
fiction.  Moreover, Meltwater copied works that were already

published.  As a consequence, this factor "is at most neutral on the question of fair use," Nihon, 166 F.3d at 73, and should be weighed in favor of finding fair use.

C. Amount and Substantiality of the Copying

The third factor examines the amount and substantiality of the copying by the infringing work.  This factor has both quantitative and qualitative dimensions, NXIVM Corp. v. the Ross Inst., 364 F.3d 471, 480 (2d Cir. 2004), and is reviewed "with reference to the copyrighted work, not the infringing work." Wright, 953 F.2d at 738.

The quantitative assessment examines the portion of the copyrighted work that was taken in relation to the whole of that work.  The qualitative dimension of this factor considers the importance of the expressive components of the portion copied. See Campbell, 510 U.S. at 587; see also Rogers v. Koons, 960 F.2d 301, 311 (2d Cir. 1992).  In other words, the court should consider whether the portion taken is "essentially the heart" of the copyrighted expression.  NXIVM Corp., 364 F.3d at 480 (citation omitted).  The "most relevant" question for this factor is whether the infringer has taken "no more" than is necessary.  Infinity Broadcast Corp., 150 F.3d at 110.

In terms of quantitative copying, the Second Circuit has found that copying as little as eight percent of the original

46

work may tip this factor against a finding of fair use.  Iowa State Univ. Research Found., Inc. v. Am. Broad. Co., 621 F.2d 57, 61-62 (2d Cir. 1980) (broadcasting of eight percent of student-made film); see also Salinger v. Random House, Inc., 811 F.2d 90, 98 (2d Cir. 1987) (copying one-third of seventeen letters and ten percent of forty-two letters weighed against finding of fair use).  It is clear, however, that no bright-line rule exists with respect to how much copying is too much.  New Era Publ'ns Intern., ApS v. Carol Publ'g Group, 904 F.2d 152, 158 (2d Cir. 1990).  Thus, in other cases, copying up to eight percent of an original work is not inconsistent with fair use. Id. (eight percent); Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1263 (2d Cir. 1986) (4.3 percent).  Indeed, while appropriation of a copyrighted work in its entirety weighs against a finding of fair use, where a work is indivisible it is not an absolute bar to such a finding.  See Bill Graham Archives, 448 F.3d at 613 (image of poster).  At the same time, relatively small takings may be significant if the portions taken are qualitatively important.  Harper & Row, 471 U.S. at 564-65 (copying of 300 words of biography held substantial where copied portion was "essentially the heart of the book").

The reasonableness of the amount and portions copied will vary depending on the character and purpose of the secondary

use.  It may be necessary for the secondary user to copy a
certain amount or specific portion of the original work in order
to accomplish the transformative purpose.  The Supreme Court's
analysis in Campbell v. Acuff-Rose Music, 510 U.S. 569 (1994),
is instructive.  In that case, a rap group -- 2 Live Crew --
sampled portions of Roy Orbison and William Dees' song "Oh,
Pretty Woman" in a rap parody entitled "Pretty Woman."  Id. at
572.  In considering the amount and substantiality of the
copying, the Supreme Court offered the following analysis:

> When parody takes aim at a particular work, the parody
> must be able to 'conjure up' at least enough of that
> original to make the object of its critical wit
> recognizable.  What makes for this recognition is
> quotation of the original's most distinctive or
> memorable features, which the parodist can be sure
> that audience will know.  Once enough has been taken
> to assure identification, how much more is reasonable
> will depend, say, on the extent to which the song's
> overriding purpose and character is to parody the
> original or, in contrast, the likelihood that the
> parody may serve as a market substitute for the
> original.

Id. at 588 (citation omitted).  An analysis of this factor may
offer insight into the fourth factor of the fair use analysis as
well.  In effect, the substantiality of the copying may
foreshadow the extent to which the second work will be capable
of serving as a market substitute for the original work.  Id. at
587.

   This factor weighs strongly against a finding of fair use

48

here.  Meltwater has not shown that its taking from the
Registered Articles was defensible from either a quantitative or
qualitative perspective.

Meltwater took between 4.5% and 61% of the Registered
Articles.  It automatically took the lede from every AP story.
As described by AP's Standards Editor, the lede is "meant to
convey the heart of the story."  A lede is a sentence that takes
significant journalistic skill to craft.  There is no other
single sentence from an AP story that is as consistently
important from article to article -- neither the final sentence
nor any sentence that begins any succeeding paragraph in the
story.

Nor has Meltwater attempted to show that it took no more
than necessary to perform as a search engine, which is how it
seeks to justify its infringement.  It has not offered evidence
that its automated programs for culling and displaying passages
from articles are consistent with the industry standards for
search engines.  As the evidence offered on this motion
illustrates, search engines regularly display briefer segments
of news articles.  As the CCIA describes the segments taken by
search engines, they are no more than "a headline and a snippet
of context" designed to direct users to the original source.
Indeed, in its foreign operations, it is undisputed that

49

Meltwater provides its customers with far less material than it provides in the United States.  In Canada it delivers only headlines, and in the United Kingdom its excerpts are far shorter.

Meltwater makes essentially three arguments to support its infringement under the third factor's quantitative and qualitative tests.  None of these arguments is persuasive.

First, Meltwater relies on Nihon, 166 F.3d at 65, to argue that its taking was not quantitatively significant.  In Nihon, the Second Circuit found, although acknowledging that it was a "close call," that the copying of only one paragraph of a six-paragraph news article was not an act of infringement since the two articles were not substantially similar in a "quantitative sense."  Id. at 71.  Since Meltwater has not chosen, however, to contest AP's showing that its copying of each of the Registered Articles was an act of infringement, the Nihon court's discussion about the substantial similarity test for infringement has limited relevance here.  In any event, when it reached the fair use defense, the Nihon court found that the abstracting of news articles by the defendant was not a fair use of those articles.  In connection with the third factor, it emphasized the amount of copying of protectable expression and

held that this factor also tipped against fair use.  Id. at 73.[17]

Next, Meltwater argues that the extent of its copying is justified because its purpose is to serve as a search engine. But, Meltwater has failed to show that it takes only that amount of material from AP's articles that is necessary for it to function as a search engine.  Indeed, the evidence is compellingly to the contrary.

Finally, Meltwater disagrees that the lede is qualitatively significant.  It points out that two of the ledes are teasers and not summaries of news.[18]  This observation misses the mark. If anything, the observation emphasizes the creativity and therefore protected expression involved with writing a lede and the skill required to tweak a reader's interest.

> D. The Effect of the Use on the Potential Market or Value of the Work

> The final fair use factor is multi-faceted.  It

> requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and

---

[17] In Nihon, the court found that the average abstract used two-thirds of the protectable material, using the same structure and organization of facts.  166 F.3d at 71.

[18] Meltwater quotes the following two ledes:  "When Emily Russell's two young sons wake up on Christmas morning, they'll find that Santa left them a note instead of the videogames they requested;" and "To much of the nation, Ted Stevens was the crotchety senator who famously referred to the Internet as 'a series of tubes' and fought to build the 'Bridge to Nowhere.'"

> widespread conduct of the sort engaged in by the
> defendant would result in a substantially adverse
> impact on the potential market for the original.

Campbell, 510 U.S. at 590 (citation omitted).  Where there is a
fully functioning market for the infringer's use of the
copyrighted material, it will be difficult for the infringing
party to show that it made fair use without paying a licensing
fee.  See Harper & Row, 471 U.S. at 566 n.9.  In contrast, "when
the only possible adverse effect occasioned by the secondary use
would be to a potential market or value that the copyright
holder has not typically sought to, or reasonably been able to,
obtain or capture," this fourth factor will favor the infringer.
Am. Geophysical Union, 60 F.3d at 930.  But, again, because fair
use is an affirmative defense, it is the defendant's burden to
present evidence of relevant markets that is favorable to its
defense.  Campbell, 510 U.S. at 590; Infinity Broadcast Corp.,
150 F.3d at 110.

When analyzing the fourth factor, "the impact on potential
licensing revenues is a proper subject for consideration."  Am.
Geophysical Union, 60 F.3d at 929.  In considering this type of
harm, however, a court must be wary of falling into the trap of
circular reasoning.  The Second Circuit has provided the
following guidance:

> [I]t is not unsound to conclude that the right to seek

payment for a particular use tends to become legally
cognizable under the fourth fair use factor when the
means for paying for such a use is made easier.  This
notion is not inherently troubling: it is sensible
that a particular unauthorized use should be
considered more fair when there is no ready market or
means to pay for the use, while such an unauthorized
use should be considered less fair when there is a
ready market or means to pay for the use.  The vice of
circular reasoning arises only if the availability of
payment is conclusive against fair use.

Id. at 930-31.  Thus, in order to prevent the loss of licensing

fees from becoming a syllogistic consideration, courts consider

only the loss to potential licensing revenues from "traditional,

reasonable, or likely to be developed markets."  Id. at 930; see

also Bill Graham Archives, 448 F.3d at 614.

Consequently, when the use is transformative or takes place

in a market that the copyright holder is unlikely to develop, it

is more likely that the defendant has engaged in a fair use of

the material.  After all, "[c]opyright holders rarely write

parodies of their own works, or write reviews of them, and are

even less likely to write news analyses of their underlying data

from the opposite political perspective."  Twin Peaks Products,

Inc. v. Publ'ns Intern LTD, 996 F.2d 1366, 1377 (2d Cir. 1993)

(citation omitted); cf. Campbell, 510 U.S. at 592-93.

Accordingly, while a copyright holder's current participation in

a given market is relevant to the determination of whether the

market is "traditional, reasonable, or likely to be developed,"

it is not determinative.

> [A] copyright holder cannot prevent others from
> entering fair use markets merely by developing or
> licensing a market for parody, news reporting,
> educational or other transformative uses of its own
> creative work.

Bill Graham Archives, 448 F.3d at 614-15 (citation omitted).  In

other words, "[c]opyright owners may not preempt exploitation of

transformative markets."  Id. at 615 (citation omitted).

Additionally, this factor requires careful attention to the

source or cause of the harm.

> If the harm resulted from a transformative secondary
> use that lowered the public's estimation of the
> original (such as a devastating review of a book that
> quotes liberally from the original to show how silly
> and poorly written it is), this transformative use
> will be found to be a fair use, notwithstanding the
> harm.

On Davis, 246 F.3d at 175.  The concern of this factor is not

with "whether the secondary use suppresses or even destroys the

market for the original work or its potential derivatives, but

[with] whether the secondary use usurps or substitutes for the

market of the original."  Castle Rock Entm't, 150 F.3d at 145.

The fourth factor weighs strongly against Meltwater.  AP

has expended considerable effort to develop an on-line presence.

Among other things, it licenses its content to media monitoring

services that live in the very commercial space in which

Meltwater resides.  By refusing to pay a licensing fee to AP,

Meltwater not only deprives AP of a licensing fee in an established market for AP's work, but also cheapens the value of AP's work by competing with companies that <u>do</u> pay a licensing fee to use AP content in the way that Meltwater does.  The value of AP's work is further harmed by the fact that Meltwater directly competes with AP for customers.  Through its use of AP content and refusal to pay a licensing fee, Meltwater has obtained an unfair commercial advantage in the marketplace and directly harmed the creator of expressive content protected by the Copyright Act.

Meltwater ignores most of this record.  It relies almost exclusively on its contentions that it is a search engine and that search engines make a transformative use of the copyrighted news stories.  But, as discussed above, AP has not shown that it should be characterized as a search engine imbued with a transformative purpose; adopting technology used by search engines does not by itself make one a search engine in this sense.  As tellingly, Meltwater has not shown that it has taken only that amount of content that is necessary for it to function as a search engine.

E. Aggregate Assessment of the Fair Use Factors

Examining the four factors individually, and considering them as a whole in light of the purposes of the Copyright Act

55

and the fair use defense, Meltwater has failed to raise a
material question of fact to support its fair use defense.
Meltwater's business model relies on the systematic copying of
protected expression and the sale of collections of those copies
in reports that compete directly with the copyright owner and
that owner's licensees and that deprive that owner of a stream
of income to which it is entitled.  Meltwater's News Reports
gather and deliver news coverage to its subscribers.  It is a
classic news clipping service.  This is not a transformative
use.  As significantly, the rejection of the fair use defense
here will further the ultimate aim of the Copyright Act, which
is to stimulate the creation of useful works for the public
good.  Harper & Row, 471 U.S. at 558.

Throughout its discussion of the fair use defense,
Meltwater has attempted to escape the straight forward
application of the four-part fair use test by characterizing
itself as a search engine.  Meltwater has failed to show,
however, that its interactions with its subscribers are
equivalent in any material way to the functioning of search
engines, as that term is commonly understood.  Exploitation of
search engine technology to gather content does not answer the
question of whether the business itself functions as a search
engine.  In any event, however Meltwater's business is

56

classified, it must still show that its use of copyrighted

expressive content was a fair use.  This it has not done.

II. Implied License

AP has also moved for summary judgment on Meltwater's

second affirmative defense, the defense that Meltwater was

granted an implied license by AP.  It is a defense to copyright

infringement that the alleged infringer possessed a license to

use the copyrighted work.  Graham v. James, 144 F.3d 229, 236

(2d Cir. 1998).  The burden of proving that a license exists

falls on the party invoking the defense.  Id.

Pursuant to the Copyright Act, all grants of exclusive

rights in a copyright must be made in writing.  17 U.S.C. §

204(a).  Nonexclusive licenses, however, need not be in writing.

17 U.S.C. § 101; see also MacLean Assocs. Inc. v. VM. M. Mercer-

Medinger-Hansen, Inc., 952 F.2d 769, 778-79 (3d Cir. 1991).

Thus, a nonexclusive license can be granted orally or it can be

implied from conduct.  See MacLean Assocs., 952 F.2d at 778-79.

As the Supreme Court explained in De Forest Radio Telephone &

Telegraph v. United States, 273 U.S. 236 (1927), in the course

of deciding whether a company had given a license to the United

States to manufacture a product covered by patents:

> No formal granting of a license is necessary in order
> to give it effect.  Any language used by the owner of
> the patent or any conduct on his part exhibited to

> another, from which that other may properly infer that
> the owner consents to his use of the patent in making
> or using it, or selling it, upon which the other acts,
> constitutes a license, and a defense to an action for
> a tort.

Id. at 241.

The test for determining whether an implied license exists in the copyright context has three elements.  The defendant must show that

(1) the licensee requested the creation of a work;

(2) the licensor made that particular work and delivered it to the licensee who requested it; and

(3) the licensor intended that the licensee copy and distribute his work.

See Latimer v. Roaring Toyz, Inc., 601 F.3d 1224, 1235 (11th Cir. 2010); see also Wilchombe v. TeeVee Tonns, Inc., 555 F.3d 949, 956 (11th Cir. 2009); Atkins v. Fischer, 331 F.3d 988, 991-92 (D.C. Cir. 2003); Nelson-Salabes, Inc. v. Morningside Development, LLC, 284 F.3d 505, 514 (4th Cir. 2002); I.A.E. Inc. v. Shaver, 74 F.3d 768, 776 (7th Cir. 1996).  The circumstances in which an implied license may be found are therefore quite "narrow."  SmithKline Beecham Consumer Healthcare v. Watson Pharmaceuticals, Inc., 211 F.3d 21, 25 (2d Cir. 2000) (citation omitted).

Even those courts that do not require evidence of each of

these three elements do require evidence of a meeting of the minds between the licensor and licensee such that it is fair to infer that the licensor intended to grant a nonexclusive license.  Baisden v. I'm Ready Prods., Inc., 693 F.3d 491, 501 (5th Cir. 2012) (collecting cases); see also Psihoyos v. Pearson Educ. Inc., 855 F.Supp.2d 103, 124 (S.D.N.Y. 2012).  Since an implied license is a creature of contract law, the parties' intent is a critical factor.  I.A.E., 74 F.3d at 775-76; see also Johnson v. Jones, 149 F.3d 494, 502 (6th Cir. 1998).

Meltwater has failed to offer evidence from which a reasonable juror could conclude that AP impliedly granted Meltwater a license to copy and distribute its articles.  It is undisputed that the Registered Articles were not created at Meltwater's request.  Moreover, the parties had essentially no contact with each other before this litigation.[19]  As a result, Meltwater is unable to point to any interaction with AP from which it could be inferred that there was a meeting of minds between the parties that AP was granting Meltwater a nonexclusive license to extract and re-publish excerpts of its news stories that appeared on the Internet.

Meltwater has not shown that it had the type of interaction

---

[19] Meltwater insists that the parties had no contact in 2009, 2010, or 2011, while AP contends there was "a casual" exchange between the parties in January 2011.

with AP that existed in any of those few instances in which Courts of Appeals across the country have found evidence of an implied license.  See, e.g. Lukens Steel Co. v. Am. Locomotive Co., 197 F.2d 939, 941 (2d Cir. 1952) (the parties "were engaged in business relationship involving mutual confidence and mutual effort"); Atkins, 331 F.3d at 990 (parties had formal agreement under which appellant would create designs for appellees' product); I.A.E., 74 F.3d at 771-72, 776 (architect prepared schematic design drawings at company's request and delivered copies to company).

Nor has Meltwater offered any evidence of interaction with any of AP's licensees from which it could be inferred that any one of those licensees had impliedly granted a sublicense to Meltwater to excerpt material found on their websites.  This is unsurprising since AP's licenses do not grant its licensees the authority to sublicense AP content.

In its opposition, Meltwater makes one argument to support its affirmative defense of implied license.  It once again equates its activities with those of a search engine that makes its searches freely available to the public in order to direct the Internet user to the websites that respond to the user's search requests.  Meltwater argues that AP impliedly granted Meltwater a license to use the Registered Articles when it did

60

not require its licensees to employ on their websites robots.txt
protocol to exclude web crawlers.[20]

Meltwater has not offered any expert testimony about
robots.txt, but the parties appear to agree that it functions as
follows. Robots.txt protocol, also known as the Robot Exclusion
Standard, was designed by industry groups to instruct
cooperating web crawlers not to access all or part of a website
that is publicly viewable. If a website owner uses the
robots.txt file to give instructions about its site to web
crawlers, and a crawler honors the instruction, then the crawler
should not visit any pages on the website. The protocol can
also be used to instruct web crawlers to avoid just a portion of
the website that is segregated into a separate directory.

For several reasons, the failure of AP's licensees to
employ the robots.txt protocol did not give Meltwater an implied
license to copy and publish AP content. First, what Meltwater
is suggesting would shift the burden to the copyright holder to
prevent unauthorized use instead of placing the burden on the
infringing party to show it had properly taken and used content.

---

[20] Meltwater makes this argument with respect to AP licensees
alone, but Meltwater's argument would seemingly apply with equal
force to AP's own websites. Applying Meltwater's reasoning, AP
itself would have to adopt a robots.txt protocol to limit the
access of web crawlers to its own websites or be deemed to have
granted them an implied license.

As significantly, there is no fair inference, based simply
on the absence of the robots.txt protocol, that there has been a
meeting of the minds between the copyright owner and the owner
of the web crawler about the extent of copying.  The implied
license that Meltwater is advocating would reach to every web
crawler with no distinction between those who make fair use and
those who do not, or between those whose uses may be publicly
observed and those whose uses are hidden within closed,
subscriber systems.  Meltwater has presented no evidence to
suggest that robots.txt instructions are capable of
communicating which <u>types</u> of use the copyright holder is
permitting the web crawler to make of the content or the extent
of the copying the copyright holder will allow.

There are also practical problems with Meltwater's argument
in the event that AP and its licensees wanted to continue to
permit search engines to visit their sites.  AP is engaged in an
ongoing licensing program that includes granting licenses that
permit the scraping of AP content by web crawlers from online
sources.  Robots.txt protocol can be adopted to allow or
disallow specific web crawlers.  If Meltwater's argument were
successful, with each change in the list of licensees AP and
each of its licensees would have to update their robots.txt
protocol to indicate which web crawlers had permission to visit

each site's webpages.[21]

There is yet another policy reason against the use of robots.txt protocol to enforce the Copyright Act. The protocol is a helpful innovation that gives instructions to cooperating crawlers. But, in the interest of openness on the Internet, one would expect it to be used only when it is in the clear interest of the website to broadly limit access. It is fair to assume that most Internet users (and many owners of websites) would like crawlers employed by search engines to visit as many websites as possible, to include those websites in their search results, and thereby to direct viewers to a vast array of sites. Adopting Meltwater's position would require websites concerned about improper copying to signal crawlers that they are not welcome.

Finally, in support of its argument, Meltwater cites Field v. Google, 412 F.Supp.2d 1106 (D. Nev. 2006), and Parker v. Yahoo!, Inc., No. 07 Civ. 2757, 2008 WL 4410095 (E.D. Pa. Sept. 25, 2008). Neither decision suggests that AP impliedly

---

[21] While the robots.txt protocol could work precisely the opposite way, that is, to indicate that every web crawler is permitted access except for those for whom permission is denied, it is difficult to envision how a website could effectively manage a program that requires it to keep an accurate list of all crawlers who are roaming the web and for whom permission is being denied. Meltwater has reserved the right, however, to ignore an exclusion list that lists it.

consented to the copying done by Meltwater because its licensees permitted search engines to crawl their sites.  These two decisions principally discuss a website protocol that performs a different function than robots.txt.  They address the storage of web pages by search engines.  The "cached" pages at issue allowed users of the search engines to access an archival copy of a webpage stored in the search engine's system.  The archival copy shows the page as it appeared the last time the search engine visited the page.  Field, 412 F.Supp.2d at 1111.  This can be particularly useful when a page has been removed from its original location.  Id.  By adopting a "no-archive" meta-tag, the website owner could instruct the search engines not to provide a cached link to search engine users.  Id. at 1112-13.  The copyright owners in each of these decisions chose not to use the "no-archive" meta-tags, knew that the search engines would honor the meta-tags, and also knew the search engines would remove the cached copy upon request.  In such circumstances, the courts found an implied license.  Id. at 1116; Parker, 2008 WL 4410095, at *4.

Meltwater does not provide its subscribers with access to cached pages, reserves the right to disregard certain robots.txt instructions, and has not suggested that it will remove content from its system at the request of the copyright owner.  As a

result, these two decisions have limited relevance.

It is worth observing that, when a crawler is making a fair use of a website's content, it does not need to resort to the implied license doctrine; where it does not, then the website's failure to use the robots.txt protocol to block its access will not create an implied license.  Accordingly, Meltwater's implied license defense fails as a matter of law.[22]

III. Equitable Estoppel

Meltwater relies on three additional affirmative defenses as reasons why summary judgment may not be entered in favor of AP on its copyright infringement claim.  The first is equitable estoppel.

Meltwater argues that AP is estoped from bringing its

---

[22] Although Meltwater has not moved for summary judgment on its affirmative defense of an implied license, it has argued that the evidence presented in connection with these summary judgment motions "establishes" its implied license "as a matter of law." Nonetheless, it makes one request pursuant to Rule 56(d) in the event the Court disagrees and believes that AP's motion has merit.  Meltwater contends that it needs discovery of AP's internal documents that discuss the "viability" of robots.txt. This argument does not prevent an entry of summary judgment for AP.  Meltwater never mentioned the phrase "robots.txt" in any of its document requests of AP or in any application to the Court for additional discovery.  It had a full opportunity to take discovery of AP on this issue and every other issue related to this summary judgment motion and may not prevent entry of summary judgment for AP through this belated request.  In any event, discovery of AP's internal deliberations regarding the robots.txt protocol would have no impact on the decision reached above.

claim of copyright infringement because it failed to take protective measures and was silent in the face of Meltwater's actions.  This defense is no more effective than Meltwater's affirmative defense of implied license.

The doctrine of equitable estoppel applies "where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 292 (2d Cir. 2002) (citation omitted). Essential to any finding of estoppel is "detrimental reliance on the adverse party's misrepresentations."  Republic of Ecuador v. Chevron Corp., 638 F.3d 384, 400 (2d Cir. 2011).  Reliance is not justifiable if the party invoking estoppel "had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means."  In re Becker, 407 F.3d 89, 99 (2d Cir. 2005) (citation omitted) (Emphasis omitted.)  Silence alone is rarely a basis for finding equitable estoppel, but "where a party has a legal duty to speak, silence can constitute an affirmative 'misrepresentation.'"  Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001); see also Veltri v. Bldg 32B-J Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004); General Elec. Capital Corp. v. Armadora, S.A., 37

F.3d 41, 45 (2d Cir. 1994).

Meltwater has not carried its burden of raising a question of fact suggesting that AP made any misrepresentations or acted in any way that would have justified Meltwater believing that it was entitled to publish the excerpts from the Registered Articles or would not be sued for copyright infringement if it did.  Meltwater has not pointed to any representation by AP or its licensees that led it to believe that it could act as it did in publishing the excerpts of AP articles.  To the contrary, many if not all of AP's licensees display terms of use on their websites prohibiting the commercial use of content.[23]  Nor has Meltwater shown that it acted with the diligence required to assert this defense.  Indeed, Meltwater has not offered any evidence that it actually held the belief that AP had authorized it to publish the excerpts it took from AP online articles.

Meltwater relies instead on two omissions by AP to support its affirmative defense of equitable estoppel.  The first is that AP did not restrict general access to its online content by

---

[23] AP has offered examples of the terms of use found on a number of AP's licensees' websites.  Meltwater objects that AP has not demonstrated that these terms of use were present on the licensees' websites during the time period in which Meltwater scraped articles from those websites.  It is undisputed, however, that in at least one instance, Meltwater had knowledge of a website's terms of use prohibiting commercial use of the website's content and nonetheless scraped an AP article from that website a month later.

requiring its licensees to put AP content behind a paywall, require registration for access, or use robots.txt instructions to signal that AP content was off-limits.  AP had no duty to take any of these steps before it could act to enforce its rights against copyright infringement.  No infringer of AP's copyright could reasonably rely on the absence of these measures to excuse infringement.

Meltwater next argues that, until it initiated this lawsuit, AP never told Meltwater that it had any objection to Meltwater's use of AP content.  But, Meltwater has offered no evidence of any relationship or communication with AP that imposed upon AP the duty to speak.  In the absence of a duty to speak, Meltwater could not reasonably rely on AP's alleged silence about its copyright infringement.

Not only has Meltwater failed to offer evidence of any justifiable reliance, but the evidence submitted on these motions also indicates that Meltwater was on notice of the risk it ran of being sued by AP for copyright infringement.  As mentioned, many -- if not all -- of the websites that Meltwater crawled in order to copy AP articles post terms of use that specifically prohibit commercial use of the website's content. In October of 2007, AP sued one of Meltwater's competitors -- Moreover Technologies, Inc. ("Moreover") -- for copyright

68

infringement on the basis of Moreover's scraping of AP content
from websites and distribution of excerpts or entire articles to
Moreover's customers.[24]  In April 2009, AP issued a press release
describing its launch of an industry initiative to protect news
content from online misappropriation.  Later that year, AP
announced that an initiative to monitor the use of AP's content
online had been created.  Had Meltwater been reasonably diligent
in acquiring knowledge about AP's views on the commercial
redistribution of its content, it could not have remained
ignorant of the true facts.  Meltwater has failed, therefore, to
show that the doctrine of equitable estoppel prevents the entry
of summary judgment in favor of AP.

IV. Laches

    Meltwater also argues that its affirmative defense of
laches prevents summary judgment from being granted in AP's
favor.  The Copyright Act sets a three-year statute of
limitations for copyright infringement claims.  17 U.S.C. §
507(b).  A copyright claim accrues "when a plaintiff knows or
has reason to know of the injury upon which the claim is

---

[24] Meltwater objects to the evidence of AP's complaint against
Moreover on the ground that it constitutes inadmissible hearsay.
The complaint has not been received for the truth of the matters
asserted.  Instead it has been received as evidence of
Meltwater's notice that AP was unlikely to consider Meltwater's
actions authorized.

69

premised." Merchant v. Levy, 92 F.3d 51, 56 (2d Cir. 1996).
When the copyright claim is based on infringement, the "action
may be commenced within three years of any infringing act,
regardless of any prior acts of infringement." Kwan v. Schlein,
634 F.3d 224, 228 (2d Cir. 2011).  The parties agree that the
plaintiff's copyright infringement claims with respect to the
Registered Articles were filed within the three-year statute of
limitations.

     The defendant claims that while the statute of limitations
may not bar the plaintiff's claims, the doctrine of laches does.
The doctrine of laches is derived from the equitable principle
that "equity aids only the vigilant, and not those who sleep on
their rights." Ivani Contracting Corp. v. City of New York, 103
F.3d 257, 259 (2d Cir. 1997) (citation omitted).  The doctrine
of laches has three elements: "(1) the plaintiff knew of the
defendant's misconduct; (2) the plaintiff inexcusably delayed in
taking action; and (3) the defendant was prejudiced by the
delay." Ikelionwu v. United States, 150 F.3d 223, 237 (2d Cir.
1998) (laches applied to request for return of seized property).

     There is disagreement among the Circuits regarding whether
laches is a viable defense to a copyright claim brought within
the three-year statute of limitation.  See Petrella v. Metro-
Goldwyn-Mayer, Inc., 695 F.3d 946, 958 (9th Cir. 2012)

(Fletcher, J., concurring) (describing the circuit split).  In
the Second Circuit, "[t]he prevailing rule" in the context of a
federal statutory claim seeking legal relief, is one in which
"laches cannot bar that claim, at least where the statute
contains an express limitations period within which the action
is timely." Ivani Contracting Corp., 103 F.3d at 260.  Even in
the context of an action in equity, the doctrine of laches will
rarely be applied within this circuit to an action brought
within the statutory period.  Ikelionwu, 150 F.3d at 238.
Nonetheless, severe prejudice coupled with unconscionable delay
may limit injunctive relief in a copyright action.  New Era
Publ'ns, 873 F.2d at 584-85.

       Accordingly, laches is not a defense to the plaintiff's
claim for damages.  Laches is also not available to Meltwater as
a defense to copyright infringement to the extent AP seeks
prospective injunctive relief.  See Peter Letterese and Assocs.
Inc., 533 F.3d at 1321.  Equitable considerations -- like laches
-- may arise, however, where a plaintiff seeks retrospective
injunctive relief and can demonstrate each of the traditional
elements of the laches defense.  See New Era Publ'ns, 873 F.2d
at 584.

       In its amended complaint, AP seeks both damages and
injunctive relief.  In terms of injunctive relief, AP seeks both

prospective relief and an order requiring Meltwater to "delete
from its database and all computers under Defendants' control
all copyrighted materials owned by AP and all AP news reports."
Should Meltwater carry its burden of showing laches, it would at
most be able to bar AP's request that AP's content be swept from
Meltwater's databases.  The parties will be given an additional
opportunity to address whether retrospective injunctive relief
should be granted in this case.

V. Copyright Misuse

    As its fifth and final affirmative defense to AP's
copyright infringement claims, Meltwater argues that AP should
be barred from enforcing its copyrights because -- by engaging
in price-fixing with competing news organizations in violation
of the antitrust laws -- it has misused its copyrights.  This
final defense fails as well.

    The Second Circuit has not yet recognized the affirmative
defense of copyright misuse.  See Shady Records v. Source
Enters., 03 Civ. 9944 (GEL), 2005 WL 14920, at *15 (S.D.N.Y.
Jan. 3, 2005).  Although copyright misuse has been acknowledged
as a potential affirmative defense to an action for copyright
infringement in at least five circuits, only a handful of
decisions have ever applied it to bar an otherwise successful
claim of copyright infringement.  See Video Pipeline, 342 F.3d

at 206 (recognizing defense but finding no misuse); Alcatel USA, Inc. v. DGI Technologies, Inc., 166 F.3d 772, 795 (5th Cir. 1999) (plaintiff's copyright misuse barred it from obtaining injunctive relief on its copyright infringement claim); Practice Mgmt. Info. Corp. v. Am. Med. Assoc., 121 F.3d 516, 521 (9th Cir. 1997) (reversing award of damages and injunction for copyright infringement because of plaintiff's copyright misuse); Lasercomb Am. v. Reynolds, 911 F.2d 970, 979 (4th Cir. 1990) (reversing award of damages and injunction for copyright infringement due to plaintiff's copyright misuse); United Telephone Co. of Missouri v. Johnson Pub. Co., Inc., 855 F.2d 604, 612 (8th Cir. 1988) (assuming defense exists but finding no misuse).

The defense of copyright misuse arises from the better-known defense of patent misuse described in Morton Salt Co. v. G.S. Suppiger, 314 U.S. 488 (1942).  In Morton Salt, the patent holder for the design of a salt-depositing machine also produced salt tablets.  Morton Salt entered into licensing agreements that required its licensees to use Morton salt tablets exclusively.  When Morton Salt brought suit for patent infringement, the Supreme Court found that its suit was barred by its use of its "patent monopoly to restrain competition in the marketing of unpatented articles."  Id. at 491.  The Supreme

Court described the rationale behind the defense as follows:

> The grant to the inventor of the special privilege of
> a patent monopoly carries out a public policy adopted
> by the Constitution and laws of the United States, 'to
> promote the Progress of Science and useful Arts, by
> securing for limited Times to Inventors the Exclusive
> Rights . . . to their 'new and useful' inventions.
> But the public policy which includes inventions within
> the granted monopoly excludes from it all that is not
> embraced in the invention.  It equally forbids the use
> of the patent to secure an exclusive right or limited
> monopoly not granted by the Patent Office and which it
> is contrary to public policy grant.

Id. at 492 (citation omitted).

In 1990, the Fourth Circuit became the first circuit to
expressly recognize the defense of copyright misuse.  Lasercomb
Am., 911 F.2d at 977-79.  Relying on "[t]he origins of patent
and copyright law in England, the treatment of these two aspects
of intellectual property by the framers of our Constitution, and
the later statutory and judicial development of patent and
copyright law in this country," the court concluded that the
misuse of copyright should be available as a defense to
copyright infringement.  Id. at 974.  It further concluded that
the existence of an antitrust violation was not a pre-requisite
to a viable copyright misuse claim:

> [W]hile it is true that the attempted use of a
> copyright to violate antitrust law probably would give
> rise to a misuse of copyright defense, the converse is
> not necessarily true -- a misuse need not be a
> violation of antitrust law in order to comprise an
> equitable defense to an infringement action.  The

> question is not whether the copyright is being used in
> a manner violative of antitrust law . . . but whether
> the copyright is being used in a manner violative of
> the public policy embodied in the grant of copyright.

Id. at 978.  Consistent with this rationale, it described

copyright misuse as arising from a copyright holder's attempt to

use its copyright in a particular expression "to control

competition in an area outside the copyright."  Id. at 979.

Whatever the metes and bounds of the defense, it is one

that is applied "sparingly."  Apple Inc. v. Pystar Corp., 658

F.3d 1150, 1157 (9th Cir. 2011).  Its focus is on the improper

stifling of competition.  Id. at 1157-59.

Meltwater contends that it has offered sufficient evidence

that AP engaged in a per se violation of the antitrust laws to

raise a question of fact that prevents summary judgment being

granted on AP's copyright infringement claim.  Specifically,

Meltwater asserts that it has offered evidence that AP violated

antitrust law "[b]y foisting a pricing structure and minimum

target prices upon a licensing entity, and by sharing its own

pricing information" with that licensing agency and its members.

The licensing entity to which Meltwater is referring is

NewsRight.  NewsRight is a joint venture between AP and other

publishers formed in 2011 and publicly launched in 2012.

NewsRight's stated aim is to "work with third parties -- such as

commercial aggregators and media-monitoring companies -- to
license content from a large set of major publishers and to
allow both publishers and third-party licensees to track and
analyze the use of news content online." Those news publishers
that are members of NewsRight have authorized NewsRight to
license their content on a nonexclusive basis. So far,
NewsRight has entered into two license agreements, but it has
not yet licensed any AP content.

Even assuming that this circuit were to adopt the
affirmative defense of copyright misuse to a claim of copyright
infringement, and assuming further that Meltwater had raised a
question of fact as to whether AP shared its own pricing
information with NewsRight and "imposed" a pricing structure on
and minimum prices for the licenses offered by the joint
venture, Meltwater has not shown that summary judgment should
not be granted to AP on its copyright infringement claim. AP's
alleged conduct does not amount to copyright abuse. Nothing in
the conduct alleged by Meltwater suggests that AP has improperly
leveraged its copyrights to exert control over competition in
the delivery of news. Every one of its competitors, whether a
member of NewsRight or not, retains the power to issue its own
licenses according to whatever pricing scale it chooses. AP
does not create the news, control access to the news, or have

76

any power to restrict any other party's entry into the business of reporting the news.  Meltwater has not explained how AP's supposed actions would have interfered with the Copyright Act's goal of "increas[ing] the store of creative expression for the public good."  Video Pipeline, 342 F.3d at 205.

Moreover, Meltwater's proffered evidence does not even suggest any misconduct by AP.  Meltwater's argument that AP has used its participation in NewsRight to engage in price fixing relies on essentially three documents.  The most significant of these is an email from 2011, in which AP suggests that the aggregator market be divided into three segments (Top players; Premium Institutional Specialists; and PR Community/Press Clipping Services) and then suggests minimum target licensing fees for NewsRight's licenses within each of the segments.[25] NewsRight ultimately rejected this approach and developed a different licensing structure.  Nothing in this opening gambit about the appropriate pricing structure for the creation of a new product by a joint venture suggests a violation of the antitrust laws.  In sum, Meltwater has not shown that the

---

[25] The other two documents, two letters exchanged between AP and the Department of Justice, are about a proposed voluntary registry.  A version of that voluntary registry was apparently incorporated into NewsRight and nothing in that correspondence suggests misconduct.

doctrine of copyright misuse, even if adopted in this circuit, should prevent summary judgment being awarded to AP on its claim of copyright infringement.[26]

## VI. Meltwater's Motion for Summary Judgment on AP's Secondary Infringement Claims

In addition to moving for summary judgment on the basis of its fair use defense, Meltwater has moved for summary judgment on AP's claims of contributory and vicarious copyright infringement. These claims are based on AP's allegations that Meltwater has encouraged and assisted its customers to copy, store, and redistribute AP articles or portions of AP articles,

---

[26] Meltwater contends that the evidence it has gathered raises a triable issue of fact on its copyright misuse defense, but argues in its Rule 56(d) motion that if the Court disagrees with Meltwater that Meltwater should be permitted to take further discovery about AP's relationship with NewsRight since AP only produced documents "sufficient" to show NewsRight's role in licensing AP content and did not respond completely to the document requests posed by Meltwater.

Meltwater made a limited request of AP for documents concerning NewsRight, and that request related to the licensing of the Registered Articles by NewsRight. It is undisputed that the Registered Articles were never licensed by NewsRight. Despite Meltwater's narrow document request, AP searched all of its e-discovery custodians for communications with NewsRight concerning licensing efforts generally and produced such documents. It also searched for hard-copy documents from those same custodians and produced documents sufficient to show NewsRight's role in licensing AP content, among other things. Meltwater examined AP deponents at length about NewsRight. In sum, Meltwater has not shown that it is entitled to further discovery on this issue before summary judgment may be entered for AP.

in particular, through the use of Meltwater's archiving, Newsletter, and Newsfeed functions.  In its motion for summary judgment, Meltwater points out that AP has offered no evidence that an actual Meltwater customer ever stored or distributed full text versions of any of the thirty-three Registered Articles.[27]  Because there is no evidence of direct infringement by its customers, Meltwater contends, there can be no finding of contributory or vicarious copyright infringement.  In an affidavit submitted pursuant to Federal Rule of Civil Procedure 56(d), AP requests additional discovery.  Because Meltwater's motion for summary judgment is based principally on AP's failure of proof, and because AP is entitled to additional discovery on these claims, Meltwater's motion is denied without prejudice to renewal.

VII. Meltwater's Evidentiary Objections

Meltwater has filed two motions to strike.  In Meltwater's first motion, it seeks to strike: (1) the declaration of Elizabeth McNamara in its entirety and sixty-seven of the accompanying exhibits; (2) portions of the declaration of Sue

---

[27] There is evidence that AP's investigator copied and stored the full text of AP articles using a trial subscription to Meltwater News.  There is also evidence that Meltwater customers used excerpts from two of the Registered Articles and distributed them in ten newsletters.

Cross ("Cross") and eight of the accompanying exhibits; (3) portions of the declaration of Thomas Curley ("Curley") and four of the accompanying exhibits; (4) portions of the declaration of Joy Jones ("Jones") and seven of the accompanying exhibits; (5) portions of the declaration of Thomas Kent; (6) portions of the declaration of John D. Rizzo and four of the accompanying exhibits; and (7) substantial parts of AP's Rule 56.1 statement. The second motion seeks to strike: (1) the declaration of Alison B. Schary in its entirety and eight of the accompanying exhibits; and (2) portions of the declaration of Linda Steinman. In addition, both parties have raised objections in their Rule 56.1 counterstatements of undisputed material facts. Some of these objections have already been addressed. To the extent that any objection is not discussed in this Opinion and the Court relied on the challenged evidence, the objection has been considered and rejected. Three more categories of objections are addressed below.

First, however, it is important to note that most of the facts in this case are undisputed. In particular, the Opinion's description of Meltwater's system is taken largely from Meltwater's own documents and the accounts of its own affiants and deponents. Many of Meltwater's evidentiary objections instead focus on the manner in which AP characterizes certain

evidence.  The Court has disregarded the parties'
characterizations and relied on the underlying documents.

In its motions to strike, Meltwater argues that the Court
should also strike statements and documents regarding matters
occurring prior to 2009, because "AP unilaterally imposed a date
restriction of January 1, 2009" in responding to Meltwater's
document requests.  Both parties preserved their objections to
the production of older documents.  AP generally objected to
production of documents predating January 1, 2009, and Meltwater
objected to producing documents predating March 1, 2010.
Despite that general objection, AP proceeded to produce
responsive documents dated before 2009, including each of the
documents submitted in connection with these summary judgment
motions.  Meltwater never indicated during discovery that AP's
general objection was a concern and it did not seek to compel
the production of other documents dated prior to 2009.
Furthermore, AP placed no timeframe restriction on its witnesses
when they were deposed.  Under the circumstances, Meltwater has
shown no basis to strike all documents and statements relating
to matters occurring prior to 2009, which in any event are few
in number.

Meltwater has also objected on grounds of relevance to the
submission by AP of many of the Meltwater documents produced in

discovery.  These include its promotional materials and samples
of its News Reports.  It also objects on relevance grounds to
the samples of Google News Alerts.  The objections to these and
other documents on the ground of relevance have been considered
and rejected.

Meltwater has raised objections to the declarations of
Cross, Curley, and Jones, among others, on the ground that these
individuals have not set forth facts showing that they have
personal knowledge of the matters described in their
declarations.  Cross has been AP's Senior Vice President of
Business Development and Partner Relations for the Americas
since 2010.  Previously, she held a number of positions with AP,
including Bureau Chief in Los Angeles, Vice President for the
Western Region, Vice President for Online Services for U.S.
Newspapers, and Senior Vice President for Global New Media and
Media Markets for the Americas.  To the extent the Court has
relied on Cross's declaration it has been for facts such as the
number of AP's licensees, AP's annual licensing revenues, AP's
agreements with its licensees, AP's business model, and a
description of AP Hosted.  All of these matters are plainly
within her personal knowledge.  Similarly, Jones (Vice President
for Platform Strategy and Operations) and Curley (former Chief
Executive Officer) offered statements expressly based on their

82

personal knowledge about the composition of AP, NewsRight,[28] AP's licensing scheme, AP Hosted, and AP's lack of contact with Meltwater.  Each of these declarants has described facts sufficient to demonstrate that they have personal knowledge of the matters referenced herein.

CONCLUSION

     The plaintiff's November 9, 2012 motion for summary judgment is granted, with one exception.  The defendants' November 9 motion for summary judgment is denied.  The parties will be given an additional opportunity to address whether retrospective injunctive relief should be granted in this case.


Dated:    New York, New York
          March 20, 2013



                              _____
                                      DENISE COTE
                           United States District Judge

---

[28] Meltwater also makes an unfounded objection to Curley's description of NewsRight on hearsay grounds.

Appendix

Article #1

| Title: Help wanted at new casino for Toledo, Ohio | |
|---|---|
| Full Text | Meltwater News Excerpt |
| TOLEDO, Ohio (AP) -- Job seekers can roll the dice to land work at another of the four casinos coming soon to Ohio.<br><br>    Hollywood Casino Toledo has posted more than 600 job listings on its website this week.  Multiple media outlets report the positions include bar and restaurant workers, slots and table games supervisors, grounds keepers and security officers.<br><br>     The casino is scheduled to open in the spring with 1,200 employees.<br><br>    The Cleveland casino, which will open first, advertised for 750 non-gaming jobs on Monday, while the Columbus casino posted openings for executive positions.<br><br>    Cincinnati also is getting a casino.  All four were approved by Ohio voters in 2009. | (AP) TOLEDO, Ohio -- Job seekers can roll the dice to land work at another of the four casinos coming soon to Ohio.  Hollywood Casino Toledo has posted more than 600 job listings on its website this week. . . . restaurant workers, slots and table games supervisors, groundskeepers and security officers.  The casino is scheduled to open in the spring with . . . |

Article #2

| Title: Wikileaks suspect's trial near super-secure NSA | |
|---|---|
| Full Text | Meltwater News Excerpt |
| FORT MEADE, Md. (AP) -- The military intelligence complex an hour outside Washington where the WikiLeaks case goes | FORT MEADE, Md. (AP) -- The military intelligence complex an hour outside Washington where the WikiLeaks case goes |

to court this week is known as a cloak-and-dagger sanctum off-limits to the public -- a reputation that's only partly true.

Maryland's Fort Meade is, for the most part, an ordinary Army post, its 5,000-acres mostly made up of neat rows of army barracks and homes, a PX, and a golf course.

Only one small part of the base houses the super-secure compound of the code-breaking National Security Agency.

Yet that juxtaposition still provides the greatest irony: Pfc. Bradley Manning, the soldier accused of one of the largest intelligence heists in U.S. history, will stand trial in a military court room on the same post as the intelligence agency charged with covertly collecting and cracking secrets.

Manning's case, a cause celebre for anti-secrecy activists, hackers and even human rights groups, is subject to unprecedented security restrictions.

The military says Fort Meade was chosen for the Manning hearing not because of its secure location but because the garrison's Magistrate Court has the largest military courtroom in the Washington area.  It's where you would go to argue your case if military police pulled you over for breaking

to court this week is known as a cloak-and-dagger sanctum off-limits to the public -- a reputation that's only partly true.

. . . low-level clearance and a Lady Gaga CD.  The prosecution can only hope that their arguments, or the evidence, will reveal the secrets of how, . . .

the 15 to 35 mph speed limit.
        Like any Army post, Fort
Meade does have security.  If
you're on the entry list at
the garrison's front gate, you
can drive in unescorted after
a routine check of your
vehicle.
        NSA is located on a
separate, far-harder-to-enter
compound, contiguous with the
main base. Entry requires the
highest of clearances or the
most diligent of escorts, and
NSA's own elite detail
provides security.  The
compound is equipped with
various electronic means to
ward off an attack by hackers.
        The compound's experts
include cryptologists,
computer hackers and
"siginters," the signals
intelligence experts who can
track a conversation inside an
Iranian nuclear scientist's
office from the vibrations of
the windows.
        Yet despite their focus
on cracking secrets, the
agency itself is hardly
hidden.  NSA's main complex is
visible from a major highway,
and features a U-shaped
building with a couple of
1980s-style glass office
blocks attached, surrounded on
all sides by a parking lot and
a chain-link fence.
        You can study the
buildings at your leisure, in
photos posted to the NSA's own
online photo gallery.  And you
can test your own code-
breaking skills at the

agency's National Cryptologic
Museum, open to the public
just outside the NSA compound.
After punching a code or two
into a genuine World War II
German Enigma code-making
machine, you can pick up a "No
Such Agency" T-shirt at the
gift shop.

The throngs of reporters
covering the Manning trial
probably won't have time to
see any of that.  They'll be
busy following the case
against a defendant alleged to
be so devious and creative
that he came up with a way to
spirit away hundreds of
thousands of classified files,
armed only with guile, a low-
level clearance and a Lady
Gaga CD.

The prosecution can only
hope that their arguments, or
the evidence, will reveal the
secrets of how, and why, so
much classified information
ended up online, for all the
world to read.

Even the NSA's experts
might want to know that.

Article #3

| Title: Sun shines on the mountain and Pearce rides again | |
| --- | --- |
| Full Text | Meltwater News Excerpt |
| BRECKENRIDGE, Colo. (AP) -- Basking in the sun and snow, surrounded by his fans and friends, Kevin Pearce carved sweet turns down a gentle run called "Springmeier" -- kicking up just enough powder behind him to remind people that, yes, this kid can still | BRECKENRIDGE, Colo. -- Basking in the sun and snow, surrounded by his fans and friends, Kevin Pearce carved sweet turns down a gentle run called "Springmeier" -- kicking up just enough powder behind him to remind people that, yes, this kid can still |

| |
|---|---|
| ride.<br>The three trips he took down that hill, some might say, were a storybook ending to a life-altering journey that began when Pearce nearly died during a training accident while preparing for the Olympics.<br><br>Or was it a new beginning?<br><br>"That's kind of my goal," Pearce said, "is to continue to have special days like this."<br><br>Yes, Tuesday was a special day -- the 24-year-old champion snowboarder's first trip down the mountain since Dec. 31, 2009, which is when he banged his head on the halfpipe in Utah while trying a difficult trick that, had he pulled it off a few months after that, might have won him a gold medal at the Vancouver Olympics.<br><br>The accident left him in a coma and his life hung in the balance for several days. When he finally awoke, severe head trauma turned the most basic of activities -- walking, talking, seeing straight -- into pressing challenges for the young athlete.<br><br>In the back of his mind, though, as he labored through his grueling rehabilitation, Pearce never gave up hope that he might ride again -- if not across a rail or through a halfpipe, then at least down a mountain. | ride. . . .<br>though, as he labored through his grueling rehabilitation, Pearce never gave up hope that he might ride again -- if not across a rail or through a . . . |

On a sunsplashed afternoon in the Colorado high country, 712 days after the accident, he did.

The day began with a trip to Vail, where Pearce hooked up with snowboarding mogul Jake Burton and the close-knit group of pro snowboarders who call themselves the "Frends" -- because there is no 'I' in friendship.

After a few mellow trips on that mountain, Pearce came to Breckenridge to ride with other friends, along with the public, a few hundred of whom cheered when he walked out of the lunchroom and toward the lift, ready to ride again.

"I didn't know if anyone was going to show up today," Pearce said. "When I walked out there and there were all these people there to support me and have my back the way they have for the last two years, it brings this feeling. It's a hard feeling to explain."

Instead of sporting the old "I Ride For Kevin" stickers that dotted every mountainside after the accident, those on the slopes with him on this day wore stickers and T-shirts with a new message: "Ride With Kevin."

The return to the snow wasn't without the most minor of falls, a very small tipping that came courtesy of a rider who bumped him on the hill. No damage done, though.  Only

smiles at the bottom, where
two years of hard, emotional
work -- filled with hundreds
of tiny steps forward and a
fair share of tiny steps back,
as well -- culminated in a day
that was never guaranteed.

"The doctors said to me,
'Don't take his hope away,'"
said Pearce's mother, Pia.
"And that's the message. It's
about doing it, but doing it
safely. It's about him making
good choices. It's about him
being a role model and a
mentor for all those . . .
athletes who get concussions.
To be smart about it.  Enjoy
life.  Have fun.  But when he
needs to make a hard choice
and not do something, as his
life goes on, we need to see.
Can he stop himself when he
wants to take that jump?"

Indeed, the future holds
many more questions for
Pearce, who, to those who
don't know him, seems as
healthy and happy as any 20-
something on the mountain.

Even he concedes
everything is not all perfect.

"I don't think anyone in
this room except my mom and my
brother have any idea what's
really going on with me right
now," Pearce said, a few hours
after the ride.  "There's so
much more than what you see."
But on this day, it wasn't so
much about the road ahead as
the celebration at hand.  Out
on the mountain in a bright
blue jacket, Pearce was the
star, even with dozens of

world-class riders practicing
nearby for the Dew Tour event
that will take place on the
same mountain later this week.
Pearce will be on hand for
that, though he knows joining
those guys at the top is not
in his future.

    "Jumps and halfpipes and
rails and that stuff aren't
important to me anymore," he
said.  "What's important to me
is to be able to get up there
and be happy with what I'm
doing.  Riding powder.  Riding
with all my friends.  There
are so many things you can do
up on the mountain that don't
involve competition.  That
stuff, that's the stuff I'm
looking forward to the most."